### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09-cv-8081 |
| | ) | |
| v. | ) | Judge Kennelly |
| | ) | |
| CITY OF CHICAGO, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT OFFICERS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
### MOTION FOR SUMMARY JUDGMENT

Respectfully Submitted,

DEFENDANT OFFICERS

BY:

/s/ *Shneur Nathan*

Andrew M. Hale
Avi T. Kamionski
Shneur Nathan
Joan Ahn
Andrew M. Hale & Associates
53 West Jackson, Suite 1800
Chicago, Illinois 60604
(312) 341-9646

/s/ *Joan Ahn*

# TABLE OF CONTENTS

INTRODUCTION...................................................................................1

LEGAL STANDARD.............................................................................2

ARGUMENT ........................................................................................3

I.      PLAINTIFF'S DUE PROCESS CLAIM FAILS AS A MATTER OF LAW BECAUSE THE OFFICERS DID NOT SUPPRESS ANY MATERIAL EXCULPATORY EVIDENCE. .................................................................................3

     A. The Police Interview of Larry Tueffel Cannot Form the Basis of A *Brady* Violation Because its Circumstances Were Well Known and Available............................4

         1. The Nature and Circumstances of the Interview Were Well-Known to Plaintiff..............................................................................4

             a. *Gauger v. Hendle* Precludes Plaintiff From Claiming That Police Coercion of Larry Tueffel Violated His *Brady* Rights Because He Personally Knew About It......................................................5

             b. Other Information Actually Known By Plaintiff or His Counsel........5

         2. The Remaining Details regarding the Larry Tueffel Interviews Were Available Through The Exercise of Reasonable Diligence......................6

             a. *Holland* Controls and Requires the Defense to Interview Witnesses About the Circumstances of their Police Interviews and Identifications.............................................................6

             b. The Interview Was Conducted Using Standard Investigative Techniques Well Known to Counsel......................................9

         3. Plaintiff Argued in the Criminal Matter that Tueffel's Alleged Misidentification Was Because of Gang Pressure; Therefore, Plaintiff Should be Judicially Estopped from Blaming it On the Detectives......................10

     B. The Circumstances Surrounding Tina Elder's Lineup Identification of Plaintiff Was Not Withheld. ...........................................................................10

         1. Reasonable Diligence Was Not Made in Attempting to Ascertain the Circumstances of Tina Elder's Lineup Identification............................11

         2. Alternatively, The Fact that Tina Elder Saw a Photograph of Plaintiff on a Desk of Papers was Not Material to Plaintiff's Conviction......................12

         3. Alternatively, There is No Evidence That Any Individual Defendants Were Personally Responsible for the Fact that Tina Elder Saw a Photo of Plaintiff Before Identifying Him in a Lineup.............................................13

     C. Plaintiff's Claim About Alleged Manipulation of Testimony Regarding the Shooter Wearing a Duke Jacket Is Not Supported by the Evidence.............................13

II.   THE DETECTIVES ARE ENTITLED TO QUALIFIED IMMUNITY REGARDING THE TONE OF VOICE USED WITH LARRY TUEFFEL AND TO THE EXTENT THEY UNKNOWINGLY ALLOWED TINA ELDER TO VIEW A PHOTOGRAPH OF PLAINTIFF BEFORE THE LINEUP.....................................................................14

III.  PLAINTIFF'S MALICIOUS PROSECUTION CLAIM FAILS BECAUSE HE CANNOT SATISFY THREE OF ITS ELEMENTS...........................................15

      A. Probable Cause is an Absolute Bar to Plaintiff's Malicious Prosecution Claim.......16

      B. Once Probable Cause Existed, the Officers Were Under No Obligation to Investigate Juan Carlos Torres...........................................................................18

      C. There is No Evidence of Malice. ...........................................................18

IV.   THE CONTINGENT CLAIMS OF FAILURE TO INTERVENE, CONSPIRACY, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND RESPONDEAT SUPERIOR FAIL BECAUSE THERE IS NO UNDERLYING WRONGFUL ACT.....19

V.    THERE IS NO SHOWING OF THE REQUISITE PERSONAL INVOEVEMENT OR PARTICIPATION BY OFFICERS RYAN AND WHITEMAN OR DETECTIVES MANTILLA, SANDERS, AND SCHALK...........................................................19

## TABLE OF AUTHORITIES

*Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987)................................................................16

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)..........................................................4

*Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006)......................................................18

*Badelle v. Correll*, 452 F.3d 648, 658-60 (7th Cir. 2006)..............................................................5

*Bielanski v. County of Kane*, 550 F.3d 632, 645 (7th Cir. 2008) ..................................................7

*Bressner v. Ambroziak*, 379 F.3d 478, 483 (7th Cir. 2004)........................................................21

*Bridewell v. Eberle*, No. 08 C 4947, 2009 WL 1028229, at *3 (N.D. Ill. Apr. 16, 2009) ............11

*Brisbon v. Fry*, No. 95 C 5033, 2004 WL 1244123, at *7 (N.D. Ill. June 7, 2004) .......................5

*Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008)......................................................5, 9

*Cervantes v. Jones*, 188 F.3d 805, 808 (7th Cir. 1999).............................................................20

*Chavez v. Martinez*, 538 U.S. 760, 774-75 (2003); .....................................................................9

*Collier v. Davis*, 301 F.3d 843, 850 (7th Cir. 2002)......................................................................5

*Cooney v. Casady*, 746 F.Supp.2d 973 (N.D.Ill. Oct. 28, 2010) .................................................21

*Denton v. Allstate Ins. Co.*, 504 N.E.2d 756, 760 (1st Dist. 1986)..............................................21

*Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003)..................................................................7

*Gramenos v. Jewel Co., Inc.*, 797 F.2d 432, 439-40 (7th Cir. 1986). .........................................18

*Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)..............................................................21

*Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2005). .................................................................5

*Harris v. Kuba*, 486 F.3d 1010, 1016 (7th Cir. 2007). .................................................................5

*Holland v. City of Chicago*, No. 09-3905, 2011 WL 2473473, at *1 (7th Cir. June 23, 2011) ......5

*Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 680 (7th Cir. 2007) ........................................18

*In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990).......................................................................12

*Jenkins v. Keating*, 147 F.3d 577, 585-86 (7th Cir. 1998) ............................................18

*Johnson v. Target Stores, Inc.*, 791 N.E.2d 1206, 1219 (1st Dist. 2003) ......................18

*Johnson*, 791 N.E.2d at 1223 .........................................................................................20

*Latta v. Chapala*, 221 Fed. App'x 443, 446 (7th Cir. 2007) ...........................................9

*Levinson v. U.S.*, 969 F.2d 260, 264-265 (7th Cir. 1992) ...............................................12

*Logan v. Caterpillar, Inc.*, 246 F.3d 912, 921-22 (7th Cir. 2001) ................................17

*Matushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ..........5

*Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000) ................................................6

*Miller v. Whalen*, 08-773, 2009 WL 2436593 * 9 (Aug. 6, 2009) ................................15

*Mosley v. City of Chicago*, No. 06 C 6314, 2009 WL 3097211, at *6-7 (N.D. Ill. Sept. 22, 2009) ................................................................................................................13

*Mustafa v. City of Chicago*, 442 F.3d 544, 547-48 (7th Cir. 2006) ..............................18

*Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201-03 (2001) ......................................................................................................................16

*People v. Bean*, 417 N.E.2d 608, 610 (Ill. 1981) ..........................................................18

*People v. Earnest*, 586 N.E.2d 449, 453 (1st Dist. 1991) ..............................................18

*People v. Hall*, 518 N.E.2d 275, 280 (1st Dist. 1987) ...................................................18

*People v. Kidd*, 536 N.E.2d 816, 820 (1st Dist. 1989) ...................................................18

*People v. Sims*, 736 N.E.2d 1048, 1060-61 (Ill. 2000) ..................................................18

*People v. Stachelek*, 495 N.E.2d 984, 989 (1st Dist. 1986) ...........................................18

*People v. Williams*, 484 N.E.2d 1191, 1196 (1st Dist. 1985) ........................................18

*Richardson v. Briley*, 401 F.3d 794, 802 -03 (7th Cir.2005) .........................................14

*Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 842 (1st Dist. 2000) ......18

*Rodriguez v. Peters*, 63 F.3d 546, 555 (7th Cir. 1995)...................................................................15

*Sang Ken Kim v. City of Chicago,* 368 Ill.App.3d 648 (1st Dist. 2006).......................................20

*Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1247-48 (7th Cir. 1994)................................................18

*Sornberger v. City of Knoxville*, 434 F.3d 1006, 1028-29 (7th Cir. 2006)....................................7

*Spiegel v. Cortese*, 196 F.3d 717, 725 (7th Cir. 1999); ..............................................................19

*Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996) ...............................................................17

*U.S. v. Hamilton*, 107 F.3d 499, 510 (7th Cir. 1997) ...................................................................5

*U.S. v. Lockhart*, 956 F.2d 1418, 1425-26 (7th Cir. 1992)...........................................................5

*U.S. v. Polland*, 994 F.2d 1262, 1267 (7th Cir. 1993)..................................................................5

*U.S. v. Senn*, 129 F.3d 886, 893 (7th Cir. 1997)........................................................................14

*Wallace v. City of Chicago*, 440 F.3d 421, 427 (7th Cir. 2006) ....................................................7

*Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007)..........................................................15

*Woods v. City of Chicago*, 234 F.3d 979, 996-97 (7th Cir. 2000)................................................18

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09-cv-8081 |
| | ) | |
| v. | ) | Judge Kennelly |
| | ) | |
| CITY OF CHICAGO, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT OFFICERS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Detectives Jerome Bogucki, Raymond Schalk, Mark Sanders, Frank Montilla, and Officers Lawrence Ryan and Robert Whiteman ("Defendant Officers"), through their attorneys, Andrew M. Hale & Associates, hereby submit their Memorandum of Law in Support of their Motion for Summary Judgment.

## INTRODUCTION

This is not a case where Plaintiff was exonerated by DNA evidence or where there is any objective evidence of his innocence. At Plaintiff's criminal trials in 1994 and 1997, eyewitnesses Larry Tueffel, Phil Torres and Tina Elder testified that they saw Plaintiff shoot a young man named Eric Morro within twenty feet of them.[1] **SOF ¶¶40, 52.** Donna Cosmen also saw Plaintiff running away from the scene. **SOF ¶18.** There was ample evidence introduced at trial to corroborate what these witnesses were saying, including motive evidence by Phil and others concerning an altercation between Plaintiff and Eric earlier in the day where Eric confronted Plaintiff about throwing gang signs at a school bus. **SOF ¶18.** It is undisputed that Plaintiff was a member of a violent street gang called the Simon City Royals and many of the key witnesses in the case against Plaintiff were threatened and intimidated. **SOF ¶60.** Larry moved out of the neighborhood after he was repeatedly threatened and beaten up, while Tina and Phil had portions of their homes set on fire. **SOF ¶60.** Nevertheless, the witnesses consistently testified that Plaintiff was the shooter.

---

[1] For the sake of clarity, Defendant Officers will generally refer to witnesses by their first names.

In 2006, Plaintiff's attorneys obtained a video recantation statement from Larry while Larry was living at a mental health facility and being treated as a paranoid schizophrenic. **SOF ¶¶61-63**. The recantation claimed that Larry lied in his trial testimony identifying Plaintiff as the shooter and the true shooter was a man named Juan Carlos Torres – the same individual Plaintiff claimed was the shooter at both of his criminal trials. **SOF ¶¶47, 62**. Plaintiff's attorneys then confronted Tina with Larry's recantation statement at a meeting they arranged at the victim's mother's house. **SOF ¶¶65-68**. At this meeting, and after playing the Larry video, Plaintiff's representatives asked Tina about the circumstances of her lineup identification and she said for the very first time that she had been seated at a desk with a bunch of papers by an unknown officer prior to her lineup identification of Plaintiff, where she also saw a photograph of Plaintiff and the victim. **SOF ¶¶65-68**. Plaintiff used Larry's recantation statement and an affidavit from Tina to obtain his release from prison. **SOF ¶75**. To this day, Larry maintains that the police never forced him to identify Plaintiff, and both Tina and Phil maintain that they saw Plaintiff murder Eric. **SOF ¶¶68, 71, 76**.

On summary judgment, the issue is not whether Plaintiff could be proved guilty beyond a reasonable doubt. That happened twice. In Plaintiff's complaint, he asserts against Defendant Officers the following claims: (I) Due Process under 42 U.S.C §1983; (II) Failure to Intervene under 42 U.S.C §1983; (III) Conspiracy under 42 U.S.C §1983; (IV) Malicious Prosecution under Illinois law; (V) Intentional Infliction of Emotional Distress under Illinois law; (VI) Conspiracy under Illinois law; and (VII and VIII) *Respondeat Superior* and Statutory Indemnification under Illinois law against the City of Chicago. None of these claims are supported by the evidence, and as such, summary judgment should be granted in favor of Defendant Officers.

## LEGAL STANDARD

Fed. R. Civ. P. 56(c) provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." To determine whether a genuine issue of material fact exists, the court "must view all evidence and inferences in light most favorable to the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)).

However, once a motion for summary judgment has been made and properly supported by the moving party, the nonmoving party must then "go beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial." *Id.* at 248. An issue of material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party, *Id.* at 249, and a mere "metaphysical" doubt will not suffice. *Matushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## ARGUMENT

**I.** **PLAINTIFF'S DUE PROCESS CLAIM FAILS AS A MATTER OF LAW BECAUSE THE OFFICERS DID NOT SUPPRESS ANY MATERIAL EXCULPATORY EVIDENCE.**

In order to establish a *Brady* violation, Plaintiff must show that: "(1) the evidence at issue is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence has been suppressed by the government, either willfully or inadvertently; and (3) the suppressed evidence resulted in prejudice." *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2005). Further, evidence is considered suppressed when the prosecution failed to disclose it in time for the criminal defendant to make use of it at trial, and only if the evidence was not otherwise available to the defendant through the exercise of reasonable diligence. *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008).

Nothing in *Brady* requires that witnesses testify truthfully or that the government create exculpatory evidence. *Id.* (citing cases). Rather, *Brady* protects a criminal defendant's ability to properly defend himself. It does not protect the criminal defendant who fails to exercise reasonable diligence. *Id.* Reasonable diligence requires a criminal defendant to "probe the witnesses and investigate their versions of the relevant events." *Id.*[2] In other words, the government is not obligated to conduct a criminal defendant's investigation for him. *See U.S. v. Hamilton*, 107 F.3d 499, 510 (7th Cir. 1997); *Harris v. Kuba*, 486 F.3d 1010, 1016 (7th Cir. 2007). At a minimum, reasonable diligence requires the defense to interview witnesses regarding their role in the case – including lineup identifications and police interviews. *Holland v. City of Chicago*, No. 09-3905, 2011 WL 2473473, at *1 (7th Cir. June 23, 2011).

---

[2] *See U.S. v. Lockhart*, 956 F.2d 1418, 1425-26 (7th Cir. 1992) (details of prosecution witness recant); *U.S. v. Polland*, 994 F.2d 1262, 1267 (7th Cir. 1993) (phone call in which one witness might have influenced another to cooperate with prosecution where existence of relationship already known); *Collier v. Davis*, 301 F.3d 843, 850 (7th Cir. 2002) (offer of prosecutorial leniency in exchange for testimony); *Badelle v. Correll*, 452 F.3d 648, 658-60 (7th Cir. 2006) (leads on another suspect known by officer testifying for defense); *U.S. ex rel. Brisbon v. Fry*, No. 95 C 5033, 2004 WL 1244123, at *7 (N.D. Ill. June 7, 2004) (benefits offered to prosecution witnesses).

3

### A. The Police Interview of Larry Tueffel Cannot Form the Basis of A *Brady* Violation Because its Circumstances Were Well Known and Available.

The main thrust of plaintiff's due process claim under *Brady v. Maryland* focuses on the circumstances of Larry's interview by police. To be charitable, Larry's statements during the civil litigation – after he was diagnosed as a paranoid schizophrenic – have been all over the map. During the 1994 and 1997 trials, Larry was brought to court under a bench warrant and testified that he witnessed Plaintiff shoot Eric. Larry explained that he initially told the police it was not plaintiff because he did not want to testify against a fellow gang member. **SOF ¶55.** The defense tried to explain that Larry was lying about Plaintiff being the shooter because his gang was upset with Plaintiff. **SOF ¶49.** Larry was not diagnosed as a paranoid schizophrenic as of the time of the trials. **SOF ¶63.** However, after the diagnosis, and while Larry was at a mental health facility, Plaintiff's attorneys obtained a video recantation from Larry that said that Plaintiff was not the shooter and that Larry testified falsely at the criminal trials because of police pressure. **SOF ¶¶61-63;** *See Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000) (recantations are inherently unreliable).

In 2009, Larry told State's Attorney's Office Investigator Brian Killacky and ASA Darren O'Brien that "he was never threatened by prosecutors or the police into identifying Plaintiff or providing testimony into what he is now contending to be a false identification." **SOF ¶64.** In 2010, Larry again signed an affidavit affirming that there was no police coercion relating to his identification of Plaintiff. **SOF ¶76.** At Larry's deposition, he was back to the police coercion story. **SOF ¶77.** Because Defendant Officers are required to take the facts in a light most favorable to Plaintiff on their motion for summary judgment, they proceed with the analysis below based on Larry's deposition testimony, which is the least favorable version. Even under this lens, however, Defendant Officers are entitled to summary judgment with respect to the allegations arising from the Larry interview. First, almost all of the circumstances of the Larry interview were actually known to Plaintiff and his attorneys in time for him to make use of it at trial. Second, any minor details regarding the interview – such as the fact that it took place in a police interview room and that detectives raised their voices – were available to the defense through the exercise of reasonable diligence.

### 1. The Nature and Circumstances of the Interview Were Well-Known to Plaintiff.

Plaintiff's claim that the interview of Larry amounts to a *Brady* violation boils down to the following: (1) the police came to his home in the early hours of the morning just after he had experienced a traumatic event; (2) the police took him to the station without a parent or guardian even though he was a minor; (3) at the station, the police told him that (A) he was lying and to tell the truth, (B) they had other witnesses, (C) the other witnesses had identified Plaintiff as the shooter, and (D) he would be in trouble if he did not identify Plaintiff as the shooter; (4) this interview took place in the same small windowless room as his second interview; (5) the police yelled at him for two hours; and (6) after repeatedly denying that Plaintiff was the shooter, he gave up and identified Plaintiff as the shooter. As explained below, none of this amounts to a *Brady* claim.

### a. *Gauger v. Hendle* Precludes Plaintiff From Claiming That Police Coercion of Larry Tueffel Violated His *Brady* Rights Because He Personally Knew About It.

As a threshold matter, much of the Larry allegations are barred by *Gauger v. Hendle* and its progeny because Plaintiff himself says he was aware of much of the pressure exerted on Larry. *See Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003) (overruled in part on other grounds by *Wallace v. City of Chicago*, 440 F.3d 421, 427 (7th Cir. 2006)); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1028-29 (7th Cir. 2006) (no *Brady* obligation to disclose plaintiff's own coerced confession); *Harris*, 486 F.3d 1010 at 1015 (plaintiff's own alibi could not be suppressed because he is aware of it). At Plaintiff's deposition, he testified that he was in the police station and actually heard the police yelling at Larry. **SOF ¶79**. In addition, Plaintiff testified that he personally spoke with Larry before his first criminal trial and Larry told him that he was testifying against plaintiff because "'they made me do it.'" **SOF ¶79**. Because Plaintiff himself claims that he had personal knowledge of the alleged police coercion of Larry, he cannot now claim that the very same information was withheld from him in violation of his due process rights. *Id.*

### b. Other Information Actually Known By Plaintiff or His Counsel.

Almost all of the remaining Larry related allegations were also well-known to Plaintiff in time for him to make use of it at trial. Accordingly, it could not have been withheld for *Brady* purposes. *Bielanski v. County of Kane*, 550 F.3d 632, 645 (7th Cir. 2008) ("*Brady* requires that the government disclose material evidence in time for the defendant to make effective use of it at trial."). First, Larry's age cannot legitimately be something Plaintiff claims was withheld. Larry

was good friends with Plaintiff prior to the shooting and Larry's age was documented on multiple police reports. **SOF ¶79**.

Second, the timing, context, and substance of Larry's various police interviews was also well documented, known, and even used at trial. Larry and Phil each testified that Larry told Phil in a police car at the scene that Plaintiff was not the shooter. **SOF ¶¶41, 53**. It was well known that Larry was an eyewitness and that he was good friends with Eric. **SOF ¶79**. Larry testified that the police then took him to the station for questioning after he initially told them that a guy named "Frankie" shot Morro. **SOF ¶43**. It was documented in police reports and Larry testified that he initially gave inconsistent descriptions before one or more detectives came to his house at approximately 3:30 a.m. on February 4, 1993. **SOF ¶¶7-8, 13**. It was also well known that the police, at that time, confronted Larry with the fact that Phil said Plaintiff was the shooter. Larry testified at trial that the police told him that he was lying and that they had other witnesses. **SOF ¶43**.

In sum, the police reports and trial testimony established the circumstances surrounding Larry's initial inconsistent descriptions and his subsequent identification of Plaintiff upon re-interview. Thus, all of the significant, alleged police "coercion" was well-known to Plaintiff and available for Plaintiff to utilize to his benefit at his criminal trials.

### 2. The Remaining Details regarding the Larry Tueffel Interviews Were Available Through The Exercise of Reasonable Diligence.

The remaining details regarding why Larry claims he changed his story and identified Plaintiff are the following: (i) the police allegedly threatened to get him in trouble if he did not identify Plaintiff as the shooter; (ii) the police yelled at him for two hours; (iii) there was no guardian present; (iv) the interview room was small and windowless; and (v) he "kept on . . . saying . . . 'it's not him, it's not him, it's not him,'" before identifying Plaintiff as the shooter. All of this – even if it actually happened – was available to Plaintiff through even a minimally diligent interview of Larry.

### a. *Holland* Controls and Requires the Defense to Interview Witnesses About the Circumstances of their Police Interviews and Identifications.

The similarities between *Holland* and this case are remarkable and demonstrate that nothing about Larry's identification of Plaintiff violated *Brady* because it all could have been,

and likely was, obtained by Plaintiff's criminal defense attorneys interviewing of Larry. In *Holland v. City of Chicago*, No. 09-3905, 2011 WL 2473473, at *1 (7th Cir. June 23, 2011), Dana Holland was convicted in 1997 for the 1993 rape of Dionne Stanley. Stanley identified Holland as her attacker both in 1993 and during the 1997 criminal trial. *Id.* at *2. The 1993 identification occurred after Stanley had denied that Holland was her attacker four times. *Id.* Stanley told Holland's attorney George Tountas that her initial denials were motivated by fear. *Id.* at *3. Stanley appeared at trial only after being arrested in Milwaukee and extradited to Chicago. *Id.* In 2003, Holland's conviction was vacated after DNA evidence proved his innocence. *Id.* at *1. In 2009, Stanley testified for the first time that the police had coerced her into identifying Holland. *Id.* at *2. Specifically, Stanley claimed that the police told her that Holland was her attacker; that they had evidence proving it; and that "[y]ou just have to say it's him and you'll be able to go home." *Id.* The Seventh Circuit explained that no *Brady* violation occurred because the details of the police interview and Stanley's identification were always available to Holland through a reasonably diligent interview of Stanley. *Id.* at *6-7. The fact that Stanley might have lied when questioned by Holland's criminal attorney or that she was not always easily accessible did not alter the analysis. *Id.*

Because this case is so remarkably analogous to *Holland*, it is helpful to quote the Seventh Circuit directly:

> Holland claims that his due process rights under *Brady* were violated during his 1997 trial because, in effect, "the police" (again, probably the female officer, Piekarski) failed to disclose the "pressure" they put on Stanley to identify him as her attacker during the show-up. There are several problems with this argument.
>
> A defendant in a criminal case that actually goes to trial has the "responsibility to probe the witnesses and investigate their versions of the relevant events." *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008) . . . one would think that the first thought to pop into the mind of an attorney defending Holland would be to ask this question: What (if anything) happened between the three times Stanley said Holland was not the rapist and the time she finally said that he was? Holland's lawyer (Tountas) actually asked that question of Stanley in an interview before the 1997 trial, and she told him that she didn't immediately ID Holland at the show-up because she was "afraid." She didn't tell him that any pressure, undue or otherwise, was applied to her. Even if she was lying when she said that to Attorney Tountas, there is no evidence that either officers Piekarski or Cullinan (the only defendants on the *Brady* claim) coerced Stanley to lie or were otherwise withholding exculpatory evidence on this point from the defense.

*Holland*, 2011 WL 2473473, at *6.

In this case, like the victim-witness in *Holland*, Larry failed to identify Plaintiff multiple times before identifying him as the offender. Obviously, the basis for the witness's changed position on the central question of identification was considered thoroughly by defense counsel. In both instances, the witnesses explained that their initial denials were motivated by fear of the offender. **SOF ¶43.** In both instances, the witnesses came up with the police coercion explanation *after* civil attorneys got involved, more than a decade after the incidents. Of course, the Seventh Circuit held in *Holland* that alleged police coercion of the material witness could not form the basis of a *Brady* claim because it should have been discovered through a reasonably diligent witness interview by defense counsel. This rule applies with equal force to Larry in the instant case and the circumstances of his police interview do not amount to a *Brady* violation.

*Brady* does not contemplate that the police provide transcripts of witness interviews – complete with footnotes on the decibel levels of the speakers, dimensions of the room in which they were speaking, and whom was present – where those witnesses are also available to be questioned by the defense. *See Lockhart*, 956 F.2d at 1426 ("[w]e simply find no merit in the contention that the government was required to transcribe the recantation of a witness available to the defendant"). Interestingly enough, in this case, Plaintiff's counsel practically did obtain a transcript of Larry's proposed testimony prior to trial because they were present for his and Tina's testimony at Victor Romo's juvenile detention hearing. **SOF ¶36.** But the rule is not full disclosure; rather, disclosure of evidence not available through the exercise of reasonable diligence. Larry's eyewitness status alone justifies a finding that the details of his identification of Plaintiff as the shooter were not suppressed. One thing is clear – Plaintiff's counsel knew where Larry was and knew how to find him. Plaintiff knew that Larry told Phil that Plaintiff was not the shooter; that he failed to identify the shooter to Ryan at the scene; that he told Bogucki that the shooter was "Frankie" during his 9:30 p.m. interview at Area 5; that even at 3:00 a.m., he at first tried to continue telling Bogucki his previous story; and that he did not identify Plaintiff as the shooter until after Bogucki told him that Phil had already done so. Like in *Holland*, all of this begs the question: why did Tueffel change his identification of the shooter? Reasonable diligence required Plaintiff to investigate the answer. The fact that his own pre-trial investigation was not reasonably diligent or strategically focused on gang pressure on Larry does not mean that the circumstances of his police interview was suppressed.

**b. The Interview Was Conducted Using Standard Investigative Techniques Well Known to Counsel.**

It is undisputed that Larry initially gave police a description of the shooter that did not match what the other witnesses were saying. Larry was then voluntarily brought to the police station and confronted with the information provided to the police by Phil. This was known to criminal defense counsel and used in their cross-examinations of Larry. **SOF ¶¶42, 54.** Trying to make something out of nothing, Plaintiff describes this re-interview of Larry as "coercive" because the detectives yelled at him. But in the statement that Plaintiff's counsel obtained from Larry before Defendant Officers were even represented in the case, Larry explains that he lied to the police because he did not think anyone would believe him. **SOF ¶62.** As a detective, Bogucki was permitted to confront Larry about the possibility that he was intentionally misleading them, and yelling at witnesses and suspects is within the bounds of acceptable police investigation. *See Bridewell v. Eberle*, No. 08 C 4947, 2009 WL 1028229, at *3 (N.D. Ill. Apr. 16, 2009) (citing *Chavez v. Martinez*, 538 U.S. 760, 774-75 (2003); *Latta v. Chapala*, 221 Fed. App'x 443, 446 (7th Cir. 2007)). There was no way for Bogucki to know that Larry was lying to him, especially in light of all the other evidence that pointed to Plaintiff's involvement. At the end of the day, the *Brady* rule does not require that detectives become mind readers. It is the role of Plaintiff's experienced criminal defense attorneys to cross-examine Larry regarding the tone of voice used by police during their interviews. We know, however, that this cross-examination did not fit with Plaintiff's strategy at the time. Instead, Plaintiff's attorneys argued to the criminal court that the "pressure" on Larry was coming from the gang. **SOF ¶¶49-50.**

At the time of Plaintiff's first trial, his attorney, Kendall Hill, had been working as a public defender for approximately twelve years. **SOF ¶39.** Moreover, he supervised three courtrooms and had served on the prestigious homicide task force. **SOF ¶39.** Today, Mr. Hill is the deputy of criminal operations, in charge of over three hundred lawyers. **SOF ¶39.** Charles Murphy, the attorney Plaintiff chose to hire for his retrial, had been practicing exclusively in the area of criminal defense for the last twenty-three years. **SOF ¶51.** As experienced criminal defense attorneys, Kendall Hill and Charles Murphy would or should have been more than sufficiently equipped to cross-examine Larry regarding his motivation for changing his initial description of the shooter from one that did not match Plaintiff to one that did. This cross-examination would have included any number of things that were known to defense counsel,

including Larry's age, whether a guardian was present for police interviews, his emotional state after witnessing his friend's murder, the time of day, and the tone of voice used by the police. Such an argument could easily have been bolstered by the fact that Larry was brought to court against his will and pursuant to a bench warrant.

Instead, criminal defense counsel made a strategic choice to cross-examine Larry regarding pressure he was receiving from gang members to testify against Plaintiff. It was not because Mr. Hill blindly trusted there was no police coercion of Plaintiff just because the police said so; in the words of Mr. Hill, "[He'd] be crazy to." **SOF ¶78.** In the case of Mr. Murphy, he does not believe that he chose to interview Larry. **SOF ¶78.** The fact that defense counsel decided they had a better shot at convincing the jury that there was undue pressure from gangs rather than the state does not mean that Plaintiff may now make an about face and claim that the circumstances surrounding Larry's interview with police was suppressed. Consequently, the circumstances of Larry's police interviews were not withheld.

### 3. Plaintiff Argued in the Criminal Matter that Tueffel's Alleged Misidentification Was Because of Gang Pressure; Therefore, Plaintiff Should be Judicially Estopped from Blaming it On the Detectives.

Judicial estoppel is a doctrine that prevents a litigant from taking a factual position that is inconsistent with previous factual positions asserted and enjoyed, merely because of convenience. *Levinson v. U.S.*, 969 F.2d 260, 264-265 (7th Cir. 1992). On appeal from Plaintiff's first conviction, he argued that he should receive a new trial because the trial court precluded him from presenting evidence that Larry's motive to testify against him was because he was ordered to do so by a high ranking member of the Simon City Royals. **SOF ¶¶49-50.** Saliently, Plaintiff never intimated that police coercion influenced Larry's testimony. It was the prosecution's theory, of course, that Larry was initially reluctant to identify Plaintiff because he did not want to identify a fellow gang member. Ruling on Plaintiff's appeal, the Illinois Appellate Court clearly considered his argument about gang influence over Larry and instructed the trial court on how to handle this evidence on retrial. **SOF ¶50.** Plaintiff should not be permitted to "play fast and loose with the courts" and now claim that Larry's testimony was the product of police coercion. *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990).

### B. The Circumstances Surrounding Tina Elder's Lineup Identification of Plaintiff Was Not Withheld.

There is no viable due process claim based on Tina Elder's identification because its circumstances was not suppressed, was not material, and cannot be tied to any individual actor. Tina was one of the witnesses that identified Plaintiff as the shooter. She was on the North side of Belmont Avenue when Eric Morro was shot on February 3, 1993 and was within 20 feet of the shooting. **SOF ¶11.** On February 4, 1993, Tina drove to the police station with Phil, and her mother, Sandra, where they viewed a lineup. At this lineup, Tina identified Plaintiff as the shooter. **SOF ¶27.** Since 1993, Tina consistently testified – at the 1993 detention hearing of Victor Romo, Plaintiff's trials of 1994 and 1997, and her deposition – that she witnessed Plaintiff shoot Eric. After providing trial testimony, someone threw a brick through Tina's window that hit her in the head, beat up her father, burned down her mother's garage, and told her to mind her own business. **SOF ¶60.** Tina moved out of the neighborhood in 1995 because she could no longer stand the harassment, and her family soon followed. **SOF ¶60.**

In 2006 and 2007, Plaintiff's attorneys arranged a meeting with Tina, Larry, and the victim's mother. **SOF ¶65.** The attorneys played a video of Larry's videotaped recantation. **SOF ¶66.** The fact that Larry's video statement was taken at a mental health facility was not disclosed to Tina. **SOF ¶66.** Nevertheless, the attorneys proceeded to interview Tina and obtained a statement from her concerning the circumstances of the February 4, 1993 lineup. **SOF ¶68.**

Tina stated that prior to the lineup, all of the witnesses – herself, her mother, Phil, and Larry – were separated and not permitted to communicate. **SOF ¶26.** During the time that the witnesses were separated, Tina says she was seated at a desk by an unknown officer. **SOF ¶70.** At the desk, there was a photograph of Plaintiff, a photograph of Eric, and a bunch of other papers. **SOF ¶67.** No police officer ever discussed the photos with her or told her whom to pick out at the lineup. **SOF ¶¶28, 70.** Plaintiff contends that the state had a *Brady* obligation to disclose these circumstances surrounding Tina's lineup identification. To this day, Tina maintains that Plaintiff is the person she witnessed murder Eric Morro.

### 1. Reasonable Diligence Was Not Made in Attempting to Ascertain the Circumstances of Tina Elder's Lineup Identification.

The very first time that Tina told anyone she saw a photo of Plaintiff prior to identifying him in a lineup was in response to a question from Plaintiff's attorneys in 2007. This is not because she was hiding anything: she just was never asked. **SOF ¶69.** Again, facts that could be learned through a simple witness interview cannot form the basis of a *Brady* claim. "A defendant in a criminal case that actually goes to trial has the 'responsibility to probe the witnesses and

investigate their versions of the relevant events.'" *Holland*, 2011 WL 2473473, at *6 (quoting *Carvajal*, 542 F.3d at 567); *Mosley v. City of Chicago*, No. 06 C 6314, 2009 WL 3097211, at *6-7 (N.D. Ill. Sept. 22, 2009) (finding no suppression where plaintiff could have interviewed witness regarding his lineup identification). This was not done by Plaintiff's criminal defense counsel. Tina "volunteered" that she saw a photo of Plaintiff prior to the lineup in response to generic questions regarding her identification of Plaintiff posed by his post-conviction attorneys. **SOF ¶¶67, 69.** If this information was available to Plaintiff fourteen years after the fact simply by asking general questions regarding Tina's involvement in the case, then it was certainly available to Plaintiff in the months following the shooting and at both trials through the exercise of reasonable diligence. *See U.S. v. Senn*, 129 F.3d 886, 893 (7th Cir. 1997) ("without having obtained the Broward County file they would not have a *Brady* argument, but the ease with which they obtained that file defeats their claim"). Similar to Larry, Tina's role as an eyewitness and the importance of probing her identification of Plaintiff was clear. Plaintiff had the opportunity to question her lineup identification. Having failed to interview Tina, Plaintiff cannot now complain that the very same information was suppressed. Therefore, the circumstances of Tina's lineup identification did not violate *Brady*.

### 2. Alternatively, The Fact that Tina Elder Saw a Photograph of Plaintiff on a Desk of Papers Was Not Material to Plaintiff's Conviction.

An additional reason that the circumstances of Tina's lineup identification does not amount to a *Brady* violation is because it is entirely speculative as to whether it would have changed the outcome of the trials. The jury was presented with evidence that Larry was standing within feet of Eric at the time of the shooting. It heard evidence that Larry was friends with Plaintiff, in the same gang as Plaintiff, and that Larry identified him as the shooter. In addition, Phil Torres testified that he saw Plaintiff shoot Eric and that he too knew Plaintiff before the shooting. But that was not all. The jury also heard evidence from several witnesses that Plaintiff was involved in an altercation with Eric earlier that day. **SOF ¶¶40, 53.** In any event, Tina maintains that Plaintiff was the shooter, that the photo of Plaintiff did not impact her identification, and that she did not even know at the time that Plaintiff's photo had any relationship to Eric. **SOF ¶¶67-70.** In other words, Plaintiff would probably have been convicted even if Tina said that she inadvertently saw Plaintiff's photograph before the lineup identification. To assume otherwise is a venture into "metaphysical" valleys of speculation. *Richardson v. Briley*, 401 F.3d 794, 802 -03 (7th Cir.2005) (Grant of habeas corpus petition

based on prosecutors misrepresentation of impeachment evidence of a witness reversed because there was no reasonable probability that Richardson would have been acquitted as other witnesses identified Richardson as the perpetrator). *See also Miller v. Whalen*, 08-773, 2009 WL 2436593 * 9 (Aug. 6, 2009) (Conlon, J) (Circumstances and lack of disclosure of a photo array shown to a rape victim was immaterial and thus not a *Brady* violation, where other eye-witnesses testified the criminal defendant turned plaintiff was the perpetrator).

### 3. Alternatively, There is No Evidence That Any Individual Defendants Were Personally Responsible for the Fact that Tina Elder Saw a Photo of Plaintiff Before Identifying Him in a Lineup.

In order for there to be liability under §1983, there must be personal involvement. *Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007). Further, evidence cannot be withheld for *Brady* purposes unless it was actually known by the state. *Rodriguez v. Peters*, 63 F.3d 546, 555 (7th Cir. 1995). In *Peters*, the petitioner claimed that his *Brady* due process rights were violated by a witness identification he claimed was tainted by the fact that the witness saw a photograph on a prosecutor's desk prior to making an in court identification. *Id.* The Seventh Circuit held that there was no evidence that the state even knew that the witness had seen the photograph on the desk, and therefore, there could be no *Brady* obligation to disclose it. *Id.*

Similar to the facts in *Peters*, here, there is no evidence that any officers knew that Tina saw a photograph of Plaintiff before she identified him in the lineup, let alone any of the individual defendants. Quite the contrary, Tina testified that the detectives took care to make sure that the witnesses did not communicate with each other before or during the lineup. **SOF ¶26.** During this separation, Tina was seated at a desk with a bunch of papers – including a photograph of Plaintiff and Morro. She does not remember who seated her at the desk. **SOF ¶¶67, 70.** No one ever told her whom to pick out at the lineup and she did not even realize that Plaintiff's photo had any relationship to the case. **SOF ¶¶69-70.** She did not speak with any officers regarding the photographs on the desk; in fact, the first people with whom she shared this information were Plaintiff's post-conviction attorneys. **SOF ¶¶69-70.** There is no evidence that any individual defendant put Tina at the desk or that they knew that she had seen the photo. Therefore, the lack of evidence of personal involvement or knowledge by any individual defendant is yet another reason the *Brady* claim should be dismissed on summary judgment as it relates to Tina's lineup identification.

### C. Plaintiff's Claim About Alleged Manipulation of Testimony Regarding the Shooter Wearing a Duke Jacket Is Not Supported by the Evidence.

In response to an interrogatory question propounded by Defendant Officers, Plaintiff claimed that "Defendants [Bogucki, Montilla, and Sanders] manipulated testimony and/or police reports to make it appear that eyewitnesses to Eric Morro's shooting saw the shooter wearing a Blue and White Duke jacket." **SOF ¶80 at Ex. 57, ¶3**. Whether this allegation relates to the due process claim or some other legal theory is unclear - but it is not supported by the evidence.

Contrary to plaintiff's conclusory allegations, Defendant Officers properly documented any conflicting descriptions of the jacket worn by the shooter. In Larry's initial description of the shooter and his accomplice, he described them wearing a turquoise jacket with yellow lettering and a Georgetown University jacket, respectively. This description was properly documented in Officer Ryan's case report and in a detective's handwritten notes. **SOF ¶¶8, 13**. To be clear, however, Phil actually did tell detectives that the shooter was wearing a Duke jacket. **SOF ¶16**. Phil Torres provided this description without any prompting from the police. **SOF ¶17**. Despite Plaintiff's efforts to have Tina testify at her deposition, approximately seventeen years after the shooting, that she never told the police the shooter was wearing a Duke jacket, her memory was eventually refreshed and she ultimately maintains that she did tell the police that the shooter was wearing a Duke jacket. **SOF ¶27**. She also maintains that Plaintiff was the shooter, that her description to the police was truthful, and that no one told her what to say. **SOF ¶¶28, 68**. The description of the Duke jacket matched Plaintiff because Plaintiff's only jacket in February 1993 was a Duke University jacket. **SOF ¶23**. Accordingly, Plaintiff's allegations concerning the Duke jacket are contrary to the undisputed facts, which demonstrate that eyewitnesses actually did in fact describe the shooter as wearing a Duke jacket.

## II.  THE DETECTIVES ARE ENTITLED TO QUALIFIED IMMUNITY REGARDING THE TONE OF VOICE USED WITH LARRY TUEFFEL AND TO THE EXTENT THEY UNKNOWINGLY ALLOWED TINA ELDER TO VIEW A PHOTOGRAPH OF PLAINTIFF BEFORE THE LINEUP.

Qualified immunity shields public officials from liability when they act in a manner that they reasonably believe to be lawful. *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). To resolve a qualified immunity claim, the Court must decide whether the facts that a plaintiff can "make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *See Pearson v. Callahan*, 129 S.

Ct. 808, 816 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201-03 (2001)). The Court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818.

If this Court finds that Defendant Officers should not have used a loud voice when confronting Larry about the inconsistencies of his initial identification, it should find that they are entitled to qualified immunity for their reasonable belief that a raised tone of voice was permitted during a homicide investigation. When Detective Bogucki confronted Larry, he reasonably believed, based on information provided by Phil, that Larry was lying in order to protect a fellow gang member as Larry testified to at trial. **SOF ¶55.** Given that courts permit homicide detectives to use raised voices, and even lie about the facts of the investigation when interviewing witnesses and suspects, a belief that using a raised voice in this context was reasonable.

Similarly, Defendant Officers have found no case that imposes a duty upon detectives to provide lineup witnesses a special room without any paperwork in it in order to avoid the risk of the witness unknowingly seeing investigative documents that could possibly impact the identification. Lineups commonly take place in police stations, where there are numerous active investigations and there is typically paperwork involved. Based on the undisputed evidence, the detectives involved in the Tina lineup did a good job of separating the witnesses that already saw the lineup from the ones that had not in order to ensure they could not communicate about their identifications. **SOF ¶26.** They did not tell anyone whom to identify. **SOF ¶28.** Therefore, Defendant Officers are entitled to qualified immunity to the extent that an unspecified detective may have unknowingly seated Tina at a desk with paperwork relating to the ongoing investigation. *Peters*, 63 F.3d at 555.

## III. PLAINTIFF'S MALICIOUS PROSECUTION CLAIM FAILS BECAUSE HE CANNOT SATISFY TWO OF ITS ELEMENTS.

In order to prevail on a malicious prosecution claim, Plaintiff must prove that: (1) the detectives commenced or continued the criminal proceeding against him; (2) the absence of probable cause for the proceeding; (3) the proceeding terminated in his favor; (4) malice; and (5) damages. *See Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996); *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 921-22 (7th Cir. 2001). The absence of even one of these elements precludes

Plaintiff from prevailing on his claim. *See Id.* In this case, Plaintiff's malicious prosecution claim fails because probable cause existed and the detectives did not act maliciously.

## A. Probable Cause is an Absolute Bar to Plaintiff's Malicious Prosecution Claim.

For purposes of an Illinois law malicious prosecution claim, probable cause is "a state of facts that would lead a person of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged." *Johnson v. Target Stores, Inc.*, 791 N.E.2d 1206, 1219 (1st Dist. 2003) (quoting *Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 842 (1st Dist. 2000)). The public interest in effective law enforcement is an important factor in this practical analysis. *See People v. Stachelek*, 495 N.E.2d 984, 989 (1st Dist. 1986). The facts known at the time the defendant was charged – not those alleged eighteen years later – determine whether probable cause existed for purposes of a malicious prosecution claim. *See Holland*, 2011 WL 2473473, at *5.

Appellate courts have time and time again held that even a single eyewitness identification, so long as it is reasonably credible, suffices to establish probable cause. *See Gramenos v. Jewel Co., Inc.*, 797 F.2d 432, 439-40 (7th Cir. 1986).[3] Here, even if Larry's account is completely discounted, though it should not be, there was still undisputed probable cause to prosecute. To begin with, there was strong motive and opportunity evidence. Shawn Cosmen, Donna Cosmen, and Phil told Detective Bogucki before Plaintiff's arrest that Plaintiff and Eric had an altercation around 2:30 or 3:00 p.m. the day of the shooting. They further explained that the argument was triggered when Eric told Plaintiff to stop throwing gang signs at a school bus and Plaintiff threatened Eric. **SOF ¶18**; *See People v. Williams*, 484 N.E.2d 1191, 1196 (1st Dist. 1985) (finding probable cause based, in part, on prior altercation); *Kidd*, 536 N.E.2d at 820 (same). In addition, Plaintiff was known to have access to guns.

Against this backdrop, Detective Bogucki was presented with eyewitnesses that said they observed Plaintiff shoot Eric. Officer Ryan, one of the first beat officers to arrive at the scene of the shooting, noted in the initial case report that Phil was a witness at the scene of the shooting.

---

[3] Accord, *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1247-48 (7th Cir. 1994); *Jenkins v. Keating*, 147 F.3d 577, 585-86 (7th Cir. 1998); *Woods v. City of Chicago*, 234 F.3d 979, 996-97 (7th Cir. 2000); *Mustafa v. City of Chicago*, 442 F.3d 544, 547-48 (7th Cir. 2006); *Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 680 (7th Cir. 2007); *People v. Bean*, 417 N.E.2d 608, 610 (Ill. 1981); *People v. Hall*, 518 N.E.2d 275, 280 (1st Dist. 1987); *People v. Kidd*, 536 N.E.2d 816, 820 (1st Dist. 1989). *See also Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006); *People v. Earnest*, 586 N.E.2d 449, 453 (1st Dist. 1991); *People v. Sims*, 736 N.E.2d 1048, 1060-61 (Ill. 2000).

**SOF ¶¶4-8.** At approximately 9:30 p.m. on February 3, 1993, the same evening as the shooting, Detective Bogucki interviewed Phil at the Area 5 police station. **SOF ¶14.** Phil gave a description of the shooter at that time and related that the shooter had been to his mother's house. **SOF ¶14.** Several hours later, at around 1:00 a.m. on February 4, 1993, Phil called Bogucki and told him that Plaintiff was the shooter. **SOF ¶16.** This prompted Detective Bogucki to go to Phil's mother's house and re-interview him in person. During this interview, Phil gave a detailed description of the shooting and told Detective Bogucki that the shooter was wearing a blue and white Duke jacket. **SOF ¶17.**

The information Phil provided was corroborated by physical evidence when Plaintiff put on his Duke jacket at the time of his arrest. Still further, the probable cause that already existed was strengthened when Plaintiff was identified in an in-person lineup later that morning. On February 4, 1993, at approximately 10 a.m., Phil voluntarily made an in person identification of Plaintiff as Morro's killer. **SOF ¶27.** Although Sandra Elder, another eyewitness, was not absolutely positive in her identification, she identified Plaintiff as one of two subjects in the lineup that she believed may be the shooter. **SOF ¶27.**

Under the *Gramenos* line of cases, Phil's identification alone established probable cause. Indeed, the Seventh Circuit has suggested that "the police always may arrest on the basis of a single coherent eyewitness." *Sheik-Abdi*, 37 F.3d at 1247. In this case, there was more than enough probable cause to prosecute Plaintiff – even though Phil's identification alone was sufficient. There was motive, opportunity, witness identification, and corroboration. Defendant Officers anticipate that Plaintiff will attempt to circumvent the undisputed probable cause by arguing that the facts taken through a lens most favorable to Plaintiff indicate that Detective Bogucki yelled at Larry, that Tina's identification was tainted, and Victor Romo said that Juan Carlos Torres was the shooter. First, Tina's identification was reliable for probable cause because none of the detectives knew that she had seen the photo. Moreover, as explained above, Larry and Tina are unnecessary for probable cause purposes because there were other eyewitnesses, motive, opportunity, and physical evidence that established probable cause. To the extent that witness identifications and descriptions conflicted, it was not for the police to resolve; rather, these matters were properly presented to a fact finder for adjudication. *See Spiegel v. Cortese*, 196 F.3d 717, 725 (7th Cir. 1999); *Askew*, 440 F.3d at 896.

Illinois law supports the proposition explained above that there was ample probable cause

even when discounting Larry and Tina's testimony. In *Sang Ken Kim v. City of Chicago*, 368 Ill.App.3d 648 (1st Dist. 2006), police officers arrested the Plaintiff based on a battery victim's statement, medical evidence and the Plaintiff's confession. The victim later recanted her statement and the Plaintiff claimed his confession was coerced. *Id.* at 781. The court found probable cause based on all of the evidence presented to the officers at the time of arrest. *Id.* at 778-79. Additionally, the court noted that the officers could have relied on the victim's statement alone, which is presumed reliable. *Id.* Nevertheless, the *Sang Ken Kim* court teaches, probable cause is evaluated with all of the facts in mind.

In sum, the evidence of Plaintiff's motive and stated intentions to harm Eric as provided by Phil, Shawn, and Donna; his access to a gun; the identification by Phil; the tentative identification by Sandra; and the physical evidence in the form of the Duke jacket, more than constituted an "honest and strong suspicion" that Plaintiff murdered Eric Morro. See *Cervantes v. Jones*, 188 F.3d 805, 808 (7th Cir. 1999) (dispute on one fact does not negate probable cause).

### B. Once Probable Cause Existed, the Officers Were Under No Obligation to Investigate Juan Carlos Torres.

The existence of probable cause eliminates any obligation to conduct further investigation. See *Spiegel*, 196 F.3d at 723; *Woods*, 234 F.3d at 997. Thus, once probable cause existed to believe that Plaintiff was the shooter, the Defendant Officers were under no obligation to investigate further. Nevertheless, in this case, when Victor and Ezequiel Romo told Detectives Bogucki and Schalk on February 10, 1993, that a guy named Juan Carlos was the shooter, the detectives properly documented the information in a report. They then followed up on the information by first locating, and then interviewing Juan Carlos Torres. **SOF ¶¶30-32**. When Detectives Bogucki and Schalk were told about a cassette tape on March 8, 1993, by an attorney for Victor Romo, that he claimed was an admission by Juan Carlos Torres, these detectives re-interviewed Juan Carlos Torres and documented it in another report. **SOF ¶¶33-34**. Consequently, the investigation into Juan Carlos Torres as a potential suspect merely evidences the Defendant Officers' good faith investigation.

### C. There is No Evidence of Malice.

Where probable cause exists, malice may not be inferred. See *Denton*, 504 N.E.2d at 762. Moreover, the absence of probable cause does not *ipso facto* mean that the officers acted with malice. See *Id.* Rather, malice may be found "only where there is no other credible evidence which refutes that inference." *Johnson*, 791 N.E.2d at 1223. In this case, even in the absence of

probable cause, the evidence at worst suggests that the Defendant Officers utilized common interview techniques and did not investigate Juan Carlos Torres as vigorously as Plaintiff's civil attorneys wish they did. But that does not equate to malice.

## IV. THE CONTINGENT CLAIMS OF FAILURE TO INTERVENE, CONSPIRACY, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND RESPONDEAT SUPERIOR FAIL BECAUSE THERE IS NO UNDERLYING WRONGFUL ACT.

In order to establish a claim for failure to intervene under §1983, there must, at a minimum, be an underlying constitutional violation. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)(regarding failure to intervene). The same is true for claims of civil conspiracy. *Bressner v. Ambroziak*, 379 F.3d 478, 483 (7th Cir. 2004) (actionable injury required for civil conspiracy claim). An additional basis to dismiss the conspiracy claims is because there is no evidence that any of the Defendant Officers made an agreement to violate plaintiff's rights. *Id.*

Similarly, an underlying wrongful act is required in order to recover against police officers or their municipal employer under state law theories of intentional infliction of emotional distress, *respondeat superior*, and statutory indemnification. *Cooney v. Casady*, 746 F.Supp.2d 973 (N.D. Ill. Oct. 28, 2010) (granting summary judgment on emotional distress claim without evidence of underlying extreme and outrageous conduct as required by Illinois law); *Rodriguez*, 509 F.3d at 392; 745 ILCS 10/2-109 (2010) ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable"). As demonstrated above, Defendant Officers did not violate Plaintiff's constitutional or state law rights; therefore, they are also entitled to summary judgment on the contingent claims.

## V. THERE IS NO SHOWING OF THE REQUISITE PERSONAL INVOLVEMENT OR PARTICIPATION BY OFFICERS RYAN AND WHITEMAN OR DETECTIVES MONTILLA, SANDERS, AND SCHALK.

As described above, Defendant Officers are entitled to summary judgment on all of Plaintiff's claims. In addition, certain officers and detectives are entitled to summary judgment because there has been no showing of personal involvement or culpability. *Rodriguez*, 509 F.3d at 402 (personal involvement required for §1983 liability); *Denton v. Allstate Ins. Co.*, 504 N.E.2d 756, 760 (1st Dist. 1986) (for liability on malicious prosecution claim, "participation in [the proceeding] must have been of so active and positive a character as to amount to advice and cooperation.").

To begin with, it is confounding as to why Officers Ryan and Whiteman were forced to participate in this lawsuit as defendants at all. They just responded to a call of a person shot and wrote the police report. **SOF ¶8**. Nothing in discovery even suggested they engaged in improper conduct. As for Detectives Montilla, Sanders and Schalk, there is no evidence upon which a reasonable jury could find they personally committed any constitutional or state law violations. Detective Montilla did a canvass of the shooting scene and possibly participated in one of the interviews with Phil. **SOF ¶15**. Detective Sanders was involved in the February 4, 1993 lineup but there was no evidence that anyone told the witnesses whom to identify or knew that Tina saw a photo of Plaintiff prior to the lineup. Detective Schalk was not involved in the case until well after Plaintiff was charged. **SOF ¶30**. When Detectives Bogucki and Schalk were presented with statements by Victor Romo, his father and his attorney that suggested Juan Carlos Torres may have been involved, they followed up on the leads and documented their findings in their reports. **SOF ¶¶30-34**. Accordingly, Defendants Ryan, Whiteman, Montilla, Sanders and Schalk are entitled to judgment in their favor for lack of personal involvement.

Respectfully Submitted,

DEFENDANT OFFICERS

BY:

/s/ *Shneur Nathan*

/s/ *Joan Ahn*

Andrew M. Hale
Avi T. Kamionski
Shneur Nathan
Joan Ahn
Andrew M. Hale & Associates
53 West Jackson, Suite 1800
Chicago, Illinois 60604
(312) 341-9646
Att. No. 6294495