**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

THADDEUS JIMENEZ,                       )
                                        )
              Plaintiff,                )
                                        )
       v.                               )        Case No. 09-cv-8081
                                        )
CITY OF CHICAGO, *et al.,*               )
                                        )        The Hon. Matthew F. Kennelly
              Defendants.               )

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS
PURSUANT TO RULE 56 AND LOCAL RULE 56.1(B)(3)(C)**

**THE ERIC MORRO MURDER**

1.     **On February 3, 1993, two friends, Victor Romo and Juan Carlos Torres approached two other boys, Eric Morro and Larry Tueffel, in front of 3018 West Belmont Avenue.**  *PX1: V. Romo Dep. at 79:13-80:13; PX2: Tueffel Dep. at 10:17-2; and PX21: Transcript of Tueffel Witness Interview of 07/31/06 at 5:7-12.*  **Victor questioned Eric about money that Eric apparently owed to a "Leo."** *PX1: V. Romo Dep. at 85:21-86:1; PX2: Tueffel Dep. at 11:3-4; and, PX21: Transcript of Tueffel Witness Interview of 07/31/06 at 5:13-16.*  **Eric told Victor to mind his own business.**  *PX1: V. Romo Dep. at 86:2-10; and, PX2: Tueffel Dep. at 11:3-7.*

2.     **A scuffle ensued, and at some point Juan pulled a gun.**  *PX1: V. Romo Dep. at 86:11-14; PX2: Tueffel Dep. at 16:12-23; and, PX21: Transcript of Tueffel Witness Interview of 07/31/06 at 5:16-6:2.*  **When Eric took a swing at Juan, the latter shot Eric dead.**  *PX1: V. Romo Dep. at, 88:2-12.*

1

3.     **Victor and Juan fled the scene, running westbound on Belmont.**  *PX1: V. Romo Dep. at 88:21-24.*  **Larry also ran after the shot was fired, but then returned to check on his friend Eric.**  *PX2: Tueffel Dep. at 19:12-16, 20:23-21:4.*

4.     **At the time of the shooting, Plaintiff was at his Grandmother's house, playing video games with his cousins and doing homework with his uncle.**  *PX10: Angela Jimenez 1994 Criminal Trial Testimony at C175:14-C176:8, C177:4-20; and, PX3: Thaddeus Jimenez Dep. at 159:7-14.*

### THE WITNESSES' ORIGINAL DESCRIPTIONS

5.     **The district beat police officers (not Defendants) questioned Larry Tueffel at the scene, took him to the station for a few hours, and then brought him home.**  *PX15: CPD Supplementary Report re: Field Investigation (JIM 00013 - 00020) at JIM 00017; PX2: Tueffel Dep. at 23:21-24:12; and, PX21: Tueffel Statement at 12:8-22.*

6.     **During that initial round of questioning, Larry told the officers everything he knew, describing the scuffle referenced above that led to the shooting.**  *PX16: CPD General Progress Report re: Notes of Tueffel Interview at TRJ 00255 – TRJ 00256.*  **Larry also provided a contemporaneous physical description of the shooter (memorialized by Officers Whiteman and Ryan in a police report) as being a 13-14 year old male Hispanic, 5'4-5'5 tall, with curly black hair, wearing a "purple Jacket with yellow lettering and/or #'s" and baggy blue jeans.**  *PX17: CPD General Offense Case Report at JIM004-005.*

7.     **Larry's original description did not match Plaintiff, who did not, and never has had, curly hair.**  *PX18: CPD Polaroid of 13-Year Old Thaddeus Jimenez (TRJ00259).*  **On the date of the murder, Jimenez had a brand new blue and white Duke Starter jacket.**  *PX3: Thaddeus Jimenez Dep. at 131:24-133:2.*

8.  P**hil Torres was also interviewed by Defendant Ryan at the scene.  Phil did not actually see the shooting, and did not claim to have seen it; he was not an eyewitness.**  *PX5: Phil Torres Dep. 34:13-18,* 72:24-73:3.  **As with Larry, Phil made no claim to have been able to identify the perpetrator by name.**  *PX5: Phil Torres Dep. 22:15-18, 40:3-6.*

DEFENDANTS' VERSION

9.  **Defendant Detective Jerome Bogucki was put in charge of the investigation, assisted primarily by Defendant Detectives Sanders and Schalk.**  *PX4: Bogucki Dep. at 55:1-5 and PX15: CPD Supplementary Report at JIM00016*; *PX4: Bogucki Dep. at 185:14-186:2; 36:1-9 and 253:6-258:23.*

10.  **According to Defendants, Phil called the police after the shooting in the early morning hours of February 4th to report that he just happened to be looking out the window at the time of the incident.**  *PX4: Bogucki Dep. at 124:14-17, 126: 16-127:4 and 141:11 – 142:12; and, PX19: CPD General Progress Report re: Notes of Torres Interview (JIM0033 and JIM0036, TRJ257 –58).*

11.  **According to Defendants, Phil reported that he witnessed Eric being shot by Plaintiff, who Phil supposedly identified by name as someone known to him, wearing a Duke jacket.**  *PX4: Bogucki Dep. at 146:23-147:6, 155:10-156:7.*  **Defendants further claimed that Phil supplied a motive, an altercation that Plaintiff supposedly had with the victim earlier that day.**  *PX4: Bogucki Dep. at 147:7-11.*  **The main police report memorialized those "facts," as well as Phil's subsequent selection of Plaintiff out of a lineup.**  *PX15: CPD Supplementary Report (JIM 00013 – 00020) at JIM 00017 - 00019.*

12.  **After speaking to Phil, Defendant Bogucki went to Larry's home (purportedly by himself), who, according to Bogucki provided a new account that, in**

3

contrast to the interview he gave at the scene and to Bogucki earlier, now matched Phil's identification that Plaintiff was the shooter. Bogucki also claimed that Larry, like Phil, had asserted that the shooter was wearing a Duke jacket and that Larry, like Phil, had now repeated a story that Bogucki had heard earlier about TJ throwing gang signs at a bus of school children. Bogucki did not take any notes of this interview of Larry. In addition, Bogucki insists this entire conversation took place in Larry's home, took only 15 minutes, and that he did not take Larry from his home and to Area 5 at that time. *PX15: CPD Supplementary Report (JIM 00013 – 00020) at JIM 00018 – 00019*; *PX4: Bogucki Dep. at 165:24-170:22; 172:17-174:10; 184:3-184:11; 185:4-17.*

13. **Larry's identification of Plaintiff was then supplied to the prosecutors via the Defendants' police report.** *PX15: CPD Supplementary Report at JIM 00018.*

### PLAINTIFF'S ARREST

14. **At 4:00 a.m. in the morning hours after the murder, Defendants Bogucki and Sanders went to Plaintiff's grandmother's home and arrested him.** *PX20: CPD Arrest Report JIM 00046 and TRJ 00052*. **Plaintiff denied any knowledge of the murder, and provided an alibi.** *PX3: Thaddeus Jimenez Dep. at 182:2-10.* **While Defendants removed Jimenez from his grandmother's apartment at 4:00 a.m., Jimenez took with him his new Duke (Blue Devils) jacket.** *PX4: Bogucki Dep. at 201:4-12; PX63: Testimony of Jerome Bogucki at 1994 Criminal Trial at D54:14-24; PX3: Thaddeus Jimenez Dep. at 131:24-133:2.*

### PHIL TORRES

15. **According to the Defendants' version, Phil called the police very late that night to report that, from the window that he just happened to be looking out at the time of the incident, he witnessed Eric being shot by Plaintiff, who Phil supposedly identified by**

4

name as someone known to him, wearing a Duke jacket. *PX12: Testimony of Phil Torres at 1994 Criminal Trial B71:19 – B72:4 (JIM 01826 – 01827); PX13: Testimony of Phil Torres at 1997 Criminal Trial R122:17 - R123:12 (JIM 03059 –03060); PX15: CPD Supplementary Report at JIM0018.*

16.    **According to Phil, he told the Defendants he never even saw the shooter and did not know who he was, which was true.** *PX5: Phil Torres Dep. 22:15-18, 68:4-9; PX2: Tueffel Dep. 124:21-24.* **Phil never claimed to be a witness, and did not want to be a witness.** *PX5: Phil Torres Dep. at 22:15-18, 34:13-18, 44:18-21, 72:24-73:5.*

17.    **The police came to Phil's mother's house sometime around 1:00 a.m.** *PX13: Phil Torres Testimony at 1997 Criminal Trial at R123:7-9 (JIM 03060); PX4: Bogucki Dep. at 80:22 – 81:1.* **He was high, and would not have gone with the police if he had a choice.** *PX5: Phil Torres Dep. 41:10-12, 42:23-43:2, 43:6-8, 71:19-22* (**"I told you I was high man. Fuck."**).

18.    **At the scene, Phil told the beat officer he had no real knowledge. Moreover, he does not recall calling the police that night (as they claim), and certainly believes now that he would have had no interest in doing so at the time.** *PX5: Phil Torres Dep.19:10– 20:10, 22:19-24, 34:13-18, 42:23 – 43:2, 43:6-8; PX59: Ryan Dep. at 19:9-16.*

19.    **Assuming Phil did initiate re-contact with the police late that night (rather than the other way around), the most he could or would have told them was that he heard about a possible altercation hours before the murder involving Plaintiff and the victim.** *PX5: Phil Torres Dep. 19:20 – 20:1, 34:19 – 35:23, 37:4 – 38:5, 55:22 – 56:9.*

20.    **In particular, Phil believes he heard from his sister that Plaintiff might have gotten into an argument with the victim, but Phil does not claim to have personal**

knowledge of any of that -- nor does he believe that his sister has any personal knowledge of the shooting. *PX5: Phil Torres Dep. 19:20 – 20:1, 34:19 – 35:23, 37:4 – 38:5, 55:22 – 56:9, 73:6-17.* **According to Phil, he "might have" passed on to the police the hearsay tip that his sister believed Plaintiff might have been involved.** *Id. at 36:7-16, 61:5-16, 91:11-14.*

21. **During the Defendants' interrogation of Phil, he never claimed to have been certain about the shooter's identity.** *PX5: Phil Torres Dep. 44:18-21, 78:10-16.* **At most, he explained his sister's theory that the shooter might have been Plaintiff.** *PX5: Phil Torres Dep. 90:20 – 91:14.* **The police kept telling Phil that other people (including his sister) were claiming that the shooter was in fact Plaintiff, and finally, Phil agreed to say it was Plaintiff.** *Id. at 87:10-18.*

22. **Phil did not want to testify at either of Plaintiff's trials.** *PX5: Phil Torres Dep. 6:22 – 7:3.* **Each time he did so, he was promised he would never have to do it again.** *Id. at 23:21 – 26:20, 66:24 – 67:17.*

23. **Because Phil was 18 years older than Plaintiff at the time, they were not friends; Phil claims to have seen Plaintiff only a few times in his life, and cannot describe him at all.** *PX5: Phil Torres Dep. 7:11-20, 14:11 – 15:8.* **At his deposition, Phil could not even be certain he had ever actually seen Plaintiff before.** *Id. at 33:1-24. See also Id. at 70:6–71:5.*

### LARRY TUEFFEL

24. **Sometime around 9:30 p.m., Defendant Bogucki questioned Larry Tueffel at the station for a few hours, and then an officer took Larry home.** *PX4: Bogucki Dep. at 90:7-15, 109:8-10; PX21: Tueffel Statement at 12:18-22; PX2: Tueffel Dep. at 34:7-12.* **During that initial round of questioning, Larry was fully cooperative, telling the police what he**

knew and describing the aforementioned scuffle that led to the shooting.  *Id.*

25.     **Larry also provided a contemporaneous physical description (memorialized in the police report) of a 13-14 year old male Hispanic, 5'4-5'5, with curly black hair, wearing a "purple jacket with yellow lettering and/or #'s" and baggy blue jeans.** *Id. at 28:6 – 29:6*; *PX17: CPD General Offense Case Report at JIM 00004 – JIM 00005.*  **Larry's original description of the shooter did not match Plaintiff, who did not, and never has had, curly hair.** *PX18: CPD Polaroid re: 13-Year Old Thaddeus Jimenez at TRJ 000259; PX23: 7/31/06 Handwritten Tueffel Statement at 8.*

26.     **Hours after Larry had been brought back home from the police station, Bogucki went to Larry's family's apartment (sometime near 3:30 a.m.) and began banging on the door, insisting that Larry, who was asleep, needed to come back to the station.** *PX4: Bogucki Dep. at 166:12-19, 167:4-11*; *PX2: Tueffel Dep. 36:4-18, 39:4-5*.  **According to Larry, the police "grabbed me and took me back to the station" without a parent or guardian.**  *Id.*

27.     **Larry, who was only 14 at the time, had been crying and "in shock" over having witnessed the death of his friend.**  *PX2: Tueffel Dep. at 25:8-22.*  **Larry is a high school dropout.**  *PX2: Tueffel Dep. at 175:1-10, 176:17-20.*  **As Defendants' own expert concedes, Larry is "susceptible to being influenced by leading questions" and has "difficulty in trying to make sense out of disparate and confusing information."**  *PX22: Dr. Mark I. Levy Report re Larry Tueffel at 6, 7.*

28.     **In response to the Defendants' questioning, Larry explained that he knew the shooter by sight from the neighborhood, but didn't know his name.**  *PX23: 7/31/06 Tueffel Handwritten Statement at 2.*  **At some point Larry specifically told Bogucki that he had previously seen the shooter at a second hand store near J&V Video.** *PX16: Bogucki's*

*handwritten note of his first Tueffel interview, TRJ00255.*

29.     **The Defendants told Larry that there were other witnesses who saw Plaintiff shoot Eric.** *PX2: Tueffel Dep. 39:13-14, 41-42.*  **Defendants proceeded to put substantial pressure on Larry to say the killer was Plaintiff, calling him a "liar" and accusing him of "trying to cover up for TJ."** *PX2: Tueffel Dep. 39:12-13.*  **They were yelling and screaming at him.** *PX2: Tueffel Dep. 40:16-17, 412-13*; *PX23: 7/31/06 Tueffel Handwritten Statement at 4-6.*

30.     **In response to the Defendants' assertion that the shooter was Plaintiff, Larry was "very clear" with them that the shooter was not Plaintiff.**  *PX2: Tueffel Dep. 38:1-4; 39:12-19, 141 (**Larry repeatedly told "no, no, no, it's not him, it wasn't him"**); PX23: 7/31/06 Tueffel Handwritten Statement at 2.*  **Larry knew Plaintiff, was friends with him, and used to hang out with him sometimes.** *PX24: Tueffel 8/20/10 Affidavit at ¶ 4; PX3: Thaddeus Jimenez Dep. at 92:2-16; PX2: Tueffel Dep. at 266:5-7.*

31.     **When Larry refused to implicate Plaintiff, they told this 14-year old that he was going to go be arrested and sent to jail.**  *PX2: Tueffel Dep. 39:13-18, 134:19-24.*  **They would not leave him alone, and would not let him go home despite his request.**  *Id. at 46:7-14, 136:3-9.*

32.     **Larry was very afraid, particularly when the police were accusing him of lying.**  *PX2: Tueffel Dep. at 39:10-40:9.*  **They were screaming at him and interrogating him "real bad," but he "just kept saying, no, it's not him and trying to tell the truth and tell them ... I don't know the name, but I was giving a description."**  *PX2: Tueffel Dep. at 40:17-20.*

33.     **Larry was practically falling asleep, and by the end, had broken down**

crying. *PX2: Tueffel Dep. 133:9-17*. **Eventually, Larry "just got exhausted after a long time and I just kept saying, 'no, no, no.' ... It took me a long time to just say -- I gave up, you know. I was exhausted. ... I was in shock, you know, and finally I just gave up and said okay. .... I know it was wrong to do that, but you know, I didn't know what else to do."** *PX2: Tueffel Dep. 40:16-41:7, 42:15-21, 46:7-14; PX23: 7/31/06 Tueffel Handwritten Statement at 4-7.*

34. **Larry would never have said Plaintiff was the shooter but for the pressure put on him by Defendants.** *PX2: Tueffel Dep. 164:21—165:1.*

35. **Larry regretted having become a "witness" against Plaintiff, and knew it was wrong to go through with it when he knew Plaintiff was not the shooter; he tried to hide when it was time for court, but the police arrested him on a bench warrant and had to "drag [him] out of [his] apartment to take [him] in handcuffs" to juvenile jail for a few days before he was taken straight to Plaintiff's criminal trials to testify.** *PX2: Tueffel Dep. at 51:4-23, 52:23-53:2, 54:6-21, 60:11-20; PX23: 7/31/06 Tueffel Handwritten Statement at 9.*

36. **The guilt over having borne false witness against Plaintiff has been very difficult for Larry; he eventually attempted suicide, at least in part from this guilt.** *PX2: Tueffel Dep. at 119:15-22, 180:21-81:10.* See also *Id. at 67:9-11* **("My intentions were never for this to get this far like that, you know, and it's just terrible. I mean, it was a terrible thing that the wrong -- the other guy was scot-free too, and that was on me too.").**

37. **When he turned 18, Larry tried to tell the police officer who came to get him to testify against Plaintiff that they had the wrong guy, but that officer did not accept the truth.** *PX2: Tueffel Dep. 52:19-53:1, 53:23-54:21; PX23: 7/31/06 Tueffel Handwritten Statement at 9-10.*

38.     **Larry knew the shooter from the neighborhood and later learned that his nickname was "Crazy."** *PX2: Tueffel Dep. at 57:17-58:9.* **Larry now knows Crazy's real name to be Juan Carlos Torres.** *PX2: Tueffel Dep. 211:3-10; PX24: Tueffel 8/20/10 Affidavit at Nos. 5 & 14.*

39.     **Larry later came to believe that "Crazy" wanted to shoot Larry because of Larry's knowledge.** *PX2: Tueffel Dep. 58:2-9.* **Larry feared that if he told the truth about Plaintiff's innocence, the real killer would retaliate.** *Id. at 69:2-6, 421:22-423:22.* **Larry decided to keep his mouth shut, and did not tell the judge the truth.** *Id. at 69:11-19.*

40.     **At one point, Larry went to St. Genevieve's Church with the intention of telling a priest the truth about his false testimony against Plaintiff, but he lost his nerve and did not go through with it.** *Id. 66:7-67:3.*

41.     **When he was in court being questioned, Larry wanted to tell the truth, but did not have the courage.** *PX23: 7/31/06 Tueffel Handwritten Statement at 10-11.*

### LARRY TUEFFEL'S AFFIDAVIT

41.     **The typed statement that was presented to Larry for his signature on August 20, 2010 (PX24) had been prepared by defense counsel based on counsel's prior conversation with Larry, although neither defense counsel nor the policeman they brought with them took no notes of that prior conversations.** *PX25: Defendant Officers Responses to Third Set of Interrogatories at Interrogatory Nos. 3 - 6, PX2: Tueffel Dep. 167:1-168:10, 410:22-412:2.*

42.     **Larry could not explain why he signed the pre-typed statement, other than that he was "trying to be cooperative."** *Id. at 155:22-156:11, 168:2-8.* ("He just asked me to sign it. I just did. I shouldn't have."). **Larry was not given a copy of the statement he had**

10

**signed.**  *Id. at 157:19-22.*

43.    **The statement prepared by defense counsel and then signed by Tueffel says that the police never threatened or coerced him, but that is not true.**  *PX2: Tueffel Dep. 164:9-12* (Larry does not know the meaning of the word "coercive").  **Although the statement says he is not "blaming the police," Larry clarified that "I said I'm not blaming anybody, I just wanted to get this fixed..."**  *PX2: Tueffel Dep. 153:3-7.*  **According to Larry: "I didn't mean it like that.  I said I have nothing against the police.  He asked me a question do you blame anybody.  I said, well, they kind of made -- I mean, police are supposed to do their job.  And he was trying to ask me do I hate police because -- I didn't mean -- It was wrong -- I don't know right now.  Hold on a minute."**  *PX2: Tueffel Dep. 166:18-24.*    **In fact, Larry does believe that what the officers did to coerce him to say it was TJ was wrong.**  *PX2: Tueffel Dep. 172:14-173:1* ("**[This sentence] is wrong. . . . This sentence is all screwed up saying I don't blame them for . . .  I said I had nothing against them.  That doesn't mean that what they did was right.**") and 172:23-173:1 (**Q. "And as you sit her today, do you believe that what they did was wrong? A. Was wrong, yes."**).

44.    **After having Larry sign the release, Defendants then used Larry's psychological records to prepare an expert report, which they then put into the public record with their summary judgment filing, about how his schizophrenia supposedly makes him an unreliable witness.**  *See* Defendants' Exhibit 58; *see also* PACER for *Jimenez v. City of Chicago*, No. 09-CV-8081 [Doc. 107, Exh. 58].  **In reality, Larry is perfectly capable of accurate testimony when, as now, he's medicated.**  *PX2: Tueffel Dep. 176:23-177:18, 440:3-6.*

## THE DUKE JACKET

47.     **Larry explained to the Defendants that the shooter had either a purple or maroon jacket with yellow lettering**.  *PX2: Tueffel Dep. 38:1-13, 132:6-133:6*.  **Larry never said anything about the shooter wearing a Duke jacket.**  *Id.*

48.     **The police, not Larry, kept talking about and asking about a Duke jacket**.  *Id.*  **When the police asked about the Duke jacket, Larry was "very clear" that the shooter was not wearing a Duke jacket.**  *PX2: Tueffel Dep. 141:7-13.*

49.     **According to Phil, the police were the ones who first used the description "Duke jacket" after he allegedly described colors.**  *PX5: Phil Torres Dep. at 39* ("I believe I mentioned the colors, and they came back and told me it was a Duke jacket.") *and 77* ("The police were talking about a Duke jacket").

## SANDRA ELDER

50.     **Sandra Elder has previously stated that she in fact did not come out of the bar until after the shooting.**  *PX26: Luke Netzel Affidavit [(SAO) 0103 – 0105] at ¶3.*  **Larry also says that Sandra was not present for the shooting.**  *PX2: Tueffel Dep. at 129:6-130:23*; *PX23: 7/31/06 Tueffel Handwritten Statement at SAO13-14.*  **Sandra has changed her story about where she was before, during, and after the shooting on several occasions.  In fact, the initial story she gave to the police was itself contradictory.  She said that she was standing on the "south side of Belmont" *and* that she was "standing in the middle of Belmont."**  *PX15: CPD Supplemental Report at JIM 00017.*  **In her initial story, she told police that she observed the perpetrators walking westbound on the north side of Belmont when they passed the other two boys who were traveling eastbound.**  *PX15: CPD Supplemental Report at JIM 00017.*  **At trial, she changed her story to conform to that of**

12

other witnesses and stated that the perpetrators were traveling eastbound prior to the attack, the same direction as Eric and Larry. *PX14: Sandra Elder 1997 Trial Testimony at A10:3-12.*

### TINA ELDER

51.     Defendants summoned Tina Elder and her mother Sandra to a lineup procedure but instead of providing transportation for them, Defendants allowed them to travel to the lineup with Phil. *PX6: Tina Elder Dep. at 22:7-14.* When they arrived at the police station, all three took a smoke break outside before going inside to view the lineup. *Id. at 23:3-8.* Tina Elder testified that by time she had come to the station she had already discussed the murder and the lineup with Phil and Sandra. *PX27: Tina Elder Affidavit at ¶ 8; PX6: Tina Elder Dep. at 18:5-10.* (For her part, having not seen the shooting, *see* above ¶ 50, when Sandra Elder was placed in the lineup she was not able to identify someone she believed to have committed the murder, although she did pick two of the five people in the lineup as possibilities. *PX28: CPD Supplementary Report re: Field Investigation Line-up Report (TRJ 00049- 00051) at TRJ00051.*

52.     At the moment of the shooting, Tina Elder was several months pregnant, had with her on the street her 4-year old daughter, was trying to get her daughter into the car, and was simultaneously speaking to Phil Torres, who was in a third-story window above her. *PX6: Tina Elder Dep. at 33:9-11, 31:12-18, 36:5-23; PX27: Tina Elder Affidavit [(SAO) 0020 – 0021] at ¶¶ 4, 7.* As Tina describes the scene, it was nighttime and she saw only for a few seconds the two people fighting with Eric. *PX27: Tina Elder Affidavit [(SAO) 0021 – 0021] at ¶¶ 5-7.* Although she testified at the trial that the shooter was Jimenez, she has since recanted that testimony and stated that she cannot be certain who it was. *PX27: Tina*

*Elder Affidavit [(SAO) 0020 – 0021] at ¶¶ 2-3*. **Tina has further testified that she did not know Thaddeus Jimenez at that time.** *PX6: Tina Elder Dep. at 26:10-12*. **When she got to the police station, one of the officers told her that Thaddeus Jimenez was the primary suspect and placed her at a desk, which she has described as follows:**

> [T]he police placed me at a desk. On the desk was a photo of Eric and [a] photo of Thaddeus Jimenez. I did not see and was not shown any other photos. I looked at both photos prior to viewing the lineup. My recollection of the shooter was of someone light-skinned, with hair that was short on the sides and wavy on the top. I do not recall seeing a Duke jacket.

*PX27: Tina Elder Affidavit at ¶¶ 9-10*; *PX6: Tina Elder Dep. at 28:16-18.*

53.     **At her deposition, Tina stated that the picture of Jimenez that the police placed her in front of was a square Polaroid and the picture of Eric was of his dead body**. *PX6: Tina Elder Dep. at 108:7-17; 46:7-17*. **Significantly, that square Polaroid of Jimenez was never turned over by the police or prosecutors to the defendant, either before his 1994 or his 1997 trials. In addition, there is no reference anywhere in their police reports that Defendants took a Polaroid picture of TJ or that it had been shown to Tina Elder.** *PX6: Tina Elder Dep. at 108:7-17; PX18: CPD Polaroid Photograph re: Thaddeus Jimenez a/k/a Tina Elder Dep. Exhibit 2 (TRJ 00259)*.

54.     **The police did not interview Tina until after they had told her that Jimenez was the primary suspect, until after they had placed her at a desk with TJ's photograph, and until after she had picked TJ out of the lineup.** *PX6: Tina Elder Dep. at 48:24-49:19*. **Tina never told another person – police or non-police -- that the shooter was wearing a Duke jacket, and she states that she "does not recall seeing a Duke jacket" at the time of the shooting**. *PX27: Tina Elder Affidavit at ¶ 10*. **Defendants' police reports nevertheless states that Tina "positively identified Jimenez as the offender wearing the "Duke" jacket**

14

and as the one who shot the victim." *PX15: CPD Supplementary Report at 7. See also PX28: CPD Supplementary Report re: Field Investigation Lineup Report (TRJ 00049-51)*.

### VICTOR ROMO

55.     **On February 10, 1993, exactly one week after the murder, but after the Defendants had already "cleared and closed" the case against TJ, Victor Romo turned himself into CPD and fully confessed to having been at the scene during the shooting**. *PX29: CPD Supplementary Report dated 02/10/93 re: Victor and Ezequiel Romo (JIM 00021-00024)*.

56.     **Victor quite directly informed Defendants Bogucki and Schalk that they had the wrong guy as the shooter.** *PX29: CPD Supplementary Report (JIM 00021-00024)*.  **Victor made clear to the Defendants that he did not even know Plaintiff, much less was with him that night.** *PX29: CPD Supplementary Report at JIM 00023*.  **Instead, Victor told the police that his good friend Juan was the triggerman who murdered Eric.** *PX29: CPD Supplementary Report at JIM 00023*.  **Independently, Victor's father, Ezequiel Romo, confirmed that Juan had confessed to him to shooting Eric.** *PX29: CPD Supplementary Report at JIM 00023*.

57.     **Victor and Ezequiel provided Defendants the specific address where they could find Juan, and even a map of how to get to Juan's home**. *PX29: CPD Supplementary Report at JIM 00023*; *PX30: Hand drawn Map (JIM 00039); PX31: CPD General Progress Report at JIM 00040*.  **Juan matched the contemporaneous description that Larry had immediately given to the police at the scene.**

### JUAN'S CONFESSION

58.     **Several days after the murder, Ezequiel secretly tape-recorded Juan confessing to the crime.** *PX32: E. Romo Affidavit at ¶ 4.*  **Ezequiel's purpose in making the tape was to gather evidence that would exculpate his son, Victor, by proving that he was not the shooter and had no pre-knowledge that Juan was carrying a gun.** *PX7: E. Romo Dep. at 44:4-6.*  **One-way taping was not illegal in Illinois at that time**. *See* 720 ILCS 5/14-1 *et. seq.* (**a January 1994 amendment to this provision made one-way taping illegal in Illinois but the amendment did not apply retroactively and prior to the amendment, Illinois courts interpreted the statute as permitting one party to record a conversation without the other party's consent**).

59.     **Juan can be heard on the tape stating that: "when he hit me and I wanted to shoot him" and "when I fired the shot, I ran."** *PX33: Translation of Taped Confession (JIM 00253-JIM 00262), at JIM00261.*  **Juan also says on the tape that he is not worried about getting caught because "they pinned the other blame on the, the other gang boy"** *Id.*

60.     **On February 10, 1993, Victor's defense lawyer, David Weiner, presented Defendants Bogucki and Schalk, and ASA Gina Savini, with the tape recording on which Torres confesses to shooting Eric and running away**. *PX34: CPD Supplementary Report dated 03/08/93 (JIM 00025 – 00026).*

61.     **Defendants made a record of receiving the tape, but never logged it into evidence.** *PX4: Bogucki Dep. at, 159:10-18; see PX35, PX37* (evidence logs, both the one produced and the one withheld, show no reference to the tape). **Bogucki and Schalk, claim to have never even listened to the tape, never had it translated into English, and never had a Spanish speaking officer from their Department listen to it, even though that was a**

16

**common practice within the department at the time.** *PX4: Bogucki Dep. at, 159:5-9 (never listened to tape and never had it translated); PX8: Schalk Dep. at 21:8-17 (never listened to tape and never requested an English translation); PX9: Montilla Dep. at 53:18-54:7 (was never asked by Bogucki or Schalk to translate the tape into English though Spanish to English translation was something he did for the police department quite often; he had in fact done so for Bogucki and Schalk on prior occasions)*.

62.     **The sole thing Defendants did do upon receiving the tape was go back and re-interview Juan; the following is the full extent of Bogucki and Schalk's interview report after being handed a tape in which Torres confesses to the murder:**

> **The R/Dets. went to the home of Juan Carlos TORRES where he was re-interviewed in the presence of his father. TORRES denied ever making any such admission as purported by the ROMO family. TORRES further stated that he has never had a telephone conversation with Victor ROMO's father, Ezequiel ROMO. Again, Torres stated that he had not seen Victor ROMO for months.**

*PX34: CPD Supplementary Report dated 03/08/93 (JIM 00025-26).*

### THE EVIDENCE INVENTORY

63.     **At the time of Plaintiff's trials in 1993 and 1997, the sole inventory of evidence that Defendants provided to the prosecutors to provide to defense counsel is attached hereto** as *PX35: Investigative File Inventory (JIM 00030).*

64.     **In or about January 2011 -- and over eight months after plaintiff had requested it in discovery -- the City finally produced the actual inventory of evidence that existed in 1993, but which the police had never turned over to the prosecution or the defense.** *PX36: Plaintiff's First Set of Requests for Production to Defendant City of Chicago at No. 3.* **This far more fulsome list is attached** as *PX37: Investigative File Inventory (TRJ 00254).* **Plaintiff's counsel has created** PX38**, which places the inventory list produced to**

17

Jimenez's defense counsel in 1994 and 1997 (PX35) **next to the inventory list produced to Jimenez and his counsel in 2011** (PX37), **and counsel has highlighted in yellow that portion of the evidence in inventory that was never until this lawsuit brought to the attention of Jimenez and his counsel.**

65. **PX39 is photo of a handwritten note recovered from by CPD from the pocket of the victim's clothing. The note states: "LEO" with the phone number "509-7805" and the number "40."** *PX39: Picture of Note Located Under Inventory No. 1058724.* **This note was never turned over to Jimenez and his defense counsel; in addition, the inventory list turned over to Jimenez and his defense counsel omits any reference to the fact that this handwritten note had been received into evidence with respect to Jimenez's case.** PX38.

66. **Plaintiff had no connection whatsoever with Leo, the $40 that the victim Eric owed to Leo, or the Triangle gang, to which Juan Carlos Torres, Leo Robles, and Luis Hernandez all belonged.** *PX3: Thaddeus Jimenez Dep. at 72:1-11* (*only heard the name Leo after he was arrested*); *66:14-16* (*did not know anyone who was a member of the Triangles*). See also below at ¶ 76.

**PLAINTIFF'S TRIALS**

67. **The State tried Plaintiff for Eric's murder.** *PX40: 10/4/94 Verdict Form (JIM 00118).* **Plaintiff was only 13 at the time of his purported involvement in the murder, but was tried as an adult**. *PX41: Order Permitting Prosecution of a Minor (JIM 00079 - 00080).*

68. **Prior to Plaintiff's criminal trial, the State successfully moved to exclude Juan's taped confessions.**[1] **Thereafter, the case was tried over the course of three days in the Fall of 1994; the State put on the case built by the Defendants (and described above)**

---

[1] See Defendants' Exhibit 33 re: Hearing on Offer of Proof at Plaintiff's First Criminal Trial.

including the "eyewitness" testimony of Phil, Larry, and Tina. *PX12: Phil Torres 1994 Criminal Trial Testimony at B62:15-21, B65:12-24; PX11: Tueffel 1994 Criminal Trial Testimony at B124:6-11, B129:19-24;  PX61: Tina Elder 1994 Criminal Trial Testimony at B27:6-20, B30:2-7.*

69.     The State's theory of the case at trial was that Plaintiff shot the victim due to an alleged altercation between them that supposedly took place earlier that day.  *PX62: 10//4/94 State's Closing Argument at D112:19 – D113:15.*  There was contrary evidence, however, that the real killer was a member of an organization called the Triangles who shot Eric over a confrontation about a debt to someone named Leo.  *PX16: CPD General Progress Report Notes of Tueffel Interview (TRJ 00255 - 00256) at TRJ00255; PX29: CPD Supplementary Report dated 02/10/93 (JIM 00021 - 00024) at JIM 00023.; PX1: V. Romo Dep. at 82:2-4.*

70.     At trial, defense counsel cross-examined Larry about his identification of Plaintiff. *PX11: Tueffel Testimony on 9/30/94 at B140-B158.*  In response to defense counsel's questions, Larry hewed to the version in the police reports, and did not reveal any of the facts described above in paragraphs 24-33 of this Statement.  *Id.*

71.     On October 4, 1994, the jury convicted Plaintiff of first-degree murder, and he was sentenced to 50 years in prison. *PX40: Verdict Form dated 10/04/94*.  Because he was so young, Plaintiff served his time in juvenile facilities until he turned 17, whereupon he was transferred to maximum security prison with fully-grown adult criminals.  *PX45: Letter from the IDC re: Transferring Jimenez to Adult Facility (JIM 01199 - 01202)*

72.    **The appellate court eventually reversed Plaintiff's first conviction based on a problem with the** *voir dire.* *PX46: Appellate Opinion #1.* **The State again moved successfully to exclude Juan's taped confession, and re-tried Plaintiff based on the same evidence.** *PX43: 1997 Motion in Limine Seeking to Use Out-of-Court Admission Against Penal Interest by a Third Party, Non-Defendant.* **On November 11, 1997, the jury convicted Jimenez; later that month, the judge sentenced him to 45 years in prison.**

### PLAINTIFF'S EXONERATION

74.    **From the day of his arrest, Plaintiff vigorously professed his innocence.  He wrote to anyone and everyone he thought might help him**, **including the Northwestern Center on Wrongful Convictions ("CWC"), which, assisted by several lawyers from Katten Muchin, investigated and pursued his case for four years.** *PX47: Letter from Jimenez Requesting Legal Assistance (JIM05859 – 05864 a/k/a Ex. 17 to Jimenez Dep.)*

75.    **By June 2008, CWC persuaded the CCSAO (and most specifically, the head of its post-conviction unit, ASA Celeste Stack) that there was sufficient justification to re-open and re-investigate the case and from approximately June 2008 to May 2009, the CCSAO undertook a full re-investigation of the case.**  (The CCSAO's full 12-month investigation is documented in documents marked SAO001-00233.  For now, Plaintiff has spared the court and the trees a full filing of those documents, but if there is any dispute that the CCSAO conducted such an investigation, we will readily produce the documents.)

76.    **Among other things, the CCSAO located a man named Leo Robles, the person to whom the victim owed money (with a fair inference being it was $40) at the time of his death.** *PX48: Investigative Report dated 01/08/09 re: Interview of Rosa Wiszo-Waty (sister of Victor Romo) (SAO 00042-00043), at 00043.* **During questioning by CCSAO**

20

investigators in January 2009, Leo admitted to having tossed the Morro murder weapon into the Chicago River, and he even took the CCSAO investigators to the spot on the Belmont Avenue Bridge from where he threw it. *PX49: Investigative Report dated 01/24/09 re: Interview of Leo Robles and Attempts to locate Phil Torres (SAO 00055-00057), at 00056.* **According to Leo, he received the gun from Luis Hernandez, who received it directly from Juan. At the time of that handoff, according to Leo, Juan admitted to Hernandez that he had used the gun to kill Eric.** *PX49: Investigative Report dated 01/24/09 re: Interview of Leo Robles and Attempts to locate Phil Torres (SAO 00055-00057), at 00056.*

77. **The CCSAO interviewed Larry on March 20, 2008 and February 3, 2009. Larry informed the CCSAO that he had not been threatened to change his story, that he had always been eager to tell the truthful story, that the police had interrogated him pretty hard in the middle of the night and that he was still in shock from Eric's death. Larry told them specifically that he would be willing to take a lie detector test. Larry fully disclosed his mental health situation, including several of the medications he was on.** *PX71: Investigative Report dated 02/03/2009 re:Interview of Larry Tueffel SAO0059 - 0062; PX69: March 20, 2008 Patrick Harrigan E-mail re: Celeste Stack Interview of Larry Tueffel; PX44 Patrick Harrigan Dep. at 49:7-50:14; PX2: Larry Tueffel Dep. at 106:11-113:11.* **The CCSAO also interviewed Juan Carlos Torres on December 29, 2008.** *PX50: Investigative Report dated 12/29/08.* **Juan denied even knowing Victor Romo, a verifiable lie.** *PX51: Investigative Report dated 12/29/08 re: Attempts to locate Juan Carlos Torres at ESPN Zone and Palmer Street address SAO0039.* **When the investigators asked him to listen to Ezequiel's tape containing Juan's confession, Juan indicated he would get back to the CCSAO through counsel.** *PX50: Investigative Report dated 12/29/08 re: Attempts to locate Juan Carlos Torres*

21

*at ESPN Zone and Palmer Street address at SAO0039.* **Instead, Juan pulled his children from school, quit his job, abandoned his family home, and fled the State.** *PX52: Investigative Report dated 01/13/09; PX53: Investigative Report dated 05/08/09 re: Interview of Mark Nhoddenbach (Landlord at Palmer Street Address).*

78. **On May 1, 2009, the CCSAO informed Plaintiff through his counsel that they would agree to a motion to vacate his conviction.** *PX54: CCSAO Press Release dated 05/04/09 (JIM 06057).* **The Honorable Joseph M. Claps proceeded to enter an Order vacating Plaintiff's conviction and sentence, and then immediately noted the People's motion to dismiss (*nolle pros*) the case against Plaintiff in its entirety.** *PX55: Order Vacating Conviction and Sentence (JIM 05245).* **Later that same day, Plaintiff was released from Hill Correctional.** *PX54: CCSAO Press Release dated 05/04/09 (JIM06057).* **On June 3, 2009, Chief Judge Paul Biebel granted Jimenez a Certificate of Innocence, which the CCSAO did not oppose.** *PX56: Certificate of Innocence (JIM 04351).* **The award required a finding that Plaintiff was factually innocent of the crime.** 20 ILCS 2630/5(c-6).

79. **On the same day that the CCSAO agreed to release TJ, the authorities arrested Juan in Indiana.** *PX57: Arrest Report re: Juan Carlos Torres. [(SAO) 00088-00092]; PX54: CCSAO Press Release dated 05/04/09 (JIM 06057).* **About three weeks later, May 18, 2009, a Cook County grand jury indicted Juan for Eric's murder.** *PX58: Indictment re; Juan Carlos Torres.*

**DEFENDANTS' MALICE**

80. **Defendants Bogucki and Schalk did not take any of the following investigative steps:**

- **never brought Juan Carlos Torres to the police station for questioning as they had with Larry and TJ;**

22

- **never interviewed Juan Carlos Torres outside the presence of one or more of his parents as they did with Larry and TJ;**

- **never took notes of their two interviews of Torres, as they did with Larry and others;**

- **never asked Torres to identify the individuals who he claimed to be with "across the street" at the time of the murder; they do not ask him to identify which apartment "across the street" he "believes" he was visiting; they did nothing to follow up in any way on Torres's purported alibi;**

- **never asked Torres if he was a member of the Triangles or if he knew or was friends with any members of the Triangles;**

- **never asked if Torres knew "Leo";**

- **never asked if Torres owned a gun or whether he had recently fired someone else's gun or if he had a gun in the house; they didn't search his home for a gun;**

- **never asked Victor what his friend Juan Carlos Torres was wearing when the murder occurred;**

- **never asked Torres if they could search the apartment for clothing, including but not limited to any clothes that matched the description that Larry had given to Defendant Ryan at the scene;**

- **never requested that Torres hand over to them the Chicago White Sox Starter jacket he stated he owned, so that they could look it and/or test it for potential evidence;**

- **never showed Torres's Chicago White Sox Starter jacket to Larry or any other witness (as they had with TJ's Duke Jacket to during the lineup);**

- **never took any step to corroborate Torres's claim that he had not seen Victor in months (despite Victor's claim that they had been together just one week earlier);**

- **never looked at either Victor's or Juan's phone records as a way to determine whether Torres was being truthful about not having spoken to Victor in months;**

- **never took any step to corroborate Torres's claim he had not seen Ezequiel Romo in months (even though Ezequiel had described him as having seen**

him recently and having provided Defendants with Torres's address and a map to get there);

• never took a Polaroid of Torres to show to witnesses (as they had of TJ) and never showed Larry or any other witness a picture of Torres;

• never placed Torres in a lineup;

• never checked Mr. Torres criminal history, nor obtained his mug shot from the CPD mug shot system;

• never compared Torres's features to the description that Larry had originally given to the police and which was memorialized in General Offense Case Report (JIM004-007); and

• never investigated nor established any conceivable motivation that either Victor or Ezequiel had to lie about Torres, not Jimenez, being the shooter.

Respectfully submitted,

Dated: September 2, 2011

**THADDEUS JIMENEZ**

By: __/s/__ Stuart J. Chanen
One of his Attorneys

| | | |
|---|---|---|
| Mr. Jon Loevy | Mr. Stuart J. Chanen | Mr. Locke E. Bowman |
| Mr. Russell Ainsworth | Ms. Lisa R. Carter | RODERICK MACARTHUR |
| Mr. Joel Feldman | VALOREM LAW GROUP LLC | JUSTICE CENTER |
| LOEVY& LOEVY | 35 E. Wacker Dr. | Northwestern University |
| 312 North May St. | 30th Floor | School of Law |
| Suite 100 | Chicago, IL 60601 | 357 E. Chicago Ave. |
| Chicago, IL 60607 | (312) 676-5480 | Chicago, IL 60611 |
| (312) 243-5900 | | (312) 503-0844 |