**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

THADDEUS JIMENEZ,                )
                    Plaintiff,        )
     v.                          )        Case No. 09-cv-8081
                            )        The Hon. Matthew F. Kennelly
CITY OF CHICAGO, *et al.*,        )
                Defendants.        )

**PLAINTIFF'S RESPONSE TO THE DEFENDANT
OFFICERS' MOTION FOR SUMMARY JUDGMENT**

Based on the case put together by the Defendant Officers, the Cook County State's Attorney's Office (" CCSAO ") twice prosecuted and secured the conviction of Thaddeus Jimenez (" Jimenez " or " TJ" ) for the murder of Eric Morro. More than sixteen years later, following its own extensive re-investigation, the CCSAO *joined* TJ's motion to vacate his conviction and release him from prison. Cook County Chief Criminal Judge Paul Biebel has since issued Jimenez a Certificate of Innocence, an award which, by statute, requires an affirmative showing of actual innocence by clear and convincing evidence. 20 ILCS 2630/5(c-6). Meanwhile, on the same day Jimenez walked out of prison, the CCSAO arrested the real killer, Juan Carlos Torres, who was soon after indicted by a Cook County grand jury for the Morro murder.

As the CCSAO and the criminal court now acknowledge, Jimenez did not shoot Eric *Morro*, and the Defendant Detectives are the only ones left still maintaining that he did. They have no choice. Eighteen years ago, inside a span of less than 24 hours, Defendants somehow managed to build a rather elaborate case that Jimenez supposedly shot *Morro*, complete with multiple corroborating " eyewitness" statements and identifications. The problem for the Defendants is that the case they manufactured, and everything about it, is completely false. As everyone except the Defendants now acknowledge, Jimenez had nothing to do with crime.

As the evidence establishes, Defendants' efforts to squeeze the proverbial square peg into the round hole crossed over the line from legitimate investigation and into the realm of outright witness coercion and manipulation. In the process, Defendants withheld evidence, destroyed evidence, and fabricated evidence, all violations of Jimenez's constitutional right to a fair trial.

Compounding the injustice is the fact that to ensure their concocted conviction against Jimenez, Defendants permitted the real culprit, Juan Carlos Torres, to remain free during the 16 years of this injustice. This is so even though at the time of the murder, the available evidence against Juan was overwhelming. Co-defendant Victor Romo insisted that Torres was his co-perpetrator and that he had never even met Jimenez. Moreover, Torres confessed to having committed the murder, which confession was surreptitiously captured on tape by Romo's father. (One-way taping was not illegal at that time.) By time Defendants received the taped confession, however, they had already " solved" the crime. Since 2006, every eyewitness questioned has revealed police coercion and manipulation as the direct cause of Jimenez's wrongful conviction.

Defendants' motion relies throughout on the premise that Jimenez is in fact guilty, with Defendants directing the Court to the incriminating " evidence" that they themselves created. However, because the evidence is overwhelming that Jimenez did *not* commit the murder, the tightness of the case Defendants hastily assembled at the time is nothing but proof of their own misconduct. With all reasonable inferences drawn in Jimenez's favor, the factual disputes surrounding how all of the witnesses came to implicate an innocent man are not the proper subject of a summary judgment motion; they can only be resolved by a jury.

## SUMMARY OF THE FACTS
### Juan Carlos Torres Murdered Eric Morro

On February 3, 1993, two friends, Victor Romo and Juan Carlos Torres, approached two other boys, Eric Morro and Larry Tueffel, in front of 3018 West Belmont Avenue. Plaintiff's

Rule 56.1 Statement of Facts (P. Stmt. ¶ 1). (Because several witnesses share the same last name, this memorandum adopts Defendants' use of witness first names for ease of reference.) Victor questioned Eric about money that Eric apparently owed to a "Leo." Eric told Victor to mind his own business. *Id.* A scuffle ensued, and at some point Juan pulled a gun. *Id.* ¶¶ 2. A moment later, when Eric took a swing at Juan, Juan shot Eric in the chest. *Id.* Victor and Juan fled the scene, running west. Larry also ran after the shot was fired, but then returned to check on his friend Eric. *Id.* ¶ 3. At the time of the shooting, Jimenez was at his Grandmother's house, playing video games with his cousins and doing homework with his uncle. Jimenez was nowhere near Belmont and Sacramento and had absolutely nothing to do with Eric's murder. *Id.* ¶ 4.

### The Witnesses' Original Story

Sometime that evening, Defendant Ryan questioned Larry Tueffel at the scene and then took him to the station for a few hours, where he was further questioned and then brought home. *Id.* ¶ 5. During that initial round of questioning, Larry told Ryan, Bogucki, and one or more of the other Defendants everything he knew, describing the confrontation that led to the shooting. *Id.* ¶ 6. Larry also provided a contemporaneous physical description of the shooter (memorialized in the police report) as being a 13-14 year old male Hispanic, 5'4 to 5'5, with curly black hair, wearing a purple " Purple Jacket with Yellow Lettering and/or #'s" and baggy blue jeans. *Id.* Larry's original description did not match Jimenez, who did not have curly hair. *Id.* ¶ 7. Jimenez also never had a purple jacket with yellow lettering; instead, he had a brand new blue and white Duke Starter jacket, which Defendants used to frame Jimenez and then discarded when Jimenez's mother demanded that the jacket be tested. *Id.*

Phil Torres was also interviewed at the scene. *Id.* ¶ 8. Phil did not actually see the shooting and did not claim to have seen it; he was not an eyewitness. *Id.* As with Larry, Phil

made no claim to have been able to identify the perpetrator by name. *Id.*

**Defendants' Version**

Defendant Detective Bogucki was put in charge of the investigation, assisted primarily by Defendant Detectives Saunders and Schalk. *Id.* ¶ 9. In Defendants' telling, Phil called the police in the early morning hours after the shooting to report that he just happened to be looking out the window at the time of the incident. According to Defendants, Phil reported that he witnessed Thaddeus Jimenez shoot Eric, who Phil supposedly identified by name as someone known to him and supposedly identified as wearing a Duke jacket during the shooting. *Id.* ¶¶ 10, 11. Defendants further claimed that Phil supplied a motive, an altercation that Jimenez supposedly had with the victim earlier that day. *Id.* ¶ 11. The main police report memorialized those "facts," as well as Phil's subsequent selection of Jimenez out of a lineup. *Id.*

Defendants also assert that they next went to Larry's home and that, there, Larry readily provided them a new account that, in contrast to his contemporaneous interview, now matched Phil's identification of Jimenez, including both the alleged argument with the victim earlier in the day and the fact that the shooter was wearing a Duke jacket. *Id.* ¶¶ 12. Larry's identification of Jimenez (as someone known to him by name) was then supplied to the prosecutors in Defendants' police report. *Id.* ¶ 13. Both Larry and Phil testified consistently *with Defendants' version of the facts* at both of Jimenez's criminal trials.

**Phil's Version: Never Even Claimed To Be A Witness**

In the course of the re-investigation that led to Jimenez's exoneration, new evidence came to light. Specifically, both Phil and Larry disavowed the story memorialized in the police documents, insisting instead that they had been improperly pressured to go along with it. According to Phil, the police came to his mother's house at 1:00 a.m. in the morning after the

shooting.  _Id._ ¶ 17.  He was high on drugs and would not have spoken with the police if he had

had a choice.  _Id._  Phil told Defendants he did not know who shot Eric, which was true.  _Id._  Phil

doesn't recall reaching out to the police that night (as they claim) and believes now that he would

have had no interest in doing so at the time.  _Id._ ¶ 18.

Even assuming Phil did initiate re-contact with the police late that night (rather than the

other way around), the most he could or would have told them was that he heard a rumor about a

possible altercation hours before the murder involving Jimenez and the victim.  _Id._ ¶ 19. Namely,

Phil believes he heard from his sister that Jimenez might have gotten into an argument with the

victim earlier in the day of the shooting, though Phil does not claim to have personal knowledge

of any of that.  _Id._ ¶ 20.  Phil allows that he might have passed on to the police the hearsay tip that

his sister believed Jimenez might have been involved.  _Id._  Indeed, Phil is clear that this is the only

conceivably relevant information he had.  _Id._ ¶ 21.

During his interrogation, Phil never claimed to have been certain about the shooter's

identity.  _Id._  The police kept telling Phil that other people (including his sister) were claiming that

Jimenez was the shooter, and finally, Phil agreed to say it was Jimenez.  _Id._  Although he

eventually testified at the trial that he saw Jimenez wearing a Duke jacket, at his deposition he

revealed for the first time that it was the police who brought up the Duke jacket to him first, not

the other way around.  _Id._ ¶ 49.  At bottom, Phil has admitted that, contrary to the police version,

he truthfully told the police that he did not know who shot Eric.  _Id._ ¶ 8.  He never claimed to be

a witness and did not want to be a witness.  _Id._ ¶¶ 8, 21, 22.[1]

---

[1]       Phil was 31 years old at that time, 18 years older than TJ, and they were not
friends.  In fact, Phil claims to have seen TJ only a few times in his life and cannot describe him at
all.  P. Stmt. ¶ 23.  At his deposition, Phil could not even be certain he had ever actually seen TJ
before.  _Id._  While Defendants try to discredit Phil on statements they do not like, that does not
advance Defendants' motion, as TJ is the one entitled to all reasonable (footnote continues)

### Larry's Version: Unduly Coercive Interrogation

Sometime near 3:30 a.m., Defendant Bogucki went, by himself, to Larry's family's apartment. Bogucki began banging on the door, insisting that Larry, who was asleep, needed to come back to the station. *Id.* ¶ 26. According to Larry, " they just grabbed me and took me" without a parent or guardian. *Id.*

Larry, who was only 14 at the time, had been crying and " in shock" over having witnessed the death of his friend. He is a high school dropout and as Defendants' own expert concedes, "*he appears to be susceptible to being influenced by leading questions*" and has "difficulty in trying to make sense out of disparate and confusing information." *Id.* ¶ 27 (emphasis in original). In response to the Defendants' questioning, Larry explained that he knew the shooter by sight from the neighborhood, but did not know his name. (At the time, the real shooter was known to Larry with the nickname Crazy. Larry now knows Crazy's real name to be Juan Carlos Torres. *Id.* ¶¶ 38, 39.)

Defendants told Larry that Jimenez was the shooter, and also that there were other witnesses stating that it was TJ who shot Eric. *Id.* ¶¶ 29, 30. Defendants proceeded to put substantial pressure on Larry to say the killer was Jimenez, calling Larry a " liar" and accusing him of " trying to cover up for TJ." *Id.* ¶¶ 29-33. They were yelling and screaming at him. *Id.* In response to the Defendants' assertion that the shooter was Jimenez, Larry was " very clear" with them that the shooter was " not" Jimenez. *Id.* ¶ 30. Larry knew Jimenez and used to hang

---

inferences at this stage. Moreover, the fact that Phil allowed Defendants' counsel at deposition to press certain admissions out of him through persistent questioning only shows, if anything, how suggestible and arguably subject to manipulation their star witness really is. As is often true in these types of cases, the Defendants urged the courts to believe this dubious witness back when he was pointing the finger at TJ, and yet they are stuck with him now that he is pointing the finger back at them.

out with him sometimes, so he knew him by sight. *Id.* ¶¶ 28, 30. Thus, Larry knew Jimenez had not been present for the shooting, and repeatedly told the Defendants: " no, no, no, it's not him, it wasn't him." *Id.* ¶ 30.

When Larry refused to implicate Jimenez, the detectives threatened to arrest Larry and send him to jail. *Id.* ¶ 31. They would " not leave him alone," and would " not let him go home" despite his request. *Id.* Larry was very afraid, particularly when the police were accusing him of lying. *Id.* ¶ 32. They were screaming at him " real bad," but he " just kept saying, no, it's not him and trying to tell the truth and tell them [about the real shooter]. I don't know the name, but I was giving a description." *Id.* Larry was practically falling asleep, and by the end, had broken down crying. *Id.* ¶ 33. Eventually, Larry " just got exhausted after a long time and I just kept saying, 'no, no, no.' ... It took me a long time to just say -- I gave up, you know. I was exhausted. . . . I was in shock, you know, and finally I just gave up and said okay. . . . I know it was wrong to do that, but you know, I didn't know what else to do." *Id.*

Larry has also now made clear that he would never have said Jimenez was the shooter but for Defendants' coercion. *Id.* ¶ 34. He regretted having become a " witness" against Jimenez and knew it was wrong to go through with it when he knew Jimenez was not the shooter. *Id.* ¶ 35. So guilt-ridden was Larry about testifying falsely against Jimenez that when it came time to testify in Court, Larry tried to hide from prosecutors, but the police arrested him on a bench warrant and " had to drag [him] out of [his] apartment to take [him] in handcuffs" to juvenile jail for a few days. From there the police took him straight to Jimenez's criminal trial to testify. *Id.*[2]

---

[2]     The guilt over having borne false witness against TJ has been very difficult for Larry; he eventually attempted suicide, at least in part from this guilt. *Id.* ¶ 36 (" My intentions were never for this to get this far like that, you know, and it's just terrible. I mean, it was a terrible thing, that the wrong -- the other guy was scot-free too, and that was on me too." ).

**Jimenez's Arrest**

At 4:00 a.m. the morning after the shooting, Defendants Bogucki and Sanders went to Jimenez's grandmother's home and arrested him. *Id.* ¶ 14. Jimenez denied any knowledge of the murder and provided a detailed alibi. *Id.* In the course of the arrest, Defendants learned that Jimenez had a blue and white Duke (Blue Devils) jacket. *Id.*

**Tina Elder**

Once Defendants had coerced Phil and Larry into saying that the shooter was Jimenez, the next step was to get them to view a lineup. In addition to Phil and Larry, Defendants summoned two other people to view a lineup, Tina and Sandra Elder. Instead of providing transportation for the Elders, Defendants allowed them to travel to the lineup with Phil.[3] Tina Elder testified that by time she had come to the station she had already discussed the murder and the lineup with Phil and Sandra. P. Stmt. ¶ 51.

At the moment of the shooting, Tina Elder was with her 4-year old daughter, was trying to get her daughter into the car, was several months pregnant, and was simultaneously speaking to Phil Torres, who was in a third-story window above her. As Tina describes the scene, it was nighttime and she saw the two people fighting with Eric only for a few seconds. *Id.* ¶ 52. Although she testified at the trial that the shooter was Jimenez, she has since recanted that testimony and stated that she cannot be certain who it was. Tina has further testified that she did not know Jimenez at that time, but when she got to the police station, one of the officers told her that Thaddeus Jimenez was the primary suspect and placed her at a desk, which described as follows:

---

[3]     This of course renders meaningless the Defendants' current claim that when they arrived at the station, they separated them to wait in different areas. *Cf.* Defendants Mot. at 11.

> [T]he police placed me at a desk. On the desk was a photo of Eric and [a] photo of Thaddeus Jimenez. I did not see and was not shown any other photos. I looked at both photos prior to viewing the lineup. My recollection of the shooter was of someone light-skinned, with hair that was short on the sides and wavy on the top. I do not recall seeing a Duke jacket.

*Id.* Tina has testified that the picture of Jimenez that the police placed her in front of was a square Polaroid. *Id.* ¶ 53. That Polaroid was never turned over by the police or prosecutors to the defendant, either before his 1994 or 1997 trial. The police reports make no reference to Defendants taking a Polaroid picture of Jimenez and using it in the case to show to Tina Elder. *Id.* (The first time that Jimenez received this Polaroid was in January 2011. *Id.* ¶ 64.)

The police did not take a statement from Tina until after they had told her that Jimenez was the primary suspect, until after they had placed her at a desk with TJ's photograph, and until after she had picked TJ out of the lineup. *Id.* ¶ 54. Tina never told another person – police or non-police – that the shooter was wearing a Duke jacket, and she states that she " does not recall seeing a Duke jacket" at the time of the shooting. *Id.* Defendants' police report nevertheless states that Tina positively identified TJ as " the offender wearing the 'Duke' jacket and as the one who shot the victim." *Id.*

### Victor Romo Comes Forward, Confesses, and Admits Unequivocally That Juan Was the Co-Perpetrator

On February 10, 1993, exactly one week after the murder, but after the Defendants had already " cleared and closed" the case against TJ, Victor Romo turned himself into Defendants Bogucki and Schalk and fully confessed to having been at the scene during the shooting. *Id.* ¶ 55. Victor made clear to the Defendants that he did not know Jimenez, had never met him or seen him at any time, and was not with him at the time of the shooting or any other time that night. *Id.* ¶ 56. Victor told the police that his friend Juan was the triggerman who murdered Eric. *Id.* He told Bogucki and Schalk that he had met Juan at the Burger King on Belmont and California, that

Juan had asked Eric about some money, and that a struggle began. *Id.* Independently, Victor's father, Ezequiel Romo, confirmed that Juan had confessed to him to shooting Eric. *Id.* Victor and Ezequiel provided Defendants Juan's specific address and even provided a map. *Id.* ¶ 57.

### Juan's Confession

Just two to three days after the murder, Ezequiel secretly tape-recorded Juan confessing to the crime. *Id.* ¶ 58. Ezequiel wanted to make the tape to gather evidence that would exculpate his son by establishing that he was not the shooter and had no pre-knowledge Juan was carrying a gun. *Id.* Juan can be heard on the tape stating that: " when he hit me and I wanted to shoot him" and " when I fired the shot, I ran." *Id.* ¶ 59. Juan also says on the tape that he is not worried about getting caught because " they pinned the other blame on the, the other gang boy" *Id.* At one of Victor's first hearings, Victor's defense lawyer presented Defendants with the tape recording of Juan's confession. *Id.* ¶ 60.

### Defendants Fail To Genuinely
### Investigate Juan's Involvement

There was no reason to disbelieve Victor (who was admitting against self-interest to participating in the crime) or to discredit Juan's confession on the tape, but, at this point, Defendants had a big problem: they had spent the first 24 hours of the investigation locking in various witnesses to the story that Jimenez was the shooter. It was " too late" to start the investigation all over again. Even if Juan were charged, the witnesses Defendants had already developed (pointing the finger at someone else) would likely have allowed Juan to escape conviction. Therefore, Defendants opted to abandon their obligation to search for the truth and instead go with the case they already had, or more accurately, the case they had manufactured against the grain. In particular, as set forth in detail in Jimenez's Statement of Facts ¶ 80, Defendants declined to take any genuine steps to confirm whether Victor was telling the truth

about Juan being the shooter.  As for the taped confession, Defendants made a record of receiving

the tape, but never logged it into evidence.  _Id._ ¶ 61.  Incredibly, the lead investigators, Bogucki

and Schalk, assert that to this day they have never even listened to the tape, never had it translated

into English, and never had a Spanish speaker from their Department listen to it, even though that

was a common practice within the department at the time.  _Id._

### Jimenez Is Twice Convicted For Morro's Murder
### Based On the Case Put Together by Defendants

Notwithstanding the evidence of Juan's guilt, the criminal case against Jimenez proceeded.

Although he was only 13 at the time of his purported involvement in the murder, Jimenez was

tried as an adult.  _Id._ ¶ 67. Prior to the trial, the State successfully blocked the admission of Juan's

taped confessions.  _Id._ ¶ 68.  At trial, the State put on the case built by the Defendants, including

the "eyewitness" testimony of Phil, Larry, and Tina.  _Id._  On October 4, 1994, the jury convicted

Jimenez of first-degree murder, and he was sentenced to 50 years in prison.  _Id._ ¶ 72.  Jimenez

served his time in juvenile facilities until he turned 17, whereupon he was transferred to maximum

security with fully-grown adult criminals.  _Id._

The appellate court eventually reversed Jimenez's first conviction based on a _voir dire_

problem.  _Id._ ¶ 73.  The State again moved successfully to exclude Juan's taped confession and re-

tried Jimenez based on the same evidence.  _Id._  On November 11, 1997, the jury convicted

Jimenez; later that month, the judge sentenced him to 45 years in prison.  _Id._

### Jimenez's Exoneration

For more than 16 years, TJ languished in prison for a crime he did not commit.  From the

day of his arrest, Jimenez vigorously professed his innocence.  He wrote to anyone and everyone

he thought might help him, including the Northwestern Center on Wrongful Convictions

("CWC"), which, assisted by several lawyers from Katten Muchin, investigated and pursued his

case for four years. *Id.* ¶ 74. By June 2008, CWC persuaded the CCSAO that there was sufficient justification to re-open and re-investigate the case. *Id.* ¶ 75. From approximately June 2008 to May 2009, the CCSAO undertook a full re-investigation. *Id.*

In doing so, the CCSAO did exactly what Defendants should have done when they began their investigation in 1993: they followed the actual evidence. Among other things, the CCSAO located a man named Leo Robles, the person to whom the victim owed money at the time of his death. *Id.* ¶ 76. During questioning, Leo admitted to having tossed the *Morro* murder weapon into the Chicago River, and he even took the CCSAO investigators to the spot on the Belmont Avenue bridge where he had thrown the weapon in, the very night of the murder more than 15 years earlier. *Id.* According to Leo, he was handed the gun by Luis Hernandez, who, like Leo and Juan, was a member of the Triangles street gang. Luis later told Leo (after he had already ditched it) that he had received the gun from Juan who had confessed to Luis that he had used the gun to shoot Eric *Morro*. *Id.*

The CCSAO interviewed Juan on December 29, 2008, and unlike the interview conducted by Bogucki and Schalk, this was an actual interview. *Id.* ¶ 77. Juan denied even knowing Victor or Ezequiel Romo, a verifiable lie. *Id.* When the investigators asked him to listen to Ezequiel's tape containing Juan's confession, Juan did not want to do so at that time and indicated he would get back to the CCSAO through counsel. *Id.* Instead, Juan pulled his children from school, quit his job, abandoned his family home, and fled the State. *Id.*

On May 1, 2009, the CCSAO took a very unusual step: it informed Jimenez through his counsel that they would agree to a motion to vacate his conviction. *Id.* ¶ 78. The Honorable Joseph M. Claps proceeded to enter an Order vacating Jimenez's conviction and sentence, and then immediately noted the State's motion to dismiss (*nolle pros*) the case against Jimenez in its

entirety. *Id.* Later that same day, Jimenez walked out of Hill Correctional a free man. *Id.* Four weeks later, June 3, 2009, Chief Judge Paul Biebel granted Jimenez a Certificate of Innocence, which the CCSAO did not oppose. *Id.* On the same day that TJ was released, the authorities arrested Juan Carlos Torres, who had fled to Indiana. *Id.* ¶ 79. On May 18, 2009, a Cook County grand jury indicted Torres for Eric Morro's murder. *Id.*

## ARGUMENT

### I.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON JIMENEZ'S DUE PROCESS CLAIMS.

The Due Process Clause of the Fourteenth Amendment guarantees criminal defendants the right to a fair trial. *Newsome v. McCabe*, 256 F.3d 747, 751-52 (7th Cir. 2001). Indeed, this fundamental protection is one of the most cherished and precious rights in our democratic system. *E.g., Patterson v. Burge*, 328 F. Supp. 2d 878, 889 (N.D. Ill. 2004) (" The due process clause safeguards the liberty of citizens. . . particularly in cases where the state 'has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury. . . .'" ) (citations omitted). Here, Defendants violated Jimenez's due process rights by concealing evidence of their manipulation and coercion of witnesses and by concealing exculpatory physical evidence. Defendants fabricated false evidence—a due process violation that is independent of Defendants' *Brady* violations. And Defendants perjured themselves at trial in order to push forward the false story that was created during their sham investigation.

### A.    Defendants Are Not Entitled to Summary Judgment on Plaintiff's Due Process Claim for Concealment of Exculpatory Evidence.

The Seventh Circuit made clear in *Newsome v. McCabe*, 256 F.3d 747, 751-52 (7th Cir. 2001) ("*Newsome I*") and 319 F.3d 301, 304 (7th Cir. 2003)("*Newsome II*") that Section 1983

claims have always existed where a police officer's actions in withholding material exculpatory information (including exculpatory information about the manipulation of a witness's testimony) results in a denial of a defendant's right to a fair trial. 256 F.3d at 749-53; 319 F.3d at 304-05. *Newsome II* held that the defendants were liable " under the due process clause because [the defendant officers] concealed exculpatory evidence -- *the details about how they induced the witnesses to finger [the civil rights plaintiff]*." *Id*. at 304 (emphasis added). In *Newsome*, as here, "[Plaintiff's] lawyers needed, but did not receive, information vital to probe whether manipulation [of witnesses] occurred." *Id*. at 305. The facts present here fall squarely within *Newsome*.

Since *Newsome,* a number of other cases in this Circuit have confirmed that Section 1983 liability will attach to a police officer who has manipulated a witness into identifying a suspect and then withheld material details surrounding how that witness came to identify a suspect. In *Ienco v. City of Chicago,* 286 F.3d 994, 1000 (7th Cir. 2002), the court relied on its intervening decision in *Newsome I* to reverse the district court's summary judgment in favor of officers on immunity grounds. The court held that an officer can be liable directly under the due process clause for withholding exculpatory information and lying to federal prosecutors who indicted Ienco. Citing *Brady* and *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), the court concluded that there was no absolute immunity for such conduct, and further held that if the plaintiff proved his due process claim on remand, the officers would also not be entitled to qualified immunity. 286 F.3d at 1000-01.[4]

---

[4]    The Seventh Circuit's opinion in *Jones* stands for two additional important propositions: (1) that " information undermining the credibility of a government witness is within the scope of Brady's rule" and (2) that certain intervening causes, such as " a prosecutor's decision to charge, a grand jury's decision to indict, [and] a prosecutor's decision not to drop charges but to proceed to trial" will <u>not</u> " shield a police officer who deliberately supplied misleading information that influenced the decision." 856 F.2d at 994 and 995.

The Seventh Circuit followed *Ienco* with *Manning v. Miller*, 355 F.3d 1028 (7th Cir. 2004), in which the court of appeals affirmed this Court's denial of summary judgment on absolute and qualified immunity grounds. The Seventh Circuit acknowledged that Manning's allegations went beyond perjury and conspiracy to commit perjury and included " inducing [a witness] to create a false story" and " inducing a witness to falsely identify Manning in a line-up." *Id*. at 1032-33. The court held that the fact that Manning was also complaining of perjury (for which there was testimonial immunity) did " not foreclose his *Brady* claim." Significantly, the court held that qualified immunity was also not available to the defendants because in 1990, when the misconduct allegedly occurred, it was already " well established that investigators who withhold exculpatory evidence from defendants violate the defendant's constitutional due process right." *Id*. at 1034, citing *U.S. v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985).

Finally, in *Dominguez v. Hendley*, 545 F.3d 585, 590 (7th Cir. 2008), another case in which plaintiff asserted that the "defendant officers violated his right to due process by manipulating or tampering with identification and testimonial evidence" and then " back[ed] up these allegations with [false] evidence at the trial," the court again affirmed, holding that the court properly instructed the jury that in order to find for plaintiff Dominguez, it had to find that Hendley caused Dominguez's criminal trial to be unfair through any of three specified courses of conduct: (1) withholding material, exculpatory evidence in violation of *Brady*; (2) causing an unreliable identification procedure to be used at his trial; or (3) fabricating evidence. *Id*. at 589. *See also Id*. at 590 (because the officer's defense was primarily that he denied that any evidence was fabricated, procured through suggestive procedures, or withheld, " the jury therefore had to decide who was telling the truth on these points, and ultimately whether [Officer] Hendley misled the prosecution and caused Dominguez to receive an unfair criminal trial" ). The court rejected

defendant's claims of qualified immunity on the same basic grounds as the cases cited above, giving special emphasis to the point that the officer was not claiming immunity on the ground of "legal uncertainty," but rather was, as in this case, asserting factual defenses such as denial of the accusations, insufficient proximate cause, and superseding causation, all factual issues that do not relate to " legal uncertainty," and in any event do not lend themselves to pretrial resolution on immunity grounds. Id. at 589-90.

In this long line of cases, the Seventh Circuit has repeatedly held that where, as here, the gist of the constitutional allegation is that the defendant induced witnesses to give a false identification of or make false statements about the suspect and then withheld the facts about how those witnesses were induced, defendants are not entitled to summary judgment (or post-trial reversal for that matter) on the grounds of failure to state a constitutional claim, or absolute immunity, or qualified immunity.

The facts in this case fit comfortably within these authorities. Lacking any physical evidence, a confession, or anything else linking Jimenez to the crime, the State built its case solely on the purported eyewitness accounts that Defendants Bogucki, Sanders, and Schalk forged (double meaning intended) in a locked room inside the police station in the hours shortly after the murder. When Larry and Phil walked out of that room and were presented to the prosecutors, their testimony was virtually insurmountable: they were eyewitnesses who claimed: (a) to know Jimenez personally, (b) to have seen Jimenez shoot Eric, and (c) to have seen Jimenez wearing the very Duke jacket that the police seized from Jimenez, no less. That testimony amply sufficed to convict Jimenez -- twice, as Defendants are quick to point out. The problem, however, is there a lot more to the story that was never told because it was never disclosed to the prosecutors or to the defense. Defendants' version of the story, as transmitted to the prosecutors via their original

police reports, critically withholds the following exculpatory material:

- That Bogucki and Sanders threatened, coerced, and intimidated Larry into naming Jimenez as the shooter, as well as the means they used to induce Larry's testimony and the fact that prior to naming Jimenez, Larry had repeatedly insisted for hours that Jimenez *was not the shooter.*[5]

- That Phil Torres did not actively seek out police in order to share his belief that Jimenez was the shooter and that, in truth Phil never told police he saw Jimenez shoot Eric, but rather only disclosed Jimenez's name based on a hearsay rumor from his sister that Jimenez might have been involved.

- That Defendants created a suggestive " Polaroid Show-Up Procedure" with Tina Elder and told her that Thaddeus Jimenez was the leading suspect at the time in order to influence her line-up identification.

- That they had induced witnesses to give false testimony (and in some cases simply wrote statements into their reports attributed to witnesses that were false), including but not limited to the statement that the shooter was wearing a Duke Jacket at the time of the murder. (Numerous witnesses have testified that the police, not they, inserted the wearing of a Duke Jacket into their witness statements. These false statements were in turn not disclosed to the State or defense, and the " shooter wore a Duke Jacket" theme was a major theme at both of Jimenez's trials.)

- That the following pieces of physical evidence existed: (a) Eric's handwritten note with Leo's name, telephone number and the amount of money Eric owed to Leo; (b) the square Polaroid photo of Jimenez used with Tina Elder; (c) until discovery in this case, the full inventory list of evidence that had been created in 1993.

None of this information was known to Jimenez at his criminal trial, and taken together, these facts would have made for devastating impeachment. *See Giglio v. United States*, 405 U.S. 150 (1972) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [*Brady*]" ). For summary

---

[5] It is true that Defendants' police report discloses that Larry did not originally identify TJ. (They had to include that fact because the beat officers had already created a report of their on-scene interview with Larry in which he described but did not identify, the shooter.) But the critical missing/withheld fact is that Larry not only failed to name TJ (purportedly out of fear) but that he was affirmatively insisting to his interrogators that the killer was known to him and *was not TJ.*

judgment purposes, a reasonable jury could certainly conclude that these withheld details were sufficiently material to give rise to a constitutional violation, which requires only that they " might have affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 104 (1976).

### 1. The Purported Failure to Exercise Diligence Is Not a Basis for Summary Judgment on Plaintiff's Concealment of Evidence Claim.

Relying almost exclusively on *Holland v. City of Chicago*, 643 F.3d 248 (7th Cir. 2011), Defendants argue that Jimenez's *Brady* claim should fail because Jimenez and his criminal defense counsel did not meet their responsibility to uncover the withheld facts. This argument should be rejected. According to Defendants, *Holland* essentially stands for a rule that coercion of material witnesses cannot give rise to actionable *Brady* violations because any criminal defense attorney can simply interview the witness for himself. Such a reading would effectively overrule *Newsome* (and the cases that follow it discussed above) because one could always argue that material witnesses could have been interviewed *better*. But that is simply not the law. As the Seventh Circuit explained clearly in *Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001),

> We are of the view, however, that the state's argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence. We regard as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for Brady purposes. . . . To begin with, it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses. Sometimes, a defense witness may be uncooperative or reluctant. Or, the defense witness may have forgotten or inadvertently omitted some important piece of evidence previously related to the prosecution or law enforcement.

Id. at 740. (emphasis added). (This court should especially note that the Seventh Circuit is discussing limits on a defense counsel's ability to extract favorable evidence from "defense witnesses," while in this case, this caution is doubly, if not triply, true as it applies to defense counsel's ability to extract favorable evidence from *prosecution witnesses*.)

In reality, *Holland* is easily distinguishable and its holding is thus far narrower than Defendants assert. Unlike here (and in the series of *Newsome* cases discussed above), the police in *Holland* specifically disclosed to the criminal defendant that the witness had told them *three times* that Holland was not the rapist and then later said that he was. 643 F.3d at 256. The Court mused that the " first thought to pop into the mind" would be the question "[w]hat (if anything) happened between the three times [the witness] said that Holland was not the rapist and the time she finally said that he was?" That question pops up in *Holland's* facts (where the government *had disclosed* to the defense what the witness had initially said), but not in this case. Here, Defendants never disclosed Larry's initial specific and repeated denials that Jimenez was the perpetrator. *See* PX15 at TRJ0044 (no mention of denials).

Moreover, Holland's defense lawyer had indeed interviewed the witness, who told the lawyer that the sole reason she didn't identify Holland initially was because she was afraid. She did not tell him at that time, as she did later, that it was because of pressure from the police. The court in *Holland* points out that while the witness may have been lying to Holland's lawyer that was not the fault *of the police*, so Holland could not hold the police responsible for the witness's failure to share that information. The court further stated that the police neither coerced the witness to lie nor were they " otherwise withholding exculpatory evidence on this point from the defense." 643 F.3d at 256. That is what makes this case so completely different from *Holland*. Here, Defendants did *not* disclose in the original police reports that Larry had repeatedly told the officers that they had the wrong guy and that it was not Jimenez.

The point of *Holland* is that *as long as the police officers do disclose* that the witness had repeatedly said that the defendant did not do it before changing her story and saying he did, then there is no *Brady* violation. Once the shifting story is disclosed, however, the burden shifts to the

criminal defense counsel to ferret out why the witness changed her story. Here, Defendants nowhere disclosed that Larry had repeatedly insisted, in response to their accusations about Jimenez, that he (Larry) knew Jimenez, and that Jimenez was *not* the shooter. In *Boss*, the Seventh Circuit explained how to evaluate a defense counsel's diligence:

> We also find it significant that a defense witness's knowledge is quite different from the type of evidence typically found to be available to defense counsel through the exercise of reasonable diligence. In the typical reasonable diligence case, the question is whether defense counsel had access to the document containing the *Brady* material, through an open file policy, for example. In cases like the present one, the question is whether defense counsel had access to Brady material *contained in a witness's head*. Because mind-reading is beyond the abilities of even the most diligent attorney, such material simply cannot be considered available in the same way as a document. But, the position the state advances would require a defense witness's knowledge to be treated exactly as information in a document the defense possesses. *This stretches the concept of reasonable diligence too far*.

263 F.3d at 741. (citations omitted, emphasis added). This is precisely what the defendants ask this Court to do in this case – stretch the concept of reasonable diligence too far.

Applying this *Boss* standard to the facts at bar, Defendants have failed to meet their burden of establishing what Jimenez's defense counsel "likely did obtain" and "likely could have obtained" by speaking with witnesses before trial. And, in any event, the question of what the defense counsel "likely could have obtained" is a disputed question of fact that may not be decided on Defendants' motion. For one thing, the Defendants' manipulation of Larry was not uncovered by the prosecutors either. They, too, were fooled, and they had every opportunity to interview him. There is no justification for holding defense counsel to a higher standard.[6]

---

[6]     Defendants take out of context a phrase from Larry's statement that he lied because he "did not think anyone would believe him." (Def. Mem. at 9)  There is no disputing that Larry did try to tell the truth to the Defendants:  he repeatedly told them that TJ was not the shooter, as described at length only a few paragraphs earlier in that very same affidavit that Defendants reference. *See* PX23. In fact, Defendants flip the "nobody would believe me" reference on its head:  it actually describes Larry's motive for going along with the Defendants' subterfuge *once he had to deal with the lawyers,* a fact that undermines, not supports, Defendants' *Holland* argument.

Furthermore, as the Defendants in this case concede, defense counsel *repeatedly did probe* Larry about the account he provided at trial, Def.'s SOF ¶¶ 42, 45, 46, 54, 56, 57, an account that was on the record, while Larry was under oath, no less. *Id.* Unfortunately, Larry did not budge from the false account, and declined to divulge the exculpatory details. *Id.* No amount of probing inquiry by defense counsel was able to change Larry's story, leaving one wondering what more Defendants are suggesting counsel should have asked to get to the truth. *Compare* Def. Mem. at 8 (faulting Jimenez for supposedly failing to ask the question: "why did Tueffel change his identification of the shooter?").

Finally, there is evidence that Larry had his own reasons for not exposing the Defendants' manipulations. As Larry stated, after he was pressured into the false account and was released by the police, he came to believe that the real shooter, who he knew by the name "Crazy," would retaliate against him if he exposed the police's frame-up of Jimenez. (P. Stmt. ¶¶ 38, 39.) Larry decided to keep his mouth shut in court, and Defendants have not presented any probative evidence to suggest that TJ would have obtained a different result with so-called "greater diligence." At one point, Larry went to St. Genevieve's Church with the intention of telling a priest the truth about his false testimony against TJ, but he lost his nerve and did not go through with it. (*Id.* ¶ 40.) If he was too afraid to share the truth with an anonymous priest, a jury could reasonably conclude that the cause of TJ's injuries was not inadequate interviews by the defense.

2. ***Gauger* and Other Confession Cases Do Not Furnish a Basis for Summary Judgment on Plaintiff's Concealment of Evidence Claim.**

In a related vein, Defendants argue that this Court should apply false confession cases – *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), *Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006); and *Harris v. Kuba*, 486 F.3d 1010 (7th Cir. 2005) – for the proposition that Jimenez may not state a *Newsome* claim because he was aware that Tueffel was subjected to

pressure from police. These three cases, however – *Gauger*, *Sornberger*, and *Kuba* – stand for a narrow and limited proposition. In all three of those cases (as Defendants concede), the court basically ruled that when police improperly coerce a false confession from an accused party, the party may not assert a *Newsome* claim that the police's misconduct violated his rights, because the accused party was obviously aware of the coercion to which he was subjected. In other words, a plaintiff may not assert a *Newsome* claim in relation to *his own confession* because the suppression part of a *Newsome* claim is wholly lacking.

Defendants now try to stretch that principle, asserting it is enough to foreclose a plaintiff's *Newsome* claim if the plaintiff was aware that one or more of the witnesses against him was subjected to "pressure." This proposed extension of *Gauger*, *Sornberger*, and *Kuba* is untenable, not the least because Jimenez and his counsel – and the prosecutors, for that matter – never learned many (indeed never learned any) of the critical details needed for impeachment. *United States v. Bagley*, 473 U.S. 667, 676 (1985) (*Brady* encompasses impeachment evidence affecting the credibility of prosecution witnesses). Even if Jimenez knew that Larry was young, or knew that the police had yelled, or even threatened, that does not alter the fact that the police *failed to disclose* what Larry had repeatedly *stated* to them about Jimenez's innocence.[7]

### 3. Judicial Estoppel Does Not Furnish a Basis for Summary Judgment.

Defendants assert that Jimenez is "judicially estopped" from asserting that the witness's misidentification was caused by the police because at his criminal defense trial his attorney asserted that they testified against him falsely because of gang pressure. Def. Mem. at 10. The

---

[7] At the underlying trial, both the prosecutors and the defense needed a reason for why when Larry was interviewed by the officers, he failed to name TJ. In this case, as in others, they went with a "fear of gangs" explanation, which Larry dutifully reported to the jury – never explaining why, if he was so afraid of gangs, he turned around and implicated an alleged gang member once the Defendants got ahold of him.

essence of the doctrine is the prevention of litigants from manipulating the legal system by prevailing based on one position, only to turn around and take the contrary position later. There are two reasons that judicial estoppel simply does not apply to these facts.

First, it is a fundamental element of judicial estoppel that the party who the movant seeks to estop must have been successful with the first argument (statements during his criminal trial that gang pressure caused the false testimony). In other words, in order to be estopped in a subsequent proceeding, the party " must have enjoyed the fruits" of the argument in the initial proceeding. *E.g., New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (" Absent success in a prior proceeding, a party's later inconsistent position introduces 'no risk of inconsistent court determinations,' and thus poses little threat to judicial integrity." ) Obviously, Jimenez lost at both of his trials – to the tune of 50 years and 45 years respectively. While Jimenez was later exonerated of those convictions, it was not because of the gang pressure argument, it was because Larry had finally disclosed his true motive for lying (police coercion). Put simply, police coercion, not gang retaliation, was the foundation for Jimenez's exoneration, and he thus is not estopped.

Second, if the litigant did not know certain facts at the time he made an argument in the first proceeding, he cannot be judicially estopped from asserting the newly-learned facts in the subsequent proceeding. *See Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir. 1993) (" [T]he doctrine of judicial estoppel is not an absolute bar to obtaining legal relief on the basis of new information even if inconsistent old information had gotten the party an advantage in some other proceeding." ). This exception is particularly applicable here. The very reason Jimenez was not in a position to raise police coercion earlier was because these same Defendants withheld those facts, in violation of *Brady* and *Newsome*. *Jimenez* is hardly the party in this case that is "play[ing] fast and loose" with the court system (to borrow Defendants' phrase).

### 4. Attacks on Larry's Credibility Do Not Furnish a Basis for Summary Judgment.

Defendants spend a substantial portion of their brief trying to discredit both Larry personally and the facts surrounding his recantation. There are two major reasons that these attempts to discredit are immaterial on this motion. First, the Court is not to resolve credibility disputes on summary judgment; those are to be left to the jury. And, second, even if the Court were to take on the issue of Larry's credibility for purpose of this motion (solely for sake of argument), the fact remains that Larry's recantation testimony has been strikingly consistent.

Taking the second point first, once Larry recanted and told the truth, Larry has never wavered from any of the details of the true story, providing a consistent account of how he was pressured into testifying falsely, what methods the police used to do so, why he ultimately broke down, how he tried to get out from under his lies by not going to Court, and how he finally came to recant. *See*, *e.g.*, PX23 (7/31/06 Tueffel Statement); PX69 (3/20/08 Harrigan Memo re: Larry's Meeting With CCSAO); PX70 (2/9/09 CCSAO Investigative Report re: Meeting with Larry); PX2 (3/3/11 and 3/7/11Tueffel Dep.). Larry has explained these central controlling facts in the same way to the Center on Wrongful Convictions, to the Morro family, to the State's Attorney's Office, in his affidavit, in his videotape statement, and at his deposition.

The only time he has ever deviated was when Defendants' counsel interviewed him at his home with a policeman, did not take any notes of their encounter, went back to his office to type an affidavit that he wanted Larry to sign, and then sent a policeman over get Larry to sign it the next day. (It is true that that affidavit is not consistent with the facts as Larry has consistently told them since July 2006, but that fact represents an indictment of the affidavit obtained, not an endorsement of its value as a tool of impeachment.) Moreover, even the affidavit that Defendants' counsel prepared makes perfectly clear that Jimenez is innocent and that Larry's

testimony at the criminal trial was false.  While it also states that Larry was not subject to "police coercion,"  Larry has since testified that those were Mr. Hale's words, not his; that he does not know what the word " coercion" even means, that the part about not " blaming" the police is an untrue over-simplification; and that he basically felt tricked into signing that statement (all over again, as it were).  At his deposition Larry could not explain why he signed it, other than that he was "trying to be cooperative."  P. Stmt. ¶¶ 41-43.  His testimony also made clear, however, that he now regretted signing it and the manner in which it was presented to him.  *Id*. ¶ 42 ("He just asked me to sign it.  I just did.  I shouldn't have.").  And while the statement does say that he is not "blaming"  the police, Larry clarified that as well: "I said I had nothing against them.  That doesn't mean that what they did was right."  *Id*. ¶ 43 ("I said I'm not blaming anybody, I just wanted to get this fixed . . .." ).[8]

Taking a step back, Jimenez's core theory is that the Defendants were able to pressure a weak person into knowingly implicating an innocent man.  In the bigger picture, the fact that Larry is still willing to accommodate authority figures by signing whatever was put in front of him in order to avoid conflict is hardly helpful to the Defendants.  In any event, it will ultimately be for the jury to decide whether to credit or discredit Larry's testimony.  It goes without saying that it has no place in this motion as an undisputed issue of material fact.[9]

---

[8]  In Larry's words: " I didn't mean it like that.  I said I have nothing against the police.  He asked me a question do you blame anybody.  I said, well, they kind of made -- I mean, police are supposed to do their job.  And he was trying to ask me do I hate police because -- I didn't mean -- It was wrong -- I don't know right now.  Hold on a minute."  P. Stmt. ¶ 43.

[9]  It turns out that it is not at all difficult for police officers to get Larry to sign things. Defendants' legal team (including an off-duty police officer they hired) managed to persuade Larry to sign a HIIPA release for his confidential medical records (which he also now regrets) by explaining that they just needed to "have a paper signed so they could see my background or whatever, do whatever they're trying to do.  I don't know."  *Id*. ¶ 44.  After having Larry sign the release, Defendants then used Larry's psychological records (footnote continues)

Fundamentally, though, these are not questions for resolution by summary judgment. Even though Larry is mentally ill, his credibility must be judged based on his demeanor while testifying at trial. *Cf., e.g., U.S. v. Snyder*, 189 F.3d 640, 645 (7th Cir. 1999) (" As long as a witness has the capacity to testify truthfully, it is best left to the fact-finder to determine whether he in fact did so." ). There can be no reasonable dispute that Larry Tueffel is perfectly capable of understanding and answering questions and perceiving or reporting events. P. Stmt. □ xx. This Court had the opportunity to personally observe Larry at his depositions, and thus is in a position to conclude that a reasonable jury could find him credible notwithstanding the attempt of Defendants' expert (who has never even met Larry) to assert that his mental illness wholly discredits his testimony.

In sum, Larry's testimony creates a triable issue, and Defendants' attacks on his credibility do not justify summary resolution. The same is true for Phil Torres's and Tina Elder's testimony. Jimenez states a valid *Newsome* claim based on the testimony of all three witnesses, individually and collectively, and Defendants' summary judgment motion should be summarily denied.

---

to prepare a comprehensive expert witness report, *which they then put into the public record with their summary judgment filing*, about how his alleged " paranoid schizophrenia" supposedly makes him an unreliable witness. *See* Defendants' Exhibit 58. Indeed, Defendants filed this report publicly even after receiving an internal memo among TJ's former exoneration lawyers, in which Larry asked that his diagnosis and medications not be widely circulated. *See* PX69 (after Larry told Patrick Harrigan, one of TJ's exoneration lawyers that he had fully disclosed his mental health issues to the CCSAO, "Larry asked that [TJ's counsel] not share his mental health diagnoses and medications with TJ or anyone else.")

Defendants' willingness to put Larry's highly embarrassing and confidential mental health history into the public record runs conspicuously counter to the City's unwavering fixation on the privacy rights of police officers accused of misconduct and the need for a protective order on everything about them, from a 20-year old photograph to the date they left active service of the police force.

**B.    Defendants Are Not Entitled to Summary Judgment on Plaintiff's Due Process Claim for Creation of False and Fabricated Evidence.**

Separate and apart from Defendants' suppression of material exculpatory evidence in violation of *Brady* and *Newsome*, Defenadnts may be held liable for the simple act of fabrication, without more.   Jimenez has a constitutional right not to be deprived of liberty on the basis of fabricated evidence. As the court stated in *Moran v. Clarke*, 296 F.3d 638 (8th Cir. 2002), a policeman's "intentional creation of damaging facts" against a person under investigation "shocks the conscience and violates the decencies of a civilized society." *Id*. at 646-48. *See also Wilson v. Lawrence County*, 260 F.3d 946, 957 (8th Cir. 2001) (" If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated." ); *Spurlock v. Satterfield,* 167 F.3d 995 (6th Cir.1999); *Devereaux v. Abbey,* 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc); *Castellano v. Fragozo,* 311 F.3d 689, 704-705 (5th Cir. 2002); *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir. 2004) (and cases cited within these cases).

For example, in *Spurlock*, police officers fabricated evidence and manufactured probable cause.  The Sixth Circuit found both that a constitutional right to be free from fabricated evidence and also rejected a qualified immunity claim, holding that on the basis of the Court's prior holdings in *Brady* and *Pyle* " [the defendant] cannot seriously contend that a reasonable police officer would not know that such actions were inappropriate and performed in violation of an individual's constitutional and/or statutory rights." *I*d. at 1005-06. *See also Richardson v. City of New York,* No. 02 Civ. 3651(JG), 2006 WL 2792768, at *5 (E.D.N.Y. Sept.26, 2006) (court holds it is a disputed issue of fact whether plaintiff suffered a constitutional injury where police officers fabricated evidence, passed that evidence along to the District Attorney's office, and Richardson was indicted and prosecuted as a result); *cf. also Landrigan v. City of Warwick,* 628 F.2d 736, 744-45 (1st Cir.1980) (dissemination of a false report may violate a plaintiff's rights).

Here, the summary judgment record is rife with evidence that was fabricated. Of course, Defendants coerced and manipulated Tueffel, Torres and Tina Elder into their false identifications of Jimenez. They prepared police reports falsely suggesting that Larry Tueffel readily named Jimenez as the shooter during in an interview in Larry's home before Jimenez was arrested. They used a one-photograph show up to manipulate Tina Elder into her identification of TJ. And they prepared a false report stating that Phil Torres had identified Jimenez as the shooter, when he had not done so. Even without the false reports, the manipulation of these witnesses' identifications— whether or not concealed—violates due process. *See Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006) (due process "is violated if unduly suggestive identification techniques are allowed to taint the trial").

Defendants also fabricated evidence that Eric Morro's murderer was wearing a Duke jacket. At the scene, Larry described the shooter's jacket as purple with yellow lettering – a description that matched the jacket Juan was wearing at the time of the murder. When Bogucki arrested Jimenez (and he walked out of his grandmother's apartment with a Duke jacket), Bogucki simply decided that it was would be better for the witnesses just to say that the shooter was wearing a Duke jacket. He did this by suborning witnesses to say that they had seen the shooter in a Duke jacket and by outright fabrication of witness statements in his police reports.

Defendants do not proffer an argument as to how they might be entitled to summary judgment with respect to this due process claim.

C. **Defendants Are Not Entitled to Summary Judgment on Plaintiff's Due Process Claim for Use of False Testimony.**

The Supreme Court has long recognized that due process is denied where the state has "contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the

28

presentation of testimony known to be perjured." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (such conduct is " inconsistent with the rudimentary demands of justice"). Knowing use of false evidence or perjured testimony deprives a defendant of due process and a fair trial when the evidence is material to guilt or punishment. *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001), citing *United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995) ("[W]e do not employ the term of perjury in a technical, legal sense in these types of cases, but rather as a term of art that describes the knowing use of false testimony."). An accused's right to a fair trial is violated " if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Pyle v. Kansas*, 317 U.S. 213, 216 (1942).

As the Seventh Circuit has explained, " [t]he *Agurs* standard [for perjury] is different from that in *Bagley* [for *Brady* violations] and sets a lower threshold for determining materiality." *Braun v. Powell*, 227 F.3d 908, 920 & n.11 (7th Cir. 2000), citing, among others, *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) ("different standards of materiality apply to *Brady* claims and claims that the prosecution has knowingly used perjured testimony or false evidence" and the standard for the latter is "considerably less onerous").

Jimenez's Complaint alleges that the Defendants testified falsely at Jimenez's trial about Jimenez's purported guilt and the veracity of the witness statements they procured. (Dkt. No. 40 ¶ 30.) The evidentiary record bears this out. Ordinarily, absolute immunity might bar the claim, but the Agreed Stipulation attached as PX42 moots that question. Defendants make no argument to defeat this due process claim and it therefore survives their motion for summary judgment.[10]

---

[10]  On September 1, 2011, Jimenez and the City entered into a *Monell* stipulation whereby the City agreed to be liable for " any constitutional violation" proven with respect to the individual defendants.

## II.    QUALIFIED IMMUNITY DOES NOT ENTITLE THE DEFENDANTS TO SUMMARY JUDGMENT.

Defendants make two half-hearted qualified immunity arguments, but these are both nonstarters. They state they have found no case that prohibited defendants from using loud voices with Larry when they thought he was lying to them, nor have they found any case that required them to provide Tina "a special room without any paperwork" in order to avoid the risk of her seeing the picture of Jimenez that she saw. If Jimenez's evidence is credited on this motion (as it must be), these qualified immunity arguments must fail.

Defendants do not, and cannot, dispute the premise that Section 1983 liability for withholding exculpatory evidence was well-established in February 1993. The Seventh Circuit has repeatedly stated that the a police officer's duty to disclose *Brady* material (including material that falls within the confines of *Newsome*) was clearly established not later than 1985 when the Seventh Circuit decided *U.S. v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985) and at the very latest by 1988 when the court decided *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), if not all the way back to *Brady* itself (1977). *See also supra at* pages 14-16 the *Ienco*, *Manning*, and *Dominguez* immunity cases extensively discussed above.

Defendants may also not claim in good faith that they are entitled to immunity for fabricating evidence, including fabricating evidence through an unduly suggestive identification procedure. As an initial matter, it is well-established that a policeman's fabrication of evidence against an accused is a violation of his constitutional rights, and numerous courts have already rejected defendants' claims that the state of the law did not give them a fair warning that fabricating evidence for the purpose of charging or trying a defendant was unconstitutional. As an *en banc* panel stated in *Devereaux* in 2001, "Perhaps because the proposition [that police may not fabricate evidence in order to charge someone with a crime] is virtually self-evident, we are

not aware of any prior cases that have expressly recognized this specific right, but that does not mean that there is no such right. Rather, what is required is that government officials have 'fair and clear warning' that their conduct is unlawful." The court went on to hold that the officers had a " fair and clear warning" in 1994 that it was unconstitutional to use false or fabricated evidence to charge or try a defendant. *Id*. at 1075. See also *Pierce,* at 1297-98 (court of appeals affirms the district court's denial of qualified immunity to a forensic chemist who fabricated evidence in 1986 that led to plaintiff's conviction and fifteen years in a state prison). Here, there can be no reasonable dispute that the Defendants were on notice in 1993 that Defendants had a constitutional right not to be charged or tried based on evidence that was fabricated by the police.

As to the more specific fabrication issue related suggestive identification procedures, the law has been clear since at least *Manson v. Brathwaite* that it is unconstitutional to utilize unduly suggestive identification procedures. Numerous cases have so held. *See*, *e.g.*, *Rojas v. Iannatto*, 2003 WL 169798, *4 (S.D.N.Y. Jan. 24, 2003) ("a criminal defendant's right not to be subjected to unduly suggestive identifications has been the law since [*Brathwaite* in] 1977.").

But the gist of Defendants' qualified immunity arguments is not so much to take issue with the clearly established law as it is to claim that they did not do what Larry, Phil, and Tina have said they did. Such arguments must await another day. What happened during Defendants' interactions with Larry, why and with what intention Tina came to be sitting in a room with the Morro file opened to a picture of Jimenez, and whether Phil called Bogucki or Bogucki just showed up, are all questions that can only be resolved at trial. But summary judgment on the immunity grounds asserted is simply not available. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[11]

---

[11]     Defendants assert in Section IV of their Memorandum that Jimenez's claims for failure to intervene, conspiracy, intentional infliction of emotional distress, and *respondeat superior* all fail for want of an underlying violation. Because TJ has shown (footnote continues)

**III.    SUMMARY JUDGMENT IS NOT AVAILABLE ON JIMENEZ'S MALICIOUS PROSECUTION CLAIM.**

**A.    Whether The Officers Had Probable Cause Is A Question Of Fact.**

The question of probable cause is typically "a proper issue for a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013-14 (7th Cir. 2006). Similarly, applying Illinois law, the issue of "whether a statement bears sufficient indicia of reliability to support a finding of probable cause in a malicious prosecution case is a question of fact to be resolved by the jury." *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, xxx (1st Dist. 2002); *Howard v. Firmand*, 378 Ill. App. 3d 147, 151 (1st Dist. 2007) ("It is only when the circumstances alleged to show probable cause are not disputed that the cause can be decided as a matter of law").

As discussed at length above, all of the evidence that could give rise to probable cause to believe Jimenez committed murder has allegedly been falsified by the Defendants themselves. Summary judgment is unavailable where probable cause is alleged to be based on fabricated evidence. *Tully v. Del Re*, 2002 WL 31175983, at *5 (N.D. Ill. Oct. 1, 2002) (probable cause properly left to the jury where defendants " implicitly importuned witness to manufacture a basis for charges" and "thus could not reasonably have relied on what [the witness] told them"); *Finwall v. City of Chicago*, 490 F. Supp. 2d 918, 923 (N.D. Ill. 2007) (same). *See also Smith v. City of Chicago*, 913 F.2d 469, 473 (7th Cir. 1990); *Kincaid v. Ames Dept. Stores, Inc.*, 283 Ill. App. 3d 555, 565 (1st Dist. 1996) (" Defendants rely on the written statements by Smallwood and Jennings to establish probable cause. However . . . [those witnesses] both specifically detailed

---

such a violation or at a minimum that a determination with respect to such violations requires a trial, Defendants' request for summary judgment on Counts II, III, V, and VI should also be denied.

how defendants told them to accuse plaintiff in their statements, even though plaintiff had done nothing wrong. Sufficient reliability must support any statement used to help establish probable cause."); *Mack v. First Sec. Bank of Chicago*, 158 Ill. App. 3d 497, 503-504 (1st Dist. 1987) (sufficient evidence of lack of probable cause for malicious prosecution claim where eyewitness identification allegedly lacked integrity); *Howard*, 378 Ill.App.3d at 151 ("Because the truth of Defendant's abuse allegations are disputed, [malicious prosecution] summary judgment, based on a finding of probable cause as a matter of law, should not have been granted").

### B.     Whether the Officers Acted With Malice Is Also A Question Of Fact

As with probable cause, the presence of malice *vel non* is highly disputed, and can only be properly decided by a trier of fact.  Paragraph 80 in our Statement of Facts, as well as others, sets forth in great detail ample evidence from which a reasonable jury could reasonably infer that the Defendants were not genuinely interested in solving this crime, but rather were interested in clearing and closing a case as fast as possible and without looking back.  *See, e.g., Turner v. City of Chicago*, 91 Ill. App. 3d 931, 937 (1st Dist. 1980) ("Malice may be inferred from want of probable cause when the circumstances are inconsistent with good faith . . . and where the want of probable cause has been clearly proved.").  Not only were Defendants working overtime to make the evidence fit the suspect, Jimenez, but they then also deliberately ignored the evidence that Juan was the real killer. This evidence is obviously sufficient to warrant a reasonable jury in finding the existence of malice.

## IV.    JIMENEZ VOLUNTARILY DISMISSES DEFENDANTS WHITEMAN, RYAN, AND MONTILLA.

The City's agreement to stipulate to judgment against it if Jimenez can prove the constitutional violation of any of Officers Bogucki, Sanders, Schalk, Montilla, Ryan, or Whiteman eliminates the need to sort out exactly who did what.  See PX42.  In light of the stipulation,

Jimenez is content to pursue the primary detectives. If those Defendants decide to point the finger at trial at others who seemed more peripheral earlier in the litigation (which has sometimes been a defense at other trials involving these same sets of lawyers), then Jimenez still recover under the Stipulation with the City. In the meantime, there is no need for the Court to decide liability for any Defendants except the three main detectives who built the case and interacted with the witnesses. Those Defendants do not make arguments about lack of personal involvement, so Defendants' summary judgment argument on that point is moot.

## CONCLUSION

For these reasons, Jimenez respectfully requests that summary judgment be denied.

Respectfully submitted,

**THADDEUS JIMENEZ**

By:   /s/   Stuart J. Chanen
One of his Attorneys

Dated:   September 2, 2011

| | | |
|---|---|---|
| Mr. Jon Loevy | Mr. Stuart J. Chanen | Mr. Locke E. Bowman |
| Mr. Russell Ainsworth | Ms. Lisa R. Carter | Roderick MacArthur Justice |
| Mr. Joel Feldman | Valorem Law Group LLC | Center |
| Loevy& Loevy | 35 E. Wacker Dr. | Northwestern University |
| 312 North May St. | 30th Floor | School of Law |
| Suite 100 | Chicago, IL 60601 | 357 E. Chicago Ave. |
| Chicago, IL 60607 | (312) 676-5480 | Chicago, IL 60611 |
| (312) 243-5900 | | (312) 503-0844 |

**CERTIFICATE OF SERVICE**

I, Stuart J. Chanen, certify that on September 3, 2011, I served all counsel of record by filing the attached Response Brief with the Court's ECF system.


By:   /s/   Stuart J. Chanen