PX 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


THADDEUS JIMENEZ,                )
                                 )
            Plaintiff,           )
                                 )
      vs.                        )      No. 09 CV 8081
                                 )
CITY OF CHICAGO, et al.,         )
                                 )
            Defendants.          )


        The deposition of JEROME BOGUCKI, pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Carmella T. Fagan, C.S.R., R.P.R., Notary Public

within and for the County of Cook and State of

Illinois, at 357 East Chicago Avenue, in the City of

Chicago, Cook County, Illinois, commencing at 9:50

a.m. on the 20th day of September, 2010.

1             There were present during the taking

2  of this deposition the following counsel:

3

4             RODERICK MacARTHUR JUSTICE CENTER,
              BY:  MR. LOCKE E. BOWMAN

5             (Legal Director, Clinical Associate
              Professor

6             750 North Lake Shore Drive
              Suite 800

7             Chicago, Illinois  60611)
              (312) 503-8576

8
                  Appeared on behalf of

9                 Robert Wilson;

10
             LOEVY & LOEVY,

11            BY:  MR. JON LOEVY
             (312 North May Street

12            Suite 100
             Chicago, Illinois  60607)

13            (312) 243-5900

14               Appeared on behalf of
               The Plaintiff;

15

16            VALOREM LAW GROUP,
             BY:  MR. STUART J. CHANEN

17            (35 East Wacker Drive
             Suite 2900

18             Chicago, Illinois  60601)
             (312) 676-5480

19
                Appeared on behalf of

20               the Plaintiff;

21

22

23

24

```
 1                    There were present during the taking

 2     of this deposition the following counsel:

 3

 4                    ANDREW M. HALE & ASSOCIATES, LLC,
                      BY:  MR. ANDREW M. HALE
 5                    (53 West Jackson Boulevard
                       Suite 1800
 6                     Chicago, Illinois  60604)
                      (312) 341-9646
 7
                          Appeared on behalf of
 8                        The Individually Named Police
                          Officers;
 9

10                    DYKEMA GOSSETT, PLLC,
                      BY:  MR. DANIEL M. NOLAND
11                    (10 South Wacker Drive
                       Suite 2300
12                     Chicago, Illinois  60606)
                      (312) 627-2100
13
                          Appeared on behalf of
14                        The City of Chicago;

15

16     ALSO PRESENT:

17                    MR. MARK SANDERS;
                      MR. RAYMOND SCHALK.
18

19

20

21

22

23

24
```

Page 4

1                         I N D E X

2

3    WITNESS:                              PAGE

4    JEROME BOGUCKI

5
          Examination by Mr. Bowman:          7
6         Continued Examination by Mr. Bowman:  201

7

8

9                    E X H I B I T S
10
          Bogucki Group No. 1               74
11        Bogucki No. 2                    304
          Bogucki No. 3                    306
12        Bogucki No. 4                    308
          Bogucki No. 5                    310
13        Bogucki No. 6                    311

14

15

16

17

18

19

20

21

22

23

24

BREHON REPORTING   (708) 442-4522

1          Q          Will you accept the statement that

2     throughout this investigation, you were the detective

3     who was in charge and responsible for the

4     investigation?

5          A          I would have to say that.  Yes.

6          MR. BOWMAN:  Okay.  I need to take a short

7     break at this point.

8          MR. HALE:  Okay.

9          MR. KOSBERG:  Okay.  Off record, 10:39.

10                    (WHEREUPON, there was a brief

11                    recess had in the proceedings.)

12                    On the record, 10:54.

13    BY MR. BOWMAN:

14         Q          Mr. Bogucki, we were talking about

15    your assignment to the Morro case when we broke.  Can

16    you begin by telling me what the first thing is you

17    did in relation to the investigation after you were

18    assigned to it?

19         A          I drove to the scene, saw there was no

20    one out there, and I already had information that the

21    victim had been taken to the hospital, I believe it

22    was Illinois Masonic, and I proceeded there.

23         Q          Okay.  Let's -- how long did you pause

24    at the scene for?

Page 80

1    look for somebody or something.

2           Q       All right.  And what about page 3?

3    Are these also your notes?

4           A       Yes.

5           Q       Okay.  When did you make these notes?

6           A       I'm not sure.

7           Q       Where did you --

8           A       It would be --

9           Q       Sorry.  Go ahead.

10          A       -- I think -- I think this is -- this

11   is from my interview with Phil Torres at -- at his

12   mother's apartment.

13          Q       All right.  And what -- what leads you

14   to think that?

15          A       It's just my recollection.

16          Q       Are you sure of that?

17          A       Yes.  Now -- now that I'm reading it,

18   I'm quite sure.

19          Q       All right.  And let's look at page 4.

20   What are -- are these also yours?

21          A       Yes.

22          Q       Where did you make these notes?

23          A       I believe this probably was in the

24   hospital, on the 3rd.

1       Q     Are these notes that you made of your

2  interview with Sandra Elder in the hospital on the

3  3rd of February of 1993?

4       A     I believe that's what it is.

5       Q     Are you sure?

6       A     I believe.

7       Q     Can you be sure?

8      MR. HALE:  He just answered that.  He said --

9      MR. BOWMAN:  He says he believes, and I'm

10  ask -- I get that.

11  BY MR. BOWMAN:

12      Q     I'm asking can you be sure?  Yes or

13  no.

14      A     Well, if we had a video of it at the

15  time, I'd be absolutely sure, right, because I

16  don't -- I don't have that kind of knowledge.

17      Q     Okay.  Let's take a look at the next

18  page.  What is this?  This is page 5, for the record.

19      MR. HALE:  Objection to form.

20      THE WITNESS:  These are notes that I took.

21  BY MR. BOWMAN:

22      Q     When did you take them?

23      A     Well, it could be at different times.

24  I can tell that since I've got it marked as first

Page 90

```
 1   those --

 2        A       No.

 3        Q       -- interviews.

 4        A       It would not have mattered.

 5        Q       It wouldn't have mattered?

 6        A       No.

 7        Q       What was the first thing that you did

 8   at 9:30 when you arrived back at Area 5?

 9        A       I don't know what the first thing I

10   did was.

11        Q       Okay.  Can you tell me what you did at

12   Area 5 without regard to sequence, just a list of the

13   things you did at that stage of your investigation?

14        A       Talked to Larry Toufal and Phil

15   Torres.

16        Q       Do you recall doing anything else in

17   relation to this investigation at Area 5 on the

18   evening of February 3, 19 --

19        A       I don't recall.

20        Q       -- '93?  I forgot to ask you this

21   before, and it just popped into my mind.  Since your

22   retirement from the police department, have you been

23   employed?

24        A       I've -- I've had part-time work.
```

1    don't know if they were notified or not at this

2    point, but I would certainly have notified them if it

3    was a very late hour.

4         Q      Okay.  In -- and, to the best of your

5    recollection, you talked to Larry Toufal shortly

6    after 9:30 p.m.?

7         A      Yes.

8         Q      Okay.  Was it a police officer who

9    took Toufal home?

10        A      To my best recollection, yes.

11        Q      Okay.  And then you went to talk with

12   Torres?

13        A      Yes.

14        Q      How old a man was Phil Torres?

15        A      I think he was in his upper 20s.

16        Q      Okay.  Was Torres somebody you had

17   encountered before in your police work?

18        A      No.

19        Q      Did you pull his criminal history

20   report before talking with him?

21        A      I doubt it.

22        Q      When you spoke with Torres, did you

23   speak with him in a police interview room?

24        A      Yes.

1        A        Don't know.

2        Q        How -- after you finished talking with

3    Torres, he was permitted to go home?

4        A        Yes.

5        Q        Was Torres at liberty to go home

6    before you finished talking with him?

7        A        If he wanted to go home, he would have

8    went home.  He could have gone home.  Yes.

9        Q        What about Toufal?  Was he at liberty

10    to go home?

11        A        Yes.

12        Q        Would you have concern about a

13    14-year-old kid just walking out onto the streets at

14    5555 West Grand and leaving the company of the police

15    at 9:30 at night?

16        A        If he would have done that, yeah, I

17    would have had a concern.

18        Q        Right.  So would it be fair to say

19    that Larry Toufal was dependent on the police for a

20    ride home when he was at Area 5 that evening?

21        MR. HALE:  Objection, calls for speculation.

22            But you can answer.

23        THE WITNESS:  I can't -- I can't say what he

24    had on -- in his head, but I'm sure he would have

1    preferred a ride home rather than walking.

2    BY MR. BOWMAN:

3         Q       Okay.  What's the distance from 5555

4    West Grand to Larry Toufal's home?

5         A       It's probably a 15-or-20-minute.

6    Drive.

7         Q       It would be too far to walk?

8         A       Oh, yes.

9         Q       You would have to use public

10   transportation?

11        A       Yes.

12        Q       Are there buses that go?

13        A       I imagine there is.

14        Q       You don't know?

15        A       Not -- specifically, no.

16        Q       So I'll ask it again:  Would it be

17   fair to say that Larry Toufal was dependent on the

18   police for a ride home from Area 5 on the evening of

19   February 3, 1993?

20        MR. HALE:  Objection, calls for speculation,

21   asked and answered.

22                You can answer.

23        THE WITNESS:  He could have used a ride home.

24   Yes.

1           A        Well, after the witnesses left, I

2    started to put facts and -- together and paperwork

3    together and actually started to -- started to write

4    a report.

5           Q        Did you start to prepare a

6    supplemental report?

7           A        Yes.

8           Q        Listing, populating those things that

9    come up at the beginning of the report, who the

10   assigned personnel were and so forth?

11          A        Pretty much.  Yes.

12          Q        Okay.  Anything else?

13          A        Until when?

14          Q        Well, let -- let's put it this way:

15   It's my understanding that at about 1:00 p.m. you

16   received a call from Phil Torres; is that accurate?

17          A        Yeah, that is accurate.

18          Q        Okay.  And it's my understanding that

19   it was 9:30 when you arrived back to Area 5 from your

20   trip to the scene, right?

21          A        Right.

22          Q        So I'm interested in everything you

23   did between 9:30 and 1:00 a.m., and we've established

24   that you talked with Phil Torres and with Larry

1      Q      There was --

2      A      There -- actually, and I can't say

3   this for sure, but the 17th District might have put

4   out a Flash Message out on somebody named Frankie,

5   but I don't know that for sure.  It wouldn't have

6   surprised me.

7      Q      Would that be because of information

8   you gave them or a request that you made?

9      A      No.  It would have probably been from

10  the information they had got.

11     Q      Okay.  Nothing that you asked for?

12     A      No.

13     Q      Did you work on other cases that

14  evening?

15     A      I might have.  I don't know.

16     Q      Do you recall the call from Phil

17  Torres?

18     A      I'm sorry?

19     Q      Do you recall the call from Phil

20  Torres?

21     A      Yes.

22     Q      Do you remember it?

23     A      Not word for word, but I remember it.

24     Q      Okay.  What did -- what happened?

Page 127

```
 1        A        He called up and he says, "We need to

 2    talk."  He says, "I know who did this."  And I said,

 3    "Where are you?"  And he told me, you know, where he

 4    was, and I said, "I'll be right over."

 5        Q        Okay.  Did the call come directly to

 6    you?

 7        A        It probably did.

 8        Q        Had you given him your direct number?

 9        A        Not a direct number, but I gave him my

10    card.

11        Q        Did we have cell phones in 1993?  I --

12        A        I don't think --

13        Q        -- don't remember.

14        A        -- we did.  I don't think I did

15    anyway.

16        Q        So it came on a police line, the --

17        A        Yes.

18        Q        -- call from Torres?  Is there

19    anything that you remember about the conversation

20    other than what you've told me so far?

21        A        About the phone conversation?

22        Q        Yes, sir.

23        A        I pretty much told you what I

24    remember.
```

1   I don't know.  All I could -- all I can say is I

2   don't know.

3          Q       Okay.  As you review Group Exhibit 1,

4   you don't see any notes that you took during the

5   phone call with Phil Torres, fair statement?

6          A       Not that I can identify from that

7   time.  No.

8          Q       Okay.  And you don't have any

9   recollection of taking any notes?

10         A       No.

11         Q       How do you know what time the call

12  came in?

13         A       As far as my recollection at this

14  point?

15         Q       Yes, sir.

16         A       From my court testimony.

17         Q       Okay.  So the -- the 1:00 a.m., is

18  that -- is that what you said before, 1:00 a.m.?

19         A       Yes.

20         Q       And as far as you sit here now, you're

21  just going by what you said before.  You don't

22  independently recall?

23         A       Well, I re -- I recall that it was

24  approximately that time.  Yes.

1        Q      Did you make any record of the time,

2  any kind of call log, anything like that?

3        A      Not that I -- not that I can tell you

4  right now.

5        Q      Okay.  And you've refreshed your

6  recollection of the time that the call came in by

7  looking at your trial testimony from the '90s; right?

8        A      Actually, I do have -- I pretty much

9  have an independent recollection of the timing, and

10  obviously it could have been 1:10, it could have been

11  12:40 or 12:50, you know, but it was approximately

12  1:00 a.m.

13        Q      And what's that based on?

14        A      Pardon?

15        Q      What's that based on?

16        A      On my independent recollection.

17        Q      And I'm asking you:  What's the basis

18  for your recollection?  How come you remember all

19  these years later the time that this call arrived?

20        A      I don't know.

21        Q      You just do?

22        A      Yes, sir.

23        Q      Okay.  When you went to Phil Torres's

24  home -- I'm sorry.  Where did you go exactly?

```
 1    something I should have said," or -- or whether the

 2    family was -- was still -- was still up.

 3          A       Well, those four people were up.   I

 4    can't tell you about anyone else.

 5          Q       Was everybody fully dressed?

 6          A       Yes, as far as I -- I don't remember

 7    that they won't -- were not.  Let me put it that way.

 8          Q       Where did you speak with them?

 9          A       Pardon?

10          Q       Where in the home did you speak with

11    them?

12          A       Can't recall.

13          Q       As you sit here now, can you draw up a

14    mental image of Shawn Cosmen?

15          A       No, I cannot.

16          Q       What about Kevin Cosmen?

17          A       I cannot.

18          Q       What about Donna Cosmen --

19          A       No.

20          Q       -- if she was there?  These are blanks

21    to you?

22          A       Pretty much.

23          Q       All right.  What do you remember of

24    the conversation that took place?
```

1       A      Well, I remember that Torres started

2  out by telling me that it was somebody he knew from

3  the neighborhood that did this, his name was T.J.,

4  and that he had previously told Larry that it was

5  T.J., but he didn't say anything because Larry told

6  him it wasn't.

7           Then the conversation went into

8  motive, which was an earlier incident during the day

9  between Eric Morro and T.J. Then -- then somehow

10  it -- it got to where T.J. lives, and I'm not quite

11  sure who had that information, but someone did.

12       Q      All right.  Is there anything else

13  that you remember from the conversation?

14       A      Specifically?  No.

15       Q      What about --

16       A      I mean, independently?  No.

17       Q      Okay.  There may be more information

18  in your reports, but in terms of your recollection as

19  you sit here today, that's it?

20       A      In general, that's -- that's -- that's

21  what was talked about.

22       Q      Now, was everybody in the same room as

23  you were having the conversation with Phil Torres;

24  Shawn and Kevin and possibly Donna and yourself all

1        A        I doubt it, but it's a long time ago.

2   Maybe.

3        Q        Possible?

4        A        I guess it's possible.  I don't think

5   so.  Typically after someone's name and identifiers,

6   if a phone -- if a phone number is there and it's not

7   their own phone number, I would put that in

8   parentheses, that that's her grandmother's phone

9   number.  I mean, that would be typical for me.

10       Q        Did somebody tell you something in

11   this conversation at Phil Torres's mother's house

12   about a Duke jacket?

13       A        Yes.

14       Q        Who said that?

15       A        Phil Torres.

16       Q        Phil Torres?

17       A        Yes.

18       Q        Said that T.J. has a Duke jacket?

19       A        Yes.

20       Q        Okay.  Is that what he said, "T.J. has

21   a Duke jacket"?

22       A        I don't know what his words were.

23       Q        Okay.  Is that how you interpret this?

24       A        I interpret that he was wearing a Duke

1    jacket at the time of the murder.

2        Q       Okay.  So there are two possible

3    interpretations here:  That Phil Torres told you that

4    T.J. wears a Duke jacket; another possibility is that

5    the offender was wearing a Duke jacket.  Can you

6    determine which one it is?

7        A       I believe it's one and the same.

8        Q       Well, there's a possibility that T.J.

9    didn't commit this murder, right?

10       A       Not to my knowledge.

11       Q       Okay.  Well, let -- let me ask you

12   about that:  Do you have any doubt in your mind as

13   you sit here today that Thaddeus Jimenez killed Eric

14   Morro?

15       A       Well, I wasn't there, so it's --

16   it's -- it's not for me to decide that.  With the

17   information I had from my -- from the witnesses, I

18   had no doubt in my mind that Thaddeus Jimenez should

19   have went to court, and from there, it should be

20   determined whether he did it or not.

21       Q       Well, after Thaddeus Jimenez went to

22   court, you had this tape come to your attention,

23   right?

24       A       Yes.

1          MR. HALE:  Objection, a lack of foundation,

2     calls for speculation.

3               You can answer.

4     BY MR. BOWMAN:

5          Q     Did you ever listen to the tape?

6          A     No, I did not.

7          Q     Did you ever get someone to translate

8     the tape?

9          A     I did not.  No.

10         Q     Did you take any investigative steps

11    whatsoever after you got the tape?

12         A     No.  The -- the case was then into the

13    state's attorney's office.  They were full aware of

14    the tape.  They had the tape in their -- in their

15    hands.  It was their case at that point.  They were

16    let know that, you know, anything you want us to do,

17    tell us, we will.  They have -- they also have

18    investigators.

19         Q     You didn't have any concern that an

20    error might have been committed?

21         A     I -- I didn't know what to make of it.

22    It was unusual.  It could have been a total

23    falsification.

24         Q     Let me ask the question again, and I

Page 166

1    conversation with Phil Torres and the other

2    individuals at Torres's mother's house?

3            A       I went back into the Area 5.

4            Q       And what did you do at Area 5?

5            A       No.  I actually -- I did not at this

6    point.  I'm sorry.  I -- I think I would have went

7    right to Larry Toufal's house.

8            Q       Okay.  And that's the address that

9    appears on the page of notes that you made when you

10   were talking to Larry Toufal?

11           A       I can only assume that.  Yes.

12           Q       All right.  And what time was it that

13   you arrived at Larry Toufal's house?

14           A       It -- I believe it was about 3:00 in

15   the morning.

16           Q       Who was present at Larry's (sic)

17   Toufal's house when you arrived there?

18           A       There were family members there.  I

19   don't -- I'm not sure who they were.

20           Q       What kind of a place was it?

21           A       I think it was an apartment.

22           Q       What floor?

23           A       Pardon?

24           Q       What floor?

1          A          I don't know.

2          Q          Did you go there by yourself?

3          A          Yes.

4          Q          Okay.  And were folks awake at the

5     house or asleep?

6          A          I -- I think I had to wake them up.  I

7     mean, I think it's -- from what I recall, I don't

8     recall that they were awake.

9          Q          It would be unusual for the family to

10    be awake at 3:00 in the morning?

11         A          Yes.

12         Q          And did you consider whether you might

13    want to wait until the next morning to speak with

14    Larry Toufal about this new information?

15         A          No.  That wasn't under consideration.

16    It needed to be done then.

17         Q          Okay.  Why is that?

18         A          Well, this is a -- what was looking to

19    be a gang case and it had to be -- people had to be

20    talked to rather quickly.

21         Q          Why is that?

22         A          To avoid any intimidation or -- and

23    that type of thing.

24         Q          So you thought it was important to

1    Torres or did someone else?

2         A      I don't know.

3         Q      Do you have any information as to what

4    was said to Larry Toufal when he was requested to

5    come to Area 5 to view a lineup?

6         A      No.

7         Q      Did you request that of Larry Toufal

8    or did someone else?

9         A      I don't know.

10        Q      Why is it that Larry Toufal didn't

11   come on his own?

12        A      I believe, if I -- my memory serves me

13   correct, he needed a ride.

14        Q      So as a general matter, Larry Toufal

15   was dependent on the police for transportation to and

16   from Area 5, fair?

17        A      So it seems.

18        Q      Prior to the lineup, where was Tina

19   Elder situated?

20        A      I believe that Tina Elder and all --

21   and all the witnesses were in the -- what we called

22   the homicide office at the time.

23        Q      And describe the homicide office.

24        A      It's an office with four desks.  They

1    kept homicide file -- files in there, and witnesses

2    would be kept there, out of sight of the lineup room.

3         Q         Okay.  And your recollection is that

4    the four witnesses were all placed in that same room

5    at the same time?

6         A         To begin with, yes.

7         Q         Was any officer in the room with them

8    or were they by themselves?

9         A         I don't know.

10        Q         All right.  Did you make any effort to

11   insure that an officer was with the witnesses?

12        A         No, not that I remember.

13        Q         Who were the personnel, police

14   personnel, who participated in the administration of

15   the lineup?

16        A         Myself and Detective Sanders.

17        Q         All right.  Forgive me.  I know I've

18   been over this with you before.  Sanders was in the

19   room with the lineup participants and you were in the

20   room with the witnesses?

21        A         Correct.

22        Q         That's the way it worked?  And I

23   understand from material I've read that you had to

24   get the fillers from one of the local schools?