**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **THADDEUS JIMENEZ,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 09 C 8081** |
| ) | |
| **CITY OF CHICAGO, JEROME BOGUCKI,** ) | |
| **MARK SANDERS, RAYMOND SCHALK,** ) | |
| **FERNANDO MONTILLA, LAWRENCE RYAN,** ) | |
| **and ROBERT WHITEMAN,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Thaddeus Jimenez has sued the City of Chicago and six Chicago police

detectives and officers for claims arising from his wrongful conviction of the murder of

Eric Morro.[1]  Jimenez asserts due process, failure to intervene, and conspiracy claims

under 42 U.S.C. § 1983 and state law claims for malicious prosecution, intentional

infliction of emotional distress, conspiracy, respondeat superior, and indemnification.

The police officer defendants have moved for summary judgment.  For the reasons

stated below, the Court grants the summary judgment motion in part and denies it in

part.

---

[1] In his response to defendants' motion for summary judgment, Jimenez voluntarily dismissed his claims against defendants Montilla, Ryan, and Whiteman.  The Court therefore considers only the three Chicago police detectives who remain, Bogucki, Sanders, and Schalk.

**Background**

A.     **The shooting**

On the evening of February 3, 1993, nineteen-year-old Eric Morro was walking

west on Belmont Avenue in Chicago with fourteen-year-old Larry Tueffel.  On the street

they passed two boys, one of whom was Victor Romo.  Romo confronted Morro about

money he owed to someone named Leo, and a scuffle resulted.  The other boy who

was with Victor pulled a gun and shot Morro.  The two boys fled.  Tueffel initially ran as

well but returned to check on Morro.  Morro was taken to a hospital but was pronounced

dead on arrival.

At the scene, Tueffel and Phil Torres,[2] who lived near the scene of the crime,

described the incident to police.  Tueffel also provided a description of the shooter,

stating that he was thirteen or fourteen, five feet and four or five inches tall, and curly

black hair; was wearing a purple jacket with yellow lettering, baggy blue jeans; and was

carrying a small-caliber silver handgun.  This description did not match Jimenez, who

did not have curly hair and owned a blue and white Duke University jacket.  Phil

likewise did not identify Jimenez as the shooter when he spoke to police at the scene.

At one point, however, Phil and Tueffel were seated in the back of a squad car

together, and Phil asked Tueffel if Jimenez had shot Morro.  Tueffel denied that

Jimenez had been the shooter.

Detective Jerome Bogucki was assigned to the case and began his investigation

on the night of the shooting at the hospital where Morro had been taken.  He spoke to

---

    [2] For the sake of convenience and clarify, the Court will refer to Phil Torres as
"Phil" and to Juan Carlos Torres (referenced in a few moments) as "Juan Carlos."

Sandra Elder, who stated that she and her daughter Tina[3] had witnessed the shooting. Bogucki was not able to interview Tina at the time. Bogucki also interviewed Tueffel and Phil at a police station on the night of the shooting. Again, neither identified Jimenez as the shooter.

**B.    Phil Torres**

The parties dispute the next events. The defendants contend that at 1:00 a.m. on February 4, Phil called Bogucki to change his story. Phil stated that he had seen the shooting from his third-floor apartment window and that Jimenez was the shooter. Defendants say that Bogucki then went to the home of Phil's mother, where Phil said that he knew Jimenez and that he saw the shooter wearing a blue and white Duke jacket. According to defendants, Phil told Bogucki that Tueffel had denied that Jimenez shot Morro but explained that he suspected that Tueffel was trying to protect Jimenez. Bogucki also talked to Phil's younger siblings, Shawn and Donna Cosman, who provided a motive for the shooting by telling the detective of an altercation earlier in the day between Jimenez and Morro.

Jimenez's version of the events is different. He asserts that Phil saw only part of the incident from his window and did not actually see the shooting occur. Jimenez contends that Phil did not call the police to change his story but rather that Bogucki showed up without invitation at 1:00 a.m. to talk with him. Jimenez also asserts that the police took Phil to a police station to interview him and did not simply talk to Phil at his mother's house. According to Jimenez, Phil did not want to be a witness and was high

---

[3] For the sake of convenience, the Court will refer to Sandra Elder as "Sandra" and to Tina Elder as "Tina."

that night, so he would not have willingly contacted the police or gone with them.

Jimenez contends that because Phil had not been an eyewitness to the shooting, the

only thing he could have told the police was that his siblings knew of a possible motive

for Jimenez to attack Morro. Additionally, Jimenez argues, Phil did not mention a Duke

jacket but instead described the colors of the jacket; he says the police were the first to

say that the jacket had a Duke inscription. Finally, Jimenez asserts that the police

pressured Phil to say that Jimenez had been the shooter by telling him "that other

people (including his sister) were claiming that the shooter was in fact [Jimenez], and

finally, [Phil] agreed to say it was [Jimenez]." Pl. Stat. of Undisputed Facts ¶ 21.

## C.  Larry Tueffel

During Larry Tueffel's initial interview with Bogucki on the night of February 3, he

did not identify Jimenez as the shooter and instead told the detective that a person

named Frankie had shot Morro. Tueffel was then driven home. After Bogucki and

Detective Mark Sanders talked to Phil, they went to Tueffel's house, arriving between

3:00 and 4:00 a.m. on February 4. Jimenez contends that they gave Tueffel no choice

but to accompany them to the police station and did not allow Tueffel's parents to

accompany him even though he was only fourteen years old. It is undisputed that

Tueffel was awakened and taken to a police station without his parents.

At the station, Tueffel told the police that he knew the shooter by sight but not by

name. Tueffel was friends with Jimenez and sometimes spent time with him. The

police told Tueffel that other witnesses had identified Jimenez as the shooter, and they

accused him of lying and covering up for Jimenez. They also asked Tueffel if the

shooter had been wearing a Duke jacket, contrary to Tueffel's earlier description.

4

Although Tueffel was scared because the police were yelling and screaming at him, he repeatedly stated that Jimenez had not shot Morro. The police told Tueffel that he would go to jail and continued to interrogate him for two hours, even though he asked to be taken home. After two hours, exhausted and crying, Tueffel broke down and told the police that Jimenez had been the shooter.

In deposition testimony, Jimenez stated that he was able to overhear Tueffel's interview for less than one minute. Def. Ex. 21 at 420–22. He was able to identify Tueffel's voice and could tell that the police were yelling and accusing Tueffel of lying.

Bogucki and Sanders arrested Jimenez around 4:00 a.m. that morning.

**D.     The lineup**

Later on the morning of February 4, Jimenez was placed in a lineup to be viewed by Larry Tueffel, Phil Torres, Sandra Elder, and Tina Elder. The Elders and Phil drove together to the police station to view the lineup. They also smoked outside of the station before going in to see the lineup. Pl. Ex. 6 at 22–23. During the ride and while smoking, they discussed Morro's death.

After entering the police station, the witnesses were kept separate. Phil and Tueffel identified Jimenez in the lineup. Jimenez contends that the police manipulated the lineup by asking them to pick him out rather than asking them to pick out the shooter. Sandra Elder picked out Jimenez and another one of the lineup participants and said that both looked like the shooter.

Before Tina Elder viewed the lineup, a police officer seated her at a desk. On the desk, she saw two Polaroid pictures sitting next to each other, one of Morro's body

and one of Jimenez.  No police officer discussed the photos with Tina.  Jimenez contends, however, that a police officer told Tina that Jimenez was the primary suspect. When Tina was taken to view the lineup, she identified Jimenez as the shooter.  She was not interviewed by police until after she had seen the photo and had picked Jimenez in the lineup.

Sandra Elder testified at a deposition that she saw the picture of Jimenez as she was walking out of the lineup room and thought that everyone else had seen it as well. Def. Ex. 12 at 35–36.  Sandra also said, however, that Tina did not tell her that she had seen the picture before viewing the lineup.  Tina did not tell anyone she had seen the picture until 2007.

### E.    Victor Romo and Juan Carlos Torres

On February 10, Victor Romo turned himself in and confessed to Bogucki and Detective Raymond Schalk that he had been at the scene of the shooting.  This was six days after the authorities had already arrested and charged Jimenez for the murder. Romo stated that Jimenez was not the shooter and that he did not even know Jimenez. Instead, he claimed that the shooter was Juan Carlos Torres and that Juan Carlos was wearing a gold jacket at the time.

Victor's father, Ezequiel Romo, told the detectives that Victor had first confessed to him.  Ezequiel said that he then spoke to Juan Carlos and that Juan Carlos had admitted shooting Morro after Morro had punched him in the face.  The Romos provided detectives with Juan Carlos's address and a map of how to get to his home. Bogucki and Schalk located Juan Carlos and interviewed him.

6

Later, Victor Romo's defense attorney presented Bogucki, Schalk, and Assistant State's Attorney Gina Savini with a tape recording that he said included a confession by Juan Carlos, in Spanish, to Ezequiel Morro. Savini took possession of the tape, but the detectives made a copy. They did not list the tape as evidence in Jimenez's case. Nor did they listen to the tape, have it translated, or request that a Spanish-speaking officer listen to it. Bogucki and Schalk did interview Juan Carlos again on March 8. He denied that he had confessed to Ezequiel Morro.

Jimenez claims that on the recording, Juan Carlos stated, "when he hit me and I wanted to shoot him," "when I fired the shot, I ran," and "they pinned the other blame on the, the other gang boy." Pl. Stat. of Undisputed Facts ¶ 59. Defendants contend that an expert they have retained has determined that the recording is fraudulent.

Victor Romo was tried as a juvenile for his part in the shooting. He testified at his trial that Juan Carlos was the shooter. Larry Tueffel also testified at Romo's trial. He stated that Jimenez was the shooter and that he had told the police this after they confronted him with the fact that there was another witness and that he was not telling the truth. The court found Romo delinquent—the equivalent of a finding of guilt.

## F.    Thaddeus Jimenez's trials

Jimenez was indicted on June 24, 1993 for Morro's murder. At his trial, Larry Tueffel, Phil Torres, and Tina Elder identified Jimenez as the shooter. Tueffel and Phil also testified about their conversation in the squad car at the scene of the crime. Jimenez's lawyer cross-examined Tueffel about the different stories he had told the police. Both Bogucki and Tueffel testified about the early morning interview, but neither

7

revealed (either before or at the trial) that the police had threatened and yelled at Tueffel for two hours before he implicated Jimenez.  Instead, in his testimony at the trial, Tueffel explained that he had initially not identified Jimenez as the shooter because they were members of the same gang and he was afraid of implicating a fellow gang member.  Victor Romo testified that the person who shot Morro was Juan Carlos Torres, not Jimenez.

Jimenez was convicted on October 4, 1994 and was sentenced to a fifty-year prison term.  The Illinois Appellate Court overturned his conviction because the trial court had not asked prospective jurors whether Jimenez's gang affiliation would affect their opinions of the case.

At Jimenez's second trial, Tueffel, Phil Torres, and Tina Elder again identified Jimenez as the shooter.  Tueffel and Phil again testified about their conversation in the squad car.  Bogucki and Tueffel again testified about the early morning interview without testifying to the length of the interview, the yelling, or the threats.  Tueffel explained again that he feared pointing the finger at a fellow gang member.  Victor Romo again testified that Juan Carlos, not Jimenez, was the shooter.  At both trials, Jimenez attempted to introduce the taped confession of Juan Carlos to Ezequiel Romo, but the court refused to admit it or Ezequiel's related testimony.  Jimenez was convicted again on November 11, 1997 and was sentenced to forty-five years' imprisonment.

### G.    Thaddeus Jimenez's exoneration

Jimenez maintained his innocence after his second conviction and obtained assistance from the Northwestern Law School's Center on Wrongful Convictions.

In 2006, an investigator working on Jimenez's case visited Larry Tueffel, who

8

had been diagnosed as a paranoid schizophrenic in 2001 or 2002, in the residential facility where he was living and being treated. "Larry immediately told him that [Jimenez] was innocent." Def. Stat. of Undisputed Facts ¶ 61 (internal quotation marks omitted). Lawyers and investigators met with Tueffel and obtained written and video statements in which he recanted his testimony identifying Jimenez as the shooter; identified Juan Carlos Torres as the actual shooter; and detailed his treatment by the police during his early morning interview on February 4, 1993.

Attorneys for Jimenez then showed the videotaped recantation to Tina Elder in May 2007. They did not tell her that Tueffel had been diagnosed with a mental illness or was in a residential treatment facility at the time of the recantation. Tina informed the lawyers that she had seen a picture of Jimenez before being shown the lineup and signed an affidavit to that effect. In her deposition testimony, Tina stated that she still believed that Jimenez was the shooter but that Tueffel's recantation had given her more doubts.

In June 2008, attorneys for Jimenez convinced the Cook County State's Attorney's Office to reinvestigate his conviction. Jimenez contends that county investigators located a man Leo Robles, to whom Morro had owed money and who admitted throwing the murder weapon into the Chicago River. Jimenez asserts that Robles received the gun from a man who received it from Juan Carlos Torres. Investigators also spoke to Juan Carlos, who denied knowing Victor Romo. They asked Juan Carlos to listen to the tape that Ezequiel Romo claimed contained his confession. Juan Carlos said that he would do so after obtaining counsel, but instead he fled the state.

9

On May 1, 2009, Jimenez and the State's Attorney jointly asked a Cook County judge to vacate Jimenez's conviction. Judge Joseph M. Claps vacated the conviction and then granted the State's Attorney's motion to dismiss the charges. On June 3, 2009, Cook County Criminal Court Chief Judge Paul Biebel granted Jimenez a certificate of innocence, which required a finding that he was factually innocent. 735 ILCS 5/2-702(g)(3).

Also in May 2009, Juan Carlos was arrested in Indiana and was indicted for the murder of Morro. He is currently awaiting trial.

### Discussion

On a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus a court may grant the motion "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Defendants make five arguments in support of their motion for summary judgment: (1) Jimenez's due process claim fails on the merits; (2) they are entitled to qualified immunity; (3) Jimenez cannot satisfy the elements of his state-law malicious prosecution claim; (4) the remaining claims are contingent and will fail if the Court grants summary judgment on the due process and malicious prosecution claims; and (5) Jimenez has not shown personal involvement by Sanders or Schalk in the alleged

10

wrongdoing.

## A.    Due process claim

Jimenez contends that the defendants violated his due process rights by "deliberately with[holding] exculpatory evidence—such as the police manipulation of witnesses that resulted in fabricated witness testimony—and fabricat[ing] false reports and other evidence . . . .  The Defendant Officers' misconduct directly resulted in the unjust criminal conviction of [Jimenez], thereby denying him his constitutional right to a fair trial."  Compl. ¶¶ 45–46.

The Constitution's Due Process Clause guarantees a fair trial, and Jimenez can sue under section 1983 for a violation of that guarantee.  *See Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006); *Newsome v. McCabe*, 256 F.3d 747, 751–52 (7th Cir. 2001).  In particular, police officers are liable if they withhold material exculpatory evidence.  *Newsome*, 256 F.3d at 752; *see Brady v. Maryland*, 373 U.S. 83, 87 (1963).

> A *Brady* violation can be broken down into three basic elements: (1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, materiality.  Evidence is suppressed when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) evidence was not otherwise available to the defendant through the exercise of reasonable diligence.  Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

*Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008) (citations and internal quotation marks omitted).

Beyond withholding evidence, Jimenez claims that the defendants created false evidence and testified falsely against him.  The Seventh Circuit has held that section 1983 does not provide a remedy for claims of malicious prosecution or violation of substantive due process rights, if state law provides an adequate remedy.  *See Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010); *Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002).  Illinois recognizes the tort of malicious prosecution.  *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011) (no section 1983 claim when plaintiff alleged that police planted drugs in her car but she was not prosecuted).  Section 1983 does, however, "provide[ ] a remedy for certain forms of trial-based government misconduct based on violations of due process," because a "fair and impartial trial [is] guaranteed by the U.S. Constitution."  *Ienco*, 286 F.3d at 998–99; *see Tully v. Barada*, 599 F.3d 591, 594–95 (7th Cir. 2010).

A plaintiff can bring a section 1983 claim when the government withheld exculpatory evidence or used unduly suggestive identification procedures and the plaintiff's right to a fair trial was violated.  *See Newsome*, 256 F.3d at 752; *Alexander*, 433 F.3d at 555.  Similarly, when police induce false testimony, create false evidence, and commit perjury, this gives rise to a claim under section 1983.  *See Manning v. Miller*, 355 F.3d 1028, 1032–33 (7th Cir. 2004).  This is true even though the Seventh Circuit has stated that "[t]he Constitution does not require that police testify *truthfully*," *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006), and even though all witnesses who testify at trial, including police but excepting complaining witnesses who instigate the prosecution, are "granted absolute immunity from civil liability."

12

*Manning*, 355 F.3d at 1031; *see Gauger v. Hendle*, 349 F.3d 354, 358 (7th Cir. 2003)

*overruled in part on other grounds by Wallace v. City of Chicago*, 440 F.3d 421, 423

(7th Cir. 2006).[4]  "[T]he constitutional rule is that the defendant is entitled to a trial that

will enable jurors to determine where the truth lies," and the *Brady* analysis governs

whether a plaintiff has shown that he did not have such a trial.  *Sornberger*, 434 F.3d at

1029; *see Manning*, 355 F.3d at 1032–33.

The Court therefore must assess, using the *Brady* framework, whether a

reasonable jury could find that the misconduct Jimenez describes deprived him of a fair

trial.  Jimenez argues that the police violated his right to a fair trial by withholding or

tampering with five different categories of evidence:  (1) the circumstances leading up

to and surrounding Larry Tueffel's eventual identification of Jimenez as the shooter; (2)

evidence regarding whether Phil Torres was a witness and whether he voluntarily

contacted the police and identified Jimenez as the shooter; (3) the circumstances

leading up to and surrounding Tina Elder's identification of Jimenez in the lineup; (4)

evidence that the police induced key witnesses to give false statements including that

---

[4] Jimenez argues that absolute immunity is not a consideration here because knowing use of false testimony violates a criminal defendant's due process rights, and the City has agreed that it will be liable if one of the police officer defendants has violated his constitutional rights.  *See Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001); Pl. Ex. 42 ¶ 4.  But the agreement between the City and Jimenez does not state that the City will pay damages even if the officers are immune from suit.  *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  That said, defendants did not make an absolute immunity argument in their summary judgment motion or opening brief, nor does the Court understand Jimenez to ground his claim on false testimony by one or more of the defendants.  As in *Manning*, the fact that Jimenez cites allegedly false testimony by one or more of the defendants does not insulate them from liability for their non-testimonial actions.  *Manning*, 355 F.3d at 1033 (citing *Ienco*, 286 F.3d at 1000).  Any contrary argument would be frivolous.

the shooter was wearing a Duke jacket and failed to disclose that they had mentioned a Duke jacket before the witnesses did; and (5) three pieces of physical evidence that police withheld from Jimenez and his attorneys.

## 1.     Larry Tueffel's identification

Defendants did not disclose the circumstances of the late-night interview during which Tueffel allegedly identified Jimenez as the shooter only after police repeatedly called him a liar and yelled at and threatened him for two hours. Defendants argue that this information was not suppressed because it was otherwise known to Jimenez or available through reasonable diligence. They note that Jimenez heard part of Tueffel's late-night interview and that Tueffel admitted at Jimenez's trials that he had initially not identified Jimenez as the shooter. They contend that any parts of Tueffel's story that Jimenez did not know about could have been obtained by interviewing Tueffel or through cross-examination.

But Jimenez did not know much about Tueffel's interview with the police. Jimenez stated that he heard less than one minute of Tueffel's interview. Def. Ex. 21 at 420–22. He heard only the police yelling and accusing Tueffel of lying and Tueffel stating that he was not lying. *Id.* at 421–22. Jimenez did not know that before Tueffel implicated him, this went on for two hours, police told Tueffel they had other witnesses contradicting him, and they threatened him with arrest. Jimenez also did not know that Tueffel had been taken from his home in the middle of the night, that he felt that he had no choice but to go with them, or that he was brought to the police station without his parents. Pl. Ex. 2 at 36–37.

Defendants cite cases concluding that the circumstances of a criminal

14

defendant's allegedly coercive interrogation are not *Brady* material because the defendant knows those circumstances. *E.g.*, *Sornberger*, 434 F.3d at 1028–29; *Gauger*, 349 F.3d at 360; *see Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007) (police had no obligation to disclose alibi because defendant was aware of his own alibi); *United States v. Dawson*, 425 F.3d 389, 393 (7th Cir. 2005) (conversations that defendant was a part of are not *Brady* material). That, however, is not what this case involves. Unlike the plaintiffs in those cases, Jimenez did not have within his own knowledge significant portions of the material facts concerning the alleged coercion of Tueffel. And, just as importantly, no Seventh Circuit case extends *Gauger* in this context. In any event, even if these cases extend to the circumstances of an interview of a witness other than a defendant, Jimenez had knowledge of only a small part of the allegedly coercive circumstances of Tueffel's middle-of-the-night interview.

Defendants also contend that Jimenez's defense attorneys could have questioned Tueffel to learn about the circumstances of his interview. If Jimenez did not learn of those circumstances, defendants argue, it is only for lack of reasonable diligence. Defendants note that Jimenez was aware that Tueffel had initially not identified him as the shooter and heard the police call Tueffel a liar and that Tueffel told Jimenez before the first trial that "they made me do it." Pl. Stat. of Undisputed Facts ¶ 79. Defendants argue that *Brady* did not obligate them to provide Jimenez with what would amount to a transcript of Tueffel's late-night interview or to describe exactly what tone they used when questioning him.

To support their argument, defendants cite *United States v. Lockhart*, 956 F.2d

1418, 1426 (7th Cir. 1992). In that case, the Seventh Circuit stated that "[w]e simply find no merit in the contention that the government was required to transcribe the recantation of a witness available to the defendant." Defendants also cite *Holland v. City of Chicago*, 643 F.3d 248, 256 (7th Cir. 2011), in which the court held that it was not a violation of *Brady* for police not to disclose pressure they put upon a witness to change her story in a case in which the accused knew that the witness had changed her story.

These cases are nothing like this one. *Lockhart* involved a witness who had recanted statements that implicated the defendant. *Lockhart*, 956 F.2d at 1422. The prosecution did not call the witness at trial but did inform the defendant and the court of the recantation. The defendant declined to call the witness. *Id.* Given these circumstances, the court did not accept the defendant's contention that the government was required to disclose specific details of the recantation. *Id.* at 1426. A key distinction between *Lockhart* and the present case is that, in *Lockhart*, the core exculpatory evidence (the recantation) was disclosed; here, a jury reasonably could find it was not.

In *Holland*, the police showed Holland to the victim of a rape three times, and each time she denied that he was her attacker. *Holland*, 643 F.3d at 251–52. She later claimed that the police then pressured her to identify Holland as the perpetrator, telling her that they had other evidence that Holland was her attacker and that she could go home once she made a positive identification. *Id.* at 252. During a fourth show-up, the victim identified Holland as the attacker. *Id.* After DNA evidence exonerated him, the

court rejected Holland's claim that the police had violated *Brady* by failing to disclose the pressure they had put on the victim. *Id.* at 256. The court reasoned that a defendant "has the responsibility to probe the witnesses and investigate their versions of the relevant events." *Id.* (internal quotation marks omitted). Because Holland knew that the victim had not identified him as the attacker three times, the court concluded that it was his responsibility to ask what had happened before she finally did identify him. *Id.*

Again, however, this case is different. First, a reasonable jury could find that Jimenez did not know, and was never told, that Larry had repeatedly refused to identify him in the late-night interview. By contrast, the plaintiff in *Holland* had been told by the police that the victim had three times denied that he was her attacker before changing her story. Second, Tueffel was not exclusively in police custody from the time that he initially failed to identify Jimenez to the time when he did. Unlike the victim in *Holland*, he had time to go home and have an unforced change of heart. Without disclosure of what the police had done in the late night interview, Jimenez could not know that Tueffel changed his story due to coercive tactics by the police. Finally, Tueffel actually testified about his change-of-story at trial and provided a reason other than police pressure—an inculpatory reason at that (fear of implicating a fellow gang member). Although Tueffel has since stated that he changed his story because of police pressure, a reasonable jury could find that there is no basis to believe that, if interviewed, even intensively, by Jimenez's defense lawyers at the time of Jimenez's criminal trials, Tueffel would have told them anything different from what he testified at those trials.

17

More generally, the Seventh Circuit has stated that:

> We regard as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for *Brady* purposes. To begin with, it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses. Sometimes, a defense witness may be uncooperative or reluctant. Or, the defense witness may have forgotten or inadvertently omitted some important piece of evidence previously related to the prosecution or law enforcement. Or, as may have been the case here, the defense witness learned of certain evidence in the time between when she spoke with defense counsel and the prosecution.

*Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001) (citations omitted). The court went on to say in *Boss* that in cases like that one (and the present one):

> the question is whether defense counsel had access to *Brady* material contained in a witness's head. Because mind-reading is beyond the abilities of even the most diligent attorney, such material simply cannot be considered available in the same way as a document. But, the position the state advances would require a defense witness's knowledge to be treated exactly as information in a document the defense possesses. *This stretches the concept of reasonable diligence too far.*

*Id.* at 741.

Judge Williams' sage comments on the court's behalf in *Boss* apply equally here. Defendants' argument seems to assume the existence of a *Perry Mason*-like world in which prosecution witnesses readily give up impeaching information when interviewed or questioned by defense counsel. Real life does not work that way, or at least the governing legal rule cannot realistically be premised on the assumption that it always works that way. Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders. A legal rule that assumes that such a witness will readily describe the circumstances of the coercion or persuasion simply because the other side's lawyer asks the witness the right question

18

would defy common sense. And just as importantly, it would effectively render *Brady* and its progeny, including *Giglio v. United States*, 405 U.S. 150 (1972), a dead letter: if the governing rule is predicated on the assumption that a prosecution witness will, if interviewed by the defense, disclose impeaching information, then the prosecution effectively is relieved of the legal responsibility under *Brady* and *Giglio* to disclose that information.

All of that aside, if one draws reasonable inferences in Jimenez's favor as required on summary judgment, a reasonable jury could find that he could not have obtained the circumstances of Tueffel's interview through reasonable diligence. The evidence suggests that Tueffel felt he had no choice but to testify against Jimenez; when the police came to pick him up after he tried to avoid coming to court, there is evidence that he said that "you guys have the wrong guy," but he nonetheless testified and named Jimenez as the shooter. Pl. Stat. of Undisputed Facts ¶¶ 35, 37. Further, as the Court has noted, Tueffel was directly asked at trial the reason for his changed story. In response, he said not that he had been pressured to inculpate Jimenez, but rather that he had initially feared implicating Jimenez because they were in the same gang. A reasonable jury could find there is no basis to believe that Tueffel would have said anything different had Jimenez's attorneys interviewed him before trial.[5]

Defendants also argue that the doctrine of judicial estoppel should preclude Jimenez from now arguing that Tueffel was pressured by police. They base this

---

[5] It is worth noting that defendants' legal theory also assumes that prosecution witnesses like Tueffel are always willing to submit to a pretrial interview by defense counsel or investigators, another belief that is not borne out in real-life experience.

argument on the fact that at the criminal trial and on appeal, Jimenez argued that Tueffel had changed his version of the events due to pressure from his gang and that Jimenez should have been able to introduce evidence to that effect. This argument is entirely lacking in merit. Jimenez did not succeed with his gang pressure argument. As a result, the doctrine of judicial estoppel does not apply. *See Levinson v. United States*, 969 F.2d 260, 264–65 (7th Cir. 1992) ("a litigant is not forever bound to a losing argument"). Even were this not enough by itself to take estoppel out of the picture, the information about the amount of police pressure applied to Tueffel is new, and use of new information is not barred by judicial estoppel. *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir. 1993) ("judicial estoppel is not an absolute bar to obtaining legal relief on the basis of new information, even if inconsistent old information had gotten the party an advantage in some other proceeding").

**2.      Phil Torres's identification**

Defendants argues that Jimenez knew about the circumstances surrounding Phil Torres's identification of him, such as the fact that Phil had not identified him at the scene of the crime, or that Jimenez could have found this out through reasonable diligence. What was available through reasonable diligence, however, is very much in dispute.

Phil was a reluctant witness who stated several times during his deposition that he did not want to be a witness and would not have talked with the police voluntarily. Def. Resp., Ex. 2 at 34, 42–43. During his deposition, he attempted to walk out before the lawyers had finished questioning him, and they were able to get him to answer

questions only by promising that there would be only fifteen minutes of questions per side. *Id.* at 27–30. Further, Phil stated that he used drugs at the time of the criminal investigation as well as subsequently, and he blamed his faulty memory on this. *Id.* at 5, 12, 41, 71. Based on this evidence, there is a genuine issue of fact regarding what Jimenez would have obtained through a pretrial interview with an uncooperative and intoxicated or addicted witness.

Defendants also contend that it is undisputed that Phil identified Jimenez as the shooter. But Phil's deposition testimony is contradictory and does not clearly indicate whether he was actually a witness to the shooting or whether, instead, the police pressured him into identifying Jimenez. At one point, Phil said he saw Jimenez shoot Morro. *Id.* at 18. At another, he stated that he was not a witness, although he may have simply been indicating he did not want to testify at either trial. *Id.* at 34. He also stated that he did not know the shooter was Jimenez until his sister told him about the earlier altercation between Jimenez and Morro. *Id.* at 18–20. Phil was not sure if he had called the police at 1:00 a.m. on February 4 initially, but after being reminded of previous testimony, he claimed he remembered calling the police. *Id.* at 38–39, 80. At one point, he testified that he was taken to a police station in the middle of the night and that the police interviewed him for at least two hours and that he would not have gone voluntarily. *Id.* at 40–41, 42–43. Later, he stated that he might have only been at the police station for a very brief time and that he was not held at the police station against his will. *Id.* at 56, 65. During examination by Jimenez's attorney, Phil stated that he never claimed to be certain about his identification of Jimenez, *id.* at 44–45, but

during examination by the defendants' attorney, he stated that he still believed that the shooter he saw was Jimenez. *Id.* at 82. Phil also stated that the police might have told him they had other witnesses who identified Jimenez, including Sandra Elder, and that this might have influenced him. *Id.* at 79.

Based on Phil's own testimony alone, there are genuinely disputed issues of fact regarding whether he voluntarily talked to police early in the morning of February 4, whether the police took him to the station and how long the interview was, and whether he actually saw Jimenez or rather acted on suggestions from his sister or from the police.

### 3. Tina Elder's lineup identification

Defendants argue that the allegedly exculpatory or impeaching facts surrounding Tina Elder's identification of Jimenez in the lineup were available to Jimenez through the exercise of reasonable diligence, were not material, and were not known to any of the police officer defendants.

Defendants argue that because Tina volunteered when questioned by Jimenez's attorneys in 2007 that she had seen a picture of Jimenez before identifying him in the lineup, she would have done the same years earlier if questioned by Jimenez's criminal defense attorneys. Tina stated at her deposition that she would have mentioned the photo if she had been asked at the time of the criminal trials. Def. Ex. 12 at 19–20. But during the 1997 trial, Jimenez's attorney asked Tina if the police had done anything to suggest to her that one of the suspects would be in the lineup. Pl. Ex. 68 at 99. She responded no, and she gave a similar response to a prosecutor's question by stating

that no one had indicated to her who in the lineup was the shooter.  *Id.* at 106.  Given

this testimony, a reasonable jury easily could find that, if interviewed around the time of

the criminal trial, Tina would not have volunteered that she had seen a photo of

Jimenez (a fact otherwise unknown to him or his attorneys).  Rather, Tina volunteered

that she had seen the picture only after watching Larry Tueffel's taped recantation of his

testimony, which she testified increased her doubt that Jimenez was the shooter.  Pl.

Ex. 6 at 106.

Defendants cite *United States v. Senn*, 129 F.3d 886 (7th Cir. 1997), in which

the court held that there had been no suppression of *Brady* material simply because the

prosecution had not provided a witness's complete criminal record.  *Id.* at 892–93.  In

that case, however, the defendants knew that the witness had a criminal record and

were later easily able to obtain documentation of this themselves.  *Id.*  That is nothing

like the situation in this case.  Here the question is whether Tina would have admitted, if

asked at the time of the criminal trials, that she had seen a photo of Jimenez before the

lineup, not whether (as in *Senn*) a criminal defendant could have obtained from a

government agency more detail regarding information of which he was already aware.

A reasonable jury could also find that the fact that Tina saw the photograph of

Jimenez before the lineup was material.  The prosecution's case against Jimenez was

built on a motive and a few eyewitnesses.  Thus discrediting the identification of one of

the witnesses would have helped Jimenez significantly.  Further, the defense could

have used the photo incident to argue that Elder was deliberately seated at the desk by

police, which in turn could have called into question whether the police were attempting

to manipulate her testimony. Had the jury believed that the police had tried to concoct an identification, they might also have viewed the testimony of Tueffel and Phil Torres more skeptically, because each had identified Jimenez in a late-night interview after initially failing to identify him. In short, a reasonable jury could find that Jimenez's defense attorneys could have used the photo incident to discredit the only three eyewitnesses who were able to pick Jimenez out of a lineup. A reasonable jury similarly could find that the result of the criminal trial would have been different had the police disclosed that Tina saw the photo before viewing the lineup.

Finally, defendants argue that none of them was personally responsible for failing to disclose that Elder saw the photo because they did not know she had seen it. *See Rodriguez v. Peters*, 63 F.3d 546, 555 (7th Cir. 1995). But there is an issue of material fact regarding what the defendants knew. At her deposition, Tina could not specifically identify who had placed her at the desk where the photo was sitting, but she testified that it was a police officer. Def. Ex. 12 at 91–92; Pl. Ex. 6 at 27–28. In light of her testimony that police specifically placed her away from the other witnesses so they would not communicate, a reasonable jury could find that a police officer had put some thought into where to seat her. Pl. Ex. 6 at 28. Bogucki testified that he and Sanders conducted the lineup and that he (Bogucki) was the one handling the witnesses, and Tina testified at the 1997 trial that she met Bogucki when she arrived at the station. Pl. Ex. 4 at 229; Pl. Ex. 68 at 99. A reasonable jury could conclude from this evidence that the defendants knew that Elder had seen the photo.

Further, Sandra Elder testified that she saw the photo of Jimenez as she was

24

leaving the lineup, stating, "There was a photo sitting on the desk that you glanced at as you walked by." Def. Ex. 11 at 32–35. Sandra believed it likely that everyone who participated in the lineup had seen the picture, because "[t]he desk was right there." *Id.* at 36. Given that several of the witnesses may have seen the photo, there is certainly a genuine factual dispute regarding whether Bogucki or Sanders saw it and knew that Tina Elder sat at the same desk.

## 4.     The Duke jacket

Defendants do not separately address the Duke jacket. A reasonable jury could find that information on whether police first mentioned the jacket to Larry Tueffel, Phil Torres, and Tina Elder was not available to Jimenez with reasonable diligence for the same reasons that the details of Tueffel and Phil's interviews and Elder's lineup identification were not. Further, a reasonable jury could find from the evidence that it was the police who first mentioned the Duke jacket to each witness. Tueffel testified that the police mentioned a Duke jacket first. Def. Ex. 2 at 132. Phil testified that he saw the shooter wearing a Duke jacket, but at another point, he said that he could not remember whether the police first brought up the Duke jacket (Phil later settled on the story that he told the police the colors and they asked if it was a Duke jacket). Def. Ex. 2 at 39, 51–52. Elder testified that at the lineup the police had each lineup participant put on a Duke jacket, and she was not interviewed until after she viewed the lineup. Def. Ex. 12 at 71.

## 5.     Physical evidence

Jimenez claims that the police withheld three pieces of physical evidence from

his lawyers and him at the time of the criminal trials: (1) a note written by Morro and found in his coat stating that he owed forty dollars to a "Leo" and listing a telephone number; (2) the Polaroid picture of Jimenez that Tina Elder saw; and (3) a complete inventory list of the evidence gathered by police. Defendants argue that these items were disclosed to Jimenez and that he makes these contentions too late by asserting them in his response to their motion for summary judgment.

Defendants provide an affidavit from a sergeant in the Records Division of the Chicago Police Department who states that the complete inventory list and the photograph were within the department's file for the Morro case. Def. Ex. 14 at 2; *see Boss*, 263 F.3d at 741. Jimenez has not provided any evidence to suggest that the inventory and picture were not in the file or that, if there, they were not accessible to his criminal defense attorneys. Defendants are entitled to summary judgment to the extent that Jimenez claims a *Brady* violation based on the alleged non-disclosure of these items.

Defendants have also offered evidence that an inventory report related to Morro's note was in their files. Def. Resp. Ex. 14 at 5. The inventory sheet, however, shows only that the police had possession of a coat of Morro's. Though the note was in the coat pocket, the inventory report does not reflect that there was a note. A reasonable jury could find that reasonable diligence did not require Jimenez's defense counsel to rifle the pockets of the victim's coat absent some indication that evidence might be found there.

Defendants argue that the Court should not consider any *Brady* claims related to the physical evidence because Jimenez first made these contentions in his response to

the summary judgment motion.  In *EEOC v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443

(7th Cir. 2008), the court noted that a change in legal theory was made too late,

because "[f]ederal pleading rules require the plaintiff to give the defendant fair notice of

what the claim is and the grounds upon which it rests."  *Id.* (ellipses omitted).  In this

case, however, defendants received adequate notice and were able to present

evidence to attempt to counter Jimenez's claims.  They have suffered no unfair

prejudice by the purportedly late nature of the claims.

**B.    Qualified immunity**

Defendants argue that they are entitled to qualified immunity with regard to using

loud voices during the interview of Larry Tueffel on the early morning on February 4 and

seating Tina Elder in a room that contained paperwork related to the Morro case.

Determining whether a government official has qualified immunity is a two-step process.

> First, a court must decide whether the facts that a plaintiff has alleged or
> shown make out a violation of a constitutional right.  Second, if the plaintiff
> has satisfied this first step, the court must decide whether the right at
> issue was clearly established at the time of defendant's alleged
> misconduct.

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations and internal quotation marks

omitted).  A court may consider either step first.  *Id.* at 236.  The Court has already

concluded that Jimenez has shown enough to make out a violation of his due process

rights on these claims.

In a *Brady* case, the qualified immunity question is not "whether a law

enforcement officer would clearly know that he had to disclose impeaching or

exculpatory information."  *Carvajal*, 542 F.3d at 569.  Instead, the question is whether it

was clearly established that the information that Jimenez claims they failed to disclose had to be disclosed as exculpatory or impeaching. *Id.* Because "[t]he *Brady* principle was announced in 1963," the only question is whether the defendants should have recognized the information as exculpatory or impeaching. *See Newsome*, 256 F.3d at 752–53.

It is abundantly clear, and would have been clear to any reasonable police officer at the time, that the information that defendants failed to disclose was clearly impeaching or exculpatory. Defendants do not contend otherwise. Rather, they argue that they did not know they were not allowed to use loud voices when interviewing Tueffel. This argument completely misses the point, and it is frivolous as a basis for a defense of qualified immunity. The wrong Jimenez alleges is not that police yelled at Tueffel. Rather, it is that police did not disclose that Tueffel repeatedly stated that Jimenez had not shot Morro and that it was not until after they yelled at, lied to, and threatened Tueffel for two hours in the early morning that he changed his story. Similarly, Jimenez's claim with regard to Tina Elder is not that the police should have seated her in a place where she could never see any paperwork related to the Morro case. Defendants' qualified immunity argument, which assumes that this is Jimenez's claim, is again legally frivolous. It is abundantly clear that Jimenez's actual claim is that the defendants failed to disclose that Tina had seen a picture of Jimenez next to a picture of Morro's corpse just a few minutes before being asked to pick Morro's killer out of a lineup. No reasonable police officer could fail to see this episode as highly impeaching of Elder's identification and later testimony. If defendants knew that Elder

28

had seen a picture of Jimenez before the lineup—and a reasonable jury could find they did—it was clearly established at the time that this was materially impeaching and had to be disclosed.

## C.   Malicious prosecution

The elements of a malicious prosecution claim under Illinois law are:

(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.

*Swick v. Liautaud*, 169 Ill. 2d 504, 512, 662 N.E.2d 1238, 1242 (1996) (internal quotation marks omitted).  Defendants argue that Jimenez's malicious prosecution claim fails because there was probable cause and because Jimenez has not shown malice.

Probable cause is a complete defense to a malicious prosecution claim.  *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001).  "Probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged."  *Id.* (internal quotation marks omitted).  A single credible witness is enough to create probable cause.  *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 680 (7th Cir. 2007) (false arrest claim).  When there is a disagreement about facts, however, courts "adopt[ ] the plaintiff's version of the disputed facts for which there is some support in the record."  *Logan*, 246 F.3d at 926 (internal quotation marks omitted).

Defendants argue that even if one discredits Larry Tueffel and Tina Elder's

29

statements, probable cause still existed based on Phil Torres's identification of Jimenez as the shooter. As discussed earlier, however, there are genuinely disputed facts regarding whether Phil was actually saw the shooting and whether he was pressured by police in a manner similar to Tueffel. *See Kincaid v. Ames Dep't Stores*, 283 Ill. App. 3d 555, 565, 670 N.E.2d 1103, 1110 (1996) (witness statements supporting probable cause must be reliable and not induced by police). Additionally, Tueffel testified at his deposition that he told the police that there were no other witnesses on the street at the time of the shooting. This too, calls calling into question whether Phil actually saw the shooting from his window. Pl. Ex. 2 at 130–31. In short, under Jimenez's version of the facts, which a reasonable jury could adopt, Phil's statements are unreliable and thus cannot be a basis for a finding that probable cause existed as a matter of law.

Without the statements of Tueffel, Phil, and Elder, there were no witnesses who could identify Jimenez. The only other evidence against him was the existence of an alleged motive. In sum, there is far less evidence to support probable cause than in the Illinois cases defendants cite. In one of those cases, a witness had seen a previous altercation between the defendant and the victim, and other witnesses heard the gunman say "I told you so." *People v. Williams*, 137 Ill. App. 3d 736, 742, 484 N.E.2d 1191, 1196 (1985). In another, a witness who knew both the defendant and the victim saw the shooting and an argument between the defendant and victim over money and drugs earlier in the day. *People v. Kidd*, 180 Ill. App. 3d 1065, 1072, 536 N.E.2d 816, 820 (1989).

"The question of probable cause is typically a proper issue for a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be

drawn from them." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013–14 (7th Cir. 2006) (internal quotation marks omitted). That is the case here.

"Malice is defined as the initiation of a prosecution for any reason other than to bring a party to justice." *Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340, 349, 733 N.E.2d 835, 842 (2000). "Lack of probable cause does not itself establish malice, but the trier of fact may infer malice from lack of probable cause if there is no other credible evidence which refutes the inference." *Id.* Defendants argue that the fact that they did not investigate Juan Carlos Torres as extensively as Jimenez would have preferred does not establish malice.

The Court concludes that there is sufficient evidence to give rise to a genuine factual issue regarding whether defendants acted with malice. Victor Romo told police, against his own interest, that Juan Carlos Torres had shot Morro, and defendants received a tape recording that allegedly contained a confession by Juan Carlos. But the evidence suggests defendants did little to investigate further. They interviewed Juan Carlos but did not pursue the matter beyond accepting his statements that he had not seen Romo recently and had not confessed to the murder in front of Ezequiel Romo. There is no evidence that they attempted to put any pressure on Juan Carlos (as they are alleged to have previously pressured Larry Tueffel), and there is no indication that they made any attempt to locate Leo Robles, the man to whom Morro owed money. In addition, as discussed earlier, the evidence would permit a reasonable jury to find that the defendants pressured Tueffel and Phil Torres to change their stories and implicate Jimenez and that they sought to influence Tina Elder to identify him. A reasonable jury could find from this evidence that the defendants acted with malice.

31

**D.     Contingent claims**

Defendants argue that the contingent claims of failure to intervene, conspiracy, intentional infliction of emotional distress, and respondeat superior all fail because Jimenez's due process and malicious prosecution claims fail.  Because the Court has declined summary judgment on the majority of the due process and malicious prosecution claims, the Court similarly denies summary judgment on the contingent claims.

**E.     Personal involvement of Sanders and Schalk**

Defendants final argument is that Detectives Sanders and Schalk were not personally involved in any violation of Jimenez's rights.  To the contrary, there are genuine issues of fact regarding their participation.

Sanders participated in two of the most important events giving rise to Jimenez's due process and malicious prosecution claims.  He and Bogucki picked up Larry Tueffel early in the morning of February 4 and arguably required him to come to the police station with them.  Def. Stat. of Undisputed Facts ¶ 20.  Defendants state that Tueffel was interviewed by more than one detective, making it reasonable to infer, favorably to Jimenez, that the second detective was Sanders.  *Id.* ¶ 22.  Sanders also helped Bogucki conduct the lineup in which Tina Elder saw the photo of Jimenez just before identifying him.  Although Bogucki testified that Sanders did not deal with the witnesses and stayed with the lineup participants, there is a genuine question of fact regarding whether he had knowledge of the alleged use of the photo.

Schalk did not begin work on case until February 8 and thus was not involved in

the earliest stages of the case. But he was involved in obtaining Victor Romo's confession and in the subsequent interview with Juan Carlos Torres. Schalk was also present when Romo's attorney gave police a tape purporting to be Juan Carlos's Spanish-language confession, and he went with Bogucki to interview Juan Carlos again after receiving the tape. Although Schalk could not have played a part in the initial arrest of Jimenez, a reasonable jury could find that he was involved in the continuation of the case even as more evidence arose that Jimenez had not shot Morro. *See Johnson v. Target Stores, Inc.*, 341 Ill. App. 3d 56, 73–74, 791 N.E.2d 1206, 1220 (2003) (considering malicious prosecution claim at the time of arrest, commencement of prosecution, and continuation of prosecution).

Jimenez has not provided any evidence, however, that Schalk was aware of any of the exculpatory and impeachment evidence that he contends the police concealed. All of the events surrounding that evidence took place before Schalk began to work on the case. For these reasons, the Court grants summary judgment in favor of Schalk on the due process claim and the section 1983 failure to intervene and conspiracy claims, but declines to grant summary judgment in his favor on the malicious prosecution, intentional infliction of emotional distress, and state law conspiracy claims.

**Conclusion**

For the reasons stated above, the Court grants in part and denies in part defendants' motion for summary judgment [docket no. 104]. Specifically, the Court grants summary judgment in favor of all defendants on the due process claim to the extent it relates to the alleged failure to produce the complete inventory list and the

33

picture of Jimenez and in favor of Schalk on the due process, failure to intervene, and section 1983 conspiracy claims in their entirety. The Court denies the remainder of the summary judgment motion. In addition, plaintiff's claims against defendants Whiteman, Ryan, and Montilla are dismissed, and the Clerk is directed to terminate them as defendants. The case is set for a status on Monday, November 14, 2011 at 9:30 a.m., for the purpose of addressing what discovery and disclosures remain to be completed before the December 5 trial date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: November 10, 2011