# EXHIBIT 3

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

THADDEUS JIMENEZ,            )
                             )
        Plaintiff,           )
                             )
    vs.                      )
                             )
CITY OF CHICAGO, Chicago     )
Police Detectives JEROME     )
BOGUCKI, MARK SANDERS,       ) No. 09-cv-8081
RAYMOND SCHALK, F. MONTILLA, )
Chicago Police Officers      )
LAWRENCE RYAN and ROBERT     )
WHITEMAN, and as-yet unknown )
City of Chicago Employees,   )
                             )
        Defendants.          )
STATE OF ILLINOIS  )
                   )  SS.
COUNTY OF COOK     )

The video conference deposition of LILIANA WARD, called by the Plaintiff for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Sharon A. Jerndt, Certified Shorthand Reporter and Registered Professional Reporter, at 205 West Randolph Street, 5th Floor, Chicago, Illinois commencing at 1:09 p.m. on the 1st day of November, A.D., 2011.

## Page 2

1   APPEARANCES:
2       LOEVY & LOEVY
        MR. JON LOEVY
3       312 North May Street
        Suite 100
4       Chicago, Illinois 60607
        Phone: (312) 243-5900
5
        On behalf of the Plaintiff;
6
        ANDREW M. HALE & ASSOCIATES
7       MR. AVI T. KAMIONSKI
        53 West Jackson Boulevard
8       Suite 1800
        Chicago, Illinois 60604
9       Phone: (312) 870-6930
        E-mail: akamionski@ahalelaw.com
10
        On behalf of the Defendants.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 3

1              I N D E X
2   WITNESS                           PAGE
3   LILIANA WARD
4       Direct Examination By Mr. Loevy . . . . . . .  4
5
6
7              E X H I B I T S
8         (NO EXHIBITS MARKED)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1                (Witness sworn.)
2   WHEREUPON:
3            LILIANA WARD,
4   called as a witness herein, having been first duly
5   sworn, was examined and testified as follows:
6            DIRECT EXAMINATION
7   BY MR. LOEVY:
8       Q.  If you could state and spell your name for the
9   record, please.
10      A.  My name is Liliana Ward; first name is
11  L I L I A N A; last name Ward, W A R D.
12      Q.  And what do you do for a living Ms. Ward?
13      A.  I am director of operations and general
14  counsel for Trusted Translations, Inc.
15      Q.  How many people work at Trusted Translations,
16  Inc.?
17      A.  It is mostly comprised of independent
18  contractors.  We have roughly -- we have 2 principals in
19  the United States.  We have 50 people roughly
20  affiliated with the company and then we have a book of
21  roughly 10,000 translators that we draw from on any
22  given day depending upon the work that needs to be done.
23      Q.  So how many people are employees of the
24  company?

Page 5

1      A.  Two.
2      Q.  You and -- I assume you are one of them?
3      A.  Yes.
4      Q.  Who is the other?
5      A.  The other one is Richard Estevez.  He is the
6   CEO of the company.
7      Q.  And what is your relationship to Mr. Estevez?
8      A.  He is my brother.
9      Q.  Who started the company, you or your brother?
10     A.  He did.
11     Q.  When did he start it?
12     A.  October of 2003 is the incorporation date.
13     Q.  And when did you join?
14     A.  I joined in September of 2005.
15     Q.  Has there ever been any other employees other
16  than you and your brother?
17     A.  No.
18     Q.  And you said how many people do you have an
19  independent contractor relationship with presently?
20     A.  Up to 10,000, depending all over the world,
21  depending on what is needed.  We have a book of people
22  that we work with on a regular basis.
23     Q.  How do you find those 10,000 people if you
24  want to get in touch with No. 9,422?

Page 6

1      A.  We have addresses, we have phone numbers, we
2   have e-mails.  They are listed -- we get them through
3   professional references.  There are agencies in other
4   countries.
5      Q.  Do you have a formal relationship with 10,000
6   people?
7      A.  No.  We form a relationship by contract as we
8   hire them.  So at any given time we may have less active
9   contracts, but it depends on the day.
10     Q.  Well, how many today; how many active
11  contracts do you have?
12     A.  I couldn't tell you.  I have no idea.
13     Q.  Do you think it is less than 10?
14     A.  Oh, no.  No.  We are working on more projects
15  than that right now.
16     Q.  Do you think you have as many as a hundred
17  contracts open today?
18     A.  There is a possibility, sure.
19     Q.  So maybe more, maybe less, somewhere in there?
20     A.  Probably.
21     Q.  Have you -- so let's say you decided you
22  wanted to do a job and you needed somebody to translate
23  a document, how would you go about communicating with
24  the 10,000 potential contractors?

Page 7

1      A.  Well, I wouldn't be doing it.  It would be
2   someone who works for us, but it would be we would look
3   on the database to see what is required for the job
4   which means the language, any kind of specialized
5   background they would require such as we need a medical
6   background, legal background, what kind of experience is
7   required and then we would look at our database to see
8   who fits those requirements and who is available to do
9   the work.
10     Q.  Well, let's say it was just a general,
11  somebody just needed a document translated from
12  Spanish.  Would you just put by e-mail or I mean, what
13  is the mechanism by how you would pick among those
14  10,000 people?
15     A.  We have people that we pick on a regular -- we
16  have some translators that we work with more than
17  others.  So we would probably go to the people that we
18  work with most and see what their availability is and
19  then work down from there.
20     Q.  How many are regulars -- how many regulars do
21  you guys work with?
22     A.  I don't think I could quantify that to be
23  honest with you.
24     Q.  Well, do your best, you know, just give me

Page 8

1   some idea if we are talking about one or a million or
2   somewhere, you know, just some idea.
3      A.  I usually handle the ones that are located in
4   the United States and located in the United States there
5   would be 15 to 20 Spanish-English language pair that I
6   would be paying probably on a monthly basis.
7      Q.  All right.  Are any of those 15 to 20
8   regulars, did they get used in this project?
9      A.  No.  None of them were U.S. based translators.
10     Q.  How much did the translators earn for their
11  work on translating projects?
12     A.  We pay for Spanish 1 to 2 cents per word for
13  translation.  Interpretation is a different rate.
14     Q.  Is there any work that your company performs
15  that is paid by the hour?
16     A.  Yes.
17     Q.  Tell me about the difference between per word
18  and per hour.
19     A.  Well, the per hour work is often DTP which is
20  Desktop Publishing which is done on web sites and
21  interpretation, but we do not do as much interpretation
22  as we do translation.
23     Q.  What is interpretation?
24     A.  Interpretation is translating the written --

Page 9

1  spoken word between two parties in conversation. For
2  example, telephonic interpretation, I would be --
3  someone would be speaking to me in Spanish and I would
4  translate it into English for someone who doesn't speak
5  English, usually right there, sometimes simultaneous,
6  sometimes people take turns talking. It depends on the
7  equipment available.
8      Q.  What is Desktop --
9      A.  We can --
10     Q.  I'm sorry. I wasn't thinking. I know what
11  interpreting is. I get it now.
12         What is Desktop Publishing?
13     A.  Desktop Publishing is when, for example,
14  someone hires us to translate a web site. Spanish tends
15  to be longer than English, usually about 25 percent word
16  expansion. So if you are translating an English web
17  site into a Spanish web site, the blocking of -- the
18  visual of the actual web site is going to be different.
19  So we have people in house, graphics people that will
20  shrink the font, make recommendations as to how to
21  change the web site so it still looks like the customer
22  wants, but has the extra words in there.
23     Q.  And if you were going to pay a contractor for
24  Desktop Publishing, how much per hour do you pay the

Page 10

1  contractors?
2      A.  I don't have that fee schedule in front of
3  me. I wasn't asked for any.
4      Q.  Is it less than $5 an hour?
5      A.  No.
6      Q.  Is it less than $10 an hour?
7      A.  I don't know.
8      Q.  Is it somewhere between 5 and $10 an hour?
9      A.  I don't know. I'm sorry.
10     Q.  If I could ask you why is it that you don't
11  know?
12     A.  Because I don't handle the finances of the
13  company.
14     Q.  That's your brother?
15     A.  Yes.
16     Q.  Do you have any idea at all as to whether the
17  translators are paid more or less than $5 an hour?
18     A.  No.
19     Q.  Do you know if they are paid more than $1 an
20  hour?
21     A.  They are paid -- well, the translators are
22  paid by the word.
23     Q.  I'm sorry. The people that are doing the
24  hourly work, do you know either way whether they are

Page 11

1  paid more or less than $1 an hour?
2      MR. KAMIONSKI:  You are talking about the Desktop
3  Publishing?
4  BY MR. LOEVY:
5      Q.  Well, you said that there are some jobs that
6  your company, people get paid by the hour, and that you
7  are not involved in that and I am asking if you know
8  either way if the people that are involved in that get
9  paid more or less than $1 an hour?
10     A.  No, I have no way of knowing.
11     Q.  But the answer was no, you don't know, right?
12     A.  No, I don't know.
13     Q.  How about the per word translate. Does your
14  company use different rates on the per word for
15  translating?
16     A.  Depending on the language.
17     Q.  How about for Spanish? Is there just one flat
18  per word?
19     A.  It depends on the technical, the technical
20  complexity, but for the most part it is about 2 cents a
21  word, 1 to 2 cents a word which is standard in the
22  industry.
23     Q.  If the company is going to charge more than 1
24  to 2 cents a word, who negotiates that?

Page 12

1      A.  We have sales associates who represent us.
2      Q.  Are they employees of the company?
3      A.  No. We have -- (inaudible).
4      Q.  She said no. Sometimes because of the video
5  conferencing, the word just blips out. Probably if we
6  are both talking at the same time is my sense of what is
7  going on. So we have to both avoid doing that and I
8  will too because it is not one; obviously it is both of
9  us.
10         Who are the sales associates who negotiate
11  your rates?
12     A.  You want me to name them?
13     Q.  Well, just tell me like more about that.
14     A.  There is a company called Translation
15  Solutions in Argentina and we have a staff there. We
16  meaning we have a relationship with that company and
17  they have a staff there who answer the phones on our
18  behalf and negotiate the contracts. Our president also
19  negotiates the larger contracts with corporations in the
20  United States.
21     Q.  So somebody might call the company in
22  Argentina with a job and then the company in Argentina
23  will negotiate a rate and then they call you; is that
24  how it works?

Page 13

1    A.  No.  We have project managers there as well.
2    Q.  When you say we have, they don't work for your
3  company though, right?
4    A.  No.  It is an Argentine company.
5    MR. KAMIONSKI:  Jon, you guys are talking over each
6  other.  Just let her finish and then --
7    MR. LOEVY:  Well, Avi, as I said, it is both of us
8  obviously.
9    MR. KAMIONSKI:  She was in the middle of answering
10  the question, your question.
11  BY MR. LOEVY:
12    Q.  The people in Argentina don't work for you,
13  right?
14    A.  They are -- we issue 1099s to anyone who is
15  American, but there are Argentine citizens who also work
16  for us that don't have an employment relationship with
17  us.
18    Q.  So does the client come through Argentina to
19  you or do you send it to Argentina?
20    A.  It depends on the client.  There are clients
21  who contact me directly and there are other clients who
22  call the call center through the 1-800 number and then
23  they are set up with translators through them.
24    Q.  So if someone goes on your web site and says I

Page 14

1  think this is a good looking company that I am going to
2  try out, the call gets routed to Argentina?
3    A.  Yes, sometimes.  Sometimes it comes to me, but
4  99 percent of the time it goes to Argentina.
5    Q.  Did Avi and Andy Hale's call go to Argentina?
6    A.  Yes, it did.
7    Q.  All right.  And you said the people -- and the
8  people in Argentina negotiate a deal with the people
9  that are looking for the job usually?
10    A.  Yes, based on standard -- we have standard
11  contracts and standard rates that we pay.
12    Q.  And then they send the job back to the United
13  States to you?
14    A.  No, I didn't do the translation.  We send it
15  to the translator to do the work.  He mails the document
16  to the translator.  The majority of translation work is
17  done in people's homes.  They don't have people sitting
18  in rooms or cubes doing translation all day.  They do
19  have that, but for the most part people are in their
20  homes.  They receive the document, they translate it
21  using translation tools and then they send it back.
22    Q.  So the people in Argentina when they get the
23  calls, do they decide which translator to use or do you,
24  or does your company?

Page 15

1    A.  They do.
2    Q.  All right.  So quite a bit of this process is
3  out sourced it sounds like?
4    A.  Yes, although the president is very, very
5  involved in the Argentine operation because he goes down
6  there several times a year.  He is the one who sets the
7  standards and he is the one who -- they receive
8  supervision from Richard's point of view.
9    I handle different parts.  I handle
10  compliance.  I handle certification.
11    Q.  Does any work get done in the United States?
12    A.  Yes.
13    Q.  What work is that?
14    A.  Some translation, all certifications.  That's
15  all we really do, so.  I have done a few interpretation
16  jobs and I do do translations on occasion as well when
17  they are legal and fall in my background.
18    Q.  What is the income, the annual income for your
19  company?
20    A.  Over a million.
21    Q.  Is that net profit or I guess I am not using
22  the term very precisely?  Revenues are over a million?
23    A.  Yes.
24    Q.  What are the costs?

Page 16

1    A.  I couldn't give you an accurate estimate of
2  that right now because I don't handle the finances of
3  the company.
4    Q.  Are the revenues more than 2 million?
5    A.  I don't know what we stated on our last tax
6  return.
7    Q.  Well, I didn't even ask that question.  That's
8  a different question I guess.
9    A.  I don't know.
10    Q.  Are the revenues more than 5 million?
11    A.  I don't believe they are.
12    Q.  You are not sure though?
13    A.  No, but I doubt it very seriously.  I don't
14  want to give you a specific answer when I don't know.
15    Q.  And I understand that you don't want to, but
16  you understand it is my job just to ask you.
17    A.  It would be speculation on my part.
18    Q.  You are an attorney, are you not?
19    A.  Yes.
20    Q.  All right.  Are you able in your own words to
21  put any kind of range on how much the revenues were last
22  year of your company?  Say, for example, 2 to 5 million
23  or 1 to 10 million.  What range do you feel comfortable?
24    A.  1 to 3 million.

Page 17

1  Q.  How much of that 1 to 3 million did the
2  company take home in profits?
3  A.  I do not know.
4  Q.  Well, how much did you earn?
5  A.  With or without the bonus?
6  Q.  Let's say total compensation last year,
7  however you want to characterize compensation, how much
8  did you earn?
9  A.  $35,000.
10  Q.  How much did your brother earn?
11  A.  72 I believe.
12  Q.  All right.  Is it your testimony that you and
13  your brother combined have taken home a grand total of
14  about a hundred thousand in benefits last year as far as
15  everything the company has produced?
16  A.  As far as I know.
17  Q.  In other words, perhaps we are talking past
18  each other and I wasn't asking about your consultant's
19  pay or, you know, something that is not technically
20  salary.  Do you know what I am saying?
21  A.  There is no additional pay.
22  Q.  So the sum total of financial benefit that you
23  got from your company last year was $35,000?
24  A.  Yes, sir.

Page 18

1  Q.  Was that a typical year?
2  A.  Yes.
3  Q.  All right.  Have you ever earned more than
4  35,000 in a given year for your work in this company?
5  A.  No.
6  Q.  Do you know why if the company's revenues are
7  somewhere between 1 and 3 million that you and your
8  brother only took home a hundred thousand?  Can you
9  explain?
10  A.  I can explain why I do because I work part
11  time and I work from home so I can be home with my
12  children which is why I left the practice of law.
13  Q.  I think you might have misunderstood the
14  question.  I am not saying why do you not work harder.
15  I am saying if there is 1 to 3 million dollars in the
16  pie, how is it that only a hundred thousand goes to the
17  people that run the business?  Where does the rest of
18  the money go?
19  A.  I don't do the financials for the company.
20  Q.  Do you have any explanation for where the
21  other money went?
22  A.  The way the per word -- we charge roughly 10
23  to 12 cents per word which is actually very, very low
24  for the industry.  So we are a very low margin

Page 19

1  provider.  We have actually been criticized for being so
2  low, you know, people commenting that they can't do it
3  for that low, but that's why we do it.
4  So if you are only making 10 cents, the total
5  per word, 2 are going to the translator.  You've got
6  proofreaders and editors that also get something along
7  those lines.  If you have DTP involved, that may or may
8  not come out of that.  So where the margin is, it is
9  very small and when you are charging 10 cents a unit --
10  Q.  All right.  Thank you.  That helps me
11  understand it better.
12  Does the company have any assets?
13  A.  No.  We have a few computers.
14  Q.  How long -- your brother I think you said
15  started it in 2003?
16  A.  Yes.
17  Q.  What has the growth looked like for the
18  company?  Has it steadied out or is it still going up?
19  What does it look like?
20  A.  It has been steady growth.  I think we started
21  between a hundred thousand to 200,000 in revenue in the
22  first couple of years and it has grown pretty steadily,
23  but again, I don't follow that, really follow that part
24  of it.  So I couldn't give you any type of detailed

Page 20

1  analysis of the financials of the company.
2  Q.  Does your brother work full time?
3  A.  He has another position as well with a
4  different company.
5  Q.  What is his full-time job?
6  A.  I think he splits his time between the two.
7  Q.  So he has two part-time jobs; is that
8  accurate?
9  A.  He is not really -- I mean, when you run a
10  business you are in it all the time, but he also has
11  responsibility to another company that he also happens
12  to be a shareholder in.  So I don't think it really -- I
13  couldn't tell you.  I have never asked him how much he
14  makes.
15  Q.  Well, you have -- are you just guessing about
16  the 75,000 or do you think that's the ballpark?
17  A.  No.  That's the ballpark he gets from
18  Trusted.  I don't know from the other endeavor, so.
19  Q.  How many hours a week do you spend in the
20  company?
21  A.  It depends on the week, but I would say
22  average 10 to 15.
23  Q.  And do you have any idea how many hours your
24  brother spends on the company?

Page 21

1      A.  No.
2      Q.  Is it more than 20?
3      A.  Probably, but it is his company, his baby.
4      Q.  You are not sure if it is more or less than
5   20?
6      A.  Oh, it is probably more than 20.
7      Q.  Do you know if it is more than 40?
8      A.  No.
9      Q.  What are your responsibilities for the
10  company?
11     A.  I am general counsel.  I am -- I deal with
12  compliance which is things like sending in our annual
13  reports for the corporation, keep the corporate
14  documents viable, keep everything -- you know, renew our
15  ATA membership.  So that type of thing.
16         If we have paperwork, that kind of paperwork
17  that needs to be done, I handle that.  I handle deposits
18  of any stray checks.  We get most of our checks
19  deposited automatically through with the bank, but every
20  once a while a stray check will be sent directly to the
21  office.  So I will pick that up at the office and
22  deposit it directly in the account.
23         If we have someone infringing on our copyright
24  for our web site, I will write the letter asking them to

Page 22

1   stop.  I do sign all the certifications for the
2   company.  So if someone needs a certified translation, I
3   will certify that it is accurate so that they can
4   present it in a court or for immigration purposes or
5   those types of things.
6      Q.  And you said once in a while you serve as an
7   interpreter?
8      A.  I have done interpretation in the past.  I
9   have done translation in the past.  I don't do it
10  regularly, but sometimes the opportunity presents
11  itself.  For example, something local.  I certainly will
12  not travel to do any type of interpretation, but I have
13  done a couple of things for American University.  I have
14  done a couple of things locally over the years, but
15  not -- I would say probably 10 times in the last 5
16  years.
17     Q.  All right.  You anticipated my next question.
18  How about translating?  How often do you translate?
19     A.  Well, when I am doing the certifications, the
20  certifications that I do are between 2 and 3 a week.
21  Sometimes there is more.  Obviously it depends, but on
22  average.  I do the proofing, Spanish-English language
23  pair.  I will look at both documents and I will compare
24  and that is a function of -- that is a translation

Page 23

1   function.  Raw translation from, I don't do that work.
2      Q.  When you do what you just described about the
3   translating, how much do you charge by the hour?
4      A.  I don't.  I don't charge by the hour.  I
5   charge a $50 flat.  Well, the company charges a $50 flat
6   fee for that.
7      Q.  How does that work?
8      A.  They charge the client $50.
9      Q.  So if someone needed some documents
10  translated, it would be a $50 cost and you would do the
11  work?
12     A.  No.
13         MR. KAMIONSKI:  That's not what she said.
14  BY MR. LOEVY:
15     Q.  Okay.  I misunderstood.  And I am not saying
16  you do a lot of translating.  You said this is a rare
17  thing when you translate, but when you translate, how
18  does it work?
19     A.  Okay.  Translation is the first stage.  Most
20  documents go through translation, edition and
21  proofreading.  Translation is translating documents from
22  one language to another.  Edition is reading the second
23  document to make sure it looks like -- that it is
24  grammatically correct and looks like it was written in

Page 24

1   the target language.
2         Proofreading is comparing the two to make sure
3   that the first and the second say substantially the same
4   thing.  Those are 3 levels.  Once it has gone through
5   those 3 levels, if someone wants it certified, which
6   means a document from our company saying that the
7   translator is qualified to read and translate this
8   material, has translated it and it is accurately
9   translated from source language to target language.
10        That is the part that I do and I will
11  essentially do a reproof which is read both documents,
12  compare them, make sure that they say basically the same
13  thing so then I can then certify them.
14     Q.  And if you did that and say it took you an
15  hour, how much would you charge?
16     A.  No.  That's part of my job description.
17     Q.  Well, how much would the client get charged if
18  you certified it and it took you an hour?
19     A.  I don't do that by the hour.  It is a $50
20  charge to have it certified.  So it is just a flat $50
21  to have it certified and that includes the documents --
22  producing a document that says that it is certified and
23  delivered to the client.
24     Q.  All right.  And maybe I misunderstood you, but

Page 25

1  I thought you said once in a while you do translate.
2  Did I misunderstand?
3      A.  That is the translation.  That's the
4  translation function in a sense that I am reading in
5  Spanish and I am reading in English and I am doing
6  both.  I have translated in the past.
7      Q.  That's what I wanted to ask you about.
8      A.  Okay.  I have done in the past where I had a
9  document in Spanish that I translated in English.
10  Usually they are contracts and it is very, very rare
11  occasions.  The most recent one I did was a couple of
12  years ago and it involved an insurance company because I
13  have insurance legal background and it was an insurance
14  contract and I did that on.
15      Q.  And how much did you charge for that work?
16      A.  That was part of the -- part of my services to
17  the company.
18      Q.  Well, how much did the client pay for that
19  work?
20      A.  They paid our per word rate, whatever it would
21  have been at the time.  I can't quote my rate card for
22  several years ago.  I don't know what our contract rate
23  per word would have been at that time.
24      Q.  Well, has anybody at your time at the company

Page 26

1  ever paid you $225 an hour to do anything?
2      A.  No.
3      Q.  Has anybody ever paid you $350 an hour to do
4  anything?
5      A.  No.
6      Q.  What is the most you have ever been paid in
7  all of your work at the company by the hour?
8      A.  I have never been paid by the hour for the
9  company.
10      Q.  Well, if you were to add up the work that you
11  have done for the company like translating or certifying
12  and what you guys got from the client, has it ever gone
13  more than $25 an hour?
14      A.  I have never tried to quantify it that way,
15  but I have also never done a deposition for the company
16  either.
17      Q.  Well, I didn't ask about depositions, but I am
18  asking -- focusing on my question, of all the jobs that
19  you have done, let's say you put in an hour of work, has
20  the client ever been charged more than $25 an hour?
21      A.  Per hour, yes.
22      Q.  Has the client ever been charged -- and why do
23  you say that?  Can you explain your answer?
24      A.  Because it doesn't take -- the average

Page 27

1  certification, if I am certifying a birth certificate
2  and I am proofreading a birth certificate, it does not
3  take more than 10 minutes.
4      Q.  All right.  And yet you are charging $50?
5      A.  Charge $50 an hour.
6      Q.  Although less the money for the translator and
7  the proofreader, et cetera, right?
8      A.  They are charged based on the rate card and
9  number of words.  We do have a minimum charge of $100
10  for any document for a first time client and then $50
11  per document.  So if you had 10 words to translate and
12  that's the only document you had, you wouldn't be paying
13  a dollar.  You would be paying the minimum fee depending
14  if you are a returning client or a new client.
15      Q.  Do you know how defendant's law firm found
16  you?
17      A.  It is my understanding that we were found
18  through Google.
19      Q.  Well, tell me more about your understanding of
20  how they found you.
21      A.  He told me that they found me through Google.
22      Q.  Do you know if they found any other company?
23      A.  No.
24      Q.  You don't know either way, right?

Page 28

1      A.  No.
2      Q.  When did you start communicating with them?
3      A.  I don't really remember the date.  Somewhere
4  late spring, maybe April time frame.
5      Q.  Tell me what you remember about your initial
6  conversation.
7      A.  With --
8      Q.  With the attorneys who wanted to hire you.
9      A.  Okay.  He called and he asked me -- he said
10  that he had called the company earlier and asked us to
11  make -- to give an opinion as to the linguistic
12  background of a certain -- two speakers on a tape and he
13  had gotten the opinion from our -- my project manager
14  had gone through with the request and gotten back to him
15  and said here is the answer.  It appears they are both
16  Mexican.
17      And so he called me saying I need someone who
18  can testify to that.  Can you determine this.  And I
19  said well, the way to do that is to run the experiment
20  again, but in a contained fashion.
21      Q.  All right.  So before you ever talked to the
22  defendant's law firm, your understanding is that the
23  Hale Law Firm had already been told that this was a
24  Mexican person on the tape?

Page 29

1     A.   That, yeah, that they were both Mexican.
2     Q.   Why weren't you contacted at the very
3  beginning before they got the opinion?
4     A.   I don't know what conversation he had with our
5  project person, project account manager, but I think it
6  was probably done very informally.
7     Q.   All right.  Do you know if they contacted 10
8  different firms and then took it further with the ones
9  that they liked the answers?
10    A.   No, I have no idea who else he contacted.
11    Q.   Who is the --
12    A.   (Inaudible.)
13    Q.   Sorry.  Who is the project manager?
14    A.   Right now it is Brian Koozma (phonetic).  The
15  first one, her first name was Lisa, and I apologize, I
16  don't remember her last name.  She is no longer with the
17  company.
18    Q.   All right.  She is the one who was the project
19  manager -- I'm sorry.  You weren't done I guess?
20    A.   She was the first phone call because there is
21  essentially two phone calls.  The first phone call, when
22  the first experiment was done, was done through Lisa and
23  Lisa said oh, sure, I'll ask -- I'll make sure people
24  listen to the tape and let you know what the linguistic

Page 30

1  background is and she communicated with him and
2  apparently told him yes, they were both Mexican.
3         When he called back, he was routed to me and
4  at that point that's when he and I discussed doing it
5  for testimony purposes.
6     Q.   So when the Hale Law Firm called you back
7  after they learned that the translator thought it might
8  be a Mexican person, they asked you if you could testify
9  in court about that?
10    A.   Yes, if someone in the company could testify
11  in court.
12    Q.   And how did you decide who that someone was
13  going to be?
14    A.   It would be me.
15    Q.   What -- think for a second about Lisa's last
16  name.
17    A.   Honestly, I don't -- I would be a stab in the
18  dark.  I really don't remember Lisa's last name.  She
19  wasn't with us for that long.
20    Q.   That was my next question.  When did she start
21  at the company?
22    A.   I don't know.  I don't have those specifics.
23    Q.   Just generally, you know, was she there in
24  2005?

Page 31

1     A.   No, she was not.
2     Q.   Was she there for more than a year?
3     A.   I don't recall.  I really don't.  I doubt it.
4  I think I would have more familiarity with her if she
5  had been there longer because we do have several people
6  that have been with us for several years and I talk with
7  them on a regular basis and I did not have that much
8  contact with her.
9     Q.   If I understand your answer, she might have
10  been with the company for longer than a year, it might
11  have been shorter, you just can't remember anymore or do
12  you think it is shorter?
13    A.   Yeah, I doubt if it was much more than a year,
14  if it was a year.  It was a short period of time.
15    Q.   All right.  Where did she work?
16    A.   Argentina.
17    Q.   Oh, I see.  Did you ever meet her?
18    A.   No.
19    Q.   How would someone go about finding Lisa?
20    A.   We probably have contact information for her.
21  I am pretty sure we do unless she has moved from the
22  last address we have, but she has not been gone that
23  long.  So we would probably have her information for
24  this year because we have to continue paying her any

Page 32

1  commissions that she earned.  So we probably have
2  contact information for her.
3     Q.   When did she stop working for the company?
4     A.   Sometime in the summer.
5     Q.   All right.  When you talked to Mr. Hale, did
6  they tell you that they -- did they explain the project?
7     A.   I didn't speak to Mr. Hale.  I have only
8  spoken to Mr. Kamionski.
9     Q.   All right.  Let me ask the question again
10  then.
11         When you talked to Mr. Kamionski, did he
12  explain the project?
13    A.   Yes.
14    Q.   Did he explain to you that there was a man on
15  the tape and that it was their theory that the person
16  was Mexican and not Puerto Rican?
17    A.   No.
18    Q.   At any point did you come to understand that
19  the defendants wanted the guy not to be Puerto Rican?
20    A.   Only after we had given the opinion.
21    Q.   All right.  At some point you came to
22  understand that the defendants wanted the guy not to be
23  Puerto Rican?
24    A.   Yes, after, but I am the only one who knows

Page 33

1   that.
2       Q.  Tell me about that conversation.
3       A.  Which -- where he told me?
4       Q.  Yes, what he wanted -- was hoping you would
5   find.
6       A.  Well, it wasn't a hope at that point because
7   we had already given our opinion, and what he told me
8   was that the person is supposed to be, according to the
9   theory of the case, and I'll be honest with you, I don't
10  know that much about the facts of the case, but the
11  person that Speaker 2 was supposed to be is supposed to
12  be Puerto Rican.  That's what he told me.
13      Q.  He did tell you that, but you are saying it's
14  after, after what?
15      A.  Afterwards.
16      Q.  After --
17      A.  After I had given the opinion.
18      Q.  So until you gave him the opinion, you had no
19  idea if it was supposed to be Mexican or Puerto Rican?
20      A.  No.  I knew that those were the two
21  nationalities involved, but I was the only one that knew
22  that.  I made sure not to tell Brian what I was looking
23  for.  I told him I need five translators, one has to be
24  Mexican, one has to be Puerto Rican and the other three

Page 34

1   need to be three completely different nationalities and
2   I want them all to --
3       Q.  You did know before you assigned the
4   translators that there was a Puerto Rican and a Mexican
5   angle?
6       A.  No.  I knew that there was a Puerto Rican and
7   a Mexican angle, but I didn't know what it was.  I
8   didn't know what his hopes were.  I didn't know if he
9   expected them both to be Mexican.  I didn't know if he
10  expected them both to be Puerto Rican.  I did not know
11  which side he fell on.  All I knew is that there was a
12  dispute as to whether or not they were Mexican or Puerto
13  Rican and that's what we needed to find out, but I did
14  not know what his interest was.
15      Q.  Okay.  Before you picked the translators, what
16  did he tell you about Mexican versus Puerto Rican?
17      A.  He said that we are trying to determine
18  whether or not the speakers are Mexican or Puerto Rican.
19      Q.  Did he only give you two choices?
20      A.  Yes.
21      Q.  Did you find that unusual that he only gave
22  you two choices; that you could only pick one of the
23  two?
24      A.  No.  I mean, well, he didn't really say that.

Page 35

1       Q.  What did he say exactly?
2       A.  We need to determine whether or not they are
3   Mexican or Puerto Rican, but he didn't tell me he had an
4   interest in this -- he didn't tell me he was expecting
5   them to be anything specific.  He said the dispute is to
6   whether or not they are Mexican or Puerto Rican.
7       Q.  What if they were Ecuadorian or Argentinean?
8       A.  Then that 's what -- it would have come out
9   that way.
10      Q.  But he told you it was either Mexican or
11  Puerto Rican?
12      A.  And that was what his dispute was.  So that I
13  made sure that there would be a Mexican translator and I
14  made sure that there would be a Puerto Rican translator
15  so that we would have those two ears, sets of ears
16  covered, and then I chose three -- well, I didn't choose
17  them, Brian did, but he did a very good job of choosing
18  three others that were not Mexican or Puerto Rican.
19          So we have Argentine so we could cover that
20  southern half of South America.  We had Ecuadorian for
21  North Central South America and then we had Guatemalan
22  which is Central America which would sound a lit bit how
23  we have it here towards the southern part of Mexico, but
24  also that whole Central America area.  So he covered

Page 36

1   this hemisphere pretty well I think for five
2   translators.
3       Q.  Did you ever communicate with Mr. Kamionski in
4   writing?
5       A.  Other than this, no, not really.
6       Q.  Well, let's --
7       A.  I'm sorry.  I am pointing to the report.
8       Q.  And let's be precise because when you said not
9   really, I have to explore that.
10      A.  He sent e-mails back and forth, you know, are
11  you available for a conference call on this specific
12  date, that kind of thing, that he wanted to talk.
13      Q.  Did you ever talk -- is the only conversation
14  you had with Avi Kamionski about the nature of the work
15  that he wanted you to perform, were those all on the
16  phone and none in e-mails?
17      A.  Yes.
18      Q.  When was the conversation where he told you
19  that it was either Mexican or Puerto Rican?  Can you
20  pinpoint that date?
21      A.  It would be the first one.  It would be the
22  introductory conversation that he and I had and we
23  discussed -- that's when we discussed that.
24      Q.  Do you guys have a bill that would reflect

Page 37

1  that?
2      A.  No.
3      Q.  Have you created any kind of bill?
4      A.  Yes.
5      Q.  Why would the bill not reflect when you first
6  spoke to Mr. Kamionski?
7      A.  Because it just -- I mean, we don't bill like
8  by dates like that.
9      Q.  What does the bill look like?
10     A.  It has -- we block those so we have 10 hours
11 of $35 an hour in administrative fees and then we have 7
12 hours at $225 an hour which was the preparation of the
13 report and I didn't bill him until the end of the --
14 until we had finished the report.
15     Q.  All right.  What are the 10 hours at $35 an
16 hour, what does that represent?
17     A.  That included probably the time -- because we
18 weren't billing by the word and we had never really done
19 this before, we had to come up with kind of a way to
20 bill for our time, and so Brian's time in finding the
21 translators, paying the translators, those types of
22 things.
23     Q.  Anything else in the 10 hours that you guys
24 spent other than finding the translators and paying the

Page 38

1  translators?
2      A.  There was no DTP.  I don't believe so.
3      Q.  How much did the translators earn for their
4  work on the project?
5      A.  I don't know what they were paid.
6      Q.  You mean they might have earned nothing?
7      A.  I am sure they were paid.
8      Q.  Oh, I thought you said I don't know if they
9  were paid.  You said you don't know what they were paid.
10     A.  No, I don't know what they were paid.  I'm
11 sorry.
12     Q.  All right.  Were they paid more than a dollar
13 an hour?
14     A.  Yes.
15     Q.  How can you say that if you don't know?
16     A.  Because we don't have anything that could be
17 less than a dollar an hour.  I mean, no one would work
18 for that.
19     Q.  Well, how long was the tape?
20     A.  I don't know.  I didn't listen to it.
21     Q.  Do you have any idea how long the tape was?
22     A.  Based on the transcript I saw, and I didn't
23 read the transcript, I just kind of looked at it,
24 generally I would say 2 to 3 minutes, could be a little

Page 39

1  longer.
2      Q.  All right.  And then the person had to fill
3  out the form after they spent those 2 or 3 minutes
4  listening to the tape, right?
5      A.  I don't know how many times they listened to
6  the tape.
7      Q.  Right.  After they got done listening to the
8  tape, however many times they wanted to listen to it,
9  and then filled out the forms, do you think that is more
10 than a half an hour's worth of work?
11     A.  I don't know.  It depends on the individual
12 translator.
13     Q.  All right.  Well, for this work, approximately
14 how much were the translators paid?
15     A.  Interpreters who would be doing the
16 interpretation, anywhere between 60 and 75 bucks an
17 hour.
18     Q.  Is there a record --
19     A.  So -- $35, that would be reasonable.
20     Q.  I'm sorry because I started talking.  I
21 thought you were done.  Can you repeat that because we
22 lost it here.
23     A.  Interpreters can charge between 60 and $75 an
24 hour.  That is not unusual.  So if they spent a

Page 40

1  half-hour on it and we paid them $35, I wouldn't be
2  surprised if that is how it happened, but I can't give
3  you specifics because I really don't deal with that side
4  of the company.
5      Q.  All right.  Do you have a record of how much
6  the translators earned for their work on this project?
7      A.  I can find out, but I don't know.
8      Q.  Well, do you know if there is a record?
9  That's all I am asking.
10     A.  There probably is, yes, because we just paid
11 them and we have a record that they were paid and they
12 were paid on a specific date for a specific project.  So
13 I would assume, yes, there is a record.
14     Q.  And then that -- you also mentioned you billed
15 the city here for 7 hours at 225 an hour?
16     A.  Yes.
17     Q.  What did that entail?
18     A.  That entailed speaking -- well, all my
19 conversations with Mr. Kamionski, it included all of the
20 time in writing the report, you know, evaluating the
21 evidence and the time that that took.
22     Q.  Had you ever written a report like this
23 before?
24     A.  No.

Page 41

1    Q.  This part where you describe your background,
2  is this cut and pasted from anywhere else?
3    A.  Part of it probably is.
4    Q.  Where is it cut and pasted from?
5    A.  My C.V. and I have a bio that we use for
6  different marketing purposes that has been written and
7  added to.
8    Q.  So would you say the first 3 pages are cut and
9  pasted from your bio?
10   A.  Not in its entirety.  I mean, yes, most of
11  it because there is nothing new here.
12   Q.  Okay.
13   A.  But I had to read it.  I wanted to make sure
14  it was relevant to what I was doing here as opposed to a
15  legal C.V. with my legal experience.
16   Q.  How many conversations did you have with
17  Mr. Kamionski?
18   A.  I don't know.
19   Q.  Was it more than 20?
20   A.  I don't believe so.
21   Q.  You are not sure?
22   A.  No.
23   Q.  Could it have been as many as 50?
24   A.  No.

Page 42

1    Q.  What range do you feel comfortable with
2  confidence?
3    A.  I don't know.  It was over several months.
4    Q.  I am just asking, you know, your best
5  recollection.  Was it between one and a thousand,
6  between 20 and 50?  What do you think?
7    A.  I really, really don't feel comfortable
8  guessing at things like numbers to be honest with you.
9    Q.  Well, as a lawyer I am sure you understand
10  that the judge may decide, you know, that certain things
11  are speculation or guessing, but as a lawyer you also
12  understand that you have information that I don't.  I
13  don't know if you have talked to Avi everyday for the
14  last 3 months or if you talked to him twice.  So I am
15  just trying to get more information about that.
16   A.  It was more than twice.  A lot of times it was
17  just calling to see hey, you know, what's the status of
18  the report, did you finish it yet, those types of
19  things.  I know I spoke to him when the results first
20  came in and we had a conclusion before I wrote the
21  report, those types of conversations.
22   Q.  All right.  Well, approximately how many, if
23  you can give me a range?
24   A.  Let's say between 10 and 20.

Page 43

1    Q.  All right.  And you are not sure.  It might
2  have been more; it might have been less, right?
3    A.  I am really not.  I don't keep records of
4  that.  I don't keep a time sheet or anything like that
5  from that perspective.
6    Q.  I appreciate you giving me some perspective on
7  your best memory of how much there was.
8        When you called Avi to tell him the results,
9  did you know at that point whether it was supposed to be
10  a Puerto Rican or a Mexican?
11   A.  No.
12   Q.  Did he tell you?
13   A.  He did after that, yes.
14   Q.  Well, I mean, during that conversation I am
15  asking.
16   A.  Yes.  During -- after -- when I called him
17  after we were all done, he did tell me that the theory
18  in the case is that the person -- the second person on
19  the tape was supposed to be Puerto Rican.
20   Q.  All right.  And that was on the conversation
21  where you reported the results to him?
22   A.  Yes.
23   Q.  Did he tell you he wanted you to write it up?
24   A.  Yes.

Page 44

1    Q.  And what did you do?
2    A.  He told me to give a written report.  So I
3  gave a written report.
4    Q.  You don't have any notes from that
5  conversation, do you?
6    A.  No.
7    Q.  Do you have any notes from any of your
8  conversations with Mr. Kamionski?
9    A.  No.
10   Q.  How is it that you remember which conversation
11  it was that he gave you the theory of the case?
12   A.  Because it was when I called him to tell him
13  what the answer was, what the results were.  I didn't
14  know before then.
15   Q.  I am asking how you remember that detail as
16  opposed to maybe it was on a different conversation.
17  Maybe it was on the conversation when he was saying hey,
18  how is it going.  Why do you remember that detail?
19   A.  Because it stands out because we didn't have a
20  lot of lengthy conversations.  We had the one at the
21  beginning when the whole project was set up.  I had one
22  or two follow-up conversations with him as I recall just
23  fine tuning how we were going to -- how the solution I
24  had come up with was how I was going to make sure that

Page 45

1  everyone -- we got the support that we needed for giving
2  an opinion.
3       And then other than how are we doing with the
4  project, I really didn't talk to him again in any kind
5  of detail until I called him with the results, and at
6  that point he said, that's when he told me that it
7  was -- the second person is supposed to be Puerto Rican.
8       Q.  How positive are you that he didn't explain
9  that to you at the beginning?
10      A.  Very positive.
11      Q.  Do you know if he explained that to
12  Jennifer -- I'm sorry -- Lisa?
13      A.  No, I don't know.
14      Q.  You don't know either way?
15      A.  Um-um.
16      Q.  I think it was an um-um.
17      A.  She was gone by the time this ever got to me,
18  so I didn't even -- I didn't talk to her about it at
19  all.  By then it was a new project manager because she
20  was already gone.  So once she went away and decided to
21  wanted us to do this again or testify, by then Lisa was
22  gone and they found another project manager to deal with
23  it and that's when they brought me in.
24      Q.  Do you know if Mr. Kamionski explained to

Page 46

1  Brian Koozman, the project manager, that they wanted it
2  to be a Puerto Rican or didn't want it to be a Puerto
3  Rican or something?
4       A.  To my knowledge Brian didn't know.
5       Q.  Well, do you know?
6       A.  (Inaudible.)  Pardon me?
7       Q.  Do you know if Brian knew?
8       A.  Not -- in fact, that's a conversation that he
9  would have had with Avi, but to my knowledge the
10  conversation I had with him, he did not know and I made
11  a point of not telling him what we were looking for.
12  All I said is one has to be Mexican -- one translator
13  has to be Mexican, one translator has to be Puerto Rican
14  and the other three should be of completely different
15  nationalities of those two, and those were the only
16  instructions I gave him in regards to finding
17  translators.
18      Q.  Why did you make it a point to not tell Brian
19  that it was supposed to be either a Mexican or a Puerto
20  Rican?
21      A.  Because I didn't want him to know.
22      Q.  Why?
23      A.  I didn't want any of the translators --
24      Q.  The question was why?

Page 47

1       A.  Because I didn't want any of the translators
2  to know either.
3       Q.  Why?
4       A.  Because I wanted to try to be as absolutely
5  unbias as possible.
6       Q.  Why is that --
7       A.  (Inaudible.)
8       Q.  I'm sorry.  You know, I am terrible at this,
9  but sometimes you stop talking, and then you think and
10  then you start talking again, so our styles aren't
11  mixing good, but we will just redouble our efforts
12  here.  You can continue.
13      A.  I knew that going in after talking to Avi the
14  first time, I knew this was for litigation.  There was a
15  dispute as to whether the person was Mexican or Puerto
16  Rican and that someone was going to ask me to render an
17  opinion and to testify regarding what findings were
18  made.  I wanted to make sure that those findings were as
19  clean and unbias as possible.
20      So the less information they had, please
21  listen to the tape, and the instructions to the
22  translators were tell me -- as you can see, they got
23  written translations.  They didn't really talk to
24  anybody.  They got written instructions which you have

Page 48

1  in the report, but it was tell me where you think they
2  are from, give me the support based on these questions
3  as to why you hold that opinion and that's it and then I
4  took that information back in.
5       Q.  Who spoke to the translators about the job?
6       A.  Brian e-mailed them.  He e-mailed them the --
7  he found out -- we probably went through, and just based
8  on how we do things, he probably went through and found
9  out who was available that met the criteria and then
10 contacted them, sent them -- found out that they were
11 available, sent them the tape and the questionnaire.
12 Please fill this out and get it back to us.
13      Q.  Do you know if there was a cover letter with
14 it?
15      A.  No, I do not know whether or not there was.
16      Q.  You never personally spoke to the translators?
17      A.  No.
18      Q.  Do you have any personal knowledge if Brian
19 spoke to the translators?
20      A.  No.
21      Q.  Do you know if Brian talked to Lisa?
22      A.  About this?
23      Q.  Yes.
24      A.  I doubt it because she had left before it ever

Page 49

1  got to him. So it was at that point his problem to deal
2  with; his job to fill out the request. So he just took
3  it on as okay, here is a project that I have to take
4  care of.
5      Q. Do you know if Brian spoke to Lisa about this?
6      A. No, I don't know. By my own personal
7  knowledge, no, I do not know.
8      Q. Do you know if Brian talked to the translators
9  on the phone?
10     A. No, but he wouldn't be finding translators.
11 Our resource manager would have found them, so it would
12 have been our resource manager to talk to them on the
13 phone if anyone from the company talked to them at all,
14 but it probably would not have been Brian.
15     Q. Do you have any way of finding out who
16 actually spoke to them, if anybody?
17     A. I can ask. These aren't details that people
18 keep track of though, so I don't know if they are going
19 to remember, but yes, absolutely I can ask.
20     Q. Can you ask if anybody e-mailed the
21 translators?
22     A. Well, they were definitely e-mailed.
23     Q. All right. So can we get copies of those
24 e-mails?

Page 50

1      A. If they still exist, sure.
2      Q. Any reason they wouldn't still exist?
3      A. If they cleared them off the system.
4      Q. This happened just in this year, right?
5      A. Um-hum.
6      Q. All right. How would a person in your shoes
7  go about getting every e-mail between your company and
8  the translators?
9      A. I would have to call Brian and call the
10 general manager and find out.
11     MR. LOEVY: Well, we are asking you, Mr. Kamionski,
12 to do that. If you need a subpoena, we will give you
13 one, but does that sound like a reasonable request given
14 this person's opinion? Is that a problem?
15     THE WITNESS: No problem.
16     MR. KAMIONSKI: Sure, not a problem.
17 BY MR. LOEVY:
18     Q. So you said there was a $5,000 retainer?
19     A. Yes.
20     Q. Does your company keep the whole retainer?
21     A. No. We return whatever doesn't get used.
22     Q. Are you going to bill more than 10 hours
23 administrative and 7 hours for everything else?
24     A. I'll bill for today and if I testify in court,

Page 51

1  I'll bill for that.
2      Q. How much has your company billed so far till
3  now?
4      A. Whatever the math is of 7 times 225 and 10
5  times 35.
6      Q. Well, I mean, not the numbers, but you have
7  already used 7 hours you are saying?
8      A. Um-hum.
9      Q. Before today?
10     A. Yes.
11     Q. All right. Do you practice law?
12     A. I am an active member of the bar, but I do not
13 practice law to the general public.
14     Q. Do you have any relatives from Mexico?
15     A. No.
16     Q. Do you have any relatives from Puerto Rico?
17     A. No.
18     Q. Have you ever lived in a Mexican neighborhood?
19     A. No.
20     Q. Have you ever lived in a Puerto Rican
21 neighborhood?
22     A. No.
23     Q. Tell me about your law practice.
24     A. I was the law clerk for Circuit Court of

Page 52

1  Arlington in Arlington, Virginia law clerk to four
2  judges. I did that for approximately 3 years. After
3  that I went and worked for Jackson & Kimball for
4  approximately 4 years doing insurance coverage defense,
5  and after that I moved to Fletcher, Heals & Tildron
6  (phonetic) where I worked for -- where I did
7  administrative law in front of the FCC and I represented
8  Puerto Rican radio stations and television stations as
9  part of the FCC.
10     Q. Have you ever --
11     A. (Inaudible.) I left there to go to work for
12 Trusted.
13     Q. Have you ever worked for plaintiff's side
14 attorneys?
15     A. Well, regulatory, we do -- I did do litigation
16 for the regulatory, but no, we were defense attorneys
17 when we were at Fletcher, Heals.
18     Q. Have you ever done work on the plaintiff's
19 side?
20     A. No, I never did. I didn't. They did. The
21 firm did, but I personally didn't work on any.
22     Q. How many languages do you speak?
23     A. Two.
24     Q. Do you have any idea how the five translators

Page 53

1    were chosen from all of the 10,000 possibilities?
2        A.  No.
3        Q.  You have no idea?
4        A.  Well, he was told to find one from Mexico,
5    find one from Puerto Rico and three from three different
6    countries.
7        Q.  Have you ever met any of the translators?
8        A.  No.
9        Q.  Have you ever spoken to any of the
10   translators?
11       A.  No.
12       Q.  Have you ever communicated with the
13   translators in writing?
14       A.  No.
15       Q.  Was any of the translators born in America?
16       A.  Not to my knowledge, not according to the
17   information that I have.
18       Q.  Were any of the translators born in Puerto
19   Rico?
20       A.  To my knowledge the Puerto Rican one was born
21   in Puerto Rico.
22       Q.  And you know that from reading her bio?
23       A.  Yes.
24       Q.  Were any of the translators under 30?

Page 54

1        A.  I don't know.  I mean, I have their C.V.s
2    here.  I mean, I didn't ask them what their age was or
3    date of birth.  We have some that have high school
4    graduation information.  Probably glean it from that.
5        Q.  But other than what you can glean from their
6    resume, you don't know either way if any of the
7    translators were under 30?
8        A.  Not from my personal knowledge.
9        Q.  How about from indirect knowledge?
10       A.  Um-um.  I didn't ask.
11       Q.  Have you ever heard the tape?
12       A.  No.
13       Q.  Do you know if there was any issues about the
14   volume of the speaker?
15       A.  They -- from what they commented, I've seen
16   the exact same material that you have seen is what I saw
17   was what you have in front of you as far as the report.
18   That's the raw data that I used.
19       Q.  Is their --
20       A.  So the commentary --
21       Q.  Sorry.
22       A.  So the commentary on the questionnaires where
23   they talk about the volume is what I know of the volume
24   of the tape or the speaker.

Page 55

1        Q.  Did you do any follow up with them to ask them
2    if the volume was an issue that could be --
3        A.  No.
4        MR. KAMIONSKI:  I think she said she hadn't
5    communicated with them.
6        BY MR. LOEVY:
7        Q.  So the question was did you do any follow up
8    to see if there was anything that could be adjusted
9    based on the volume or anything like that?
10       A.  No.
11       Q.  Did you have any raw material other than the
12   surveys that came back?
13       A.  No.
14       Q.  When you wrote this report, you knew that the
15   defendants wanted you to find that the person was
16   Mexican, not Puerto Rican, right?
17       A.  No, I don't think I knew that at the time.
18       Q.  Didn't you say that Mr. Kamionski when you
19   reported the results to him told you what the defendant's
20   theory of the case and you remembered that very well?
21       A.  No, he didn't tell me what the defendant's
22   theory of the case was.  He said that the second person
23   was supposed to be Puerto Rican, but I did not know if
24   that was his theory of the case or yours.

Page 56

1        Q.  So he was cryptic with you?
2        A.  I don't know if he was cryptic.  I don't know
3    that it was relevant to the conversation we were having
4    at the time.
5        Q.  Well --
6        A.  He thought it was both Mexican and he was like
7    well, the second one was supposed to be Puerto Rican.
8    I'm like no.  It is what it is.
9        Q.  So did you think he was telling you uh-oh,
10   looks like I got a result that doesn't work for me?
11       A.  I didn't -- I don't know.
12       Q.  Well --
13       A.  At that time I didn't (inaudible).
14       Q.  Sorry.  I have to ask it again because now I
15   screwed it up.
16           If when Mr. Kamionski told you oh, the second
17   person was supposed to be Puerto Rican, did you ask him
18   any follow-up questions?
19       A.  No.
20       Q.  Did you ask Mr. Kamionski why he wanted you to
21   write up a report if you were telling him it was Mexican
22   and it was supposed to be Puerto Rican?
23       A.  I didn't know what the theory of the case
24   was.  All I knew is that he wanted -- and I didn't know

Page 57

1  why he needed to know.  I didn't know if it was good for
2  him, bad for him, a neutral fact.  I knew nothing.  He
3  wanted me to write it up and that was it.
4      Q.  Well, you --
5      MR. KAMIONSKI:  Let her finish.
6  BY THE WITNESS:
7      A.  We used to -- I used to hire engineers.  I
8  used to hire experts, not me personally, but my firm and
9  we would ask for a report, even if it didn't go our
10  way.  I mean, it is what it is.  You can't tell the
11  client, look, this didn't work.  So the fact that he
12  asked me for a report didn't surprise me.
13      Q.  All right.  When he made that statement that
14  the No. 2 person was supposed to be Puerto Rican and you
15  knew that your translators said Mexican, you are saying
16  in your mind you had no understanding that he wanted the
17  person to be Mexican, none at all in your mind?
18      A.  Not at that time.
19      Q.  Did you ask him any follow up to what he meant
20  by the person was supposed to be Puerto Rican?
21      A.  No.
22      Q.  Why not?
23      A.  Because I wanted to be as neutral as possible.
24      Q.  Are you certain that you didn't know that it

Page 58

1  was supposed to be Puerto Rican was the other side's
2  theory and not his theory?  Are you certain?
3      A.  I am positive because I didn't want to know.
4  I didn't ask a follow-up question.  In my mind I wanted
5  to be as neutral as possible.  So I didn't want to know.
6      Q.  If you wanted to be as neutral as possible --
7  if you wanted to be as neutral as possible, why was it
8  appropriate that Mr. Kamionski told you that he was
9  supposed to be Puerto Rican?
10      A.  At that point we already had the results.
11      Q.  But you hadn't written your report, right?
12      A.  That's right.
13      Q.  So why was it --
14      A.  (Inaudible.)
15      Q.  You said that's right.  Sorry.  That's why I
16  went to ask another question, but you answered the
17  question.
18          Why was it appropriate for Mr. Kamionski to
19  tell you he was supposed to be Puerto Rican before you
20  wrote the report then?
21      MR. KAMIONSKI:  Objection, calls for speculation,
22  and it's already been asked and answered.  You can
23  answer.
24

Page 59

1  BY THE WITNESS:
2      A.  Why was it appropriate?  The results were at
3  that point what they were.  I just had to write up the
4  report, but I didn't -- I didn't look -- they all say
5  Mexican.  Mexican.  That's what I am going to put on the
6  paper.  He is Mexican.
7      Q.  Do you wish --
8      A.  Him telling me that he thought it was Puerto
9  Rican is not going to make me all of a sudden make the
10  second person Puerto Rican.
11      Q.  Do you wish --
12      A.  I did not --
13      Q.  All right.  You know, you do have full stops
14  in those answers.  It is not going to show in the
15  transcript, but, you know, question, answer.
16  Explanations for later at trial.
17          Was it appropriate that you were told he was
18  supposed to be Puerto Rican before you wrote your
19  report?
20      A.  I don't see -- it didn't influence.  It was
21  just information.  It did not influence what the results
22  were of the report at all.  The results were in.
23      Q.  All right.  When you were a lawyer you said
24  sometimes you would talk to an expert.  If the expert

Page 60

1  gave you news that you didn't want to hear, you are
2  saying you still told the expert to put it in writing
3  and write up a report?
4      A.  If someone needed the information for.
5      Q.  I am asking you when you were a lawyer and you
6  get an oral report from an expert that doesn't go your
7  way, wasn't it your practice to say -- you got to let me
8  finish this time.  Wasn't it your practice to say well,
9  you know, thank you very much, you still get paid, but
10  you don't have to write up a report that is bad for us?
11      A.  It depended on the situation.
12      Q.  Can you ever think of a situation where an
13  expert gave you a bad news and you nonetheless told the
14  expert I want to pay you to write up the report with the
15  bad news?
16      MR. KAMIONSKI:  I'm just going to object to the
17  extent that it misstates her testimony.  I thought she
18  said her firm did the expert retention.  I don't think
19  she said she did the expert retention.
20      MR. LOEVY:  Avi, that's not a proper objection.
21  That's an explanation.  That's a hope that the witness
22  will pick up on what you said.  Please just limit your
23  objections to form or something appropriate, but you can
24  answer the question as it was posed.

Page 61

```
 1   BY THE WITNESS:
 2       A.  When I was in litigation, I didn't deal with
 3   that, but when we were in -- when we were in the FCC
 4   practice, you needed to know the information one way or
 5   the other, and if it was bad for you, you also had to
 6   present that to the client, look, this is bad for us.
 7   We are going to have to take a different route because
 8   we don't have this, but it still needs to be
 9   documented.  We need to release it to the client.
10       Q.  At what point did Avi tell you that his side
11   didn't want him to be Puerto Rican?
12       A.  I think after I sent him the written report.
13       Q.  You said I think.  Is there any doubt in your
14   mind that before you sent him the written report you
15   didn't know that Avi's side didn't want him to be Puerto
16   Rican?
17       A.  I don't recall having any conversations with
18   Avi other than, you know, the report is coming.  I am
19   still working on it.
20       Q.  Is there any doubt in your mind?
21       A.  No, (inaudible.)
22       Q.  We missed that answer.  Sorry.
23       A.  No, there isn't any doubt.
24       Q.  There is no doubt in your mind that before you
```

Page 62

```
 1   put fingers to keyboard to write this report, you didn't
 2   know that it was supposed to be Puerto Rican was the
 3   other side, and not Avi's side?
 4       A.  I didn't know.
 5       Q.  If you had known, would your report be
 6   invalid?
 7       A.  No.
 8       Q.  Why not?
 9       A.  Because it doesn't matter.  If he wanted him
10   to be Puerto Rican and this had said Mexican, I would
11   say Mexican.  If he had wanted him to be Mexican, this
12   would say Mexican.  It is Mexican.  That's what the
13   translator told me and that's what I wrote up.
14       Q.  All right.  Has your firm ever done any work
15   like this before for litigation?
16       A.  No.  The closest we have ever done for
17   litigation was at one point we had a company who was a
18   treasure and salvage company who hired us to translate
19   some 17th century Spanish documents regarding the bills
20   of lading, the contents of a Spanish schooner or
21   something.
22       Q.  That's the closest?  Sorry.
23       A.  Yeah, I have never been asked to testify in
24   this manner before, no.
```

Page 63

```
 1       Q.  Has your company ever done anything like this
 2   project?
 3       A.  No.
 4       Q.  Has your -- and you said your company once
 5   testified in court about a 17th century schooner?
 6       A.  We did not testify.  We prepared documents
 7   that were then presented to court.  We knew that they
 8   were for litigation at the time.
 9       Q.  All right.  Were you --
10       A.  (Inaudible.)  No one in my company has ever
11   testified in court on behalf of or against any client.
12       Q.  Were you involved in the schooner project?
13       A.  No.  It was fun though.  I read it.
14       Q.  What was the gist?
15       A.  The gist was that they had -- they pulled up
16   this Spanish boat from the 1600s and they wanted to find
17   out what was on it, and so we had correspondence from
18   the captain to the crowd of Spain that said, you know,
19   what was on it, who was on it.  There was some
20   documentation there about whether these people were paid
21   and so we were translating all of that, but it was very
22   old Spanish and so in some cases our translators had to
23   do some research to try to explain context so that the
24   document would be understandable.  So that's what we
```

Page 64

```
 1   did.
 2       Q.  Got it.
 3       A.  But I wasn't present on the project.
 4       MR. KAMIONSKI:  Jon, can we do a 5-minute bathroom
 5   break?
 6       MR. LOEVY:  I'll defer to you and the witness if
 7   you would like to break now or push forward a little
 8   bit.
 9       MR. KAMIONSKI:  How are you on time?
10       MR. LOEVY:  Hard to say, but, you know, we are
11   making progress.  We haven't gotten to the -- we aren't
12   finishing probably before you have to go to the
13   bathroom.
14           (Short break was taken.)
15       MR. LOEVY:  All right.  We will go back on the
16   record if everybody is ready.
17   BY MR. LOEVY:
18       Q.  You mentioned that sometimes you would have
19   conversations with Avi where you guys were fine tuning
20   the project.  Can you tell me what you meant?
21       A.  He came to me.  He said this is, you know, he
22   said I would like someone to be able to testify, you
23   know, your company has found that they are Mexican from
24   his first conversations with Lisa and that whole
```

Page 65

1  finding. And he said can someone testify to that. And
2  I said well, the only way I can testify to that is if we
3  did it again in a controlled situation where I kind of
4  knew the circumstances by the way people got the
5  information, what instruction they were given, because I
6  didn't know what Lisa had said.
7       So I said so I am willing to do it again and
8  run the experiment again, and so then we talked later
9  when I finally, you know, was able to decide how to do
10 it and I created the questionnaires, that this is what I
11 am going to do. I am going to hire the five people,
12 give them the questionnaire and the tape and then they
13 will fill it out.
14     Q.  Do you know if they --
15     A.  I -- (inaudible.)
16     Q.  Do you know if they were the same people Lisa
17 used; did any of them overlap?
18     A.  I am trying to remember.
19     Q.  If you don't know, you don't know.
20     A.  I specifically asked Brian not to, but I don't
21 know what the record was of who did it earlier, but to
22 my knowledge they are not the same.
23     Q.  But you have no knowledge either way it sounds
24 like?

Page 66

1      A.  No.
2      Q.  That is accurate, right, you don't know
3  personally either way whether the same people were used?
4      A.  No.
5      Q.  You have to say I agree or I disagree.
6      A.  I do not know whether or not the same people
7  were used.
8      Q.  Do we have any way of knowing who the Lisa
9  people were?
10     A.  No, because I believe, and again, I did not
11 speak to her, but I believe that project was done very
12 informally.
13     Q.  But we don't -- maybe they informally pulled
14 the same five speakers. We just don't know, right?
15 Same five translators, sorry.
16     A.  I can't speak to that either way, but I can
17 tell you what my understanding was, but that doesn't --
18 I don't know anything for a fact. But my understanding
19 was that she pulled people that were there --
20 translators that were there in the office.
21     Q.  But it sounds like you have no personal
22 knowledge as to who Lisa used, right?
23     A.  No, I don't.
24     Q.  So you can't say as a factual matter either

Page 67

1  way whether when the project got redone they used the
2  people that Lisa had already used?
3      MR. KAMIONSKI:  Objection, asked and answered. You
4  may answer again.
5  BY THE WITNESS:
6      A.  I don't know for a fact, no.
7      Q.  All right. How did you chose five translators
8  instead of three or seven or ten?
9      A.  Round number.
10     Q.  How come you didn't chose more Mexicans and
11 more Puerto Ricans?
12     A.  I don't know. It really didn't occur to me.
13     Q.  All right. What expertise are you bringing to
14 the project?
15     A.  My expertise is my company does language.
16 That's what we do. We chose linguists. We base those
17 linguists on the needs of the client. I understand from
18 my personal background and my personal experience that
19 different people from different cultures -- there are
20 roughly 17 Hispanic cultures. Different people from
21 different cultures in different countries have different
22 accents and different vocabulary. It is the same in
23 English, but we know Spanish.
24     Q.  All right. But I'm --

Page 68

1      A.  (Inaudible) very talented translators and I
2  have access to that pool of talent. They can give me,
3  in my opinion, very reliable information as to whether
4  or not this type -- this vocabulary is used in this part
5  of the world or that part of the world, and doing my
6  research, my research was essentially contacting these
7  people and saying you are from this country. You tell
8  me. Do you use this language or not. If this person
9  sounds like someone, you know, where do they come from.
10     Q.  But you didn't select the translators,
11 correct?
12     A.  No, but we have well-qualified translators.
13 Our book of translators are well qualified.
14     Q.  My question was you didn't select the
15 translators, right?
16     A.  No.
17     Q.  So you didn't bring any expertise to bear on
18 selecting the translators, right?
19     A.  No, but my company -- these are translators
20 who work with my company which means they have already
21 been bidded by my company and by my company standards
22 for working with our clients. So they are translators.
23 They are actual translators. They are not just people
24 who speak a language. I know plenty of people from all

Page 69

1 countries in Latin America.
2     Q. But these are 5 of 10,000?
3     A. Pardon me?
4     Q. These are 5 of the 10,000 people that your
5 company uses?
6     A. Yes, but not all 10,000 are Spanish speakers.
7     Q. All right. Are they the regulars, any of
8 these five?
9     A. I believe so. I actually recognized a couple.
10    Q. I'm sorry. I cut you off.
11    A. I actually recognized a couple of the names.
12 We have been working with them for a significant period
13 of time, significant in the life of the company.
14    Q. Which of the five are regulars? And if I can
15 ask you without looking. Can you tell me without
16 looking or have you already looked?
17    A. No, I haven't looked, but I have their names
18 here to be honest with you.
19    Q. Well, without looking any further. Look up.
20    A. Okay. So I am not looking at anything.
21    Q. Well, it looks like you are looking.
22    A. Well, I didn't actually get to that page is
23 what I am saying.
24    Q. Well, do you know if any of them are regulars?

Page 70

1     A. There were two names that I recognized, but I
2 redacted the names very early in the process.
3     Q. What do you mean?
4     A. I redacted -- the names are not on here. The
5 names are not in the report.
6     Q. All right. So are there any regulars that
7 were used?
8     A. Yes.
9     Q. What are their names?
10    A. I remember recognizing the names as people we
11 have used frequently in the past.
12    Q. Which --
13    A. (Inaudible) that I actually reviewed, but I
14 don't remember which names they are.
15    Q. Which country did they come from?
16    A. I want to say the Ecuadorian one and the
17 Argentine and I can't recollect the rest of them.
18    Q. So were the Mexican --
19    A. They were familiar.
20    Q. Were the Mexican --
21    A. The Mexican -- the Mexican name was not
22 familiar to me.
23    Q. Was the Puerto Rican name a regular?
24    A. I don't want to say yes or no on that because

Page 71

1 I can't remember one way or the other. I do know for a
2 fact that the Mexican name was not familiar to me.
3     Q. All right. Will you tell me the five names of
4 the five translators?
5     A. Yes, I think they have already been provided
6 to you.
7     Q. I thought you said it was redacted?
8     A. No. They were provided to --
9     MR. KAMIONSKI: I sent you an e-mail a few days ago
10 with the list of names and where they are from.
11    MR. LOEVY: All right. That I don't have. Did you
12 send us the addresses?
13    MR. KAMIONSKI: We sent you the city and the
14 country that they were in.
15    MR. LOEVY: Did you send us the -- so you did not
16 send us the addresses?
17    MR. KAMIONSKI: Right. I was waiting to follow up
18 on what more information you wanted after that.
19 BY MR. LOEVY:
20    Q. Would you be willing to send us their phone
21 numbers?
22    A. Yes, we have them and e-mails.
23    Q. Would you be willing to let us talk to them?
24    A. Yes. That's up to them.

Page 72

1     Q. Well, would you facilitate us talking to
2 them?
3     A. I would not block you talking to them and I
4 will give you the contact information that we have.
5     Q. Would you facilitate us talking to them?
6     MR. KAMIONSKI: What does that mean?
7     MR. LOEVY: Like we want to depose them possibly.
8 You know, I think what we all agreed was we would wait
9 and see how this deposition went to see if there was a
10 need to take it further. As you know, we reserve the
11 right to bar the admissibility of this testimony, but
12 Mr. Kamionski, the way I understood the way we were
13 going to proceed was we are going to take this
14 deposition and then reevaluate whether there is a need
15 to depose the translators. Is that your understanding?
16    MR. KAMIONSKI: Yes.
17    MR. LOEVY: Are you guys in a position to produce
18 the translators for deposition?
19    MR. KAMIONSKI: I mean, we would have to figure
20 that out. I am not sure logistically how that would
21 work out because they are out of the country. We would
22 have to work on that because it is a project.
23    MR. LOEVY: Well, let's defer that and see how the
24 rest of the deposition goes.

Page 73

1    BY MR. LOEVY:
2        Q.  You, to prepare your report, you read the
3    questionnaires, correct?
4        A.  Yes.
5        Q.  And you did not listen to the tape, correct?
6        A.  No.
7        Q.  You keep saying no, but it is ambiguous if you
8    say no.
9        A.  I'm sorry.  It is correct.
10       Q.  And then you wrote up the report based on
11   reading the questionnaires, right?
12       A.  Yes.
13       Q.  There is nothing about your summary in your
14   report about the questionnaires that is not merely a
15   summary of the questionnaires; would you agree with
16   that?
17       A.  Yes.
18       Q.  And the reports themselves are a better source
19   of data than your summary of the reports; would you
20   agree with that?
21       MR. KAMIONSKI:  Objection to the form of the
22   question.
23   BY THE WITNESS:
24       A.  That's why I included the actual

Page 74

1    questionnaires themselves.  I did not want to
2    misrepresent the data that I was given.
3        Q.  Well, let's take a look at the report on the
4    Ecuadorian.  Do you have the questionnaire for the
5    Ecuadorian?  The Ecuadorian translator I am talking
6    about.
7        A.  Yes.
8        Q.  All right.  What did the Ecuadorian say about
9    Speaker No. 2?
10       A.  Speaker 2 -- well, which block?
11       Q.  The nationality of Speaker No. 2?
12       A.  Speaker 2 seems to be from Mexico.
13       Q.  All right.  Is that the same thing as the
14   person is Mexican?
15       A.  No.
16       Q.  Why in your report did you not write that one
17   of the translators says seems to be from Mexico?
18       A.  Again, that's why I attached the actual
19   information, so that to the extent that my summary was
20   not clear, that the actual opinions of each of the five
21   translators were there so there was no -- there is no
22   question as to what this person said.  So --
23       Q.  But I'm asking --
24       A.  (Inaudible) each summary because the only

Page 75

1    other way I could have done it was essentially lift this
2    answer and put it in my summary and list one said this,
3    one said this, one said this, one said this and one said
4    this.  I attached the actual information so it would be
5    perfectly clear what this person says.
6        Q.  Why is your summary an improvement on just
7    attaching the reports?  I don't understand what your
8    summary adds.
9        A.  Why is it an improvement?
10       Q.  What does your summary add?
11       A.  It compiled the information.  There was no
12   decision to be made here.  They all said Mexico.  So
13   there was no -- there is nothing -- it is very
14   straightforward.
15       Q.  What does your summary add to the presentation
16   other than that is not in the reports?
17       A.  My summary as a result of the reports?
18       Q.  Yeah.
19       A.  I don't add anything to the data itself.
20       Q.  All right.  Why when you were writing up the
21   summary didn't you include that the Ecuadorian said it
22   seems to be Mexican?  Why didn't that make your summary
23   as opposed to is Mexican?
24       A.  May I look at my summary, please?

Page 76

1        Q.  Sure.
2        A.  His accent and vocabulary one.
3        Q.  Well, what you wrote in the report was all
4    five translators agreed that his accent and vocabulary
5    were decidedly Mexican.  That's what you wrote in your
6    report, correct?  Correct?
7        A.  They did not -- yes, I did.  They did not
8    choose any other nationality, either Mexican or Cuban.
9        Q.  I got to ask the question again because I was
10   just asking you wrote in your report that all five
11   translators agreed that his accent and vocabulary were
12   decidedly Mexican.  You wrote that, correct?
13       A.  Yes.
14       Q.  Why didn't you write that the Ecuadorian, for
15   example, said seems to be Mexican?
16       A.  Because I attached it.
17       Q.  All right.  But would you agree with me seems
18   to be Mexican is different than decidedly Mexican?
19       A.  None of them suggested any other possibility.
20       Q.  Would you just focus on my question.
21           Is saying that they seemed to be Mexican a
22   different thing than saying they said it was decidedly
23   Mexican?  Are those two different things?
24       A.  Okay.  Sure.

Page 77

1    Q.  Well, I am just asking you.  Is that in your
2  view two different things?
3    A.  When I was writing the report, my focus was
4  Mexican over any other linguistic background and none of
5  them -- they all said Mexican.
6    Q.  All right.  Let's look at the Guatemalan
7  person.  It says I could say he is Mexican, but seems to
8  be living in several years in the U.S., do you see that,
9  and then it goes on?
10    A.  Which one is this?
11    Q.  The Guatemalan.
12    A.  For Speaker 1?
13    Q.  Yes.
14    MR. KAMIONSKI:  Is there a question?
15  BY MR. LOEVY:
16    Q.  Yeah.  You see where it says I could say he is
17  Mexican, but he seems to be living in the U. S. and then
18  it goes on?
19    A.  Yes.
20    Q.  And then for Speaker 2 it says he talks very
21  softly and it is hard to understand and hear clearly,
22  but I think he is Mexican too, and then that one goes
23  on.  Do you see that?
24    A.  Yes.

Page 78

1    Q.  Did you do any follow up to determine whether
2  they thought he was or wasn't Mexican?
3    A.  He said he thought he was Mexican.
4    Q.  It says I think he is Mexican.
5    A.  That's right.
6    Q.  Now, on the same one, on the Guatemalan one,
7  it says list any other clues that give you the
8  impression that support the country, correct?  That's
9  one of the fields?
10    A.  Yes.
11    Q.  And for Speaker No. 1, the Guatemalan gave a
12  clue why he thought that Speaker No. 1 was Mexican,
13  correct?
14    A.  Yes.
15    Q.  And for the Guatemalan translator, when they
16  were asked if there is any clues that support his
17  conclusion that I think he is Mexican, they didn't have
18  any clues, correct?
19    A.  The clues were accent or vocabulary.
20    Q.  All right.
21    A.  So they already (inaudible) vocabulary.  They
22  didn't have anything else.
23    Q.  That's what I was asking.  They left that
24  field blank, correct?

Page 79

1    A.  Yes.
2    Q.  All right.  Let's look at the Mexican
3  translator.
4    A.  Okay.
5    Q.  You see the last field.  It says if you can't
6  determine where the speakers are from, please give an
7  opinion regarding whether the speakers are of the same
8  nationality or if they have different backgrounds.  Do
9  you see that?
10    A.  Yes.
11    Q.  Would you agree with me that the way to read
12  that paragraph is if you can't determine where the
13  speakers are from, to please give an opinion.  That's
14  what it says, right?
15    A.  Yes.
16    Q.  All right.  Now, the Mexican in response to
17  the question if you cannot determine where the speakers
18  are from, please give an opinion, the Mexican translator
19  gave an -- answered that question for Speaker No. 2,
20  didn't he?
21    A.  Yes.
22    Q.  So would you agree with me that the Mexican
23  translator is saying he can't determine where the
24  speakers are from?  He says there is no clear accent.

Page 80

1    A.  In Question No. 2, does he have an accent
2  specific to any country or region.  If so, what country
3  and/or region and he identified Mexico as their
4  qualifications.
5    Q.  Well, that says he has a Mexican accent,
6  right?
7    A.  Yes.
8    Q.  But I am asking you a different question.
9      It says on the last question if you can't
10  determine where the speakers are from, please answer
11  this question.  And isn't it true that the Mexican
12  translator answered that question and said there is no
13  clear accent for Speaker No. 2.  That is true what it
14  says, correct?
15    A.  Yes.
16    Q.  Would you read this form to be that this
17  Mexican translator can't determine where the speakers
18  are from because there is no clear accent?
19    A.  He indicates in Question 2 that his accent is
20  specific to country or region and he said Mexico and
21  that's where I gleaned the information.
22    Q.  Let's take that one step at a time.
23      In Question No. 2 it says does he have an
24  accent and the answer is Mexico, correct?

Page 81

1     A.  Yes.
2     Q.  But then at the bottom, the final question
3  says if you cannot determine where the speakers are
4  from, please answer this question and the translator did
5  answer that question and said there is no clear accent
6  for Speaker No. 2.  That is also true, right?
7     A.  He did say that.
8     Q.  All right.  That's what I am asking.  Now,
9  when you made up your summary, why didn't you summarize
10 that the translator from Mexico said he couldn't
11 determine where the guy was from because there is no
12 clear accent?  Why didn't you put that in your summary?
13    A.  Because I did not give an opinion as to where
14 he was from.  I am giving an opinion as to what accent
15 and language he was using and the Mexican translator
16 said that he had an accent that was specific to Mexico
17 and he was using vocabulary that was consistent with the
18 Mexican speaker, but he couldn't -- he says here that he
19 couldn't determine where he was from which means he
20 couldn't say Central America, Central Mexico, Northern
21 Mexico, U.S. based.  He couldn't pinpoint it because the
22 accent wasn't there.
23    Q.  He did -- the Mexican translator said that
24 Speaker No. 2, the one we are talking about, the one we

Page 82

1  are interested in, did not have a clear accent, correct?
2     A.  There is no clear accent for Speaker 2.
3     Q.  All right.  When you use the term their
4  nationality, what do you mean by that?
5     A.  If you were listening to U.S. based speakers
6  and you hear someone who sounds southern, you may be
7  able to say they don't sound like they are from New
8  York.  They sound like they are somewhere in the south,
9  but you may not be able to pinpoint whether it is
10 Virginia, Alabama, Texas, Georgia.
11    Q.  The question was what do you mean by
12 nationality, Miss Ward?  Is that your answer?
13    A.  Nationality is ethnic background.
14    Q.  What is your nationality?
15    A.  I am American.
16    Q.  Okay.
17    A.  My ethnic background is Columbian and Cuban.
18    Q.  Well, I didn't ask your ethnic background.  I
19 said what is your nationality?
20    A.  My nationality is American.
21    Q.  Do you have -- are people that are born in
22 this country and Mexican parents and live in Mexican
23 neighborhoods and speak Spanish at home but they are
24 American citizens, what is their nationality?

Page 83

1     A.  Born in the U.S.?
2     Q.  Yes.
3     A.  They are American, U.S. born.
4     Q.  All right.  There is no question on your form
5  of ethnicity, is there?
6     A.  No.
7     Q.  That's the old ambiguous no there.
8     A.  No, there is no question on here.
9     Q.  One of the questions has to do with accents,
10 correct?
11    A.  Yes.
12    Q.  Tell us what informs a person's accent.  What
13 are some of the factors?
14    A.  Decadence of their voice; where they put the
15 accent in when they speak; how they pronounce their
16 vowels; how they pronounce the consonants.  How quickly
17 they speak sometimes.  I mean, the announcements would
18 be the same in any language.  You can tell the
19 difference between maybe younger as a rule.
20       Not, you know, these things aren't down pat,
21 but you can tell if you listen to Joe Pesche, he is not
22 from Alabama.  He is from the New York area somewhere
23 between Philadelphia and New Jersey, New York.  If you
24 are not from that area, you are not going to be able to

Page 84

1  pinpoint where he is from, but you know he is not from
2  Alabama, he is probably not from California, probably
3  not from Texas.
4     Q.  I am going to cut you off.
5     A.  There is stereotypes.
6     Q.  Because I was asking a different question.
7  Sorry.  I was going to let it run its course, but it
8  started going long.
9        My question was what are the factors that go
10 into an accent?  For example, where a person lives, what
11 their parents sound like?  Do you understand what I am
12 getting at more now?
13    A.  Oh, like how you pick up an accent?
14    Q.  Yeah, that's what I am asking.  How do you
15 pick up an accent?
16    A.  Where you live, where your parents are from,
17 where you learn how to speak that particular language.
18    Q.  How about your peers?  Could your peers affect
19 your accent?
20    A.  Yes.
21    Q.  Could your neighborhood affect your accent?
22    A.  Probably.
23    Q.  I mean, if you live on Bourbon Street in
24 Louisiana, you are going to have a certain sound that is

Page 85

1    going to be different than if you live in East LA,
2    right?
3         A.  That could be true, yes.
4         Q.  Have you ever --
5         A.  Not universal, but it could be true.
6         Q.  Have you ever done any academic study on stuff
7    like that?
8         A.  No.
9         Q.  Have you ever -- what did you major in in
10   school?
11        A.  Government.
12        Q.  Have you ever done any study of accents or
13   ethnicity, any academic training?
14        A.  No.
15        Q.  And you said you did go to law school though?
16        A.  Yes.
17        Q.  Who picked the fields on the questionnaire?
18        A.  I wrote those.
19        Q.  Did you do that in consultation with the
20   defense firm for the city?
21        A.  No.
22        Q.  How did you know what was the fields to use
23   then?
24        A.  What I would want to know.

Page 86

1         Q.  Well, what was your understanding of the
2    project?  You were trying to figure out what he was,
3    where he lived, what his accent was?
4         A.  Yeah, what he sounded like.
5         Q.  Were you trying to find out where he was born,
6    the man on the tape?
7         A.  No.
8         Q.  Were you trying to find out where the man on
9    the tape grew up?
10        A.  No.
11        Q.  Were you trying to find out what neighborhood
12   the man in the tape lived in?
13        A.  No.
14        Q.  Were you trying to find out where -- what the
15   nationality was of the man on the tape?
16        A.  No.
17        Q.  Were you trying to find the ethnicity of the
18   man on the tape?
19        A.  No.  I was trying to find his accent and
20   language background.
21        Q.  All right.  You have no opinions about the
22   tape, right, because you have never listened to it,
23   correct?
24        A.  That's correct.

Page 87

1         Q.  Why didn't you listen to the tape?
2         A.  Because my background is in Columbian and
3    Cuban and I was born in the United States.  So while I
4    could tell you that they are not Columbian or they are
5    not Cuban, I knew that the language pair of Mexican or
6    ethnicity pair of Mexican and Puerto Rican, I would not
7    be able to give an opinion other than to say they are
8    not Columbian or they are not Cuban.
9         Q.  Sometimes if someone has an accent -- well,
10   let me strike that.
11             If someone's parents are a certain ethnicity
12   but they live in a different neighborhood from their
13   parents ethnicity, can that affect their accent?
14        A.  Do you want to know from my personal
15   experience?
16        Q.  Well, let's start there.  How about from your
17   personal experience?
18        A.  From my personal experience it didn't affect.
19        Q.  Okay.
20        A.  My --
21        Q.  I'm sorry?
22        A.  Pardon me?
23        Q.  That's your personal experience.  Do you have
24   any expertise on that subject?

Page 88

1         A.  No.
2         Q.  All right.  And when you say your personal
3    experience, you mean your parents are I think you said
4    Columbian and Cuban?
5         A.  Cuban, um-hum.
6         Q.  And what neighborhood did you grow up in?
7         A.  I grew up in southern --
8         Q.  You don't have to be specific.
9         A.  I grew up in a southern town.
10        Q.  Did you develop any southern drawl?
11        A.  No.
12        Q.  At any point in your life did you speak with a
13   southern drawl?
14        A.  No.
15        Q.  Sometimes when people go home, they sort of
16   revert.  Do you sound different when you go home?
17        A.  No.  We spoke Spanish at home and my father
18   has a very neutral English accent because he learned
19   English in a classroom.  So he doesn't really have an
20   accent per se, and so I spoke two languages from very,
21   very early on so my vowels kind of a little more
22   available I suppose.
23        Q.  How far south are we talking?
24        A.  Southwest Virginia.

Page 89

1     Q.   What is -- do me an impression of southwest
2 Virginia. How do they sound?
3     A.   I am not very good at this. They tend to be
4 exaggerated. My best friend talks like this (vocally
5 demonstrating).
6     Q.   All right. That's full scale southern drawl.
7     A.   Um-hum.
8     Q.   Did anybody in your family adopt a southern
9 drawl?
10     A.   No.
11     Q.   Brothers or sisters?
12     A.   I only have one brother, and no, he doesn't
13 have a southern accent.
14     Q.   The subject of whether a person adopts the
15 linguistic speaking patterns and accents of their
16 neighborhood, that subject you have no expertise in?
17     A.   I am from a mixed Hispanic background and I
18 have friends from, and to this day have friends from
19 Puerto Rico, I have friends from Mexico, I have friends
20 from Columbia, I have friends from Cuba, and Cubans in
21 Miami have stronger accents, stronger Cuban accents than
22 Cubans elsewhere, but they don't sound like somebody
23 else. They just might have a milder accent.
24     Q.   Well, I am asking if the question of whether a

Page 90

1 person who if they grow up in a certain neighborhood, if
2 they do or don't adopt that accent, that's not a subject
3 that you have expertise in beyond the average person?
4     A.   (Inaudible) that I sound like my parents.
5     Q.   I cut you off. Can you answer that?
6     A.   My personal experience is that I sound like my
7 parents, but I have never done any study on the
8 linguistic patterns of acquisition; the patterns of
9 acquisition of accents based on where you live.
10     Q.   All right. And I understand that you, like
11 all of us, have personal life experiences, but I am not
12 limiting it to academic research.
13     Do you have any particular expertise at all
14 beyond your normal I am a person too stuff?
15     A.   Other than I have actually been interested in
16 this for a long time and I grew up in a household that
17 had two different accents. My father is Cuban and my
18 mother is Columbian.
19     Q.   But aside from your --
20     A.   So I grew up with accents. I grew up
21 translating between one set of vocabulary and a
22 different set of vocabulary and my experience it is not
23 uncommon based on my communications with people from all
24 over the country that are Latin American that had the

Page 91

1 exact same experience, whether they grew up here or
2 whether they grew up in another country, their
3 experiences in translating language, in acquiring
4 language, in speaking language based on the large number
5 of people that I know who have these -- that's what I
6 base my opinion on, on my life experience.
7     Q.   I am asking a specific question though. I
8 have life experiences and I know a lot of people too and
9 so does Mr. Kamionski, but my question is do you have
10 any particularly different or unique or better
11 experience in the subject of whether people acquire
12 accents from the neighborhood that they are in?
13     A.   No, I would have to say not other than are
14 those -- no, no.
15     Q.   All right. You said that in your personal
16 experience people can acquire accents from their
17 neighborhood. Did I understand that correctly?
18     A.   Yes.
19     Q.   Tell me more about that.
20     A.   If, for example, children who have parents at
21 home who don't speak English fluently or speak English
22 with an accent. For example, my mother speaks English
23 with a Latin American accent. I do not. I have
24 American, standard American English. My early training

Page 92

1 in English was off the television which tends to be a
2 very neutral accent in English, and that's how I learned
3 how to speak English, off the television. So that's
4 where my accent came from. So you are a product of
5 your -- you are a product of your surroundings.
6     Q.   All right. Again --
7     A.   You learn what --
8     Q.   That is just your life experience, but you
9 don't have any particular expertise in that, right?
10     A.   That's based on my life experience.
11     Q.   Are people with regional accents, either
12 Mexican or Puerto Rican accents -- well, let me strike
13 that.
14     If someone sounds Puerto Rican, that could be
15 a product of having Puerto Rican ethnicity. It could
16 be, correct?
17     A.   It could be.
18     Q.   It also could be a product of having a lot of
19 Puerto Rican peers, correct?
20     A.   Sure.
21     Q.   It could also be a product of having Puerto
22 Rican parents?
23     MR. KAMIONSKI: You froze the last question.
24

Page 93

BY MR. LOEVY:
1  BY MR. LOEVY:
2      Q.  If you have a Puerto Rican accent when you
3  speak your Spanish, that could be a product of having
4  Puerto Rican parents, correct?
5      A.  Yes.
6      Q.  It could also be a product of living in a
7  Puerto Rican neighborhood, correct?
8      A.  Yes.
9      Q.  If someone was Phillipino and they lived in a
10  Puerto Rican neighborhood, they might sound Puerto
11  Rican; is that true?
12      A.  Speaking what language?
13      Q.  I guess Phillipinos don't speak Spanish or do
14  they?
15      A.  I mean, if they learned how to speak Spanish
16  and they learned to speak Spanish with Puerto Ricans, I
17  would assume that they would sound like Puerto Ricans
18  because that's who they learned Spanish from.
19      Q.  All right.  Well, let's take it with a more
20  clearer example.  If a Mexican, person of Mexican
21  ethnicity grew up in a Puerto Rican neighborhood with
22  Puerto Rican peers, that person might have a Puerto
23  Rican accent.  Would you agree with that?
24      A.  What do their parents speak?

Page 94

1      Q.  Well, let's just leave it equal.  Let's say
2  their parents speak English.
3      A.  So they don't speak -- so the parents don't
4  speak Spanish at all?
5      Q.  I am asking you about the question is about
6  the peers.  Okay?  Let's say they don't have parents.
7      A.  So they learned Spanish solely from their
8  peers?  They are going to speak it from their peers --
9  like their peers.
10      Q.  Well, here is my question.
11          If someone was Puerto Rican say and grew up in
12  a Mexican neighborhood and his peers were Mexican, that
13  person might adopt a Mexican accent.  Would you agree
14  with that?
15      A.  It depends on how they speak at home and where
16  they learned how to speak the language.
17      Q.  Well, you can't rule that out, can you?
18      A.  No.
19      Q.  You don't have any expertise --
20      A.  (Inaudible.)
21      Q.  You don't have any expertise either way,
22  correct?
23      A.  No.
24      Q.  You said no, but I think you are agreeing that

Page 95

1  that is correct, right?
2      A.  Yes.
3      Q.  Do you know which is stronger for a particular
4  accent?  If your peers speak -- let's say you are Puerto
5  Rican, okay, and your peers speak Mexican, but you learn
6  the language as a child from Mexicans.  Do you
7  understand the difference what I am asking you?
8      A.  Okay.  Could you start that all over again,
9  please.
10      Q.  Let's start again.  Let's say you are a Puerto
11  Rican ethnicity, but you have peers who speak Spanish
12  with a Mexican accent.  Do you understand my
13  hypothetical so far?
14      A.  So far.
15      Q.  And let's say your parents speak Spanish with
16  a Puerto Rican accent.  Are you with me so far?
17      A.  Yes.
18      Q.  But let's say you spend a lot more time with
19  your peers who speak Spanish with a Mexican accent.  Do
20  you understand my hypothetical?
21      A.  Yes.
22      Q.  Okay.  Other than guessing, do you have any
23  particular training which would enable you to say that
24  the person would sound more Puerto Rican than more

Page 96

1  Mexican?
2      A.  No.
3      Q.  So you would just be guessing?
4      A.  I would be basing it on what I know.
5      Q.  Which is your life experience?
6      A.  My life experience and the experience of
7  dealing with people that I know.
8      Q.  Well, let me ask you.  If the person spent a
9  lot of time with their peers who had a Mexican accent on
10  their Spanish, wouldn't that person sound Mexican?
11      A.  Not necessarily.
12      Q.  But --
13      A.  But they might.  It would be a blend.  They
14  would probably be -- I would expect an influence from
15  both.  I don't think it would be 100 percent.  I don't
16  think the child living in a home with one accent would
17  have their accent be completely like the other.  I think
18  there would be phrases of both in their vocabulary and
19  accent.  It would be a blending.
20      Q.  All right.  So if someone was Puerto Rican and
21  they had a lot of Mexican peers, you would expect
22  some -- you would expect them to sound at least somewhat
23  Mexican, correct?
24      A.  They would be blending.  I would expect that

Page 97

1 there would be some blending.
2     Q.  Do you know which influence would be stronger,
3 the peers or the parents?
4     A.  Based on what I know, people I know, the
5 parents would be more influential than the peers.
6     Q.  Have you ever, you know, backed that up or
7 thought about it?
8     A.  I have thought about it a lot.
9     Q.  All right.  What if they didn't spend very
10 much time at home?  What if they spent a lot more time
11 with their peers?  Would that change the calculus?
12     A.  Well, I base it on where you learn the
13 language.  If you learn -- if you learn the language
14 from your parents, then you are going to get some -- you
15 are going to get occasions from them first and then
16 your --
17     Q.  Let me ask you this.  If I took somebody from
18 Detroit and put them in southwest Virginia, in 2 years
19 they might sound like they have a southern drawl; would
20 you agree with that?
21     A.  They might, but that hasn't been my
22 experience.
23     Q.  Well, in Virginia didn't some people start
24 adopting a southern accent?

Page 98

1     A.  Some people start picking it up, but you could
2 usually tell who wasn't born in southwest Virginia.
3     Q.  Some people fairly quickly started picking up
4 a southern accent, didn't they?
5     A.  I don't know.
6     Q.  Well, I am asking from your life experience.
7 When you were in Virginia, some people who hadn't
8 started in Virginia but maybe lived there for 5 or 10
9 years, did they sound like Virginians?
10     A.  No.
11     Q.  Did they develop a southern accent?
12     A.  Not like the ones that everybody else has.
13 They might say certain things with a southern accent or
14 say it a certain way so they could be understood.
15     Q.  What if one parent was Mexican and one parent
16 was Puerto Rican?
17     A.  Yes.
18     Q.  How would that affect your analysis here?
19     A.  Well, that would be a situation that I grew up
20 in.
21     Q.  So you had a Columbian parent and a Cuban
22 parent.
23     A.  I have a Columbian mother and a Cuban father.
24     Q.  Okay.  When people -- if we would have

Page 99

1 recorded your voice for 2 minutes talking softly and
2 somebody listening to it talking Spanish, what would
3 that person say you were?
4     A.  They would probably if they were going to pick
5 something, they would pick Columbian.  That's what I
6 have been told.
7     Q.  All right.  So if someone recorded you in
8 Spanish for 2 or 3 minutes and listened to it, the most
9 likely thing is people would say that's a Columbian?
10     A.  Yes.
11     Q.  And you said your father is Cuban?
12     A.  Yes.
13     Q.  Do you know whether the neighborhood trumps
14 the peers or trumps the parents as a scientific matter?
15     A.  No.
16     Q.  When you were in your household, did your
17 father speak Spanish to you?
18     A.  I spoke to my father more in English.  My
19 mother and I always spoke Spanish.
20     Q.  Did you ever speak Spanish with your father?
21     A.  Of course, yeah.
22     Q.  Did you develop any Cuban accent?
23     A.  It depended on the words because there are
24 some words that Columbians just don't use.  So if I use,

Page 100

1 for example, Columbians say Gafa (phonetic), Cubans say
2 (inaudible).
3     MR. KAMIONSKI.  We will (inaudible).
4 BY MR. LOEVY:
5     Q.  Speaking of making the court reporter's life
6 difficult, I am going to play you some Spanish
7 speaking.  So I guess the court reporter is going to
8 write Spanish words unless she is bilingual.  We should
9 have requested a bilingual and I would like you to
10 listen to this.
11     A.  Okay.
12         (Whereupon, an audio tape was
13          played in Spanish.)
14 BY MR. LOEVY:
15     Q.  Where was that person born, Miss Ward?
16     A.  Where was he born?
17     Q.  I said where was that person born?
18     A.  I don't know.
19     Q.  How many parents in that person's home were of
20 Puerto Rican nationality?
21     A.  I don't know.
22     Q.  How many parents in that person's home were of
23 Mexican nationality?
24     A.  I don't know.

Page 101

1    Q.  Where did that person grow up?
2    A.  I don't know.
3    Q.  Do you have any opinion on any of those
4  subjects?
5    A.  No.
6    Q.  All right.  Listen to the next one.
7          (Whereupon, an audio tape was
8          played in Spanish.)
9  BY MR. LOEVY:
10   Q.  All right.  Where was that person born,
11 Miss Ward?
12   A.  I don't know where they were born.
13   Q.  All right.  How many parents in that person's
14 home were Puerto Rican?
15   A.  I don't know.
16   Q.  How many parents were Mexican?
17   A.  I don't know.
18   Q.  What neighborhood did that person grow up in?
19   A.  I don't know.
20   Q.  Did that person grow up in a Mexican
21 neighborhood or a Puerto Rican neighborhood?
22   A.  I don't know.
23   Q.  All right.  Listen to the next one.
24

Page 102

1          (Whereupon, an audio tape was
2          played in Spanish.)
3  BY MR. LOEVY:
4    Q.  Where was that person born?
5    A.  I don't know.
6    Q.  How many parents in that person's home were
7  Puerto Rican?
8    A.  I don't know.
9    Q.  How many parents were Mexican?
10   A.  I don't know.
11   Q.  Where did that person grow up?
12   A.  I don't know.
13   Q.  Do you have any opinion on those?
14   A.  No.
15   Q.  How about for the second one I played you?  Do
16 you have any opinion at all on any of those questions?
17   A.  No.
18   Q.  All right.  Let's listen to the next one.
19          (Whereupon, an audio tape was
20          played in Spanish.)
21 BY MR. LOEVY:
22   Q.  All right.  Where was that person born?
23   A.  I don't know.
24   Q.  Was that person's mother or father Puerto

Page 103

1  Rican?
2    A.  I don't know.
3    Q.  Was that person's mother or father Mexican?
4    A.  I don't know.
5    Q.  Did that person grow up in a Spanish
6  neighborhood?
7    A.  I don't know.
8    Q.  Did that person grow up in a Puerto Rican
9  neighborhood?
10   A.  I don't know.
11   Q.  Did that person grow up in a Mexican
12 neighborhood?
13   A.  I don't know.
14   Q.  Did it sound to you like that person grew up
15 in a Mexican or a Puerto Rican neighborhood?
16   A.  I don't know.
17   Q.  Are you able to tease out if that person's
18 accent was more from their parents or more from their
19 peer group?
20   A.  No.
21   Q.  Can you do that for any of the ones I have
22 played you so far?
23   A.  No.
24   Q.  All right.  I am going to play you another

Page 104

1  one.
2          (Whereupon, an audio tape was
3          played in Spanish.)
4  BY MR. LOEVY:
5    Q.  All right.  Where was this person born?
6    A.  I don't know.
7    Q.  What is your guess as to where that person was
8  born?
9    A.  I don't have a guess as to where they were
10 born.
11   Q.  What is your opinion as to where they were
12 born?
13   A.  I don't have an opinion as to where they were
14 born.
15   Q.  What about what neighborhood that person grew
16 up in, Mexican or Puerto Rican or somewhere else?
17   A.  No opinion.
18   Q.  Do you have an opinion as to whether they grew
19 up in a Cuban or a Columbian neighborhood?
20   A.  No.
21   Q.  Do you have an opinion as to whether they had
22 a parent who was Columbian or Cuban?
23   A.  No.
24   Q.  Let's listen to the next one.

Page 105

1          (Whereupon, an audio tape was
2          played in Spanish.)
3    BY MR. LOEVY:
4      Q.  All right.  What is your guess as to where
5    that person was born?
6      A.  Where they were born?  I don't have any guess.
7      Q.  All right.  Did that person have a peer group
8    that was Mexican growing up?
9      A.  I don't know.
10     Q.  Did that person have a peer group that was
11   Puerto Rican growing up?
12     A.  I don't know.
13     Q.  Did that person have an accent that was
14   Mexican or Puerto Rican?
15     A.  To me it did not.  I don't know.
16     Q.  Well, could you tell from the accent whether
17   it was Mexican or Puerto Rican?
18     A.  No.
19     Q.  Do you have an opinion?
20     A.  No.
21     Q.  Would you be able to have any expertise at all
22   as to whether the guy's whose voice I just played you
23   was maybe Mexican but had a Puerto Rican peer group or
24   actually had a Puerto Rican ethnicity but had a Mexican

Page 106

1    peer group?  Could you tell the difference there?
2      A.  No.
3      Q.  Could anybody?
4      A.  No.  Listening would give you where their
5    linguistic influence was.
6      Q.  But you couldn't be able to say if the person
7    had Mexican parents and a Puerto Rican peer group or a
8    Puerto Rican parent and a Mexican peer group, you
9    couldn't tease that out from just a recording, could
10   you?
11     A.  No.
12     Q.  Let's take a look at the questionnaire for the
13   Puerto Rican translator.  The box that says list other
14   clues that give you the impression.  The Puerto Rican
15   translator didn't put anything in that box, correct?
16     A.  That's right.
17     Q.  Although obviously there are other boxes on
18   the form, right?
19     A.  Yes.
20     Q.  Did you ask the translators as part of the
21   project to give you any kind of probabilities?
22     A.  No.  I gave them exactly what you have in the
23   report.  That's the only things they were given; that
24   and the tape.

Page 107

1      Q.  All right.  You weren't trying to get at -- or
2    were you trying to get at what the person's ethnicity
3    was?
4      A.  We were trying to get their linguistic
5    background which is their accent.  What do they sound
6    like.  Do they sound like a Puerto Rican national or do
7    they sound like a Mexican national or someone who had
8    those influences in their life.  I did not --
9      Q.  You weren't trying to figure out if where they
10   were born, for example, right?
11     A.  No, no.
12     Q.  And you weren't trying to figure out what
13   their blood lines were, whether they were Mexican or
14   Puerto Rican blood lines, correct?
15     A.  No, no.
16     Q.  That was correct?
17     A.  Yes.
18     Q.  It was more like what they sound like?
19     A.  Yes, what they sound like, exactly.
20     Q.  And you don't disagree that a Mexican person
21   that has Mexican blood lines can sound like a Puerto
22   Rican, do you?
23     A.  No, I don't disagree with that at all.
24     Q.  And a person who was Puerto Rican can sound

Page 108

1    like a Mexican, correct?
2      A.  Yes.
3      Q.  After you gathered all this data, are you
4    forming an opinion as to whether the guy on the tape had
5    a Puerto Rican parent or not?
6      A.  No.
7      Q.  After you gathered all the data and reviewed
8    it, are you forming any opinion as to whether the guy on
9    the tape had a Mexican parent?
10     A.  No.
11     Q.  Are you forming any opinion whether the guy on
12   the tape had a Mexican peer group?
13     A.  No.
14     Q.  Are you forming any opinion whether the guy on
15   the tape had a Puerto Rican peer group?
16     A.  No.
17     MR. LOEVY:  All right.  I don't have any other
18   questions.
19     MR. KAMIONSKI:  Nothing further on our end.
20     MR. LOEVY:  Thank you for your time.
21     THE WITNESS:  Thank you.
22     MS. REPORTER:  Signature?  Avi, are you reserving?
23     MR. KAMIONSKI:  Sure.  We will reserve.
24          (AND DEPONENT FURTHER SAITH NAUGHT)

Page  109

Page  111

UNITED STATES OF AMERICA )
WESTERN DISTRICT OF WASHINGTON )SS.
STATE OF ILLINOIS )
COUNTY OF COOK )

I, Sharon A. Jerndt, Certified Shorthand Reporter and Registered Professional Reporter, do hereby certify that LILIANA WARD was first duly sworn by me to testify to the whole truth and that the above deposition was reported stenographically by me and reduced to typewriting under my personal direction.

I further certify that the said deposition was taken at the time and place specified and that the taking of said deposition commenced on the 1st day of November, A.D., 2011, at 1:09 p.m.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor financially interested directly or indirectly in this action.

Page  110

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

THADDEUS JIMENEZ, )
                   )
        Plaintiff, )
                   )
     vs.           )
                   )
CITY OF CHICAGO, Chicago )
Police Detectives JEROME )
BOGUCKI, MARK SANDERS, RAYMOND ) No. 09 -cv-8081
SCHALK, F. MONTILLA, Chicago )
Police Officers LAWRENCE RYAN )
and ROBERT WHITEMAN, and )
as-yet unknown City of Chicago )
Employees, )
                   )
        Defendants. )
STATE OF ILLINOIS )
                   ) SS.
COUNTY OF COOK )

I, LILIANA WARD, state that I have read the foregoing transcript of the testimony given by me at my deposition on the 1st day of November, 2011, and that said transcript constitutes a true and correct record of the testimony given by me at the said deposition except as I have so indicated on the errata sheets provided herein.

_____
LILIANA WARD

No corrections (Please initial)_____
Number of errata sheets submitted_____(pgs.)

SUBSCRIBED AND SWORN to
before me this _____ day
of_____, 2011.

Page  112

Witness my official signature on this 10th day of November, A.D., 2011.

_Sharon A. Jerndt_

_____
SHARON A. JERNDT, CSR, RPR
205 West Randolph Street
5th Floor
Chicago, Illinois 60606
Phone: (312) 236-6936

CSR No. 084-004044