IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THADDEUS JIMENEZ | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | NO. 09-CV-8081 |
| | ) | |
| CITY OF CHICAGO, ET. AL. | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**PLAINTIFF'S MOTIONS *IN LIMINE***

| | | |
|---|---|---|
| Arthur Loevy | Stuart J. Chanen | Locke E. Bowman |
| Jon Loevy | Lisa Castle | RODERICK MACARTHUR JUSTICE |
| Russell Ainsworth | VALOREM LAW GROUP LLC | CENTER |
| LOEVY & LOEVY | 35 East Wacker Dr. | Northwestern University |
| 312 North May Street | 30th Floor | School of Law |
| Suite 100 | Chicago, IL 60601 | 357 E. Chicago Ave. |
| Chicago, IL 60607 | | Chicago, IL 60611 |
| (312) 243-5900 | | |

Plaintiff Thaddeus Jimenez, through counsel, respectfully requests an order *in limine* barring the following evidence and arguments from trial.

## 1. TO BAR "EXPERT" LILIANA WARD FROM TESTIFYING

The Federal Rules and the *Daubert* case law impose familiar restrictions on the admissibility of expert testimony. Here, the proposed testimony of Liliana Ward falls well short.

### Background

As the Court is aware from the summary judgment briefing, the Defendant police officers are alleged to have used improper methods in building a rather elaborate case suggesting that Plaintiff shot Eric Morro, complete with eyewitness statements and identifications. The problem for the Defendants, however, is that both the co-perpetrator (Victor Romo) and the surviving victim (Larry Tueffel) claim that Juan Carlos Torres was actually the person who shot Eric Morro, a fact confirmed by Juan Carlos' confession, which was captured on audiotape.

At trial, Defendants apparently aspire to challenge the validity of Juan Carlos' confession. To that end, they have disclosed the Rule 26 report of Liliana Ward, a lawyer who owns a translation company in Washington D.C. See Exhibit 1. Ms. Ward's opinion is that the person confessing on the audiotape speaks Spanish with a Mexican accent as opposed to Puerto Rican accent, whereas Juan Carlos apparently has a father of Puerto Rican descent.

While that opinion might be at least marginally relevant and admissible if it was based on genuine expertise, the problem with Ms. Ward is that she is plainly unqualified to provide it. Her testimony fails to withstand scrutiny for the following reasons.

### Argument

Ms. Ward is not a linguistic expert in any regard and has no expertise to bear whatsoever on the accent of the speaker on the Ezequiel Romo tape. *Incredibly, she herself has never*

1

*actually listened to the audio tape at issue*. *See* Exhibit 2, Ward Dep. at 38, 54, 73, 86. The reason why Ms. Ward did not bother to listen to the tape is because she is totally unable to discern Mexican-accented Spanish from Puerto Rican-accented Spanish. *Id*. at 87. As it turns out, her mother is Columbian and her father is Cuban, and she has never lived in either Mexico or Puerto Rico, or a Mexican or Puerto Rican neighborhood. *Id*. at 51.

At her deposition, Plaintiff's counsel played for Ms. Ward six different voices reading a paragraph of text drawn from the Juan Carlos tape recording. *Id*. at 100-06. For each of the six speakers, Ms. Ward conceded she was totally unable to offer any opinion whatsoever as to whether the speaker was of Mexican ethnicity or Puerto Rican ethnicity. *Id*. Indeed, for each of the six speakers, she was unable even to offer a guess. *Id*. When asked why she did not even bother to listen to the tape, Ms. Ward explained (*id*. at 86-87):

> Because my background is in Columbian and Cuban, and I was born in the United States. So while I could tell you that they were not Columbian or they were not Cuban, I knew that the language pair of Mexican, or the ethnicity pair of Mexican and Puerto Rican, I would not be able to give an opinion other than to say they are not Columbian and they are not Cuban.

By her own admission, Ms. Ward is not qualified to render an opinion. But Defendants have not really hired her to render an opinion. Rather, they hired her to take the witness stand to parrot the opinions of five other persons – all of whom live out of the United State and none of whom were identified by name in Ms. Ward's report – whose opinions she solicited in order for her to prepare her report. In other words, Ms. Ward's company retained five translators to listen to the tape and fill out a questionnaire on whether the voice of the person confessing to murder had features of Mexican-accented Spanish or Puerto Rican-accented Spanish.

Defendants apparently believe that Ms. Ward should be allowed to come to court to read to the jury the various impressions that these translators reported back to her via written survey

results, even though she is just a former lawyer turned businesswoman who runs a translation service, and cannot personally offer any opinion whatsoever on the topic the Defendants have identified. Such proposed testimony is inadmissible for at least three reasons.

## A.    Ms. Ward's Proposed Testimony Is Not Based On Any Legitimate Expertise

Given how the Defendants have framed matters, Ms. Ward is not actually being offered as an expert in anything. Ms. Ward's academic background was in government, then she became a lawyer; she has no training in linguistics, nor has she conducted any studies on the subject. *Id*. at 85, 90, 95. Ms. Ward concedes that there is nothing in her report that is not merely a summary of the worksheets filled out by the five translators. *Id*. at 73, 75.

Defendants, in other words, contemplate that Ms. Ward would merely report to the jury what these other people supposedly think about the voice on the tape. Such testimony does not satisfy Rule 702. There is nothing even remotely scientific about it, nor is it based on any specialized knowledge, and it fails on that basis. *See U.S. v. Kladouris*, 964 F.2d 658, 669-70 (7th Cir.1992) ("District courts must ensure that expert opinion testimony is in fact expert opinion, not merely opinion given by an expert"). Ms. Ward admitted that she has never attempted to form this sort of opinion for litigation (or for any purpose), much less been approved by a court to provide such an opinion. Exhibit 2, Ward Dep. at 40, 62-63.

## B.    The Manner In Which Defendants Propose to Present Ms. Ward's Testimony Unfairly And Improperly Precludes Cross-Examination.

Without deciding whether testimony of an unqualified person summarizing other people's opinions can ever satisfy 702, it must be rejected in this context. If Ms. Ward were permitted to provide the testimony at issue, Plaintiff would be effectively precluded from conducting any meaningful cross-examination. It bears repeating that Defendants do not propose to bring anyone to court who actually listened to the tape. When Ms. Ward opines that her

sources have concluded that the speaker has a Mexican accent, she is insulated from any challenge on the witness stand. She cannot be confronted with evidence or arguments undermining the validity of any such conclusion, because she has no knowledge of the underlying subject matter. That result is clearly unacceptable. See Fed. R. Ev. 702 (requiring that "*the witness*" have applied the principles and methods reliably to the facts of the case) (emphasis added), and Fed. R. Ev. 705 (contemplating cross-examination as a means for examining the basis of an expert's opinions and testimony).

Further compounding the problem, Ms. Ward cannot even be cross-examined as to how exactly the project was framed for the translators: Ms. Ward never spoke to or communicated in any way with any of them, and has no personal knowledge of what they were told and not told to do. *Id*. at 48; 53-55. This lack of personal knowledge creates more untenable unfairness as far as cross-examination. For example, at Ms. Ward's deposition when Plaintiff's counsel tried to ascertain if the translators knew that the client wanted the result to be Mexican, Ms. Ward (while attempting to deny it) had to confess she had no personal knowledge either way because she never interacted with the people who did the work. *Id*. at 33-36; 53-55. Ms. Ward was unable even to provide the name of the person who interacted with them so that Plaintiff's counsel could investigate the matter for himself. *Id*. at 29. Ms. Ward pledged on the record to "ask" and to provide the name to defense counsel, along with any emails that were sent to the translators. *Id*. at 49-50. Defense counsel agreed to provide the information without the need for a subpoena, *Id*., but Ms. Ward has apparently been unable to locate the identity of the person, or any of the emails to the translators in the three weeks since the deposition, and continuing to this day. *See* Exhibit 3 (Plaintiff's written follow-up attempts seeking the information).[1]

---

1    Similarly, Ms. Ward had no idea why these five translators were chosen from among the 10,000 independent contractors used by her company, *Id*. at 65-69, and had no personal knowledge of

All of this illustrates why it would be fundamentally unfair to permit Ms. Ward to simply read to the jury the survey results of the five absent translators with whom Ms. Ward had no contact. An attorney herself, she is situated no differently than the other lawyers on the defense team; there can be no doubt that those lawyers could not get up and simply read to the jury the results of the opinions of five foreign translators without any opportunity for cross-examination. The fact that Ward was paid a retainer to bestow herself with the title of "expert" does not change the result. *Daubert*, 509 U.S. at 592.

### C. Ms. Ward Has No Admissible Opinions

Even leaving aside all of the foregoing, careful examination of Ms. Ward's deposition admissions reveals an independent fatal flaw. Upon scrutiny, even if she were otherwise qualified to testify, she is not offering anything that actually meets the standard of admissibility.

To Plaintiff's knowledge, the only relevant data point for comparison to the voice on the tape is from a State's Attorney document suggesting that Juan Carlos's father is of Puerto Rican ethnicity. Ms. Ward acknowledges, however, that a person's accent can be affected not only by where a parent is from, but also by the neighborhood he grew up in and the peers with whom he spends time. *Id*. at 84-85. Ms. Ward further admitted that she had no expertise on the question of whether the accent of a person whose parents are one ethnicity can be affected by the (different) accents of their peers. *Id*. at 87-91. A person of Mexican ethnicity can sound Puerto Rican if he grew up in a Puerto Rican neighborhood. *Id*. at 94; 107-08 (Ms. Ward does not disagree "at all" that a person with "Mexican blood lines can sound like a Puerto Rican").

Ms. Ward has no idea in any scientific sense whether neighborhood influences trump

---

whether any of these five were included in the informal "test run" that was apparently performed by a project manager before defense counsel decided to retain Ms. Ward (and which project manager no longer works for the company, and whose last name Ms. Ward has been unable to locate since her deposition). *Id*. at 65.

parental influences, or vice versa. *Id*. at 99. Not having any background in linguistics or having ever studied the issue, *id*. at 85, Ms. Ward further admitted that her knowledge of the subject is actually no deeper or better than compared to anyone else's life experiences. *Id*. at 91, 94-96.[2]

Based on these admissions, coupled with her total inability to form any opinions (or even guesses) about the six Spanish speakers whose taped voices were played during the deposition, *id*. at 100-06, Ms. Ward began a series of concessions that put the final stake in her opinions.

First, in designing her survey for the five translators, Ms. Ward admitted that she was not even trying to ascertain where the person on the tape who provides the confession was born, where he grew up, what neighborhood he lived in, what his nationality was, or even his ethnicity. *Id*. at 86, 107. Crucially, even after she gathered the data, Ms. Ward was not offering any "opinion as to whether the guy on the tape had a Puerto Rican parent or not." *Id*. at 108. Likewise, even after gathering the data and reviewing it, she was not offering any opinion as to whether the guy on the tape had a Mexican or Puerto Rican peer group. *Id*. at 108. With those admissions in hand, there was no opinion left for Ms. Ward to actually provide, so Plaintiff's counsel promptly terminated his questioning. *Id*. At that point, defense counsel had every opportunity to redirect in order to try to salvage some opinion or clarify what exactly was left of her report. Instead, defense counsel declined to ask any questions at all. *Id*. Without any actual opinion, Ms. Ward should not be permitted to testify even if she was qualified, which she is not.

WHEREFORE, for any or all of the foregoing reasons, the testimony of Liliana Ward should be barred as inadmissible.

---

[2] Interestingly, according to Ms. Ward, if someone recorded her own voice, a person knowledgeable in such matters would conclude that she sounds Columbian. *Id*. at 98-99. Yet, Ms. Ward's father is Cuban. *Id*. at 99. As applied to Juan Carlos Torres, her opinion is therefore meaningless: Juan Carlos has a Puerto Rican father, so, using the linguistic construct of how her own voice would be perceived, there is no relevance to the fact that Juan Carlos Torres may or may not sound Mexican.

2.    **TO BAR DEFENDANTS' EXPERT DR. MARK LEVY FROM TESTIFYING.**

The defendant police officers have designated Mark Levy, M.D., a forensic psychiatrist, as an expert witness on their behalf.  Levy's report, a copy of which is attached as Ex. 4, makes clear that Levy's purpose at trial will be to provide commentary on the credibility of testimony that will be offered by Larry Tueffel.  Levy's proposed testimony fails the *Daubert* test, would usurp the role of the jury, and should be barred.

### A.    Larry Tueffel's Anticipated Testimony

Larry Tueffel, the Court will recall, was present with Eric Morro when Morro was fatally shot on the afternoon.  Tueffel will testify at trial that Plaintiff was not the person who shot Morro and that the shooter instead was an individual Tueffel accurately described at the scene as a 13-14 year old male Hispanic, 5'4 to 5'5, with curly black hair, wearing a "Purple Jacket with Yellow Lettering and/or #'s" and baggy blue jeans..

Tueffel, who was 14 at the time, will explain that, the morning following the murder, he was awakened at his home between 2:00 and 3:00 a.m. by police officers who insisted that he accompany them to police headquarters without his parents.  Once there, Tueffel was hostilely and aggressively questioned by defendants, who told him they had evidence Plaintiff committed the shooting, called Tueffel a liar and accused him of covering up for Plaintiff.  When Tueffel continued to insist that Plaintiff was not involved in Morro's shooting, the defendants threatened to arrest Tueffel and send him to jail.  The defendants would not leave Tueffel alone and would not allow him to go home.  Tueffel caved to the pressure and, at the defendants' insistence, reluctantly named Plaintiff as Morro's killer.

Tueffel felt considerable guilt and remorse for having testified falsely against Plaintiff. In two 2006 interviews, Tueffel recanted to members of Plaintiff's legal team, telling the full

story of his mistreatment by the defendant police officers and acknowledging that Plaintiff did not shoot Eric Morro. Tueffel gave a video deposition under the Court's direct supervision, in which he related all of these circumstances.

B. **Dr. Levy's Opinions**

Larry Tueffel had a series of psychiatric hospitalizations, starting in his late teens—some three years following the events in issue. Medical records reflect that he has been variously diagnosed as a paranoid schizophrenic and as suffering from schizoaffective disorder. He has abused drugs and alcohol at various points in his life starting at the age of 14, the same age he was when he witnessed Morro's murder and lied about the real identity of the shooter. He has also received a psychiatric diagnosis of polysubstance dependence.

Prior to preparing the 67 page report that is attached as Exhibit 4, Dr. Levy had never met or spoken with Tueffel and, thus, was in no position to offer his own diagnosis of his psychiatric condition, if any. *See* 11/2/11 Levy Dep. Tr. at 51-52 (portions attached as Ex. 5). Dr. Levy had not performed or requested a neuropsychological assessment of Tueffel (the battery of tests designed to evaluate various aspects of a person's cognitive functioning, including memory). *Id.* at 48. Nor had Dr. Levy reviewed any records of neuropsychological assessments performed by others at any time in the course of Tueffel's psychiatric treatment. *Id.* at 48-49.

Dr. Levy opines, generically, that persons with diagnoses of paranoid schizophrenia and/ or schizoaffective disorder "usually exhibit significant cognitive impairment including impaired memory." Ex. 4 at 4. He opines that this cognitive impairment increases over time. *Id.* He asserts that a history of substance abuse over many years may also lead to impaired cognition (and memory). *Id.* And he claims that people with paranoid schizophrenia and/or schizoaffective disorder may be particularly naïve and trusting and capable of being "pied-pipered." *Id.*

As to Tueffel in particular, Dr. Levy devotes 41 pages of his opinion to deconstructing 27 excerpts of Tueffel's video deposition in which Dr. Levy claims to see evidence that Tueffel: (a) was compliant and susceptible to leading questions that may have altered his recounting of events; (b) was confused and may have confused reality and fantasy in his recounting of events; or (c) may have confabulated (that is, offered a made-up version of events as the truth). *See* Ex. 4 at 9-50. Dr. Levy opines that the possible susceptibility to leading questions, confusion of fantasy and reality and confabulation are consistent with the mental illnesses with which Tueffel has been diagnosed. *See id.* at 6-8.

It is apparent from the report what the defendant police officers plan for Dr. Levy's testimony at the trial: He will offer generic opinions about the cognitive deterioration often associated with schizophrenia and other psychoses. He will offer the opinion that paranoid delusions could have intruded on Tueffel's testimony, affecting his recollection of events. *See id.* at 54. He puts that proposition forward in his report even though, at his own deposition, Dr. Levy was forced to admit that he did not know whether that had occurred with respect to any aspect of Tueffel's testimony. *See* Ex. 5 at 110-112.

Without having taken any steps to evaluate Tueffel's own cognitive functioning, Dr. Levy will then go on to provide an elaborate discourse on Tueffel's credibility, dissecting every inconsistency and nuance in Tueffel's prior deposition testimony in order to cast aspersions upon the reliability of Tueffel's story. In other words, Dr. Levy's role is to advise the jury that Tueffel is not a believable witness. As he does in his report, Dr. Levy can be expected to testify, that specific answers Tueffel has given are, for example, "possible confabulation" (*see id.* at 11); reflective of "compliance with leading questions" (*id.* at 13); indicative of a "strong desire to affiliate with the 'team' from Northwestern" and/or to "avoid conflict" (*id.* at 17, 24); a sign of

"memory impairment" (*id.* at 21); "really quite confused" (*id.* at 22); or, fabricated, because Tueffel "doesn't actually remember" the matter in issue (*id.* at 25).

### C. Dr. Levy's Opinions Are Not Admissible under *Daubert*

Expert testimony is admissible under Federal Rule of Evidence 702 only if "'the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.'" *United States v. Hall*, 93 F.3d 1337, 1341 (7th Cir. 1996) ("*Hall I*") (quoting *Daubert*); *see also U.S. v. Parra*, 402 F. 3d 752, 758 (7th Cir. 2005) ("Expert testimony is admissible if offered by a witness qualified as an expert by knowledge, skill, experience, training, or education, and if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.") (*quoting* Fed. R. Evid. 702).

Daubert requires that an expert's testimony bear upon his field of expertise. *Hall I*, 93 F.3d at 1343. Thus, the district court, in analyzing expert testimony for admissibility, must "rule out 'subjective belief or unsupported speculation.'" *Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607, 613 (7th Cir. 1993) (quoting *Daubert*, 509 U.S. at 590). In other words, the expert must be able to aid the jury in understanding a disputed fact at issue in the case. *Hall I*, 93 F.3d at 1342, 1343 ("Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403."); *see also United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) ("An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness's expertise) rather than simply an opinion broached by a purported expert.") (emphasis in original). Dr. Levy's opinions fail this test.

At his own deposition, Dr. Levy admitted that, in his extensive experience as an expert witness, he has never before conducted an analysis like the one he did in this case, where he scrutinized a deposition transcript for evidence that particular portions of a witness's testimony might not be reliable. Ex. 5 at 84, 105-107. Nor can Dr. Levy point to any research, studies or other scientific literature that explains how to go about performing an analysis like the analysis Levy did of the Tueffel deposition. *Id.* at 87-89. With no body of scientific research or scientific procedure that could be used to validate Dr. Levy's approach or the specific findings he makes, it cannot be said that Levy's analysis of Tueffel's deposition answers and Levy's impressions of the reliability thereof is the "product of reliable principles and methods."

There are, of course, no experimental error rates associated with Dr. Levy's analysis of Tueffel's testimony. The truth is that the "analysis" is pure speculation that is not grounded in science. Dr. Levy's expertise as a forensic psychiatrist does not afford him any special ability to analyze sworn testimony for "reliability" or to guess at the cognitive processes that lie behind any witness's answers. Such opinions are inadmissible under Rule 702 and should be barred.

Dr. Levy's planned attack on Tueffel's credibility, in other words, extends well beyond the scope of his education, training and experience in forensic psychiatry and clearly "is divorced from the scientific, medical, or other expert basis that qualifie[s] the witness in the first place." *Hall I*, 93 F.3d at 1344; *see also United States v. Lundy*, 809 F.2d 392, 935 (7th Cir. 1987) ("Courts agree that it is improper to permit an expert to testify regarding facts that people of common understanding can easily comprehend.").

Finally, Dr. Levy's proposed testimony in this case also runs afoul of the principle that the *jury* is the sole judge of the credibility of witnesses. It is hornbook law that the credibility of a witness is not a proper subject for expert testimony and should be barred. *Hall I*, 93 F.3d at

1343; *Klein v. Vanek*, 86 F. Supp. 2d 812, 817 (N.D. Ill. 2000) ("[C]redibility is not a proper subject for expert testimony."). Whether a witness appears uncertain, whether his memory is vague, whether he wavers or is inconsistent are matters that our system trusts the jurors to evaluate, based on their life experience. Dr. Levy's proposed testimony, therefore, would usurp the jury's role as fact-finder. *See U.S. ex rel. Garrett v. Acevado*, 608 F. Supp. 2d 1005, 1017 (N.D. Ill. 2009) ("The credibility of witnesses and conflicts in testimony are to be resolved by the trier of fact.") (citing *United States v. Bailey*, 510 F.3d 726, 733 (7th Cir. 2007)).

The defendants, in sum, should not be permitted to call an expert witness whose only purpose at trial will be to hector Larry Tueffel and encourage the jury to disregard his testimony. Training in psychiatry does not afford Dr. Levy or anyone else special insight into whether or not a witness is testifying truthfully (or "reliably," to use Dr. Levy's word). The defendants should be barred from calling Dr. Levy to pretend to such powers of divination.

WHEREFORE, for any or all of the foregoing reasons, the testimony of Dr. Mark Levy should be barred as inadmissible.

## 3.     TO BAR REFERENCES TO STREET GANGS

Plaintiff, as well as certain juveniles involved in the murder of Eric Morro, were members of organizations that are sometimes referred to as street gangs. Plaintiff, 13 years of age in 1993, was not old enough to be a member of the Simon City Royals, so he was a "pee wee" or junior "member." The person who was actually responsible for Morro's murder was a member of a group called the Triangles and two other Triangles were involved in getting rid of the murder weapon later that night.

As Defendants themselves have emphasized, the Triangles were invariably referred to, not as a gang, but as a "party crew." The Simon City Royals, including the Pee Wee Royals,

were sometimes referred to as a gang. The Triangles and the Pee Wee Royals were entirely similar in that their members were informally affiliated, many of the members were friends, and people came and left both of these organizations. And in the case of the Pee Wee Royals, they were not involved in the central part of a gang's identity: the drug trafficking. The witnesses in this case who formerly had these affiliations are now in middle age. None is currently a member of a gang or a party crew, so bias in that respect is a non-issue.

The terms "gang" and "street gang" are extremely inflammatory. The use of these terms could inflame the jury against Plaintiff and/or others associated with the Royals or the Triangles who may testify in this case. The term "party crew" does not contain the same potential for unfair prejudice. Accordingly, Plaintiff requests an order providing that the terms "gang" and "street gang" should not be used before the jury. The Royals and the Triangles should simply be referred to as "party crews." Plaintiff recognizes that it may be necessary to underline the different affiliations that he and other witnesses once had. But that need can be accomplished by use of the term "party crew," rather than inflammatory terms such as "gang" or "street gang." The term "party crew" will convey all that is necessary about the affiliations of the various actors. The term "gang" has no incremental probative value; it merely adds undue prejudice.

"Our Court of Appeals has repeatedly recognized 'the insidious quality' of evidence of gang membership as well as 'the damage it can do.'" *Finley v. Lindsay*, 1999 WL 608706, at *1-*2 (N.D. Ill. Aug. 5, 1999), citing *United States v. Sargent*, 98 F.3d 325, 328 (7th Cir. 1996). Because there is a "substantial risk of unfair prejudice attached to gang affiliation evidence," courts must closely scrutinize its admissibility. *United States v. Irvin*, 87 F.3d 860, 864-67 (7th Cir. 1996) (citing a substantial "danger of unfair prejudice" in that "[g]angs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior. There

is therefore always the possibility that a jury will attach a propensity for committing crimes to [witnesses] who are affiliated with gangs or that a jury's negative feelings towards gangs will influence its verdict. Guilt by association is a genuine concern whenever gang evidence is admitted."). Based on this case law, courts in this district frequently bar references to gangs in Section 1983 cases. *See Charles v. Cotter*, 867 F .Supp. 648, 657-58 (N.D. Ill. 1994) ("Identifying Charles as a gang member is unfairly prejudicial insofar as it encourages the inference that Charles is an evil and menacing person. Because the court finds that the prejudicial effect of evidence of Charles' gang affiliation substantially outweighs its probative value, Charles' motion to exclude any such evidence is granted."); *Finley v. Lindsay*, 1999 WL 608706, at *1-*2 (N.D. Ill. Aug. 5, 1999) ("Given the highly prejudicial nature of gang affiliation evidence and the tenuous, unsupported basis for Officers' argument that such evidence is relevant to this case at all, Finley's motion is granted. Evidence of his gang affiliation and tattoos are excluded, as is any evidence relating to Teddy or Ronald Finley."); *Lopez v. City of Chicago*, 2005 WL 563212, at *5 (N.D. Ill. March 8, 2005) (granting motion *in limine* to bar any references to the plaintiff gang member's gang membership); *United States v. Davis*, 2001 WL 1195729, at *2 (N.D. Ill. Oct. 9, 2001) (excluding gang references as "enormously and unfairly prejudicial" under FRE 403). A similar conclusion is warranted here.

This Court should adhere to this case law. There is no good reason why this case cannot be tried without reference to the fact that some of the witnesses are former gang members. The "status" of certain witnesses (including Plaintiff) as former gang members is obviously prejudicial, and any arguable incremental probative value is easily outweighed by the danger that the jury will be so prejudiced that no fair trial would be possible.

14

WHEREFORE, Plaintiff respectfully requests an order barring the Defendants from using the terms "gang" and "street gang" before the jury and, instead, directing them to use the term "party crew" to refer to the groups with which Plaintiff and certain witnesses were once affiliated.

## 4.     TO BAR TESTIMONY OF CARMELO CORTEZ

On October 26, 2011, the police officer defendants wrote a letter to Plaintiff's counsel (attached as Exhibit 6) announcing that they had located a new witness, Carmelo Cortez, whom they intend to call at trial. Mr. Cortez's testimony should be barred because he was disclosed far too late in the day. Pursuant to the parties' agreement, fact discovery in this case was closed on December 15, 2010. *See* Doc. No. 32. Thus, the disclosure of Mr. Cortez (without leave of court or any showing of good cause) comes almost a year too late. Because fact discovery is closed, Plaintiff's counsel is unable to undertake the discovery necessary to ascertain the details of Mr. Cortez's testimony; to explore how the defendants learned of that testimony; and to investigate other possible avenues of impeachment.

According to the defendants' October 26 letter, Mr. Cortez was a friend of Eric Morro, the victim of the February 1993 murder for which Plaintiff was wrongfully convicted. Larry Tueffel, the Court will recall, was with Morro the night he was killed. Although he identified Plaintiff as the shooter at trial, Tueffel has since recanted and has testified in multiple sworn statements and in a deposition supervised by the Court that Plaintiff was not the person who shot Morro. According to the defendants' letter, however, Mr. Cortez will testify that Tueffel told Cortez on the night of the shooting that Plaintiff shot and killed Eric Morro.

This newly discovered evidence is bizarre and highly suspect. Mr. Cortez's name has never before emerged as a witness—not in the police investigation immediately after the Morro

murder, not in the two criminal trials of Plaintiff, not in the re-investigation of the case by counsel at Northwestern University's Center on Wrongful Convictions, not in the second re-investigation of the case by the Office of the Cook County State's Attorney (resulting in murder charges against another individual, Juan Carlos Torres), and not once in the nearly two years of intensive discovery in this case from January 2010 to October 2011.

To be adequately prepared to meet this new evidence, it would be necessary for Plaintiff's counsel to do much more than just depose Mr. Cortez. Collateral discovery into the following issues (among others) would also be necessary:

a. How did the defendants locate Mr. Cortez?

b. Who on the defense team took a statement from Mr. Cortez and under what circumstances was any such statement taken?

c. To whom, other than the defense counsel or their investigators, has Mr. Cortez disclosed his purported conversation with Larry Tueffel in the eighteen years since it supposedly occurred?

d. Why did Mr. Cortez not come forward earlier with his information?

Fact discovery in this case closed nearly a year ago. Though the parties have cooperated to extend and complete expert depositions, there is nothing in the course of dealing between the parties to authorize an eleventh-hour disclosure of a new fact witness, such as Mr. Cortez. It would be unfairly prejudicial to allow Mr. Cortez' testimony under the circumstances here.

The Defendants may claim that the late disclosure of Mr. Cortez is justified because he was only recently located. In an email sent on November 15 after the parties' meet and confer, Plaintiff asked for an explanation of how the Defendants came to locate Mr. Cortez and who found him.[3] There has been no response. Defendants failed to seek leave of court to reopen fact

_____

[3] While Plaintiff makes no accusations against defense counsel personally, it is entirely likely that Mr. Cortez' eve of trial "revelation" was procured by the same investigators who managed to secure a similar new piece of evidence in a recent case litigated between the same firms. *See* Fifth

discovery, and have utterly failed to demonstrate why due diligence could not have uncovered this witness during the time that was set aside for discovery. He should be barred.

WHEREFORE, Plaintiff Thaddeus Jimenez respectfully requests that this Court enter an order *in limine* barring the defendants from calling Carmelo Cortez during the trial of this case.

## 5. TO BAR REFERENCES TO "THREATS" IN LETTERS PLAINTIFF WROTE TO HIS THEN GIRLFRIEND

The defendants seek to introduce evidence of "threats" in letters that Plaintiff wrote as a 13-year-old to his then-girlfriend (Elizabeth Heatley, now Elizabeth Gutekanst) while Plaintiff was confined in the Juvenile Temporary Detention Center awaiting trial. The letters are filled with childish expressions of love and longing. Defendants want to use them because of assertions that could be read as constituting threats to those who were expected to testify against Plaintiff at his upcoming trial. By way of example:

a. In a late February 1993 letter (attached as Ex. 8), Plaintiff writes: "I here [sic] the Royals are looking for Larry [Tueffel]. You see I got connections in and out of gail [sic]."

b. In a March 1993 letter (attached as Ex. 9), Plaintiff says: "The Royals are supposed to be looking for him [*i.e.,* Larry Tueffel]. It looks like ill [sic] have to kill him myself since the Royals wont [sic]."

There will be no evidence at trial that Plaintiff ever took a single concrete step to threaten the well-being of any witness in his criminal case. There will be no evidence that Plaintiff— a

---

Supplemental Rule 213 Disclosure in *Lopez v. City of Chicago,* No. 08 L 7549 (Circuit Court of Cook County), attached as Ex. 7. In that case, investigators managed to find a brand new witness in Texas who supposedly heard Mr. Lopez threaten the murder victim, a witness never previously disclosed in nine years of litigation, including a criminal trial, a comprehensive discovery period, and an entire civil trial. It was only after the trial ended in a hung jury that this new witness surfaced weeks before the re-trial was to have begun, and these investigators (present or former Chicago Police Officers to the best of Plaintiff's understanding) had been accused by at least one other witness of using heavy-handed tactics to try to strong-arm a photo identification of Mr. Lopez. It is for this reason that Plaintiff would want to conduct discovery as to the circumstances leading to Mr. Cortez's discovery and the obtaining of a statement from him.

13-year-old child confined in a secure detention facility—ever remotely had the capacity to carry out any threat. There will be no evidence that any Royals were ever "looking for" Mr. Tueffel. And Mr. Tueffel confirms that he was never harmed or threatened with harm in that time frame.

The letters and the "threats" they contain are simply not probative of any fact that is in issue in this case. The issues here concern whether the wrongful charges against Plaintiff were the result of civil rights violations on the part of the defendant police officers. The letters do not bear on those issues and they should therefore be excluded under Rule 401. And even if the letters were probative of a fact in issue, there is a risk that Plaintiff's childish statements could inflame the jury resulting in undue prejudice to Plaintiff. Therefore, the letters should also be excluded pursuant to Rule 403.

WHEREFORE, Plaintiff requests an order barring any references to any "threats" contained in letters Plaintiff wrote to his girlfriend from juvenile detention.

## 6. TO BAR REFERENCES TO PLAINTIFF'S MOTHER'S CONDUCT

During the parties' meet and confer, Defendants were unaware of this issue, and could articulate no basis on which references thereto would be admissible. That alone should suffice, but because Defendants would not commit to leaving it out (once they figure out what Plaintiff was talking about) Plaintiff brings this motion out of an abundance of caution.

When Victoria Jimenez, Plaintiff's mother, learned that letters her son had sent to Elizabeth Heatley had landed in the hands of the police, she called Elizabeth to inquire about why Elizabeth had turned over the letters. See Exhibit 10, at 113-115. Elizabeth claims that Victoria said two things to her: (1) that Victoria was going to send a police officer to her home because Elizabeth's mother and sister were reading mail not addressed to them, and (2) that Victoria accused Elizabeth of being in a gang or having a boyfriend in a gang as the impetus for

turning over the letters. *See* Exhibit 11, at D43 – D46; Exhibit 12, at S127 – S129. Importantly, Elizabeth also testified that Victoria never told her not to come to court. *Id.*

Victoria's inquiry to Elizabeth about her motives regarding the letters bears no relevance to the issues in this case. Conversations between them bear no relevance to anything relevant. Moreover, even if Victoria's conversation with Elizabeth were relevant, the unfair prejudice that would result significantly outweighs any probative value.

WHEREFORE, Mr. Jimenez respectfully requests this court bar references to conversations between Elizabeth Heatley and Victoria Jimenez.

**7. TO BAR STATEMENTS THAT WITNESSES WERE THREATENED WITHOUT ANY FOUNDATION TO SUPPORT THE ALLEGED THREATS AND WITHOUT ANY FOUNDATION TO TIE ANY OF THE THREATS TO PLAINTIFF OR HIS FAMILY**

A common defense theme during the depositions was: "Isn't it true that TJ or his family threatened you not to testify against him" or words to that effect. The vast majority of the witnesses who answered this question, simply said, "No, they were never threatened by TJ or TJ's family." Several went further and stated that no-one threatened them at all. *See*, *e.g.*, Exhibits 13 - 16 as follows: Victor Romo Transcript, Exhibit 13, at 62, 120, 125; Larry Tueffel Transcript, Exhibit 14, at 111, 226; Donna Cosmen Transcript, Exhibit 15, at 30-31; Sandra Elder Transcript, Exhibit 16, at 104-105; Ezequiel Romo Transcript, Exhibit 17, at 74-75, 116.

Notwithstanding the repeated statements of witnesses that they were not threatened by Mr. Jimenez or his family, there is a smattering of amorphous testimony that individual witnesses were threatened either by wholly unnamed individuals at wholly unidentified times and/or that they were threatened by members of the Simon City Royal party crew, of which Mr. Jimenez was a junior member. Mr. Jimenez is concerned that the defendants will try to raise a suggestion that witnesses were threatened, when in fact there is no evidence with a sufficient

19

foundation that anyone was threatened or that any fire that purportedly occurred was in any way associated with the 1994 and 1997 murder trials, and certainly no evidence whatsoever that at any time Mr. Jimenez, any member of his family, or any other person at his direction, threatened any of the witnesses in any way, including but limited to: threats to not testify, to alter their testimony, to leave town, or any other type of coercion of witnesses in any way.

Federal Rule of Evidence 602 provides in pertinent part that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony." Mr. Jimenez respectfully requests, for the reasons stated in detail below, that defendants be prohibited from arguing to the jury or suggesting through questions to witnesses that a witness was threatened in any way by Mr. Jimenez, members of his family, or others at his direction (hereafter, "relevant threat"), because there is insufficient evidence to support a finding that any witness has personal knowledge that any relevant threat ever occurred. In addition to barring such questioning or argument generally, we also request the Court bar four purported occurrences that defendants may try to characterize as threats:

**A.      Threats purportedly made by an unidentified individual to Sandra Elder.**
Sandra Elder testified that they had a "few threats" with words to the effect of "you will be sorry if you testify against TJ" and that she moved away from Chicago because of fear of "gang retaliation." Exhibit 16, at 75. While being examined by Mr. Hale, Ms. Elder stated that she was not able to identify who was making the threats. *Id.* On cross-examination, she stated that only one person threatened her, that he was a high-level Simon City Royal at that time, that she did not want to divulge his name, that she never told the police about it at the time, indeed that she never told anyone about it prior to her deposition, that she believed that this was something that

this person was doing on his own initiative and that she cannot tie the threat in any way to Thaddeus Jimenez himself. *Id.* at 92-95. In fact, she affirmatively stated that she does not believe that it was Mr. Jimenez's initiative and not at the initiative of his family. *Id.* In light of this testimony on cross-examination, the threats purportedly made by a person that Sandra Elder has chosen not to identify and which threats the purported victim does not in any way tie to Thaddeus Jimenez or his family, should not be admissible or mentioned in this case.

**B.** **A threat purportedly implicit in the fire that Sandra Elder states occurred in her garage**. During her direct testimony (questioning by Mr. Hale), Ms. Elder claimed that her garage was burned down. Exhibit 16, at 75. On cross-examination, however, Ms. Elder testified she reported a 1996 or 1997 fire in her garage to the police, but she has no memory at all of what conclusion the police or fire department reached regarding the cause of the fire. *Id.* at 95. In addition, she indicated that the unidentified Simon City Royal she mentioned earlier had never threatened to burn down her garage. *Id.* Ms. Elder offered no evidence that the fire was in any way tied to Mr. Jimenez or his family, and to our knowledge, no police or fire report has been presented to lay the foundation that it was even an intentional fire. Any suggestion to the jury that the purported fire in Ms. Elder's garage was a threat or retaliation for her testimony, let alone that it was initiated or tied in any way to Mr. Jimenez or his family, would be wholly speculative. There is simply not enough material evidence in the record or accessible to the parties to permit that kind of speculation under Rule 602.

**C.** **A threat purportedly implicit in the fire that Phil Torres states occurred on his back porch.** The same exact argument applies to Phil Torres's porch. During his testimony, Phil Torres was asked by Mr. Hale whether his apartment was burned, and Mr. Phil Torres responded that the "whole back . . . got burnt up . . . shortly after this. Exhibit 18, at 81-82. The

Court," but on examination from Mr. Loevy, Mr. Phil Torres stated that he had never been threatened by any gang member having anything to do with the trial or his testimony. Exhibit 18, at 77. With the sole exception of a Donna Cosmen statement discussed below, there is no evidence that has been submitted anywhere in the case that suggests that the fire was started purposefully or was related to Phil's testimony against Mr. Jimenez, or was initiated by Mr. Jimenez or anyone on his behalf. Indeed, far from suggesting that the fire was set intentionally, when Sandra Elder was asked whether Phil ever told her what caused the fire at his house, she said, "I think it was electrical . . . His fish tanks." Exhibit 16, at 96. And later she added that at no time did Phil tell her that he thought the fire was caused by Mr. Jimenez, or Mr. Jimenez's family, or the Simon City Royal gang, or by the leader of the Simon City Royal gang who she refused to identify earlier in her testimony. *Id*. at 97-98. The sole person to suggest on the record that she thought the fire was intentionally started was Donna Cosmen, who stated that "somebody set [Phil's] back porch on fire," but she specifically stated that she does not know who did so, and when she was asked in the very next question whether she remembered Phil getting threats, she stated that she did not recall or remember him getting threats. Exhibit 15, at 31. As with the purported Sandra Elder garage fire, there is simply not enough evidence related to this purported porch fire that would support permitting questions to the witnesses or statements to the jury about it under Rule 602.

> **D.** **Threats purportedly made to Tina Elder.** The final set of purported threats that we wish to have excluded is Tina Elder's testimony that prior to her testifying before Mr. Jimenez's first trial in 1994, her family received threats to the effect of "mind your own business," "keep your mouth shut," "I had a brick thrown through the window [that] hit me in the head," and "they beat up my dad." Exhibit 19, at 67-68. She stated that these threats were made

by "the neighborhood punks," but when specifically asked whether those threats came from members of the Royals gang, Tina specifically stated she did not know. *Id.* at 68. She was asked who beat up her dad; she stated she did not know. *Id.* at 68-69. She was never asked who threw the purported brick that hit her head, but given other answers of being wholly unaware of Mr. Jimenez's gang affiliation and not mentioning any threats coming from Mr. Jimenez or his family even though she was asked directly about who made those threats, there is no evidence that any of these purported threats or other purported actions can be tied to Plaintiff.

In sum, even though the defendants' counsel asked every witness who testified in 1994 and/or 1997 whether they were threatened, there is simply no evidence to support the question or the inference that Mr. Jimenez or his family or the Simon City Royals at his direction ever threatened anyone not to testify or directed another to do so. Therefore, this topic should be barred from argument and questioning pursuant to Rule of Evidence 602. It should also be barred under Rule of Evidence 403 as the danger of unfair prejudice and misleading the jury from such questioning or argument substantially outweighs the probative value of such evidence.

## 8. TO BAR AN ALLEGATION FROM A JAIL GUARD THAT PLAINTIFF'S COUNSEL EMBRACED AND KISSED HIM AT THE END OF AN ATTORNEY VISIT

Defendants apparently reserve the right to reference a supposed embrace that allegedly occurred between Plaintiff Jimenez and one of his exoneration attorneys, Rachel Vorbeck, in front of several guards at the end of an attorney visit at the Cook County Jail on June 11, 2010. This evidence is so obviously irrelevant that, in the interests of space, Plaintiff has deleted his more extended discussion. Presumably, the Defendants are unable to offer a straight-face explanation for why this would be relevant; if they do, Plaintiff would be happy to address it in reply or oral argument.

9.      **TO BAR IRRELEVANT WITNESSES**

Defendants' witness list includes the following names: Jerry Scroggins, Terry Sullivan, Graciela Viale-Val, Catalina Romo, Margot Gillin, and David Weiner. These witnesses have no relevant testimony to add to the trial of this case. The Defendants should be barred from calling them. For example, during a phone call among counsel on the afternoon of November 15, defense counsel explained that Catalina Romo's testimony could be fairly characterized as reflecting no recollection at all of the events in issue in this case, a fact that was purportedly relevant for reasons not divulged. David Weiner is a lawyer who represented Victor Romo, Plaintiff's co-defendant, also has no other connection to the facts of this case. The other witnesses are similarly lacking in probative value. It would needlessly prolong the trial of this case if the Defendants were permitted to call witnesses with no relevant testimony to contribute.

WHEREFORE, Plaintiff Thaddeus Jimenez respectfully requests this Court to enter an order barring the Defendants from calling Jerry Scroggins, Terry Sullivan, Graciela Viale-Val, Catalina Romo, Margot Gillin, or David Weiner as witnesses during the trial of this case.

10.     **TO BAR CERTAIN OPINIONS OF STATE'S ATTORNEY ANITA ALVAREZ, ASA CELESTE STACK, AND ASA DARREN O'BRIEN**

The Defendants have included State's Attorney Anita Alvarez and Assistant State's Attorneys Celeste Stack and Darren O'Brien on their witness list. Plaintiff does not object to them testifying about what they directly found in their reinvestigation of Morro murder, but Plaintiff does object to Defendants eliciting their opinions or the hearsay opinions of others regarding the manner in which the Chicago Police conducted the original investigation of the Eric Morro murder in 1993. Specifically, these witnesses (who are usually aligned with the CPD given the nature of their relationship) included in various written reports and summaries their gratuitous conclusions that no police officers did anything wrong. There is obviously no place at

this trial for that sort of opinion, even had it been disclosed, which it has not.

WHEREFORE, Plaintiff requests an order barring the Defendants from eliciting from SA Alvarez, ASA Stack, and ASA O'Brien any opinions regarding the manner in which the Chicago Police conducted the original investigation of the murder of Eric Morro.

## 11. REFERENCES TO PLAINTIFF'S PRIOR ARRESTS AND BAD ACTS

Prior to the 1993 arrest that led to Plaintiff's wrongful conviction, Plaintiff had been arrested a number of times as a juvenile. Ten of his arrests resulted in station adjustments and thirteen of them were referred to court. *See* Exhibit 20, at p. 2-3. With one exception, the court referrals did not lead to a finding of delinquency. The single exception was an October 1992 finding of delinquency for criminal trespass to a vehicle.

These prior arrests and bad acts are not relevant to the issues in this case and are not admissible under Federal Rules of Evidence 402 and 404. As an initial matter, the arrests simply are not relevant under Rule 402 to any issue that must be decided in this case, which is about police misconduct and its effect on Mr. Jimenez. In addition Rule 404 makes clear that evidence of prior crimes (or other bad acts) is strictly inadmissible to "prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(a) and (b). Nor can any of Mr. Jimenez's pre-1993 arrests be back-doored under a claim that they are probative of Mr. Jimenez's truthfulness or untruthfulness. Fed. R. Evid. 404(c) and 608(b).

It is well-established in civil rights cases that prior arrests that do not result in convictions are inadmissible. The law is uniform such that this is no longer an open question. *See Gregory v. Oliver*, 2003 WL 1860270, at *1 (N.D. Ill. April 9, 2003) ("Arrests that have not led to convictions are classic candidates for exclusion under [FRE] 404(b)"); *Anderson v. Sternes*, 243 F.3d 1049, 1054 (7th Cir. 2001) ("The law is clear that a defendant's prior arrest record is

inadmissible, and while the reference to Anderson's past arrest was only indirect, it was still improper"); *Jones v. Scientific Colors, Inc.,* 2001 WL 668943, at *2 (N.D. Ill. 2001) ("Whether any of the claimants have been previously arrested -- as opposed to convicted -- is a matter of slight probative value in relationship to the claims before the Court. Such inquiries threaten more to confuse than enlighten"); *Brandon v. Village of Maywood,* 179 F. Supp. 2d 847, 853-55 (N.D. Ill. 2001) (carefully considering and rejecting all arguments for admission of arrest record -- such as "bias" or damages -- because prejudice outweighs probative value where officers did not know about it); *cf. Earl v. Denny's, Inc.,* 2002 WL 31819021, at *8 (N.D. Ill. Dec. 13, 2002) ("[A] jury may deny plaintiff a verdict and an award, not because it doubts its veracity, but because it is appalled by his prior conduct that has nothing to do with the events in question. That is precisely the kind of unfair prejudice that Rule 403 seeks to prevent").

Not only is this evidence inadmissible under Federal Rules 402, 404, and 608(b), but even if admissible, the evidence should still be excluded under Rule 403. Under the facts of this case, the possibility of jury confusion or unfair prejudice to Mr. Jimenez substantially outweighs the probative value of this evidence. "Evidence is unfairly prejudicial if it 'will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented.'" *United States v. Vretta*, 790 F.2d 651, 655 (7th Cir. 1986). As to jury confusion, admission of these arrests improperly focuses the jury on the kind of kid Plaintiff was at age 13 (with the added suggestion that he committed Morro's murder because he had a propensity to do so), not on whether he in fact committed the murder and whether Defendants coerced witnesses and manipulated evidence to improperly charge him.

WHEREFORE, all references to Mr. Jimenez's prior arrests and bad acts should be barred.

12.    **TO  BAR  PLAINTIFF'S  POST-EXONERATION  CONVICTIONS  AND ARRESTS.**

Since being released, Plaintiff has pled guilty in the Rolling Meadows courthouse to a misdemeanor charge of resisting a police officer and to a misdemeanor charge in the Skokie courthouse for driving without a front license plate.  Nor does Plaintiff dispute that he was in possession of Psilocybin when the Chicago Police improperly (and we believe illegally) raided Plaintiff's Park Ridge home that he shared with his mother and cousin.  He vigorously disputes that he ever sold Psilocybin to anyone, and the charges that he did so are still pending unresolved in the Circuit Court of Cook County.  In addition, Mr. Jimenez concedes that he was in possession of firearms at the time of the raid, but they were legal, as he had a proper FOID card which permitted the possession of each firearm.  Although the Cook County State's Attorney's Office originally charged Mr. Jimenez with an administrative charge of possessing firearms with a suspended FOID card, a misdemeanor, that charge was ultimately dropped by the State.

The law regarding impeachment evidence of a prior conviction is clear.  First, it must be used solely for the purpose of attacking a witness's character for truthfulness.  Fed. R. Ev. 609(a).  Neither Mr. Jimenez's two misdemeanor convictions, nor the lone felony with which he has been charged, nor the gun charge that was dropped, have anything whatsoever to do with Mr. Jimenez's character for truthfulness and should be excluded on this ground alone.  Second, in order for a conviction to be admissible, it must be for a conviction of a crime that is punishable by at least imprisonment in excess of one year.  Fed. R. Ev. 609(a)(1).  Here, neither of the two misdemeanor convictions were punishable by imprisonment in excess of one year, and therefore is inadmissible under Federal Rule 609(a)(2).  Third, while Rule 609(a)(2) is a bit redundant of the opening line of Rule 609, subsection (2) emphasizes that regardless of length of punishment, if proof of the underlying crime involved proof of an act of "dishonesty or false statement by the

witness," it shall be admitted. Again, however, for the reasons stated above, neither the two misdemeanors for which he has been convicted, the misdemeanor for which he was charged (but which charges were dropped), and the felony with which he has been charged, involve proof of an element of dishonesty or false statement and therefore are inadmissible under Rule 609(b).

WHEREFORE, references to these arrests and convictions should be barred.

## 13.   TO BAR OTHER ALLEGED BAD ACT EVIDENCE

In addition to the misdemeanor conduct and felony conduct for which he has been charged, but not convicted, Defendants may attempt to have admitted or to argue other acts taken by Mr. Jimenez that have no basis being brought out in this case. They are neither relevant under 402 nor admissible under Rule 404. For example, Defendants forwarded to us within the last week a purported missing persons' report regarding Mr. Jimenez's girlfriend (and mother of his child), Albertin Betbabo. It is unclear where this document came from (despite repeated requests, defendants refuse to identify the source of these documents, nor does it appear they were obtained pursuant to subpoena), and in any event, defendants have not provided any explanation of how the allegations in the document are at all relevant to this case. There are substantial hearsay allegations in the document about alleged domestic difficulties between the two including allegations by a Ms. Hruby (who is not on Defendants' witness list) that Jimenez is a "convicted felon (murder)" and that he was physically abusive to her, which both Mr. Jimenez and Ms. Betababo deny. Such uncorroborated hearsay allegations that are found in uncorroborated hearsay and unauthenticated police reports and which may have been improperly obtained have no place in this case. Such evidence is not admissible under Rule 402 or 404 and in any event, should also be barred under Rule 403.

The same would be true of other examples of ways in which the defendants may attempt

to smear Mr. Jimenez. Other possibilities of alleged "bad acts" that Defendants might seek to introduce include the mere possession of firearms at the time of the police raid, verbal disputes that he has had with other family members, and the supposed "hug and kiss" that he had with Ms. Vorbeck at the Cook County Jail (which merited its own separate motion, No. 8). We cannot foresee (and even if we could foresee, we cannot address here) each of the possible ways in which Defendants might seek to admit improper evidence regarding other alleged bad acts.

In any allegations of other bad acts that Defendants seek to argue or have admitted, Plaintiff requests the Court to bar any such allegations that are inadmissible as improper propensity evidence under Rule 404, improper hearsay under Rules 801 and 802, or purported character evidence that is not admissible because it does not go to Mr. Jimenez's character for untruthfulness under Rule 608. Plaintiff also requests that this Court bar such evidence, even if otherwise admissible, under Rule 403 because the unfair prejudice to Mr. Jimenez of admitting such evidence substantially outweighs the probative value of such evidence.

WHEREFORE, Plaintiff respectfully requests this Court to enter an Order *in limine* prohibiting evidence related to Mr. Jimenez's post-exoneration convictions, post-exoneration charges, and any other alleged bad acts evidence propounded by Defendants, unless Defendants can satisfy the Court outside the presence of the jury that such evidence is admissible.

## 14. BAR REFERENCES TO ILLEGAL DRUGS

Drug use is not legitimately at issue here. There is evidence, in various forms, that Plaintiff, at different times in his life, has used illegal drugs. That evidence has absolutely no probative value. It has nothing to do with the reasons for Plaintiff's wrongful arrest or why he might have been suspected of the Morro murder. The subject of illegal drugs is enormously prejudicial and inflammatory. The case law is well-settled that testimony on that subject is to be

avoided unless absolutely necessary. *See United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007) (discussing the possibility that witness testimony will be unduly discounted once jury hears about illegal drugs), citing *United States v. Robinson*, 956 F.2d 1388, 1397 (7th Cir. 1992) and *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987).  Indeed, the Seventh Circuit has been consistently clear (reaffirmed at least twice in the past two years) about the "considerable danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony." *Kunz v. City of Chicago*, 538 F.3d 667, 677 (7th Cir. 2008); *see also Buffone v. Rosebud Restaurants, Inc.,* 2006 WL 2425327 (N.D. Ill. Aug. 21, 2006) ("Even if relevant, any arguable probative value of evidence about their drug use is substantially outweighed by the danger of unfair prejudice").

WHEREFORE, Plaintiff therefore requests that this Court enter an order barring the Defendants from referring at trial to Plaintiff's use of illegal drugs.

## 15.    UNOPPOSED MOTION TO ALLOW THE FILING OF ADDITIONAL MOTIONS *IN LIMINE* TO ADDRESS MATTERS THAT MAY APPEAR IN EXPERT REPORTS THAT HAVE NOT YET BEEN DISCLOSED

As the Court is aware, the parties have agreed to exchange certain expert reports in the final weeks leading to the scheduled trial date for this case.  One effect of the parties' agreement is that there are a few expert reports that will not be disclosed until *after* the November 15 due date for filing motions *in limine*.  Yet-to-be-disclosed reports may contain references to matters that, in Plaintiff's view, should be barred from the trial on grounds of relevance, undue prejudice or for other reasons.  In fairness, Plaintiff should be permitted to supplement his motions *in limine* promptly after receiving any expert report that contains objectionable material. The Defendants have no objection to this motion so long as the right to supplement applies equally to them with respect to Dr. Dinwiddie's recently-produced report.

Dated: November 23, 2011

Respectfully submitted,
THADDEUS JIMENEZ


By:     /s/ Stuart J. Chanen
        One of his Attorneys


| | | |
|---|---|---|
| Arthur Loevy | Stuart J. Chanen | Locke E. Bowman |
| Jon Loevy | Lisa Castle | RODERICK MACARTHUR JUSTICE |
| Russell Ainsworth | VALOREM LAW GROUP LLC | CENTER |
| LOEVY & LOEVY | 35 East Wacker Dr. | Northwestern University |
| 312 North May Street | 30th Floor | School of Law |
| Suite 100 | Chicago, IL 60601 | 357 E. Chicago Ave. |
| Chicago, IL 60607 | | Chicago, IL 60611 |
| (312) 243-5900 | | |

**CERTIFICATE OF SERVICE**

       I, Stuart J. Chanen, an attorney, certify that on November 23, 2011, I delivered a copy of this PLAINTIFF'S MOTIONS *IN LIMINE* via the Court's Electronic Court Filing ("ECF") system to all counsel of record (See below).


                             /s/ Stuart J. Chanen

Dated: November 23, 2011

              *Attorneys for Defendant City of Chicago*
              Mr. Terrence M. Burns
              Mr. Daniel Noland
              Mr. Harry Arger
              DYKEMA
              10 S. Wacker Drive
              Chicago, IL 60606


              *Attorneys for Individual Defendants*
              Mr. Andrew M. Hale
              Mr. Avi T. Kamionski
              Christina M. Liu
              Joan E. Ahn
              ANDREW M. HALE & ASSOCIATES
              53 W. Jackson Blvd.,
              Suite 1800
              Chicago, IL 60604