IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | 09 C 8081 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Matthew F. Kennelly |
| | ) | |
| CITY OF CHICAGO, *et al.* | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## PLAINTIFF'S RESPONSES TO DEFENDANTS' MOTIONS *IN LIMINE*

Plaintiff, THADDEUS JIMENEZ, by his attorneys, respectfully responds to Defendants' motions *in limine* as follows.

### 1. Indemnification and the City of Chicago in the Case Caption

Plaintiff has no objection to the proposition that evidence of indemnification is presumptively irrelevant and inadmissible. The only exception would be if Defendants open the door, *e.g.*, by in any way intimating poverty or implying that the verdict would work a hardship on themselves or their families. Lawson v. Trowbridge, 153 F.3d 368, 378-79 (7th Cir. 1998). Should that occur, Plaintiff should be permitted to petition the court outside the presence of the jury to establish indemnification. The law on that point is well-established. E.g., Galvan v. Norberg, 2006 WL 1343680, *2 (N.D.Ill. May 10, 2006) ("But defense counsel should be aware that if they plan to apprise the jury of the fact that the individual officers will have to bear such damages out of their own pockets, fairness would require that the jury also be informed of the true situation (indemnification) as to compensatory damages"); Moore v. City of Chicago, 2008 WL 4549137, *5 (N.D.Ill. April 15, 2008) ("The motion to bar mention of indemnity is granted, except as to the extent defendant officers open the door by offering evidence that they are not financially capable of paying compensatory damages to plaintiff. In that event, the

court, with the help of the parties, will fashion an appropriate jury instruction to inform the jury that the defendant officers will be indemnified as to compensatory, but not punitive, damages."); Mohr v. Chicago Sch. Reform Bd. of Trustees, 155 F.Supp.2d 923, 928-29 (N.D.Ill. 2001) (Bucklo, J.) ("defendants insisted on arguing that Clark and Jernigan would suffer financial hardship if they had to pay a judgment, and I warned them, before closing, that this argument would open the door to the fact of indemnification") (relying on "legal scholar" John R. Williams, Representing Plaintiffs in Civil Rights Litigation under Section 1983, 619 PLI/Lit 127, at 555 (1999) ("[O]nce a defendant has opened up the area, by presenting evidence concerning his financial affairs, the plaintiff has an absolute right to introduce evidence that the defendant will be indemnified and the exclusion of such evidence is reversible error")); Rosario v. City of Chicago, 2008 WL 905874, *6 (N.D.Ill. April 1, 2008) ("To earn the benefit of this Court's ruling excluding evidence as to indemnification, Witt and his counsel must be circumspect in avoiding any statement or implication as to Witt's financial situation. If any such statement or implication that might create the flipside risk identified here were to take place, this Court would not hesitate to instruct the jury as a matter of law that Witt is entitled to indemnification as to compensatory but not as to punitive damages. Thus Witt and his counsel have total control over the enforcement of this Court's ruling on the subject.").

As for the argument that the City should not be on the caption or verdict form given the parties' Monell stipulation, Plaintiff agrees that this particular "consideration" was part of the benefit of the bargain for the Monell stipulation. As such, Plaintiff does not oppose this request for relief either.[1]

---

[1] As the Court has been repeatedly advised, the parties are remain hopeful they can work through the Monell stipulation issue without the need for the Court's assistance. Efforts to that end are remain ongoing, but if the parties are unable to come to agreement, the Court will have to be

## 2. Bifurcation of Punitive Damages

Defendants argue next that this Court can and should bifurcate the issue of punitive damages. Those are two different questions. While the Court obviously does have the discretion to bifurcate the trial, none of the arguments offered by the Defendants suffice to justify that result.

The party moving for bifurcation under Rule 42(b) "bears the burden of proving that separate trials are justified." Caterpillar, Inc. v. Deere & Co., No. 96 C 5355, 1997 WL 17798, at *1 (N.D. Ill. Jan. 14, 1997); 5 Moore's Federal Practice, § 42.03[1]. As Judge Aspen has explained: "I proceed from the position of the Federal Rules of Civil Procedure; specifically, that the unitary resolution of lawsuits is sought. A single trial on the merits of all contested issues and claims of the parties is preferable to their piecemeal adjudication." Terrell v. Childers, No. 93 C 2460, 1996 WL 385310, at *14 (N.D. Ill. July 3, 1996) (citing Advisory Committee Notes to Rule 42(b) and 9 Wright & Miller, Federal Practice & Procedure, § 2388).

In this case, the proposed bifurcation would double up the need for opening statements, closing arguments, and witness testimony, an unnecessary inefficiency that should be avoided unless Defendants could point to a compelling reason to do everything twice. They have failed to do so here. The purported risk of "juror nullification" (Motion at 4) is unexplained and totally unclear. Equally unsupported is Defendants' conclusory statement, without more, that "the City would be prejudiced" without bifurcation. As for Defendants' concern about Plaintiff's interests in avoiding sympathy based on Defendants' inability to pay, Plaintiff is perfectly willing to accept that risk.

That leaves as Defendants' only remaining argument the fact that Defendants could avoid what they describe as the "presumed prejudice associated

---

involved prior to trial.

3

with the introduction of indemnification evidence." To the contrary, however, there would be no prejudice, and certainly no unfair prejudice, because the jury would be informed accurately about who would be responsible for which award.

Balanced against that absence of prejudice to the Defendants, the risk to Plaintiff is real. Leaving aside the inefficiencies referenced above (which are themselves sufficient to justify denial of the motion), if the jury were told that they could go home if they decided against Plaintiff, but would have to return for more trial if they found liability, this could create unfair pressure in a close case. Absent any compelling rationale to bifurcate the trial, the presumption of a single trial should govern, and Defendants' proposal should be rejected.

### 3. The Warfield Verdict

Last year, the primary Defendants in the Jimenez case were found liable at a federal civil rights trial of doing exactly what they are accused of doing here: manipulating third-party witnesses to implicate their criminal suspect by means of heavy-handed tactics, including involuntary detention at the police station and coercive pressure. Given the closeness of the fit if the alleged conduct for purposes of Fed. R. Evid. 404(b), evidence of this adjudication is relevant and admissible for the following reasons.

### A.    Background: The Warfield Verdict

Defendant Detectives Bogucki and Schalk, the primary investigators in the Jimenez case, were previously sued in a case captioned Warfield v. City of Chicago, 05 C 3712. As set forth in the Warfield complaint, the Defendants were accused of (a) detaining against their wills a group of third-party witnesses to a police shooting; and then (b) exerting pressure on these third-party witnesses to provide an account that was consistent with the police version of what had happened; and (c) only agreeing to release the witnesses after they agreed to change their stories to

4

become consistent with the police version.  See Exhibit A (Warfield complaint, ¶¶ 16-26).

These Warfield allegations were tried to a federal jury last year before Judge Castillo.  Not only was there an adequate opportunity and incentive for Bogucki and Schalk to defend, but they were represented by the same law firm that represents the Jimenez Defendants (Hale & Associates).[2]

At the conclusion of the Warfield trial, the jury found against Bogucki and Schalk (and others) on all counts, awarding a total of $109,000 of compensatory damages to a total of eight plaintiffs.  See Exhibit B.  The jury further found that Bogucki and Schalk acted with sufficient malice to justify awards of $66,060 in total punitive damages against each of them.  Final judgment was entered against them on July 23, 2009.  Id.

For purposes of admissibility determinations at trial, evidence of mere accusations are treated differently than final adjudications.  Thus, evidence of misconduct for which Plaintiff is arrested but not convicted is generally inadmissible, while misconduct for which Plaintiff is convicted is a different story.  E.g., Jones v. Scientific Colors, Inc., 2001 WL 668943, at *2 (N.D.Ill. 2001).  By analogy, courts routinely exclude CR complaints of police misconduct, except where there is a finding of wrongdoing.  Cosey v. City of Chicago, No. 97 C 6808, 1999 WL 300238, *3 (N.D. Ill. May 3, 1999) (finding sustained C.R. file against defendant admissible under Fed. R. Evid. 803(8)(c)); Edwards v. Thomas, 31 F. Supp. 2d 1069, 1074-75 (N.D. Ill. 1999) ("It is unnecessary to draw any inference from the low incidence of sustained complaints against police officers to hold that where such a complaint is sustained the evidence is sufficient to support a jury finding that the

---

[2] The Warfield plaintiffs were represented by one of the same law firms that represents Mr. Jimenez (Loevy & Loevy).

5

defendant committed the similar act.") (emphasis in original).

Here, the Defendants are estopped from denying that they did in fact commit the allegations from Warfield. They have already litigated and lost that issue. The only remaining question is whether the Warfield allegations satisfy the test for admissibility under Fed. R. Evid. ("Rule") 404(b). As discussed below, they easily do.

**B.    The Warfield Verdict Satisfies Rule 404(b)**

Under Rule 404(b), "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). However, it may, be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. "Rule 404(b) does not require the party offering the evidence to force the evidence into a particular listed category, but simply to show any relevant purpose other than proving conduct by means of a general propensity inference." United States v. Robinson, 161 F.3d 463, 466-67 (7th Cir. 1998).

Evidence is admissible under Rule 404(b) where: (1) it is directed towards establishing a matter in issue other than the defendant's propensity to commit a crime, (2) it shows that the other acts is similar enough and close enough in time to be relevant to the matter in issue, (3) it is sufficient to support a jury finding that defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. Treece v. Hochstetler, 213 F.3d 360, 363 (7th Cir. 2000); United States v. Zapata, 871 F.2d 616, 620 (7th Cir. 1989). The Warfield misconduct satisfies this four-part test.

Courts have cautioned, moreover, that the 404(b) witness's experience need not be identical to Plaintiff's to be admissible. See United States v. York, 933 F.2d

6

1343, 1351 (7th Cir. 1991) (if prior act is sufficiently similar in type, it need not be a "duplicate[] of the ones for which the defendant is now being tried"), *overruled on other grounds*, Wilson v. Williams, 182 F.3d 562 (7th Cir. 1999); see also United States v. Radseck, 718 F.2d 233, 236 (7th Cir. 1983) (same). Where *modus operandi* is at issue, similarities should be "sufficiently idiosyncratic to permit an inference of pattern for purposes of truth." United States v. Hudson, 884 F.2d 1016, 1021 (7th Cir. 1989). And, "[i]ntent, unlike *modus operandi,* does not require a 'singular strong resemblance' between the prior bad act and the conduct alleged, but instead requires a lesser showing of similarity." Akbar v. City of Chicago, No. 06 C 33685, 2009 WL 3335364, at *2 (N.D.Ill. Oct. 14, 2009).

Here, evidence establishing the manner in which Defendants conducted their interrogations in murder investigations is relevant not only to establishing their *modus operandi* and intent, but also knowledge and plan, all of which are relevant issues in this case. Hill v. City of Chicago, 2011 WL 3840336, *4-*11 (N.D.Ill. Aug. 30, 2011). Defendants are going to deny that they would coerce suspects to confess, and will claim that their interrogation technique is simply to ask questions and receive voluntary answers. The Warfield finding suggests otherwise. Just as is alleged in the Jimenez case, the Warfield misconduct involved holding third-party witnesses against their will in interrogation rooms, and refusing to allow them to leave unless these witnesses cooperated in telling Bogucki and Schalk's version of the events. Bogucki and Schalk are also accused in both Warfield and in this case of exerting psychological pressure on vulnerable witnesses in the same manner, *i.e.,* by threatening them that they would themselves face legal trouble unless they changed their stories to fit what the Defendants were claiming. These allegations are sufficiently similar to satisfy Rule 404(b). See, e.g., Wilson v. City of Chicago, 6 F.3d 1233, 1238 (7th Cir. 1993); United States v. Conley, 291 F.3d 464 (7th Cir.

7

2002); <u>United States v. Green</u>, 258 F.3d 683, 694 (7th Cir. 2001); <u>Edwards v. Thomas</u>, 31 F. Supp. 2d 1069, 1074-75 (N.D. Ill. 1999); <u>United States v. Senak</u>, 527 F.2d 129, 143-45 (7th Cir. 1975).[3]

## C.     Defendants' Counter-Arguments Are Unpersuasive

Defendants raise several arguments in opposition to admissibility of the Warfield adjudication, but none withstand scrutiny.

First, Defendants incorrectly argue that the <u>Warfield</u> wrongdoing could only be proved up with testimony by the <u>Warfield</u> plaintiffs. Indeed, if Plaintiff had proposed to introduce the <u>Warfield</u> plaintiffs' testimony, Defendants would have been up in arms about a "mini-trial." Here, there is no need for the <u>Warfield</u> plaintiffs to prove up the allegations because Defendants are estopped from denying them. At trial, Mr. Jimenez should thus be permitted to confront Bogucki and Schalk with the <u>Warfield</u> allegations and the final judgment against them, a copy of which is on Plaintiff's FPTO Exhibit List. This evidence satisfies the test for admissibility set forth above, entails no risk of unfair prejudice, and will occupy a very small percentage of the time at trial. The <u>Warfield</u> witnesses themselves are unnecessary.

Second, Defendants argue that the settlement reached by the parties while the <u>Warfield</u> appeal was pending nullifies this evidence. This argument is frivolous. The <u>Warfield</u> parties reached a settlement by which the City agreed to pay the entire compensatory damages verdict without delay, plus an additional award of attorneys' fees, in exchange for dismissing the appeal. The resulting settlement

---

[3] Nor is the passage of time a barrier to admissibility here. Courts are liberal about temporal proximity, and cases have found allegations that involve conduct from a decade ago or longer to be close enough in time to provide admissible evidence of prior bad acts. <u>See, e.g.</u>, <u>United States v. Ross</u>, 510 F.2d 702, 713 (7th Cir. 2007) (acts from five to six years earlier were sufficiently close in time); <u>United States v. Wimberly</u>, 60 F.3d 281, 286 (7th Cir. 1995) (thirteen-year time gap); <u>United States v. Macedo</u>, 406 F.3d 778, 793 (7th Cir. 2005) (nine-year time gap); <u>United States v. Mounts</u>, 35 F.3d 1208, 1214-15 (7th Cir. 1994) (permitting admission of drug purchase that occurred seven years prior to arrest to prove intent).

agreement provided that Plaintiffs' counsel would not rely on the "release and satisfaction of judgment" for proof of anything in future litigation. See Exhibit C, Settlement Agreement, ¶ 3. This provision has no bearing here because Mr. Jimenez (and his counsel) are not attempting to rely on the Warfield release for any purpose. Instead, Mr. Jimenez relies on the final judgment in Warfield.

Defendants also argue that "the settlement specifically called for vacating the judgment against them" (Def. Mot. at 5), but that representation is flatly contradicted by the document itself, which is entitled "Release and Satisfaction of Judgment." See Exhibit C. This release and satisfaction document does not purport to vacate or otherwise impair the underlying judgment, and Defendants certainly cite to nothing suggesting otherwise. Id.[4]

Finally, Defendants cite to case after case for the proposition that unsustained CR records, personnel files, and other complaints in an officer's disciplinary file are generally inadmissible. See Def. Mot. at 8-9. That body of case law has no bearing on the issue before the court, namely, the admissibility of proven allegations of misconduct mirroring the allegations in this case.

### 4. "Generalized" References to Police Misconduct

Plaintiff agrees with the general proposition that the parties should not unduly seek to inflame the jury by complaining about unrelated cases of police misconduct. However, there is no justification for a blanket order that Plaintiff's counsel can never reference anything but this case, depending on the direction of the trial. As Judge Shadur explained in denying a similar motion to bar references to current events:

---

[4] As part of the settlement, Plaintiffs did agree to join and file a motion to rescind Judge Castillo's finding that defense counsel had committed a Batson violation during jury selection. See Exhibit D. That motion, however, in no way "called for vacating the judgments" against the Defendants, nor did it create that result. Id.

Again defense counsel have sought to obtain a bar order in advance of trial on a subject that far better lends itself to consideration in the trial environment. It looks very much as though the motion is one lodged in the Corporation Counsel's Office computer, for this Court's colleague Honorable Ruben Castillo was called on to deal with an identical motion in <u>Charles v. Cotter</u>, 867 F.Supp. 648, 664 (N.D.Ill. 1994). This Court shares Judge Castillo's "unwilling[ness] to muzzle [plaintiff's] counsel at this early phase" (id.), and it denies the motion (just as Judge Castillo did).

<u>Regalado v. City of Chicago</u>, 1998 WL 919712, *2 (N.D.Ill. Dec. 30, 1998).

Here, too, Defendants ask the court to do what Judge Castillo characterized as an unacceptable attempt to "muzzle counsel at this early phase of the trial." <u>Charles v. Cotter</u>, 867 F. Supp. 648, 664 (N.D.Ill. 1994) ("the court cannot conclude at this time that mere references to other acts [of current or past events] are unduly prejudicial. Accordingly, defendants' motion is denied").

The same conclusion is appropriate here. The Court "exercises broad discretion in controlling counsels' arguments and ensuring that argument does not stray unduly from the mark." <u>Cotter</u>, 867 F.Supp. at 664. However, it is impossible to say definitively at this early stage that any and all references to current events have no place whatsoever at this trial. The Defendants' blanket motion should therefore be denied without prejudice, with the Defendants remaining free to object as the issues develop at trial.

### 5. References to Northwestern's Center on Wrongful Convictions And Other Post-Conviction Cases

A number of witnesses in the case came to be involved in Plaintiff's case through Northwestern's Center on Wrongful Convictions, including, for example, Steve Drizin, Alison Flaum, and Luke Netzel. These witnesses are not only on Plaintiff's FPTO witness list because of their status as damages witnesses, but they are also on Defendants' FPTO witness list, given Defendants' recurrent theme that the evidence giving rise to Plaintiff's exoneration (e.g., the Tueffel recantation, the Elder recantation) was allegedly tainted by the CWC's involvement and actions.

10

Given Defendants' argument in that regard, it would be unduly constraining to try to explain the role, involvement, and motivations of these witnesses without also permitting an explanation of their role in the context of the CWC. If, for example, Defendants intend to call into question the motives and actions of CWC witnesses, those witnesses should be permitted to explain why they did what they did. A contrary holding would leave CWC witnesses vulnerable to the inference that they had personal incentives to manipulate testimony; they should not be prevented from explaining that their objective was to further the CWC's mission, rather than their own agenda or pocketbook.

Knowing that they intend to attack the organization as part of their case, Defendants do not really dispute the premise that the affiliation is relevant, arguing instead that references should be limited semantically to "Northwestern" rather than to the CWC. This argument is conspicuously analogous to Plaintiff's own argument that the "Triangles" and the "Royals" should be referenced as "party crews" rather than "street gangs." Plaintiff respectfully submits that if the Court is inclined to limit the danger of unfair prejudice associated with the CWC label (while still capturing the probative value of the affiliation itself) in the context of Plaintiff's motion, then the same ruling should govern Defendants' motion -- and visa versa.[5]

### 6. The Prosecution of Juan Carlos Torres

Defendants are correct in at least one respect: the fact of criminal charges pending against Juan Carlos does not prove (or even tend to prove) that Juan Carlos is guilty of the crime. That truism, however, does not end the discussion, and it certainly does not compel a conclusion that all references to those criminal

---

[5] The one point on which Defendants' motion makes sense is to the extent that it seeks to bar references to other, unrelated exonerations. That subject seems sufficiently tangential, and Plaintiff had no intention of exploring it. The motion to bar it is thus unopposed in that respect.

11

charges must be barred for all purposes. Indeed, the Juan Carlos charges are independently relevant at trial for several different and admissible purposes.

## A.   The Evidence Is Necessary To Establish an Essential Element of Plaintiff's Malicious Prosecution Claim

To prevail in his malicious prosecution claim, Plaintiff must prove that the criminal charges against him were dismissed in a manner indicative of innocence. Swick v. Listaud, 169 Ill. 2d 504, 513, 662 N.E.2d 1238 (1996). A *nolle pros* of the criminal charges (as happened here) is insufficient to satisfy the element. Id. After all, murder has no statute of limitations, and charges that have been nolle'd are subject to reinstatement. The law is thus well-settled that a nolle is not alone sufficiently indicative of innocence without proof of more facts tending to establish that it was. Brown v. McGee, 2000 WL 821712, at *3 (N.D.Ill. June 23, 2000) (given the transcript of the court hearing at issue, "the plaintiff has presented some evidence. . . which creates a genuine issue of fact as to the reason for the *nolle pros*"); *Mizwicki*, 1999 WL 413501, at *10 ("The bare fact of the *nolle prosequi* does not prove that the state lacks reasonable cause to pursue the criminal proceedings against [the plaintiff], but defendants [have] not demonstrated the absence of a dispute with respect to the question").

Because it is impossible to get into the minds of decision- maker who dropped the charges, the "indicative of innocence" inquiry tends to be circumstantial, and turns on the facts surrounding the dismissal. Treece v. City of Naperville, 1998 WL 142391, at *6 (N.D.Ill. March 25, 1998) (the question is whether "a reasonable jury could infer that the Assistant State's Attorneys requested the nolle prosequi order because they lacked reasonable grounds to pursue the criminal prosecution"); Velez v. Avis Rent A Car System, Inc., 308 Ill. App. 3d 923, 929, 721 N.E.2d 652 (1 Dist. 1999) (failure to prosecute case despite "ample opportunity" to do so indicated that "the disposition was premised upon a lack of probable cause and was indicative of

12

the innocence of the plaintiff"); Ferguson v. City of Chicago, 343 Ill. App. 3d 60, 66, 795 N.E.2d 984 (1 Dist. 2003) (plaintiff's allegation that he appeared in court nine times before the prosecutor requested the court to "SOL" the case were sufficient to "amount to a 'favorable termination' which would support a malicious prosecution claim"); Mizwicki v. City of Naperville, 1999 WL 413501, at *10 (N.D.Ill. June 2, 1999) (although no record existed regarding the reason for the entry of the *nolle pros,* the plaintiff's disputed claim that a complaining officer failed to attend court on the date of the trial because he knew the plaintiff to be innocent was sufficient).

Here, the dismissal of the charges against Plaintiff occurred in a specific context suggesting his innocence. On the same day that the charges were dropped, the State's Attorney arrested and charged Juan Carlos with the very same crime. The fact that charges were concurrently brought against Juan Carlos thus provides persuasive and necessary proof of the final element of Plaintiff's malicious prosecution claim, and it is thus admissible on that basis. Aguirre v. City of Chicago, 382 Ill. App. 3d 89, 98, 887 N.E.2d 656 (2008) (upholding the trial court's admission of the actual killer's testimony as relevant to show that the plaintiffs received a favorable termination of the proceedings).

## B. The Evidence Is Independently Admissible Because It Bears On Juan Carlos' Presumed Invocation Of The Fifth

Defendants have made no secret of their intent to try to prove at trial that Plaintiff murdered Eric Morro. Throughout discovery, Defendants' position has consistently been that Plaintiff's guilt is a defense to the charge that they manufactured the case against him, not to mention minimizing his entitlement to damages even if there were due process violations.

For his part, Plaintiff intends to establish at trial that the crime was committed not by him, but by Juan Carlos. To that end, Plaintiff plans to call Juan Carlos, among others.

13

Juan Carlos, of course, has the constitutional right to remain silent, and may well decide it is in his own best interest to assert the privilege against self-incrimination. In a civil case, the jury would then be permitted to infer that truthful answers to the questions would have been adverse to his interests (though not necessarily to the Defendants *per se*). Baxter v. Palmigiano, 425 U.S. 308 (1976).

To be clear, there is nothing in Baxter that limits its holding to parties as opposed to non-party witnesses. See, e.g., Greviskes v. Universities Research Ass'n, Inc., 417 F.3d 752, 758 (7th Cir. 2005) (relying on Baxter for the proposition that the district court was permitted to draw negative inferences from the assertion of privileges by the plaintiff and a witness who was not a party); Central States, SE and SW Areas Pension Fund v. Wintz Prop., Inc., 155 F.3d 868, 872 (7th Cir. 1998) ("[I]nvoking the Fifth Amendment in a civil context invites an inference that the witness' testimony would be adverse to his interests . . . ."); Daniels v. Pipefitters' Ass'n Local Union No. 597, 983 F.2d 800, 802 (7th Cir. 1993) ("[A]n adverse inference may be drawn against a witness who pleads the Fifth Amendment even if that witness is not a party."); Pyles v. Johnson, 136 F.3d 986, 997 (5th Cir. 1998) (discussing the Baxter rule and stating that "[t]he same is true regarding an invocation of the privilege by a non-party witness in a civil action"); Brink's Inc. v. City of New York, 717 F.2d 700 (2d Cir. 1983) ("[T]he Supreme Court [s]tandard made no distinction between criminal and civil cases or between claims of privilege asserted by a party and claims of privilege asserted by a nonparty witness"); Rad Services, Inc. v. Aetna Cas. and Sur. Co., 808 F.2d 271, 275 (3d Cir. 1986) (permitting a non-party's invocation of the privilege against self-incrimination in civil litigation to be used against a party).

Plaintiff is entitled to establish that it would be adverse to Juan Carlos'

14

interests to testify truthfully because there are charges pending against him. This is a second, independent reason why those pending charges are relevant and admissible.[6]

## C. Defendants' Argument That Plaintiff Should Be Barred From Proving Juan Carlos' Guilt Is a Nonstarter

In passing, Defendants half-heartedly suggest that Plaintiff should be barred from proving that the crime was committed by Juan Carlos rather than by Plaintiff himself. Def. Mot. at 11. The argument is unavailing.

For starters, it is worth noting that Defendants are not contending that the issue of Plaintiff's underlying guilt/innocence is irrelevant. Indeed, Defendants have spent most of discovery trying to build the case that they got the right man, i.e., that Plaintiff really did commit the Morro murder. The argument at issue is simply that Plaintiff should not be able to support the premise of his innocence with evidence that the real killer was Juan Carlos.

That argument is inconsistent with the law. It is well-settled that evidence tending to show that someone else committed the charged offense is relevant to disprove one's own guilt. People v. Kirchner, 194 Ill. 2d 502, 539, 743 N.E.2d 94 (2000); People v. Whalen, 158 Ill. 2d 415, 430-31, 634 N.E.2d 725 (1994). See also People v. Beaman, 229 Ill. 2d 56, 72-76, 890 N.E.2d 500, 509-12 (2008) (Brady violation committed where state failed to turn over evidence of a viable alternative suspect).

In response, Defendants' argument relies on Porter v. City of Chicago, 393 Ill. App. 3d 855, 912 N.E.2d 1262 (1 Dist. 2009), a case which is easily distinguishable.

---

[6] Any other result would be perverse: Plaintiff would be unfairly deprived of critical evidence (or at a minimum, the benefit of favorable inferences) just because Juan Carlos fears prosecution for the very crime Plaintiff was falsely accused of committing. There is no persuasive rationale for depriving Plaintiff of that evidence, particularly where Juan Carlos' interests are fully protected by the availability of a privilege that he in all likelihood will assert.

Leaving aside that <u>Porter</u> was limited to state law malicious prosecution (and thus
the presence *vel non* of probable cause), <u>Porter</u> merely held that the trial court in
that case did not abuse its discretion in excluding evidence of a confession by
someone else in that particular case. That discretionary determination was driven
by doubts about the reliability of the particular confession in issue, which was given
under questionable circumstances and had since been recanted, 392 Ill. App. 3d at
867-68, and by the fact that Mr. Porter was independently able to introduce for the
jury's consideration an innocence pardon, thereby establishing that proposition
without the need for the confession evidence. <u>Id.</u> at 863. In that light, <u>Porter</u>'s
holding does not support the proposition that evidence of someone else's confession
would never be relevant; the Court simply affirmed the trial court's discretion on
those facts, without even necessarily agreeing with the conclusion. <u>Id.</u> ("Given this
context for jury deliberation, we cannot say the trial judge abused his discretion by
barring evidence of Simon's guilt.").[7]

The present case, by contrast, is far closer to <u>Aguirre v. City of Chicago</u>, 382
Ill. App. 3d 89, 887 N.E.2d 656 (2008), a case discussed at length in <u>Porter</u>. The
<u>Aguirre</u> plaintiffs brought a malicious prosecution claim after their murder
convictions were reversed. At trial, they were permitted to call the confessed
murderer to testify about the actual circumstances of the crime, including his
confession that he (not the plaintiffs) committed it. 382 Ill. App. 3d at 97-100. The
appellate court affirmed the introduction of this testimony, finding that it was
relevant to rebut the evidence assembled by the defendant officers tending to
suggest the plaintiff's guilt, evidence that had allegedly been procured through

---

[7] In fact, the Court allowed for the possibility that the evidence was erroneously excluded, but
nonetheless concluded that any such error was harmless. <u>Porter</u>, 393 Ill. App. 3d at 385 ("Even if
Porter is correct and the trial court erred in excluding evidence of Simon's guilt, that error would not
give rise to the relief Porter requests: a new trial").

improper coercion. Id.

In holding that evidence of someone else's guilt supported an inference that the evidence suggesting plaintiffs' guilt was maliciously fabricated, the court rejected Defendants' argument that the "chain of inferences becomes so tenuous that their probative value becomes nonexistent," 382 Ill. App. 3d at 100, a characterization equally inapplicable here. As in Aguirre, if Juan Carlos truly committed the murder, it hardly requires a "tenuous" chain of inferences to reach the conclusion that Defendants utilized improper influence to procure a series of eyewitness statements and identifications suggesting that someone else (Plaintiff) committed the crime. Id.[8]

### 7. The Polaroid and The Inventory List

As the Court discussed in its summary judgment opinion, Mr. Jimenez asserts that one or more of the Defendants not only improperly placed a polaroid photo of Jimenez in front of Tina Elder immediately before she viewed a lineup, but they also kept the polaroid photo off the inventory list of exhibits that the police and prosecutors shared with Jimenez's counsel in 1994 and 1997. Defendants have argued that the documents were available to defense counsel through the Records Division. Indeed, this Court -- based on an affidavit from a Sergeant Spellman in the Chicago Police Department Records Division that the complete inventory list and the photograph were within the department's file for the Morro case -- granted summary judgment for Defendants to the extent that Jimenez claims a Brady

---

[8] Defendants' citation to Gauger v. Hendle, 954 N.E.2d 307 (1st Dist. 2009) is equally unhelpful for the same reason. The Appellate Court affirmed the discretionary exclusion of evidence bearing on innocence in part because, as in Porter, the jury was informed of the parties' stipulation that the real killers were apprehended, and that plaintiff was "pardoned based on his actual innocence." 954 N.E.2d at 333 & 337 ("[E]ven if introduction of the details of how Miller and Schneider committed the murders might have ... led to an inference that [plaintiff's] confession was the product of police suggestion, we conclude that plaintiff suffered no prejudice in light of the evidence that was presented in the present suit, most significantly ... that he was pardoned based on his innocence, and that the killers were apprehended").

violation based on the alleged non-disclosure of these items. R. 151, 11/10/11
Memorandum Op. and Order at 26.[9]

While this Court has prohibited Jimenez from arguing at trial that Defendants'
failure to timely disclose the polaroid and inventory list constituted a <u>Brady</u>
violation under Section 1983, the Court denied summary judgment that the use of
the photograph to influence Tina Elder's identification of Plaintiff could constitute a
<u>Newsome</u> violation under Section 1983, which must go to the jury. The fact that
the photograph was not included on the inventory log is probative of the defendants'
mental state. In other words, the omission of the photograph from the log that was
given to defense counsel supports the inference that the defendants surreptitiously
and maliciously used the photograph in order to manipulate Elder. Plaintiff should
be permitted to argue that inference despite the Courts' ruling that the omission of
the photograph from the log is not also an independent Brady violation. Plaintiff
should still be permitted to question the officers about why they did not disclose the
polaroid in their police reports (as they had the Victor Romo picture) and why the
polaroid was not on the evidence lists produced to defense counsel in 1994 and 1997
(as was the Victor Romo photo). As noted above, such cross-examination (and any
direct examination of Jimenez's former criminal counsel that is needed to tie up
these facts) is further evidence of Jimenez's claim that defendants Bogucki and
Sanders conducted a purposefully false line-up procedure in violation of Section
1983 and that their prosecution of Jimenez was malicious (both of which this Court
upheld for trial on summary judgment). Indeed, the very reason that this Court
dismissed the Section 1983 claims against Schalk was because, unlike Bogucki and

---

[9] Although (a) Defendants did not file the Spellman affidavit until their reply brief, and (b)
Spellman was never disclosed as a witness in the litigation during discovery; and (c) the Spellman
affidavit does not state that the polaroid and longer inventory list were in the file or available to
Jimenez in 1994 and 1997 (but only that they are there today), Jimenez is not challenging that
aspect of the Court's summary judgment ruling.

Sanders, he was not present when this polaroid manipulation occurred.

In sum, that Jimenez's polaroid-related claim was barred on Brady grounds does not and should not mean that it has been barred for all purposes. Robinson v. Village of Matteson, 1999 WL 1270685, *2 (N.D.Ill. Dec. 23, 1999) (dismissal of Brady claim does not necessarily compel the conclusion that all evidence that formed the basis of the Brady claim was thereby inadmissible).

### 8. Phil Torres Deposition

Back at Plaintiff's criminal trials, Phil Torres provided purported-eyewitness testimony implicating Plaintiff in the Morro murder. The Defendants very much like Torres' trial testimony, and seek to rely upon it here. However, as the Court is aware from the summary judgment briefing, Torres made certain admissions and statements at his 2011 deposition that undercut the strength of his prior trial testimony. Defendants do not like Torres' deposition testimony. Citing his history of drug use, Defendants therefore seek to "strike" it. That relief is totally inappropriate for the following reasons.

First, Torres did not purport to be high during the deposition; he merely indicated that he is someone who has trouble remembering things because he gets high. Exhibit E, Torres Dep. at 12-13. Torres' history of drug use, while regrettable, does not distinguish Torres from thousands of other Americans, many of whom are routinely deemed competent to testify at criminal drug trials. Defendants cite no authority supporting this as a valid basis to strike a deposition, and it is not. United States v. Bailey, 510 F.3d 726, 734 (7th Cir. 2007) ("It is probably true that witnesses who were stoned during the relevant parts of the investigation did not have all their wits about them, making their memories fuzzy when they took the stand. This could, in turn, lessen the credence that is owed to their version of events. But it is for the jury to evaluate the credibility of the

19

witnesses, including any cloudiness brought on by their drug use.").

Moreover, Torres made the claim about impairment in the context of asking to be released from the remainder of the deposition. By all accounts, he clearly did not want to be answering questions about his role in Plaintiff's prosecution (especially because he believed he had previously been told he would never have to testify about the case again), and his explanation about drug use was an attempt to convince the lawyers to let him go home. See Exhibit E, Torres Dep. at 13, 27-30. When it was explained to Torres that he would be required to complete the deposition pursuant to a judicial subpoena, Torres clarified that his impairment claim was more generalized, and that he was no more affected by drugs on the day that his deposition was taken than he would have been on any other day, and he agreed to proceed. Id. And when he did, Torres was plainly able to respond to dozens of factual questions with specific answers during the course of the 90-page deposition, notwithstanding his purported memory shortcomings. Id. at 15-23, 46-62.

Equally significant for present purposes, when Torres announced at his deposition that he was suffering from memory issues as a result of drug use, defense counsel nevertheless decided to proceed with the deposition through to completion. Id. at 13, 27-30. In fact, Defendants' counsel entered into a deal with Torres that he would stay at the deposition and answer questions, as long as both sides agreed to a time limit. Id. at 45-46.

Thereafter, Defendants' counsel obviously found Torres sufficiently lucid to ask him all sorts of questions concerning Plaintiff, Larry Tueffel, the Elders, the Cosmens, and Eric Morro, as well as the details of Torres' account of what happened on the day of the murder. Id. at 46-62. Torres did not claim to be incompetent to respond to defense counsel's questions. Id. Having elected to see what Torres

20

would say about the issues in the case even after being apprised that Torres was
claiming to be affected by drug use, Defendants cannot now (having heard certain
testimony they do not like) turn around and argue that the deposition should
essentially be erased.

At bottom, any issues Defendants may have with Torres' credibility and
memory are fair game for cross-examination. While those same criticisms arguably
apply to Torres' criminal testimony as well (he was already into his thirties with a
history of drug abuse at the time of the criminal testimony), Defendants are
obviously entitled to try to undercut the weight of Torres' deposition testimony with
questions and arguments about his professed drug-induced memory challenges.
United States v. Bailey, 510 F.3d 726, 734 (7th Cir. 2007) ("A prophylactic rule that
drug-using witnesses are *per se* unbelievable would derail most drug prosecutions
which frequently involve, of necessity, the testimony of drug users. These witnesses'
shortcomings must be accounted for through cross-examination, not an exclusionary
rule."). But an order striking the deposition altogether is plainly unjustified.
United States ex rel. Garrett v. Acevado, 608 F.Supp.2d 1005, 1017 (N.D. Ill. 2009)
("The credibility of witnesses and conflicts in testimony are to be resolved by the
trier of fact.").

### 9. Cover-Up, Code of Silence, and Other Bias Arguments

Despite their preoccupation with the term "code of silence," Defendants have
not justified an order barring Plaintiff from arguing that police officers (like
members of other tightly-knit, hierarchical organizations) are reluctant to implicate
one another. Defendants are entitled to take the contrary position if they wish, but
Plaintiff should not be precluded from asking questions about bias. For this reason,
courts have consistently denied this same motion. See Saunders v. City of Chicago,
320 F.Supp.2d 735, 740 (N.D.Ill. 2004) ("Defendants' motion to bar testimony that

21

police officers in general or these officers in particular conspire to cover up one another's bad acts through a 'code of silence' is denied as overly broad. The plaintiff may explore the possibility that the defense witnesses in this case are biased because of loyalty to one another."); Galvan v. Norberg, 2006 WL 1343680, *3 (N.D. Ill. May 10, 2006) (denying similar motion because "evidence or argument of this type can go to the issue of the bias or motivation of witnesses. This is a matter that calls for Rule 403 balancing, so that the blanket motion *in limine* is denied for now, without prejudice to the reassertion of any objections on this score in the context of specific evidence when proffered at trial.").[10]

RESPECTFULLY SUBMITTED,

_____
One of Thaddeus Jimenez's Attorneys

Stuart J. Chanen
Lisa R. Carter
Valorem Law Group
35 E. Wacker Drive
30th Floor
Chicago, IL 60601

Arthur Loevy
Jon Loevy
Russell Ainsworth
Loevy & Loevy
312 N. May Street
Suite 100
Chicago, IL 60607

Locke E. Bowman
Roderick MacArthur
 Justice Center
Northwestern U. School of Law
357 E. Chicago Avenue
Chicago, IL 60611

---

[10] It is certainly telling that despite casting their net nationally, neither of the two cases cited by Defendants' motion are the least bit helpful to their cause. First, the issue in Shaw v. City of New York, 1997 WL 187352 (S.D.N.Y. April 15, 1997) was whether to permit Plaintiff to admit into evidence the Mollen Commission Report, dealing with police corruption. Id. at *9. Plaintiff is not attempting to admit into evidence anything even remotely like the Mollen Commission Report. The only other case cited by Defendants, Townsend v. Benya, 287 F.Supp.2d 868, 876-77 (N.D.Ill. 2003), did not even grant a similar motion in full. Rather, Judge Denlow expressly permitted the Plaintiff leeway to explore bias among police officers. Id.

## CERTIFICATE OF SERVICE

I, Jon Loevy, an attorney, certify that on November 28, 2011, I served Plaintiff's Response to Defendants' Motions *in Limine* on all counsel of record via the court's ECF system.

