# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09-cv-8081 |
| | ) | |
| v. | ) | Judge Kennelly |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS *IN LIMINE*

Defendants Jerome Bogucki, Raymond Schalk, and Mark Sanders ("Defendants"), by their undersigned attorneys, hereby respond to Plaintiff's motions *in limine* as follows:

1. **Response to Plaintiff's Motion *in Limine* No. 1**

Defendants are withdrawing their expert Ms. Lilliana Ward. Therefore, this motion is moot.

2. **Response to Plaintiff's Motion *in Limine* No. 2**

Larry Tueffel is arguably the most important witness in this case. Tueffel was standing within a few feet of the person who murdered Eric Morro. In 1993, Tueffel identified Plaintiff as the shooter and testified in three trials (Victor Romo's juvenile trial and both of Plaintiff's trials) that Plaintiff murdered Eric Morro. For the next sixteen years Tueffel never told anyone[1] that he lied under oath when he identified Plaintiff as the murderer. That all changed in 2006, when an investigator working on Plaintiff's behalf confronted Tueffel in a mental health nursing home –

---

[1] Tueffel does claim he told his mother and a priest, although the priest story has been re-told by Tueffel several different ways. In some versions he did tell a priest while in other versions he went to the church but never spoke to a priest. None of these stories have been checked out and, as Dr. Levy explains, the story changes depending on who is questioning Tueffel.

Somerset Place – about his identification of Plaintiff. After speaking with Plaintiff's investigator, Tueffel, for the first time in over sixteen years, recanted his identification of Plaintiff.

Sometime in 2000, Tueffel was diagnosed as a paranoid schizophrenic. Tueffel was also diagnosed with a polysubstance dependence, including a cocaine disorder. None of this is in dispute. What is in dispute is how Tueffel's psychiatric condition affects his recantation. Both sides have retained experts to opine on the relationship between Tueffel's psychiatric condition and his testimony. Both experts agree that his schizophrenia has to be taken into consideration when Tueffel testifies. Dr. Steve Dinwiddie Report at p. 9, submitted under separate cover as Exhibit 1; Dr. Mark Levy Report at pp. 4-5, submitted under separate cover as Exhibit 2. This is in line with the way the Court will instruct the jury.

The Court will instruct the jury that, when deciding what witnesses to believe, it may consider factors like bias, prejudice, witness intelligence, and the witnesses' memory. Just like the jury must consider these factors, it must also consider the effect of a psychiatric condition on the testimony of a witness. Courts across the country have recognized this – especially with schizophrenic individuals. *See United States v. Butt,* 955 F.2d 77, 82-83 (1st Cir. 1992); *United States v. Hargrove,* 382 Fed. App'x 765, 776 (10th Cir. 2010); *United States v. Lindstorm*, 698 F.2d 1154, 1160 (11th Cir. 1983) (finding it reversible error to limit cross examination on psychiatric condition). "Simply put, knowledge relies on cognition, and cognition can be affected by schizophrenia." *Clark v. Arizona*, 548 U.S. 735, 783 (2006) (Justice Kennedy, in dicta and dissent, discussing the knowledge of a criminal defendant and citing the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 299 (4th ed. text rev. 2000) ("The characteristic symptoms of Schizophrenia involve a range of cognitive and emotional

dysfunctions that include perception")); *ibid.* (Symptoms include delusions, which are "erroneous beliefs that usually involve a misinterpretation of perceptions or experiences").

Dr. Mark Levy, an experienced clinical and forensic psychiatrist who has been practicing in this field of medicine for more than 36 years, explains that there is extensive, peer-reviewed, scientific literature on the cognitive impairment found in people suffering from chronic schizophrenia and chronic substance abuse and addiction. In schizophrenia, the cognitive symptoms often persist and contribute to chronic cognitive disability, including impaired executive functioning (problem solving), learning, memory and processing speed that are a core feature of the illness.[2] These significant cognitive disabilities may impair the accuracy and reliability of testimony from such individuals. This explains why courts across the country admit evidence of a witness's schizophrenia.

## I.    Motion to Bar Limited To Deposition Analysis

Although Plaintiff's motion is styled as motion to "bar Dr. Mark Levy's expert opinions," Plaintiff only seeks to bar Dr. Levy from discussing his analysis of Tueffel's testimony.[3] Dr.

---

[2] **Autobiographical memory**. In G. Cohen & M. A. Conway (Eds.), *Memory in the Real World* (3rd ed., pp. 21-90). Hove, UK: Psychology Press
**True and false autobiographical memories in schizophrenia**: preliminary results of a diary study, Pernot-Marino E, Schuster C, Hedelin G, Berna F, Zimmermann MA, Danion JM. *Psychiatry Res.* 2010 Aug 30;179(1):1-5. Epub 2010 May 15.
**Reduced levels of specific autobiographical memories in schizophrenia**, Riutort M, Cuervo C, Danion JM, Peretti CS, Salamé P,. *Psychiatry Res.* 2003 Jan 25;117(1):35-45.
**Types and characteristics of remote memory impairment in schizophrenia**, . Feinstein A, Goldberg TE, Nowlin B, Weinberger DR, *Schizophr Res.* 1998 Mar 10;30(2):155-63; Glutamate: New Hope for Schizophrenia Treatment, Kantrowitz,J.T, Javitt, D.C., *Current Psychiatry,* 10:4, Apr 2011;
**Antecedents, symptom progression, and long-term outcome of the deficit syndrome in schizophrenia,** Fenton WS, McGlashan, TH, *Am J Psychiatry,*1994;151(3):351-356;
**Premorbid IQ in schizophrenia: a meta-analytic review**, Woodberry, KA, *Am J Psychiatry,*2008; 165(5):579-587. Woodberry, KA, Conway, M. A., & Cohen, G. (2008).
**Prefrontal cortical circuits in schizophrenia**.Volk DW  Lewis DA. Department of Psychiatry, University of Pittsburgh, *Curr Top Behav Neurosci.* 2010;4:485-508.

[3] Plaintiff is critical that Dr. Levy did not interview Tueffel until months after issuing his opinion. The criticism is misplaced. First, under court order (requested by Plaintiff), no one was allowed to talk to

Levy does go through several points in Tueffel's deposition to explain how certain responses are consistent with schizophrenics. These responses include several inconsistencies. Although it is true that you do not need to be schizophrenic to testify inconsistently at a deposition, this is not the point of Dr. Levy's analysis.

First, Dr. Levy has still been unable to explain what he has done. Plaintiff is still in the middle of Dr. Levy's deposition. The deposition was suspended so that Plaintiff could complete questioning on another date. Defense counsel attempted to ask follow-up questions based on the questions Plaintiff's counsel posed until that point – but Plaintiff objected and would not allow defense counsel to ask any questions. Deposition of Mark Levy at 124:24-125:13, attached hereto as Exhibit 3. As such, at this point it is unfair for Plaintiff's counsel to rely on a deposition that is not complete in seeking to bar Dr. Levy. Second, Plaintiff's motion suggests that it is an aberration for experts to analyze deposition transcripts. All experts review depositions and extract points from the depositions in forming their opinions. Here, the very nature of Dr. Levy's opinion is explaining the effects of schizophrenia on someone's testimony. Prior to having the opportunity to actually examine Tueffel, Dr. Levy merely used the transcripts of Tueffel's deposition testimony as a template or data set to examine for evidence of cognitive difficulty. Dr. Levy's analysis identified the kinds of verbal behavior that might result from the deficits in autobiographical memory commonly demonstrated by people suffering from chronic schizophrenia and chronic substance abuse and dependence.

For instance, the central issue in this case will be whether the police coerced Tueffel into identifying Plaintiff. What does Tueffel have to say? Well, it depends. When speaking to

---

Tueffel. Second, Tueffel's diagnosis is well documented in three thousand pages of mental health records. Dr. Levy's opinions address the general problems of cognitive and memory dysfunction found in people who have been diagnosed with chronic schizophrenia and chronic substance abuse, both of which are examples of severe mental disorders possessed by Tueffel. Dr. Levy's subsequent interview confirmed this diagnosis.

Plaintiff's team, Tueffel reports that the police yelled and screamed at him until he would identify Plaintiff. However, when speaking to the State's Attorney's Office in 2009 or defense counsel in 2010, Tueffel stated that the police treated him well. SAO Investigative Report Re: Larry Tueffel at pp. 2-3, attached hereto as Exhibit 4; Larry Tueffel Affidavit, attached hereto as Exhibit 5. Why the change? Schizophrenics have impairment in "*reality testing*." Dr. Levy will explain:

> Reality testing is the objective evaluation of situations, a process which is defective in Schizophrenia, enabling one to distinguish between the external objective world and one's internal world of subjective reality including fantasy and dreams. Impaired reality testing is a hallmark symptom of all psychoses. Mr. Tueffel's impaired reality testing make his "recollections" easily influenced and changeable by questioners urging him to "recall" specific facts. []

> Mr. Tueffel's impaired reality testing also causes him difficulty in trying to make sense out of disparate and confusing information. Among people with cognitive impairment from Schizophrenia, one solution to this dilemma is to confabulate false answers to questions, or to confuse false information with actual memories and be unable to clearly differentiate one from the other. []

Ex. 2 at p. 7.

To explain his points further, Dr. Levy uses Tueffel's deposition to highlight these points. It is true that you do not need an expert to point out inconsistencies or find leading questions in a deposition – but that is not Dr. Levy's point or the purpose of his analysis. As Dr. Levy stressed several times in his deposition, it is up to the trier of fact to determine if Tueffel is telling the truth. Ex. 3 at 115:9-13, 116:7-10. Dr. Levy used the transcripts to demonstrate the phenomena he explained is prevalent among schizophrenics to explain to the trier of fact the evidence that Tueffel is compliant in his testimony. There is no need for an error rate in evaluating compliance. Dr. Levy uses the deposition to show "here is an example of compliance." Showing evidence of compliance and inconsistencies is not expert work. The expert work is explaining how these examples differ from normal adult reporting and how it relates to cognitive vulnerabilities.

## II.     Dr. Levy's Remaining Opinions Are Admissible.

If the Court is not inclined to allow Dr. Levy to comment on Tueffel's specific testimony, in addition to his comments on Tueffel's deposition, Dr. Levy's remaining opinions are still relevant and admissible. As explained in his report, Dr. Levy will opine:

1. *People with diagnoses of chronic psychotic conditions such as schizophrenia, paranoid type, or schizo-affective disorder usually exhibit significant cognitive impairment including impaired memory. This cognitive impairment often progresses over time regardless of whether the person is acutely psychotic or in remission.*
2. *People with paranoid schizophrenia and chronic psychotic mental illness may be particularly naïve and trusting under certain circumstances. As such they are susceptible to being "Pied Pipered," or easily influenced and compliant when being questioned. For these and other reasons detailed below, their legal testimony may be unreliable.*
3. *People with a history of heavy substance abuse over a number of years, particularly but not limited to cannabis abuse and/or alcohol abuse, often suffer over time cumulative and chronic cognitive impairment that may eventually affect the reliability of their memory.*

*Opinions Specific to Lawrence Tueffel:*

1. *11 or 12 years ago at age 19 or 20 Mr. Tueffel was originally diagnosed with a chronic psychotic major mental illness, either paranoid schizophrenia or schizo-affective disorder.*
2. *In the documents reviewed, Mr. Tueffel exhibits many of the usual cognitive impairments associated with schizophrenia. In a remarkable video and written transcription of Mr. Tueffel's 2 day deposition testimony on March 3 and March 7, 2011, he appears to be susceptible to <u>being influenced by leading questions</u> and to <u>confuse speculation and fantasy with actual recollection. At times he also appears to confabulate. These are typical symptoms of the cognitive impairment associated with schizophrenia.</u>*
3. *For several years apparently ending in his mid-twenties, Mr. Tueffel heavily abused a variety of mind altering substances including, but not limited to, alcohol, marijuana and cocaine. It is probable that his cumulative heavy exposure to these psychoactive substances eventually interfered with his cognitive functioning and worsened those symptoms of his schizophrenia.*

Ex. 2 at pp. 4-5.

Tueffel was not diagnosed as a paranoid schizophrenic at the time he witnessed the murder and when he testified against Plaintiff in three trials. Tueffel was, however, a diagnosed

paranoid schizophrenic in 2006, at the time of the recant. Tueffel was actually living in a mental health nursing home facility when Plaintiff solicited Tueffel's recantation. Therefore, Dr. Levy should be able to explain the characteristics of schizophrenics and their effects to the jury. This is in line with case law explaining the relevance and considering the effects of a witness's mental health on issues of credibility.

Courts in Illinois have held "that in determining credibility of a witness or the weight to be accorded his testimony, regard is generally given to his mental condition. Almost any emotional or mental defect may materially affect the accuracy of the testimony." *People v. Hogan*, 904 N.E.2d 1036, 1047 (1st Dist. 2009) (Schizophrenia was one of the witness's diagnoses) (citations omitted). "The mental-health history of a witness is relevant as it relates to her credibility and it is a permissible area on impeachment." *Id.* (citing *People v. Plummer,* 743 N.E.2d 170, 179 (1st Dist. 2000).

As to schizophrenics, Courts across the country have explained why such evidence is admissible. In *United States v. Lindstorm,* 698 F.2d 1154, 1160 (11th Cir. 1983), the Eleventh Circuit explained:

> Certain forms of mental disorder have high probative value on the issue of credibility.... Mental illness may tend to produce bias in a witness' testimony. A psychotic's veracity may be impaired by lack of capacity to observe, correlate or recollect actual events. A paranoid person may interpret a reality skewed by suspicions, antipathies or fantasies. A **schizophrenic** may have difficulty distinguishing fact from fantasy and may have his memory distorted by delusions, hallucinations and paranoid thinking. A **paranoid schizophrenic,** though he may appear normal and his judgment on matters outside his delusional system may remain intact, may harbor delusions of grandeur or persecution that grossly distort his reactions to events.

In *United States v. Jimenez*, 256 F.3d 330, 343 (5th Cir. 2001), the Fifth Circuit noted the following:

> [A] defendant has "the right to attempt to challenge [a witness's] credibility with competent or relevant evidence of any mental defect or treatment at a time

probatively related to the time period about which he was attempting to testify."
*United States v. Partin*, 493 F.2d 750, 763 (5th Cir.1974). To be relevant, the
mental health records must evince an "impairment" of the witness's "ability to
comprehend, know, and correctly relate the truth." Id. at 762 . . . the decisions of
this and other circuits stand for the general principle that a diagnosis of
**schizophrenia** or a psychosis will be relevant, unless the diagnosis is too remote
in time from the events alleged in the indictment.

In *United States v. Butt,* 955 F.2d 77, 82-83 (1st Cir. 1992), the First Circuit explained:

For over forty years, federal courts have permitted the impeachment of
government witnesses based on their mental condition at the time of the events
testified to. *See United States v. Hiss*, 88 F. Supp. 559, 559-60 (S.D.N.Y.1950).
Evidence about a prior condition of mental instability that "provide[s] some
significant help to the jury in its efforts to evaluate the witness's ability to
perceive or to recall events or to testify accurately" is relevant. *United States v.
Moore*, 923 F.2d 910, 913 (1st Cir.1991) . . . federal courts appear to have found
mental instability relevant to credibility only where, during the time- frame of the
events testified to, the witness exhibited a pronounced disposition to lie or
hallucinate, or suffered from a severe illness, such as **schizophrenia**,
that dramatically impaired her ability to perceive and tell the truth.

To be clear, Dr. Levy will not be testifying about whether or not Larry Tueffel is actually
telling the truth. That is not his role. In line with the issues recognized in the case law, Dr. Levy
will be explaining the signs and symptoms of cognitive deficit commonly found in the two major
psychiatric illnesses from which Tueffel suffers, chronic paranoid schizophrenia and chronic
substance abuse and dependence. This clearly falls within the purview of *Daubert* and is
recognized by the case law discussed above. Therefore, Plaintiff's motion should be denied.

### 3. Response to Plaintiff's Motions *in Limine* Nos. 3, 11-14

Defendants recognize that, as a general rule, arrests not resulting in a conviction are
inadmissible, absent Plaintiff opening the door. The door in this case is wide open. Plaintiff's
expert, Dr. Antoinette Kavanaugh, will testify that Plaintiff suffers from Post-Traumatic Stress
Disorder ("PTSD") and Depression on a "debilitating level" as a result of his arrest and sixteen-
year incarceration. Dr. Kavanaugh Report at p. 28, submitted under separate cover as Exhibit 6.

Plaintiff is seeing Ms. Peggy Hough, a mental health specialist, who has also diagnosed him with PTSD and Depression. Like any competent psychologist making a severe mental diagnosis, Dr. Kavanaugh and Ms. Hough evaluated Plaintiff's entire life in reaching their conclusion. They both discuss his arrests, drug use and gang activity and how these events affected Plaintiff's life. Therefore, Plaintiff cannot cherry-pick his life apart and decide what did and did not factor into his expert's opinions.

Second, even without his PTSD claim, Plaintiff's pre and post arrest conduct would be relevant as Plaintiff will still be arguing he suffered severe emotional distress from this case. The extent of his conduct is relevant to rebut those emotional distress claims and at the very least attribute them to other causes.

Third, Plaintiff's pre-arrest history is relevant to explain why Plaintiff was tried as an adult. Likewise, Plaintiff's pre-arrest history is also relevant as it was used in aggravation at his sentencing hearings and caused his sentences to be longer than usual. Finally, Plaintiff's pre-arrest history supported the probable cause for his charging, because Defendants knew of his extensive juvenile record prior to the lineup.

**A. Prior Juvenile Arrests – Plaintiff's Motion *in Limine* No. 11**

**i.     Plaintiff's Prior Juvenile Arrests Are Relevant to Emotional Damages**

Plaintiff was charged with murder at the age of 13 and had already been arrested **over 20 times** between the ages of 10 and 13. This is relevant to understanding Plaintiff's mental condition prior to his arrest in this case and Dr. Kavanaugh agrees. Dr. Kavanaugh relies upon Dennis Brady's juvenile probation reports, which detail Plaintiff's extensive prior criminal history. Ex. 6 at pp. 2-3.

Much of Plaintiff's pre-arrest conduct involved violence. At Dr. Kavanaugh's deposition,

she explained that violent behavior pre-arrest was relevant to her analysis:

> Q:      Okay. And do you know if TJ committed any crimes before he was arrested in this case.
>
> MR. BOWMAN: Objection to the form of the question.
>
> A:      Well, I'm going to ask you to tell me what you mean by "violent crime."
>
> Q:      If he fought with -- If he was fighting with anybody.
>
> A:      Well, I know that he fought from his own report.
>
> Q:      Is that relevant to your -- to your opinion?
>
> A:      Yes. And it's something that I considered.
>
> Q:      And why is that important to consider?
>
> A:      Because it let's me know how he was, it let's me know where he was at the time -- where he was psychologically at the time that all of this started, what kind of coping skills he might rely upon in a time of stress and -- Yes, that's my answer.

Deposition of Dr. Kavanaugh at 110:5-22, attached hereto as Exhibit 7.

> Q:      Did you ask him how many times he engaged in fights?
>
> A:      I don't know if I exact -- asked him that exact question, but he talked that he engaged in fights.
>
> Q:      Do you know how often?
>
> A:      I do not know. I don't have an exact number.
>
> Q:      Is that important to know one way or the other?
>
> A:      My impression based upon what I read and the interviews is that it was something that he engaged in and was not an infrequent occurrence.

Ex. 7 at 113:10-20.

To rebut Dr. Kavanaugh's PTSD diagnosis, defense expert Dr. Alex Obolsky opines that Plaintiff's pre-arrest conduct is actually consistent with someone who has a conduct disorder and not PTSD. Dr. Obolsky explains that a review of Plaintiff's criminal history demonstrated the following:

> [Plaintiff] recklessly disregarded others' safety for personal entertainment…He showed extreme indifference to the feelings and welfare of other people. He exhibited no remorse or fear upon apprehension.

Dr. Obolsky Report at pp. 3-4, submitted under separate cover as Exhibit 8.

Plaintiff's pre-arrest criminal history includes:

1.      03/10/90 - criminal damage to property (i.e., broken plate glass)

2.    05/28/90 - attempted strong armed robbery (i.e., confronted a victim in attempt to take away a bike)

3.    06/06/90 - simple battery (i.e., bit victim's hand and attempted to tear her shirt while truant from school)

4.    07/20/90 - theft (i.e., bicycle; then attempted to sell k to another person)

5.    12/07/90 - simple battery (i.e., verbal and physical battery including taunting and taking victims' property)

6.    01/10/91 - vehicle theft (i.e., allegedly drove grandmother's car without permission)

7.    02/05/9l - battery (i.e., threw a rock at a another student)

8.    11/15/91 - criminal damage to public property (i.e., etched gang symbols on his classroom desk; Mr. Jimenez was suspended for similar offences before)

9.    01/16/92 -) vehicle theft (i.e., stole a car)

10.   02/18/92 - aggravated battery (i.e., shot two victims in the back with pellets from attic window)

11.   02/20/92 - aggravated battery (i.e., shot victim in the back, other passers-by, car window, and a bus with a BB gun)

12.   02/29/92 - weapons violation (i.e., apprehended with an air rifle used in previous attacks)

13.   03/15/92 - vehicle theft (i.e., driving a stolen car)

14.   04/30/92 - theft (i.e., stole tools out of a car)

15.   05/08/92 - weapons violation (i.e., mother calls police to report her son who is wanted on warrants; during arrest, found to possess 22 caliber starter pistol)

16.   06/07/92 - criminal damage to vehicle (i.e., broken rear car window)

17.   06/26/92 – attempted theft (i.e., attempt to steal a car)

18.   07/18/92 - aggravated assault (i.e., threw bricks and bottles at victims)

19.   08/08/92 - vehicle theft (i.e., driving stolen car)

20.   10/18/92 - burglary (attempted stealing and destruction of school property)

21.   10/25/92 - delinquent of criminal trespass to vehicle

22.   01/05/93 – burglary

Dr. Marchlewski, a child adolescent psychiatrist, evaluated Plaintiff in April of 1993. His findings are the most hands-on observation of Plaintiff's emotional condition at the time he was first incarcerated for the murder which is relevant to evaluating whether or not Plaintiff has PTSD today. Dr. Obolsky summarized his findings:

According to Dr. Marchlewski, Mr. Jimenez exhibited various negative behavioral and prognostic aspects, such as a history of multiple court referrals, evidence of manipulative behaviors in evading consequences for his delinquent acts, and, despite probation officer's great investment into Mr. Jimenez, lack of positive response to various interventions. Despite voicing the desire to leave the gang, Mr. Jimenez does not do so. He has a significant alcohol and drug misuse history. The positive aspect to Mr. Jimenez's functioning was his ability to do

well academically. Dr. Marchlewski's diagnosis was conduct disorder and poly-substance abuse.

Both side's experts discuss and address Plaintiff's prior arrests as a part of their analysis. Therefore, it cannot be excluded as evidence in this case. In fact, courts have recognized that arrests are admissible in rebutting emotional distress claims – even in cases where no experts were retained – let alone cases where the experts on both sides address the effect of Plaintiff's arrests on his current mental condition. *See Gribben v. City of Summit,* 2010 WL 2928094 at * 3 (N.D. Ill. July 20, 2010) ("Court also agrees that evidence concerning Mr. Gribben's prior convictions and arrests is relevant for the limited purpose of undermining his claim of intentional infliction of emotional distress"). *See also Redmond v. City of Chicago,* No. 06 C 3611, 2008 WL 539164, at *2 (N.D. Ill. Feb. 26, 2008) (evidence concerning prior arrests is relevant, not for purpose of showing bad character, but to allow jury to assess claim of emotional distress stemming from arrest).

### ii. Plaintiff's Prior Juvenile Arrests Are Relevant to the Amount of Time He Spent In Prison and the Probable Cause for His Charging

Plaintiff seeks damages for sixteen years of incarceration. But not all juveniles charged with murder are tried as adults or given such lengthy sentences. Defendants should be permitted to argue that Plaintiff received unique treatment because of his particularly extensive juvenile criminal record. First, Plaintiff's prior juvenile arrests caused him to be tried as an adult. At Dennis Brady's deposition, he testified:

Q. Let me ask a new question. T.J.'s 10 station adjustments -- Strike that. Thaddeus Jimenez's 10 station adjustments and his 13 court referrals -- The ones we just talked about, correct?
A. Correct.
Q. (Continuing) -- all of these were considered by you in your recommendation that T.J.'s court be transferred -- T.J.'s murder trial be transferred to the adult court versus being in the juvenile court; is that correct?
A. Correct.
Q. And they formed one of the major bases for why you asked for the case to be

transferred to the adult court versus the juvenile court; is that correct?

MR. CHANEN: Object to the form.

BY THE WITNESS:

A.     I think there were seven criteria for where you make that recommendation. So that would be one of the criteria. And it was definitely a reason, yes.

Deposition of Dennis Brady at 26:24-27:19, attached hereto as Exhibit 9. Second, Plaintiff's prior juvenile arrests caused him to receive lengthy sentences. Twenty witnesses, including Dennis Brady, testified at Plaintiff's first sentencing about his juvenile arrests. After hearing this testimony, Judge Berkos sentenced Plaintiff to fifty years' imprisonment, observing:

> Thaddeus, you have an extensive juvenile record. It starts at age nine or ten years old. A variety of crimes, attempt robbery, batteries, criminal damage to property, thefts, trespass to motor vehicles, possession of weapons, I think there were two or three possession of stolen motor vehicles, a couple of burglaries, attempt burglaries, several disorderly conducts, battery, looks like 22, 23 crimes that you've been involved in . . . Most of these crimes although they're juvenile crimes would except for your age have been felonies.

Finally, Defendants knew of Plaintiff's juvenile record of over twenty arrests prior to his lineup. His extensive prior juvenile arrests also supported the probable cause for his charging following the lineup. Therefore, because Plaintiff's prior juvenile arrests are relevant to his claim of emotional damages, the amount of time he spent in prison, and the probable cause for his charging, those arrests should be admissible.

**B. Conduct In Prison**

Dr. Kavanaugh discussed why Plaintiff's conduct in prison is relevant as well.

Q:     Why did you ask for records related to his tickets? Why was that important to you?

A:     So that I can have an understanding of what tickets he obtained.

Q:     Why is that important?

A:     So I can have an understanding of his behavior while he was in.

Q:     Why is that important?

A:     Because it's a relevant factor and it helps to have a -- as complete picture as possible knowing that there are inherent limits of how complete you can get.

Ex. 7 at 57:4-14.

Q:    Do you think you don't have a complete picture of Mr. Jimenez?

MR. BOWMAN: Objection, argumentative.

BY THE WITNESS:

A:    I feel that given what data I have, I have as complete a picture as I have.

Q:    Okay. Now, back to the tickets, the tickets were so that they can assist you in getting as complete of a picture as possible; that would be fair?

A:    The tickets were so that I can understand how others -- meaning the system -- documented his behavior while he was there.

Q:    Why is his behavior in prison relevant?

A:    Because -- His behavior in prison is relevant to the degree in which they noted it, which isn't always complete, because it helps me understand how he was behaving during that time and that's part of my assessment.

Q:    My question is: Why is that important? Why is it important how he was behaving in prison?

A:    To allow me to assess how he was during that time.

Ex. 7 at p. 58:10-59:13.

Q:    How about while he was incarcerated, do you know how many fights he engaged in while he was incarcerated?

A:    I don't have a tally of the number of fights.

Q:    Do you know if he engaged in fights --

A:    Yes.

Q:    -- while he was incarcerated? Do you know if it was just as infrequent as it was before he got incarcerated?

A:    Well, I know that he -- Well, I guess – Wow Okay. So it's really hard to assess that because he, before incarceration, was 13 and he had a 16-year period, so even with the same -- So there's a -- So – I know that he, by his report, engaged in a lot of fights while he was incarcerated and also records from the detention center describe him in a similar manner.

Ex. 7 at pp. 113:21-114:12.

Accordingly, even Dr. Kavanaugh agrees that one must look at the complete picture, including Plaintiff's conduct in prison, when evaluating his mental condition.

### C. Post-Release Conduct – Plaintiff's Motion *in Limine* No. 12

As with his prior arrests, Plaintiff's post-release arrests are relevant to assessing his emotional damages and PTSD claim. After serving sixteen years for a crime he claims he did not commit, Plaintiff was released from prison in May of 2009. Since that time, Plaintiff has been arrested at least five times. These arrests include driving on a suspended license, guns and drugs

14

recovered in a search of his home, resisting arrest, and aggravated assault on a police officer.

For one case, Plaintiff was incarcerated without bail in Cook County Jail for over six months in 2010. As a part of facilitating his release on bail (which he currently is on), Plaintiff submitted a report to the Circuit Court of Cook County Criminal Court judge by Ms. Peggy Hough, who evaluated Plaintiff and diagnosed him with PTSD. Peggy Hough Report at p. 9, submitted under separate cover as Exhibit 10. In fact, Plaintiff's first PTSD diagnosis came from Ms. Hough, who evaluated Plaintiff while he was incarcerated for his post-release arrests. Dr. Kavanaugh summarized Ms. Hough's opinions:

> [Plaintiff] suffers from symptoms of PTSD including hypervigilance, flashbacks, intrusive thoughts or images related to his incarceration as well as "nightmares and traumatic responses, [and] feeling as if it is really happening." She reported that as a result of being convicted of a crime that he did not commit and serving more than sixteen years in prison "he experiences a fair amount of detachment and problems with trusting people for fear that the relationship will not last or will be interrupted without any control on his part." Moreover, she opined that he experiences paranoia, which she conceptualizes as "extension of what I consider the hyper vigilance." She opined that aspects of his depression "**manifest with rage,** but I think he is depressed. At times he demonstrates hopelessness and helplessness. It is going to be a long time before he can navigate through this and see life through a different lens."

Ex. 6 at p. 23.

Dr. Kavanaugh had no idea that Plaintiff was even incarcerated in Cook County Jail when she evaluated him and diagnosed him with PTSD. For all we know, Plaintiff's emotional distress may come from the six months he spent in Cook County Jail. Moreover, Plaintiff seeks compensatory damages for "the loss of a normal life that [he] has suffered and is reasonably certain to experience in the future." Pl's Jury Instruction No. 23. His multiple arrests and six-month incarceration in Cook County Jail rebut the notion that Defendants deprived him of a normal life. Therefore, Defendants should not be precluded from introducing evidence related to his post-release arrests and recent 2010 incarceration.

Dr. Obolsky explains in his report that on March 19, 2010:

Mr. Jimenez refused to comply with directions of the fire department to move his vehicle as to allow an emergency vehicle pass though a toll booth in order to respond to an emergency of another driver having a heart attack Indeed, Mr. Jimenez reportedly yelled: "Fuck you. I don't have to move. I ain't listening to you."

Eventually Mr. Jimenez moved his vehicle, parked his car, and exited the car. He walked up to Sergeant McDonald with his arms raised and he was yelling, "Fuck you. I'll fuck you up." Mr. Jimenez walked closer to Sergeant McDonald swinging his arms. Officer McDonald identified himself as peace officer and toll Mr. Jimenez he was under arrest and to lay on the ground with his hands behind his back Mr. Jimenez refused and continued to approach Sergeant McDonald. At that time, Officer McDonald and first deputy superintendent apprehended Mr. Jimenez and arrested him.

At the police station, the search of Mr. Jimenez resulted in finding marijuana in his sock At the time of this hearing on 06/10/10, the case was pending at Rolling Meadows with the next court date on 07/29/10.

Upon further hearing the arguments made by defense attorney, the judge stated that he saw a "theme here and I see a theme that he has very little self-control. He is impulsive and responds instinctually. He yells and screams and he acts out. He has an order of protection, he is a danger." The bond was increased to $50,000 and Mr. Jimenez was released to Cook County Sheriff's Day Reporting in addition to wearing a bracelet. The judge ordered mental health counseling and alcohol and drag treatment. In the judge's opinion, Mr. Jimenez was "a time bomb."

Dr. Pica, a psychologist, and Chief Judge Rodriguez interviewed Mr. Jimenez on 06/18/10 in order to ascertain his fitness to participate in the Cook County Sheriff's Day Reporting program. According to the report, Mr. Jimenez did not exhibit florid signs of mood or thought disorders.

During this interview, Mr. Jimenez was found to contradict himself on occasion. Mr. Jimenez denied current gang involvement and downplayed his past involvement as a "pee-wee;" yet he boasted about running a prison house (i.e., he was in charge of the entire division) while incarcerated. He initially reported he can identify a gang member anywhere only to contradict himself when he stated that he did not know of any gang members in jail.

Ex. 8 at pp. 21-22.

In summary, the review of contemporaneous records documenting Mr. Jimenez's involvement with the criminal justice system since May 2009 indicates a pattern of various acts that brought him to the attention of law enforcement. Although

many charges were dropped, the facts are that Mr. Jimenez was involved in drug related behaviors, driving offenses, weapon offenses, and overall he exhibited aggressive, impulsive, and hostile behaviors. Indeed his mandated mental health treatment focused on his poor self-control, irritability, impulsivity, not taking responsibility for his own actions and blaming others, and lastly domestic violence treatment.

Ex. 8 at p. 24.

Even Dr. Kavanaugh admits that Plaintiff's post-release "conduct was consistent with what one would expect given what he has undergone." Ex. 7 at p. 81:12-13. Accordingly, all of his post-release conduct is relevant in evaluating his emotional damages in this case.

**D. Drug Use – Plaintiff's Motion *in Limine* No. 14**

Plaintiff seeks to keep out his drug use. Once again, drug use is relevant to damages. Both Dr. Kavanaugh and Dr. Obolsky address Plaintiff's use of drugs. As recently as last year, Plaintiff was forced to undergo drug counseling. According to a November 29, 2010 court order, Plaintiff was required to attend a weekly AA/NA meeting. Dr. Obolsky, in rebuttal to Dr. Kavanaugh's PTSD assessment, also diagnosis Plaintiff with substance abuse disorders based on the DSM-IV guidelines. Dr. Obolsky will explain how Plaintiff's prior and current drug use is relevant to understanding his mental disorder. Even Dr. Kavanaugh considered Plaintiff's drug use as a part of her overall analysis of his mental condition.

> Q:    There's some brief mention in your report about his drug use, and I want to talk to about some of that right now. Okay?
> A.    Yes.
> Q.    He told you he did cocaine, correct?
> A.    When are we talking about?
> Q.    Prior to his incarceration he told you that he did cocaine?
> A.    I just need to check the time period which is -- Hold on. Correct.
> Q.    How much did he do?
> A.    I don't -- It's not included in my report. I don't know.
> Q.    Did you ask him?
> A.    I don't have -- I don't know.
> Q.    Would it have been important to ask him?
> A:    I think what was important for me is understanding what his -- what substance he was using and get some idea of the pattern of his use and when it started. What I

know -- So I think that that's -- That's what I felt that I needed to do.

Ex. 7 at pp. 115:6-116:3.

Therefore, this Court should not bar evidence of Plaintiff's drug use as it is relevant to his claim of emotional damages. *E.E.O.C. v. Kim and Ted, Inc.,* 1996 WL 26871, at *3 (N.D. Ill Jan. 22, 1996)(evidence of prior drug use is relevant to claim of emotional damages); *Egebergh v. Village of Mount Prospect,* 2004 WL 856437, at *1 (N.D. Ill. April 20, 2004)(drug use relevant to damages.)

### E. Gang Evidence – Plaintiff's Motion *in Limine* No. 3

#### i. Gang Evidence Is Relevant to Plaintiff's Motive to Shoot Eric Morro

Just a few hours before the shooting, Eric Morro saw Plaintiff throwing Royals signs and yelling Royals at a school bus around Belmont and Sacramento. When Mr. Morro told Plaintiff to take his gangbanging elsewhere, Plaintiff responded by threatening him, saying "you'll get yours, you'll get yours." Donna and Shawn Cosmen witnessed this altercation, and told Detective Bogucki about it prior to Plaintiff's arrest and charging for the murder of Eric Morro. The motive supplied by this gang-related altercation thus supported the probable cause for Plaintiff's charging, and is directly relevant to Plaintiff's claims. The State argued at Plaintiff's first trial:

> [T]he Thaddeus Jimenezes of the world believe that if somebody crosses their path and he disagrees with them or they try to stop him from doing his gangbanging crap in front of little kids, that he has the right to take their life.

Plaintiff's gang affiliation cannot be disentangled from his motive for shooting Eric Morro. Therefore, because gang evidence was an element of the probable cause for Plaintiff's charging and the evidence supporting his allegedly wrongful convictions, it should not be barred.

#### ii. Gang Evidence Is Relevant To Explain Why Larry Initially Refused To Identify Plaintiff

Plaintiff's gang affiliation is also relevant to establish the relationship and actions people took in this case. The Seventh Circuit has long recognized that gang membership has probative values under appropriate circumstances, "particularly 'in cases where the interrelationship between people is a central issue.'" *United States v. Morales*, 03-CR-90, 2009 WL 1456567, at *16 (N.D. Ill. May 22, 2009). *See also United States v. Westbrook,* 125 F.3d 996, 1007 (7th Cir.1997) ("Gang affiliation is particularly relevant, and has been held admissible, in cases where the interrelationship between people is a central issue.")

For example, Plaintiff and Larry Tueffel were both members of the Simon City Royals. Tueffel was interviewed on three occasions by the police. Tueffel only told the police Plaintiff committed the murder after he was told that another witness had identified Plaintiff. During cross-examination at trial, Tueffel explained that at first he was scared to identify Plaintiff because "if you trick on another gang member . . . You end up dead." Larry Tueffel Testimony at Plaintiff's First Criminal Trial at B134:6-136:5, attached hereto as Exhibit 11.

Additionally, Jerry Scroggins was a probation officer who documented that Plaintiff and Victor Romo were in the same gang. Both Plaintiff and Mr. Romo deny this gang affiliation – but this is probative of their motive to lie for each other. *United States v. Thomas,* 86 F.3d 647, 652 (7th Cir. 1996) (affirming district court's ruling allowing gang evidence because that evidence "helped demonstrate the existence of the conspiracy and the connections between members of the conspiracy").

### iii.    Gang Evidence Is Relevant to Emotional Damages

Plaintiff seeks to exclude evidence that he was a member of the Simon City Royals. Better yet – he would like to tell the jury that the Royals was some "party crew" that he was a part of. This could not be farther from the truth and is a distortion of how Plaintiff was leading

his life prior to his arrest, which, as discussed above, is relevant to understanding the "complete picture" of Plaintiff and its relation to his incarceration.

During his forensic interview with Dr. Obolsky, Plaintiff explained that his uncle Mark taught him how to protect himself, how to fight, and how to maintain respect from others. According to Plaintiff, these skills came in handy when he was incarcerated because he was able to keep himself safe. Uncle Mark – as well as other family members – were gang members who acted as role models for him. Plaintiff explained that he joined the gang because:

> Because I always wanted to. I seen my uncles, they were, I joined the same gang that my uncles were and my cousins were in. I wanted, I knew that's what they were part of, that was the gang that they were a member of and I wanted to follow in their footsteps. I wanted to do it too... I wanted to be in that same gang. I wanted to do the things they did. I wanted to walk their footsteps and that's what I did.

In his interview with Dr. Obolsky, Plaintiff explained:

> I quickly developed a reputation as a bad ass in the neighborhood quickly, quickly. I was, this is what I was told, not, I was told to do this, I was told to do that, whatever I was told to do I did it immediately and without question and without hesitation whatsoever, I did it and that gained my reputation for me. People would call this guy is serious about it, you know, don't mess with him, he's a gangbanger, you know, and...

Plaintiff experienced satisfaction from his reputation and the respect gang membership gathered for him. He explained:

> It, in, in some ways it made me feel good, it did, I cannot lie. In some ways, you know, this was a sense of power, a sense of authority for me because I could walk around the neighborhood and none of the other kids would mess with me, none of the other kids would be scared of or would, all the other kids were scared of me. Even neighbors, you know, even adults in the neighborhood they knew who I was and, you know, they didn't give me no problems. All the girls in the neighborhood they liked me, not because they knew me because I was a good guy, but because they knew who I was and they knew of me and, you know, in that, in that aspect, you know, I liked it because I was, I was force, I was somebody...

Again, even Dr. Kavanaugh considered Plaintiff's gang affiliation in her analysis.

> Q.     Do you know how old TJ was when he joined the gang?

A.      I don't know off the top of my head.

Q.      Is that important to this case? Strike that. Is that relevant in anything to consider in your opinion in this case?

A.      What's more relevant is me being aware that he was in -- was gang involved.

Q.      Why is that relevant?

A.      Because it helps me to understand him and what kind of potential issues might have been involved when was incarcerated -- that he would face when incarcerated.

Q.      And we're talking about the gangs prior to incarceration?

A.      Correct, we are.

Q.      Okay. So why is his gang prior to him being incarcerated relevant?

A.      Because it could put him in more danger or perhaps afford some level of -- I don't know -- for lack of a better word -- protection at a cost while incarcerated.

Ex. 7 at pp. 117:14-118:11.

Therefore, this Court should not bar any discussion of Plaintiff's gang activity and affiliation because it is relevant to damages.

**F.  Margot Gillin's Testimony Is Relevant – Plaintiff's Motion *in Limine* No. 9**

Margot Gillin was Plaintiff's teacher while he was incarcerated at the Audy Home. Ms. Gillin will testify to her observations of Plaintiff, observations she clearly remembers to this day. These observations are relevant to the assessment of his conduct while incarcerated on this case. As Dr. Kavanaugh explained, it is important to have as complete a picture as possible. Ex. 7 at 57:4-58:9. Here, we have direct observations of Plaintiff when he was incarcerated in the Audy Home. Ms. Gillin testified:

The reason I recall Thaddeus is I remember he shook my belief in humankind, made me question my religious beliefs very deeply, and I have never seen a child that I was as scared of. Nor had I seen a child that I took their threats as seriously as this child. That's why this child stands out in my mind.

Deposition of Margot Gillin at 11:2-8, attached hereto as Exhibit 12.

Ms. Gillin will also testify about the threats Plaintiff made against Victor Romo's father.

According to Ms. Gillin's report dated 5-26-93:

On 5-25-93 Thaddeus announced that he would kill the father of the young man he is on the case with if the young man said he pulled the trigger. Thaddeus has been fighting, attempting to steal things, and being uncooperative, sneaky.

It is Defendants' position that Ezequiel Romo fabricated the Juan Carlos Torres confession tape because he was scared of Plaintiff. Ms. Gillin's recollection and memorialization of the threat is circumstantial evidence the threat was made and supports Defendants' assertion that Mr. Romo was indeed afraid of Plaintiff. Mr. Romo in fact confirmed he knew about the threat. Deposition of Ezequiel Romo at 74:23-75:6, attached hereto as Exhibit 13. Plaintiff tries to massage the threat because Mr. Romo does not admit hearing the threat directly from Plaintiff. This is really beside the point. First, Mr. Romo could very well be lying about the circumstances of the threat. Truth be told, he might still be scared of Plaintiff. Second, whether he heard the threat directly or not, he learned about it. Ms. Gillin's testimony about the threat supports that Plaintiff actually did make a threat to Victor Romo's father.

Ms. Gillin also testified that Plaintiff bragged that he arranged for the apartment of one of the witnesses in the case to be firebombed. Ex. 12 at 14:6-13, 24:8-20. Phil Torres testified to a fire at his apartment after he agreed to be a witness against Plaintiff. Plaintiff denies participating in the fire at Mr. Torres's apartment. Ms. Gillin's testimony is therefore also relevant to rebut Plaintiff's denial of any involvement in the fire at Mr. Torres's house.

Therefore, Ms. Gillin's testimony is relevant to both damages and to establish that Plaintiff did in fact threaten Ezequiel Romo and brag about the fire at Phil Torres's house.

According to Dr. Kavanaugh, just looking at Plaintiff and observing his mannerisms show that he is extremely depressed. Ex. 7 at 137:3-22. Therefore, even if Plaintiff seeks to withdraw Dr. Kavanaugh, Plaintiff's conduct, arrests, drug use and gang activity are relevant to explain Plaintiff's emotional distress.

### 4. Response to Plaintiff's Motion *in Limine* No. 4

Plaintiff's motion to bar Carmelo Cortez from testifying at trial should be denied. First, Plaintiff is not prejudiced by the timing of Mr. Cortez's disclosure. Second, Rule 26(a)'s disclosure requirements do not apply to impeachment witnesses. Fed. R. Civ. P. 26(a)(1)(A)(i).

Under Rule 37, this Court should consider whether Plaintiff is prejudiced by the timing of Mr. Cortez's disclosure and Plaintiff's ability to cure any prejudice that may exist. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 857-58 (7th Cir. 2003). Defendants disclosed Mr. Cortez's name, address, and expected testimony on October 26, 2011, promptly after locating and interviewing him. Plaintiff's motion *in limine* poses some questions regarding Mr. Cortez's contacts with defense counsel and his conversation with Larry Tueffel which Plaintiff claims cannot be answered before trial. In response, Defendants state the following:

- In September of 2010, Plaintiff testified that he, Danny, and Eric Morro once delivered drugs to "Carmello."
- In February of 2011, Defendants first learned the full name Carmelo Cortez in the course of their investigation, and began trying to locate Mr. Cortez.
- In March of 2011, Larry Tueffel testified that "Carmello" came by his house after the shooting and asked him who shot Eric Morro, and that he did not tell "Carmello" that Plaintiff shot Eric Morro.
- In October of 2011, Defendants finally located Mr. Cortez.
- On October 16, 2011, Defendants' investigator made contact with Mr. Cortez.
- On October 25, 2011, Andrew Hale interviewed Mr. Cortez.
- On October 26, 2011, Defendants disclosed Mr. Cortez.

The remainder of Plaintiff's questions – such as why Mr. Cortez did not "come forward earlier" – can be answered through the standard process of taking Mr. Cortez's deposition. Defendants previously advised Plaintiff that they have no objection to Plaintiff deposing Mr. Cortez should they desire. If Plaintiff chooses to depose Mr. Cortez, he will also have the opportunity to verify that defense counsel did not engage in any misconduct. A deposition of Mr. Cortez would be consistent with the parties' practice of continuing to conduct discovery past the official discovery cut-off date in this case. For example, Plaintiff recently issued a subpoena for a video of Juan

Carlos Torres. This video was referenced in a State's Attorney's Office Investigative Report produced by Defendants in April or May of 2010. Plaintiff could have sought the video in 2010, yet waited until the eve of trial to do so, then strenuously argued to this Court that three weeks was ample time for Defendants to find, retain, and obtain a response report from a voice comparison expert – a decidedly more time-consuming task than deposing a single witness. Other recent examples include Plaintiff's seeking to obtain more of Mr. Tueffel's medical records in November, and the production of Rosa Wiszo-Waty's grand jury testimony in October on Plaintiff's motion in Cook County Criminal Court. By January 9, 2011, Plaintiff will have had more than two months from the time Mr. Cortez was disclosed during which to depose Mr. Cortez and learn the answers to his questions. Thus, the timing of Mr. Cortez's disclosure has not prejudiced Plaintiff.

Moreover, the plain language of Rule 26(a) exempts impeachment witnesses from the general requirement that witnesses be disclosed in advance of trial. *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir. 2005). Mr. Cortez is a textbook impeachment witness. Mr. Tueffel testified that Mr. Cortez came by his house after the shooting and asked him who shot Eric Morro, and that he did not tell Mr. Cortez that Plaintiff shot Eric Morro. Mr. Cortez is expected to testify to exactly the opposite, that is, that Mr. Tueffel did, in fact, tell him that Plaintiff shot Eric Morro. As such, Mr. Cortez directly impeaches Mr. Tueffel. Therefore, both because of the absence of prejudice and because Mr. Cortez is an impeachment witness, Plaintiff's motion to bar Mr. Cortez from testifying at trial should be denied.

### 5. Response to Plaintiff's Motion *in Limine* No. 5

Plaintiff's motion to bar evidence of the Elizabeth Heatley letters should be denied. First, the letters were important evidence supporting Plaintiff's allegedly wrongful convictions.

24

Second, the letters corroborate Larry Tueffel's original testimony that he did not immediately identify Plaintiff as the shooter because he was afraid of implicating a fellow member of the Simon City Royals. Third, the letters are relevant to Plaintiff's emotional damages.

First, the State prominently featured the letters in its case against Plaintiff at both trials. For example, the State began its closing argument at Plaintiff's first trial as follows:

> There are 13-year-old children, and there are Thaddeus Jimenez. Thaddeus Jimenez is the type of person that writes letters and says, "Oh, this Saturday on the 8th I am going to call John Spaw . . . I am going to tell him to stop Larry from going to court in any way he has to, even if he has to kill him."

Likewise, the State ended its closing argument as follows:

> Ladies and Gentlemen, don't stop at just his actions. Listen to his words. Listen to the letter he wrote on April 19, 1993. "Even if he has to kill him, it won't mean anything to me, and it only takes the pull of a trigger."

Plaintiff claims that he was wrongfully convicted due to Defendants' misconduct, and seeks substantial damages for injuries stemming from those convictions. Defendants are entitled to argue that Plaintiff was not convicted because of any police misconduct, but because the State successfully utilized the letters as powerful evidence of consciousness of guilt. The letters also mitigate Plaintiff's *Brady* allegations. To prove his *Brady* claim Plaintiff must show that the failure to disclose certain evidence was "material" i.e. the jury would have reached a different result if the material suppressed were disclosed. Here, the jury could easily find that the even if Defendants withheld certain *Brady* evidence, it was not material because the threatening letters written by Plaintiff were strong indicators of guilt. Indeed, Plaintiff appealed his second conviction based on the trial court's admission of his letters. The appellate court rejected this argument, finding that the letters were properly admitted as probative of consciousness of guilt. Appellate Opinion at p. 17, attached hereto as Exhibit 14. While Plaintiff is free to disagree and call the letters "childish expressions of love and longing," he should not be permitted to pretend

that they do not exist. Such a sanitized version of what occurred at Plaintiff's trials would be a gross rewriting of history and deprive Defendants of a significant line of defense. Moreover, Plaintiff intends to argue that, following his arrest, Defendants failed to investigate the "real shooter." Defendants should be permitted to argue that they did not investigate Juan Carlos Torres as much as Plaintiff wishes because, even after Plaintiff's arrest, they continued to receive evidence that Plaintiff was the shooter.

Second, the letters corroborate Larry Tueffel's criminal trial testimony that he did not initially identify Plaintiff as the shooter because he was afraid of implicating a fellow member of the Simon City Royals. The letters demonstrate that those fears were justified. Therefore, for all of the aforementioned reasons, Plaintiff's motion to bar evidence of the Elizabeth Heatley letters should be denied.

Third, the letters are relevant to Plaintiff's mental condition shortly after the shooting. Dr. Obolsky relied on the letters in diagnosing Plaintiff with a juvenile conduct disorder. Ex. 8 at p. 10. The letters are thus relevant to Plaintiff's claim of emotional damages. *See* Response to Plaintiff's Motions *in Limine* Nos. 3, 11-14.

### 6. Response to Plaintiff's Motion *in Limine* No. 6

Plaintiff's motion to bar references to Victoria Jimenez's communications with Elizabeth Heatley should be denied. First, Defendants anticipate that Ms. Jimenez will testify that she always believed in Plaintiff's innocence. Defendants should be permitted to counter this testimony with evidence that Ms. Jimenez attempted to manipulate the case against Plaintiff. Such testimony also goes to bias i.e. to what extent Ms. Jimenez will act on behalf of her son. Second, like the letters themselves, Ms. Jimenez's communications with Ms. Heatley regarding the letters were a part of the criminal trials and likely affected the juries' determinations of Ms.

Jimenez's credibility. Just as the letters affected the outcome of Plaintiff's trial so did his mother's actions. Therefore, Plaintiff's motion to bar references to Ms. Jimenez's communications with Ms. Heatley should be denied.

### 7. Response to Plaintiff's Motion *in Limine* No. 7

Plaintiff's motion to bar "amorphous" threats should be denied. The threats are admissible to explain the witnesses' testimony at Plaintiff's criminal trials and during the current lawsuit as well. Virtually every civilian witness who testified against Plaintiff at his criminal trials was threatened in connection with the case. To briefly summarize:[4]

- Larry Tueffel was threatened by Plaintiff in the Elizabeth Heatley letters, and originally testified that he was afraid to identify Plaintiff because of gang retaliation. Charles Snyder testified that Tueffel's home was burned down a few days after the shooting. Deposition of Charles Snyder at 36:15-37:3, attached hereto as Exhibit 15.
- Tina Elder was told to "mind her own business" and "keep her mouth shut." She "[took] that to mean [her] family shouldn't get involved in Mr. Jimenez's criminal trial." Deposition of Tina Elder at 67:16-69:12, attached hereto as Exhibit 16.
- Sandra Elder was told that "we'd be sorry if we testified against TJ." She was "concerned about testifying against TJ at the criminal trials." At her deposition, she testified that the threats "scared me. Still scares me." Deposition of Sandra Elder at 75:3-76:1, attached hereto as Exhibit 17.
- Phil Torres's apartment was burned down after he identified Plaintiff as the shooter. Tina Elder, Sandra Elder, Donna Cosmen, Shawn Cosmen, and Charles Snyder have all corroborated that the fire occurred. Margot Gillin recalled Plaintiff bragging about having a witness's home firebombed.
- Shawn Cosmen's life was threatened by members of Plaintiff's family. At the time of his deposition, he was still afraid of gang retaliation. Deposition of Shawn Cosmen at 36:3-40:14, 64:8-22, attached hereto as Exhibit 18.
- Elizabeth Heatley was threatened by Plaintiff's mother after Plaintiff's letters were turned over to the police.
- Margot Gillin also recalled Victor and/or Ezequiel Romo being threatened by Plaintiff on multiple occasions. Ezequiel and Catalina Romo recall threats against the Romo family.

Taken together, the threats show a striking pattern of witness intimidation. The fact that some witnesses did not identify their aggressors is beside the point. First, they may still be too afraid to

---

[4] Plaintiff has only moved to bar some of these threats. The complete list is included for illustrative purposes.

name names, especially knowing that Plaintiff has been released and will learn everything they say. (Plaintiff attended Tina and Sandra Elders' depositions in Fulton, Illinois.) Second, regardless of whether they can identify their aggressors, the threats are admissible to explain why they testified the way they did at Plaintiff's criminal trials. *See People v. Williams*, 635 N.E.2d 781, 788 (1st Dist. 1994) (evidence of threats admissible to explain witnesses' inconsistent statements). Even today, these witnesses are still very reluctant to testify because of everything they endured at the time of the criminal proceedings and because of fear of what might happen if they continue to testify against Plaintiff. As such, the threats are also admissible to explain the witnesses' testimony in this lawsuit. Therefore, Plaintiff's motion to bar "amorphous" threats should be denied.

### 8. Response to Plaintiff's Motion *in Limine* No. 8

This Court should reserve ruling on Plaintiff's motion to bar references to an incident at Cook County Jail between Plaintiff and Rachel Vorbeck, one of his former post-conviction attorneys. On June 11, 2010, Ms. Vorbeck visited Plaintiff at Cook County Jail for over nine hours. She was no longer his attorney at the time. At the conclusion of the visit, Cook County Jail personnel witnessed Plaintiff and Ms. Vorbeck kissing on the lips which prompted them to complete both an Incident Report and a Memorandum. At this point, Defendants do not intend to reference the incident at trial. If, however, Plaintiff opens the door by testifying that he is in a healthy, committed relationship with the mother of his child, Abby Betbabo, then Defendants should be permitted to question him regarding the incident. If Ms. Vorbeck is called at trial, the incident is also potentially relevant to bias. Therefore, this Court should reserve ruling on Plaintiff's motion to bar references to the Cook County Jail incident.

### 9. Response to Plaintiff's Motion *in Limine* No. 9

Plaintiff's motion to bar "irrelevant witnesses" from testifying at trial should be denied. As a threshold matter, the motion should be denied because it is overbroad and supported solely by conclusory allegations of irrelevance. Nevertheless, Defendants will briefly describe each witness's expected testimony.[5] Jerry Scroggins is expected to testify about a probation report which he authored stating that Plaintiff and Victor Romo were members of the same gang, contradicting both of their claims that they did not know each other prior to the shooting. Terry Sullivan, Executive Director of the Illinois Council on Long Term Care, is expected to testify about the requirements for admission to Somerset Place, where Larry Tueffel was residing at the time that he recanted in July of 2006. Graciela Viale-Val is expected to testify about a psychological evaluation of Plaintiff which she completed in May of 1993, which is relevant to Plaintiff's claim of emotional damages. Catalina Romo, Victor Romo's mother, is expected to testify about the Romos moving due to threats. Deposition of Catalina Romo at 14:15-15:18, attached hereto as Exhibit 19. David Weiner, Victor Romo's defense attorney, is expected to testify about the Ezequiel Romo audiotape which he handed to ASA Gina Savini in Defendants' presence on March 8, 1993. Therefore, Plaintiff's motion to bar "irrelevant witnesses" from testifying at trial should be denied.

### 10. Response to Plaintiff's Motion *in Limine* No. 10

Plaintiff's motion to bar Anita Alvarez, Celeste Stack and Darren O'Brien from testifying about whether, based on their investigation, they believe Defendants engaged in any misconduct should be denied. The motion should be denied for two reasons. First, depending on which version Tueffel goes with at trial, Stack and/or O'Brien may be called as impeachment witnesses. Despite Plaintiff claiming that Tueffel told them that the police screamed and yelled at him,

---

[5] Defendants reserve the right to question the witnesses regarding matters beyond those included in these necessarily brief descriptions.

Tueffel told Stack and O'Brien that the police treated him well and did not engage in any misconduct. Stack and O'Brien are expected to testify that they met with Tueffel on several occasions and he never said anything about the police coercing him to identify Plaintiff as the shooter. Second, Stack, O'Brien and Alvarez's opinion that Defendants did not engage in any misconduct is relevant for that very reason. Plaintiff's police practices expert Gregg McCrary has opined that, if Plaintiff's allegations are true, then Defendants are "guilty of willful, deliberate misconduct." Thus, Defendants should be permitted to examine Stack, O'Brien or Alvarez, who conducted a re-investigation of the criminal case, about their conclusion of whether police misconduct was the cause of their decision to join the motion to vacate Plaintiff's conviction. If, as McCrary claims, Defendants engaged in this horrible conduct, then representatives from the State's Attorney's Office should be permitted to explain why Defendants were not charged with a crime. Plaintiff should not be allowed to dissect what parts of the re-investigation are admissible.

WHEREFORE, Defendants respectfully request that this Court deny Plaintiff's motions *in limine* nos. 1-7 and 9-14, and reserve ruling on Plaintiff's motion *in limine* no. 8.

Respectfully Submitted,

DEFENDANTS

BY:

/s/ Joan E. Ahn
One of the Attorneys for Defendants

Andrew M. Hale
Avi T. Kamionski
Joan E. Ahn
Andrew M. Hale & Associates, LLC
53 W. Jackson, Suite 1800
Chicago, IL 60604
312-341-9646

## <u>CERTIFICATE OF SERVICE</u>

I, Joan E. Ahn, an attorney, hereby certify that on December 1, 2011, I caused DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS *IN LIMINE* to be served upon all counsel of record by filing the same before the Court via the ECF system.

<u>/s/ Joan E. Ahn</u>