**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-cv-8081 |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | The Hon. Matthew F. Kennelly |
| Defendants. | ) | |

**PLAINTIFF'S MOTION *IN LIMINE* TO BAR
CERTAIN OPINIONS OF ALEXANDER OBOLSKY**

**INTRODUCTION**

The Defendants are operating under the mistaken assumption that Plaintiff's claim for emotional distress damages automatically throws open the door to any and all prior bad acts ever allegedly committed by Plaintiff, including juvenile arrests, "pee wee" gang membership, cannabis use, and so forth. Defendants have retained an expert, Dr. Alexander Obolosky, to try to make these otherwise-inadmissible and inflammatory subjects relevant to the issues at trial.[1]

The majority of Dr. Obolsky's opinions fail to withstand scrutiny. Not only are these opinions of dubious merit, but they are irrelevant even if they were valid. Because the subject-matter is so prejudicial, and because the potential to unfairly affect the trial outcome is so substantial, Plaintiff moves in limine to bar those opinions, as well as references to certain underlying information upon which Dr. Obolsky purports to rely.[2]

---

[1] Plaintiff did not receive Dr. Obolsky's report and materials until the due date for submitting motions in limine, which is why the present motion is being submitted at this time.

[2] To simplify the trial and streamline the evidence, Plaintiff has elected not to call his own psychologist, Dr. Antoinette Kavanaugh, during his case in chief. There will thus be no psychological testimony elicited by the Plaintiff for which Dr. Obolsky's testimony could be considered fair rebuttal.

Dr. Obolsky offers four opinions. *See* 11/15/2011 Report of Alexander Obolsky, Ex. A hereto. First, Dr. Obolsky opines that as a boy prior to his arrest for the Morro murder, Plaintiff "was exhibiting behaviors" of a "severe and profound conduct disorder," a disorder that disposed Plaintiff to criminality and presaged a life of crime and imprisonment. *Id.* at 2-7, 33 ("Mr. Jimenez was reasonably expected to grow up to be an adult with antisocial personality disorder, and an adult involved in criminal acts with a reasonable probability of adult incarceration, whether or not he was incarcerated on the first degree murder charge at age 13."). Second, he opines that Plaintiff was "exhibiting substance abuse symptoms" prior to his incarceration (*id.* at 33), and presently warrants a DSM diagnosis of "Cannabis abuse" and "history of polysubstance abuse." *Id.* at 2. Third, Dr. Obolsky opines that Plaintiff presently "exhibits ... antisocial personality features." *Id.* at 27-33. Fourth, he opines that Plaintiff did not develop any depression, post-traumatic stress disorder, or other "condition of mental ill-being because of his 16 year incarceration. *Id.* at 2, 30-33.

Of these four opinions, only the last is valid and admissible. Though Plaintiff obviously disagrees with the fourth opinion, there are no grounds to move to exclude it. The first three opinions, on the other hand, are objectionable and should be barred.

I.  **DR. OBOLSKY'S OPINION THAT PLAINTIFF "EXHIBITED BEHAVIORS" OF A "SEVERE AND PROFOUND CONDUCT DISORDER" THAT FORETOLD A LIFE OF CRIMINALITY SHOULD BE BARRED.**

Defendants' objective is no secret: they are looking for a hook to introduce a number of alleged prior bad acts that would otherwise be barred by the Rules of Evidence. To be sure, this is not an inherently impermissible or objectionable tactic. If the "dirty laundry" evidence upon which an expert relies is genuinely sufficient to form an opinion, and if that particular valid opinion is relevant to the issues at trial, then, assuming Rule 403 does not provide an independent ground for

2

exclusion, the introduction of the dirty-laundry can be justified. In this case, however, Defendants' attempt fails on both levels.

*First,* and most important, the opinion itself has no relevance to anything legitimately at issue here. While never defined by Dr. Obolsky (a conspicuous absence in his 35-page report), a childhood conduct disorder is simply "[a] repetitive and persistent pattern of behavior [in childhood] in which the basic rights of others or major age-appropriate societal norms or rules are violated." *See* DSM IV-TR, Diagnostic and Statistical Manual of Mental Disorders, 312.81, Conduct Disorder, Childhood Onset Type. It is not clear whether Defendants are expressly offering this opinion to help create doubt about whether Plaintiff committed the Morro murder. *See, e.g.,* Ex. A at 6, quoting speculation by probation officer after Plaintiff's murder arrest that Plaintiff was "capable of murder." That justification is obviously improper under Rule 404, which bars the introduction of evidence to show propensity. Moreover, there is certainly no logical support for an argument that an alleged pattern of childhood behavior would genuinely rebut Plaintiff's claim to have been damaged by 16 years of wrongful incarceration. While Defendants and Dr. Obolsky obviously considered various ways to try to make the evidence relevant at trial, their proposed "conduct disorder" solution misses the mark. That opinion is simply irrelevant.

*Second*, despite having spent years searching for every scrap of unflattering information about Plaintiff's pre-arrest life, and having deposed numerous witnesses and scoured every available juvenile record, the Defendants came up short. Examined carefully, the pile of alleged bad acts that defense counsel provided to Dr. Obolsky—particularly once the unsupported allegations are separated out from the verified conduct—is plainly insufficient to support the diagnosis.

3

### A. Dr. Obolsky's Diagnosis of "Conduct Disorder" Is Not Relevant To Anything Legitimately At Issue.

Dr. Obolsky is supposedly a witness to rebut Plaintiff's claim to have been damaged by his 16 years of wrongful incarceration. Dr. Obolsky's opinion that Plaintiff suffered from a conduct disorder in childhood is completely beside the point. Accurate or fallacious, the diagnosis doesn't bear on damages or any other issue in this case. It should therefore be barred.

The opinion is particularly insidious because Dr. Obolsky's diagnosis of conduct order is supported by a list of bad childhood behavior that would obviously be inadmissible under Federal Rules of Evidence 401, 404, or at a minimum, 403. There is a manifest danger that Dr. Obolsky's conduct disorder opinion (and the information Dr. Obolsky cites to support it) could be misconstrued as evidence that Plaintiff might be guilty of the Morro murder. There is a grave risk that the otherwise-inadmissible prior bad acts would unfairly prejudice Plaintiff generally. Therefore, Rule 403 requires a showing of probative value sufficient to justify admission.

The probative value of the conduct disorder diagnosis, however, is strikingly absent. For starters, Defendants presumably are not relying on a propensity theory. The Rules of Evidence expressly forbid such arguments. Turning to damages, there is nothing in Dr. Obolsky's report suggesting that Plaintiff suffered less during the sixteen years he spent in prison because he (supposedly) has a "conduct disorder." The conclusion simply does not follow from the premise, and Dr. Obolsky cites no literature or studies or even conjecture suggesting otherwise.[3]

---

[3] For the sake of argument (although it is waived here because it is nowhere part of Dr. Obolsky's report), if Dr. Obolsky could support a scientifically-valid opinion that the "conduct disorder" alleged here truly rises to the level of psychopathology, one could at least imagine the link to damages because psychopaths are devoid of emotion. Dr. Obolsky's problem is that there is insufficient evidence to opine that Plaintiff is or was lacking in emotion. The evidence simply does not support that characterization of

4

**B.     There Is Insufficient Evidence To Diagnose a Childhood "Conduct Disorder."**

Even if the conduct disorder diagnosis were relevant, there is not sufficient evidence in this case to support the diagnosis.  Clearing away the smoke (*i.e.,* the arrests for unproven allegations, the rumors, and the conclusory characterizations) there is insufficient evidence to support Dr. Obolsky's conclusion that there is anything pathological about Plaintiff's behavior, much less Dr. Obolsky's characterization of Plaintiff's "early age psychology."  *Id.* at 3.  *See also id.* at 13 ("psychopathic personality features"); *id.* at 8 ("presence of psychopathy").

First, Dr. Obolsky lists Plaintiff's juvenile arrests (ages 10-13).  These accusations can be grouped into two categories: relatively benign allegations, and more serious ones.  The more benign arrests include: breaking a plate glass; trying to take another child's bicycle; biting a girl and trying to tear her shirt; stealing a bike and trying to re-sell it; a "simple battery" involving taunting and taking property; driving his grandmother's car without permission; throwing a rock at someone; etching a gang sign in a school desk; stealing tools from a car; breaking a car window; and throwing a brick and bottle at someone;

The more serious arrests include: five allegations involving trespassing in or driving (stolen) cars that did not belong to him (an offense also referred to as "joyriding"); another allegation of attempting the same; shooting two people in the back with a pellet gun from a window; shooting a BB gun at a person's back, a car window, and a bus; being apprehended with the air-rifle used in the prior attack; caught in possession of a .22 caliber "starter pistol"; "attempted stealing" and destruction of undefined school property; and an undefined "burglary."

Leaving aside any debate about how to characterize this list, the problem with Dr. Obolsky's jump from the arrests to his diagnosis (*id.* at 2-3) is that all of these arrests are just that—arrests.

Plaintiff.                                                          5

They are accusations of misconduct. With one known exception, there are no convictions, and none of this other alleged conduct has ever been proven.[4] Our legal system affords a presumption of innocence. For purposes of the present analysis, there is no admissible evidence to corroborate that Plaintiff committed any of these acts.

Dr. Obolsky and the Defendants skip right over this problem. The specific use Defendants seek to make of the arrests assumes the truth of the underlying allegations, and thus rests on an improper foundation. Our legal system does not permit the inference that if someone is accused of many wrongs, we can safely assume he must have committed some or all of them. Defendants would surely object, for example, if Plaintiff provided a long list of CR allegations to a psychologist to opine from those allegations that a Defendant officer had a "conduct disorder" disposing him to criminality and misconduct. This is no different.[5]

In fairness, Dr. Obolsky relies on other information, including the fact that Plaintiff was in a gang, "cooperating and collaborating in a team effort" of criminality. *Id.* at 4. Regardless of what being a gang member—even a "committed" one—really means in the case of a 10 to 13 year-old child (especially one who has never even been adjudicated guilty of any drug or gun offense), mere identification and status as a gang member does not differentiate Plaintiff from thousands of other boys in the neighborhood where Plaintiff lived and went to school and in other neighborhoods across the City of Chicago.

Dr. Obolsky next relies on the report by a single boy (Shawn Cosmen) who claims to have

---

[4] There appears to be only one finding of delinquency in Plaintiff's juvenile records: for criminal trespass to a vehicle.

[5] Having gone the conduct disorder route, Dr. Obolsky does not opine that a history of juvenile arrests could somehow reduce the amount of pain and suffering from 16 years of wrongful incarceration. Nor is there any scientific support for such an opinion.

6

seen Plaintiff in the possession of a gun "4-6 times" (and who apparently also claims to believe that Plaintiff "always" carried one). *Id.* at 4. The danger of unfair prejudice cannot be understated (Defendants accuse Plaintiff of shooting someone) and the relevance is virtually nil.

Dr. Obolsky also relies upon probation reports that describe Plaintiff as declining to express remorse. *Id.* at 4-5. Without a baseline for knowing whether Plaintiff actually committed the crime for which he allegedly declined to express remorse, the information is useless.[6]

In sum, once the Court isolates the conduct that can be legitimately attributed to Plaintiff, it adds up to a boy who was a "pee wee" gang member who undoubtedly got into trouble. This is hardly sufficient to support Obolsky's opinion that Plaintiff had traits of a "psychopath" and a diagnosable "severe and profound" conduct disorder such that he "was reasonably expected to grow up to be an adult with antisocial personality disorder, and an adult involved in criminal acts with a reasonable probability of adult incarceration, whether or not he was incarcerated on the first degree murder charge at age 13." *Id.* at 33.

This is truly an extraordinary and unprecedented opinion. Dr. Obolsky identifies no scientific support for his claim to be able to review the juvenile record of a 13-year-old boy and say to a "reasonable degree of scientific certainty" that Plaintiff was going to end up in prison even if the Defendants had not framed him. Dr. Obolsky's professed ability to predict that outcome based upon Plaintiff's gang membership, arrest history, and cat-kicking is unsupported by any empirical studies, literature, or anything else. It is precisely the sort of junk science that is inadmissible after

---

[6] Dr. Obolsky relies on other facts to support his "conduct disorder" diagnosis, including the fact that he supposedly admitted to making fires in garbage cans and cruelty to animals. Id. at 4. His evidence is that Plaintiff supposedly admitted that he "does not like cats and tends to kick them and throw them out of windows." Id. at 7. He is also not shy about relying on rumors. Id. at 5 ("Reportedly minor was carrying weapon to school, a rumor never substantiated").

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). It should be barred.

Dr. Obolsky should be barred from offering the opinion that Plaintiff exhibited a "conduct disorder" or that Plaintiff had a propensity for a life of crime. Pursuant to Plaintiff's previously-filed motions *in limine,* Dr. Obolsky (and the Defendants) should also be barred from referencing the information he claims to have supported that opinion, including references to Plaintiff's gang membership; juvenile arrest record; and the other subjects listed above.

**II.   DR. OBOLSKY'S OPINION THAT PLAINTIFF WAS EXHIBITING SUBSTANCE ABUSE SYMPTOMS PRIOR TO HIS INCARCERATION, AND PRESENTLY WARRANTS A DSM DIAGNOSIS OF "CANNABIS ABUSE" SHOULD BE BARRED.**

Plaintiff has previously filed a motion citing the abundance of case law that references to a civil rights plaintiff's drug use is an irrelevant and inadmissible prior bad act. That law governs the issue. *See United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007) (discussing the possibility that witness testimony will be unduly discounted once jury hears about illegal drugs), citing *United States v. Robinson*, 956 F.2d 1388, 1397 (7th Cir. 1992) and *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987). Indeed, the Seventh Circuit has been consistently clear (reaffirmed at least twice in the past two years) about the "considerable danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony." *Kunz v. City of Chicago*, 538 F.3d 667, 677 (7th Cir. 2008); *United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007), citing *United States v. Robinson*, 956 F.2d 1388, 1397 (7th Cir. 1992) and *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987). *See also Buffone v. Rosebud Restaurants, Inc.,* 2006 WL 2425327 (N.D. Ill. Aug. 21, 2006) ("Even if relevant, any arguable probative value of evidence about their drug use is substantially outweighed by the danger of unfair prejudice"), citing *Mankey v. Bennett*, 38 F.3d

8

353, 360 (7th Cir. 1994).

Here, Defendants seek to wedge the issue back into the trial by having Dr. Obolsky attach a DSM diagnosis to Plaintiff's use of marijuana and other drugs, including LSD. The fact that Dr. Obolsky can talk about drug use in scientific terms does not make the underlying subject matter any more relevant or admissible. Any minimal probative value is greatly outweighed by the possibility that the jury would unfairly punish Plaintiff. The danger for unfair prejudice is simply too great.[7]

### III. DR. OBOLSKY'S OPINION THAT PLAINTIFF HAS "ANTISOCIAL PERSONALITY FEATURES" SHOULD BE BARRED.

Dr. Obolsky opines that Plaintiff presently has "features" of an antisocial personality. Dr. Obolsky does not explicitly define what that means, but he explains that "children who exhibit severe conduct disorder often grow up to be adults with antisocial personality disorder." *Id.* at 33. This purported phenomenon apparently does not apply to Plaintiff, who did not grow up to have an antisocial personality, but rather, according to Dr. Obolsky, merely "exhibits antisocial personality features." *Id.* at 33.

There are numerous problems with this opinion. First, as with the conduct disorder opinion, it is largely reliant on Plaintiff's post-exoneration arrest record. Plaintiff stands convicted of none of those allegations, and disputes them.[8] Second, as is also true of the conduct disorder, there is no apparent reason why features of an antisocial personality disorder are in any manner relevant to this trial.

Third, and most dispositive, Plaintiff has decided to voluntarily withdraw any claim for

---

[7] Additionally, as discussed immediately below, Plaintiff has decided to voluntarily dismiss any claim for damages from six months after his exoneration forward. That concession removes any doubt that the issue is irrelevant.

[8] Since filing this lawsuit, Plaintiff has attracted an undue amount of attention from the police.

present and future damages. Because he has elected to cut off his claim for damages at the period of time six months after his exoneration, evidence of more recent arrests are irrelevant.

**IV. DR. OBOLSKY'S OPINION THAT PLAINTIFF DID NOT DEVELOP ANY DEPRESSION, POST-TRAUMATIC STRESS DISORDER, OR OTHER "CONDITION OF MENTAL ILL-BEING" BECAUSE OF HIS 16 YEAR INCARCERATION IS ADMISSIBLE, BUT SOME OF THE EVIDENCE "RELIED UPON" BY DR. OBOLSKY IN SUPPORT IS NOT.**

Finally, Dr. Obolsky also opines that the 16 years that Plaintiff spent incarcerated (from ages 13 to 30) did not cause him any emotional injury or "condition of mental ill-being" qualifying for a psychological diagnosis. *Id.* at 7-33. In support, Dr. Obolsky relies upon what he characterizes as contemporaneous and recent denials by Plaintiff of symptoms associated with Post Traumatic Stress Disorder (*id.* at 7, 9, 11, 14, 15, 22); the absence of any clinical disorders or psychiatric diagnoses noted by various prison treaters (*id.* at 8, 9, 10, 11, 12, 14, 15, 23); Dr. Obolsky's interview (*id.* at 12); and the psychological testing administered at Dr. Obolsky's behest (*id.* at 24-25, 31-32).

Though he disagrees with it, Plaintiff has no basis to try to prevent Dr. Obolsky from offering this opinion. Unlike the others, it is both relevant and supported by admissible evidence. However, Dr. Obolsky is not entitled to parlay the opinion that Plaintiff's incarceration did not cause psychic injury into bootstrapping testimony regarding a number of Plaintiff's other alleged prior bad acts—references that do not support much less directly relate to the opinion. Specifically, the following facts are contained in the "discussion" of Dr. Obolsky's opinion as things he claimed to have taken into consideration. Closer examination reveals that none of them is sufficiently related to the substance of the opinion in question to outweigh the tremendous danger of unfair prejudice:

10

1. "Stealing and fighting" starting in the first or second grade, including "punching the other kid in the face," and a serious attack by a rival gang member. *Id.* at 8, 16.

2. Plaintiff's use of inhalant sprays. *Id.* at 8.

3. A "family component to Mr. Jimenez's delinquent behaviors." *Id.* at 9 ("Mr. Jimenez's older sister was violent toward others").

4. Plaintiff's claim to be "vice-prez over the pee wees for the Simon City Royals."

5. Plaintiff's experimentation with alcohol, marijuana, uppers, "wickie sticks," and acid, the last between 10 and15 times. *Id.* at 10.

6. "Various incidents and rule violations" in prison. *Id.* at 10.

7. An alleged threat against Margot Gillen, Plaintiff's teacher. *Id.* at 11.

8. An extremely unflattering opinion of Plaintiff by Ms. Gillen, who claimed that Plaintiff was so angry and scary to her that he made her question her religious beliefs and "shook [her] belief in humankind." *Id.* at 11.[9]

9. Detention records indicating "oppositional, defiant, threatening, manipulative, and aggressive behaviors. *Id.* at 11.

10. Letters written by Plaintiff that Dr. Obolsky claims exhibit, *inter alia,* evidence of entitlement, grandiosity, poor behavioral control, multiple rule violations, and sadism. *Id.* at 11.

11. Plaintiff's need to "be more aggressive" to survive at the Audy Home. *Id.* at

---

[9] In his defense, Plaintiff was at the time convicted of a crime he did not commit, and looking at a long sentence. He was very angry and bitter.

12 ("I had to be tougher, I had to badder.").

12. Plaintiff's intention after his conviction to "make a scene" at his sentencing because he was so angry about his conviction. *Id.* at 12-13 ("When you're fifteen years old and you've got, uh, all these different people ... trying you for a crime you didn't commit, you know, you tend to take a disliking to them. ... I charged them. I was attempting to, you know, hit them, strike them, something ... kick the table, do anything, just do something to them. And, uh, before I got close to them, though, the guards ... tackled me and restrained me"). According to Dr. Obolsky, this demonstrates not only premeditated use of violence, but "the ability to use violence as an instrument to achieve a premeditated goal." *Id.* at 13 ("This incident exemplifies Mr. Jimenez's psychopathic personality features").

13. Alleged rule violations in prison, including gang activity, contraband, intimidation, and fighting. *Id.* at 14.

14. Plaintiff's description, in response to Dr. Obolsky's questioning, of his uncles' involvement in the gang, and how Plaintiff looked up to them. *Id.* at 16.

15. Plaintiff's description, in response to Dr. Obolsky's questioning about how he learned that gangs had access to weapons and drugs. *Id.* at 16.

16. Plaintiff's description in response to Dr. Obolsky's questioning, about how he experienced satisfaction from the respect that he felt gang membership "gathered for him." *Id.* at 17.

17. Plaintiff's description, in response to Dr. Obolsky's questioning, about the "cat and mouse game between the police and us on the streets" where he and others would sometimes lie and be smartasses. *Id.* at 17.

18. Plaintiff's description, in response to Dr. Obolsky's questioning, of Plaintiff's belief that the older guys in the gang "wouldn't like even consider[] ever violating me." *Id.* at 17.

19. Plaintiff's description, in response to Dr. Obolsky's questioning, of how he would turn on gang members if they said something he didn't like and ... start beating on them." *Id.* at 18.

20. Plaintiff's description, in response to Dr. Obolsky's questioning, of his "rise through the ranks" in the gang as a 10 to13 year old boy, including his claim to have been "in charge" of six to twenty-five gang members. *Id.* at 18.

21. Plaintiff's description, in response to Dr. Obolsky's questioning, of how he would "lie" to other gang members about his location. *Id.* at 18.

22. Dr. Obolsky's claim that Plaintiff told him during the interview that (brackets in original): "It was [fun committing a crime], it depends on what it was." *Id.* at 19 ("If I got away from the cops, I would feel, you know, some sense of accomplishment.").

23. Plaintiff's description, in response to Dr. Obolsky's questioning, of how he "would use anything as a potential weapon if outnumbered or fighting an adult." *Id.* at 20.

24. Plaintiff's post-exoneration arrests, and the particulars of the disputed

13

incidents that underlie them. *Id.* at 20-22.

25. An order of protection his cousin placed against Plaintiff. *Id.* at 22.

26. A suggestion, without any further discussion or explanation, that "secondary elevations" on some of the written tests "are associated with longstanding characterological problems featuring diagnosis of ... borderline personality disorders." *Id.* at 24.

27. An incident with Plaintiff's girlfriend in August 2011 where a police report was filed concerning verbal, but not physical abuse, wherein Plaintiff "reportedly" said terrible and outrageous things about his girlfriend.

For each of these subjects, the question has to be, "why exactly should the jury hear this inflammatory evidence?" As stated, each and every one of these topics has no relevance to Dr. Obolsky's sole admissible opinion, namely, that Plaintiff did not suffer from depression, PTSD, or any other disorder as a result of his wrongful incarceration. Though woven into the discussion of this opinion in the Rule 26 report, all of these references are purely gratuitous. They are designed to invoke prior bad acts, an alleged propensity for violence, and a perception that Plaintiff might really have been guilty of the Morro murder. But none are connected in any way to Dr. Obolsky's sole admissible opinion: the absence of any emotional distress meriting a clinical diagnosis. Plaintiff thus asks the Court to require the Defendants to go through these references, one by one, outside the presence of the jury, and justify why any of these references has anything to do with any of the issues in the case.

## CONCLUSION

For the foregoing reasons, this Court should enter an order barring all of Dr. Alexander

Obolsky's proposed opinions except for the opinion that Plaintiff's incarceration did not cause him emotional injury and, as to that one admissible opinion, barring certain evidence on which the opinion purports to be based.

                                               Respectfully submitted,

                                               **THADDEUS JIMENEZ**

                                               By: /s/ Locke E. Bowman
                                                      One of his Attorneys

| | | |
|---|---|---|
| Arthur Loevy | Stuart J. Chanen | Locke E. Bowman |
| Jon Loevy | Lisa Castle | RODERICK MACARTHUR |
| Russell Ainsworth | VALOREM LAW GROUP | JUSTICE CENTER |
| LOEVY & LOEVY | 35 East Wacker Dr. | Northwestern University |
| 312 North May Street | 30th Floor | School of Law |
| Suite 100 | Chicago, IL 60601 | 357 E. Chicago Ave. |
| Chicago, IL 60607 | | Chicago, IL 60611 |
| (312) 243-5900 | | |