IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THADDEUS JIMENEZ,   )  | |
|         Plaintiff,   )  | |
| v.   ) | Case No. 09-cv-8081 |
| ) | The Hon. Matthew F. Kennelly |
| JEROME BOGUCKI, *et al.,*   ) | |
|         Defendants.   ) | |

**PLAINTIFF'S MOTION TO BAR TOM OWEN'S TESIMONY**

Plaintiff Thaddeus Jimenez respectfully moves this Court, pursuant to Federal Rule of Evidence 702 and this Court's January 16, 2012 Opinion and Order in this case, to bar the testimony of Defendant's voice identification expert Tom Owen. As the proponent of Mr. Owen's testimony, Defendant bears the burden of establishing that his testimony is admissible. *Jimenez v. Bogucki*, 09 C 8081, Mem. Op. and Order at 3 (N.D. Ill. Jan. 16, 2012) ("Opinion and Order"), citing *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Defendant has not met and cannot meet its burden. Owen's Rule 26 report (attached as Exhibit 1) and his proposed testimony (attached as Exhibit 2) suffer from the exact same deficiencies that this Court identified in its Opinion and Order with respect to Mr. Gibson's testimony. While Owen uses a method different from Gibson to reach his conclusion that the compared voices are *different*, the underlying basis for Owen's opinion:

    (1) is not grounded in any scientific process;

    (2) is not even known by Mr. Owen himself;

    (3) purports to be "language independent" and "word dependent," but Mr. Owen is unable to give any scientific explanation of how a system that has been language and word *dependent* for the past 40 years is now all of a sudden language and word independent;

1

(4) does not account at all for the 16-year, 3-month difference between the February 1993 and May 2009 recordings; and

(5) does not in many ways follow Owen's own required protocol.

**I.      Owen's Opinion Is Not Grounded In Any Scientific Process.**

Defendant has failed to establish that the methodology used by Owen is sufficiently reliable to be admissible. In his written report, Owen provides no scientific support whatsoever for his opinion. He identifies a software he used to conduct his analysis called the "Russian Easy Voice Biometrics Analysis Automatic System" (which, solely for ease of reference, we will call "Easy Voice Biometrics" or "Easy Voice"). He never explains in his written opinion how this software works or what testing has been done to determine its purported reliability. At his deposition, despite being given the opportunity to explain the scientific basis and reliability of his opinion, he was unable to do so.

In addition, Mr. Owen fails to disclose in his report, but finally conceded in his deposition, that Easy Voice is not yet commercially available for sale, that it is being beta-tested in Russia and other foreign countries. He could not identify any of the beta-testers. Owen Dep. at 50 ("I can't really tell you who their [the Russians'] beta testers are."). He further stated that he was the only beta-tester in the U.S. of whom he is aware for sure. *Id*. at 51. (He mentioned that a friend of his was "probably" also a beta-tester, but he was not sure. *Id*. at 51. *See also Id*. at 48, 49). It also appears from his deposition testimony that this is the first time that the program has ever been used to provide an opinion in a court of law, *Id*. at 239-40 (although Owen claims to have used Easy Voice to write one other report, but he has never previously been deposed or testified about its use in a contested forensic setting. *Id*. at 329-330.

Mr. Owen further disclosed at his deposition that Easy Voice Biometrics is specifically a program that he asked a Russian manufacturer to manufacture and to distribute in the U.S. through an American distributor. Indeed, Mr. Owen disclosed that he had a financial interest in "Easy Voice Biometrics" and that he had recently entered into a three-way contract with the manufacturer and a U.S. distributor to distribute the product in the United States.

Mr. Owen also confirmed that the three algorithms that were used to undertake his analysis are the three algorithms from Easy Voice Biometric. *Id.* at 97-98. He testified that he does not know how much weight the Easy Voice Biometric program gives to each of the three distinct algorithms. *Id.* at 98 ("You'd have to ask [the Russians]."); *Id.* at 110 ("I can't speak to that issue. I don't know."); Id. at 80 ("You'll have to speak to the Russians to get a better understanding of how the program actually works.")

He also testified that he "can't really speak to how [the Russian's] algorithms work" and that when he runs Easy Voice, as he has in this case (for the first time ever in a contested lawsuit), "the results of the three individual algorithms are not available to him." *Id.* at 101-02. We then asked Mr. Owen, "What is it that you're relying on when you use the system?," to which he responded, "you're relying on the fact that the system has been tested," but Mr. Owen did not know when it was tested or under what name it was tested, how the algorithms were weighted at the time of the testing ("I can't speak to that issue. I don't know"), nor does he know the current weight that is given to the different algorithms in the current system of Easy Voice. *Id.* at 109-110.

Moreover, as Mr. Owens' deposition proceeded, it became clear that Mr. Owen was not relying on any of the testing that had been done *of Easy Voice* itself, but rather was relying on testing that had been done a few years earlier on what he asserts was a precursor to Easy Voice

3

called TRAWL (also not mentioned in his report). *Id*. at 109-110. (Mr. Owen was not certain whether the program TRAWL had yet become VoiceGrid at the time of the testing. *Id*. at 110 ("I don't know what it was called when they did the test.") Nowhere in the report written by Owen does he even once mention the program called TRAWL or VoiceGrid or indicate that he used a program called TRAWL or VoiceGrid to reach his result, and yet he repeatedly responds at his deposition that he is relying on scientific support for TRAWL and/or VoiceGrid to support his opinion. Although he claims that hundreds of people around the world use VoiceGrid, Owen himself could only name three colleagues who even owned it. *Id*. at 48-49, 112.[1]

Ultimately, Owen could neither identify nor explain the specific testing upon which he was relying nor, for that matter, could he identify or explain how the VoiceGrid testing applied to Easy Voice Biometric. See *Id*. at 241-43 ("Q: So . . . you can't say one way or the other what the report on VoiceGrid from NIST says or doesn't say. A: I can only say what I've been told.") Mr. Owen repeatedly stated that we had to ask the Russians how the system worked and how it had been tested, and even though he insisted that he was not just relying on his own "say-so," it is clear that he has simply accepts the conclusions of his Russian business partners that: (1) their algorithms are sound; (2) the interrelationship between the three working algorithms are sound; and (3) the Match v. No Match conclusion that Easy Voice spits outs at end (without providing any of the underlying data other than a global FA and FR) is reliable. *See e.g., Id*. at 50, 98, 110. This is insufficient under *Daubert*, under Rule 702, and under this Court's January 16, 2012 Opinion and Order. Owen's testimony should be barred.

---

[1] While Owen himself never mentions VoiceGrid in his Report, there is a reference to it in one of the nine screen shots that Owen inserted into the report. That VoiceGrid reference is so small and blurred, however (*see* Owen Report at 3), that it cannot be seen with the naked eye; it can only be viewed with a magnifying glass. We did not know until shortly before his deposition that he was attempting to rely on the purported science behind VoiceGrid and not Easy Voice for purposes of attempting to defend his report.

**II.     Even If This Court Were To Conclude That Owen's Opinion Is Supported By A Scientific Method, It Is Not A Scientific Method Known or Understood By Owen.**

A second reason to bar Mr. Owen's opinion in this case is that even if (contrary to all of the information above), this Court believed that a scientific method existed to support the use of Easy Voice Biometric, Mr. Owens is not himself qualified to provide information about that to the jury. Mr. Owen repeatedly conceded at his deposition that he is wholly unaware of how the purported methodology he has chosen to rely upon in fact works. *See* Owen Dep. at 80 ("You'll have to speak to the Russians to get a better understanding of how the program actually works.").

He then proceeded to give numerous examples of aspects of the program that he could not explain. For example, while Mr. Owen states that a *spectrographic analysis* makes up more than a third of the comparison values that are applied by the Easy Voice Biometrics program, Mr. Owens concedes that he set forth no information in his report about what the results were of the spectrographic algorithm; he concedes that he inserted no visual spectrogram into his report that is in fact related to this case; and he further conceded that the one visual spectrogram that he did put in his report was just there as a sample, but had nothing to do with the data from this particular case. *Id.* at 93-94. Perhaps more importantly, Owen concedes that he has no access to the data that the Easy Voice spectral algorithm generates; he just takes it at face value that whatever spectrographic conclusion the program reaches is correct; that specific data is locked in the machine and then mixed with other factors, and Owen is never made aware of what the results are of the spectrographic analysis or how they interrelate with the other two factors (although he asserts at the deposition that there will come a time when data from each of the three individual modules will become separately available).

The same is true for the "Gaussian analysis" he undertakes. While Mr. Owen states that Gaussian analysis makes up more than a third of the analysis in Easy Voice Biometrics, he

5

concedes (1) that he set forth no information in his report about what the results were of the Gaussian analysis, (2) that the data from the Gaussian analysis is not available to him; and (3) that he is unaware the precise weight given to the Gaussian analysis or how it relates to the other two modules.

In short, for all the reasons stated above, Easy Voice is simply not ready for prime time. Other methods may have been available to Mr. Owen, but for whatever reason, he and defendant chose not to use them. His software has not been proven scientifically reliable, nor is he personally capable of explaining why it is scientifically reliable, even if it was. For all these reasons, his testimony should be barred.

**III.     "The Divaricated Files" and the Claim That Easy Voice is "Language Independent"**

While this may be obvious from the section above, Owen spends no time in his report informing this Court or Plaintiff's counsel what he in fact *did* to conduct the voice comparison about which he purports to opine. Owen indicates in his report that he was given two tapes to compare, one in Spanish with two unknown voices (one loud and one soft) and one in Spanish and English with a known voice of Torres. Owen then indicated in passive voice that from these tapes "recordings had to be made of just one voice at a time with no spaces in between," that "at least 16 seconds [of each tape] must be used," and the tape must "be divaricated." Report at 3. At his deposition, Owens concedes that the viability of voice comparison testing "would depend on the preparation of the tape," as well as some "other factors," which remain unidentified. Owen Dep. at 85. While Mr. Owen states that he made recordings for "both voices," he never indicates how he made the tapes, what protocols, if any, he followed in making the tapes; and what protocols, if any, he did not follow, in making the tapes, and why, if he didn't follow some of his own protocols, he did not do so. He does not identify the lengths of the tapes. He does not

6

disclose in his report that he altered the amplitude of one of the tapes (although he conceded this point at his deposition), nor of the affect that increasing the amplitude may have had on his comparison.

At no point in his report did Owen disclose that the comparison he conducted was between one "divaricated" tape that was in Spanish only with another divaricated tape that was *in a combination of Spanish and English*, although he later conceded this fact at his deposition. *Id*. at 122. Owen further asserted at his deposition that even though spectrographic analysis had always required not only the same language but even the same words, under Easy Voice Biometrics, it was now possible to do spectrographic analysis without the same words and indeed, without even the same language. According to Owen, Easy Voice Biometrics is "both language and text-independent," which means "you don't have to have the same words . . . and you don't have to have the same language." *Id*.

So, we asked him why he thought that Easy Voice was "language and text- independent" and his response was that the Russians had told him so. Owen Dep. at 133 (quoting the Russians as saying, "Oh, by the way, we don't have to have the exact same word nor do we have to have it said in the exact same manner" any more). So then we asked Owen, what had the Russians said to him to make him believe that the Easy Voice Biometric program – and its spectrographic component – were now "language independent" and "word independent," given that spectrographic analysis had been word and language dependent for the past 40 years? *Id*. at 126-27. Owen never answered that question directly; he repeatedly ducked it, see *Id*. at 127-37, and at no point did he provide an answer as to what had changed scientifically within the Easy Voice Biometrics algorithm and program to now enable it to do a spectrographic voice comparison analysis in a manner that was language or word independent.

7

Finally, Owen conceded at his deposition that when he took away the English from the "divaricated tape," and just compared Spanish words to Spanish words – the results spit out by the Easy Voice Biometrics software changed significantly (increasing the likelihood of the voices being the same by more than 50%) – clearly disproving that the system is "language independent." When pressed on the issue, Owen said,

> I'm just assuming [language independence] because I don't know this to be a fact – that you may bring the numbers up by using the same language. So, to say that language doesn't matter, that may or may not be true. I haven't run enough tests on that, I've only run this test [apparently referring to the one in this case]. So, I don't know that absolutely, positively. The Russians say that's the case. I don't know.

*Id.* at 288-89.

In sum, Owens' report fails to establish both the manner in which the divaricated tapes were prepared and the scientific basis for doing a spectrographic analysis that purports to be language and word independent, when in fact Owen concedes that the program may not be language or word independent, and he just doesn't know.

**IV.     Owen's Opinion Does Not Account for the 16-Year, 3-Month Difference Between The February 1993 and May 2009 Recordings.**

At the end of the Court's Opinion and Order, it indicates that it was barring Mr. Gibson's opinion without reaching the question of what effect the 16-year, 3-month gap between the two tapings (hereafter, the "time gap") had on Gibson's or Owen's opinion. We add this brief section to emphasize that Owen similarly does not address or explain what effect, if any, the time gap had on his conclusion that the voices are different. We looked to the website of a close colleague of Mr. Owen, Gregg Stutchman (who, according to Owen, may be the only other beta-tester for Easy Voice in the U.S.). Stutchman's website, however, raises this issue directly, stating that for spectrographic analysis, "[t]he voice samples must not be more than six (6) years apart." Exhibit 3 at 2. Stutchman goes on to state that the six-year standard has been accepted nationally

8

by all professional organizations involved with voice identification, including but not limited to the IAI (of which Owen is a life member in two states), the ABRE (for which Owen is now the Chairman Emeritus, after serving as Chairman for more than six years), the AES (Audio Engineering Society), and FBI. Exhibit 3 at 2. Given that Mr. Owen purports to have a substantial component of his "three-module" analysis that is spectrographic, his failure to address the time gap problem directly casts overwhelming doubt about his entire analysis. He has not accounted for the 16-year time gap in relation to the apparently universal view that spectrographic analysis may only be conducted when comparing voices that were recorded *six years* apart. This problem is yet another reason to bar Owen's testimony.[2]

## V. Owen Did Not Follow His Own Protocol In Preparing This Report.

Even though Mr. Owen's own protocol requires that he engage in "critical listening" and that he consider "his standard list of nine oral cues," and even though he indicated that he puts these nine oral cues "in every single voice identification report I do" and further stated that they are "the basic methodology for doing a voice identification analysis," *Id*. at 116, it immediately became clear thereafter that Mr. Owen had not in fact considered each of these nine oral cues in his report in this case. For example, while he stated on page 91 that it was important to consider oral cues such as "educated speech versus non-educated street talk," he later testified on page 154 that he "wouldn't be in a position to give that opinion [because] I'm not an expert in the language." Owen Dep. at 91, 154. Although he stated on page 91 that it is important to consider "the rate at which a person speaks," he stated on page 148 that he did not do so in this case. Owen Dep. at 91, 148. Although dialect and accent are listed on Owen's "basic methodology

---

[2] At his deposition, Gibson acknowledged directly the applicability of this rule to spectral analysis, but challenged the suggestion that the time gap would have the same effect on altering pitch and certain linguistic characteristics.

for doing a voice identification analysis," which Owen claimed to conduct in every single voice identification report, in this instance, he did not draw any conclusions, one way or the other, with respect to dialect or accent. He was asked if he considered the speaker's hesitation of speech, and responded that he was not a "linguistics expert. I really can't address that issue." *Id*. at 153-54. On page 91 he stated that he generally considered "amplitude," that is, "how loud does a person speak, or softly," and yet on page 152-53, he conceded that he changed the amplitude on the tapes before he did a comparison of amplitude between them. Id. at 91, 152-53.[3]

## Conclusion

For all of these reasons, Plaintiff Thaddeus Jimenez respectfully requests this Court to bar the testimony of Tom Owen.

Respectfully submitted,

**THADDEUS JIMENEZ**

By: /s/ Stuart J. Chanen
One of his Attorneys

Dated: January 18, 2012

| | | |
|---|---|---|
| Mr. Jon Loevy | Mr. Stuart J. Chanen | Mr. Locke E. Bowman |
| Mr. Russell Ainsworth | Ms. Lisa R. Carter | Roderick MacArthur Justice |
| Mr. Joel Feldman | Valorem Law Group LLC | Center |
| Loevy& Loevy | 35 E. Wacker Dr. | Northwestern University |
| 312 North May St. | 30th Floor | School of Law |
| Suite 100 | Chicago, IL 60601 | 357 E. Chicago Ave. |
| Chicago, IL 60607 | (312) 676-5480 | Chicago, IL 60611 |
| (312) 243-5900 | | (312) 503-0844 |

---

[3] The change in amplitude was not disclosed in the report, but Owen's position was that that fact did not matter since one could tell that he had altered the amplitude if one listened to the original and divaricated tapes. Owen Dep. at 152-53. The experts disputed whether Owen's unilateral change in amplitude altered the ability to measure pitch, with Owen stating no, and Gibson insisting that it had.

## CERTIFICATE OF SERVICE

I, Stuart J. Chanen, certify that on January 18, 2012, I served all counsel of record by filing the attached Motion to Bar Tom Owen's Testimony, with the Court's ECF system.

By: /s/ Stuart J. Chanen