```
              IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

THADDEUS JIMENEZ,                    )
                                     )
          Plaintiff,                 )       09 C 8081
                                     )
          v.                         )       Judge Kennelly
                                     )
CITY OF CHICAGO, et al.              )
                                     )
          Defendants.                )       Jury Trial Demanded
```

## PLAINTIFF'S POSITION STATEMENT REGARDING
## THE FINAL JURY INSTRUCTIONS

Plaintiff, by his counsel, respectfully submits the following Memorandum in support of his jury instruction on the issue of liability.

### Introduction

1. Plaintiff obviously believes that he has proven at trial a number of <u>Brady</u> violations that support his due process claim. He remains hopeful that the jury will agree.

2. However, there have been other violations of Plaintiff's right to due process proven at this civil trial that are not predicated on <u>Brady</u> violations, either because the violations were exposed during testimony at the criminal trial or even in the police reports. These "disclosed" due process violations fall into two categories.

3. First, the police can violate due process by means of overly suggestive identification procedures even if they fully disclose their suggestive tactics. To take a general but obvious example, a "show-up" can violate due process if it is overly

suggestive, even if the police make no effort to conceal their suggestive tactics.

4. Second, police can violate due process by testifying falsely at the criminal trial, even if that misconduct might otherwise be immune from civil liability. (As is also true of the overly suggestive due process claim, a false testimony violation likewise requires a predicate showing that the result was sufficiently material to have affected the outcome in the context of the criminal trial.)

5. This case presents both such types of "disclosed" due process violations. Plaintiff discusses them seriatim.

    **A. The Suggestive Identification Procedures Claim Should Proceed To The Jury Notwithstanding That Certain Suggestive Tactics Were Disclosed And Known To Plaintiff At His Criminal Trial**

6. Back in 1993, Defendant Bogucki made no secret of the facts that he: (a) informed the Elders that the police had a suspect he wanted them to view in a lineup; and then (b) allowed the Elders an opportunity to confer at the police station in a room with two other witnesses (Phil and Larry) who had already identified Plaintiff; but then, even more importantly, (c) had each boy in the lineup take turns wearing Plaintiff's Duke jacket.

7. All of this is undisputed. In fact, each of these facts was disclosed at the criminal trial.

8. That said, a reasonable jury could fairly conclude that the procedures were unduly suggestive and therefore resulted in identifications that, when introduced against Plaintiff, violated

2

his right to due process. There are several reasons for this:

9. First, Plaintiff's expert testified that the opportunity for the Elders to confer in a room with Larry and Phil at the station was unduly suggestive. As Plaintiff's expert put it, what else would they be talking about? Bogucki conceded that no police officer told them not to confer. The inference that Phil or Larry or both said to the Elders that the suspect was Plaintiff is almost unavoidable. They all understood that they were there to identify Eric's killer. Crediting Defendants' evidence, two of the four of them believed that they knew the killer by name. The fact that the Elders claimed not to have known Plaintiff by name would have required Phil and/or Larry to describe him: the boy who walks around the neighborhood in that Duke jacket.

10. Even more important, Bogucki allowed the eyewitnesses to view a lineup at which Plaintiff's Duke jacket was passed from person to person -- an unusual tactic by Bogucki's own admission. If Plaintiff's testimony is credited, Sandra and Tina Elder knew Plaintiff from the neighborhood.[1] The suggestiveness of this procedure is overwhelming. The significance of the coat was communicated to the Elders because every boy was asked to put it on. All the Elders had to do was pick out the boy whom they recognized as the one who wears the coat that was being passed along.

11. The fact that these particular suggestive procedures

---

[1] Although she told a different story at the criminal trial, Sandra testified at her deposition that she knew Plaintiff. (Sandra Elder Dep. 13:17-24; 50:13-51:6, Jan. 3, 2011)

3

were disclosed to Plaintiff in reports, and thus cannot form a Brady violation, does not mean that there has been no due process violation. A flawed identification procedure can also give rise to a due process violation. Manson v. Brathwaite, 432 U.S. 98, 114 (1977) (fact-intensive inquiry, with factors to weigh including: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself."); Neil v. Biggers, 409 U.S. 188, 198 (1972) (if, under the "totality of the circumstances," the out-of-court identification procedure was so unnecessarily suggestive that it raised a "substantial likelihood of irreparable misidentification," such a result would violate the principle of fundamental fairness required by the due process clause); Foster v. California, 394 U.S. 440 (1969); Simmons v. United States, 390 U.S. 377 (1968); Stovall v. Denno, 388 U.S. 293 (1967).

      12. The Alexander case, previously cited to the Court by both sides, makes plain that an actionable Section 1983 due process claim lies where the police engage in suggestive identification procedures which result in identifications that then taint the Plaintiff's trial. Alexander v. City of South Bend, 433 F.3d 550, 555 (7th Cir. 2006); Hensley v. Carey, 818 F.2d 646, 648-50 (7th Cir. 1987). As Judge Sykes' opinion explained in Alexander:

4

> The Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality. It does, however, guarantee the right to a fair trial-in this context, via the due process clause of the Fourteenth Amendment-*and that right is violated if unduly suggestive identification techniques are allowed to taint the trial.*

Alexander, 433 F.3d at 555 (emphasis added), citing Hensley v. Carey, 818 F.2d 646, 648-50 (7th Cir. 1987) (§1983 liability for police officers if, but only if, the "improper identification has some prejudicial impact on an accused's defense" at trial) (citations omitted).[2]

In Alexander, the plaintiff lost because he failed to prove the claim. As referenced in Defendants' prior memo (quoting Alexander):

> South Bend cannot be liable under § 1983 unless Alexander shows how the flaws in South Bend's identification techniques made his trial unfair. See [Hensley] ("Hensley has no claim under § 1983 arising out of his participation in an unduly suggestive lineup since he was not deprived of his right to a fair trial.").

> But Alexander has told us almost nothing about his trial. He has only very generally asserted that some of the witnesses who viewed the photo arrays and lineup testified. This is insufficient to forestall summary judgment. Hensley's point is this: flawed identification procedures are not themselves constitutional violations; plaintiffs must show how those flawed procedures compromised the constitutional right to a fair trial. What identification evidence was actually admitted at trial? What did the victims, eyewitnesses, and police officers say? Were they

---

[2] To illustrate, a suggestive show-up can violation due process if the resulting identification is admitted at the criminal trial. Velez v. Schmer, 724 F.2d 249, 251-53 (1st Cir. 1984) (show-up where witness was told "this is him, isn't it?" was so suggestive "that the witnesses' subsequent recollection, in all probability, was simply of the person they saw at the stationhouse, rather than at the scene of the crime.").

5

>cross-examined? Were the circumstances surrounding the identification and the police procedures put before the jury? What exhibits were admitted on this issue? Was any objection or motion to suppress the identification evidence made? What other evidence tended to link the defendant to the crime? Each of these factors-the list is illustrative, not exhaustive-have a bearing on whether a fair trial was had.

Alexander v. City of South Bend, 433 F.3d 550, 555 (7th Cir. 2006). As was true in Alexander, the fact that the police did not conceal their overly-suggestive tactics has nothing to do with the due process inquiry.

**B. The Perjured Testimony Claim Should Proceed To The Jury**

13. At the criminal trial, Phil Torres "came off the paper" and told of making a 1:00 a.m. phone call to Bogucki to implicate Plaintiff, whereupon Bogucki received Plaintiff's name at the Cosmen home. Crim. Trial Tr., Nov. 5, 1997 at JIM03059-60. After Phil testified about the 1:00 a.m. break in the case, Bogucki proceeded to testify to the same thing. Crim. Trial Tr., Nov. 6, 1997 at JIM02371. This call is nowhere referenced in the police reports. To the contrary, the police reports indicate that Phil implicated Plaintiff at the station. Plaintiff's Exhibit 4.[3]

14. Same with Larry. At trial, Bogucki's testimony suggested that Larry implicated Plaintiff in the non-coercive atmosphere of his own home. Criminal Trial Tr., Nov. 6, 1997 at JIM02373. Larry, however, testified that it happened at the station, (Crim. Trial Tr., Nov. 5, 1997 at JIM03106) which is what the police

---

[3] For the Court's convenience, all of the cited transcript pages are attached as Group Exhibit A.

6

reports said.  Plaintiff's Exhibit 4.

   15.  Bogucki also denied that Larry told him Victor Romo's name as of February 4 (Crim. Trial Tr., Oct. 3, 1994 at JIM01568-69), which is inconsistent with Bogucki's deposition admission (read to the civil jury) that Larry did tell him Victor's name.

   16.  Bogucki also testified that he spoke to Sandra Elder at the hospital.  Crim. Trial Tr., Nov. 6, 1997 at JIM02369.  To the best of Plaintiff's counsel's recollection, this too is inconsistent with his civil trial testimony.[4]

   17.  False testimony establishes a due process violation, irrespective of whether there have been adequate Brady disclosures.  Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness.  A police officer violates the Due Process Clause if he assists witnesses in fabricating false evidence or testimony, where the result denies a criminal defendant a meaningful opportunity to present a complete defense.  California v. Trombetta, 467 U.S. 479, 485 (1984); Mooney v. Holohan, 294 U.S. 103, 112 (1935); United States v. Agurs, 427 U.S. 97, 112 (1976); Napue v. Illinois, 360 U.S. 264 (1959).

---

   [4] In terms of conspiracy to commit perjury, the eyewitnesses, too, allegedly committed all kinds of perjury.  In addition to the (disputed) perjury about whether Plaintiff was falsely implicated by all of eyewitnesses, the falseness of some of the testimony cannot be disputed, including Larry's testimony at both trials that Bogucki never fed him Plaintiff's name or told him what Torres said.  Crim. Trial Tr., Sept. 30, 1994 at JIM1892 and Crim. Trial Tr., Nov. 5, 1997 at JIM03119.

18. That kind of due process violation is present here. Notwithstanding their absence from the police reports, the aforementioned issues came out at trial, and thus cannot be the basis for a Brady violation. But perjury remains a due process violation.

19. Even if the foregoing violates the due process clause, absolute immunity is a defense to liability for Defendant Bogucki. In this case, however, the City has entered into an agreement by which it has promised to pay a judgment if Plaintiff can establish a constitutional violation, even if that is a constitutional violation for which the individual Defendant would normally be immune. Plaintiff specifically negotiated for that result, and should not be denied the benefit of that bargain.

    **C.**    **The City Has Entered Into An Agreement By Which It Agreed To Pay A Judgment If Plaintiff Can Establish A Constitutional Violation, Even If That Is A Constitutional Violation For Which The Individual Defendant Would Be Immune**

20. Plaintiff pleaded a Monell claim.

21. The City did not want to litigate the Monell claim, or even try to defeat it on summary judgment.

22. As a result, the parties entered into the original stipulation by which the City agreed to pay a judgment if Plaintiff could establish a constitutional violation. See Dckt. No. 199.

23. On July 15, 2011 the Defendants moved for summary judgment. On September 28, 2011, Plaintiff responded.

24. Plaintiff's summary judgment response argued that Plaintiff stated a due process violation for the use of false

testimony that survived summary judgment. See R. 128 at 28-29, attached hereto as Exhibit B. While such a claim would ordinarily be barred by absolute immunity, the response pointed out that the City had entered into a Monell stipulation by which it agreed to be liable for "any constitutional violation" Plaintiff could establish. Id. at 10.

25. Having been provided no background on the stipulation, the Court's summary judgment opinion indicated that it was not persuaded:

> Jimenez argues that absolute immunity is not a consideration here because knowing use of false testimony violates a criminal defendant's due process rights, and the City has agreed that it will be liable if one of the police officer defendants has violated his constitutional rights. See Shasteen v. Saver, 252 F.3d 929, 933 (7th Cir. 2001); Pl.Ex. 42. But the agreement between the City and Jimenez does not state that the City will pay damages even if the officers are immune from suit. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). That said, defendants did not make an absolute immunity argument in their summary judgment motion or opening brief, nor does the Court understand Jimenez to ground his claim on false testimony by one or more of the defendants. As in Manning, the fact that Jimenez cites allegedly false testimony by one or more of the defendants does not insulate them from liability for their non-testimonial actions. Manning, 355 F.3d at 1033 (citing Ienco, 286 F.3d at 1000). Any contrary argument would be frivolous.

Jimenez v. City of Chicago, 5507375 WL 2011 n.4 (Nov. 10, 2011).

26. Thereafter, there was a series of status hearings. Plaintiff's counsel does not have those transcripts, and thus must communicate his recollection, which is as follows. The City's attorney and Plaintiff's counsel told the Court that they were in the process of negotiating whether they had any agreement on the

9

stipulation, or whether the City would instead be participating at trial.

27.   Counsel for the City and for Plaintiff represented that they were trying to ascertain whether there was a "meeting of the minds" on the stipulation.  The Court was told that there would be a face to face meeting at Plaintiff's counsel's office to try to resolve the matter.  After that meeting, the Court was told that the issue had been resolved, that the City would not be participating in the trial, and that an amended stipulation had been entered into to that resolved the ambiguity.

28.   On December 19, 2011 the parties filed their signed amended stipulation.  The amended stipulations, R. 199, makes it explicit that what Plaintiff had previously argued was true under the original stipulation: that the City was agreeing to be liable if Plaintiff could prove a constitutional violation, even if that was a constitutional violation for which the individual Defendants would have been immune (because municipalities do not have immunity).  "See Exhibit C (the amended stipulation)."

29.   In Plaintiff's view, that resolved the matter, and he submitted proposed jury instructions consistent with the parties' agreement.

30.   However, attorneys for the Individual Defendants filed a response on January 8, 2012, the day before trial, accusing Plaintiff's counsel of having attempted to "swindle new claims into the case at the last minute."  R. 258 at 5-6.

31. Specifically, Defendants' pleading stated that: "The only discussions on the issue of immunity concerned whether the officers were going to assert a qualified immunity appeal on actions they took in the case and the Defendants indicated they were not. That is the only reason the City agreed to that language in the stipulation based on Plaintiff's expressed concern that the Defendants could assert a qualified immunity defense." Id. at 5-6.

32. Disturbingly, this representation is false. The City's attorney was ordered to come to Court, and when he (Harry Arger) met with Plaintiff's counsel and counsel for Bogucki, he confirmed that absolute immunity was expressly discussed by the parties, and that absolute immunity was part of the City's understanding of the scope of the revised stipulation, which by its plain terms supports Plaintiff's position because it contains no limitation to qualified immunity.

33. When the Court considered the issue on the first day of trial, everyone was anxious to get to the jury. Plaintiff does not have a copy of the trial transcript from the morning session of January 9th at which Mr. Arger appeared and memorialized the City's position, but will provide the court with the specific language of the discussion of absolute immunity upon obtaining a copy of the aforementioned trial transcript on January 15th. Plaintiff has a strong recollection that Mr. Arger confirmed that Bogucki's aforementioned representations are inaccurate, and that absolute immunity was expressly discussed. However, Plaintiff's counsel also

has a strong recollection that the issue was discussed quickly so that the preliminary instructions could be finalized, and that the Court indicated it would be willing to revisit the issue before the final instructions were finalized. Trial Tr., Jan. 9, 2012, Vol. 1, 220:23-221:3.

34. Here is the point. Mr. Arger confirmed in unambiguous terms for Plaintiff's counsel and for Bogucki's counsel prior to court that he agreed with Plaintiff about the fact that absolute immunity was discussed and contemplated. Plaintiff's counsel is confident that Bogucki's counsel will have to acknowledge this as well in whatever form their response to this motion takes. As stated, Plaintiff's counsel also believes that Mr. Arger put that confirmation on the record once the Court directed him to get to the point. Plaintiff's counsel has emailed Mr. Arger to explain to him the status of the dispute, and urged him to come to Court and put his position on the record, especially if it is anything different than as represented in this filing, with which he will be served via ECF.

35. Plaintiff realizes that this particular fact (that the amended stipulation by its terms and intent is meant to include claims which would have otherwise been absolutely immune) is not by itself determinative of the issue. However, Mr. Arger's confirmation is the "fact" that Plaintiff needs to establish for purposes of making a record.[5]

---

[5] The Court previously indicated that the Plaintiff received benefit in terms of no qualified immunity appeal. However,

36. Finally, Bogucki's "swindle" accusation is premised on the contention that the false testimony claim was not on the table at the time the City entered into the amended stipulation. This argument fails to withstand scrutiny. There can be no contention that Bogucki did not see this coming. Bogucki's original affirmative defenses in this case included the defense that he was absolutely immune for any of his testimony. R. 41, Aff. Def. No. 6.

37. Moreover, were there any doubt, Plaintiff had already responded to summary judgment on September 28 (making the argument that he stated a due process claim based on perjury) weeks *before* the amended stipulation was negotiated. Plaintiff did not "swindle" new claims into the case after reaching the stipulation.

38. Plaintiff further reminds the Court that the City is not taking a position that Plaintiff is misreading the stipulation. It is Bogucki's attorneys who are objecting. To the limited extent they have any standing to complain, it is because of the Court's point that allowing Plaintiff to prove a claim for which the City (but not Bogucki) would be responsible to compensate might confuse the jury.

39. Plaintiff respectfully submits that there is nothing

---

notwithstanding the amended stipulation, there was absolutely nothing stopping Bogucki from taking a qualified immunity appeal. Had Bogucki's qualified immunity appeal been successful, it would have eliminated him from the case and avoided any possibility of him being assessed punitive damages. His failure to take a qualified immunity appeal had nothing to do with the City's obligations under the stipulation, and is likely best explained by Defendant's desire to get this trial completed before Juan Carlos Torres' criminal trial.

13

unusual or inherently confusing about having a trial where Bogucki is personally responsible only for some of the claims and not for others. That happens not infrequently whenever there are co-defendants. In fact, assuming the verdict form asked specific questions, the jury would never even know the difference until the punitive damages phase, at which a clear jury instruction could avoid any confusion.

40. Moreover, even assuming that result is not 100% ideal for Bogucki, that reality should not, and does not, invalidate the agreement Plaintiff reached with the City. That agreement should be enforced. The City has made the decision not to attend trial, notwithstanding having put itself on the hook for constitutional violations for which Bogucki would be immune. That was the City's prerogative, and it is obviously prepared to live up to the consequences.

**D. The Court Should Err On The Side Of Instructing The Jury On The Proposed Claims**

41. In the final analysis, the best course is to instruct the jury on each of the alternative claims. The jury could be asked to make specific yes/no findings on each. If this Court or some other court decided that one or more claims could not be sustained, that verdict could be cleanly severed. If, however, the Court errs on the side of exclusion, the only remedy for error would be to start over from scratch.

RESPECTFULLY SUBMITTED:

/s/ Jon Loevy
_____
Attorneys for Plaintiff


Jon Loevy
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607

Stuart Channen
VALOREM LAW GROUP
35 East Wacker, Suite 3000
Chicago, IL 60601

Locke Bowman
RODERICK MACARTHUR JUSTICE CENTER
Northwestern University School of Law
375 East Chicago Avenue
Chicago, IL 60611