**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THADDEUS JIMENEZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09-cv-8081 |
| | ) | |
| v. | ) | Judge Kennelly |
| | ) | |
| CITY OF CHICAGO and | ) | |
| JEROME BOGUCKI, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RULE 59 MOTION FOR A NEW TRIAL**

Defendants City of Chicago and Jerome Bogucki, by their undersigned attorneys, hereby move this Court for a new trial pursuant to Fed. R. Civ. P. 59(a).[1] In support thereof, Defendants state as follows:

**LEGAL STANDARD**

A new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "The test to be applied . . . is whether the verdict is against the weight of the evidence, that the damages were excessive, or that, for other reasons, the trial was not fair to the party moving." *Taylor v. Nat'l R.R. Passenger Corp.*, 920 F.2d 1372, 1377 (7th Cir. 1990).

**ARGUMENT**

**I.     This Court Erred In Sustaining Plaintiff's *Batson* Challenge To Defendant's Peremptory Strike Of Juror Shirley McKee And Forfeiting Defendant's Third Peremptory Strike.**

   **A.  Background.**

---

[1] With regard to the post-verdict proceeding concerning the punitive damages, the City states that it had no notice of that proceeding and was not given an opportunity to object. For this reason alone, the City does not agree that testimony given during that proceeding has any import in the event of a new trial, which is the only circumstance in which the plaintiff proposed to use the testimony.

1

During voir dire, Shirley McKee stated that her great-nephew was released from prison last year after serving fourteen years for murder, and that she went to his court dates while he was incarcerated. (Transcript of Civil Trial at 77:22-78:12, attached hereto as Exhibit 1.) When asked if there was any question or issue about him being treated fairly, she responded "no." *Id.* at 78:14-19. When asked if she could put this aside if chosen for the jury, she responded "yes." *Id.* at 78:20-24.

Edward Casey stated that he served two and a half years in prison for possession of marijuana forty years ago in Iowa. *Id.* at 81:21-82:1, 154:13-22. When asked if there was any question or issue about him being treated fairly, he responded "No. I was guilty" and "the only person I was mad at was me for getting caught." *Id.* at 82:2-4, 154:23-155:5.

Defendant challenged Shalonda Tillman and Anthony Medrano for cause because they failed to disclose prior arrests on their juror questionnaires despite a question specifically asking for this information. *Id.* at 183:2-3, 185:24-186:12, 187:7-8. This Court granted the challenge to Medrano[2] but overruled the challenge to Tillman. *Id.* at 202:5-8.

Defendant exercised his peremptory strikes against Shalonda Tillman, Sylvia Margolin, and Shirley McKee. Plaintiff raised a *Batson* challenge to the strikes of Tillman and McKee. Defendant explained his strike of McKee as follows:

> [S]he said she had a nephew who was in prison for murder and spent 14 years in prison for murder and just got out. She is going to -- I think she's going to relate to what it's like to have a family member in prison. Mr. Jimenez was in prison for 16 years, and I think with her having a nephew in prison for 14 years . . . My point is the damages issue. She is somebody I think that is going to be very sympathetic to somebody like Mr. Jimenez who is claiming 16 years in prison, You know, we're going to say he wasn't damaged in prison because, you know, basically he was properly charged. She's a difficult juror for us in light of her experience with the nephew.

---

[2] Both parties challenged Medrano for cause. Medrano stated in his juror questionnaire that "I want to be a Chicago police officer, and I know a few police officers." Ex. 1 at 137:20-21. When asked if he could give a fair trial to a person suing the police, he responded "yes." Ex. 1 at 140:3-5.

*Id.* at 210:13-211:14. Defendant distinguished Casey as follows:

> Two and a half years is much different. It's a much smaller time compared to 14. His I think was in the 1970s . . . his was the marijuana charge . . . it was a much smaller charge . . . And I think the difference is what he said was he didn't contest that, you know, he [properly] was charged. With this woman, who is 62, she doesn't -- Like I said, I'm sure she doesn't know the circumstances of the murder, and I think in her heart she probably believes her -- she could believe he was innocent. I think she could sympathize with Mr. Jimenez and view [him] as being like her nephew, and that's my concern. Mr. Casey, who was in prison for two years in 1975, he's not going to associate himself with Mr. Jimenez, but I think Ms. McKee could.

*Id.* at 211:20-212:19. This Court denied the *Batson* challenge to Defendant's strike of Tillman

(*Id.* at 213:8-14), but granted the *Batson* challenge to Defendant's strike of McKee, stating:

> I just think you're grasping at straws. And it's largely the difference between her -- or the differential treatment of her and [Casey] . . . you've got a person here who spent two and a half years in prison himself. He expressed some concerns about fairness, about the fairness of the proceeding. She didn't. You struck her, you didn't strike him. The only conclusion I can reach is it's racially based . . . I'm not giving you another one because you forfeited it.

*Id.* at 213:15-214:6.

**B. Argument.**

**i.     This Court erred in forfeiting Defendant's third peremptory strike.**

Assuming, for purposes of argument, that this Court's finding that Defendant's strike of

McKee violated *Batson* was correct, it erred in sanctioning Defendant by forfeiting his third

strike. In *Maloney v. Plunkett*, 854 F.2d 152, 154 (7th Cir. 1988), the Seventh Circuit discussed

the authority for and propriety of depriving a party of peremptory strikes based on perceived

*Batson* violations. It found:

> In the present case the district judge did not deny either side its Seventh Amendment right to trial by jury, but he did deny a statutory incident to jury trial; more important, he deliberately refused to enforce a peremptory (pun intended) statutory command. Section 1870 of the Judiciary Code provides, in words that could not be clearer, that, "In civil cases, each party shall be entitled to three peremptory challenges" . . . The deprivation of the statutory right to exercise peremptory challenges as a sanction for misconduct is, so far as we are able to

3

> determine, utterly without precedent. Absence of authority would not necessarily be decisive if Judge Plunkett had given a reason for punishing the parties in this way, other than sheer irritation at what he considered their childish and improper behavior; but he gave no reason. He was annoyed with the parties and didn't want the bother at a new voir dire of trying to prevent them from again exercising their peremptory challenges on what he considered improper, indeed deeply offensive, grounds.

*Id.* The fact that a party's exercise of a strike may violate *Batson* does not authorize the forfeiture of that strike. In fact, forfeiting the strike "as a sanction for misconduct is . . . utterly without precedent." *Id.* The proper sanction for discriminating against a juror is having the juror seated. Moreover, this Court forfeited Defendant's strike without "giv[ing] a reason for punishing [him] in this way." In *Maloney*, Judge Plunkett's disapproval of the parties "exercising their peremptory challenges on what he considered improper, indeed deeply offensive, grounds" was insufficient to justify the extreme measure of forfeiting strikes guaranteed by 28 U.S.C. § 1870. *Id.* The fact that a party might be exercising its strikes in a discriminatory manner in violation of *Batson* cannot, without more, justify denying the statute's "simple and clear imperative." *Id.* It is possible that in certain extraordinary circumstances, a party's violation of *Batson* might justify the equally extraordinary sanction of forfeiture. But no such circumstances existed in this case.

This Court's error requires automatic reversal for two reasons. First, the forfeiture was arbitrary and irrational. As explained in *Maloney*, it was "utterly without precedent." *Id.* Moreover, at the time, this Court failed to provide any reason why this extraordinary sanction was warranted or justified. In *Rivera v. Illinois*, 556 U.S. 148, 160 (2009), the Supreme Court distinguished good-faith errors in applying *Batson* from errors that are "arbitrary or irrational." This Court's forfeiture of Defendant's third strike falls into the latter category. Therefore, it requires automatic reversal.

Second, the forfeiture skewed the peremptory challenge system in Plaintiff's favor. In *United States v. Harbin*, 250 F.3d 532 (7th Cir. 2001), the defense exhausted all of its

peremptories during jury selection, while the prosecution had peremptories "left over." The district court allowed the prosecution to exercise one of its peremptories mid-trial, in apparent violation of the court's own jury selection procedure. The Seventh Circuit held that the defendant's due process rights were violated by a peremptory challenge system that "skewed the jury selection process in favor of the prosecution." *Id.* at 541. It observed:

> Any other holding would effectively eliminate the ability of defendants to appeal any restrictions on peremptory challenges, thus frustrating the peremptory challenge device as a means of ensuring an impartial jury . . . the framework in which the trial proceeds is fundamentally altered, with an effect that is difficult to establish. Are we to say that reversal is inappropriate in those instances because the jury that actually sat was impartial, based on the fiction that the challenges for cause eliminated all biased jurors and that peremptory challenges are a statutory creation not constitutionally-required? Although they are not constitutionally required, the Supreme Court has long recognized that the right of peremptory challenges is one of the most important of the rights secured to the accused. They are a tool for achieving the constitutional mandate of an impartial jury, by allowing each party to eliminate those jurors with real or suspected biases. (Citation omitted.) Although challenges for cause eliminate presumptively biased jurors, peremptory challenges weed out the extremes of partiality on both sides. (Citation omitted.) Thus, a system that grants the right to only one party threatens that goal of an impartial jury by skewing the jury towards the favored party. This is different from an error that impedes the ability of a defendant to maximize the strategic use of his peremptory challenges, or that affects the number of peremptory challenges available in a technical sense.

*Id.* at 548-49. This Court's forfeiture of Defendant's third strike heavily skewed the jury selection process in Plaintiff's favor by giving Plaintiff a full fifty percent more peremptory strikes than Defendant. This is not a case where Defendant was prevented from "maximiz[ing] the strategic use" of his strikes. *Id.* Rather, his third strike was eliminated entirely. In *United States v. Martinez-Salazar*, 528 U.S. 304 (2000), the district court erroneously denied a challenge for cause by the defendant. He chose to exercise a peremptory strike against the juror. The Supreme Court held that the error did not require automatic reversal, noting "a hard choice is not the same as no choice." *Id.* at 315. In this case, Defendant was given "no choice" when he was deprived of the use of his third strike altogether. Because this Court's error in forfeiting

Defendant's third strike skewed the jury selection process in Plaintiff's favor, "crippl[ing] the device designed to ensure an impartial jury," it requires automatic reversal.

### ii.   This Court erred in granting Plaintiff's *Batson* challenge.

#### a.   Error.

The Supreme Court has framed a three-step process for analyzing *Batson* challenges. First, the party raising the challenge must make out a prima facie case of racial discrimination. *See Purkett v. Elem*, 514 U.S. 765, 767 (1995). Second, the party exercising the strike must articulate a race-neutral explanation for the strike. *Id.* This step "does not demand an explanation that is persuasive, or even plausible." *Id.* at 768. Third, the court must determine "whether the opponent of the strike has proved purposeful racial discrimination." *Id.* at 767. The "ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* at 768.

Defendant easily satisfied the requirement of providing a race-neutral explanation for his strike of McKee. The fact that McKee's great-nephew, like Plaintiff, had recently been released from prison after serving almost the same number of years for the same crime was a reason having nothing to do with race. The Seventh Circuit has repeatedly upheld denials of *Batson* challenges based on similar reasoning. *See United States v. Lampkins*, 47 F.3d 175, 178 (7th Cir. 1995) (prosecution struck potential juror whose ex-boyfriend and uncle were convicted of distribution of crack cocaine where defendants charged with conspiracy to possess and distribute cocaine); *United States v. Brown*, 289 F.3d 989, 993 (7th Cir. 2002) (prosecution struck potential juror whose husband was convicted of a firearms offense twenty years earlier where defendant charged with possession of a firearm by a convicted felon); *United States v. Hendrix*, 509 F.3d 362, 370 (7th Cir. 2007) (prosecution struck potential jurors with relatives in prison). In fact,

Defendant's explanation was not only race-neutral but sufficient to justify a challenge for cause. *See Hunley v. Godinez*, 975 F.2d 316, 319 (7th Cir. 1992) (collecting cases).

This Court concluded that Defendant's strike of McKee was racially motivated based primarily on his failure to strike Casey. This was error. McKee and Casey were distinguishable in a few significant respects. McKee's great-nephew's situation strongly mirrored Plaintiff's: both served lengthy sentences, both were recently released from prison and, most importantly, both were convicted of the same crime – murder. The fact that McKee attended his court dates indicated that she was close to him and supported the inference that, despite her denying that there was any issue as to the fairness of the proceedings, she might still believe in his innocence. Casey, on the other hand, served only two and a half years, forty years ago, for possession of marijuana. This Court took into consideration that Casey "expressed some concerns about the fairness of the proceeding." He did not. To the contrary, Casey stated that he was guilty and that the only person he was mad at was himself "for getting caught." Ex. 1 at 155:4-5.

Murder and possession of marijuana are vastly different crimes in any scenario. The difference was significant in this case because Plaintiff alleged he was wrongfully convicted for murder. *See Lampkins*, 47 F.3d at 178; *Brown*, 289 F.3d at 993. There was no reason to believe that Casey, who openly admitted his guilt, might sympathize with Plaintiff because of a four-decades-old marijuana conviction in another jurisdiction. The same simply could not be said of McKee. Moreover, although Defendant exercised peremptory strikes against both black jurors, he first challenged Tillman and the only other juror who failed to disclose prior arrests, Medrano, for cause. That is, where a black and a non-black juror were truly comparable, Defendant treated them equally. Therefore, this Court erred in finding that Defendant's strike of McKee was racially motivated and granting Plaintiff's *Batson* challenge to the strike.

### b. Automatic Reversal.

Although Defendant did not challenge McKee for cause, he could and should have on the basis of implied bias. Courts presume bias where "the prospective juror is connected to the litigation at issue in such a way that [it] is highly unlikely that he or she could act impartially." *Hunley*, 975 F.2d at 319. In this case, the fact that McKee's great-nephew's situation strongly matched Plaintiff's, combined with her attendance at his court dates, made it "highly unlikely that she could act impartially." As such, McKee was challengeable for cause. *See United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979) (juror whose sons were in prison for heroin-related crimes challengeable for cause where defendants charged with conspiracy to distribute heroin). Because this Court's error resulted in the seating of a juror who was challengeable for cause, it requires automatic reversal. *See Martinez-Salazar*, 528 U.S. at 316.

Even if this Court finds that McKee was not challengeable for cause, this Court's error in denying Defendant's strike still requires automatic reversal. Peremptory challenges "assure the selection of a qualified and unbiased jury by enabling each side to exclude . . . extremes of partiality." *Harbin*, 250 F.3d at 541. Because this Court's error impaired Defendant's statutory right to exclude jurors on the "extremes of partiality," it requires automatic reversal.

*Rivera* does not mandate a different outcome. In *Rivera*, the Supreme Court explicitly limited its review to the question of whether a state court's erroneous granting of a *Batson* challenge violates the federal Constitution. It expressly left states "free to decide, as a matter of state law, that a trial court's mistaken denial of a peremptory challenge is reversible error *per*

*se*."[3] 556 U.S. at 162. *Rivera* did not address the consequences of the erroneous denial of a peremptory challenge guaranteed by 28 U.S.C. § 1870.

Finally, even under a harmless-error standard of review, this Court's error substantially prejudiced Defendant by the seating of a juror predisposed to be highly sympathetic to Plaintiff.

## II. This Court Erred In Not Giving Defendant's Proposed Instruction No. 2, Identifying The Particulars Of The Due Process Claim That Was Relevant For The Jury To Consider.

The jury was improperly instructed on the scope of the due process claim. Defendant's Proposed Instruction No. 2 identified the particulars of a viable due process claim. (Proposed Instruction, attached hereto as Exhibit 2.) Defendant proposed this instruction to make sure that the due process claim was confined to material evidence that was allegedly withheld and not otherwise available through the exercise of reasonable diligence. This Court rejected Defendant's proposed instruction and allowed the jury to consider numerous examples of alleged *Brady* violations that, in reality, could not be considered true *Brady* violations. For example, during his closing argument, Plaintiff identified, for the first time, ten allegedly independent *Brady* violations that he claimed supported his due process claim. Plaintiff argued that if the jury found *any one* of his ten alleged *Brady* violations, then the jury should find in his favor on the due process claim. Ex. 1 at 2814:8-17. This was improper. Without placing proper guideposts on this claim, Plaintiff was able to submit invalid alleged *Brady* violations to the jury. These invalid *Brady* violations tainted the trial. This Court cannot speculate as to how the jury analyzed Plaintiff's due process claim. But, if even just one of the ten alleged *Brady* violations was invalid, Defendant is entitled to a new trial.

The instruction given by this Court stated the law, but did not explain what specific

---

[3] Since *Rivera*, at least two states have held that the erroneous denial of a peremptory challenge requires automatic reversal as a matter of state law. *See People v. Hecker*, 942 N.E.2d 248, 271-72 (N.Y. App. 2010).

"evidence" Defendant was alleged to have withheld. (Due Process Instruction, attached hereto as Exhibit 3.) Unlike an excessive force case, where the question of the officer's use of force is confined to a specific incident, a due process claim can be amorphous and lack guideposts. In *Albright v. Oliver,* 510 U.S. 266 (1994), the Supreme Court cautioned against proceeding with due process claims that are amorphous and lack guideposts. *Albright* addressed the issue of whether a plaintiff can successfully convert "every alleged injury which may have been inflicted by a state official acting under 'color of law' into a violation of the Fourteenth Amendment." *Id.* By the plain reading of *Albright,* the answer to this question is a resounding no. *Id.* In the words of *Albright's* four justice plurality, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id.* at 273.

In the Seventh Circuit, *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) provided a claim – under due process – for allegations that a police officer withheld material exculpatory evidence. Since *Newsome*, plaintiffs have sought to wedge every allegation of wrongdoing into a due process claim. The Seventh Circuit has time and again been very clear that absent a true *Brady* violation, plaintiffs cannot seek redress under the guise of due process. *See Gauger v. Hendle*, 349 F.3d 354 (7th Cir. 2003) (overruled in part on other grounds by *Wallace v. City of Chicago*, 440 F.3d 421 (7th Cir. 2006)), *Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006) (claim barred when plaintiff was aware of the misconduct he complains of); *see also McCann v. Mangialardi*, 337 F.3d 782 (7th Cir. 2003) (claim barred when allegations were just a recast of his malicious prosecution claims). That is why guideposts are necessary.

Defendant's Proposed Instruction No. 2 set forth specific guideposts as to the scope of

Plaintiff's due process claim. The proposed instruction was actually adopted from this Court's instruction in *Manning v. Dye, et al.,* 02 CV 372. This Court has identified these instructions on its website as model instructions and even advises counsel trying cases in its courtroom "to adapt these instructions to the circumstances of their case."[4]

In *Manning*, this Court gave very specific guideposts to the jury on what evidence the plaintiff claimed was withheld. (*Manning* Instruction, attached hereto as Exhibit 4.) This instruction clearly defined the scope of the due process claim and prevented the plaintiff from arguing that the withholding of any other facts, independently, satisfied his due process claim. A similar instruction with guideposts should have been given in this case as well. Because the instruction given in this case lacked guideposts, it is impossible to know on what basis the jury decided Plaintiff's due process claim. The jury could very well have decided the claim based on evidence that does not support a *Brady* violation.

### A.      Standard Of Review On Jury Instruction Issues.

In reviewing a claim that jury instructions were incorrect, the court must examine whether the instructions were misleading and prejudiced the complaining party. *See United Airlines, Inc. v. United States,* 111 F.3d 551, 555 (7th Cir. 1997). "If the misleading instruction did prejudice the complaining party, then the proper remedy is a new trial." *Heller Int'l Corp. v. Sharp,* 974 F.2d 850, 856 (7th Cir. 1992).

"An incorrect instruction calls for a new trial even if the jury could have based its verdict on a different, properly instructed theory."  In that situation, the Seventh Circuit has held that one "cannot speculate about which theory the jury chose." *Simmons, Inc. v. Pinkerton's, Inc.,* 762 F.2d 591, 599 at n. 3 (7th Cir. 1985). When a jury could have based its verdict on either correct or incorrect statements of the law, "its verdict must be set aside even if the verdict may have

---

[4] *See* http://www.ilnd.uscourts.gov/JUDGEKENNELLY/mfk_02c00372.pdf.

been based on a theory on which the jury was properly instructed." *Saturday Evening Post Co. v. Rumbleseat Press, Inc.,* 816 F.2d 1191, 1197 (7th Cir. 1987) (dicta).

The Seventh Circuit "will not assume that the jury decided one way or another. Prejudice to the complaining party includes the possibility that the jury based its decision on incorrect law." *Dawson v. New York Life Ins. Co.,* 135 F.3d 1158, 1165 (7th Cir. 1998). *See also Simmons, Inc.,* 762 F.2d at 599 n. 3 (in a case where the jury could have based its decision on a valid or an invalid theory, we cannot speculate as to which the jury chose); *Bammerlin v. Navistar Int'l Transp. Corp.,* 30 F.3d 898, 901 (7th Cir. 1994) (remanding for new trial where jury verdict for the plaintiff in a vehicle defect case could have been based on an improper legal theory).

**B.      Plaintiff's Closing Argument List Of *Brady* Violations Failed As A Matter Of Law And The Jury Should Not Have Been Allowed To Consider It.**

In order to establish a *Brady* violation, a plaintiff must show that: "(1) the evidence at issue is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence has been suppressed by the government, either willfully or inadvertently; and (3) the suppressed evidence resulted in prejudice." *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007). Further, evidence is considered suppressed when the prosecution failed to disclose it in time for the criminal defendant to make use of it at trial, and only if the evidence was not otherwise available to the defendant through the exercise of reasonable diligence. *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008).

Nothing in *Brady* requires that witnesses testify truthfully or that the government create exculpatory evidence. *Id.* (citing cases). Rather, *Brady* protects a criminal defendant's ability to properly defend himself. It does not protect the criminal defendant who fails to exercise reasonable diligence. *Id.* Reasonable diligence requires a criminal defendant to "probe the

witnesses and investigate their versions of the relevant events." *Id.*[5] In other words, the government is not obligated to conduct a criminal defendant's investigation for him. *See United States v. Hamilton*, 107 F.3d 499, 510 (7th Cir. 1997); *Harris*, 486 F.3d at 1016. At a minimum, reasonable diligence requires the defense to interview witnesses regarding their role in the case – including lineup identifications and police interviews. *Holland v. City of Chicago*, 643 F.3d 248, 255-56 (7th Cir. 2011).

Where a plaintiff is aware of the existence of evidence, similar to confession cases, his *Brady* claim "never leaves the ground." *Jardine v. Dittmann*, 658 F.3d 772, 776 (7th Cir. 2011). The Seventh Circuit's approach (articulated less than six months ago) to the plaintiff's *Brady* claim is worth recounting here:

> The parties dispute the exculpatory value of Jardine's gun, the butt of which—years after trial—contained no trace of Grandhagen's DNA. Jardine says this shows his gun was not used to bash her head in; the warden says otherwise, trading on the time Jardine had to wipe away any gore before he was caught. But in this fight the parties overlook a simpler problem: by Jardine's account, Wisconsin never suppressed the gun. Suppression, for *Brady* purposes, happens only when prosecutors and police fail to disclose evidence not otherwise available to a reasonably diligent defendant. (Citations omitted.) Nothing in Jardine's petition suggests his defense team was unaware of his own gun's existence, the state's possession of it, or the prosecution's theory of its role in the crime. Nor does Jardine allege that he unsuccessfully requested access to the gun. Thus, Jardine's *Brady* claim about his gun never leaves the ground. (Citations omitted.)

*Id.* Here, in closing arguments, Plaintiff identified ten allegedly independent *Brady* violations. Ex. 1 at 2814:8-2819:11. Each alleged violation will be discussed in order below.

---

[5] *See United States v. Lockhart*, 956 F.2d 1418, 1425-26 (7th Cir. 1992) (details of prosecution witness recant); *United States v. Polland*, 994 F.2d 1262, 1267 (7th Cir. 1993) (phone call in which one witness might have influenced another to cooperate with prosecution where existence of relationship already known); *Collier v. Davis*, 301 F.3d 843, 850 (7th Cir. 2002) (offer of prosecutorial leniency in exchange for testimony); *Badelle v. Correll*, 452 F.3d 648, 658-60 (7th Cir. 2006) (leads on another suspect known by officer testifying for defense); *United States ex rel. Brisbon v. Fry*, No. 95 C 5033, 2004 WL 1244123, at *7 (N.D. Ill. June 7, 2004) (benefits offered to prosecution witnesses).

**(1)** Plaintiff argued that Defendant failed to disclose that he allegedly coerced Larry Tueffel into identifying Plaintiff as the shooter. As discussed in Defendant's Rule 50 motion, Plaintiff testified that when he was in the police station, he heard the police yelling at Tueffel and telling Tueffel that he was lying. Moreover, Plaintiff claims that he spoke with Tueffel before his first criminal trial and when asked why he was testifying against Plaintiff, Tueffel responded "they made me do it." Ex. 1 at 740-41. Because Plaintiff himself admits that he had personal knowledge of the alleged police coercion of Tueffel, he cannot now claim that the very same information was withheld from him in violation of his due process rights. *See Gauger*, 349 F.3d at 360.

**(2)** Plaintiff argued that the police failed to disclose that Shawn Cosmen was detained and brought back to the scene of the murder for an informal "show-up" identification. Plaintiff argued to the jury that this alleged failure to disclose was a *Brady* violation. That is simply not the case. Cosmen testified at Plaintiff's criminal trials about this incident. Ex. 1 at 2565:21-2567:17. As such, Plaintiff was clearly aware of Cosmen's involvement and, hence, this evidence cannot be considered to have been withheld for purposes of *Brady*. *See Bielanski v. County of Kane*, 550 F.3d 632, 645 (7th Cir. 2008) ("*Brady* requires that the government disclose material evidence in time for the defendant to make effective use of it at trial"). There is no evidence to suggest that Plaintiff was unable to make effective use of Cosmen's testimony at both of his criminal trials. *See also Moore v. Casperson,* 345 F.3d 474, 493 (7th Cir. 2003) (nothing in *Brady* requires that disclosures be made before trial because, as long as ultimate disclosure is made before it is too late for the defendant to make use of any benefits of the evidence, due process is satisfied); *Jardine*, 658 F.3d at 776.

**(3)** Plaintiff argued that the fact that Phil Torres did not want to testify against Plaintiff

was withheld. Additionally, Plaintiff argued that the circumstances of Torres's identification of Plaintiff were also withheld. Both arguments are incorrect. Torres testified at Plaintiff's criminal trials that he did not want to testify or be a witness. (Transcript of Plaintiff's First Criminal Trial at B106-B107, attached hereto as Exhibit 5.) Torres testified that at first he did not identify Plaintiff and that only later, after calling Defendant at 1:00 a.m., did he first identify Plaintiff as the shooter. *Id.* at B69-B72. Torres also testified about seeing the shooter wearing a Duke jacket. *Id.* Accordingly, Plaintiff was aware of Torres's involvement in the case and the circumstances of his identification of Plaintiff. *See Bielanski*, 550 F.3d at 645. Consequently, no evidence was withheld for purposes of *Brady*.

**(4)** Plaintiff claimed that the police placed a photograph of Plaintiff on a desk and had Tina and Sandra Elder view this photograph prior to viewing the lineup. Plaintiff argued that this procedure was not disclosed and amounted to a *Brady* violation. As discussed in Defendant's Rule 50 motion, Tina and Sandra Elder both recognized Plaintiff from the neighborhood. Ex. 1 at 700-01. Likewise, Plaintiff admitted that he knew Tina and Sandra Elder from the neighborhood. As such, even if true, it is inconsequential that Tina and Sandra Elder saw a photograph of Plaintiff before viewing the lineup as their viewing of Plaintiff's photograph would not have rendered the lineup suggestive.

**(5)** Plaintiff argued that Tina Elder gave a description of the shooting that was exculpatory and that Defendant intentionally chose not to memorialize it. This is simply not true. No witness (including Tina) gave testimony to even support this allegation. Plaintiff's speculation is based on a note written by Defendant. When interviewing Tina, Defendant admitted that he did not write down everything that Tina told him. Ex. 1 at 1429:4-6. Defendant explained that since Tina's statements were consistent with the other witnesses, he did not write

down everything she told him. *Id.* Tina does not claim that she provided Defendant with any exculpatory information. The fact that Defendant did not document consistent non-exculpatory information learned from Tina in a police report is not a *Brady* violation. Plaintiff's assertions to the contrary are mere speculation – not *Brady* violations. *See United States v. Jumah*, 599 F.3d 799, 809 (7th Cir. 2010) (*Brady* violation cannot be established by "mere speculation" or "unsupported assertion[s] that the government suppressed evidence"). In addition, the fact that Defendant did not memorialize his interview with Tina in his notes was known to Plaintiff prior to his criminal trials and therefore was not "withheld" in *Brady* terms. *Gauger*, 349 F.3d at 360.

**(6)** Plaintiff argued that Defendant's notes of Sandra Elder's interview were taken after the lineup and not in the hospital as Defendant contends. First, Plaintiff has no factual basis to support this argument. Defendant testified that he interviewed Sandra Elder at the hospital and took notes at the hospital, and there is no evidence to the contrary. Ex. 1 at 1020:21-1021:13. For Plaintiff to claim otherwise is pure speculation. Second, Plaintiff was provided with copies of the notes and reports prior to his criminal trials and was free to do any investigation on when and how Sandra Elder was interviewed. There is no evidence to suggest that the police withheld any information they learned from Sandra Elder. As such, there can be no *Brady* violation here.

**(7)** Plaintiff argued that the identity of the person who told Defendant that Victor Romo was present at the shooting was withheld from him. However, Plaintiff knew that the police reports stated that the police received "information" that Victor Romo was present and that no specific person was identified. Hence, the failure to identify the specific person was known to Plaintiff. Plaintiff could have sought discovery in the criminal case to follow up regarding what precise information the police obtained regarding Victor Romo and who the source of this information was. *See Holland*, 643 F.3d at 256 (quoting *Carvajal*, 542 F.3d at 567). Similarly,

16

Plaintiff had a responsibility to follow up on the information contained in the police reports. Through reasonable diligence, Plaintiff could have discovered this information had he chosen to.

**(8)** Plaintiff argued that the lack of signatures and dates on Defendant's General Progress Reports (GPRs) was an independent *Brady* violation. Plaintiff contended that without dates and signatures, Defendant was able to shuffle the GPR deck of notes and make up whatever order of events he chose. Even if this were true, the lack of dates and signatures cannot constitute a *Brady* violation. Plaintiff had the GPRs and knew they were unsigned and undated back in 1993. At both of his trials, Plaintiff was free to make the same "deck shuffling" argument he made in this case. The *Brady* analysis, however, focuses on whether or not the evidence was disclosed. In the case of the notes, they clearly were. Thus, the lack of signatures and dates was not withheld and, consequently, there can be no *Brady* violation. *Gauger*, 349 F.3d at 360.

**(9)** Plaintiff argued that Defendant withheld evidence tending to show Juan Carlos Torres was the shooter and that this too was an independent *Brady* violation. Plaintiff is incorrect. The police reports properly documented the fact that Victor Romo was claiming that Juan Carlos Torres was the shooter. (Supplementary Report Dated February 10, 1993, attached hereto as Exhibit 6.) The police interviewed Juan Carlos Torres and documented the interview in a report. *Id.* The police also documented the fact that Ezequiel Romo claimed to have an audiotaped confession from Juan Carlos Torres. (Supplementary Report Dated March 8, 1993, attached hereto as Exhibit 7.) Since Juan Carlos Torres's alleged involvement in the murder (from the standpoint of Victor and Ezequiel Romo) was properly disclosed, no evidence was withheld for purposes of *Brady*. *Brady* does not impose an obligation on the police to create exculpatory evidence. *See Harris*, 486 F.3d at 1017. The police had an obligation to disclose the material exculpatory information they learned about Juan Carlos Torres. As evidenced by the police

17

reports, they fulfilled this obligation.

**(10)** Plaintiff argued that Defendant failed to disclose that Defendant seized Plaintiff's Duke jacket when he was arrested but it was never inventoried. Defendant testified that he recovered Plaintiff's Duke jacket when he arrested Plaintiff. Ex. 1 at 1293:25-1294:3. That Duke jacket was used during the lineups. Ex. 1 at 1307:14-1308:19. There were photographs taken of Plaintiff in the Duke jacket at the time of the lineup. (Photograph, attached hereto as Exhibit 8.) All the witnesses who viewed the lineup testified that they saw all the lineup participants trying on the Duke jacket. Defendant further testified that after Plaintiff was charged with the murder, he gave the jacket back to Plaintiff's mother. Ex. 1 at 1134:8-18. Whether that is true or not is irrelevant for the *Brady* analysis. Plaintiff knew back in 1993 that his Duke jacket was taken by the police but was never "inventoried" with the evidence in the case. This fact was not withheld. Moreover, the evidentiary value of the jacket is pure speculation. The failure to have the jacket as evidence in the criminal trials was not material. Without the jacket at the criminal trials, Plaintiff was free to argue that no forensic evidence was recovered from his clothing to connect him to the crime. That is the best inference Plaintiff could get with the jacket in evidence, even assuming it was forensically tested. Therefore, not only was no evidence withheld, but evidence that the jacket was not inventoried was not exculpatory. *See Jumah*, 599 F.3d at 809.

## III.    This Court Erred In Granting Plaintiff's Motion *In Limine* To Bar Carmelo Cortez.

Defendant first began trying to locate Carmelo Cortez in February 2011. Defendant finally located Cortez in October 2011. *See* Def.'s Resp. to Pl.'s MILs at p. 23 (D.E. 187) (timeline). Defendant disclosed Cortez on October 26, 2011, promptly after locating and interviewing him. Trial did not commence until January 9, 2012, over two months after Defendant's disclosure. This Court granted Plaintiff's motion *in limine* to bar Cortez from

testifying at trial based on the timing of his disclosure. Although this Court appeared to agree with Defendant that Cortez was an impeachment witness (Transcript of Dec. 7, 2011 PTC at 17:5-12, attached hereto as Exhibit 9), it stated:

> I mean, I have to say I don't regard there being some separate category of -- you know, we've got another issue here. It's not just 26(a)(1). It's -- hang on. It's the pretrial order rule. And that involves a whole process. Give me just one second here. I just wanted to check another thing. And it's a general problem of, you know, lateness and unfair prejudice. That's what it is.

*Id.* at 19:22-20:5.

In his November 23, 2011 motion *in limine*, Plaintiff claimed that he was "unable to undertake the discovery necessary to ascertain the details of Mr. Cortez's testimony; to explore how the defendants learned of that testimony; and to investigate other possible avenues of impeachment." In fact, Plaintiff was free to undertake whatever discovery he wished. Instead, he chose to do nothing, simultaneously claiming that nothing could be done. Any prejudice from the timing of Cortez's disclosure could have been cured through the standard process of taking his deposition, where Plaintiff could have asked all of the questions raised in his motion *in limine*. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 857-58 (7th Cir. 2003).

Moreover, the plain language of Rule 26(a) exempts impeachment witnesses from the general requirement that witnesses be disclosed in advance of trial. *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir. 2005). Similarly, Local Rule 16.1 contains a Standing Order stating "[a]ny witness not listed [in the Final Pretrial Order] will be precluded from testifying absent good cause shown, except that each party reserves the right to call such rebuttal witnesses (who are not presently identifiable) as may be necessary, without prior notice to the opposing party." Tueffel testified in his deposition that, after the shooting, he spoke with Cortez but did not tell him that Plaintiff was the shooter; Cortez was expected to testify that, on the night of the shooting, Tueffel did, in fact, tell him that Plaintiff was the shooter. As such,

Cortez was a textbook impeachment witness. Under Rule 26(a), Defendant was not required to disclose Cortez in advance of trial. Local Rule 16.1's Standing Order was inapplicable to Cortez because he was properly listed on Defendant's witness list in the Pretrial Order.

This Court's error in granting Plaintiff's motion *in limine* substantially prejudiced Defendant. Tueffel was the most important witness in the case. He was on the street with Eric Morro at the time of the shooting. He and Plaintiff were friends and fellow members of the Simon City Royals. Plaintiff's own post-conviction attorney, Alison Flaum, admitted:

> Q.    Who was the most important witness in your case as a result of your reinvestigation?
> A.    It would be Larry [Tueffel].

Ex. 1 at 2411:8-12. Plaintiff's theory of the case depended on Defendant pressuring or coercing Tueffel into falsely identifying him as the shooter. Plaintiff acknowledged this point in his closing argument, stating "Everything Mr. Hale said about Larry comes down to this. If Larry saw TJ shoot Eric, then he's right. But if Larry didn't see TJ shoot Eric, then everything he said is a big lawyer trick." *Id.* at 2926:22-25. According to Plaintiff, "nobody said it was TJ until Detective Bogucki got involved." *Id.* at 251:23-24. The crucial difference between Cortez and another witness who impeached Tueffel at trial, Elizabeth Gutekanst, is that Cortez was expected to testify that Tueffel told him Plaintiff was the shooter *before* the interview where Defendant allegedly coerced Tueffel into identifying Plaintiff as the shooter. If the jury found Cortez's testimony credible, then Tueffel voluntarily told one of his peers that Plaintiff was the shooter before Defendant ever mentioned Plaintiff's name to Tueffel. This would powerfully rebut Plaintiff's claim that Defendant caused Tueffel to falsely identify him as the shooter. Therefore, this Court's error in granting Plaintiff's motion *in limine* to bar Cortez from testifying at trial substantially prejudiced Defendant.

**IV.** **This Court Erred In Granting Plaintiff's Motion *In Limine* To Bar Evidence Of His Threatening Victor Romo.**

  **A. Background.**

On May 25, 1993, Margot Gillin witnessed Plaintiff threatening to kill his codefendant's father if his codefendant testified that he pulled the trigger. On May 26, 1993, Gillin documented the threat. In her deposition, Gillin recalled Plaintiff making the threat "loudly and clearly across the room." (Deposition of Margot Gillin at 7:17-8:15, 10:2-12, attached hereto as Exhibit 10.)

During the Final Pretrial Conference, this Court denied Plaintiff's motion *in limine* to bar evidence of the threat, stating:

> It's pretty clearly going to be admissible unless, you know, [Gillin's deposition] transcript wasn't correctly recorded or something . . . It's classic consciousness of guilt evidence.

(Transcript of Dec. 5, 2011 PTC at 65:3-66:7, attached hereto as Exhibit 11.) The parties drafted an order memorializing this Court's rulings on their motions *in limine*, which this Court signed and entered. The Order stated that "Defendants are [ ] permitted to reference . . . the threat (allegedly) heard by Margot Gillin concerning Victor Romo."

On January 2, 2012, this Court ordered the parties to brief the issue of the relevance and admissibility of evidence of Plaintiff's guilt and innocence. The Order stated that this Court might order responsive briefing based on the initial briefing. Plaintiff took the position that this evidence was relevant to malice and damages, and again argued that the Romo threat should be barred. Defendant took the position that this evidence was relevant to both of Plaintiff's claims, as well as damages. This Court did not order any further briefing, issue a ruling on the subject of evidence of Plaintiff's guilt and innocence, or modify any of its prior rulings.

On January 11, 2012, during the third day of trial, this Court revisited its ruling on the

Romo threat. When asked to explain the theory under which he was offering this evidence,

Defendant stated:

> Well, the theory would be that it would not make any -- it corroborates his guilt
> because there would be no reason for him to be threatening Victor Romo if Victor
> Romo just simply told him at the Audy Home, hey, I know it wasn't you, it was
> Juan Carlos Torres . . . I told the police it was Juan Carlos Torres, you got nothing
> to worry about.

Ex. 1 at 751:19-752:10. This Court then discussed the relevance of evidence of Plaintiff's guilt

and innocence for the first time, concluding that such evidence was relevant to damages but

rejecting Defendant's arguments that it was relevant to liability. *Id.* at 754:5-756:20. Following

this discussion, this Court changed its ruling on the Romo threat, stating:

> And so what this really boils down to is it's consciousness of guilt evidence. I
> think really the only viable purpose for which it's admissible is on damages. And
> that, I think, has an effect on the 402 issue of relevance and the 403 issue of
> balancing relevance and probative value . . . everybody seems to agree that Mr.
> Romo had reported that Mr. Torres was the shooter long before this alleged threat
> happened. There's been a decent amount of threat evidence introduced . . . And so
> for these reasons I think it has really tiny probative value. I think that it's
> massively unfairly prejudicial. And it's excluded for that reason.

*Id.* at 756:18-757:19.

**B. Argument.**

This Court appeared to believe that the Romo threat had "really tiny probative value" for

three reasons: guilt was only relevant to damages, other threat evidence had been introduced, and

the Romo threat occurred after Romo had already identified Juan Carlos Torres as the shooter.

This Court erred in ruling that subsequent evidence of guilt was not relevant to malice for

purposes of a malicious prosecution claim. This Court stated that "Malice concerns intent. And if

this information wasn't known to the defendant, it can't possibly be relevant to his intent." Ex. 1

at 755:14-15. This was a misapplication of Illinois law. In *Aguirre v. City of Chicago*, 887

N.E.2d 656 (1st Dist. 2008), the court affirmed the introduction of subsequent evidence of the real killer's testimony, finding it was relevant to the malice element of the plaintiff's malicious prosecution claim. Thus, it was incorrect for this Court to state that malice must be evaluated based solely on evidence that was known to the defendant at the time of charging, as *Aguirre* holds otherwise. Here, Plaintiff's threat to Victor Romo, while not known to Defendant at the time Plaintiff was charged, was relevant to rebut Plaintiff's claim that Defendant acted with malice. Plaintiff's threat showed consciousness of guilt and such evidence was relevant to rebut a finding of malice as it provided the jury with an alternate explanation for why the witnesses were implicating Plaintiff other than coercion, i.e., because Plaintiff actually was the shooter.

Moreover, damages evidence is just as important as liability evidence, especially in a high-damages case like this one. *See Cobige v. City of Chicago*, 651 F.3d 780, 785 (7th Cir. 2011) (district court erred in excluding damages evidence under Rule 403; error was not harmless where evidence "could have significantly reduced the award of damages"). Evidence does not become less probative or admissible simply because it is only relevant to damages.

The Romo threat was highly probative as evidence of consciousness of guilt. *See United States v. Blake*, 286 F. App'x 337, 340 (7th Cir. 2008) (describing threat evidence as "highly probative" of guilt). The only other threat evidence introduced at trial was Plaintiff's threats to Larry Tueffel in letters he sent to Elizabeth Heatley. Gillin observed Plaintiff threatening a second witness: the shooter's accomplice and one of two living witnesses who were right beside the shooter at the time of the shooting (Tueffel was the other). Unlike the Tueffel threats, the Romo threat was made to Romo directly. The threat was also sharply inconsistent with Plaintiff's story that Romo openly told him when they first met in the Audy Home that Torres was the shooter and always freely maintained the same. If this were true, then Plaintiff had no reason

whatsoever to threaten Romo. The timing of the threat went to the weight, rather than the admissibility, of the evidence. Defendant's position was that Romo was always frightened of Plaintiff, and that Plaintiff threatened Romo in the Audy Home to keep Romo from testifying against him. Therefore, the Romo threat was highly probative as to Plaintiff's guilt.

The high probative value of this evidence was not "substantially outweighed" by the danger of unfair prejudice. In *Blake*, the Seventh Circuit discussed the admissibility of threat evidence under Rule 403, holding:

> True enough, like any evidence against a defendant, Pittman's testimony was prejudicial, but it is hard to see how that prejudice was "unfair" or how the probative value could have been outweighed by it. *See* Fed. R. Evid. 403. Courts routinely admit threat evidence to show consciousness of guilt.

286 F. App'x at 340. Similarly, in *United States v. Centracchio*, 265 F.3d 518, 531-32 (7th Cir. 2001) (abrogated on other grounds by *Crawford v. Washington*, 541 U.S. 36, 64 (2004)), the Seventh Circuit held that the district court abused its discretion in excluding evidence of guilt under Rule 403, observing:

> True, the testimony makes the defendants look guilty, but probative evidence is always prejudicial in this literal sense. However, such prejudice is not "undue" and is therefore not subject to exclusion under Rule 403.

Because the high probative value of the Romo threat was not substantially outweighed by the danger of unfair prejudice, this Court erred in excluding it.

This Court's error substantially prejudiced Defendant. Plaintiff's threat to kill Romo's father if Romo testified against him was powerful, non-cumulative evidence of consciousness of guilt. It was also more compelling evidence rebutting Plaintiff's story about his first meeting with Romo than anything admitted at trial. Finally, the error was exceptionally prejudicial in light of this Court's denial of Defendant's motion *in limine* to bar evidence or argument regarding the current prosecution of Juan Carlos Torres, as discussed in Section VI.

**V.      This Court Erred In Granting Plaintiff's Motion *In Limine* To Bar His Juvenile Arrests.**

Plaintiff moved *in limine* to bar his twenty-three juvenile arrests preceding his arrest for the murder of Eric Morro. Defendant responded that the arrests were admissible to explain, among other things, why Plaintiff was tried as an adult. This Court ruled that the fact that Plaintiff had been arrested before was admissible only to explain specific investigative decisions by Defendant. (Transcript of Dec. 12, 2011 PTC at 31:21-32:10, attached hereto as Exhibit 12.)

Dennis Brady, Plaintiff's juvenile probation officer, recommended to the court that Plaintiff be tried as an adult based on his extensive juvenile criminal history. (Deposition of Dennis Brady at 26:24-27:19, attached hereto as Exhibit 13.) The court order granting the State's Attorney's Office's motion to permit Plaintiff to be prosecuted as an adult listed his juvenile criminal history as one of the factors in its ruling. (Court Order, attached hereto as Exhibit 14.) After his two trials, Plaintiff was sentenced to fifty and forty-five years, respectively, in prison. In 1996, Plaintiff was transferred to the adult division of the Illinois Department of Corrections. *See* 730 Ill. Comp. Stat. 5/3-10-7(a) (minors tried as adults eligible for transfer at age 17). If Plaintiff had been tried as a juvenile, he would have been released, at the latest, when he turned twenty-one years old in 2000. *See* 705 Ill. Comp. Stat. 405/5–33(2) (West 1992) ("[t]he commitment of a delinquent to the Department of Corrections shall be for an indeterminate term which shall automatically terminate upon the delinquent attaining the age of 21 years"); *In re L.J.*, 654 N.E.2d 671, 674 (1st Dist. 1995) (statute "mandates that [delinquent charged with murder] be at large when he becomes 21 years old"). By contrast, Victor Romo, who was also charged with murder but tried as a juvenile, was released in January 1997 and only served time in juvenile facilities.

Plaintiff's juvenile criminal history was highly probative on the issue of damages. But for his numerous prior arrests, Plaintiff would have been tried as a juvenile, served far fewer years in prison, and only served time in juvenile facilities, like Victor Romo. Put another way, Brady's recommendation to the court and the State's Attorney's Office's motion to permit Plaintiff to be prosecuted as an adult were intervening acts breaking the chain of causation between Defendant's alleged misconduct and Plaintiff's full damages. *See Duncan v. Nelson*, 466 F.2d 939, 943 (7th Cir. 1972) (error to assess damages based on number of years in prison where chain of causation broken by discretionary sentencing decision). Because the probative value of this evidence was so high, it was not substantially outweighed by the danger of unfair prejudice.

Defendant was substantially prejudiced by this Court's error in granting Plaintiff's motion *in limine*. Plaintiff sought damages for sixteen years' incarceration, most of which was spent in adult facilities, and was awarded $25 million, when only a fraction of his claimed damages could be attributed to Defendant's alleged misconduct.

## VI. This Court Erred In Denying Defendant's Motion *In Limine* To Bar Evidence Or Argument Regarding The Current Prosecution of Juan Carlos Torres.

First, this Court erred in allowing Plaintiff to introduce evidence regarding the current prosecution of Juan Carlos Torres.[6] Plaintiff conceded that "the fact of criminal charges pending against Juan Carlos does not prove (or even tend to prove) that Juan Carlos is guilty of the crime." That is, the charges had extremely limited, if any, probative value as to whether Torres was guilty. Nevertheless, Plaintiff primarily used the charges to prove exactly that: Torres's

---

[6] During the Pretrial Conference, Plaintiff argued Torres's charging, taken in context, showed that his criminal proceedings were terminated in a manner indicative of innocence. First, the charges had minimal probative value on this point given that the State's Attorney's Office joined in Plaintiff's motion to vacate his conviction following their own reinvestigation of the murder. Any limited probative value was substantially outweighed by the danger that the jury would conclude, based on the fact of Torres's prosecution alone, that he was guilty. Second, Plaintiff's use of the charges at trial went far beyond the ostensible grounds for their admission.

guilt. Second, this Court erred in allowing Plaintiff to call Torres as a witness at trial. On January 10, 2012, Plaintiff called Torres as his first witness and asked him a series of questions built on inadmissible evidence developed during the State's Attorney's Office reinvestigation. Torres, as expected, invoked his Fifth Amendment privilege against self-incrimination. Plaintiff argued that Torres's invocation of his Fifth Amendment privilege also proved his guilt. As discussed in Section IV, this Court did not rule that guilt and innocence were only relevant to damages until January 11, 2012. Under this ruling, Plaintiff should have been barred from calling Torres as a witness. Indeed, Plaintiff himself placed Torres's expected invocation of his Fifth Amendment privilege in the category of evidence relevant to liability under *Aguirre*. Pl.'s Brief at p. 4 (D.E. 241). Defendant was substantially prejudiced by this Court's error in denying his motion *in limine* to bar evidence or argument regarding the current prosecution of Torres, as well as by this Court's belated ruling barring Defendant from countering Plaintiff's evidence with highly probative evidence of consciousness of guilt.

## CONCLUSION

For all of the reasons discussed herein, Defendants respectfully request that this Court grant their motion for a new trial pursuant to Fed. R. Civ. P. 59(a).

Respectfully Submitted,

/s/ Joan E. Ahn
One of the Attorneys for Defendant Bogucki

/s/ Terrence Burns
One of the Attorneys for Defendant City of Chicago

| | |
|---|---|
| Andrew M. Hale | Harry Arger |
| Avi T. Kamionski | Terrence Burns |
| Joan E. Ahn | Daniel Noland |
| Andrew M. Hale & Associates | Dykema |
| 53 W. Jackson, Suite 1800 | 10 S. Wacker Dr., Suite 2300 |
| Chicago, IL 60604 | Chicago, IL 60606 |