IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

THADDEUS JIMENEZ, )
           )
         Plaintiff, )      09 C 8081
           )
         v. )      Judge Kennelly
           )
CITY OF CHICAGO, et al. )
           )
         Defendants. )      Jury Trial Demanded

## PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' RULE 50 AND RULE 59 MOTIONS

Arthur Loevy
Jon Loevy
Vince Field
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607

Stuart Chanen
Lisa Carter
VALOREM LAW GROUP
35 East Wacker
Suite 3000
Chicago, IL 60601

Locke Bowman
MacARTHUR JUSTICE CENTER
University of Chicago
375 East Chicago Avenue
Chicago, IL 60611

# Table of Contents

I.  Defendants' <u>Batson</u> Argument Fails To Justify A New Trial............................ 1

    A.  The Court's <u>Batson</u> Ruling Was Correct.................................................. 2

    B.  The Court Did Not Abuse Its Discretion In Fashioning Its
        <u>Batson</u> Remedy ........................................................................................ 4

    C.  Assuming *Arguendo* The Court Erred And Defendants
        Preserved The Issue, Any Hypothetical Error Was Harmless ............. 6

    D.  Defendants Forfeited The Right To Challenge The Court's
        Decision To Not Award Them An Additional Peremptory Strike .......... 9

II. Defendants' Sufficiency Of The Evidence Challenge Should Be Rejected ...... 11

    A.  Defendants' Failure To Bring A Rule 50(a) Motion At The
        Conclusion Of The Evidence Is Fatal To Their Present Rule
        50(b) Motion .......................................................................................... 11

    B.  Even If It Had Been Properly Preserved, Defendants'
        Sufficiency Of The Evidence Challenge Has No Merit ........................ 12

        1.  There Was A Sufficient Evidentiary Basis To Support
            The Jury's Verdict On The Due Process Claim ......................... 12

                The True Circumstances Surrounding Phil
                Torres' False Identification............................................... 13

                Sean Cosmen's Arrest ...................................................... 16

                The True Circumstances Surrounding Larry
                Tueffel's False Identification ........................................... 17

                The True Circumstances Surrounding Tina And
                Sandra Elders' False Identifications ................................ 20

                The Existence And Identity Of The Witness Who
                Led The Police To Victor Romo......................................... 23

                Juan Carlos Torres' Contemporaneous Account............. 24

                The Missing Duke Jacket.................................................. 25

2. There Was A Sufficient Evidentiary Basis To Support The Jury's Verdict On The Malicious Prosecution Claim As Well........................................................................................ 26

Probable Cause ................................................ 26

Malice ............................................................... 28

3. There Was A Sufficient Evidentiary Basis To Support The Jury's Verdict On The Conspiracy Claim ............................ 28

III. The Waiver Of Defendants' Rule 50 Sufficiency Of The Evidence Challenge Cannot Be Avoided Simply By Recasting Their Argument As A Rule 59 Challenge To The Due Process Jury Instruction....................... 29

A. To Justify A New Trial On This Basis, Defendants Would Need To Demonstrate Both That The Court's Instruction Was Inaccurate And That Defendants Were Prejudiced As A Result.......... 29

B. The Court's Due Process Instruction Was An Accurate Statement Of The Law .......................................................... 30

C. Defendants Were Not Prejudiced By The Absence Of A So-Called "Guidepost" Instruction ............................................. 31

IV. Defendants' Complaints About Plaintiff's Closing Argument Fail As Well.......................................................................................... 32

V. The Court Committed No Evidentiary Errors, And Certainly None Of The Magnitude Necessary To Justify A New Trial..................................... 34

A. Legal Standard ......................................................................... 34

B. Defendants' Arguments Fail ................................................... 34

1. Plaintiff's Purported Threat Involving Victor Romo's Father ................................................................................ 34

2. Plaintiff's Juvenile Arrests Not Leading To Convictions ........... 39

3. Carmelo Cortez ............................................................... 42

4. The Current Prosecution Of Juan Carlos Torres ....................... 46

ii

Plaintiff, THADDEUS JIMENEZ, by his counsel, respectfully submits this memorandum in opposition to Defendants' Rule 50 and Rule 59 motions.

## I.   Defendants' <u>Batson</u> Argument Fails To Justify A New Trial

Shirley McKee and Shalonda Tillman were the only African Americans in the entire roughly 30-person venire, and Defendants used two of their three peremptory strikes in an attempt to keep them from serving on the jury. Jimenez objected to those strikes on the ground that they were exercised in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), and the Court agreed with respect to McKee. <u>See</u> Trial Transcript (hereafter, "Tr." all attached as Group Exh. F) at 213. To remedy Defendants' <u>Batson</u> violation, the Court empaneled McKee, and declined to award Defendants an additional peremptory. In addition to not objecting to the Court's refusal to grant them an additional strike after their <u>Batson</u> violation, Defendants did not challenge McKee for cause, and they have never suggested that McKee's serving on the jury violated their constitutional rights.

Defendants nonetheless seek a new trial based on how the *voir dire* process proceeded. Specifically, without citing a single analogous case, Defendants assert that they were improperly denied one of the three peremptory strikes to which they were entitled pursuant to 28 U.S.C. § 1870, thereby warranting "automatic reversal." Def. Rule 59 Mem. at 6. Contrary to Defendants' unsupported contention, the case law overwhelmingly shows that Defendants are not entitled to a new trial because: (1) the Court's <u>Batson</u> decision was correct; (2) the Court's remedy for the <u>Batson</u> violation was not an abuse of discretion; (3) even had the Court's <u>Batson</u> ruling or chosen remedy been erroneous, any such error was harmless; and (4) Defendants forfeited the right to challenge the Court's decision to not award them an additional peremptory by failing to voice any objection to that decision during the time period in which the Court could have corrected the purported error.

### A.    The Court's <u>Batson</u> Ruling Was Correct

Whether a party has violated <u>Batson</u> must "be determined by the trial judge, who is in the best position to evaluate the demeanor of the attorney exercising the challenge." <u>United States v. Hendrix</u>, 509 F.3d 362, 370 (7th Cir. 2007); <u>see also</u> <u>United States v. Roberts</u>, 163 F.3d 998, 999 (7th Cir. 1998) ("<u>Batson</u> requires the judge to determine whether a race-neutral reason offered for a challenge is honest, and district judges are much better situated than appellate judges to evaluate the honesty of the lawyers who practice in district court."). A <u>Batson</u> ruling may be reversed only if it was clearly erroneous, <u>e.g.</u>, <u>Dunham v. Frank's Nursery & Crafts, Inc.</u>, 967 F.2d 1121, 1124 (7th Cir. 1992), and a ruling is clearly erroneous only if it leaves a reviewing court with a "definite and firm conviction that a mistake had been made." See <u>Alverio v. Sam's Warehouse Club, Inc.</u>, 253 F.3d 933, 941 (7th Cir. 2001) (internal quotation omitted). In determining whether a trial court's <u>Batson</u> ruling was clearly erroneous, reviewing courts give "great deference to the [trial] judge's determination of discriminatory intent." <u>Alverio</u>, 253 F.3d at 941.

Defendants accurately summarize the three-step process for analyzing <u>Batson</u> challenges: (1) the party making the challenge must present a *prima facie* case of discrimination; (2) the challenged party must then articulate a race-neutral explanation for the strike; and (3) the court must determine whether the party making the <u>Batson</u> challenge has proved purposeful discrimination. Def. Rule 59 Mem. at 6. In the present case, Defendants concede that Jimenez presented a *prima facie* case of discrimination, but contend that the Court erred by concluding that Defendants did not proffer a sufficient race-neutral explanation for attempting to strike McKee. Contrary to Defendants' contention, the Court's ruling was correct, and it certainly was not clearly erroneous.

Defendants attempted to defend striking McKee on the ground that her great-nephew (*i.e.*, a sibling's child's child) previously served time for murder. Tr.

2

209. The Court appropriately rejected this explanation, as McKee stated unambiguously that she would be impartial and that her great-nephew was not wrongfully convicted or treated unfairly. Id. at 79, 213. That judges in other cases may have permitted the removal of jurors whose relatives were convicted of the same crime as the accused[1] does not mean that it was proper for Defendants to strike McKee in this case or that the Court clearly erred by sustaining Jimenez's Batson challenge.

In any event, Defendants' purported rationale for striking McKee applied with even more force to Edward Casey, a white juror who Defendants chose not to strike despite the fact that he himself spent several years in prison for a drug conviction. Tr. 153. Casey also (a) had "many [other] incidents" with police officers as a long-time member of a motorcycle club; (b) felt that his criminal defense attorney had treated him unfairly in the process leading to his drug conviction; and, to the best of Plaintiff's counsel's recollection, © indicated membership on his juror questionnaire in the progressive advocacy group MoveOn.org (Plaintiff had to return his copy of the questionnaire, but perhaps the Court has it). Tr. 153, 211-212.[2] Numerous courts have found Batson violations where minorities were struck for reasons that applied even more strongly to non-minority jurors, and the Court was well within its discretion to so find here. See United States v. Taylor, 636 F.3d

---

[1] See Def. Rule 59 Mem. at 6-7, citing, *inter alia*, United States v. Lampkins, 47 F.3d 175, 178 (7th Cir. 1995).

[2] When ruling, the Court further noted that Casey "expressed some concerns about fairness. . ." Tr. 213. Technically, Casey's answers on the transcript page state that he could be fair, but the Court was presumably referring to the fact that those of us who had the opportunity to observe his demeanor could not help but note his hesitation and equivocation in response to the fairness-related questions. That is precisely why the case law leaves this sort of determination to the discretion of the trial court. Cf. Patton v. Yount, 467 U.S. 1025, 1038 (1984) (determination of juror bias is "essentially one of credibility, and therefore largely one of demeanor"); United States v. Ray, 238 F.3d 828, 836 (7th Cir. 2001) ("We afford great deference to the district court based on the judge's unique opportunity to assess juror credibility during *voir dire*"); United States v. Warner, 498 F.3d 666, 678 (7th Cir. 2007) (juror credibility findings are "binding on appeal unless the district court judge has chosen to credit *exceedingly* improbable testimony") (emph. in original).

901, 903-04 (7th Cir. 2011) (ordering new trial where party attempted to strike African-American jurors but not similarly-situated jurors of other races); see also United States v. Williamson, 533 F.3d 269 (5th Cir. 2008) (same); Davidson v. Harris, 30 F.3d 963, 965 (8th Cir.1994) (same).[3]

### B. The Court Did Not Abuse Its Discretion In Fashioning Its Batson Remedy

As Defendants correctly point out, parties in civil cases are entitled to three peremptory challenges. 28 U.S.C. 1870. In this case, Defendants used three peremptory challenges, and two of their three strikes resulted in jurors being excluded. Tr. 206-209, 213-215. The third strike drew an objection that it had been used improperly, an objection the Court sustained.

Without citing any authority, Defendants assert that "[t]he proper sanction for discriminating against a juror is having the juror seated." Def. Rule 59 Mem. at 4. Although seating the challenged juror is one appropriate remedy, it is not the only one. Contrary to Defendants' unsubstantiated suggestion otherwise, courts have broad discretion to fashion a remedy for Batson violations, see, e.g., Kentucky v. Batson, 476 U.S. 79, 100 n.24 (1986), and courts are not required to award additional peremptory strikes to parties who violate Batson. See, e.g., Rivera v. Illinois, 556 U.S. 148, 129 S. Ct. 1446, 1455 (2009) ("mistaken denial of a state-provided peremptory challenge does not, at least in the circumstances we confront here," require reversal). To the contrary, multiple courts have held that declining to award parties additional peremptory strikes is an appropriate remedy for Batson violations. See United States v. Walker, 490 F.3d 1282, 1294-95 (11th Cir. 2007)

---

[3] This is not the first time Bogucki has lost a Batson challenge. In 2010, Judge Castillo found that lawyers representing Bogucki in the Warfield case also used peremptory strikes in a discriminatory fashion to improperly exclude an African American juror. Warfield v. City of Chicago, 679 F.Supp. 2d 876, 882-83 (N.D. Ill. 2010). At the City's request, this finding was vacated months later as part of a global settlement with the Warfield plaintiffs, and is thus technically void.

(affirming decision to not provide replacement peremptory strikes when party violated Batson); United States v. Aleman, 246 F. App'x 731, 735 (2d Cir. 2007) (explaining that trial court's refusal to award additional peremptory strikes after Batson violation "is entirely in keeping with both the goal of Batson and its clear statement that trial courts retain broad discretion to fashion an appropriate remedy for a violation of its rule"); Gabe v. United States, 2009 WL 50161, at *3 (S.D. Ga. Jan. 6, 2009) ("There is no hard and fast rule requiring a district court to give 'replacement strikes' to a litigant who has misused his prior peremptory challenges"); Peetz v. State, 180 S.W.3d 755, 760 (Tex. App. Ct. 2005) (affirming decision to not award additional strike after Batson violation, and noting that having a strike not result in juror's removal due to a Batson violation "is not the same as not exercising [the] strikes, which is guaranteed by statute").

Defendants' inability to cite any cases that support their argument is damning. The lone case on which they rely, Maloney v. Plunkett, 854 F.2d 152 (7th Cir. 1988), is inapposite. In Maloney, the Seventh Circuit vacated a trial court's order that would have discharged a jury that had been seated to hear a civil trial, and then seated an entirely new jury without allowing either party any peremptory challenges. Maloney, 854 F.2d at 153. The Seventh Circuit made clear, however, that it may not have vacated the trial court's order had the trial court "given a reason for" its decision to seat a jury without allowing any peremptory challenges. Id. at 154. Absent any explanation, the Seventh Circuit inferred that the trial court simply "was annoyed with the parties and didn't want the bother at a new *voir dire* of trying to prevent them from again exercising their peremptory challenges on what he considered improper, indeed deeply offensive, grounds[,]" including in violation of Batson. Id.

When Maloney was decided, moreover, the Seventh Circuit had not yet held that Batson applied to civil cases. Id. Therefore, the trial court essentially sanctioned the parties because it found their actions personally offensive, not

5

because the parties violated established law by making race-based strikes. The Seventh Circuit did not decide "whether there might be legal grounds other than equal protection for restricting the use of peremptory challenges notwithstanding section 1870." Id. In other words, the Seventh Circuit did not decide whether taking away a party's statutorily-mandated strikes would be appropriate if there was a legal justification for doing so.

Two years after it decided Maloney, the Seventh Circuit held in Dunham v. Frank's Nursery & Crafts, Inc., 919 F.2d 1281 (7th Cir. 1990) that Batson applies to civil cases and, as stated above, multiple courts since Maloney have refused to grant additional peremptory strikes to parties who violate Batson. See, e.g., Walker, 490 F.3d at 1294; Aleman, 246 F. App'x at 735. Defendants cite no cases, and plaintiff is aware of none, requiring trial courts to award additional peremptory challenges to parties that violate Batson. Indeed, such a rule "would improperly reward [Defendants] for violating Batson," see Walker, 490 F.3d at 1282, or, at the very least, encourage abusive overreaching by removing the possibility of negative consequences for attempting discriminatory strikes.

C. **Assuming *Arguendo* The Court Erred And Defendants Preserved The Issue, Any Hypothetical Error Was Harmless**

Defendant Bogucki made certain admissions on the record after the liability phase concluded. Tr. 2979-80.[4] Even assuming the Court erred by allowing McKee to serve as a juror and by not granting Defendants another peremptory strike, those errors were harmless in light of Bogucki's admissions. See Mason v. Southern Illinois Univ., 233 F.3d 1036, 1047 (7th Cir. 2000) (any error in excluding testimony

---

[4] Post-trial, counsel for the parties have not agreed about whether Plaintiff should be permitted to rely on the specific statements for purposes of appeal, or even reproduce them in this brief. Erring on the side of caution, Plaintiff has not set forth the exact nature of Bogucki's statements, and has cleared with defense counsel prior to this filing the use of the phrase "certain admissions" so the issue can be presented to the Court for an adjudication of what use can be made of them.

was harmless because it "did not deprive [plaintiff] of a 'substantial right' (as required by Fed. R .Civ. P. 61 and Fed. R. Evid.103(a)) in that we do not think the outcome would have been different but for the excluded testimony"); see also Brandt v. Vulcan, 30 F.3d 752, 760 n.13 (7th Cir. 1994) (error that does not "call into question the fundamental fairness of the trial" is harmless).[5]

Even without Bogucki's admissions, any error was harmless for another, equally fundamental reason. As noted above, Defendants did not challenge McKee for cause. In fact, no one who Defendants challenged for cause served on the jury, and Defendants have not provided any evidence that any of the jurors were biased. As such, any error was necessarily harmless and cannot justify a new trial. See Johnson v. Grady Way Station LLC, 448 F. App'x 778, 780 (9th Cir. 2011) (potential Batson error harmless where plaintiff "did not challenge any juror for cause at trial" or produce "any evidence at all that a juror on his panel was biased").

At bottom, Defendants were entitled to a jury trial pursuant to the Seventh Amendment, and they received such a trial. Defendants were not entitled to the jury of their choice. Even in the criminal context, which implicates the Sixth Amendment right to a fair trial by an impartial jury, "[a] defendant is entitled to an impartial jury, not to a jury of any particular composition or assembled by any particular means." See United States v. Boyd, 86 F.3d 719, 723 (7th Cir. 1996), citing Holland v. Illinois, 493 U.S. 474, 482-83 (1990). That Defendants purportedly lost a peremptory to which they were statutorily entitled does not change the analysis. Where, as here, "a defendant is tried before a qualified jury composed of

---

[5] Bizarrely, the City argues that it had "no notice" of the punitive damage proceedings, and thus no "opportunity to object." Def. Rule 59 Mem. at 1 n.1. The City fails to specify what objection it would have had standing to assert, but its contention that it had no notice that there was going to be a punitive damage proceeding is frivolous. In fact, the City's lawyers were present in the courtroom for whatever parts of the proceedings they wished to attend, including (if we are not mistaken, and if we are, we urge the Defendants to correct us in their Reply) the verdict, which was followed immediately by the punitive damage phase.

7

individuals not challengeable for cause, the loss of a peremptory challenge due to a state court's good-faith error is not a matter of federal constitutional concern" and does not warrant automatic reversal of a verdict. Rivera, 129 S. Ct. at 1453.[6]

Notwithstanding the Supreme Court's decision in Rivera, Defendants maintain that "automatic reversal" is warranted here because Rivera did not "address the consequences of the erroneous denial of a peremptory challenge guaranteed by 28 U.S.C. 1870." Def. Rule 59 Mem. at 9. This is unpersuasive. Rivera's "reasoning is not unique to the state court system, nor does its holding suggest that the Supreme Court would come to a different conclusion regarding the federal system." United States v. Lindsey, 634 F.3d 541, 550 (9th Cir. 2011) (affirming conviction of criminal defendant who was improperly denied a peremptory strike). For more than sixty years, courts have applied harmless-error review to errors that do not implicate constitutional rights. See, e.g., Kotteakos v. United States, 328 U.S. 750, 776 (1946). Errors are harmless, and thus do not

---

[6] Relying on *dicta* from United-States v. Martinez-Salazar, 528 U.S. 304, 316 (2000), Defendants contend that they are entitled to a new trial because the Court's ruling on the Batson challenge "resulted in the seating of a juror who was challengeable for cause." Def. Rule 59 Mem. at 8. Defendants ignore the language in Martinez-Salazar that forecloses this contention, namely that a criminal defendant would be entitled to a new trial if the trial court improperly declined to remove a juror for cause *and* the defendant "properly preserved his right to challenge the trial court's failure to remove" the juror. Martinez-Salazar, 528 U.S. at 316-317 (internal quotation and citation omitted). Unlike the hypothetical criminal defendant discussed in Martinez-Salazar, Defendants here chose not to challenge McKee for cause, so they cannot now complain that McKee should have been removed for cause. See United States v. Brazelton, 557 F.3d 750, 753-55 (7th Cir. 2009) (a party may not raise a for-cause challenge after a verdict is reached); see also Zito v. United States, 64 F.2d 772, 773 (7th Cir. 1933) ("the failure to challenge a juror for cause is waived and objection cannot be first urged after verdict"). Similarly, Defendant's citation to United States v. Eubanks, 591 F.2d 513, 517 (9th Cir. 1979), a case in which a defendant received a new trial based on implied juror bias of which defendant was not aware until after his trial, provides no support for Defendants' contention that they are entitled to a new trial despite not challenging McKee for cause. The "idea of presumed bias is reserved for extreme cases, such as when a juror is a close relative of a party or victim in the case." United States v. Tucker, 243 F.3d 499, 509 (8th Cir. 2001). See also Remmer v. United States, 347 U.S. 227 (1954) (attempted bribe of juror for favorable verdict did not require finding of implied bias).

warrant reversal, "unless they had a 'substantial and injurious effect or influence on the jury's verdict.'" See Harris v. Davis, 874 F.2d 461, 465 (7th Cir. 1989), quoting Kotteakos, 328 U.S. at 776.

Defendants also seek support for "automatic reversal" in United States v. Harbin, 250 F.3d 532 (7th Cir. 2001), but that case does not even moderately support their position. In Harbin, the Seventh Circuit held that allowing a prosecutor to use a peremptory strike to remove a juror mid-trial, without any notice to the defendants that such a procedure would be permitted, violated the defendants' "Fifth Amendment due process right to a fair trial as well as their Fifth Amendment right to the intelligent exercise of their peremptory challenges." Id. at 537. There are no analogous concerns in a civil case, but even assuming otherwise for the sake of argument, those concerns were not present in this case. Unlike the unprecedented mid-trial use of a peremptory in Harbin, this case involved a straightforward application of Batson, and Defendants certainly had notice that they were not permitted to exercise peremptory challenges in violation of the Constitution. The Court's decision did not "skew the jury selection process" in either party's favor, let alone in a manner requiring reversal.

### D. Defendants Forfeited The Right To Challenge The Court's Decision To Not Award Them An Additional Peremptory Strike

In addition to all of the foregoing, Defendants forfeited the right to review by failing to make a contemporaneous objection to the Court's decision not to award them an additional peremptory. Parties forfeit any purported errors by not bringing those errors to the trial court's attention in a timely fashion. See, e.g., United States v. Olano, 507 U.S. 725, 731 (1993) ("a constitutional right, or a right of any other sort, may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it") (internal quotation omitted); see also Gonzalez v. Volvo of Am. Corp., 752 F.2d

295, 298 (7th Cir. 1985) (per curiam) ("[D]efendant-appellant waited until the jury had returned an unfavorable verdict to complain to the trial court that plaintiffs' closing argument had been improper ... This court has not hesitated in the past to bind a party to its strategic decision to sit silent in the face of claimed error by refusing relief when the party complains because the result is unfavorable."). The forfeiture doctrine applies to errors concerning the exercise of peremptory strikes, Lindsey, 634 F.3d at 550,[7] as well as constitutional, statutory, and rule-based errors. See United States v. Macedo, 406 F.3d 778, 789 (7th Cir. 2005) (defendant forfeited appeal of purported misapplication of statutory sentencing guidelines by failing to object in trial court); see also Oberg v. Allied Van Lines, Inc., 11 F.3d 679, 684 (7th Cir. 1993) (party forfeited objection to trial court's misapplication of federal rules of civil procedure and local rules).

Defendants failed to object when the Court declined to reward them with another peremptory strike after they violated Batson. Instead, Defendants stayed silent after the court ruled, and then remained silent for the entire two week trial and, in fact, "waited until the jury had returned an unfavorable verdict to complain" about the purportedly improper denial of a peremptory strike. See Volvo of Am. Corp., 752 F.2d at 298. Defendants' strategic choice not to object deprived the Court of any opportunity to correct the purported error, and they have thereby forfeited the right to review even had the Court erred, which it did not.

---

[7] In Lindsey, the Ninth Circuit held that a criminal defendant forfeited his rights regarding the number of peremptory strikes to which he was entitled by failing to object when the trial court miscounted the number of available strikes and thus improperly denied the defendant one of his strikes. Because it was a criminal case, the court conducted a plain-error review before holding that the defendant was not entitled to a new trial, as he "advance[d] no serious argument of prejudicial error" and did "not claim that his jury was biased in any way." Id. at 551. Defendants do not ask this Court to undertake a review for plain error and, in any event, Seventh Circuit law precludes such a review. See Deppe v. Tripp, 863 F.2d 1356, 1364 (7th Cir. 1988) ("a plain error doctrine, at best, has an extremely limited application in civil litigation").

## II.     Defendants' Sufficiency Of The Evidence Challenge Should Be Rejected

After considering dozens of exhibits and hearing from 34 witnesses over the course of a two-week trial, the jury found for Plaintiff on all counts. Defendants contend that there was no rational basis for the jury's verdict, but their argument fails for multiple reasons.

Most importantly, there plainly was a rational basis for the jury's findings, particularly given the broad deference afforded jury verdicts on post-trial review. Regardless, however, the Defendants have waived any such argument by failing to bring a Rule 50(a) motion on either the due process or the malicious prosecution claim prior to submission of the case to the jury, an election which precludes post-trial Rule 50 relief. Plaintiff begins with the latter point.

### A.     Defendants' Failure To Bring A Rule 50(a) Motion At The Conclusion Of The Evidence Is Fatal To Their Present Rule 50(b) Motion

After the close of the evidence, Defendants moved for a directed verdict, but only on Plaintiff's conspiracy claim, and not any other. Tr. 2722-30. The absence of any Rule 50 motion with respect to Plaintiff's two primary claims is dispositive.

Indeed, Rule 50 is unambiguous, as is the case law surrounding it: "[b]ecause the Rule 50(b) motion is only a renewal of the preverdict [Rule 50(a)] motion, it can be granted only on grounds advanced in the preverdict motion." Thompson v. Memorial Hosp. of Carbondale, 625 F.3d 394, 407 (7th Cir. 2010), quoting Wallace v. McGlothan, 606 F.3d 410, 418 (7th Cir. 2010). Where, as here, a party attempts to raise an argument in a Rule 50(b) motion not specifically presented in a Rule 50(a) motion prior to submission of the case to the jury, then the argument is waived, and the Rule 50(b) motion must be denied. Id. Dating at least as far back as Downes v. Volkswagen of Am., 41 F.3d 1132 (7th Cir. 1994), a long line of Seventh Circuit cases repeatedly makes clear that Rule 50 is applied "strictly." Id. at 1139-40.

There is no way for Defendants to escape this waiver. Because they do not even attempt to suggest any way out, there is no argument for Plaintiff to rebut.

11

**B.** **Even If It Had Been Properly Preserved, Defendants' Sufficiency Of The Evidence Challenge Has No Merit**

Generally speaking, "[a]ttacking a jury verdict is a hard row to hoe." Sheehan v. Donlen Corp., 173 F.3d 1039 (7th Cir. 1999). Parties seeking to set aside a verdict as contrary to the manifest weight of the evidence can prevail only if "no rational jury" could have reached the decision at issue. King v. Harrington, 447 F.3d 531, 534 (7th Cir. 2006). Such challenges face what the Seventh Circuit characterizes as a "daunting task, given the deferential standard that applies to such reviews," Cruz v. Town of Cicero, 275 F.3d 579, 586 (7th Cir. 2001), and they "rarely succeed because [appellate courts] owe great deference to the jury's verdict." United States v. Avila, 557 F.3d 809, 815 (7th Cir. 2009). Still more deference is appropriate in cases, such as this one, involving "simple issues but highly disputed facts." Moore ex rel. Estate of Grady v. Tuelja, 546 F.3d 423, 427 (7th Cir. 2008).

**1.** **There Was A Sufficient Evidentiary Basis To Support The Jury's Verdict On The Due Process Claim**

Plaintiff alleged a Brady-based due process violation in that evidence was withheld from him that was both material and exculpatory. Manning v. Miller, 355 F.3d 1028, 1034 (7th Cir. 2004). Exculpatory evidence is "material within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (internal quotation marks omitted). As the Supreme Court reaffirmed earlier this year, "[a] reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." Smith v. Cain, 565 U.S. --, 132 S. Ct. 627, 629 (Jan. 10, 2012), citing Cone v. Bell, 556 U.S. 449 (2009).

Defendants' motions seek to isolate ten pieces of withheld evidence, asking whether each is sufficient to support liability standing alone. This approach is

12

contrary to the applicable law, under which the suppressed evidence is to be
"considered collectively, not item by item." Kyles, 514 U.S. at 433-34 (the withheld
evidence is reviewed for its cumulative impact, its utility to the defense, as well as
its potentially damaging impact on the prosecution's case) (citing Bagley); Banks v.
Reynolds, 54 F.3d 1508, 1518 (10th Cir. 1995) ("[courts] do not consider each piece
of withheld evidence in isolation"). Moreover, what might be considered
insignificant evidence in a strong case might suffice to disturb an already-
questionable conviction. United States v. Agurs, 427 U.S. 97, 113 (1976).[8]

### The True Circumstances Surrounding Phil Torres' False Identification

At Plaintiff's criminal trial, Phil Torres (and Defendant Bogucki) testified
that Phil reached out to the police by phone in the early morning hours after the
shooting to report that he had seen Plaintiff shoot Morro while wearing a Duke
jacket. Tr. 2687-89. According to the police reports and Phil's criminal trial
testimony, he had been looking out his window and recognized Plaintiff as someone
known to him by name, case closed. See Plaintiff's Exhibit ("PX") 3; Tr. 2688-89.

At the civil trial, Plaintiff proved that was not what really happened.
Viewing the testimony favorably to Plaintiff, Phil told the Defendants he never even
saw the shooter and did not know his identity, which was true. Tr. 2666, 2698; see
also Tr. 852 (Larry's testimony that Phil was not visible). Though Bogucki pulled

---

[8] Because the verdict requires all inferences to be drawn in Plaintiff's favor, the
time for Defendants to try to dispute the weakness of the criminal case has passed.
And the weakness was indeed overwhelming. The surviving victim, Larry Tueffel,
failed to identify Plaintiff when first interviewed immediately after the shooting, as
did Phil Torres, who even Bogucki conceded was a problematic witness for many
reasons, Tr. 1079-87, not the least of which was that he was inside his apartment at
the time of the shooting. Sandra Elder failed the lineup identification (Tr. 1151-53)
and neither she nor her daughter Tina were really even present on the street during
the shooting. Tr. 355, 860. There was no other evidence (physical, forensic, etc.) of
any kind connecting Plaintiff to the crime, and the true accomplice and his father
were adamant that the real shooter was someone other than Plaintiff, namely, Juan
Carlos Torres, who confessed to the crime on audiotape. Tr. 362-63, 2048.

13

his name from the original incident report, Phil never actually claimed to be a witness, and did not want to be a witness. Id. at 2674, 2682, 2701.[9]

Assuming that Phil did initiate re-contact with the police late that night (rather than the other way around), the most he could or would have told them was that he heard about a possible altercation hours before the murder involving Plaintiff and the victim. Tr. 2665, 2674, 2676, 2679. Phil believes he heard from his sister that Plaintiff might have gotten into an argument with the victim, and he "might have" passed on to the police the hearsay tip that his sister believed Plaintiff might have been involved. Id. at 2664-65, 2675-77, 2689-90, 2692-93, 2701, 2711.

At the civil trial, Sean Cosmen supplied the missing link for how Plaintiff was identified. Sean was one of the participants in a "group interview" at the Cosmen apartment in the early morning hours following the shooting. Tr. 1063-65; 2582-83.[10] Sean, who did not himself see the shooting, "put two and two together" upon hearing that the shooter wore a Starter jacket. Tr. 2578-83. Sean was the one who told the Area 5 detectives that the description matched Plaintiff, and even drove in the detectives' car to show them where to find Plaintiff. Id.

---

[9] Citing to transcripts that were not referenced at the civil trial, Defendants contend that it came out at the criminal trial that Phil was not claiming to be a witness. The argument overlooks two problems. First, Defendants cannot challenge the sufficiency of the evidence supporting a jury verdict by citing to evidence that is not even part of the trial record. Defendants failed to introduce the subject matter contained in Exh. 5 to their Rule 59 Mem. at the civil trial (presumably because it was totally inconsistent with the defense theory of the case) so this transcript should be stricken, or at least disregarded. That problem aside, Phil's criminal trial testimony, which basically just parrots the story in the police reports, does not contain anything close to the revelations that came out at the civil trial. And if the Court declines to strike Def. Exh. 5, the next transcript page following those cited by the Defendants clarifies that Phil's reluctance to come to court was elicited by the prosecutor on redirect to make the point that Phil was afraid of testifying against Plaintiff and did not want to get involved -- not, as he later testified at the civil trial, that he wasn't claiming to be a witness at all. See Exhibit A at 108.

[10] According to the uncontradicted testimony of Plaintiff's police practices expert Gregg McCrary, Bogucki conducted and documented this interview in a highly unusual and inappropriate fashion. Tr. 1609-10. By aggregating witnesses' stories into a single consistent account in a manner inconsistent with standard police practices, Bogucki effectively concealed who had really said what. Id.

Sean's involvement in identifying and locating Plaintiff was totally omitted from the police reports, and was unknown at the time of Plaintiff's criminal trials. This would have been critical cross-examination. At the criminal trial, Plaintiff was convicted because Phil testified that he knew and immediately recognized Plaintiff from his window, and Bogucki claimed that Phil related the same to him. Tr. 1053. Decades later, Sean revealed a completely different story, *i.e.,* that Phil had not recognized Plaintiff after all, and that Sean was the one who told everyone that Plaintiff wore a Starter jacket. Bogucki's decision to conceal the true circumstances of the identification, and instead recast it as something other than what it was, is a quintessential <u>Brady</u> violation, and one which Defendants' post-trial motions totally ignore. <u>Newsome v. McCabe</u>, 319 F.3d 301, 302-05 (7th Cir. 2003) (liability where the officers "concealed exculpatory evidence -- the details of how they induced the witnesses to finger Newsome. . . Newsome's lawyers needed, but did not receive, information vital to probe whether manipulation occurred.").

Other avenues for cross-examination were suppressed as well. Contrary to the detectives' claim that Phil volunteered to help solve the crime, Phil did not in fact want to go to the station; he was high, and would not have gone with the police if given the choice. Tr. 2665-66, 2674, 2681 ("I told you I was high man. Fuck."). Phil also never claimed to have been certain about the shooter's identity. <u>Id.</u> at 2682, 2696, 2704. At most, he explained his sister's "earlier altercation" theory that the shooter might have been Plaintiff. <u>Id.</u> at 2711. The police kept telling Phil that other people (including his sister) were claiming that the shooter was in fact Plaintiff, and finally, Phil agreed to say it was Plaintiff. <u>Id.</u> at 2709.

The true nature of how Phil came to be a witness against Plaintiff was further concealed by the manner in which Bogucki created the Torres GPR report, which, contrary to regular police practices, contains no dates, times, locations, or list of people present for the interview(s). PX 3; Tr. 1045-47. At trial, Bogucki

15

revealed for the first time ever (thereby retracting his deposition testimony in embarrassing fashion, Tr. 1077-78) that the final two lines on his Torres GPR -- the only lines implicating Plaintiff as the shooter -- were not actually added until after his first interview of Phil had already been completed. Tr. 1044-45. As Bogucki was forced to concede, that highly exculpatory fact is not apparent from the face of the document. PX 3. <u>Smith v. Cain</u>, 565 U.S. --, 3, 132 S.Ct. 627, 629-31 (2012).[11]

**Sean Cosmen's Arrest**

The revelation that Sean Cosmen was hardly the disinterested observer he was held out to be at the criminal trials also qualified as concealed <u>Brady</u> material. As Defendants point out, Sean supplied the motive for the shooting, an alleged altercation with the victim involving gang signs that supposedly occurred earlier in the day. What was missing from all of the police reports, however, was the fact that Sean was himself arrested (or at least placed in handcuffs and put on the ground) and placed in a show-up in connection with the shooting because of his Georgetown jacket. Tr. 2571-72. Defendants had no explanation for the omission of all references to these events, the disclosure of which would have helped to cross-examine the finger that Sean was pointing at Plaintiff.[12]

---

[11] <u>Cain</u> is especially instructive. In <u>Cain</u>, as here, the State's murder case was built entirely on eyewitness testimony. <u>Cain</u>, 132 S.Ct. at 629-30. What was withheld were certain statements by the eyewitness contained in the lead investigator's notes that sharply conflicted with the eyewitness' trial testimony identifying the petitioner as the perpetrator. The sole question before the Court was whether these statements were sufficiently material to justify postconviction relief. Chief Justice Roberts' opinion acknowledged that impeachment evidence is not automatically material where the State has other strong evidence of guilt. <u>Id.</u> at 630. However, where eyewitness testimony was the "only evidence linking Smith to the crime" and where the undisclosed evidence strongly undermined that eyewitness testimony, eight of the Supreme Court Justices (all but Justice Thomas) agreed that the undisclosed notes containing impeaching witness statements "alone suffice to undermine confidence in Smith's conviction." <u>Id.</u>

[12] Defendants' motion points out that Sean confirmed in response to Mr. Hale's questioning that he previously admitted at the criminal trial to being "picked up" by the police on the night of the shooting, Tr. 2565-67, but that limited reference (for which there are no police reports) is the sum total of the evidence in the record on the point, and it is far less than the truth as revealed at the civil trial.

16

### The True Circumstances Surrounding
### Larry Tueffel's False Identification

Defendants correctly note that Larry was a very important witness. Plaintiff was convicted in no small part because Larry and the police all testified that Larry, who knew Plaintiff well, saw his friend walk up and shoot Morro. Tr. 944-48.

It was undisputed that Larry originally only described the shooter, and then claimed at the criminal trial that he had been afraid at first to give Plaintiff's name. Tr. 1006, 1239. According to Bogucki, when he returned to Larry's house late that night and urged him to tell the truth in light of Phil's (purported) identification, Larry immediately agreed that "it was TJ." Id. at 1101, 1110-11. By Bogucki's telling, the entire interaction lasted just a few minutes at Larry's home. Id.

It turned out, however, that this was not at all the way this identification occurred. According to Larry, he was roused from his sleep at 2 or 3 a.m. and brought back to the police station, where he was repeatedly confronted with Bogucki's insistence that other witnesses were saying the shooter was Plaintiff. Tr. 873-74. Larry *expressly denied that the shooter was Plaintiff,* telling Bogucki that he knew Plaintiff, and that Plaintiff had not been present. Tr. 875-78, 881, 934-36, 983. Bogucki told Larry he was lying to cover for Plaintiff and yelled at him that he was in trouble; more seriously, Bogucki threatened Larry with jail. Id.

This went on for multiple hours, with Bogucki refusing to accept Larry's denials about Plaintiff's involvement. Id. Crediting Larry's description, he spent hours telling his interrogators they were wrong about Plaintiff before finally succumbing to exhaustion and adopting Bogucki's insistence that Plaintiff was the shooter, when in fact he knew that Plaintiff was innocent. Id. The truth, in other words, was starkly different from the police version presented in their reports and at the criminal trial. Kyles v. Whitley, 514 U.S. 419, 446 (1995) (Brady is violated where suppressed evidence could have been used to cross-examine police witnesses about the good faith reliability of their investigation).

17

Unlike appellate judges, this Court and the civil jury had the opportunity to personally observe Larry on the stand. Based on Larry's weak and vulnerable demeanor, it was perfectly reasonable for the jury to conclude that the totality of these previously-undisclosed tactics could have been viewed by a jury as sufficiently coercive to persuade a 14-year old version of this witness to falsely implicate his friend. See also Tr. 987 (Larry's mini-breakdown on the stand when confronted with repetitive questioning). At a minimum, the civil jury was well within its rights to conclude that, had the truth come to light, "the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." Cain, 132 S.Ct. at 629-30, quoting Kyles, 514 U.S. at 434.

Without denying the aforementioned details were suppressed, Defendants nonetheless contend that Brady could not have been violated because Plaintiff heard elevated voices at the police station, and because Larry later told him "they made me do it." Def. Rule 59 Mem. at 14. Neither argument has merit. With respect to the former, Plaintiff clarified at trial that he could not actually make out any of the words in the nearby room at the station, and really only suspected that Larry was involved in the yelling. Tr. 735-36. As to Larry's ambiguous statement to Plaintiff that an undefined-"they" made him do it, a jury could reasonably find this insufficient to defeat a Brady violation. See Dckt. 151 ("S.J. Mem. Op.") at 14-15 (summary judgment rejection of Defendants' Gauger argument because "Mr. Jimenez had knowledge of only a small part of the allegedly coercive circumstances of Tueffel's middle-of-the-night interview"). Larry also thwarted all attempts by Plaintiff's defense lawyer, Kendall Hill, to interview him, stating: "I don't have to tell you anything." Tr. 918-19, 952, 990. Mr. Hill explained that this was not an uncommon reaction by prosecution witnesses, who would typically be subpoenaed to, and then essentially sequestered in, the prosecutors' offices until their testimony. Tr. 2144. See also Tr. 2148-49 (ASA Gaughan's admission that he informed his witnesses they could tell defense attorneys that they did not wish to talk to them).

For these reasons, Defendants' heavy reliance on the "reasonable diligence" language from Holland v. City of Chicago, 643 F.3d 248 (7th Cir. 2011) continues to be misplaced. Plaintiff distinguished Holland at length in his response to summary judgment, and in the interests of conserving space, incorporates those arguments here rather than repeating them. See Dckt. No. 117 at 18-21. In any event, this Court has already considered and rejected Holland's applicability to this fact pattern, holding that it is easily distinguishable. S.J. Mem. Op at 16-17, citing Boss v. Pierce, 263 F.3d 740 (7th Cir. 2001) (an argument like the one raised here "stretches the concept of reasonable diligence too far"). If Defendants disagreed with the Court's legal analysis and conclusion, they could have taken a qualified immunity appeal, but they elected not to do so.[13]

A final point bears mention. Defendants had every opportunity to introduce evidence about what came out at the criminal trials, and did so liberally during Larry's exam and that of the prosecutor. When examining Larry, for example, defense counsel walked Larry through a great deal of his testimony from Victor's and Plaintiff's trials (Tr. 943-50, 954-73) and counsel picked and chose which parts of Larry's criminal trial testimony to discuss with the prosecutor. Tr. 2146-49.

Immediately before the evidence closed for good, Plaintiff's counsel informed this Court that Defendants had neglected to introduce everything Larry had said at the criminal trial, and expressed Plaintiff's willingness to stipulate to the fact that Larry had originally testified about what could be fairly described as more suggestive tactics by Bogucki than the civil jury had heard. Tr. 2754-57 ("Our

---

[13] Without imputing any ill-motive to the defense, it appeared that they were eager to conclude this trial before Juan Carlos' criminal trial, given their theory of the case. Regardless of why, Bogucki did forgo a qualified immunity appeal, which waives the issue because "once the trial has concluded, the opportunity for that protection is lost." Alexander v. Milwaukee, 474 F.3d 437, 442 (7th Cir. 2007) ("The jury has found that the defendants' conduct violated the constitutional rights of the plaintiffs and those rights were firmly established at the time they acted. At this posttrial stage of these proceedings, the court will not delve further into this issue").

position is that it would be illegitimate and improper for them to put it in a post-trial motion or an appeal evidence that it was in the trial record since they had the opportunity to put it in"). At their request, the Court gave defense counsel an opportunity to confer to consider whether they wanted to put that evidence before the civil jury. This evidence, however, would have undermined Defendants' trial theory that Larry identified Plaintiff because Plaintiff was guilty, and Defendants ultimately declined. Id. Having refused to make certain evidence part of the trial record, Defendants' evidence-sufficiency challenge must be confined to that record.

For example, Def. Rule 59 Mem. at 6 argues that Plaintiff somehow knew "that even at 3:00 a.m., [Larry] at first tried to continue telling Defendant his previous story," but fails to the cite to the record. Similarly, id. at 4 claims that it

> was also well known that the police, at the time, confronted Tueffel with the fact that Torres said Plaintiff was the shooter. Tueffel testified at trial that the police told him that he was lying and that they had other witnesses. Id. [Tr.] at 875.

The only page of transcript cited (Tr. 875) provides no support for the notion that any of this came out at the criminal trial.[14]

### The True Circumstances Surrounding
### Tina And Sandra Elders' False Identifications

Defendants continue to fail to analyze this issue in a light most favorable to the verdict. For present purposes, Plaintiff was not on the street when the shooting occurred, and nor were Tina or Sandra for that matter. Tr. 860, 355-6. Moreover, the real killer, who had black curly hair, looked nothing like Plaintiff. Tr. 1007-08, 1214. Despite all of that, Bogucki still somehow managed to obtain Sandra and

---

[14] Even if Defendants had accepted Plaintiff's invitation to introduce Larry's criminal testimony that the police told him that they had other witnesses, Plaintiff would have responded by introducing Larry's further (untrue) criminal trial insistence that the police *never told him the shooter was Plaintiff.* All of that said, it is hardly a stretch that the bulk of Larry's revelations about what really happened during the interrogation were never disclosed at the criminal trial; had the truth come out, Plaintiff never would have been convicted.

Tina's identifications of Plaintiff. A reasonable jury could have concluded that the true circumstances of how that came to be were suggestive, exculpatory, and concealed. Alexander v. South Bend, 433 F.3d 550, 555 (7th Cir. 2006) (due process is violated if unduly suggestive identification techniques taint the criminal trial).

Most obvious was the photograph of Plaintiff that Tina and Sandra saw immediately prior to the lineup. When she was separated from the others, Tina was placed at a desk with two photographs on it: one picture was her deceased friend and the other, as she still recalls to this day, was Plaintiff. Tr. 2433. It was at this time that she learned from the police that Plaintiff was the primary suspect. Id. at 2433, 2440-42. Sandra described something very similar. Tr. 2469-70, 2475. Even all these years later, Sandra recalls that there was a photo of Plaintiff on the table a few feet from the entry to where the lineup was conducted. Id.[15]

Although he denied wrongdoing, Bogucki acknowledged that the Polaroid of Plaintiff was his, and that he was responsible for it. Tr. 1150-51. He was also the lead investigator, and in charge of the lineup and handling of the lineup witnesses. Id. at 1151. A rational jury could have concluded that what the Elders described about seeing Plaintiff's photo -- and only Plaintiff's photo -- immediately prior to the lineup was unduly suggestive. See S.J. Mem. Op. at 22-24; United States v. Recendiz, 557 F.3d 511, 526 (7th Cir. 2009) (courts defer to juries in "weighing the reliability of potentially suggestive out-of-court identifications").[16]

---

[15] Defendants seek to rehash the point from their closing argument that all bets are off because of certain suggestions that Plaintiff knew Tina. Def. Rule 59 Mem. at 15. The first flaw in this argument is that Tina flatly *denied* knowing Plaintiff at the time, and the jury was entitled to credit that evidence. Tr. 2431. But that aside, Defendants never actually explain why showing Plaintiff's photo to Tina was any less suggestive if Tina knew or recognized him.

[16] Defendants' citation to Rodriguez v. Peters, 63 F.3d 546, 555 (7th Cir. 1995) is unhelpful. In Peters, the eyewitness saw a copy of a photo of five Latino boys on the prosecutor's desk as he was "passing through" the office, but approximately three weeks passed before the actual identification. Id. at 555.

There is also the matter of the missing documentation of the Elders' original stories. These omissions were especially critical because at the crime scene and then the hospital, Tina never reported to the police that she had actually witnessed the murder. Tr. 1020, 2436. When Sandra brought Tina along for the lineups, Bogucki failed to ask Tina a single question about what, if anything, she had seen that night *until after* she had already picked out Plaintiff. Tr. 1020, 1145. At that point, when Bogucki finally sat down with her to get her story, Bogucki's GPR report reflects an initial bullet point stating that she was "5 feet away," but the second bullet point is blank. PX 44. There are no further notes. Id. According to Bogucki, as Tina began to relate what she claimed to have occurred, he decided to put down his pen. Tr. 1431. Likewise, there are virtually no notes of Sandra's account. DX 05.[17]

A reasonable jury could have concluded that this willful and inexplicable failure to record Tina and Sandra's stories qualified as suppression. United States v. Rodriguez, 496 F.3d 221, 226 (2d Cir. 2007) ("The obligation to disclose information covered by the Brady and Giglio rules exists without regard to whether that information has been recorded in tangible form"). Based on her deposition (not to mention the fact that she was not even present during the shooting) it is fair to assume that whatever Tina told Bogucki during this roughly hour-long interview, Tr. 2442, it was materially inconsistent with what Larry, Phil, and Victor were describing. For example, Tina claims that she, not Larry, arrived with Eric on Belmont Avenue by car; that she was crossing the street and yelling at Eric to get back into her car to go cut his hair when one person, not two, approached Eric and

---

[17] As they did at trial, Defendants argue that the jury was required to accept Bogucki's insistence that the Sandra note referencing curly-hair was taken at the hospital prior to Bogucki learning that Larry was describing a curly-haired shooter. The truth, however, is that Bogucki's failure to record dates, times, and locations in his notes effectively suppressed the details about who said what and when, thereby concealing the truth. And according to Plaintiff's expert, the failure to document those types of details was so far beyond the norm for a homicide investigation (Tr. 1608-10) that the possibility of intentional obfuscation is a reasonable inference.

shot him; and that she helped lay Eric on the ground as he died. Tr. 2435-38, 2445. Sandra, too, claims that she literally caught Eric in her arms as he fell. Tr. 2464.

If these parallel-universe versions are what Tina and Sandra told Bogucki at the police station (a fair inference, given that these are their stories) then Bogucki's failure to record anything deprived Plaintiff of cross-examination when Tina and Sandra later pointed the finger at Plaintiff at the criminal trial. This inference is further bolstered by the absence of any valid explanation from Bogucki as to why he failed to write down their contemporaneous stories, plus the testimony of Plaintiff's unrebutted police practices expert (he was not cross-examined, and Defendants failed to call their own expert) that these interviews were conducted in a manner contrary to the expectation of legitimate investigation. Tr. 1609-10.

### The Existence And Identity Of The Witness
### Who Led The Police To Victor Romo

To make sense of why Larry originally described someone other than Plaintiff as the shooter, the story in Bogucki's police reports was always that Larry, out of fear, started out intent on obstructing the police investigation rather than cooperating to solve the crime. PX 2. According to Bogucki, Larry was trying to throw the police off the track. Id.

One of the problems for Bogucki was that he was never able to explain satisfactorily how he located one of the true assailants (Victor Romo) almost immediately upon initiating his investigation. If it was Larry who had in fact led Bogucki straight to Victor, that would have been inconsistent with Larry's purported desire to mislead the police about the real perpetrators.

Bogucki's written police reports attributed the Victor lead to someone other than Larry, stating that he "received information that the second offender in the homicide of Eric Morro is known as Victor Romo." PX 14. At the civil trial, however, there was evidence that this representation was misleading. Bogucki admitted at

23

one point that Larry did in fact tell him about Victor, Tr. 1035-36, an impeaching fact which was concealed from the police reports and during the criminal trial.

At another point, Bogucki claimed to have received the Victor tip from a different source. Tr. 1170. That assertion, if credited, gave rise to an independent Brady violation, and a very serious one. Under this version, Bogucki knew the name of the witness who had sufficient knowledge of the crime to be able to identify one of the murderers. For someone in Plaintiff's shoes, a witness with genuine knowledge about what really happened would have been a critical source of potentially exculpatory material. For all Defendants' insistence that Plaintiff's criminal attorney did not do enough investigation, there was no ability to investigate if Bogucki withheld the existence and identity of this key witness.

And the term "anonymous source" is a misnomer. Bogucki admitted he once know this witness' name, though he testified that he has since forgotten it. Tr. 1172-73. According to him, he never wrote the name down, never shared it with the prosecutor, and never even told the prosecutor about the witness' existence. Tr. 1170-71, 1174-77. Bogucki not only suppressed the witness' identity, in other words, but he intentionally concealed the existence of the witness altogether, at least in part via the carefully-worded police report. Id. If this evidence is viewed in a light most favorable to Plaintiff, the undisclosed witness could have been exculpatory, especially given that Juan Carlos, not Plaintiff, committed the crime.[18]

### Juan Carlos Torres' Contemporaneous Account

As Defendants point out, Bogucki did create police reports regarding conversations with Juan Carlos Torres. He had to. He knew that Victor and his father were going to testify at Victor's trial that Juan Carlos was the shooter.

---

[18] Bogucki claimed to specifically recall that the missing witness was relying on third-party hearsay and only knew about Victor and not the shooter, but the jury was not required to accept this self-serving (and uncanny) selective memory.

Bogucki concealed, however, all of the material facts surrounding Juan Carlos. Despite having been told by one of the admitted perpetrators that Juan Carlos was the shooter and had confessed to the crime, Bogucki effectively suppressed any information that would have enabled Plaintiff to prove Juan Carlos' involvement, and thereby his own innocence. This included refusing to: (1) request or memorialize Juan Carlos' specific alibi; (2) ask to see Juan Carlos' jacket; (3) take any notes; (4) confront Juan Carlos with the Romos' claims; and (5) memorialize in any manner Juan Carlos' then-existing physical description, including his hair style, so that Plaintiff could later prove it was curly. PX 2 & 3; Tr. 1022-23, 1203-06, 1213-14. Considering the lack of evidence that Juan Carlos would have talked voluntarily to Plaintiff's team about this murder, Bogucki's failure to memorialize this information was prejudicial.

### The Missing Duke Jacket

Bogucki's police reports claimed that eyewitnesses were supposedly mentioning the shooter's Duke jacket before Bogucki arrested Plaintiff and learned that Plaintiff owned one, Tr. 1130-32, but the witness statements contain no dates/times to corroborate that proposition. PX 2, 3. In reality, Phil revealed that it was the police who first brought up the Duke jacket, not he. Tr. 2678. Similarly, Tina testified at the criminal trial about having seen the shooter wearing a Duke jacket, Tr. 2449, but she now claims the shooter was wearing a grey sweatshirt, and that she never actually saw or told anyone about any Duke jacket. Tr. 2438-40.

Moreover, the Duke jacket itself disappeared. Despite Bogucki's admission that it was the only piece of physical evidence in the case, it was nowhere to be found by trial. Bogucki admits seizing it, Tr. 1133-34, but claims he then returned it to Plaintiff's mother. Id. at 1134. Ms. Jimenez strongly disputed that assertion. Id. at 1530. According to her, she was begging Bogucki to test it for gun shot residue, but he refused. Id. at 1529-30. What is undisputed, however, is that the

jacket disappeared, and thus could not be tested. Tr. 1369. Compare Def. Rule 59
Mem. at 13 (reproducing a block quote from Jardine v. Dittman, 658 F.3d 773. 776
(7th Cir. 2011) finding no Brady violation where the gun that was never tested for
DNA was in no sense suppressed or unavailable for testing).[19]

In summary, a rational jury could have reasonably concluded that any of
these Brady violations support a verdict for Plaintiff. Considering everything in the
aggregate, rather than in isolation from one another, that conclusion becomes
unavoidable. When the truth about this investigation ultimately rose to the
surface, there was nothing left to legitimately implicate Plaintiff in the crime, a
crime he did not commit. Defendants have fallen well short of their "heavy burden"
of showing there was no evidence whatsoever to support Plaintiff's claim, even had
they properly preserved the argument, which they did not.[20]

## 2. There Was A Sufficient Evidentiary Basis To Support The Jury's Verdict On The Malicious Prosecution Claim As Well

Defendants contend that no rational jury could have found for Plaintiff on the
issues of probable cause and malice. Neither argument withstands scrutiny.

### Probable Cause

The question of probable cause is typically "a proper issue for a jury if there is
room for a difference of opinion concerning the facts or the reasonable inferences to
be drawn from them." Sornberger v. City of Knoxville, 434 F.3d 1006, 1013-14 (7th
Cir. 2006). Under Illinois law, the issue of "whether a statement bears sufficient
indicia of reliability to support a finding of probable cause in a malicious prosecution
case is a question of fact to be resolved by the jury." Fabiano v. Palos Hills, 336 Ill.

---

[19] Defendants' argument that Plaintiff knew the jacket had disappeared misses
the point. Knowledge that the evidence had disappeared was no consolation when
what Plaintiff needed was the evidence itself.

[20] Bogucki's post-trial admission provides an independent basis to reject the
evidence-sufficiency point, as it does for the evidentiary arguments raised below.

App. 3d 635, 642 (1st Dist. 2002). Indeed, it is "only when the circumstances alleged to show probable cause are not disputed that the cause can be decided as a matter of law." Howard v. Firmand, 378 Ill. App. 3d 147, 151 (1st Dist. 2007).

Here, the identifications were anything but undisputed. As discussed above, all of the evidence that could give rise to probable cause to believe Plaintiff committed murder was tainted by Bogucki's actions. Probable cause cannot be based upon fabricated evidence. Tully v. Del Re, 2002 WL 31175983, at *5 (N.D.Ill. Oct. 1, 2002) (probable cause is for the jury where officers "implicitly importuned witness to manufacture a basis for charges" and "thus could not reasonably have relied on what Ryba told them"); Finwall v. City of Chicago, 490 F. Supp. 2d 918, 923 (N.D. Ill. 2007) (same), citing Smith v. City of Chicago, 913 F.2d 469, 473 (7th Cir. 1990).

In arguing that no rational jury could have found anything but probable cause, Defendants rely solely on Phil Torres. According to their Rule 50 motion, even leaving aside Larry and the Elders, Phil's identification alone gives rise to probable cause. Def. Rule 50 Mem. at 10-11. The obvious problem with this argument is that it improperly construes the evidence in a light most favorable to the defense. If the record is viewed instead consistent with the jury's verdict, then Phil saw nothing and did not claim to see anything, and was pressured into making a false identification, which was thus meaningless for probable cause purposes. See supra at 13-16. Probable cause is lacking under those circumstances. Kincaid v. Ames Dept. Stores, Inc., 283 Ill. App. 3d 555 (1st Dist. 1996) ("Defendants rely on the written statements by Smallwood and Jennings to establish probable cause. However ... [those witnesses] both specifically detailed how defendants told them to accuse plaintiff in their statements, even though plaintiff had done nothing wrong. Sufficient reliability must support any statement used to help establish probable cause."); Mack v. First Sec. Bank of Chicago, 158 Ill. App. 3d 497, 503-504 (1st Dist. 1987) (sufficient evidence of lack of probable cause for malicious prosecution claim

where eyewitness identification allegedly lacked integrity). Although Defendants have abandoned reliance on any such arguments, the same could obviously be said for identifications by Larry and the Elders.[21]

### Malice

Defendants' motion does not fully capture Plaintiff's evidence of malice. Plaintiff established at trial that Bogucki found himself in a tough spot when Victor confessed and revealed the identity of the real killer. By then, Bogucki had already personally secured multiple false identifications of an innocent boy. Tr. 1182-85. In order to avoid having to answer difficult questions from his superiors, he proceeded to take affirmative actions to minimize the possibility that Juan Carlos would be prosecuted (see supra at 24-25) even at the risk that an innocent boy would be wrongfully convicted. Id. It was not irrational for the jury to accept a theory that Bogucki's actions suggested malice, particularly given Bogucki's subsequent efforts to intervene in the post-conviction proceedings to keep Plaintiff in prison. Tr. 1219-21. Were there any doubt, the law also permits the inference of malice where, as here, the jury could find that probable cause was totally lacking. See Edwards v. Haritos, 2012 WL 774531, at *3 (N.D. Ill. March 8, 2012) (Holderman, C.J.).

### 3. There Was A Sufficient Evidentiary Basis To Support The Jury's Verdict On The Conspiracy Claim

Finally, in two conclusory sentences, Defendants argue that the conspiracy verdict cannot stand because the due process verdict should be reversed. Because the due process claim survives, so does the conspiracy claim.[22]

---

[21] Defendants' reliance on Sang Ken Kim v. Chicago, 368 Ill. App. 3d 648 (1st Dist. 2008) is unavailing. Unlike the probable cause finding in Sang Ken, Phil did not identify Plaintiff only to recant later. He never identified Plaintiff the first time.

[22] In response to the narrowly-drawn Rule 50(a) motion on this claim, Plaintiff's counsel previously put his argument for the conspiracy claim on the record, Tr. 2722-30 (relying on, inter alia, Officer Sanders' false testimony about having interviewed Larry), and the Court agreed with Plaintiff. The Court's ruling was correct, and Defendants' post-trial motion has now waived any argument otherwise.

III.     **The Waiver Of Defendants' Rule 50 Sufficiency Of The Evidence Challenge Cannot Be Avoided Simply By Recasting Their Argument As A Rule 59 Challenge To The Due Process Jury Instruction**

Having waived the ability to directly challenge sufficiency of the evidence, Defendants instead attempt a back-door Rule 59 attack on the Court's jury instructions. Specifically, they contend that the Court committed reversible error by declining to give their proposed "add-on" instruction limiting the factual predicate for Plaintiff's due process claim to four possible categories of evidence, *i.e.*, the Larry Tueffel inducement, Tina Elder photo, Phil Torres inducement, and the statements about the Duke jacket. Defendants' argument fails.

A.     **To Justify A New Trial On This Basis, Defendants Would Need To Demonstrate Both That The Court's Instruction Was Inaccurate And That Defendants Were Prejudiced As A Result**

The district court "is afforded substantial discretion with respect to the precise wording of instructions so long as the final result, read as a whole, completely and correctly states the law." United States v. DiSantis, 565 F.3d 354, 359 (7th Cir. 2009) (citations omitted); Calhoun v. Ramsey, 408 F.3d 375, 379 (7th Cir. 2005). The law does not require a "perfect set of jury instructions," as long as they are correct legal statements. Lasley v. Moss, 500 F.3d 586, 589 (7th Cir. 2007).

To justify a new trial, Defendants would have to demonstrate not only that the due process instruction was legally inaccurate, but even if so, that the resulting inaccuracy was sufficiently misleading to have cause prejudice. Northbrook Excess & Surplus v. Proctor & Gamble, 924 F.2d 633, 638 (7th Cir. 1991) (reversal is unwarranted unless it appears that "the jury was misled. . . [and its] understanding of the issue was seriously affected to the prejudice of the complaining party"). Reversal is only appropriate, in other words, if the jury's comprehension of the issues is so misguided that a litigant is prejudiced. New Burnham Prairie Homes v. Burnham, 910 F.2d 1474, 1483 (7th Cir. 1990).

Here, Defendants can satisfy neither prong. Their position fails at the threshold because the Court's instruction was an accurate statement of the law, and then fails all over again because there was no prejudice associated with rejection of their proposed supplemental instruction, which was itself incomplete and thus inaccurate.

## B. The Court's Due Process Instruction Was An Accurate Statement Of The Law

The Court's due process instruction required Plaintiff to prove that the Defendants concealed from the criminal prosecutor evidence that was material, as well as either exculpatory or impeaching. Tr. 2776. The instruction properly defined each of those terms, and further explained (at Defendants' request) that evidence qualifies as concealed only if it was "not otherwise available through the exercise of reasonable diligence." Id. The resulting instruction is an accurate statement of the law in every respect. Dominguez v. Hendley, 545 F.3d 585, 590 (7th Cir. 2008); Manning v. Miller, 355 F.3d 1028, 1033 (7th Cir. 2004); Newsome v. McCabe, 256 F.3d 747, 749-53 (7th Cir. 2001).

Tellingly, Defendants' Rule 59 motion does not presently even attempt to suggest otherwise, nor did Defendants object at the instruction conference to the actual substance of the primary due process instruction. Tr. 219-21. Indeed, the Court's primary due process instruction is virtually indistinguishable from the version proposed by the defense. See Exhibit B; see also Doe v. Johnson, 52 F.3d 1448, 1460 (7th Cir. 1995) ("This court has enunciated the clear principle that in a civil case, a litigant may not attack an instruction of which he was a proponent").

All of that is really the end of the matter. Lasley v. Moss, 500 F.3d 586, 589 (7th Cir. 2007) (no error if instructions accurately state the law). As stated, where the Court has correctly instructed the jury on the law governing a given claim, there are no grounds for a new trial on that basis. Javier v. City of Milwaukee, -- F.3d --, 2012 WL 678284, at *5 (7th Cir. March 2, 2012).

30

## C. Defendants Were Not Prejudiced By The Absence Of A So-Called "Guidepost" Instruction

While conceding the legal accuracy of the primary due process instruction, Defendants submit that the Court committed reversible error by declining to supplement it with their proposed "guidepost" instruction. According to Defendants, the Court abused its discretion by deciding not to adopt their supplemental attempt to delineate the specific nature of evidence that Plaintiff is claiming was suppressed.

In support of their theory, Defendants are conspicuously short on authority. As with their Batson position, they are unable to cite a single directly-analogous case, ever, where any court, anywhere, has adopted their "guidepost" argument, much less granted a new trial. Cf. United States v. Tolliver, 380 F. App'x 570, 573 (9th Cir. 2010) (no error where district court gave jury instruction that accurately summarized the law in criminal racketeering case but "did not give a specific instruction clarifying that the predicate racketeering acts of murder and attempted murder needed to be separate and distinct from the substantive offenses charged"); United States v. Walsh, 194 F.3d 37, 53-54 (2d Cir. 1999) (no plain error where jury instruction did not list specific "factors enunciated in [case law] to evaluate whether" officer committed criminal offense by physically abusing prisoner).

It is not difficult to surmise why Defendants could find no authority. A supplemental "guidepost" instruction is, by definition, redundant, see United States v. Chavin, 316 F.3d 666, 670 (7th Cir. 2002) (no error in refusing redundant instructions), and the refusal to give it cannot be prejudicial if the primary instruction is accurate. Schobert v. Illinois Dep't of Transp., 304 F.3d 725, 730 (7th Cir. 2002) (we do not require that trial court issue an "idealized set of perfect jury instructions," as long as they are correct legal statements).

There is an additional dispositive problem with Defendants' argument, namely, that their proposed "guidepost" instruction is not an accurate statement. Defendants' proposed guideposts contain only four possible Brady claims, an unduly

31

limited formulation of Plaintiff's claim. As discussed above, there are numerous other valid bases in this record that could support an actionable <u>Brady</u> claim, particularly when considered cumulatively rather than in isolation. That kills Defendants' argument because the inaccuracy of their proposed guidepost instruction is an independently sufficient grounds to have rejected it.[23]

## IV. Defendants' Complaints About Plaintiff's Closing Argument Fail As Well

Defendants alternatively try to shoehorn their arguments into an attack on Plaintiff's closing argument, maintaining that Plaintiff's counsel should not have been permitted to advocate that certain categories of allegedly-withheld evidence could support a <u>Brady</u> claim. Though nominally a Rule 59 issue, this argument, too, is really just another misfit attempt to revive their waived sufficiency of the evidence contention, and an unpersuasive one at that.

For starters, Defendants failed to assert any objections on these points during Plaintiff's closing. The resulting waiver is an absolute bar to the relief Defendants seek. <u>Houskins v. Sheahan</u>, 549 F.3d 480, 495 (7th Cir. 2008) ("Keith has waived this argument because he failed to object to these statements at the time they were made, thus failing to preserve the argument on appeal."). Any contrary ruling would reward Defendants for sitting on their hands while Plaintiff argued, thus depriving the Court of any opportunity to redirect matters, and Plaintiff any opportunity to cure the problem. <u>Soltys v. Costello</u>, 520 F.3d 737,

---

[23] Defendants' explanation at trial for why the "guidepost" instruction was supposedly necessary was less than illuminating. The totality of the argument upon which they now seek to build their new trial request was as follows (Tr. 2765):

> MR. KAMIONSKI: From the defense, we submitted a particulars claim for the due process instruction. That was defendant's number 2. And we expressed that when we left summary judgment, there was certain things that we believed were what was called material exculpatory evidence, and we feel that certain things that the plaintiff's counsel may have implied in closing arguments are -- in addition, we didn't have much opportunity to respond to on summary judgment, and we would have at the time. And so we object to the not including the particulars instruction number 2.

745 (7th. Cir. 2008) (absence of a timely objection constitutes a waiver). Defendants have not even attempted to postulate an explanation or justification for their decision to remain silent during closing. Moore ex rel. Estate of Grady v. Tuelja, 546 F.3d 423, 430 (7th Cir. 2008) (plain error doctrine is "rarely applied in civil cases" and only in "exceptional circumstances" to avoid "miscarriage of justice").

In any event, it is hardly surprising that Defendants failed to object during closing. Plaintiff's counsel made no improper remarks. Counsel simply argued that the evidence supported his contention that Plaintiff had proved all of the required elements of the agreed due process instruction; to that end, he provided the jury with his explanation for why various facts surrounding the Morro murder were purportedly exculpatory, material, and withheld. When it was defense counsel's turn, he made the case that these same facts were not exculpatory, material, and/or withheld. The Court correctly defined each of those terms, and the jurors were charged to decide whether they agreed that Plaintiff had met his burden.

In that light, there was nothing objectionable about Plaintiff's arguments that Bogucki's treatment of certain evidence allegedly violated Brady. Closing arguments are a venue for commentary on how the jury should view the evidence. Arguments are made and rebutted, with the jury instructed to take counsel's comments for what they are, and then decide collectively for themselves who or what to believe. Soltys, 520 F.3d at 744 ("The jury was instructed that comments of the attorneys are not evidence. The court presumes that juries follow their instructions."). It was not "improper" in any legal sense for Plaintiff's counsel to advocate for his position, regardless of whether the jury ultimately concluded that a given piece of evidence satisfied the test for Brady material. See also Miksis v. Howard, 106 F.3d 754, 764 (7th Cir. 1997) ("improper comments during closing argument rarely rise to the level of reversible error").

33

V.    **The Court Committed No Evidentiary Errors, And Certainly None Of The Magnitude Necessary To Justify A New Trial**

Defendants take issue with several evidentiary rulings that they believe should have gone the other way. None of these judgment calls were erroneous, much less an abuse of discretion, much less sufficiently prejudicial to have affected the ultimate result. The motion for relief on this ground must therefore be denied.

A.    **Legal Standard**

A party seeking a new trial based on discretionary evidentiary rulings faces an uphill battle because Rule 403 is, by its nature, a balancing inquiry. United States v. Kapp, 419 F.3d 666, 677 (7th Cir. 2005). Defendants thus carry a "heavy burden" given the "special deference" afforded the trial court in such matters. Mason v. Southern Ill. Univ., 233 F.3d 1036, 1043 (7th Cir. 2000). Moreover, "[t]he burden is still greater" where, as here, a party "seeks to set aside a jury verdict in a civil case." Cruz v. Cicero, 275 F.3d 579, 589 (7th Cir. 2001).

In addition to abuse of discretion, the defense must also demonstrate prejudice. That is, the jury verdict will be disturbed only if "the error affected the outcome of the case." Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 866 (7th Cir. 2005).

B.    **Defendants' Arguments Fail**

Of the hundreds of evidentiary rulings made over the course of the trial, Defendants challenge four. None of their arguments have merit.

1.    **Plaintiff's Purported Threat Involving Victor Romo's Father**

Defendants contend the Court committed reversible error by refraining from allowing a "mini-trial" about whether Plaintiff really threatened Victor Romo that he would shoot his father if the latter testified that Plaintiff was guilty. Defendants have never disputed that references to this inflammatory (alleged) bad act would be prejudicial, but nonetheless argued prior to trial that this "threat" evidence was relevant to Plaintiff's damages by tending to show guilt of the underlying murder on

34

a consciousness of guilt theory. The Rule 59 motion renews this argument, but the Court correctly applied Rule 403, and a new trial is unwarranted.

### Relevance

The first problem for the defense is that the chain of inferences is attenuated. Guilt is one possible inference from a threat, but hardly the only one; an innocent man could just as easily threaten someone not to testify against him, particularly a gang member, as Defendants were so quick to point out. Tr. (12/7) 9-10.

That aside, the issue in this trial was not whether Plaintiff killed Eric Morro, and Defendants do not contend that the threat evidence is relevant to the question of due process or probable cause. Instead, they claim that the Romo threat lessens Bogucki's malice, a dubious proposition given that Bogucki never even knew about it. The malice issue was briefed extensively prior to trial (Dckt. No. 183) but to summarize, where Defendants go wrong is in assuming that every scrap of evidence bearing on guilt/innocence is automatically probative of malice. The case law does not bear out that contention. Indeed, the sole case upon which Defendants' rely held that an unambiguous third-party confession was sufficient to infer an officer's malice in procuring a false confession by someone else to the same crime. Aguirre v. City of Chicago, 887 N.E.2d 656, 664 (1st Dist. 2008). The Aguirre evidence of guilt/ innocence is a far cry from the attenuated chain of inferences relied upon here, and is indeed far weaker than the "malice" evidence excluded in Gauger v. Hendle, 2011 WL 2578186, at *23-*27 (2nd Dist. June 28, 2011) and Porter v. City of Chicago, 912 N.E.2d 1262, 1272-74 (1st Dist. 2009). See also Aguirre, 887 N.E.2d at 664 (guilt evidence was not admissible on malice where the "chain of inferences" to get to guilt "become[s] so tenuous that the final inference has no probative value").

In any event, relevance is not the only factor. Even were the Court to assume that there was some small degree of probative value on the issue of malice or, more accurately, damages, Rule 403 still justifies exclusion, and easily so.

### Reliability

While not the most important consideration, there are reliability problems with the proposed Victor threat evidence. Plaintiff denies any threat ever occurred, and Victor does not recall anything face-to-face either. Group Exhibit C (Jimenez Dep. 376; Victor Dep. 59-61). The original report did not claim definitively that Plaintiff made this (alleged) threat directly to Victor, and Gillon's deposition was at least arguably unclear on this point as well. Tr. (12/5) 63-65 (The Court: "So I think that's fairly interpreted as that [Victor] is present"). It is also entirely counter-intuitive: Victor and his father had both already repeatedly denied Plaintiff's involvement in the crime to the authorities long before Plaintiff allegedly threatened them. The reliability of this testimony is a legitimate concern.

### Cumulativeness

The fact is, Defendants were not deprived of the ability to show consciousness of guilt. This Court accepted just such a theory regarding the letters Plaintiff wrote to his girlfriend wherein he arguably threatened to murder Larry, a key witness in the case. Defendants proceeded to bang on this evidence as consciousness of guilt during opening statements and the cross of Plaintiff. Tr. 287-89, 666-75. Having been permitted to do so without restriction, Defendants are thus reduced to arguing that the small incremental probative value of additional threat evidence supposedly outweighed the very real danger of unfair prejudice. It plainly did not.

### Prejudice

Even assuming *arguendo* that the evidence was relevant, reliable, and non-cumulative, the danger of unfair prejudice was still easily sufficient to justify exclusion. See Tr. 747-57 (the Court's full ruling). Telling the jury that Plaintiff allegedly threatened to shoot someone would have been unduly prejudicial, particularly given the similarity of that accusation to the crime for which Plaintiff was prosecuted. Manuel v. City of Chicago, 335 F.3d 592, 596-97 (7th Cir. 2003) (no

abuse of discretion to exclude evidence in discrimination case that plaintiff's supervisor discriminated against other employees given risk of confusion); Kelsay v. Consolidated Rail Corp., 749 F.2d 437, 442-46 (7th Cir. 1984) (affirming decision in accident case to exclude evidence of other accidents involving defendant). Trial courts have a responsibility to ensure that inflammatory evidence does not distort the jury's consideration of the real issues in the case, and the balancing inquiry here was not a close call.

### Materiality

Even had the court erred -- which it clearly did not -- this would not be the type of error that justifies Rule 59 relief because Defendants could not seriously maintain that this piece of evidence was sufficiently significant to have changed the outcome of the trial. On that score, Defendants have no explanation for why, assuming this threat evidence was so important to them, they failed to so much as mention it during their lengthy opening statement, their exhaustive cross-examination of Plaintiff, and then their cross of Victor.

There was nothing stopping them from doing so. As Defendants' motions point out, the Court had originally *denied* Plaintiff's motion to bar this evidence prior to trial, a ruling memorialized in the written *in limine* order. Dckt. No. 244 ¶ 5. Defendants are also correct that the Court did not finally bar this evidence until the third day of trial, after it had the benefit of further briefing on the guilt/innocence issue (Dckt. Nos. 241 & 242) and, more importantly, a much fuller context of the evidence as the trial record developed. Tr. 747-57. The fact that Defendants were completely uninterested in the evidence until after it was barred belies their present insistence that its exclusion caused them fatal prejudice.[24]

---

[24] Furthermore, even with the far stronger Heatley letters, Defendants had all but abandoned consciousness of guilt as a theme by closing argument. Out of more than an hour's worth of closing argument, Defendants devoted ten lines of transcript to the threats in the letters. Tr. 2918-19.

37

## Waiver

On a related note, there is also a serious waiver issue. The Defendants allowed Victor to come and go from the witness stand before the Court formally barred the evidence, prompting the following exchange:

The Court: So Victor Romo testified, right, just here?

Mr. Hale: Yeah.

The Court: Did you not -- why didn't you ask him about it?

Mr. Hale: Well, that's a good question.

The Court: Yeah, I kind of think so.

Mr. Hale: If I did, I forgot.  * * * *

The Court: Okay. So I want to stick for a second on the fact that Mr. Romo wasn't asked about this yesterday. I mean, there was a boatload of testimony from Mr. Romo about, you know, what happened and what didn't happen in terms of, you know, who he was with and who the shooter was and Mr. Jimenez's -- whether Mr. Jimenez was involved and whether Mr. Torres was involved.

I mean, I would think that the key person that you would have wanted to bring this up with would have been Mr. Romo on the theory that the reason you're saying this is because TJ -- or the reason you said it at the time and the reason you're saying it now is that TJ threatened, you know, your father. And I guess I'm, you know, I'm a little bit concerned, that's a bit of an understatement, that now that - the key person that this would have come up with, that that was bypassed, that now we're going to go about it in this different way. What am I missing here?

Mr. Hale: You know, all I can say, Judge, is I think because this is an issue I knew had not been fully resolved in light of the briefing, *I didn't bring it up, but I should have brought it up before.*

The Court: Well, I mean, yeah, because the witness was on the stand, and it was made clear before the trial that when a witness is on the stand, they're on the stand for all purposes, and this would have been within the scope of his direct anyway.[25]

---

[25] The Court had previously ruled that witnesses would be called one time, with both sides to conduct their examinations. Tr. (12/12) at 41-42. Indeed, due to scheduling back-ups that were no one's fault, Victor Romo showed up for two separate trial days despite working the graveyard shift. When he finally testified (in a case that offered no benefit for himself) he had been awake for thirty-eight straight hours. Tr. 342. Victor's examination was the Defendants' opportunity to elicit the threat evidence, had they been so inclined.

The Court:   Honestly, the fact that it hadn't been resolved, that's not an excuse because you guys submitted these reports telling me when I needed to resolve stuff, and everybody knows these things are out there.[26]

Tr. 747-57 (the Court's full ruling) (emphasis added).

Having declined to press the issue until it was too late, Defendants waived it. This is an independent reason to reject their argument. United States v. Smith, 308 F.3d 726, 742-43 (7th Cir. 2002).

### 2. Plaintiff's Juvenile Arrests Not Leading To Convictions

The law is well-settled that arrests not resulting in convictions are ordinarily inadmissible. Prior arrests are essentially unproven allegations of prior bad acts, and the risk of unfair prejudice is substantial. Gregory v. Oliver, 2003 WL 1860270, at *1 (N.D. Ill. Apr. 9, 2003) ("Arrests that have not led to convictions are classic candidates for exclusion under [FRE] 404(b)"); Jones v. Scientific Colors, Inc., 2001 WL 668943, at *2 (N.D. Ill. May 9, 2001) ("Whether any of the claimants have been previously arrested -- as opposed to convicted -- is a matter of slight probative value in relationship to the claims before the Court. Such inquiries threaten more to confuse than enlighten."). The presumption in favor of exclusion is even stronger where the issue is juvenile arrests. Holman ex rel. D.R. v. Hensler, 2010 WL 148309, at *2 (N.D. Ind. Jan. 14, 2010) (excluding evidence of juvenile arrests and adjudications in 1983 case as, *inter alia,* as unduly prejudicial); Blessing v. Kulak, 1988 WL 67637, at *2 (N.D. Ill. June 22, 1988) (same); cf. Fed. R. Evid. 609(d) (evidence of juvenile adjudication only admissible in criminal cases).

---

[26] As Defendants' own Rule 59 motion points out, the issue was not really unresolved at all. Prior to trial, the Court had permitted inquiry about threats tied directly to Plaintiff, including the one involving Victor's father, as memorialized in the written order on the motions *in limine,*, but, in any event, the Court ordered the parties to submit a written status report detailing the deadline during the course of the trial by which the Court would have to consider a given issue. At no point prior to Victor's testimony did Defendants suggest the threat issue needed to be revisited.

The reality, however, is that the Court never actually barred Defendants from introducing Plaintiff's arrest record. Most of the third and last pretrial conference was devoted to the issue, and the Court informed Defendants that they could introduce Plaintiff's juvenile record if they disclosed to Plaintiff's counsel prior to trial why and how his arrest record affected their investigation of the Morro murder. Tr. (12/12) at 31-33. Defendants never made any such pre-trial disclosure, and never mentioned the issue again until their post-trial motions.

Post-trial review is by simplified Defendants' decision to abandon most of their original bases. They now offer one, and only one, reason for why arrest evidence should have been deemed sufficiently probative to outweigh the prejudice.[27]

According to the defense, they should have been permitted to show that Plaintiff was tried as an adult for the Morro murder at least in part because of his criminal record. There was a lengthy discussion of this subject at the first pretrial conference. Tr. (12/5) 27-49. The Court gave the defense every opportunity to articulate a coherent argument, and then explained at length why they had failed to do so. Id. at 38, 41, 43, 45 ("I'm not seeing it. So right now as I'm sitting here, you have not come anywhere close to convincing me that the issue of why he was tried in adult court is any way, shape, or form relevant to any issue in this case. So I'm going to give you one further chance here, so go for it."). Among other rationales, the Court pointed out that it was really beside the point why Plaintiff was charged

---

[27] Defendants' decision to abandon their alternative bases for admission is appropriate. There was a real question as to whether Bogucki even had access to Plaintiff's juvenile records, and Defendants' other arguments were transparently make-weight. See 12/5 Tr. 31-34 (the Court expressing profound skepticism about Defendants' argument that prior arrests were relevant to show why the officers decided not to follow-up on Plaintiff's alibi); 12/5 Tr. 45-50 (rejecting Defendants' assertion that the probation officer could testify that someone with Plaintiff's record would have ended up in prison anyway, even had he never been wrongfully convicted). Finally, because Plaintiff basically served no real time in connection with any of the other arrests, they could not validly serve to undermine his claim to damages for sixteen years of wrongful incarceration. 12/5 Tr. 34-35; 12/7 Tr. 38.

and sentenced as an adult and given 50 years, especially since Plaintiff only served 16 years anyway, far less than his full sentence or even the likely minimum. Id.

Even more fundamentally, Defendants' argument is unduly speculative. At oral argument, the Court asked the defense if they had any substantiation for their assertion that a judge relied on any prior arrests in approving prosecution in criminal court; in response, Defendants admitted that they did not have the applicable transcript and had not attached the relevant order to their *in limine* filings, 12/5 Tr. 38-39, leaving them with nothing but conjecture. Now that the trial is over, Defendants' post-trial motion belatedly puts the criminal court order before the Court (Def. Rule 59 Exh. 14), but unfortunately for the defense, all it reflects is that the fourth of the eight factors proffered by the State's Attorney for proceeding in adult court (in addition to premeditated murder with a deadly firearm) was that: "Thaddeus Jimenez has had previous Juvenile Court involvement." Id.[28]

Nothing about any of that suggests the Court erred in excluding the particular nature of any of Plaintiff's arrests. Any doubt is erased by the fact that the jury did in fact learn that Plaintiff had "previous Juvenile Court involvement" after the Court decided Plaintiff's counsel had inadvertently opened the door. Tr. 1506-07.[29] However, at no point thereafter, or at any other point during the trial, did Defendants attempt revisit the issue of whether they should be permitted to prove (which they still have not, even now) or even argue that Plaintiff's previous

---

[28] The belatedly-proffered deposition testimony of Dennis Brady is even weaker. See Def. Rule 59 Exh. 13. The probation officer merely answered "correct" when asked if Plaintiff's juvenile history was one of the seven criteria he considered when recommending that this murder case be tried in adult court. Id. at 27-28. See also Tr. (12/5) at 38 (the Court's explanation for why the reason for the probation officer's recommendation was even less germane than the judge's actual reason).

[29] The fact that Plaintiff had previously been arrested was permitted to rebut the suggestion that a damage witness was "shocked" to hear that Plaintiff had been arrested for murder. Tr. 1506. Confirming the risk of unfair prejudice, Defendants proceeded to misuse the evidence to argue for inappropriate insinuations during closing that Plaintiff was a bad person and unworthy of justice. Tr. 2845-46.

41

arrests affected the decision to try him as an adult or the length of his sentence. The Court had specifically invited the parties to raise arguments at trial in favor of admission of juvenile arrests, Tr. (12/12) 31-33, and Defendants' failure to make any argument or proffer during trial dooms their present position. United States v. Addo, 989 F.2d 238, 242 (7th Cir. 1993) (party "may not challenge the merits" of decision on motion *in limine* where party is given opportunity to reassert issue during trial but fails to do so).[30]

In the end, Defendants' second-guessing of a valid exercise of balancing discretion goes nowhere. The jury did learn that Plaintiff had a prior arrest record, and the marginal probative value associated with the number or nature of the arrests themselves (which were mostly relatively-benign juvenile troubles anyway, see Dckt. No. 188 at 4-8) was plainly insufficient to outweigh the danger of unfair prejudice. The Court did not abuse its discretion in so concluding.[31]

### 3. Carmelo Cortez

Fact discovery in this case closed on December 15, 2010. Dckt. No. 32. During its pendency, Defendants deposed at least 29 witnesses spread out all over the country, all in search of evidence that Plaintiff committed the murder. The parties then briefed summary judgment and began preparing for trial.

---

[30] Defendants' argument prior to trial was that Plaintiff's prior arrests helped explain why he got 50 years. Tr. (12/5) at 43-44. The unsupported suggestion in Defendant' post-trial motion that Plaintiff would have been free by age 21 pursuant to 705 ILCS 405/5-33(2) is brand new, and thus cannot serve as a valid basis to argue the Court abused its discretion for failing to consider it.

[31] It is also worth noting that the Court was even-handed in barring prior bad acts. In focusing the jury on the allegations in this case, the Court excluded evidence of prior CR files involving the police officers, as well as the finding that Bogucki acted inappropriately in Warfield, which, unlike the arrests, was proven in court. See Dckt. No. 155 at 6-7 (Defendants' motion *in limine* to bar references to their own internal complaints, lawsuits, and "any alleged misconduct" on grounds of unfair prejudicial and inadmissible character/propensity inferences). Finally, the Court hardly "sterilized" the record, and Defendants do not suggest otherwise. Plaintiff's motion to bar references to his gang membership was denied, and the jury also heard, for example, about the alleged threats to murder Larry in the Heatley letters. Tr. (12/5) at 22-27; Dckt. No. 244 ¶¶ 3, 5.

42

On October 26, 2011, ten months after fact discovery closed, Defendants served a "supplemental disclosure" indicating an intent to call a brand new witness named Carmelo Cortez, who allegedly heard from Larry that Plaintiff was guilty. See Exhibit D. Mr. Cortez had never been previously identified as a witness with knowledge -- not during the original police investigation, the first criminal trial, second criminal trial, Northwestern's reinvestigation, the State's Attorney's reinvestigation, or the exhaustive fact discovery period in this civil case.

When Defendants disclosed Mr. Cortez, the trial was still scheduled for December 5, 2011, and the final pretrial conference was about one month away. Dckt. No. 157-1. Defendants made this belated disclosure without ever moving the Court to re-open discovery, which presumably would have required good cause.

Upon due consideration at the final pretrial oral argument, the Court granted Plaintiff's motion *in limine* to bar Mr. Cortez' testimony. Tr. (12/7) 11-20. Failing to get any answer from the defense as to whether or not Mr. Cortez had ever mentioned any of this to anyone in the ensuing 18 years, the Court concluded that the disclosure was too late and, with trial then less than a month away, that Plaintiff would be prejudiced. Tr. (12/7) at 11-12. This conclusion was an appropriate exercise of the Court's discretion. Wilson v. AM General Corp., 167 F.3d 1114, 1122 (7th Cir. 1999) (no abuse of discretion to exclude undisclosed defense witnesses whose testimony was central to case); cf. In re: Kilgus, 811 F.2d 1112, 1118 (7th Cir. 1987) ("Judges must be able to enforce deadlines").

Repeating their same arguments, Defendants continue to have failed to make a record of reasonable diligence sufficient to justify being excused from the fact discovery cut-off. On November 15, Plaintiff's counsel sent an email to Bogucki's counsel stating: "So that we may better understand your position, we ask that you inform us how you came to locate Mr. Cortez, and who located him." See Exhibit E. As pointed out without contradiction in Plaintiff's motion *in limine* to bar Cortez

43

(Dckt. No. 157) and at pretrial oral argument, defense counsel declined to respond, and never provided answers about how exactly Mr. Cortez was located.

At the pretrial conference, defense counsel did advise that while he did not "want to share my work product with the plaintiffs," he learned Mr. Cortez' last name at Plaintiff's deposition (counsel stated that this was in January of 2011, but the deposition was actually in September 2010), but was unable to locate him at that time. Tr. (12/7) at 15. Defense counsel conceded to the Court that *about a year went by* until October 2011 – a matter of weeks away from the trial date – when they decided to try again with a new investigator. Id. Based upon the record before the Court (and reply should be deemed too late), Defendants have failed to demonstrate the necessary level of diligence to excuse their belated disclosure.[32]

An even bigger problem with the belated Cortez disclosure was the prejudice it would have caused Plaintiff at the eleventh hour. Had the disclosure occurred during fact discovery, Plaintiff could have investigated how Mr. Cortez first came to be a witness all these years later. It would not have been fair to require Plaintiff to undertake this discovery while also briefing motions *in limine* and prepping for trial.

Finally, in addition to all of the foregoing, there was no prejudice to the defense in excluding Mr. Cortez, and certainly not the kind that could justify a new trial. As with consciousness of guilt, this alleged impeachment does not bear directly on any claim in the case. Because Bogucki did not know anything about Mr. Cortez' claim (apparently, no one did for nearly twenty years), it was irrelevant to the questions of due process, probable cause, and malicious prosecution. The probative value of this peripheral evidence was therefore minimal.

---

[32] At the final pretrial conference, Defense counsel stated: "And I've got emails for this," Tr. (12/7) at 15, but he elected not to share them with the Court or otherwise make them part of the record, then or now. To be clear, Plaintiff does not dispute the veracity of defense counsel, which is beyond reproach, but the point is that Defendants made a conscious election not make a written record that could have supported their present argument that they were sufficiently diligent to justify the belated disclosure.

Like the threat evidence, it is also cumulative. For example, Plaintiff's girlfriend at the time (Elizabeth Heatley) impeached Larry at the civil trial by claiming that Larry told her Plaintiff was guilty, Tr. 2641, which Larry had denied. Id. at 980. Defendants' motion argues that this was after Larry had already interacted with the police, but the same cannot be said for Phil Torres' impeachment on the same point. Phil testified that Larry told him Plaintiff was guilty when they were in the back of a police car together immediately after the shooting, and prior to any alleged police misconduct. Tr. 2671-72. This testimony is functionally indistinguishable from the Cortez impeachment that Defendants now claim they should have been allowed to pile on.[33]

Having now seen the trial, this Court is uniquely well-positioned to assess whether yet another Larry-impeachment witness would have truly changed the outcome. Larry was not a typical witness. At times, his impatience and difficulties with comprehension made impeachment almost pointless. Besides, Defendants were not exactly hurting for impeachment material. At the civil trial, Larry told a story that was fundamentally different from his previous testimony at multiple pretrial hearings and three criminal trials. Defense counsel subjected him to withering impeachment on all of the important issues in the case. Tr. 977-81. There is no basis to conclude that this single additional point of potential impeachment would have changed the outcome.

---

[33] The irony is that Phil screwed up the story. The police version was always that Larry lied to Phil in the police car to throw Phil off the track, telling him it was *not* Plaintiff and thereby providing the necessary explanation for why Phil did not originally identify Plaintiff. Had Phil stayed on the script from the two criminal trials, he was supposed to deny that Larry told him it was Plaintiff. However, Phil got it backwards at the civil trial, and as a result, impeached Larry in precisely the same manner Mr. Cortez would have.

#### 4. The Current Prosecution Of Juan Carlos Torres

Defendants' final evidentiary contention is that "this Court erred by allowing Plaintiff to introduce evidence regarding the current prosecution of Juan Carlos Torres." D. Rule 59 Mem. at 26. This argument fails on multiple levels.

Most problematic, the Court made no such order, which is why Defendants' Rule 59 motion cites no transcript pages. At the pretrial conference, the Court heard argument, during which the defense apprised the Court that they intended to argue that Plaintiff was guilty and Juan Carlos was not. Tr. (12/7) 49-61. The Court decided to allow Plaintiff to call Juan Carlos, but expressly reserved on whether to allow references to his prosecution. Id. at 61 ("As far as the rest of it, I think I can sort of reserve on the question of whether the indictment is admissible or not until we see how this -- how the rest of this sorts out, because that is something we can deal with very quickly.").

Given that reservation, Plaintiff's counsel's opening statement steered entirely clear of the subject of Juan Carlos' criminal charges. Tr. 237-68. Defendants' counsel, however, plowed straight into it, informing the jury within his first few sentences that the State's Attorney's office had been duped. Tr. 269. Later in his opening, defense counsel explained (id. at 291-92):

> The State's Attorney got duped. Juan Carlos Torres got arrested. He hasn't had a trial. He's presumed innocent. He's going to get acquitted, and he's probably going to have his own trial, and somebody might be on his jury.

Having themselves injected the fact of Juan Carlos' prosecution into the trial before the Court had any chance to rule on admissibility, Defendants are in no position to seek a new trial on this basis. Cf. Walden v. City of Chicago, 2012 WL 718435, at *11 (N.D. Ill. Mar. 6, 2012) (Castillo, J.) (chastising these same defense counsel for referencing subjects in opening as to which the court had reserved ruling). Stated another way, Defendants are unable to point to a single objection at trial which should have been sustained, which is fatal to their argument.

In any event, references to Juan Carlos' charges were not erroneous because the subject matter was relevant and admissible. As Plaintiff correctly argued prior to trial, Juan Carlos' arrest was probative to the malicious prosecution claim, specifically, the indicative of innocence prong. Under well-settled case law, proof that the criminal case against Plaintiff was *nolle'd* is, standing alone, insufficient to satisfy this element. Swick v. Liautaud, 169 Ill.2d 504, 513, 662 N.E.2d 1238 (1996) (citations omitted). To get over the top, courts permit (indeed, require) indirect proof that the circumstances surrounding the dismissal are sufficiently indicative of innocence. Treece v. City of Naperville, 1998 WL 142391, at *6 (N.D. Ill. Mar. 25, 1998) (Williams, J.) (the question is whether "a reasonable jury could infer that the Assistant State's Attorneys requested the *nolle prosequi* order because they lacked reasonable grounds to pursue the criminal prosecution"); Richardson v. City of Chicago, 2011 WL 862249, at *10 (N.D. Ill. Mar. 10, 2011) ("Richardson has produced evidence from which the Court may infer that the circumstances surrounding the dismissal are indicative of his innocence"). Here, Juan Carlos was arrested on the same day that the prosecutors dropped the charges against Plaintiff for the exact same crime; this is circumstantial proof of a fact in issue, and thus was properly admitted. Mizwicki v. City of Naperville, 1999 WL 413501, at *10 (N.D. Ill. June 2, 1999) (fact that complaining officer failed to attend court on the date of the trial was relevant to help show reason for the *nolle*); Ferguson v. City of Chicago, 343 Ill. App. 3d 60, 66, 795 N.E.2d 984 (1st Dist. 2003) (plaintiff's allegation that he appeared in court nine times before the prosecutor requested the court to "SOL" the case were sufficient to "amount to a 'favorable termination' which would support a malicious prosecution claim").[34]

---

[34] During the pretrial conference, the Court indicated that it would be happy to give an instruction that the charges did not themselves mean that Juan Carlos was guilty. Tr. (12/7) at 52. Defendants did not take the Court up on that suggestion.

That leaves Defendants' half-hearted contention that Plaintiff should have been barred from calling Juan Carlos at all. Notably, their pretrial motion *in limine* sought no such relief, focusing exclusively on arguments why the "current prosecution of Juan Carlos Torres should be barred." Dckt. No. 155 at 10-11. Likewise, this section heading of their Rule 59 motion (at 26) claims error in "denying Defendants' motion *in limine* to bar evidence or argument regarding the current prosecution of [Torres]." Buried in the single paragraph under that heading is a sentence suggesting that ". . .Plaintiff should have been barred from calling Torres as a witness," but the sole rationale in support of that position (that the Court supposedly "did not rule that guilt and innocence were only relevant to damages until January 11, 2012 [the third trial day]") is illogical and unpersuasive.

In any event, there was no error here. In response to the Court's questions, the defense made clear that they intended to prove that Plaintiff committed the murder. Tr. (12/7) at 54-57. The Court explained:

> The defense is going to be that the Plaintiff did it. I mean, so, if you tell me right now, oh no, we're not going to argue that ... then please tell me that, and this is a nonissue. But if you are, then absolutely they get to try to refute that.

Tr. (12/7) at 57.

This makes perfect sense. The defense spent much of the trial trying to establish that Plaintiff committed the murder. Plaintiff was well within his rights to call Juan Carlos to inquire whether he was really the shooter. The fact that Juan Carlos intended to exercise his constitutional right to invoke a privilege is not something for which Plaintiff should have been penalized in terms of being deprived of this material evidence. To the contrary, the Court properly instructed the jury that Juan Carlos's Fifth Amendment assertion was a basis from which they could, but were not required to, draw an inference that truthful answers would have been adverse to his interests. Baxter v. Palmigiano, 425 U.S. 308 (1976).

During oral argument and in pretrial briefing, Defendants relied on <u>Mabrook v. United States</u>, 301 F.3d 503, 507 (7th Cir. 2002) for the proposition that a witness who intended to assert the Fifth should be barred. Tr. (12/7) at 53-54. As the Court pointed out, however, <u>Mabrook</u> was a criminal case. <u>Id.</u> In civil cases, such as this one, the law is different. <u>Greviskes v. Universities Research Ass'n, Inc.</u>, 417 F.3d 752, 758 (7th Cir. 2005) (relying on <u>Baxter</u> for the proposition that the district court was permitted to draw negative inferences from the assertion of privileges by the plaintiff and a witness who was not a party).[35] The Court asked the Defendants to submit any contrary authority they could locate, Tr. (12/7) at 60-61, but they never did – not before trial or even now in their post-trial motions. At some point, Defendants' failure to cite to anything must be dispositive; it is impossible to conclude the Court abused its discretion when the Defendants have presented no argument or supporting law.

At bottom, Defendants' objection boils down to a quibble with the manner in which this evidence was presented to the jury. Defendants argued prior to trial that Plaintiff should have been forced to stipulate that Juan Carlos would have taken the Fifth, but the law does not require parties to accept stipulations *in lieu* of proving propositions through witnesses at trial. <u>More v. City of Braidwood</u>, 2010 WL 3781331, at *1 (N.D. Ill. Sept. 10, 2010) (rejecting Defendants' attempt to stipulate to the indicative of innocence prong because the plaintiff "need not agree to the defendants' offer to stipulate the evidence away"), citing <u>United States v. Williams</u>, 238 F.3d 871, 874-6 (7th Cir. 2001); <u>see also</u> <u>Old Chief v. United States</u>, 519 U.S. 172, 188-89 (1997). Regardless, this is the sort of discretionary call that is

---

[35] <u>See also</u> <u>Daniels v. Pipefitters' Ass'n Local No. 597</u>, 983 F.2d 800, 802 (7th Cir. 1993) ("[A]n adverse inference may be drawn against a witness who pleads the Fifth Amendment even if that witness is not a party"); <u>Pyles v. Johnson</u>, 136 F.3d 986, 997 (5th Cir. 1998) (discussing <u>Baxter</u> and stating that "[t]he same is true regarding an invocation of the privilege by a non-party witness in a civil action").

routinely left to the trial court's discretion, and there was no genuine prejudice associated with eliciting the evidence live rather than by stipulation, much less the sort that could have affected the outcome of the trial. This argument fails as well.

## Conclusion

Aside from the lack of merit in their arguments, Defendants also cannot overcome the choices they made throughout this litigation. They failed to appeal qualified immunity, move for Rule 50 relief, object during closing, or introduce certain evidence at trial. There may have been strategic reasons for each decision at the time, but Defendants' elections presently operate to foreclose post-trial relief even if their arguments were persuasive, which they plainly are not. There is no basis to set aside the verdict, and Defendants' motions should be denied.

RESPECTFULLY SUBMITTED:

Attorneys for Plaintiff Jimenez

Arthur Loevy
Jon Loevy
Vince Field
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

Stuart Chanen
Lisa Carter
VALOREM LAW GROUP
35 East Wacker
Suite 3000
Chicago, IL 60601

Locke Bowman
MacARTHUR JUSTICE CENTER
University of Chicago Law School
375 East Chicago Avenue
Chicago, IL 60611

## CERTIFICATE OF SERVICE

I, Jon Loevy, an attorney, certify that on March 28, 2012, I filed the foregoing Memorandum by means of the Court's ECF filing system.