# EXHIBIT F

1

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | NORTHERN DISTRICT OF ILLINOIS<br>EASTERN DIVISION |
| 3 | |
| 4 | THADDEUS JIMENEZ, |
| 5 | Plaintiff, ) Docket No. 09 C 8081 |
| 6 | vs. |
| 7 | CITY OF CHICAGO, et al., ) Chicago, Illinois |
| 8 | Defendants. ) December 5, 2011<br>3:30 p.m. |

```
 1                  IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3

 4     THADDEUS JIMENEZ,                )
                                        )
 5                     Plaintiff,       )   Docket No. 09 C 8081
                                        )
 6            vs.                       )
                                        )
 7     CITY OF CHICAGO, et al.,         )   Chicago, Illinois
                                        )   December 5, 2011
 8                     Defendants.      )   3:30 p.m.

 9
                          TRANSCRIPT OF PROCEEDINGS
10              BEFORE THE HONORABLE MATTHEW F. KENNELLY

11
       APPEARANCES:
12

13     For the Plaintiff:     LOEVY & LOEVY
                                BY:  MR. JONATHAN I. LOEVY
14                              312 North May Street
                                Suite 100
15                              Chicago, Illinois   60607

16
                              MR. LOCKE E. BOWMAN, III
17                              MAC ARTHUR JUSTICE CENTER
                                Northwestern University
18                              School of Law
                                357 East Chicago Avenue
19                              Chicago, Illinois   60611

20
                              VALOREM LAW GROUP, LLC
21                              BY:  MR. STUART J. CHANEN
                                     MS. LISA R. CARTER
22                              35 East Wacker Drive
                                Suite 3000
23                              Chicago, Illinois   60601

24

25
```

1        THE COURT:  Let me ask you then about number 3, which
2   the defendants at least responded to in the same category.
3   It's street gang evidence.

4        One of the arguments that is made on the defense side
5   is that that is relevant in, among other things, assessing, I
6   guess, materiality on the Brady issue.  And I'm grossly
7   oversimplifying this, and maybe I'm only talking about a part
8   of their argument, but one of the things that I noted in
9   their -- in the defendants' response was that, you know, gang
10   evidence played a fairly significant role at Mr. Jimenez's
11   trials, and at least, and maybe in other ways, but at least in
12   the sense that there were people who claimed that, you know,
13   they were afraid to testify because they had been threatened
14   and so on and so forth.  And it may have provided -- the gang
15   evidence may have provided some motive for Mr. Jimenez to
16   commit the murder and various other things.

17        So it's not exactly, I don't think, the same -- it's
18   not exactly in the same category as the other stuff you've
19   just been talking about.  And that's just a partial summary of
20   what the defendants are arguing about on that.

21        So give me a sense of what you would like to say.
22        MR. LOEVY:  Well, your Honor, I think that what you
23   say makes sense.  I do think it's a different argument because
24   I think there is at least some logical basis to argue the
25   gangs.  And our position is even though there's at least a

1  logical basis to be talking about gangs, you could capture
2  most of the probative value and avoid the prejudice by
3  referring to it as, you know, what does it mean to be a Pee
4  Wee member of the Simon City Royals.

5      THE COURT:  Well, I mean, I'm not going to force
6  people to refer to him as a Pee Wee member of the Simon City
7  Royals, honestly, I mean, unless he has a membership card
8  which says Pee Wee member, okay, which I'm guessing he does
9  not have and never did.

10      So, I mean, you may want to refer to it that way.
11  I'm not going to tell everybody that that's the terminology
12  they have to use.  Ditto with party crew or whatever the lingo
13  is.

14      MR. LOEVY:  That was our best argument, your Honor,
15  that you should use your discretion.  And, obviously, all
16  judges deal with it differently, but some judges fashion that
17  kind of solution.  You know, Judge Castillo opinion in the
18  Kotter case, that's the big one.

19      THE COURT:  I mean, seriously, though, do you
20  honestly -- do you honestly actually believe that if we were
21  to refer to the Simon City Royals as a party crew that jurors
22  are not going to make some sort of a connection?

23      MR. LOEVY:  I think they would.

24      THE COURT:  I mean, this is the year 2000 and
25  whatever it is, 2011.

1          MR. LOEVY:   I think they would figure it out, and I
2     think that they would get the message, but I think it's still
3     a very good solution that balances the probative and the
4     prejudice because if we're talking about a party crew and some
5     organization called the Triangles, it's not like let -- it's
6     not as inflammatory to be saying street gangs.  And it really
7     keeps both sides in check because if it's a party crew --

8          Like, you know, if you look at Obolosky's response,
9     in their response to the gang thing they got, they want to
10    talk about street gangs, street gangs, street gangs.  And it
11    just doesn't work if you're talking about party crew, party
12    crew, party crew.  You know, it's not as inflammatory.  It's
13    not as prejudicial.

14         In other words, that's my point.  The prejudicial --
15    the probative value is there.  Everybody understands they're
16    part of some organization, but you avoid the prejudice.  So
17    that's our argument, your Honor.

18         And if we're going to let it in, either at all, you
19    know, because we have not conceded that it should come in at
20    all, but if you're going to let it in for some purposes, we
21    urge you to adopt that nomenclature because you capture most
22    of the probative and you avoid a lot of the prejudice.

23         And I also would urge you to --

24         THE COURT:   So wait a second.  Let me ask you just a
25    related question.  So you disagree with the idea that in

1   determining the materiality of the allegedly undisclosed

2   information that that has to be assessed in comparison to the

3   entire universe of what information was out there?

4           MR. LOEVY: That I accept as a legal proposition.

5           THE COURT: Okay. And the entire universe of

6   information that was out there included, as I understand it at

7   least from what's been described to me as some of the

8   testimony at one or both of the trials, that, you know,

9   witnesses were afraid to testify because they had been

10   threatened by somebody, and there's an argument made -- and

11   for whatever reason, I'm not able to put my finger on it right

12   here right now, but there's an argument made somewhere in here

13   that --

14           Yes. Hang on a second. I think I may have just

15   found it. Bear with me.

16           (Brief interruption.)

17           THE COURT: Yes. So I'm looking at page 18 of the

18   defendants' response to the motions in limine, that it was

19   argued at the first trial that essentially the gang issue

20   established or tended to establish a motive for Mr. Jimenez to

21   shoot Eric Morro. It explains or helps explain why

22   Mr. Tueffel did not originally identify Mr. Jimenez at least

23   from his testimony at one or both of the criminal trials.

24           And so, I mean, if that's the case, I mean, how can

25   one fairly keep out any reference at all to gangs?

1          And, by the way, party crew would not cover that.  If

2     Mr. Tueffel is accurately quoted as testifying in the first

3     trial as, quote, if you trick on another gang member, you end

4     up dead, close quote, I guess what I would then be doing would

5     be telling the defendant that they would have to reword that

6     to say, if you trick on another member of the party crew, you

7     end up dead.  I mean, it's almost laughable.

8          So, I mean, how could you do that?

9          MR. LOEVY:  Well, the first point was motive and

10    you're saying that they --

11         THE COURT:  I'm just asking you to respond to the

12    argument.

13         MR. LOEVY:  And I will respond to them in turn, the

14    motive and then the Larry argument.

15         The motive argument is an easier one because Larry --

16    the jury could be told that TJ had a motive to kill the victim

17    because earlier in the day they had an encounter and they had

18    words and they disrespected each other.

19         Do we need to tell the jury they disrespected each

20    other a substantive matter involving --

21         THE COURT:  Well, you know, disrespect each other

22    could mean that, you know, I didn't -- you said "hi" to me as

23    I passed you on the street and I looked the other way.

24         It could mean that, you know, that you ran a red

25    light and I flipped you off.  Or it could mean you were

1  flashing a gang symbol and yelling "Royals" at a school bus,
2  and then the person said, you know, take it somewhere else,
3  and then Mr. Jimenez allegedly said, you'll get yours.  I
4  mean --

5  MR. LOEVY:  I have tried cases, most recently in
6  front of Judge Grady, where he instructed both sides to say
7  "my group" and "your group" because it was relevant that they
8  were in different groups and it was relevant that some people
9  were in the same group and some people weren't in the same
10  group.

11  And like you said, the jury figured it out.  But you
12  can capture the probative value to say they had a disagreement
13  and, you know, they had words and they had --

14  You know, we're not disputing that they were -- there
15  was a motive there, but we could do it without saying --

16  THE COURT:  Yes, I understand that.  I don't know,
17  and I'm just going to be blunt about this and say I don't care
18  to know the entire set of evidence in Judge Grady's case
19  because that's what I would have to know in order to figure
20  out whether they're truly comparable situations or not.

21  Okay, I get what your point is.  I want to ask the
22  other side some questions here.

23  So I want to talk first about the nongang stuff.  So
24  whoever is going to talk about that, come up here.  So what I
25  need you to explain to me is basically your response to the

1   contention that the prior arrests, the subsequent arrests,
2   subsequent arrests, the other alleged bad conduct and that the
3   alleged drug usage before and after isn't -- there is no
4   connection between that and the damages claim or anything else
5   that's relevant. So talk to me about that.

6          MR. KAMIONSKI: You know, our major point in the
7   responses your Honor saw was Dr. Kavanaugh. Now we have a new
8   wrinkle with them taking out Dr. Kavanaugh. So I'm going to
9   work without Dr. Kavanaugh for this analysis.

10         THE COURT: Right.

11         MR. KAMIONSKI: As to the prior arrests, Bogucki, who
12  is the defendant in the case, testified. One of their
13  contentions is that the officers did a bad investigation.
14  They didn't follow up on an alibi. TJ said, I have an alibi.
15  Go check out my alibi. And Bogucki testified at his
16  deposition that, I knew the kid's background. I didn't trust
17  anything he had to say. I didn't go check out his alibi.

18         So part of the analysis for the police officers at
19  the time is they knew about TJ's 20-plus arrests and his
20  background. They would have run rap sheet. They had that
21  information as a part of the analysis.

22         THE COURT: They had what information? They had the
23  entirety of his juvenile arrest record available to them?

24         MR. KAMIONSKI: Correct.

25         THE COURT: And when you say they would have, do you

1 mean that they did?

2 MR. KAMIONSKI: I know that Bogucki said he did not

3 rely -- he did not do the alibi because he knew about his

4 background, and I know that Bogucki is going to testify at

5 trial that he did have his background information. That much

6 I know.

7 THE COURT: Okay.

8 MR. KAMIONSKI: He wasn't asked --

9 THE COURT: In what way, shape or form did he have

10 it? I mean, is it just like, I knew this guy was a street

11 gang member and I figure I wasn't going to trust any of his

12 gangbanging buddies, or was it I went and I looked and I saw

13 that he had been arrested 22 times?

14 MR. KAMIONSKI: That he --

15 THE COURT: You need to know the answer to this

16 question, okay. And I would be astonished if the man hasn't

17 been asked the question at some point in the last 20 years.

18 MR. KAMIONSKI: Right. He told --

19 I mean, he was not asked that question in his

20 deposition. So I guess that's my answer as to the

21 deposition point of view.

22 THE COURT: I didn't confine my question to

23 depositions asked by someone.

24 MR. KAMIONSKI: He did run his juvenile rap sheet.

25 THE COURT: When?

1          MR. KAMIONSKI:  At the time that he had him in
2     custody.
3          THE COURT:  That's not near specific enough.
4          The man's up here under oath.
5          MR. KAMIONSKI:  Right.
6          THE COURT:  He's asked a question:  Did you run his
7     juvenile rap sheet?  He's going to say, yes.
8          MR. KAMIONSKI:  Right.
9          THE COURT:  And then the next question is:  Exactly
10    when did you do that?
11          What's he going to say?
12          MR. KAMIONSKI:  I don't know at which point in time
13    he ran the criminal rap.
14          THE COURT:  Yikes.
15          MR. KAMIONSKI:  I guess I don't want to speak and say
16    when.
17          THE COURT:  Is there anybody over on this side of the
18    room that knows the answer to that question?  I mean, the
19    thing that you contend is so significant, you don't know when
20    he did it?
21          MR. KAMIONSKI:  We knew he did it when he was in
22    custody, at which point in time when he was in custody for
23    this arrest.  That's --
24          MR. HALE:  Judge, when Ms. Ahn and I met with
25    Mr. Bogucki, Mr. Kamionski wasn't there because it was in our

1 Park Ridge office. He told us he ran the rap sheet prior to

2 the lineup. That's what I remember him saying.

3          THE COURT: Okay.

4          MR. KAMIONSKI: So that's going to be the day of --

5          MR. HALE: The lineup was the morning of February

6 4th.

7          THE COURT: So let me go back to what you originally

8 said, though, about why he --

9          There's going to be a contention, I take it, that

10 they didn't follow up on things, they didn't do an adequate

11 investigation. And what you're saying is that the defendant,

12 this particular defendant, maybe the other defendant, want to

13 explain why, and the answer is going to be, well, I didn't

14 follow up on his alibi because I knew he was a member of a

15 street gang and I wasn't going to trust anything any of those

16 people said anyway.

17          MR. KAMIONSKI: I knew about his prior criminal

18 background, correct.

19          THE COURT: Okay. This guy's a detective, right?

20          MR. KAMIONSKI: Correct.

21          THE COURT: How long had he been a detective at that

22 point in time?

23          MR. KAMIONSKI: I'm not sure.

24          THE COURT: So you're telling me that a detective

25 with the Chicago Police Department is going to sit on a

1    witness stand and say that I did not follow up on an alibi

2    because the people who were claimed as the alibi -- because

3    the person who was claiming the alibi had a criminal record?

4    Somebody's going to say that in a courtroom under oath with a

5    straight face? Are you really telling me that? I mean, I

6    ought to let that in just --

7           Frankly, I would pay to cross-examine the guy. I

8    would pay good money to cross-examine that.

9           MR. KAMIONSKI: No.

10          THE COURT: Does that mean he never investigates

11    alibis because pretty much everybody he's arresting has got

12    some sort of an arrest record?

13          MR. KAMIONSKI: The way it came out --

14          THE COURT: Come on. Answer my question.

15          MR. KAMIONSKI: I don't think he's going to say that

16    that's why he -- I don't think he's going to say it the way

17    your Honor has phrased it.

18          I know during the --

19          The point that I'm making is that during his

20    deposition, when he was probed about what he did and why he

21    did what he did and why he discounted the information that he

22    was getting from the family, that's what he said in the

23    deposition. And I'm not saying that's not the only reason he

24    didn't do what they're saying he's doing, but I'm saying that

25    was something that came out.

1           THE COURT:  What are the other reasons since we're

2   talk about it?  What are the other reasons?  You just said you

3   don't know that that's the only reason.  What would be the

4   other ones that he didn't follow up on somebody's alibi, that

5   he left the state's attorney who was going to be trying the

6   case just hanging out there on the alibi?  What would be the

7   other reasons why he did that besides the fact that the

8   defendant had a criminal record?

9           MR. KAMIONSKI:  I'm not sure.

10          THE COURT:  You're not sure.  Maybe we should just

11  recess this until you come back and can answer these

12  questions.  These are pretty basic questions.

13          You're telling me that this is a critical factor and

14  you can't give me any details about it.  I mean, it's almost

15  laughable on its face, the proposition that a detective would

16  not investigate somebody's alibi because they have a criminal

17  record.  I mean, seriously.

18          I wouldn't mind asking Ms. Alvarez what she thinks of

19  that since maybe she's a witness who's going to be a witness

20  here, too.  Maybe we can put that to her on cross examination:

21  What do you think about cops who don't investigate alibis

22  because the defendant has a criminal record?  I mean, I can

23  guess what the answer would be, maybe.

24          MR. KAMIONSKI:  Well, I have some other points about

25  these issues outside of the comment that Detective Bogucki

1  made.

2      THE COURT:  Okay.  So let's put that aside for a
3  second.

4      MR. KAMIONSKI:  Okay.

5      THE COURT:  Let's talk about damages.  So the point
6  that's made here is that you take the victim as --

7      This is the not words that were used.  You take the
8  victim as you find him, and there is no -- there is not going
9  to be any evidence, and none of the defendants' experts have
10  any evidence, and it's not a viable theory even, that somebody
11  who has been arrested a bunch of times somehow doesn't
12  experience the same kind of emotional distress from being
13  incarcerated for 16 years as somebody who has been arrested a
14  number of times.

15      So talk to me about that.

16      MR. KAMIONSKI:  Well, there's two --

17      I will just go back on two other points and then I
18  can respond to that just today.

19      THE COURT:  No.  You can respond to the question I
20  just asked.

21      MR. KAMIONSKI:  Sure.

22      So they're not going to say that just because
23  somebody was arrested multiple times before doesn't mean he's
24  going to suffer damages.  The point that Dr. Obolosky was
25  making was in connection with the PTSD analysis.  And my

1  understanding is that the plaintiff is dropping his PTSD
2  claim.

3           THE COURT:  I don't know if that's the case or not.
4  All I know -- is that true?  All I know is that Kavanaugh is
5  not testifying in your case in chief.

6           MR. LOEVY:  We have no proof that there is PTSD.
7  He's going to get up there and say, I was very, very upset.
8  Nobody is going to diagnose PTSD.

9           THE COURT:  Okay.

10          MR. KAMIONSKI:  In that respect, it changes.  That
11  changes it.

12          THE COURT:  In what way?

13          MR. KAMIONSKI:  In what way is that --

14          THE COURT:  In what way does that affect the
15  admissibility of this evidence?

16          MR. KAMIONSKI:  On that issue it would not come in in
17  order to show his general background.  The PTSD beforehand
18  said look at everything before or after, during everything.
19  Doctor Obolosky was responding to that in that respect.

20          THE COURT:  Okay.

21          MR. KAMIONSKI:  The other respect that we pointed out
22  that it does come in under is there's two other critical
23  points here.  One is he was tried as an adult because of his
24  criminal background.  There is a probation officer who
25  recommended that his case be transferred to the adult court

1 │ system, and that's why he had a different trial.

2 │         THE COURT: I noticed that in the response, and I

3 │ guess I don't have much background in this particular area of

4 │ the law, so I need you to explain to me from your perspective

5 │ procedurally how that works.

6 │         In other words, was Mr. Jimenez first charged as a

7 │ juvenile and then it was transferred to adult court?

8 │         MR. KAMIONSKI: Right. That's my understanding.

9 │         THE COURT: So I would assume that there is some sort

10 │ of a process for that. A motion has to be filed.

11 │         MR. KAMIONSKI: There was some sort of a transfer

12 │ hearing.

13 │         THE COURT: And the transfer hearing is something

14 │ that's in front of a judge?

15 │         MR. KAMIONSKI: Right, and then there's

16 │ recommendations that are made, and we deposed the person who

17 │ made some of these recommendations.

18 │         THE COURT: I understand.

19 │         What I want to know is the judge who made the

20 │ decision, because the decision to transfer is made by a judge.

21 │ It's not made by a psychiatrist or a psychologist.

22 │         What information -- do we know what information was

23 │ given to the judge?

24 │         MR. KAMIONSKI: I don't know all the information. I

25 │ know that he was given this report about the plaintiff's

1    background and the recommendation by this probation officer to
2    transfer him.
3              THE COURT:  Okay.  And what exhibit number is that
4    report?  Do you know offhand?
5              MR. KAMIONSKI:  Not off the top of my head.
6         (Brief interruption.)
7              THE COURT:  Anybody can jump in here.
8              MR. KAMIONSKI:  I think it's going to be 62, 63 and
9    64 are the Dennis Brady reports.
10             THE COURT:  62, 63 and 64.  To which motion is this
11   or to which --
12             MR. KAMIONSKI:  Oh, I don't think it's an exhibit to
13   the --
14             THE COURT:  Ah.  So do I have it, I guess, is the
15   question.  Maybe that's the threshold question.  Do I have it?
16   Because I don't have anything that's got 63 on it, I know that
17   much.
18             On the plaintiff's motions in limine, they have
19   Exhibits 1 through 20 and the defense has Exhibits 1
20   through 14.  And on the defense motions, it's the -- yes,
21   there's a small number of exhibits.  The defense has none.
22   The plaintiff's got about four or five.
23             MR. KAMIONSKI:  We attached the deposition of the
24   probation officer, and that was exhibit --
25             THE COURT:  You know what, I understand that.

1    What I want to know -- because a decision was not

2 made by the probation officer. The decision was made by a

3 judge. And when you say it's relevant to why the case was

4 tried in adult court, I mean, I'm going to ask in a second why

5 that's a relevant topic at all, why the case was handled in

6 adult court as opposed to juvenile court. It was handled in

7 adult court. We know that it was handled in adult Court.

8    So I guess one of my questions is: Why does it

9 matter for purposes of the issues in this case why it ended up

10 in adult court? That's number one.

11    Number two, the decision was made by a judge. I want

12 to know what information the judge had. I don't want to know

13 what the probation officer testified that he or she said.

14 What I want to know is what information the judge had because

15 that's what determined -- that's what the judge based his or

16 her decision on is what information the judge had.

17    So let's just ask a real basic question here. Is

18 there, like, a transcript of this hearing or are there

19 motions, is there paperwork, is there something that was

20 filed?

21    Just everybody keep in mind that you were originally

22 going to be trying this case starting today. I mean, we're a

23 half an hour -- 45 minutes into this and I'm --

24    MR. HALE: There is an order, I believe.

25    THE COURT: There's a?

1          MR. HALE:  I think there's a court order explaining.

2          THE COURT:  That's the end of the process.  Oh, okay,

3   there's a court order that explains the basis for the ruling.

4          MR. HALE:  That's my recollection.

5          THE COURT:  Okay.  Does anybody have that?

6          MR. HALE:  I don't have that.

7          MR. KAMIONSKI:  We don't have that here.

8          THE COURT:  Okay, then, court order re transfer.

9          So let me go back to a question that doesn't require

10  any of that.  Let me just make a note.

11      (Brief interruption.)

12          THE COURT:  So you're arguing that his prior juvenile

13  record was relevant in the determination for the case to be

14  tried in adult court rather than in juvenile court.  Why does

15  that matter?  How does the reason --

16          Why does the reason for that decision matter to the

17  case that I'm trying here?

18          MR. KAMIONSKI:  It's relevant to damages, and my

19  understanding is that the penalties are harsher in the adult

20  court versus in the juvenile court.

21          THE COURT:  So what?  I mean, why is that relevant to

22  damages?  I mean, he got the sentence that he got.

23          MR. KAMIONSKI:  Right, because I think what the

24  plaintiff is going to argue is that he was transferred.  He

25  wasn't tried in juvenile court.  He was tried in adult court,

1   and, therefore, it's a lot worse for him that he was
2   transferred.

3          THE COURT:  Well, he's not going to argue he was
4   tried in adult court.  He was tried in adult court.  It's a
5   fact, okay.

6          And so is it your contention that because if he had
7   had a good background, he might have been tried as a juvenile
8   for shooting and killing somebody?  Even though that didn't
9   really happen, then that is somehow relevant to his damages?

10         MR. KAMIONSKI:  Right.

11         THE COURT:  I'm going to ask you the question that
12  one of my first year law professors -- and I'm not going to
13  say how long ago this was; it was a long time ago -- where's
14  the wherefore?  Explain to me why that matters.

15         That there could have been some other hypothetical
16  state of affairs that didn't actually occur, how is that
17  relevant to his damages?  The damages don't compare --
18  theories of damages don't compare what would have happened if
19  the plaintiff had been a really nice kid, you know, who was an
20  honor student in school and had never gotten in trouble as
21  opposed to the person who got whatever sentence he got and
22  served 16 years or whatever it was.

23         The comparison is between serving 16 years and not
24  serving 16 years, assuming the plaintiff proves liability.  I
25  mean, you could -- because the problem with the theory that

1  you're describing here is that there is no end to it. What if

2  he had been in front of an easier judge? What if -- you know,

3  what if the transfer had happened three days earlier as

4  opposed to three days later? It would have gotten assigned to

5  somebody else and maybe that judge would have given him a

6  lighter sentence, or maybe the other judge would have let some

7  evidence in that the other judge didn't let in. Why doesn't

8  any of that matter?

9      I mean, is there some -- can you articulate some

10  theory of damages as to why it matters what would have

11  happened if he had not been transferred to an adult court?

12      MR. KAMIONSKI: Well, he was given -- the plaintiff,

13  he was given a longer sentence than 16 years. He was given

14  close to.

15      THE COURT: I would assume so, right. The minimum

16  for murder is more than 16, I know that.

17      MR. KAMIONSKI: So he was a given a 50 -- close to a

18  50-year sentence, and that's based in part -- well, that's a

19  different issue.

20      But on the fact that it was transferred, my

21  understanding is that the tougher sentences or the longer

22  sentences even for murder are longer in the adult court versus

23  the juvenile court system.

24      THE COURT: But the plaintiff isn't going to be

25  claiming -- I assume; you will correct me if I'm wrong. The

1   plaintiff is not going to be claiming damages here standing in
2   front of the jury saying, because he was given a 50-year
3   sentence, even though he served 16, give him more damages.
4   Are you going to claim that?

5           MR. KAMIONSKI:  No, your Honor.

6           THE COURT:  I mean, no rational person would claim
7   that.  He's going to claim, I served 16 years, compensate me
8   for that.

9           MR. KAMIONSKI:  But he's going to say he was
10  sentenced to 50.

11          THE COURT:  But that's not what the damages are based
12  on.  I mean, no rational person under any damages instruction
13  is going to say, give the person damages based on the
14  hypothetical 50-year sentence.

15          MR. KAMIONSKI:  But some things --

16          I mean, in my experience in trying cases with -- in
17  these types of cases is he could have gotten the death
18  penalty.  Had he not gotten out earlier, he could have been
19  killed.  He could have spent X number of time.  And luckily he
20  only spent 16, but even the 16 is bad enough.

21          THE COURT:  I can cure that with a jury instruction.
22  Damages are to be determined based only upon injury that the
23  plaintiff actually suffered.  I mean, not in those words
24  necessarily, but that's in every compensatory damages
25  instruction that's ever given.  You can't base it on

1    conjecture.   What would have happened if he had served the
2    whole 50 years, or what would have happened, you know?

3         I'm not seeing it.  So right now as I'm sitting here,
4    you have not come anywhere close to convincing me that the
5    issue of why the case was tried in adult court is in any way,
6    shape or form relevant to any issue in this case.

7         So I'm going to give you one further chance here, so
8    go for it.

9         MR. KAMIONSKI:   And it might tie into my other point
10   on the priors.

11        THE COURT:   Tie it into whatever you need to tie it
12   into.

13        MR. KAMIONSKI:   Okay.

14        At the sentencing hearing, when they got the 50-year
15   sentence, they brought in 20 or so witnesses to talk about all
16   of his prior bad acts, and that's why his sentence was so high
17   under the circumstance that he got.

18        And I think that what plaintiff is going to say is
19   that he could have been in there for 50 years until he was
20   70 years old.  That is over -- that is going to be more
21   prejudicial because the way it's going to go, every year and
22   year, they're going to see not the just years of actual
23   damages, but even though there's going to be an instruction
24   saying he should only be compensated for what happened,
25   there's going to be the speculation and, like, the imagination

1 | of 50 years.

2 | THE COURT: So what you're telling me is because of
3 | the hypothetical possibility that the jury might think, well,
4 | gee, even though the judge is telling us only compensate him
5 | for the actual harm he suffered, that we should actually
6 | compensate him on the fact that he got a 50-year sentence,
7 | that that allows you to put in, even though it would not
8 | otherwise be relevant to any issue, every last little thing
9 | that was trotted out at the sentencing hearing in the case?
10 | That sounds like what your position is.

11 | MR. KAMIONSKI: I think it's part -- yes, I think
12 | it's part --

13 | THE COURT: That is an absurd argument, with due
14 | respect, Mr. Kamionski. It's an absurd argument. I mean,
15 | that would turn Rule 403 on its head, and it would turn
16 | Rules 401 and 402 on their head.

17 | MR. KAMIONSKI: Well, then maybe -- I think there's
18 | got to be some sort of a middle ground here because at the end
19 | of the day, it's still a 13-year-old being tried for a murder,
20 | okay. And it's not just any 13-year-old on the street, which
21 | is the sanitized version that the plaintiff would want, that
22 | just some random 13-year-old is being tried for a murder.

23 | It happened to be that this -- I mean, this is the
24 | situation we're dealing with is a person who's had this
25 | background and that's why he's facing the situation.

1         THE COURT: What other issue is it relevant to? What

2 other issue is his juvenile background relative to other than

3 that? Is there any?

4         In the situation we have right now where they're not

5 calling Kavanaugh in their case in chief, is it relevant to

6 any other issue?

7         MR. KAMIONSKI: Well, I think it's relevant to

8 damages. And my final point on that is although they been

9 mocking the argument, but it's not just Dr. --

10         THE COURT: Well, actually I think that's me that's

11 been mocking the argument, just to be fair.

12         MR. KAMIONSKI: You know, his probation officer from

13 the time testified in his deposition that even if he would not

14 have gone in for this case, he was destined to go to IDOC

15 anyways. Now, it's not just Dr. Obolosky who is saying that.

16 It's a person who knew Mr. Jimenez at the time and was

17 evaluating him at the time. We should be able to get some

18 sort of picture that he was --

19         THE COURT: That we actually did the guy a favor

20 because we put him in for something that he actually got out

21 for when he was given a declaration of innocence whereas if we

22 hadn't done that, he probably would have done something really

23 bad and ended up stuck there for the rest of his life anyway.

24 That's basically the theory.

25         MR. KAMIONSKI: No, I'm not saying that. I'm saying

1  that it's relevant to understand the amount of damages he was
2  facing. A, he was in -- he had all these prior encounters.
3  He's not, although they're --

4  THE COURT: So wait a second. Okay, I get it. I
5  mean, I understand the argument. The argument is, is that
6  if -- assuming liability for purposes of discussion, if he
7  hadn't done this time, he would have done some other time and,
8  therefore, the damages should be based on, you know, whatever
9  incremental difference, if any, there was from what he got
10  here and what he got there.

11  So you're telling me, you're telling me, that you
12  have got authority for the proposition that this probation
13  officer -- and I don't know what his or her background is, but
14  let's just assume that the person has a master's in
15  psychology, okay, or a master's in social work or something
16  like that, or let's say even a doctor of psychology -- that it
17  would be appropriate testimony in a court in this country for
18  the probation officer to come in and say in front of the jury,
19  hey, if this guy hadn't been convicted for this, he would have
20  been doing time anyway?

21  I mean, what is the possible -- what field of
22  knowledge is it that gives people the ability to make those
23  predictions in a way that makes it admissible as expert
24  testimony because that's what we're talking is expert
25  testimony? I mean, I know that people talk about that in sort

1   of ordinary everyday parlance that this guy's a troublemaker,
2   and, you know, if he wasn't convicted for this, he would have
3   been convicted for something else. We're not talking about
4   everyday parlance. We're talking about in a court, I'm a
5   gatekeeper, I've got to make decisions about, you know,
6   whether this is an opinion or an interpretation or testimony
7   that has some, you know, basis as Rule 702 requires and some
8   recognized body of knowledge and so on.

9           What is that body of knowledge? I mean, Johnny
10  Carson used to do it on the Tonight Show when he did Carnac
11  the Magnificent. But I'm kind of missing the body of
12  knowledge that gives a probation officer the ability to come
13  in and testify as an expert that this guy would have been
14  doing this same kind of time or something close to it or any
15  kind of time if he hadn't been busted for this thing. What is
16  it? You tell me.

17          MR. KAMIONSKI: His body of knowledge is the fact
18  that he was his personal probation officer or whatever. He
19  worked with TJ at the time and saw TJ's progression in life
20  and all the crimes that he was committing and made that --
21  those notes saying that he's going to be -- this person is
22  destined to a life of crime.

23          THE COURT: So it's not any particular knowledge he
24  has; it's the fact that he has ongoing contact with them.
25  That's what you just told me.

1        MR. KAMIONSKI:  Correct.

2        THE COURT:  I'm just trying to make sure I'm

3  understanding.  It's ongoing contact.

4        How much contact did he have with him?  How much

5  contact did he have with him?

6        MR. KAMIONSKI:  He met with him on several occasions.

7        THE COURT:  Define several.  Two, four, six, 500?

8        MR. KAMIONSKI:  Not 500.

9        THE COURT:  Closer to two, four or six?

10       MR. KAMIONSKI:  Probably closer to two, four or six.

11       THE COURT:  Probably closer to two?

12       MR. KAMIONSKI:  I think it was more than that.  He

13  went to visit his school.  He went to follow up with his

14  school teachers about how he was progressing.

15       THE COURT:  Okay.  So let me give you another

16  hypothetical.  Let's say that somebody's mother who has

17  contact with him every day from the day they're born were to

18  come in and say, you know --

19       Let's just say, for example, that you had interviewed

20  Mr. Jimenez's mother, and I recognize that she's maybe a

21  witness on the other side of the case.  Let's just say for

22  purposes of discussion you had interviewed his mother, and his

23  mother would have said, you know what, if he hadn't been in

24  for this, he would have been in for something else and I know

25  because I lived with him for 13 years before this happened.

1   Would that be admissible testimony?

2           MR. KAMIONSKI: Probably not.

3           THE COURT: Okay. So what is different about your

4   probation officer?

5           MR. KAMIONSKI: The reason --

6           THE COURT: That's why I'm getting back to your

7   question of expertise. What's the body of knowledge that

8   permits the probation officer to testify about that, because

9   you're right, the mother wouldn't be admissible?

10          MR. KAMIONSKI: Because I think the probation officer

11  deals with other kids and sees the system and is aware of the

12  system and how it works.

13          THE COURT: Okay. You find me a case that says --

14  you find me a case that says that a probation officer can come

15  in in a trial in front of a jury and make a predictive

16  judgment like that about the person is going to be doing time.

17  Find me a case that says that and I will consider it, but, I

18  mean, to me that is -- if Rule 702 permits that, it's Katie

19  bar the door. I mean, we might as well just go out on the

20  street and have somebody come in and sit in the pews here,

21  have him watch all the testimony, and at the end of the trial,

22  they would come up and say: Okay, who did you think was

23  telling the truth? I mean, you were here for the whole trial.

24  Who did you think was telling the truth? It's ridiculous.

25          All right, fine. We're moving on to another topic.

1   The gang thing, okay.  So I am persuaded largely that --

2           If you're the gang person, do a switch.

3           I'm persuaded to a fairly significant extent that

4   gang evidence had enough to do with the trials, the murder

5   trials, that some aspect of it has to come in here.

6           Can you give me kind of a sense of how you're going

7   to -- how the gang evidence is going to be used in this case?

8           MR. HALE:  Right.  I think the way I envision it

9   being used is the same way it was used in the criminal case,

10  which was -- and I've got Mr. Tueffel's testimony from both

11  trials here in front of me, and I'm happy to pass it up if you

12  want it.

13          THE COURT:  It helps explain why he's going back and

14  forth.

15          MR. HALE:  You know, I've read cases, and I think the

16  biggest issue is it explains the initial reluctance to

17  identify Mr. Jimenez at the scene.  He was asked about this at

18  both trials if he was a member of a gang, and he said yes, the

19  Simon City Royals.  The first trial -- I mean, the very first

20  question is, you know:  Do you know who that is?  He points

21  out TJ.  How do you know TJ?  He says, from when I used to be

22  in a gang with him.  He identified the gang as the Simon City

23  Royals.  And then he says -- they said:  Larry, why didn't you

24  tell Phil -- why did you tell Phil it wasn't TJ?  Because I

25  was scared.  And the question was, why did you think something

1  it last night, my impression -- my recollection was she was

2  saying it was made to Victor at the Audy home.

3        MR. LOEVY: Well, the contemporaneous report says

4  Thaddeus announced that he would kill the father of the young

5  man he is on the case with. That doesn't say he said to the

6  guy, you know, Victor Romo --

7        THE COURT: I understand, but, I mean, people say

8  things that aren't exactly all written down on paper all the

9  time, and that's not a basis for excluding it from a trial.

10        So what I'm more interested in is what is she going

11  to testify here, and, you know, a better sign of that would be

12  what she said in her deposition, I would think.

13        MR. LOEVY: Well, I think that we need an answer to

14  that then because, obviously, if they can't tie it up --

15        THE COURT: Was it asked in a deposition?

16        MR. LOEVY: This was not something they cited.

17        THE COURT: Can you show me the dep?

18        MR. HALE: Yes.

19        MR. LOEVY: This wasn't cited, so we didn't know.

20        MR. HALE: I have highlighted just a part of the

21  threats, Judge.

22        THE COURT: I'm looking at Ms. Gillen's deposition,

23  or it's a partial transcript of November the 4th of 2010.

24  Okay, it starts --

25        The sequence of questions, it looks like, starts

1   maybe on page 7, but I start on page 8. It sounds like he's
2   reading something to a class. That's what it says at the top
3   of page 8.

4        So page 8, the witness, Ms. Gillen, is starting --
5   it's the middle of a sentence. It says:

6        "Reading it to the class and saying, is this what he
7   said, because I wanted to make sure that when I was putting
8   something like this onto a court document I was correct and
9   accurate that I had heard it. I was very stunned by the
10  words."

11  "Q   Could you just say for the record what he -- what did he
12  tell you, what did he -- what threat did he make?
13  A   That he was threatening another young man that was in the
14  classroom that was on the case, that if this young man had --
15  would testify against him, say that he pulled the trigger that
16  he would have the kid. I remember it was like he would have
17  the kid. I can't read this here, but he would have the kid
18  killed. He referred to having already killed and having a
19  young man bombed now, not a young man but an older man bombed
20  who was watching the witness in the window."

21       So what he was saying is he had taken care of one
22  witness and he would take care of this other kid that was on
23  the case if the kid testified.

24       Then the person who is questioning in the
25  deposition -- it may have been Mr. Chanen -- says:

1        "Can you read what you wrote down?"

2        She says:

3        "On 5/25/93 Thaddeus announced that he would kill the

4    father of the young man he is on the case with -- the young

5    man said he pulled the trigger.  Thaddeus had been fighting,

6    attempting to steal things and being uncooperative and sneaky.

7    Q    And you indicated that you heard Thaddeus make this threat

8    to another individual in the classroom?

9    A    Loudly and clearly across the room."

10        So I think that's fairly interpreted as that Mr. Romo

11    is present.

12        MR. LOEVY:  Your Honor, I think we can -- I will make

13    it easy.  I think my team is confident that we can prove that

14    he wasn't in the Audy home and wasn't present.

15        THE COURT:  Well, I understand.

16        MR. CHANEN:  No, no, was in that class.

17        THE COURT:  You know, I do not act as a little

18    pretend jury before the actual jury comes out where you guys

19    argue everything to me and I say, well, your version is more

20    likely than their version or vice versa and, therefore, you

21    don't get to put in the countervailing version.  I mean, I'd

22    like to know the judge in the building that tries cases that

23    way.

24        MR. LOEVY:  That's fair.  The only thing I will say

25    in our defense, your Honor, is that we prepared based on our

```
 1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3

 4    THADDEUS JIMENEZ,                )
                                       )
 5                    Plaintiff,       )  Docket No. 09 C 8081
                                       )
 6               vs.                   )
                                       )
 7    CITY OF CHICAGO, et al.,         )  Chicago, Illinois
                                       )  December 7, 2011
 8                    Defendants.      )  3:27 p.m.

 9
                         TRANSCRIPT OF PROCEEDINGS
10            BEFORE THE HONORABLE MATTHEW F. KENNELLY

11
      APPEARANCES:
12

13    For the Plaintiff:    LOEVY & LOEVY
                              BY:  MR. JONATHAN I. LOEVY
14                            312 North May Street
                              Suite 100
15                            Chicago, Illinois   60607

16
                            MR. LOCKE E. BOWMAN, III
17                            MAC ARTHUR JUSTICE CENTER
                              Northwestern University
18                            School of Law
                              357 East Chicago Avenue
19                            Chicago, Illinois   60611

20
                            VALOREM LAW GROUP, LLC
21                            BY:  MR. STUART J. CHANEN
                                   MS. LISA R. CARTER
22                            35 East Wacker Drive
                              Suite 3000
23                            Chicago, Illinois   60601

24

25
```

1   guilt, it just seems to me that there needs to be more of a

2   tie to the plaintiff than just the fact that these people are

3   related to each other or they're members of the same gang.

4   And I don't think that Ms. Gillin's comment where he's

5   boasting about what he could do, I don't think it's enough of

6   a hook.

7           So I'm not saying you could never pass the relevance

8   test, but I think, I think you don't have a sufficient

9   foundation to tie it to the plaintiff, and for that reason I

10  don't think it's relevant.  But even if it was, given the

11  tenuousness of the link, if you will, I think it's far

12  outweighed by the unfairly prejudicial effect that it would

13  have.

14          And you've got the Heatley letters, which, I mean, in

15  comparison to the Heatley letters, you're talking about

16  literally the mountain and the molehill.

17          And so I'm excluding the evidence that's discussed in

18  7, motion 7.

19          On the Margot Gillin thing, I think we discussed the

20  other day some stuff that I said could come in about, you

21  know, things that, you know, that she said were made in the

22  presence of I think it was Mr. Romo, if I'm remembering

23  correctly.

24          MR. HALE:  Right.

25          THE COURT:  This I don't think so because, again,

1   it's a small thing.  When I say "this," I mean the boasting
2   about what he could do.

3           And the same thing on the mother.  I mean, I
4   understand that you've got an additional argument on the
5   mother that, you know, it shows her bias, but if you need
6   something more than the fact that she's his mother to show
7   he's biased, then you're not as good a lawyer as I think you
8   are.  And you don't even have to be that good on that one.  I
9   mean, the one person I get a letter from on every defendant I
10  sentence is the mother.  In fact, if it doesn't, that tells
11  you something.

12          Anyway, so that's the ruling on those.

13          MR. HALE:  Thank you, Judge.

14          THE COURT:  All right.  So we've kind of put to the
15  side Rachel Vorbeck for the time being, I think.  You're going
16  to -- somebody is going to let me know if that's an issue, I
17  gather; is that right?

18          MR. KAMIONSKI:  Yes.

19          THE COURT:  You'll let me know.  But when I say "let
20  me know," that means before it gets waved in front of the
21  jury, you let me know someplace out of the presence of the
22  jury.

23          We skipped over one, and that is somebody named
24  Cortez, Carmelo Cortez.  This was plaintiff's motion in limine
25  No. 4.  I skipped over it for a reason, because it's not

1   directly pertinent to the stuff we've been talking about, but
2   I think I now need to get back to it.
3           So the issue on this, as I get it, is disclosed way
4   too late in the game.  And the response to that is basically
5   it's a sauce for the goose argument.  So I need you to respond
6   to the sauce for the goose argument.
7           You guys were disclosing witnesses way late too, and
8   so it all kind of evens out in the long run, so tell me what
9   you have to say about that or anything else about the Cortez
10  motion.
11          MR. BOWMAN:  May I just flag one issue, because I
12  don't want to forget it, relating to the matter that we just
13  left?
14          THE COURT:  Yes.
15          MR. BOWMAN:  And I promise to be very brief.
16          There is one letter that was written by plaintiff to
17  Miss Heatley that is not on the exhibit list, and in light of
18  the ruling with respect to the Heatley letters, I'm going to
19  approach the defense and ask for permission to supplement our
20  exhibit list with this one additional letter.
21          THE COURT:  I'll worry about it when I have to worry
22  about it.
23          MR. BOWMAN:  Thank you.
24          Judge, there have been some late depositions.
25  Principally they've been expert depositions.  There have been

1   a few late depositions of fact witnesses, but those were fact
2   witnesses who would have been -- who were identified, who were
3   in everybody's -- on everybody's radar screen at the point
4   when fact discovery closed. And this is not the same sauce
5   because it's a completely new witness. It's a witness who's
6   going to involve us in some collateral investigation,
7   potentially the need for additional depositions, and it comes
8   way too late.

9       THE COURT: Another argument that is made by the
10  defendant is that he's an impeachment witness regarding
11  Mr. Tueffel.

12      MR. BOWMAN: Well, you know, he's really not an
13  impeachment witness.

14      THE COURT: It's more like -- it's sort of an --
15  well, maybe it isn't impeachment. I was going to say
16  impeachment by omission, but maybe it isn't.

17      The way it's characterized at Page 24 of the
18  defendants' response is Tueffel testified that Cortez came by
19  the house after the shooting and said who shot Eric Morro and
20  that he did not tell, Tueffel did not tell Cortez that it was
21  Mr. Jimenez that did it. They say Mr. Cortez is going to say
22  the opposite, that Tueffel did tell him that it was the
23  plaintiff.

24      MR. BOWMAN: And my response to that is to refer the
25  Court to Pages 335 and 336 of the Tueffel transcript.

1       THE COURT:  Which exhibit is that?  I can't flip to a
2   page here, but I can flip to an exhibit.
3       MR. BOWMAN:  I don't know that it's an exhibit.
4       MR. LOEVY:  Judge, I'll bring it to you.
5       THE COURT:  Okay.
6       Do you actually have the page?  I can just look at
7   it.
8       MR. BOWMAN:  Yes.
9       (Document tendered to the Cortez.)
10      THE COURT:  335 and 336.  Let me just take a second
11  to read it.
12      Basically what he says is that he talked to,
13  Mr. Tueffel said he talked to Mr. Cortez, Mr. Cortez basically
14  asked him what happened, doesn't think he asked him who shot
15  him or whether Mr. Jimenez shot him, and he says I wouldn't
16  have told him, couldn't have told him that it was Mr. Jimenez.
17  That's what he says.
18      MR. BOWMAN:  Right.  But the question is whether he's
19  pinned down to having been specifically asked that question,
20  and whether he's providing a response that would be
21  inconsistent and impeached with this becomes --
22      THE COURT:  Okay.  All right.  I think I get that.
23      Let me ask this question to the defendants:  So my
24  sense of -- so on this question of late disclosure, my sense
25  on the expert thing is that there was, you know, some

1   accommodating done on both sides, you know, appropriately that
2   everybody was kind of saying, okay, you know, we all know
3   we're all going to be scrambling, everybody is going to do
4   their best to get stuff to the other side and to, you know,
5   make people available for depositions and whatnot. And expert
6   discovery, you know, almost as a default comes at the end of
7   the process. Fact discovery, at least the way I had it set up
8   and the way I think many or if not most judges have it set up,
9   it comes earlier. So why shouldn't this be treated
10  differently, I guess, from the expert stuff?

11          MR. HALE:   I think two reasons, Judge.  The first
12  is -- I want to talk about two reasons, due diligence and then
13  impeachment.

14          I don't want to share my work product with the
15  plaintiffs, but I'm happy to show you how we, through talking
16  to other people in the case, we -- back on January 31st of
17  2011 we found out the name of a Carmelo Cortez, the last name,
18  because Mr. Jimenez had mentioned a Carmelo in his deposition.
19  We then -- and I'm happy to hand this up to you. We talked to
20  our investigator to try to locate this Carmelo Cortez, and we
21  weren't successful in finding him.

22          In October, then, we tried again with a new
23  investigator.  And I've got the e-mails for this.  And we
24  actually found him, and then I talked to him, and he --
25          THE COURT:   Him being Cortez or the investigator?

1           MR. HALE:  Correct, Cortez.

2           THE COURT:  Cortez, okay.

3           MR. HALE:  And the question here in Mr. Tueffel's

4    deposition it says did you tell Carmelo.

5           THE COURT:  I'm not terribly persuaded by he wasn't

6    pinned down enough, so you don't have to worry about that

7    part.

8           MR. HALE:  So, you know, to be fair, I didn't take

9    this as like, ah, this is a great impeachment witness, I'm

10   just going to hold him in my back pocket.  I wanted to put all

11   my cards on the table.  I disclosed him the very next day

12   after I talked to him.  And I thought in light of the parties

13   cooperating together, I had no objection to them deposing him.

14   And so I think I did it the right way, and I put it on the

15   table.  I didn't try to come in at trial and say, well, he's

16   just an impeachment witness that I've been kind of hiding.

17          So I think in light of the fact that the parties have

18   been cooperating, I don't really think they can kind of pick

19   sides and say, well, we're cooperating but only for this

20   little, we're going to exclude this bad witness, we're not

21   cooperating for that.  They just are doing that, obviously,

22   because it's somebody who's not helpful to them, and I don't

23   think that's really fair in the spirit of the way we've been

24   working together.  And I think in light of the fact that we've

25   shown due diligence and we put our cards on the table and

1   there's no prejudice, I think it's fair.

2              THE COURT:  Respond, if you would, Mr. Bowman.

3              MR. BOWMAN:  Well, you know, to be clear, if he's not

4   an impeachment witness, then --

5              THE COURT:  No.  I think he is kind of an impeachment

6   witness.  I think what Mr. Hale is saying is that he didn't

7   regard him as an impeachment witness in the sense that I'm

8   going to hold this guy in my back pocket until I find out what

9   the testimony is and then disclose him.  That's what I kind of

10  heard him to say.  Not that he's not an impeachment witness.

11  He is.  I mean, that's at least part of the reason for which

12  he's being offered.

13             MR. BOWMAN:  We're in a position now where we're a

14  month from the start of trial.  It's not just a matter of

15  taking Mr. Cortez's deposition, you know.  The first question

16  for him is going to be who else did you tell about this in the

17  intervening 18 years or however long it's been, which is going

18  to involve potentially follow-up investigation.

19             THE COURT:  What's he going to say about that?  Is he

20  going to say nobody?

21             MR. HALE:  I have no idea what he's going to say

22  about that.

23             THE COURT:  Okay.  Go ahead.

24             MR. BOWMAN:  So that's a concern.

25             And then the other question is, is the way this is

1   explained in the defense response is the investigator contacts
2   him on a certain date, there is a lapse of ten days or so, and
3   then he's interviewed by Mr. Hale.  So what all went on in
4   that ten-day period of time?  And that may lead to a
5   deposition of Roger Sandoval or --

6            THE COURT:  Who's Roger Sandoval?

7            MR. BOWMAN:  He's the defense investigator who's
8   involved in various things in this case.

9            And, you know, so that collateral discovery at the
10  point when we're getting ready for trial, at the point when
11  we're dealing with all of these expert witnesses that by
12  agreement and by understanding we've left until the very last
13  minute puts us in a position in which it's not accurate to say
14  that we're not prejudiced.  We are.

15           THE COURT:  All right.  I'm going to grant the
16  motion.  I don't think it's the same as the expert situation.
17  I mean, we're talking about expert testimony, and it's true
18  that a lot of that is being scrambled on at the last minute.
19  We're talking about sort of defined things.  It's finite.  You
20  have a written report from an expert.  You have some target
21  that you can deal with.  You have a curriculum vitae.  You
22  know what's out there.

23           When we're talking about a fact witness, particularly
24  someone who nobody knows what he has said, if anything, to
25  anybody in however many years it's been -- we're more like

1  17 years now, or is it 18 since the shooting?  18?

2          MR. CHANEN:  February of '93.

3          THE COURT:  Okay.  So going on 19 years since the

4  shooting.  I mean, the difficulty is, is that it's not just

5  the deposition of him.  It's all of the collateral

6  investigation that would have to go on.  And we're just too

7  close to the trial to do that.  So I'm barring it.

8          MR. HALE:  Judge.

9          THE COURT:  And actually one more thing.  And I will

10  say this kind of goes back -- the way I think about this kind

11  of goes back to, I'm going to show my age again, it's more

12  than a quarter of a century ago, a case I had which our firm

13  got into in front of another judge who's no longer here on

14  this court kind of at the last minute, and, you know, there

15  were certain believed understandings about when things could

16  get done.  And the judge basically said, look, I mean, you

17  know, I'm not required to enforce all of your understandings.

18  And I think that's actually right.

19          Anyway, that's the ruling.

20          MR. HALE:  That would be not as a impeachment witness

21  either, Judge?

22          THE COURT:  Right.  I mean, I have to say I don't

23  regard there being some separate category of -- you know,

24  we've got another issue here.  It's not just 26(a)(1).

25  It's -- hang on.  It's the pretrial order rule.  And that

1  involves a whole process.

2        Give me just one second here.  I just wanted to check
3  another thing.

4        And it's a general problem of, you know, lateness and
5  unfair prejudice.  That's what it is.  So, moving on.

6        I don't know if we've dealt with everybody that's
7  covered in plaintiff motion in limine No. 9 or not.  I've
8  dealt with Margot Gillin.  There were five other people
9  mentioned there, Jerry Scroggins, Terry Sullivan, Graciela
10  Viale-Val, Catalina Romo, and David I think he pronounces it
11  Weiner if I recall correctly.  He's a criminal defense lawyer,
12  right?

13        MR. HALE:  Correct.

14        THE COURT:  I think he pronounces it Weiner.  Could
15  be wrong about that.

16        And there was -- the response to that basically -- so
17  the part of the argument is we don't have a clue on the
18  plaintiff's side what these people are going to say, and then
19  there was a response that said, well, this is what they're
20  going to say.  Scroggins is going to talk about the probation
21  report.

22        It may be that I've already dealt with that.  I don't
23  remember.

24        MR. LOEVY:  You have.

25        THE COURT:  Have I dealt with that?  Okay.

1  he suffered from being in custody later.  In other words, so,
2  for example, an argument could be made, I wouldn't necessarily
3  agree with it if I was a juror, but an argument could be made
4  that somebody who just did a ten-year stretch legitimately and
5  then does another ten-year stretch illegitimately isn't
6  damaged as much as somebody who'd never done that prior
7  ten-year stretch.  I don't know how much time Mr. Jimenez had
8  ever done.
9      MR. CHANEN:  But we've also excluded, we're not
10  seeking damages for the period in which he was incarcerated
11  post exoneration.
12      THE COURT:  No.  I understand.  I'm talking about the
13  16 years.
14      MR. BOWMAN:  Well, he's 13 when he goes in, and as
15  far as --
16      THE COURT:  How long was he in?
17      MR. BOWMAN:  -- I understand it, there's a matter of
18  days or possibly a combined total of a week that he's
19  incarcerated in the Audy Home.
20      THE COURT:  Do you think it's longer than that?
21      MR. HALE:  No.
22      THE COURT:  That's so miniscule that it's not
23  relevant.
24      MR. LOEVY:  16 years by way of the answer.
25      THE COURT:  16, okay.

1    it's likely that it would be perceived that way.  I'm going to
2    exclude it.

3         So the threshold issue let's not even worry about.
4    I'm assuming that there's evidence that Bogucki and/or Schalk
5    were involved in the other case.

6         No. 4, generalized references to police misconduct.
7    Okay, so the answer is you don't get to put in something
8    that's not at issue in this case.  If there's something
9    specific that you think you want to refer to, you'll raise it
10   with me at a side bar, and I will deal with.  Okay.

11        References to the Center on Wrongful Convictions.
12        MR. HALE:  We withdrew that.

13        THE COURT:  Oh, you withdrew that.  Good, because I
14   was going to deny it.

15        Prosecution of Juan Carlos Torres.  Okay.  So what's
16   the status of it right now?  I mean, I remember when that
17   fellow from the public defender's office was in here.

18        MR. CHANEN:  Mr. Maldonado.

19        THE COURT:  Yeah, Mr. Maldonado.  He was dealing with
20   other stuff.  What's the status of the case right now?

21        MR. KAMIONSKI:  You know, it's 26th Street.  It just
22   gets continued.

23        THE COURT:  It's awaiting for trial.  Okay.

24        And so what exactly does the plaintiff want to put in
25   about that?

1           MR. LOEVY:  We want to put in that, in conjunction

2  with the dismissal of the charges against the plaintiff when

3  they nolle'd it, concurrent with that, on the same day they

4  initiated charges against the person that the state's

5  attorney's office was taking the position is the true killer,

6  the true shooter.

7           THE COURT:  Okay.  So when you say "in conjunction

8  with," what you mean is that on the same day that the charge

9  against Mr. Jimenez was nolle prosed, Mr. Torres was indicted.

10          MR. LOEVY:  Correct.

11          THE COURT:  And I assume it's an indictment.

12          MR. CHANEN:  I'm sorry.  Just to clarify, the

13  indictment actually came about 14 days later, but he was

14  arrested in Indiana --

15          THE COURT:  So he was arrested.

16          MR. CHANEN:  -- the exact day.

17          THE COURT:  In order to arrest him, they had to have

18  some sort of a criminal complaint or something.  So there was

19  a criminal complaint filed, but he was indicted 14 days later.

20          So one of my problems with this is one of the

21  problems I would have had with Ms. Alvarez coming in to talk,

22  and that is that the state's attorney doesn't indict people.

23  The grand jury indicts people.  Okay.  And so I know all of

24  the stuff about ham sandwiches and all that kind of thing, but

25  the fact of the matter is, is that some form of evidence gets

1   presented to a grand jury, a grand jury returns charges.

2       So to the extent to which you want to get up here and

3   say the state's attorney of Cook County has now charged the,

4   you know, the real killer, I mean, that's not, that's not what

5   happens.  A grand jury of citizens of Cook County.  So, I

6   mean, you could say that the person is charged, but I'm not

7   going to let you get in some sort of quasi-backdoor expert

8   opinion from the state's attorney of Cook County, because if

9   you do, you're going to be opening up that door.  Okay.  So

10  you don't want that, and I don't think it's appropriate

11  anyway.

12      So that aside, what you want to put in is that Mr. --

13  around the same time that Mr. Jimenez, the charges against him

14  were dropped, that Mr. Torres was indicted for the murder of

15  Mr. Avila -- no, Mr. Morro.  Mr. Morro.  Okay.

16      And so you've seen the response to the argument as to

17  why it's relevant, so I want to hear from the defense why you

18  think it's not relevant.

19      MR. KAMIONSKI:  And I think along the same reasons

20  your Honor just said, is that whether you call it the state's

21  attorney charging him, the fact that he was charged with a

22  crime, he's going to tell the jury that they think he

23  committed the crime.  And, you know, the plaintiffs can argue

24  that Juan Carl Torres did it, but to say that he has charges

25  pending against him for doing it is basically saying that the