## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

THADDEUS JIMENEZ,      )

     )

            Plaintiff,      )      Case No. 1:09-cv-8081

     )

       v.      )      Judge Kennelly

     )

CITY OF CHICAGO and      )

JEROME BOGUCKI,      )

     )

            Defendants.      )

## DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW AND RULE 59 MOTION FOR A NEW TRIAL

Defendants City of Chicago and Jerome Bogucki, by their undersigned attorneys, hereby submit their reply in further support of their Rule 50 motion for judgment as a matter of law and Rule 59 motion for a new trial. In support thereof, Defendants state as follows:

## ARGUMENT

**I.**      **This Court's Errors In Sustaining Jimenez's *Batson* Challenge And Forfeiting Bogucki's Third Peremptory Strike Require A New Trial.**

     **A. This Court Erred In Sustaining Jimenez's *Batson* Challenge To Bogucki's Peremptory Strike Of Shirley McKee.**

Jimenez's attempt to support this Court's *Batson* ruling misapprehends the proper analysis under *Batson*'s well-established three-step procedure. First, Jimenez suggests that McKee's statement that she could be impartial made Bogucki's reason for striking her non-race-neutral. (Resp. at pp. 2-3.) This is incorrect. Bogucki explained that he was striking McKee because her great-nephew, like Jimenez, was convicted of and recently served a lengthy sentence for murder. This reason had nothing to do with race and thus did not violate *Batson*. *Purkett v. Elem*, 514 U.S. 765, 768 (1995) ("unless a discriminatory intent is inherent in the [ ] explanation, the reason offered will be deemed race neutral").

1

Second, Jimenez argues that Bogucki's reasons for striking McKee "applied with even more force" to Casey. (Resp. at p. 3.) This, too, is incorrect. Bogucki struck McKee because of the nature of the offense for which her great-nephew was convicted, as well as the length and timing of his incarceration. Casey was convicted of a minor drug offense, not murder; served only two and a half years in prison as opposed to fourteen; and served that time three decades ago as opposed to being released the previous year. Casey's other statements during *voir dire* and on his juror questionnaire are beside the point. The question is not whether Jimenez believes Bogucki chose poorly in striking McKee. *See United States v. Hendrix*, 509 F.3d 362, 371 (7th Cir. 2007) (*Batson* requires courts to "assess the honesty—not the accuracy—of a proffered race-neutral explanation"). Rather, the inquiry is whether Bogucki's reasons for striking McKee "applied just as well" to Casey, giving rise to an inference of racial discrimination. *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). As explained, they did not. Moreover, other factors demonstrated Bogucki's lack of racial motivation in exercising his strikes. For example, where the same reason actually "applied just as well" to a black and a non-black juror (Tillman and Medrano), Bogucki attempted to strike both of them. Therefore, this Court erred in sustaining Jimenez's *Batson* challenge to Bogucki's strike of McKee.[1]

**B. This Court Abused Its Discretion In Forfeiting Bogucki's Third Peremptory Strike.**

**1. A new trial is required under prevailing Seventh Circuit law.**

Jimenez argues that this Court's forfeiture of Bogucki's third strike was proper because "the loss of a peremptory challenge due to a state court's good-faith error is not a matter of federal constitutional concern." (Resp. at p. 8 (citing *Rivera v. Illinois*, 556 U.S. 148, 157

---

[1] Jimenez correctly notes that the *Batson* ruling against Bogucki in *Warfield* is void. Thus, it has no

(2009)).[2] This argument misses the point completely. First, the forfeiture was "arbitrary and irrational" rather than a "good-faith error." Second, 28 U.S.C. § 1870 provides an independent, non-constitutional basis for a new trial under prevailing Seventh Circuit law.

The Seventh Circuit's discussion of the nature and importance of peremptory challenges in *United States v. Harbin*, 250 F.3d 532 (7th Cir. 2001) is illuminating. Importantly, *Harbin* was decided after the Supreme Court had already established that peremptory challenges are not constitutionally required. *See Ross v. Oklahoma*, 487 U.S. 81 (1988); *United States v. Martinez-Salazar*, 528 U.S. 304 (2000). As such, the Seventh Circuit based its decision on rights arising from the federal statute. It first explained that peremptory challenges allow parties to eliminate those jurors who are biased, but whose biases may not be easily proven. *Harbin*, 250 F.3d at 540-41; *see also Martinez-Salazar*, 528 U.S. at 315-16, 319 (describing peremptory challenges as a backup for challenges for cause). It distinguished errors that prevent parties from maximizing the strategic use of their strikes from those that "effect a shift in the total balance of advantages," "adversely impact[ing] the ability of the peremptory challenge device to fulfill its purpose of ensuring an impartial jury." *Harbin*, 250 F.3d at 547-48. The latter type of error "infect[s] the entire trial process," yet "it is simply impossible as a practical matter to assess [its] impact." *Id.* at 548. If the statutory right to peremptory challenges is to have any meaning, such errors must be capable of remedy without a showing of prejudice. *Id.*

This Court's forfeiture of Bogucki's third strike requires a new trial for two reasons. First, the forfeiture was arbitrary and irrational. Like the court in *Maloney v. Plunkett*, 854 F.2d 152, 154 (7th Cir. 1988), this Court forfeited Bogucki's third strike without, at the time, giving any reason why this extraordinary sanction was warranted or justified. There is no indication that

---

[2] In fact, there was no forfeiture in *Rivera*. After the trial court's *Batson* ruling, the defendant used his last strike to remove another juror from the panel. *People v. Rivera*, 852 N.E.2d 771, 789, 792 (Ill. 2006).

*Maloney* was based on the fact that *Batson* did not yet apply to civil cases. If the court had thought that an extension of *Brady* to civil cases was all that was necessary, it would not have resorted to the extreme measure of granting mandamus. (Resp. at pp. 5-6.) Rather, the Seventh Circuit found forfeiture to be a "clear error" because it violated the "simple and clear imperative" of 28 U.S.C. § 1870. *Id.* at 154.

Second, the forfeiture gave Jimenez fifty percent more strikes than Bogucki, rather than the equal distribution mandated by statute. With significantly more power during the jury selection process than Bogucki, Jimenez was able to skew the composition of the jury in his favor. Under these circumstances, the strikes could not fulfill their historical purpose of ensuring an impartial jury.

Jimenez suggests that Bogucki received his statutory allotment of peremptory challenges and was not entitled to an "additional" peremptory challenge. That is, he suggests that the statute was satisfied when Bogucki stated he wished to strike McKee, even though McKee remained in the venire. This argument is premised on a fundamental misunderstanding of the purpose of peremptory challenges. Peremptory challenges do not exist merely to allow parties to speak certain words without any corresponding effect, but rather to allow parties to actually remove jurors on the "extremes of partiality." Therefore, this Court's forfeiture of Bogucki's third strike requires a new trial.

### 2. Jimenez's cases are inapposite.

Rather than meaningfully engaging with the above arguments, Jimenez merely points to cases from other jurisdictions where forfeiture was permitted. First, the propriety of forfeiture in this case is governed by Seventh Circuit law, including *Maloney* and *Harbin*. Second, Jimenez fails to explain why the sanction applied in those cases was proper under the facts of this case.

And it was not. In none of the cases was forfeiture imposed for a single *Batson* violation. In *People v. Luciano*, 890 N.E.2d 214, 219 (N.Y. 2008), the court described factors to consider in determining whether forfeiture is appropriate, including "whether the challenged juror is available to be reseated, whether the litigant appears to be engaging in a pattern of discrimination, and the number of peremptory challenges that remain to be exercised." The court cautioned that "where the finding of discrimination is close, forfeiture may not be an appropriate remedy." *Id.* Plaintiff's cases are consistent with this holding. In *United States v. Walker*, 490 F.3d 1282, 1295 (11th Cir. 2007), the defendants struck twelve white male jurors and the district court sustained the government's *Batson* challenge as to four of them. The remaining members of the venire had been discharged prior to the *Batson* hearing. The court declined to restart *voir dire* with a new venire, resulting in the forfeiture of the defendants' remaining strikes. The Eleventh Circuit observed that "the better practice in certain circumstances is to begin afresh," but upheld the decision given the "considerable time and expense" involved in restarting *voir dire*. In *Gabe v. United States*, 2009 WL 50161, at *3 (S.D. Ga. 2009), the defendant struck ten white jurors and the district court sustained the government's *Batson* challenge as to six of them. Under these circumstances, forfeiture was permissible. By contrast, in this case, none of the factors described in *Luciano* or relied upon in Jimenez's cases existed. No members of the venire had been discharged, and there was no "pattern of discrimination" like in *Walker* and *Gabe*. This Court sustained only one *Batson* challenge, and that ruling itself was error. Forfeiture is inappropriate "where the finding of discrimination is close." *Luciano*, 890 N.E.2d at 219. *See also United States v. Ramirez-Martinez*, 273 F.3d 903, 910 (9th Cir. 2001) (forfeiture reserved for cases of "egregious bad faith or maliciousness"). It was certainly an abuse of discretion here.

### 3. Bogucki did not forfeit his objection.

Bogucki was not obligated to object when this Court ruled that his third strike was forfeited. As a procedural matter, Jimenez made no motion to which Bogucki could have objected. Rather, this Court forfeited Bogucki's third strike *sua sponte*. Bogucki was not required to move to reconsider this Court's ruling to preserve the issue. *See Walker v. Abbott Lab.*, 340 F.3d 471, 475 (7th Cir. 2003). On a more fundamental level, since it will be open to Bogucki to challenge on appeal the legal theory under which this Court proceeded, it makes little sense to say the issue is waived at this juncture. *United States v. City of Chicago*, 869 F.2d 1033, 1036 (7th Cir. 1989) ("it is folly . . . to assert that an appeals court . . . cannot consider the merits of each and every theory the district judge relied upon"). Finally, Fed. R. Civ. P. 46 provides that "a formal exception to a ruling or order is unnecessary." Rule 46 is satisfied so long as a party puts the court and other parties on notice of the action it wants to take. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 174-75 (1988); *Stone v. Morris*, 546 F.2d 730, 736 (7th Cir. 1976) (incarcerated plaintiff's failure to object to court's *sua sponte* ruling that his presence during trial was unnecessary did not waive issue of him being prevented from testifying live where inclusion of his name on "will call" list put court and parties on notice of his desire to testify live). *See also Dexia Credit Local v. Rogan*, 602 F.3d 879, 884 (7th Cir. 2010) (respondent's failure to object to preliminary injunction did not waive issue where she objected to TRO on same grounds). Bogucki clearly stated the action he wanted this Court to take when he exercised his third strike against McKee. Bogucki further elaborated during the *Batson* hearing in opposition to Jimenez's challenge. Jimenez cannot legitimately contend that he or this Court was not apprised of Bogucki's desire to use his third strike. Having opposed the challenge from the very start, Bogucki can hardly be characterized as having silently acquiesced in this Court's imposition of a harsh sanction under *Batson*'s guise. Therefore, Bogucki did not forfeit his objection.

### C.  This Court's *Batson* Ruling Also Requires A New Trial.

This Court erroneously sustained Jimenez's *Batson* challenge to Bogucki's attempt to strike McKee and violated 28 U.S.C. § 1870 by preventing him from removing McKee. Under Fed. R. Civ. P. 47, courts "must allow the number of peremptory challenges provided by 28 U.S.C. § 1870." The error impaired Bogucki's statutory right to remove jurors on the "extremes of partiality" with an "effect that is difficult to establish." Therefore, for the reasons set forth in *Harbin*, a new trial is required.

Jimenez argues that *Rivera* controls, but ignores the way in which the Supreme Court carefully circumscribed its decision.[3] The only issue open to the Court to consider was whether the erroneous denial of a state-provided peremptory challenge violates the federal Constitution. It did not, and could not, address whether violations of state statutes providing for peremptory challenges require reversal as a matter of state law. Recognizing this, the Court emphasized that "[s]tates retain the prerogative to decide whether such errors . . . require automatic reversal." 556 U.S. at 161-62. Thus, the Court decided only the federal Constitutional question. Federal courts must enforce 28 U.S.C. § 1870. The federal statute creates rights above and beyond the rights guaranteed by the Constitution that, when violated, must be capable of remedy. In this case, the remedy is a new trial.

### D.  Jimenez's Attempt To Rely Upon Bogucki's Post-Verdict Testimony Should Be Rejected.

Bogucki's post-verdict testimony does not alleviate the necessity of a new trial. First, Jimenez informed this Court in the post-verdict proceeding: "We're never going to use this again unless there's an appeal and a successful retrial, in which case then we would be able to use

---

[3] *United States v. Lindsey*, 634 F.3d 541, 549-50 (9th Cir. 2011) changes nothing. The Ninth Circuit's perfunctory statement that "*Rivera*'s reasoning is not unique to the state court system" simply misreads *Rivera*. *Rivera* treated the constitutional and statutory questions as distinct, and only decided the former.

this." He then repeated: "Let's make sure we understand . . . We intend to use this at the retrial." Therefore, the testimony cannot be considered in connection with Defendants' post-trial motions. Second, the City of Chicago, which is the indemnitor in this case, had no opportunity to object to the proceeding because defense counsel's request to speak with the City prior to the proceeding was denied. (Tr. at 2977:5-10.) Thus, there was no agreement reached with the City during the post-verdict proceeding. Third, the testimony is wholly irrelevant to whether trial errors were harmless. "Harmless-error review looks . . . to the basis on which 'the jury *actually rested* its verdict.'" *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (quoting *Yates v. Evatt*, 500 U.S. 391, 404 (1991)). By definition, the post-verdict testimony was not before the jury. As such, it cannot factor into harmless-error review. Fourth, Jimenez is in any event barred from using Bogucki's testimony to "prove or disprove the validity . . . of [his] claim" under Fed. R. Evid. 408. *See Bankcard America, Inc. v. Universal Bancard Systems, Inc.*, 203 F.3d 477, 484 (7th Cir. 2000); *Zurich American Ins. Co. v. Watts Industries, Inc.*, 417 F.3d 682, 689 (7th Cir. 2005). Jimenez settled his claim for punitive damages in exchange for Bogucki's testimony. Any attempt to use that testimony to support the liability verdict runs headlong into Rule 408.[4] For all of these reasons, Jimenez's attempt to rely upon Bogucki's post-verdict testimony should be rejected.

## II. Failing To Limit Jimenez's *Brady* Claim As Outlined In Bogucki's Proposed Instruction Number 2 Prejudiced Bogucki Because The Jury May Have Decided The *Brady* Claim Based Upon An Improper Legal Theory.

### A. This Court Did Not Properly Instruct The Jury On The Scope Of The Due Process Claim.

Jimenez argues that this Court properly instructed the jury on the due process claim because Bogucki did not object to the actual substance of the primary due process instruction.

---

[4] Jimenez merely stated that he intended to "use" the testimony in a retrial (Tr. at 2978:16-20, 2979:16-18); he did not seek or obtain a waiver of Bogucki's Rule 408 protections, and such waiver cannot be implied from the record here. Indeed, Bogucki would have immediately objected if Jimenez had ever attempted to claim that the parties had agreed to waive Rule 408's protections in the event of a retrial.

(Resp. at p. 30.) Once again, Jimenez really misses the point. Beyond merely defining the underlying law applicable to *Brady* claims in general, this Court was required to make the scope of this *Brady* claim clear for the jury. This is especially true when the plaintiff seeks to cram all sorts of allegations into *Brady* that are not *Brady* claims. The Seventh Circuit has warned against calling independent causes of action due process violations. *McCann v. Mangialardi*, 337 F.3d 782 (7th Cir. 2003). For instance, failing to investigate Juan Carlos Torres' alibi and the loss of the Duke jacket are not *Brady* claims.

Bogucki's proposed instruction would have provided the jury with the proper scope of Jimenez's *Brady* claim. Without such an instruction, the jury may have based its decision on an improper legal theory. The Seventh Circuit "will not assume that the jury decided one way or another," and "the possibility that the jury based its decision on incorrect law," is prejudice as a matter of law. *Dawson v. New York Life Ins. Co.,* 135 F.3d 1158, 1165 (7th Cir. 1998). *See also Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 599 n. 3 (7th Cir. 1985) (where jury could have based its decision on [a valid or an] invalid theory, court will not speculate [as to] which the jury chose); *Bammerlin v. Navistar Int'l Transp. Corp.,* 30 F.3d 898, 901 (7th Cir. 1994) (new trial required where verdict could have been based on improper legal theory). Accordingly, it was not enough for this Court to state the basic definition of a due process claim. In a factually complex case like this one, the particulars of the claim had to be defined to ensure that the jury considered only true *Brady* claims when analyzing whether a *Brady* violation had been committed.

**B. Bogucki's Proposed Instruction Number 2 Was Appropriate.**

Jimenez characterizes Bogucki's Proposed Instruction No. 2 as "conspicuously short on authority," adding that no court "ever" or "anywhere" has adopted a similar instruction. These comments are quite shocking, given that this Court's model jury instructions for a *Brady* claim

9

contain this identical instruction. (*Manning* Jury Instructions, attached hereto as Exhibit 1.)[5]

In *Manning*, this Court instructed the jury on the basic law of a *Brady* violation. In addition, it delimited the scope of the *Brady* claim, namely what specific acts were alleged to be *Brady* violations. This prevented the jury from basing its decision on an improper legal theory. Here, as in *Manning*, the jury should have been instructed on the particulars of Jimenez's *Brady* claim as outlined in Bogucki's Proposed Instruction No. 2.

Jimenez also claims that Bogucki's proposed instruction is incomplete, assuming that his *Brady* claim was actionable based on more issues than survived summary judgment. Bogucki objected to expanding the *Brady* claim to issues never raised prior to summary judgment. Summary judgment was the time to vet out what the actual *Brady* allegations were in the case.[6] *See Koszola v. Bd. of Educ.,* 385 F.3d 1104, 1111 (7th Cir. 2004) ("summary judgment is the 'put up or shut up' moment in a lawsuit"). If all of Plaintiff's claims had been disclosed prior to summary judgment, Bogucki would have been able to substantively address them then, and perhaps this Court would have ruled in Bogucki's favor – just as it did on one of the so-called *Brady* claims Jimenez disclosed. *Jimenez v. Bogucki,* 2011 WL 5507375 at *13 (Nov. 10, 2011).

At summary judgment, Bogucki also objected to any *Brady* allegations first raised in response to his motion. This Court noted that "'[f]ederal pleading rules require the plaintiff to give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Id.* This Court considered Jimenez's new *Brady* allegations, finding that Bogucki suffered no prejudice

---

[5] It seems a stretch for Jimenez to claim ignorance of these model instructions, which were given in *Manning v. Miller*, a case tried by plaintiff's counsel Jon Loevy. In fact, though Mr. Loevy now dismisses Bogucki's instruction as "redundant," he was actually the proponent of this identical instruction in *Manning*. (Plaintiff's Proposed Jury Instructions, attached hereto as Exhibit 2.)

[6] Bogucki's motion for summary judgment was based on Jimenez's response to an Interrogatory asking him to identify the specific misconduct he claimed Bogucki committed. (ROG Resp., attached hereto as Exhibit 3.) Jimenez's Interrogatory response was provided in May 2010 but never supplemented, even after the close of fact discovery or this Court's summary judgment ruling.

since "defendants received adequate notice and were able to present evidence to attempt to counter Jimenez's claims." *Id.* The same could not be said at the close of trial. It was not until then that Jimenez finally revealed the full extent of what he claimed was *Brady* material. This gave Bogucki no opportunity to adequately brief and address them as a matter of law. Bogucki raised this concern and explained that was why his proposed instruction was necessary.

Jimenez also claims that Bogucki's failure to object during closing constitutes waiver. That is not true. Defendants are seeking a new trial because this Court failed to instruct the jury on Bogucki's Proposed Instruction No. 2. As to this instruction, Bogucki raised his intention to use it several times. Bogucki filed it as a proposed instruction. He argued for this instruction in the off-the-record instruction conference. He also placed his position on the record just prior to closing arguments. He "[was] not required to indulge in reiterative insistence in order to preserve his [ ] rights." *Irvin Jacobs & Co. v. Fidelity & Deposit Co.*, 202 F.2d 794, 809 (7th Cir. 1953).

Bogucki tried to persuade this Court to limit Jimenez's *Brady* arguments to the actual claims that survived summary judgment. This Court refused to give his instruction. There was no use in continuing to object during closing argument. In truth, even without the closing argument, Bogucki's Proposed Instruction No. 2 was still necessary to define for the jury the scope of the *Brady* claim. Jimenez's closing argument, however, offers good examples for why Bogucki's proposed instruction was necessary.

### C. Jimenez Fails To Show That All Of His Ten Allegations Were *Brady* Violations.

Jimenez does not deny that, if the jury instructions were sufficiently misleading to have caused prejudice, a new trial is warranted. Here, each of the ten so-called *Brady* violations identified in Jimenez's closing argument could have misled the jury and caused it to base its conclusion on an improper legal theory. Thus, Jimenez is left to justify why each one amounted

to a *Brady* violation. None do. Jimenez was either aware of the information he claims was withheld or could have uncovered it through the exercise of reasonable diligence. Most egregiously, one so-called *Brady* claim – the Duke jacket – is governed not by *Brady*, but by the much stricter standard set out in *Arizona v. Youngblood*, 488 U.S. 51, 56-57 (1988). A new trial is required if even a single one of the ten fails.

### The Circumstances Of Phil Torres' Identification

Jimenez continues to claim that Phil Torres never saw the shooting and never told the police that Jimenez was the shooter. The manner in which Jimenez presents this claim only demonstrates its weakness. Although it is true that the evidence must be viewed in the light most favorable to Jimenez, this Court may not simply "ignore uncontradicted, unimpeached evidence supporting defendant's position." *Brunner v. Minneapolis, St. Paul & Sault Ste. Marie R. Co.*, 240 F.2d 608, 609 (7th Cir. 1957). Torres repeatedly testified that he witnessed the shooting and voluntarily identified Jimenez. (Tr. at 2663:8-16, 2684:16-2685:24, 2688:21-2690:2, 2696:3-16, 2709:17-2710:11, attached hereto as Exhibit 4.) That is not something this Court should ignore simply because of the verdict. Jimenez also falsely insinuates that Torres never called Bogucki. But when Torres' memory was refreshed, he testified about the 1:00 a.m. phone call to Bogucki. (Ex. 4 at 2706:4-13, 2707:7-9.) Jimenez cannot simply close his eyes and ignore that testimony.

Jimenez attempts to discredit Torres' identification by lifting testimony that Torres did not "claim to be a witness" or "claim to be certain who shot" Eric Morro. To begin with, Torres' testimony that he did not "claim to be a witness" refers specifically to the time Torres was at the murder scene and concerned his reluctance to come forward during his interactions with non-party beat officers. Additionally, the fact that Torres does not claim one hundred percent certainty to this day as to who shot Morro does not equate with actual uncertainty, much less to him expressing that uncertainty to Bogucki. When Torres had the chance to explain what he

meant by his earlier testimony, he said that Jimenez "looked like" the shooter. (Ex. 4 at 2696:13-24.) And to be clear – despite Jimenez's refusal to even admit that Torres identified him as the shooter – Torres did in fact identify Jimenez as the shooter. (Ex. 4 at 2688:15-2690:12, 2696:3-16, 2698:24-2699:5.) In any event, Torres stated that he never expressed doubt in his identification to the police. (Ex. 4 at 2682:17-19.) Moreover, Jimenez has yet to explain how any of this is *Brady* material and, if it is, why he could not have discovered any of this through reasonable diligence. It is well settled that *Brady* does not apply to materials a defendant could have uncovered through reasonable diligence. *Holland v. City of Chicago*, 643 F.3d 248, 255-56 (7th Cir. 2011).

The same is true of Shawn Cosmen's involvement in identifying Jimenez. At the criminal trials, Torres testified that he spoke with the Cosmens before calling Bogucki, and Bogucki testified that he met with Torres and the Cosmens together. (Cr. Tr. at B70:19-B72:4, C28:8-C29:3, attached hereto as Exhibit 5.) Bogucki's notes identified who was present at the home at the time of that meeting. (GPR, attached hereto as Exhibit 6.) Having had a reasonable opportunity to investigate the details of Cosmen's involvement, Jimenez cannot claim that this information was withheld.

### No Dates And Times In Reports

Jimenez continues to point to the police reports as a smoking gun in his *Brady* claim. He claims that Bogucki misled him regarding the dates and times of interviews. He also contends that various parts of the reports were written at different times. But Jimenez has yet to articulate how this possibly constitutes a *Brady* violation. If Jimenez really believes this is a violation, then the jury was likely confused as well.

Jimenez has had the police reports since before his criminal trial. Clearly, reports in Jimenez's possession cannot be considered "suppressed" in any meaningful sense of the word.

All of the arguments, questions, and insinuations Jimenez made at this civil trial based on the reports could easily have been made at his criminal trials. Jimenez could have investigated this matter and cross-examined Bogucki on the reports' lack of times and lack of names of people he interviewed. *Smith v. Cain*, 132 S. Ct. 627, 629-31 (2012) does not support Jimenez's argument. *Cain* concerned investigative notes never turned over to Cain, who first uncovered those notes after his trial. *Id.* at 629. Thus, *Cain* does not support the proposition that there can be a *Brady* violation based on reports that were in the defendant's possession at the time of the criminal trial.

Jimenez possessed the reports before his first criminal trial. Moreover, Jimenez's claim that the police reports were incomplete or that they "effectively" suppressed evidence is little more than a transparent attempt to argue that Bogucki had a duty to create exculpatory evidence on Jimenez's behalf or to make his reports in such a way that Jimenez might find most useful. The Seventh Circuit has repeatedly rejected such attempts to expand *Brady*. *See, e.g., Harris v. Kuba*, 486 F.3d 1010, 1017 (7th Cir. 2007); *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003). *See also United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) (collecting authority).

### Shawn Cosmen

Jimenez makes much of the fact that Shawn Cosmen was picked up by the police and that this information was missing from the police reports. As explained in Defendants' opening brief, Jimenez was aware of this fact at his criminal trial – Cosmen testified to exactly those events. (Ex. 4 at 2284:13-2285:5.) Testimony given at a defendant's criminal trial cannot support a *Brady* claim. *See Gauger*, 349 F.3d at 360; *Bielanski v. County of Kane*, 550 F.3d 632, 645 (7th Cir. 2008). Moreover, Jimenez's claim that Cosmen "was hardly the disinterested observer he was held out to be at the criminal trial" is also a red herring. Jimenez was certainly able to make these same points at his criminal trial. There is nothing about Cosmen that supports an

independent *Brady* violation. *See Crivens v. Roth*, 172 F.3d 991, 997 (7th Cir. 1999) (*Brady* "does not replace the expedient of asking questions to available witnesses").

### Larry Tueffel

It is undisputed that Jimenez knew prior to his criminal trial that Tueffel's version of the facts did not match with his. Tueffel testified that Jimenez was the shooter, while Jimenez claims he was not present. Jimenez knew that the police yelled at Tueffel (Ex. 4 at 735:21-737:21) and that Tueffel told Jimenez prior to his criminal trial that he was testifying against Jimenez because "they made me do it" (Ex. 4 at 740:19-741:20). Under these circumstances, putting these facts together, either Jimenez knew that the police coerced Tueffel or he could have discovered this through reasonable diligence. That knowledge defeats a *Brady* claim. *See Gauger,* 349 F.3d at 360. There was more than enough information to enable Jimenez to effectively cross-examine Tueffel at trial; his failure to do so cannot be blamed on Bogucki. *See Crivens*, 172 F.3d at 997.

### Tina and Sandra Elder

Jimenez also claims that Tina and Sandra Elder were not present for the shooting. He argues that this Court must accept his version as true because it is in the light most favorable to the verdict. Again, this Court may not "ignore uncontradicted, unimpeached evidence supporting defendant's position." *Brunner*, 240 F.2d at 609. The Elders testified that they witnessed the shooting. Jimenez's argument to the contrary does not change the actual evidence in the case.

Jimenez's reliance on *United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007) is misplaced. In *Rodriguez*, the defendants knew that the witness provided impeaching statements to the police. Here, Sandra and Tina Elder never indicated that they reported something to Bogucki that was inconsistent with their criminal trial testimony. In reality, *Rodriguez* helps Defendants. Jimenez is critical about the police officers' failure to create reports. However,

*Rodriguez* explains that *Brady* does not require the police to create reports. 496 F.3d at 224-25. As such, there can be no *Brady* violation based on the police reports.

### The Person Who Led The Police To Victor Romo

In his report, Bogucki wrote that he received "information" that the person with the shooter was Victor Romo. (Supp. Report, attached hereto as Exhibit 7.) Jimenez claims that Bogucki first admitted in 2012 that Tueffel "[told] him about Victor" and that this "impeaching fact" was concealed. (Resp. at p. 24.) This is incorrect. Bogucki testified to the same thing during the criminal trials, namely, that Tueffel told him that he knew Romo but did not know Romo's name. (Ex. 5 at C35:12-19.) During this trial, Bogucki recalled receiving the information from an anonymous source but no longer recalled the identity of the source. Jimenez knew that Bogucki received "information" that Romo was the co-offender. Through reasonable diligence, he could have explored the issue more, including by cross-examining Bogucki, if he felt it might be beneficial for his defense. *See Crivens*, 172 F.3d at 997. As for what information could have been obtained from an anonymous source, that is pure speculation. Speculation cannot form the basis for a *Brady* claim. *See United States v. Jumah*, 599 F.3d 799, 809 (7th Cir. 2010).

### Juan Carlos Torres

Jimenez identifies five points he contends support a *Brady* claim related to Juan Carlos Torres. Essentially, these are claims that Bogucki should have conducted a better investigation, but they are not *Brady* violations. *See Gray*, 648 F.3d at 567. Jimenez also states that there is no evidence that Juan Carlos Torres would have spoken to his defense team about the murder. This misstates the facts, as well as the burden of proof. Jimenez's defense attorney, Kendall Hill, subpoenaed Juan Carlos Torres to testify at Jimenez's criminal trial. (Ex. 4 at 2139:19-2141:3.) Juan Carlos Torres appeared in response to the subpoena. (Ex. 4 at 2219:16-25.) Moreover, according to Jimenez, Torres spoke so freely that he confessed to Ezequiel Romo – a man he

16

never met before in his life. The undisputed evidence indicates that in 1993, Juan Carlos Torres had no problem talking to anyone. As such, Jimenez can hardly make a *Brady* claim based on this issue, seeing that it was his burden to show that he could not obtain or use this evidence.

### The Duke Jacket

Jimenez ignores Defendants' argument regarding the jacket. Jimenez did not need to test the jacket. It was actually better for Jimenez that the jacket was missing since there was no forensic evidence connecting him to the crime. Jimenez did not need the jacket to prove that point – it was the State that had the obligation to prove Jimenez guilty.

As for Bogucki's involvement, there was no evidence that he intentionally destroyed or hid the jacket. More important, the jury was never instructed to evaluate the issue of Bogucki's intent as it related to the jacket. Although *Brady* violations generally do not require a bad faith element, claims based on the failure to preserve evidence do. Under *Arizona v. Youngblood*, 488 U.S. 51, 56-57 (1988), the loss of untested evidence does not violate due process absent a showing of bad faith. *See also Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004) (per curiam). Because Jimenez never made a showing that Bogucki lost or destroyed the jacket in bad faith, his due process claim regarding the jacket fails as a matter of law.

If Jimenez really believes all of his ten points supported independent *Brady* claims, then the jury was likely confused as well. Accordingly, a new trial is warranted if even one of the ten fails as a *Brady* claim. *See Dawson*, 135 F.3d at 1165; *Simmons, Inc.*, 762 F.2d at 599 n. 3.

### D. Jimenez Failed To Adduce The Record Of The Criminal Trial Testimony And Therefore Could Not Meet His Burden Of Proof On The *Brady* Claim.

Jimenez criticizes Bogucki for failing to place certain portions of the criminal record into evidence. This misses the larger point that Jimenez bore the burden of proof, including the burden of proving the materiality of any alleged *Brady* material. Allegedly suppressed evidence

"must be evaluated in the context of the entire record." *United States v. Robinson*, 585 F.2d 274, 281 (7th Cir. 1978) (en banc) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)). Jimenez – not Bogucki – was responsible for placing the full criminal record into evidence in order to allow the jury to evaluate materiality. Curiously, Jimenez not only appeared uninterested in providing the jury the evidence necessary to evaluate materiality, but actively sought to prevent the jury from learning about parts of the criminal record that he considered overly prejudicial. (Pl.'s MILs at D.E. 183, pp. 18-19; D.E. 204, pp. 5-6.) Jimenez also "strongly opposed" reading trial testimony because it was not in the Final Pretrial Order. (Ex. 4 at 1909:15-1911:23.)

This calculated decision to present the jury with an incomplete record dooms Jimenez's *Brady* claim as a matter of law and will lead to swift reversal on appeal. That is precisely what happened in *Ruiz v. Cady*, 635 F.2d 584 (7th Cir. 1980), in which the district court denied a habeas petition without evaluating the materiality of undisclosed evidence in the context of the entire criminal record. The Seventh Circuit vacated and remanded, finding that "without examining the trial transcript the district court could not adequately assess [the] exculpatory effects of the undisclosed evidence." *Id.* at 587-88. Here, as in *Ruiz*, Jimenez failed to meet – indeed, could not meet – his burden of proving materiality without the entire criminal record. *Cf. Old Chief v. United States*, 519 U.S. 172, 187-89 (1997) (describing the "need for evidence in all its particularity"). This failing alone is reason to grant judgment to Defendants as a matter of law; Jimenez cannot fault Bogucki for declining to present his case for him.

## III.    This Court Erred In Granting Jimenez's Motion *In Limine* To Bar Carmelo Cortez.

Jimenez does not dispute Bogucki's argument that Rule 26(a)'s general requirement that witnesses be disclosed in advance of trial is inapplicable to impeachment witnesses. *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir. 2005). This Court recognized that

Cortez was an impeachment witness (Tr. of Dec. 7, 2011 PTC at 17:5-12, attached hereto as Exhibit 8), but excluded him on the basis of "the pretrial order rule" and "unfair prejudice." This was error. Rule 26(a)'s disclosure requirements did not apply to Cortez. He should have been permitted to testify for this reason alone.

Instead of responding to this, Jimenez claims that Bogucki failed to exercise reasonable diligence. However, Bogucki explained his reasonable diligence in his response to Jimenez's motion *in limine* and during the pretrial conference. Bogucki began trying to locate Cortez in February 2011. He finally tracked Cortez down on October 11, 2011.[7] After talking to Cortez, Bogucki disclosed him on October 26, 2011. It was only through Bogucki's continued efforts to locate Cortez – a witness whose significance was not apparent until Bogucki's counsel interviewed him – that Bogucki was finally able to find Cortez.

More important, Jimenez was not prejudiced by the timing of Cortez's disclosure. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 858 (7th Cir. 2003) (finding no prejudice where only other participant in conversation with inadequately disclosed witness contradicted witness's version of conversation at trial).[8] Trial did not commence until January 9, 2012, over two months after the disclosure. Thus, Jimenez had ample time to depose Cortez. If, after that deposition, Jimenez felt he needed to conduct further discovery (which is unlikely), he could have then raised that issue with this Court. The reality is that Jimenez was well aware that Cortez was a

---

[7] Jimenez notes that on November 15, 2011, his counsel sent a letter to defense counsel stating: "So that we may better understand your position, we ask that you inform us how you came to locate Mr. Cortez, and who located him." The insinuation that Bogucki had something to do with Cortez's appearance in this case is a red herring. It is undisputed that Tueffel, at his deposition, volunteered that "Carmelo" had come by his house on the night of the shooting.

[8] Jimenez's reliance upon *Wilson v. AM General Corp.*, 167 F.3d 1114 (7th Cir. 1999) and *In re Kilgus*, 811 F.2d 1112 (7th Cir. 1987) is misplaced. In *Wilson*, the defendant belatedly disclosed two of its in-house attorneys. Of course, the defendant was well aware of its own attorneys from the beginning. By contrast, Bogucki did not find Cortez until October 2011. *Kilgus* is a bankruptcy case affirming a default judgment. Its general language about deadlines is inapposite.

very relevant, very damaging witness and had no interest in deposing him. Jimenez's prejudice argument is summed up in one sentence: "It would not have been fair to require Plaintiff to undertake this discovery while also briefing motions *in limine* and prepping for trial." (Resp. at p. 44.) This hardly shows prejudice. Jimenez was represented by a team of attorneys from three separate firms. Surely, one of those attorneys could have found the time to depose Cortez in the two months between disclosure and trial without affecting Jimenez's preparation for trial.

Jimenez also claims that Bogucki was not prejudiced by Cortez's exclusion. Not so. Cortez would have been one of Bogucki's most valuable witnesses at trial. Tueffel claimed that he implicated Jimenez only after Bogucki took him to the police station and yelled at him for two hours. Cortez, however, would have testified that he went to Tueffel's house on the night of the shooting – prior to Tueffel's alleged trip to the police station at 3:00 a.m. – and confronted Tueffel about the shooting. Cortez would have testified that Tueffel told him, then and there, that Jimenez was the person who shot Morro. This would have had immense impeachment value; after all, Tueffel admitted that Cortez came to his house that night, but also claimed that Cortez never asked him who shot Morro. On its own, Tueffel's testimony already defied common sense, as the whole purpose of Cortez's visit to Tueffel's house was to find out who shot his best friend. And if Cortez had been allowed to testify, it is hard to believe that any reasonable jury would have believed Tueffel in the least. Therefore, the exclusion of Cortez's testimony was severely prejudicial to Bogucki, seeing that Jimenez's entire case rested on Tueffel's credibility.

Finally, Jimenez argues that Cortez's testimony would have been cumulative since Jimenez's then-girlfriend had already impeached Tueffel at the civil trial. But Cortez's testimony was different, since his interaction with Tueffel took place *before* Tueffel was interviewed by Bogucki at 3:00 a.m. Thus, Tueffel's statement to Cortez that Jimenez shot Morro would have

been very powerful and credible evidence. Jimenez also argues that Cortez's testimony would have been cumulative of Phil Torres' testimony. That is not the case. Although Torres first testified that Tueffel told him in the police car that Jimenez was the shooter, Torres later changed his testimony when his memory was refreshed with his criminal trial testimony. (Ex. 4 at 2687:23-2688:8.) Cortez's testimony was even more critical to Bogucki due to Torres' muddled testimony. Moreover, in a case like this, so dependent on witness credibility, no impeachment witness like Cortez could be excluded merely as "cumulative." *See Commonwealth v. Coleman*, 264 A.2d 649, 651 (Pa. 1970) (recantations unreliable in the first place).

## IV. This Court Erred In Granting Jimenez's Motion *In Limine* To Bar Evidence Of His Threatening Victor Romo.

Although deference is afforded the trial court regarding discretionary rulings, "the usual deference does not apply when a district court incorrectly categorizes the nature of the evidence." *United States v. Manske*, 186 F.3d 770, 776 (7th Cir. 1999). In *Manske*, the Seventh Circuit held that a new trial was warranted where the defense was not allowed to cross-examine the key prosecution witness with his attempt to intimidate witnesses in another case. It also held that the defense should have been allowed to cross-examine other witnesses about whether they were biased against the defendant because they had been threatened by the key prosecution witness on other occasions. The court concluded that "the trial court construed the threat evidence too narrowly." *Id.* at 776. Similarly, this Court viewed the Victor Romo threat evidence too narrowly. In making its ruling, this Court found that the Romo threat had "really tiny probative value" because (1) guilt was relevant only to damages, (2) other threat evidence had been introduced, and (3) the Romo threat occurred after Romo had already identified Juan Carlos Torres as the shooter. This Court incorrectly categorized the Romo threat.

First, this Court mistakenly ruled that, because the Romo threat was not known to Bogucki, it was not relevant to malice. But evidence can be relevant to the presence or absence of malice even if the defendants were not aware of that evidence. *See Aguirre v. City of Chicago*, 887 N.E.2d 656 (1st Dist. 2008). Jimenez, in his response, does not dispute this statement of the law, nor does he defend this Court's conclusion to the contrary. Instead, Jimenez seizes upon the "chain of inferences" language in *Aguirre* in an attempt to distinguish that case. That attempt fails. There is no "chain of attenuated inferences" here. Rather, the inference to be drawn from Jimenez's threat to Romo is simple and powerful, i.e., that Jimenez was guilty of shooting Eric Morro. Bogucki should have been allowed to introduce Jimenez's threat to Romo to rebut Jimenez's claim of malice, and the jury should have been allowed to draw its own conclusion about the ultimate meaning of that threat.

Second, this Court erred in excluding evidence of the Romo threat because other threat evidence had already been introduced, namely, letters Jimenez wrote to his girlfriend in which he threatened Tueffel. That Jimenez threatened Tueffel was no basis to bar evidence that Jimenez had also threatened Romo. Bogucki's position at trial was that Jimenez was the person who shot Eric Morro. As such, the only two other people present for the shooting were Tueffel and Romo. Bogucki should have been allowed to present evidence that Jimenez threatened both of the witnesses against him. Since these were different threats to different witnesses, evidence of one was not cumulative of the other.

Jimenez argues that the "small incremental value" of the Romo threat did not outweigh the "very real danger of unfair prejudice." This argument misses the mark on both counts. Again, the Romo threat was powerful evidence of consciousness of guilt. Jimenez's lone argument to support his claim of unfair prejudice is that "[t]elling the jury that Plaintiff allegedly threatened

to shoot someone would have been unfairly prejudicial." (Resp. at p. 36.) Jimenez uses the word "someone" as though the Romo threat pertained to some other unrelated case. But it is undisputed that Romo was an eyewitness to the shooting of Eric Morro. Thus, Romo was a very important witness in this trial.[9] That evidence would not result in any prejudice, let alone unfair prejudice, "unless we count as 'prejudice' all evidence that undermines the other side's contentions." *Cobige v. City of Chicago*, 651 F.3d 780, 785 (7th Cir. 2011). Finally, Jimenez's claim of unfair prejudice rings hollow when he does not even discuss the cases Defendants cited, *United States v. Blake*, 286 F. App'x 337, 340 (7th Cir. 2008) and *United States v. Centracchio*, 265 F.3d 518, 531-32 (7th Cir. 2001), on the application of Rule 403 to evidence of threats.

Third, this Court erred in barring the Romo threat on the ground that the threat occurred after Romo had already identified Juan Carlos Torres as the shooter. Respectfully, Defendants fail to see why this matters. As time went by, perhaps Jimenez was worried that Romo would change his mind and not continue to falsely implicate his friend. In fact, the only reason for Jimenez to be worried is that Jimenez knew that he was the shooter and that Romo was falsely implicating someone else. In other words, if Jimenez was actually innocent, there would be no fear that Romo would somehow change his story and falsely implicate Jimenez.

A few other issues remain to be addressed. Jimenez argues that the Romo threat was unreliable. The evidence belies any such claim. Margot Gillin prepared a contemporaneous report of the threat and at her deposition still had a vivid memory of it. Jimenez himself spoke of the threat in a poem he wrote while in the Audy Home. ("The Courts Are Playing With My

---

[9] Jimenez's reliance upon *Manuel v. City of Chicago*, 335 F.3d 592 (7th Cir. 2003) and *Kelsay v. Consolidated Rail Corp.*, 749 F.2d 437 (7th Cir. 1984) is misplaced. Those cases involve a party seeking to introduce other acts of "discrimination" and other "accidents" from totally unrelated cases. Here, the Romo threat pertained directly to a key witness in this case.

Mind" at p. 2, attached hereto as Exhibit 9.) While Jimenez claimed that he was "playing," he did not contend that the threat was never made. The jury should have been allowed to evaluate it.

Jimenez also argues that the Romo threat was not material and that Bogucki waived any chance to discuss the threat by not cross-examining Romo about it. Bogucki acknowledges that he did not question Romo about the threat.[10] But the fact that Bogucki elected not to ask Romo about the threat certainly cannot be seen as a waiver of his right to ask Jimenez about that same threat. Indeed, given that Jimenez admits the threat but claims that he was "playing," Bogucki could easily have thought it more effective to discuss that threat with its source rather than with Romo, who was apparently all too willing to perjure himself on the stand. More important, the Romo threat evidence was material as Jimenez had no reason to make a threat to Romo unless Jimenez was actually guilty and afraid that Romo would change his false story to the police that the real shooter was Juan Carlos Torres. If Jimenez was really innocent, and if Romo had assured Jimenez that he, Romo, had witnessed Juan Carlos Torres shooting Eric Morro, then there would be no reason for Jimenez to go so far as to threaten to kill Romo's father if Romo testified that Jimenez shot Morro. In fact, that the threat was made after Romo implicated Torres is particularly strong evidence of consciousness of guilt – it would be most strange, after all, for an innocent person to threaten a witness who had already pointed the finger at someone else.

## V. This Court Erred In Granting Jimenez's Motion *In Limine* To Bar His Juvenile Arrests.

Bogucki should have been allowed to admit Jimenez's numerous juvenile arrests to explain why Jimenez was tried as an adult. Although Jimenez correctly notes that arrests are generally inadmissible, in this case, his juvenile arrests were of such overwhelming probative

---

[10] Prior to trial, the parties submitted briefs on the admissibility of evidence tending to show guilt. This Court had not ruled on that issue before the start of the trial and defense counsel raised this issue with the court prior to seeking to cross-examine Jimenez about the Romo threat. (Ex. 4 at 715:4-716:6.)

value on the issue of damages that the general rule simply did not apply. Dennis Brady's recommendation, the State's Attorney's Office's motion, and the court's decision to try Jimenez as an adult, which resulted in Jimenez's lengthy prison sentences, were intervening acts that broke the chain of causation between Bogucki's alleged wrongdoing and Jimenez's full damages.[11] As explained in Defendants' opening brief, *Duncan v. Nelson*, 466 F.2d 939, 943 (7th Cir. 1972) held that it was error to "assess damages on the basis of the years spent in prison" where the chain of causation was broken by a discretionary sentencing decision. *See also* 730 Ill. Comp. Stat. 405/5-805(3) (describing procedure for transfer of juveniles to adult court and listing "criminal history of the minor" as one factor in court's discretionary decision). In his response, Jimenez has elected not to address Defendants' causation argument or the *Duncan* decision. By failing to respond, Jimenez seems to concede that *Duncan* controls. Under *Duncan*, and given Jimenez's request for damages for sixteen years of incarceration, Bogucki should have been allowed to present evidence why Jimenez was tried as an adult. And Bogucki should have been allowed to argue that he should not be responsible for the entire sixteen years Jimenez spent in prison because Jimenez's juvenile record caused him to be tried as an adult and subjected to such a lengthy prison term.

Jimenez points out that the jury did learn that he had "previous Juvenile Court involvement," but that is a different issue. While the jury learned that Jimenez had been arrested before, it never learned that he had over twenty juvenile arrests and, more important, that he was tried as an adult because of his extensive juvenile record. For all the jury knew, Jimenez had been arrested once for a minor youthful indiscretion. Likewise, this Court's pretrial ruling that the fact Jimenez had been arrested before was potentially admissible to explain the officers'

---

[11] Bogucki has argued since the beginning that Jimenez's juvenile arrests are "relevant to the amount of time he spent in prison." (Def.'s Resp. to Pl.'s MILs at D.E. 187, p. 12.) *See also* Tr. of Dec. 5, 2011 PTC at 39:18-20, attached hereto as Exhibit 10.

investigative decisions did not allow Bogucki to explain the extent or significance of Jimenez's juvenile arrests.[12] Had Jimenez been tried as a juvenile, he would have served time only in juvenile facilities and only until his maturity, at most eight years, like Victor Romo. The jury was entitled to learn this fact.

## VI. This Court Erred In Denying Bogucki's Motion *In Limine* To Bar Evidence Or Argument Regarding The Current Prosecution Of Juan Carlos Torres.

Jimenez continues to argue that the Torres prosecution was relevant to prove the "indicative of innocence" prong of his malicious prosecution claim. As explained in Defendants' opening brief, whatever minimal probative value it had was overwhelmingly outweighed by the danger that the jury would conclude, despite the presumption of innocence, that Torres was guilty. Indeed, Jimenez never even argued that the Torres prosecution went to this element of his malicious prosecution claim. (Ex. 4 at 2830:12-14 (arguing in closing that "the only two [elements] in dispute are probable cause and malice")). In any event, Bogucki offered to remove this element from the jury instructions, thereby removing the necessity of proving this element.

Bogucki was prejudiced by this Court's ruling mid-trial that evidence of guilt was relevant only to damages. Based on that ruling, this Court barred some of Bogucki's evidence tending to show Jimenez's guilt, including Jimenez's threat to Victor Romo. Under this ruling, Torres' prosecution should have been barred as well.[13] However, evidence of Torres' prosecution had already been admitted by the time this Court modified its ruling. Consequently, Jimenez received the benefit of the Torres prosecution evidence while at the same time being able to keep out evidence tending to show Jimenez's guilt. This rendered the trial unfair.

---

[12] Jimenez claims that this Court "specifically invited the parties to raise arguments at trial in favor of admission of juvenile arrests." But the transcript he cites simply reflects this same ruling.

[13] Jimenez's claim that this Court reserved ruling on the admissibility of Torres' prosecution is incorrect. The order on the motions *in limine* clearly states: "Defendants' Motion No. 6 to bar references to the prosecution of Juan Carlos Torres is denied."

Finally, Bogucki was prejudiced by the specific manner in which this Court allowed Jimenez to examine Torres. *See United States v. Tanner*, 628 F.3d 890, 902 (7th Cir. 2010). At trial, Jimenez asked Torres twenty questions,[14] well aware that Torres would exercise his Fifth Amendment right. As the courts have recognized, the practice of calling a witness to the stand who will claim his Fifth Amendment privilege is "so imbued with the 'potential for unfair prejudice' that a trial judge should closely scrutinize any such request" to do so. *United States v. Vandetti*, 623 F.2d 1144, 1147 (6th Cir. 1980). And "presentation of such a witness is obviously unfair" when there is "extensive questioning" after the parties, as here, "knew that the privilege would be asserted." *Id.* Bogucki offered to stipulate that Torres would exercise his Fifth Amendment right. (Def.'s Position Paper at D.E. 242, p. 4.) Since there was a real threat of prejudice from Torres' exercise of his Fifth Amendment right in response to question after question, a stipulation would have alleviated some of this prejudice while allowing Jimenez to introduce evidence that Torres would exercise his Fifth Amendment right. *Old Chief v. United States*, 519 U.S. 172 (1997) held that, where "competing evidence [was] distinguishable only by the risk inherent in the one and wholly absent from the other," it was an abuse of discretion to admit the former. *Id.* at 191. Similarly, in this case, Torres' live testimony and a stipulation were distinguishable only by the enormous risk of prejudice inherent in the former, and it was an abuse of discretion to allow it.

## VII. Defendants' Reply In Further Support Of Their Rule 50 Motion.

### A. Defendants' Rule 50 Motion Should Not Be Deemed Waived.

Defendants' Rule 50(b) motion is based on the application of the law to the facts. This

---

[14] The questions were loaded with inadmissible information from the State's Attorney's Office reinvestigation of the shooting. For example, plaintiff's counsel questioned Torres about him "fle[eing] the state of Illinois" after being interviewed by investigators because he "knew now that [his] past had finally caught up with [him]." Bogucki was "helpless to cross-examine" Torres about these topics. *United States v. King*, 461 F.2d 53, 57 (8th Cir. 1972).

can be distinguished from arguments based on the sufficiency of the evidence. For example, the alleged failure to preserve the Duke jacket for testing simply is not a *Brady* claim as a matter of law. *Youngblood*, 488 U.S. at 56-57; *Fisher*, 540 U.S. at 547-48. The fact that Bogucki did not bring a Rule 50(a) motion at trial does not waive the legal issues in his Rule 50(b) motion. *See Carlson v. Bukovic*, 621 F.3d 610, 617 n. 13 (7th Cir. 2010); *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 720 (7th Cir. 2003).

Bogucki's position on the *Brady* claim has been clear throughout this litigation and, therefore, his reassertion of the arguments made prior to and during the trial through this motion should not be deemed waived. *See Laborers' Pension Fund v. A & C Environmental, Inc.*, 301 F.3d 768, 777-78 (7th Cir. 2002); *Petit v. City of Chicago*, 239 F. Supp. 2d 761, 767 (N.D. Ill. 2002) ("waiver rules must be considered in light of Rule 50(b)'s purpose").

Bogucki has consistently maintained that Jimenez's *Brady* claim fails as a matter of law. The first attack on the *Brady* claim came at summary judgment. The crux of the entire motion was directed to the insufficiency, as a matter of law, of the *Brady* claim. In fact, the majority of Defendants' Rule 50 motion addresses the exact same issues raised at summary judgment.

In addition, these issues were also covered in the parties' off-the-record[15] jury instruction conference. Prior to the conference, Jimenez submitted a position paper in support of his

---

[15] Plaintiff's counsel takes a jab at defense counsel – quoting defense counsel's argument in support of his instruction No. 2 – calling it "less than illuminating." (Resp. at p. 32.) This is misleading. This Court – and plaintiff's counsel – must recall that the actual jury instruction conference was held off the record and lasted several hours. There was much back-and-forth between the parties and this Court on the instructions. At the conclusion of the conference, although this Court had already ruled on the instructions, it requested that on Monday morning, just prior to the closing arguments, the parties place their objections on the record. Accordingly, defense counsel placed a short statement on the record regarding instruction No. 2. Bogucki made his position clear and this Court ruled on the jury instructions. The brief statements made on the record prior to closing argument were just for the purpose of "making a record" and were made several minutes before the closing arguments were set to begin.

proposed jury instructions. Bogucki argued against Jimenez's proposed scope of the due process claim. Jimenez identified facts to support these positions. (Pl.'s Position Paper at D.E. 280, ¶¶ 9-10, 13-16.) Bogucki pointed out to this Court that none of these points set forth a *Brady* claim. Bogucki also filed pre-trial motions related to the scope of the *Brady* claim. Prior to trial, both parties submitted lengthy briefs discussing the scope of the due process claim for trial.

Finally, Jimenez first identified the rest of his so-called *Brady* allegations at closing argument, after the evidence in the case was already closed. At that point, the purpose of the motion – to afford the other party an opportunity to cure any defect – was not even practical. *Laborers' Pension Fund,* 301 F.3d at 777. And the Seventh Circuit has made clear that arguments "better developed" through subsequent briefing are not waived. *Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011). Accordingly, Defendants' Rule 50 motion should not be deemed waived.

### B. Jimenez Failed To Prove A *Brady* Claim As A Matter of Law.

As discussed in Defendants' opening brief, Rule 59 motion and reply, Jimenez failed to establish a *Brady* violation. Jimenez was either aware of the information he claims was withheld or could have discovered it through the use of reasonable diligence.

### C. There Was Probable Cause To Charge Jimenez With The Murder And Bogucki Did Not Act With Malice.

Jimenez attacks Defendants' reliance on Phil Torres for purposes of establishing probable cause. He contends that if the evidence is viewed in the light most favorable to the verdict, then this Court must conclude that Torres did not see anything. That is not what the evidence established. Torres identified Jimenez. Therefore, Torres' identification of Jimenez, alone, established probable cause to charge him with the murder. *See Gramenos v. Jewel Co., Inc.,* 797 F.2d 432, 439-40 (7th Cir. 1986). Jimenez also dismisses Defendants' reliance on *Kim v. City of*

*Chicago* because, unlike the witness in *Kim*, Torres "never identified Plaintiff the first time." That is not why *Kim* is relevant. *Kim* teaches that even if some of the evidence supporting probable cause falls away, as in the case of a recantation, probable cause will not fail if the undisputed evidence is sufficient. Torres repeatedly testified that he voluntarily identified Jimenez. (Ex. 4 at 2663:8-16, 2684:16-2685:24, 2688:21-2690:2, 2696:3-16, 2709:17-2710:11.) Accordingly, there was ample probable cause to prosecute Jimenez based on Torres' identification.

## **CONCLUSION**

For all of the reasons stated herein, Defendants City of Chicago and Jerome Bogucki respectfully request that this Court grant their motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 and motion for a new trial pursuant to Fed. R. Civ. P. 59(a).

Respectfully Submitted,

/s/ Joan E. Ahn
One of the Attorneys for Defendant Jerome Bogucki

/s/ Terrence Burns
One of the Attorneys for Defendant City of Chicago

Andrew M. Hale                        Harry Arger
Avi T. Kamionski                      Terrence Burns
Joan E. Ahn                           Daniel Noland
Andrew M. Hale & Associates           Dykema
53 W. Jackson, Suite 1800             10 S. Wacker Dr., Suite 2300
Chicago, IL 60604                     Chicago, IL 60606
312-341-9646                          312-876-1700