**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THADDEUS JIMENEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 09 C 8081** |
| | ) | |
| **CITY OF CHICAGO and** | ) | |
| **JEROME BOGUCKI,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Thaddeus Jimenez has sued City of Chicago and Jerome Bogucki, a former

Chicago police detective, for claims arising from his wrongful conviction of the murder of

Eric Morro. Jimenez served approximately sixteen years in prison before his conviction

was vacated and he was released. In January 2012, a jury returned a verdict in favor of

Jimenez and awarded him $25 million. Defendants have moved for a new trial and for

judgment as a matter of law on Jimenez's claims. For the reasons stated below, the

Court denies defendants' motions.

**Background**

The present decision assumes familiarity with the Court's November 10, 2011

decision on defendants' summary judgment motion [docket no. 151].

In February 1993, Victor Romo and another boy, who Romo has always

identified as Juan Carlos Torres, shot and killed Eric Morro on the street in Chicago.

Morro's friend Larry Tueffel was present at the scene of the crime, and Tina Elder and

Phil Torres were nearby.

Detective Bogucki was assigned to investigate the murder. Jimenez claimed that Bogucki used middle-of-the-night interviews and other coercive tactics to coerce Tueffel and Phil Torres to falsely identify Jimenez as Morro's shooter. Jimenez also claimed that Bogucki tainted a lineup identification that Elder made of Jimenez, by arranging for her to see a picture of her friend Morro's corpse next to a picture of Jimenez before she was shown the lineup. Bogucki also allegedly planted with the witnesses the idea that the shooter was wearing a blue and white Duke jacket, because that was the type of jacket that Jimenez owned.

In October 1994, Jimenez, who was fifteen years old at the time, was tried as an adult in the Circuit Court of Cook County for the murder of Morro. Romo testified that Juan Carlos Torres had committed the murder, while Tueffel, Elder, and Phil Torres testified that Jimenez was the shooter. A jury convicted Jimenez, and the trial judge sentenced him to a fifty year prison term. After the conviction was overturned for reasons unrelated to this case, Jimenez was tried again in 1997. The same witnesses testified and gave essentially the same testimony. A jury again convicted Jimenez, and the trial judge sentenced him to a forty-five year prison term.

In 2006, an investigator working for the Northwestern University Center on Wrongful Convictions contacted Tueffel, who was institutionalized in a mental health facility because he had been diagnosed as a paranoid schizophrenic. Tueffel volunteered that Jimenez was innocent. The investigator and attorneys obtained recorded statements to that effect. Using those statements, investigators confronted Elder about her identification of Jimenez. For the first time, she revealed that she had

seen a picture of Jimenez just before she identified him in the lineup. Investigators were also able to cast doubt on other parts of the prosecution's case against Jimenez. In 2008, they convinced the Cook County State's Attorney to reopen the case, and state investigators discovered more evidence tying Juan Carlos Torres to the killing.

In May 2009, the State's Attorney and Jimenez's lawyers asked to vacate his conviction, and a judge of the Circuit Court of Cook County did so. The court later granted Jimenez a certificate of innocence. *See* 735 ILCS 5/2-702. Juan Carlos Torres was arrested for Morro's murder the same day that Jimenez was released. Torres is currently awaiting trial.

**Discussion**

Defendants contend that they are entitled to a new trial for several reasons. They claim that the Court erroneously disallowed one of their peremptory challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986); the Court erred in refusing to instruct the jury on specifically what actions by Bogucki were alleged to violate Jimenez's right to a fair trial; and the Court made several erroneous evidentiary rulings. Defendants also argue that they are entitled to judgment as a matter of law on Jimenez's due process, conspiracy, and malicious prosecution claims.

**A.     *Batson* challenge**

Defendants contend that the Court incorrectly sustained Jimenez's *Batson* objection to a peremptory challenge that defense counsel used against an African-American juror. Defendants also contend that the Court erred in not granting defendants another strike to use in place of the disallowed peremptory challenge.

3

1. **Relevant facts**

During the jury selection process, two potential jurors indicated that they had personal experience with the prison system. One, Ms. McKee, who is African-American, stated that she has a great-nephew who served fourteen years in prison for murder and was released in 2011. Def. Ex. 1 at 77–78. She stated that she attended court during his criminal case, indicating that she went to court along with other family members. *Id.* at 78. Ms. McKee did not think that her great-nephew had been treated unfairly by anyone in the process, including the courts, police, prosecutors, or his own lawyers. *Id.* She stated that she could put her great-nephew's situation aside and decide Jimenez's case based solely on the evidence before her. *Id.*

Ms. McKee also disclosed that a nephew of hers had been killed on the street seven years prior to the trial. When asked if anyone had been arrested or charged for the homicide, she answered "[n]ot yet." *Id.* at 79. She stated that she could also set that experience aside if chosen for the jury. *Id.*

Another potential juror stated that he himself had actually served a prison term. Mr. Casey, who is white, disclosed that he had spent time in prison for possession of marijuana. *Id.* at 81–82. He stated that he was convicted in Iowa in the 1970s, was sentenced to a five year prison term, and he served two and one-half years. *Id.* at 154. He did not think that the police, courts, or prosecutors had treated him unfairly, but he stated that he felt he had been treated unfairly by his defense lawyer. *Id.* at 154–55. Mr. Casey also stated, however, that he had been guilty and "the only person I was mad at was me[,] for getting caught." *Id.* at 155; *accord id.* at 82. Unlike Ms. McKee,

4

Mr. Casey never stated that he could put those experiences aside and not use them when deciding Jimenez's case. (In fact, the Court neglected to ask him this question. Counsel—including defense counsel—did not ask the Court to follow up in this regard.)

Mr. Casey also had been a member of a motorcycle club for twelve years, up until six or seven years prior to trial. When asked if "you or anybody else that you know ever had an encounter with a police officer that leaves you with bad feelings," he answered "of course." *Id.* at 153. He also claimed that at times he had been stopped by police solely because he was wearing the motorcycle club's patch on his clothes. *Id.* at 153. Mr. Casey stated that none of the encounters had been with Chicago police. *Id.* He indicated that he would not start the trial with any negative feelings about the police officers involved in the case because of previous experiences. *Id.* at 154.

Defendants did not challenge either Ms. McKee or Mr. Casey for cause. *Id.* at 183. Defense counsel used a peremptory challenge to attempt to remove Ms. McKee from the jury. They did not use a peremptory challenge with regard to Mr. Casey. Jimenez's attorneys objected to the defense challenge of Ms. McKee, arguing that the challenge violated was racially discriminatory in violation of *Batson*. They noted that defendants had exercised two of their three peremptory challenges to remove the only two African-Americans from the jury and that if defendants' strikes were allowed, the jury would be entirely white. Tr. 208–10.

The Court asked defense counsel to justify the strikes of the two African-American jurors. Defendants justified their peremptory challenge of the other potential African-American juror, whom they had also challenged for cause, on the ground that

5

she had been arrested twice and had failed to disclose either arrest. *Id.* at 208–09.

With regard to Ms. McKee, defendants' attorney stated:

> For number 17, Ms. McKee, she had a nephew who spent 14 years in prison and just got out for murder. That's not the kind of person I would like on my jury for damages because I think she would be very sympathetic to Mr. Jimenez who spent 16 years in prison for murder.

Def. Ex. 1 at 209. The attorney also said "I think she's going to relate to what it's like to have a family member in prison. Mr. Jimenez was in prison for 16 years, and I think with her having a nephew in prison for 14 years . . . ." *Id.* at 210. When the Court noted that Ms. McKee had stated that her great-nephew was treated fairly, defendants' attorney responded, "My point is the damages issue. She is somebody I think that is going to be very sympathetic to somebody like Mr. Jimenez who is claiming 16 years in prison. You know, we're going to say he wasn't damaged in prison because . . . basically he was properly charged." *Id.* at 211.

The Court then asked why defendants had not struck Mr. Casey, who (the Court noted) had spent time in prison himself. Defendants' attorney justified the differential treatment by noting that Mr. Casey had been in prison for two and one-half years, whereas Ms. McKee's great-nephew had been in prison for fourteen years. *Id.* at 211–12. The attorney also stated that Mr. Casey had been imprisoned in the 1970s and that his marijuana charge "was a much smaller charge." *Id.* The attorney concluded by noting that "Mr. Casey, who was in prison for two years . . . , he's not going to associate himself with Mr. Jimenez, but I think Ms. McKee could." *Id.* at 212.

Twice during the exchange, defense counsel also sought to justify the challenge by hypothesizing that Ms. McKee might believe that her great-nephew was wrongfully

6

convicted.  Counsel stated, "I didn't remember her saying he didn't do it.  I doubt she knows anything about the circumstances of whether he [d]id it or not.  And it wouldn't surprise me if she thought he didn't do it."  *Id.* at 210.  A bit later, counsel reemphasized this hypothesis, even more strongly:  "Like I said, I'm sure she doesn't know the circumstances of the murder, and *I think in her heart she probably believes her—she could believe he was innocent.*  I think she could sympathize with Mr. Jimenez and view her [sic] as being like her nephew, and that's my concern."  *Id.* at 212 (emphasis added).

This rationale for the strike had no basis in the record.  To the contrary, Ms. McKee had expressly affirmed, in response to a direct question, that her nephew had *not* been treated unfairly in any respect:

> THE COURT:  . . . Was there any question—and just a yes or no on this. Was there any question or issue about whether he had been treated fairly either by the courts, the police, the prosecutors, lawyers, anybody at all?
>
> [MS. McKEE]:  No, there was no question about it.

*Id.* at 78.  Defense counsel do not suggest, nor could they, that anything in Ms. McKee's demeanor suggested that she was hedging or somehow suggested a belief that her great-nephew might have been innocent.  The Court observed Ms. McKee carefully during questioning.  She responded to the questions about her nephew's case unflinchingly and without any hint that she felt the criminal justice process had gone awry in any way, shape, or form.

The Court overruled plaintiff's objection to defendants' strike of the other African-American juror, finding that it was "a legitimate nonracially based challenge."  *Id.* at 213.

With regard to Ms. McKee, however, the Court concluded that defendants' challenge was racially motivated. The Court suggested that counsel was "grasping at straws" in attempting to explain the strike. *Id.* The Court noted "the differential treatment of her and [Mr. Casey]." *Id.* Though noting that one can almost always identify some differences between two allegedly comparable jurors, the Court stated:

> [Y]ou've got a person here who spent two and a half years in prison himself. He expressed some concerns about fairness, about the fairness of the proceeding. She didn't. You struck her, you didn't strike him. The only conclusion I can reach is it's racially based, and I so find, and it's deliberate.

*Id.* The Court disallowed the challenge of Ms. McKee and also ruled that defendants were not entitled to another strike because they had forfeited it. *Id.* at 214.

### 2.    Propriety of the peremptory challenge

Allowing a party in a civil case to exclude a juror on the basis of the juror's race violates the juror's equal protection rights, and an opposing party can make a *Batson* objection to a racially discriminatory peremptory challenge. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 628–30 (1991). A *Batson* objection is analyzed in three steps.

> First, the [opponent of the strike] must establish a *prima facie* case that the strike was racially motivated. The burden then shifts to the [maker of the peremptory challenge] to articulate race-neutral reasons for the strike. Finally, the trial judge must assess the credibility of the prosecution's explanation and determine if the [opponent] has established purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with the opponent of the strike.

*United States v. Hendrix*, 509 F.3d 362, 370 (7th Cir. 2007) (emphasis in original; citations omitted).

Defendants do not contest that Jimenez established a *prima facie* case, so the Court moves on to the second step in the analysis. Defendants justified their strike of Ms. McKee by stating that she might be sympathetic to Jimenez because her great-nephew had undergone a similar experience and spent a similar amount of time in prison. This was a facially race-neutral explanation. "Unless a discriminatory intent is inherent in the [challenger]'s explanation, the reason offered will be deemed race-neutral." *Id.*

Accordingly, the Court moves to the third step of the *Batson* analysis. At this stage, a court must determine whether the opponent of the strike has proved purposeful discrimination.

> The critical question in determining whether [the opponent] has proved purposeful discrimination at the last stage is the persuasiveness of the [challenger]'s justification for his strike. The issue is whether the trial court finds the [challenger]'s race-neutral explanations to be credible. When approaching the issue of credibility, the court assesses how reasonable, or how improbable the [challenger's] explanations are; and by whether the proffered rationale has some basis in accepted trial strategy. *Batson* and its progeny direct trial judges to assess the honesty—not the accuracy—of a proffered race-neutral explanation.

*Id.* at 371 (citations and internal quotation marks omitted).

The Court found at the time, and now reaffirms, that defendants' proposed justification for striking Ms. McKee was not credible. "If a [party]'s proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). Defendants expressed concern that Ms. McKee might be a bad juror for them on damages, because she would know what it

9

was like to have a relative in prison. The same rationale, however, applied even more strongly to Mr. Casey. Ms. McKee might have a second or third-hand sense of what prison life is like through the experiences of her sibling's child's son. By comparison, Mr. Casey had direct and visceral personal experience with prison life because he himself spent two and one-half years in prison.

Defendants argued at the time that there was a substantial difference between Mr. Casey's time in prison, which he had served in the 1970s, and Ms. McKee's great-nephew's fourteen years, which he served recently. The Court finds it improbable that defendants actually relied on these distinctions when choosing whom to strike. The length of time and remoteness of the imprisonment pale in comparison to the fact that Mr. Casey personally experienced prison, whereas Ms. McKee only had a relatively distant relative who was imprisoned. The passage of time may have affected how Mr. Casey viewed his time in prison, but he still possesses direct experience of prison, whereas Ms. McKee had no such direct experience.

Furthermore, Mr. Casey stated that he felt he was treated unfairly in the criminal justice process—by his defense lawyer—although he added that he was only angry with himself for committing a crime. Ms. McKee, in contrast, stated that she did not know of any time when *anyone* involved in the criminal process treated her great-nephew unfairly. In addition, Ms. McKee stated unequivocally that she could put her experience aside when deciding Jimenez's case, whereas Mr. Casey never did so.

Finally, there were other factors that made Ms. McKee a less desirable juror from a plaintiff's standpoint than Mr. Casey and that add to the improbability that the reason defendants cited was their actual rationale for striking her. Specifically, Ms. McKee

10

stated that her family had suffered from street violence; her nephew had been the victim in an as-yet-unsolved homicide. This experience would tend to make her less sympathetic to Jimenez, who was accused of—and, the defendants contended, guilty of—a murder on the streets of Chicago. Mr. Casey, by contrast, stated he had many negative experiences with police from his time in a motorcycle club and felt that police had sometimes detained him unfairly, solely because his clothing identified him as a member of the club. Although Mr. Casey said he could put those experiences aside as a juror, they would tend to make him more sympathetic to Jimenez, who claimed the police treated him unfairly and wrongly accused him of an even more serious crime.

Defendants contend that a key difference between Mr. Casey and Ms. McKee is that Ms. McKee's great-nephew was convicted of murder, the same crime of which Jimenez was convicted, whereas Mr. Casey was convicted of a marijuana offense. In determining the propriety of a peremptory challenge, however, "the trial court should consider only the reasons initially given to support the challenged strike, not additional reasons offered after the fact." *United States v. Taylor*, 636 F.3d 901, 905 (7th Cir. 2011). During voir dire, the defendants did not suggest that the reason, or a reason, that they distinguished between Mr. Casey and Ms. McKee was that his offense was different from, or less serious that, Jimenez's or because Jimenez and Ms. McKee's great-nephew were convicted of the same crime. Rather, they focused on the fact that Ms. McKee's great-nephew spent much longer in prison and that Mr. Casey's prison time was more than thirty years ago. It would be clear error for the Court to consider this new justification for the peremptory challenge. *Id.* at 905–06.

The Court also considers it significant that in his contemporaneous attempt to

11

justify the challenge, defense counsel cited, twice, a hypothesized reason that had no support whatsoever in the record—the suggestion that Ms. McKee might have believed her great-nephew was wrongfully accused. This contention was directly contradicted by Ms. McKee's unhesitating and unequivocal statement that she did not believe her great-nephew had been treated unfairly by anyone. There was no other basis for this in the record. And any claim of intuition on the part of defense counsel cannot provide any support for this hypothesized rationale. As Judge Posner has aptly stated in a different context, "[s]uch subjective . . . appeals to an ineffable intuition should not be credited." *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005). Counsel's resort to what the Court considered to be a made-up reason to justify the strike of Ms. McKee was further evidence of discriminatory intent.

Defendants cite two criminal cases in which the Seventh Circuit upheld a district court's determination that strikes of jurors who had personal experience with similar crimes were not racially motivated. In *United States v. Lampkins*, 37 F.3d 175 (7th Cir. 1995), a crack cocaine drug conspiracy case, the prosecution struck a woman because she had an uncle and a former boyfriend who had been convicted of dealing cocaine, and was the only juror who had ever seen crack. *Id.* at 177. Defendants claimed that striking the potential juror constituted gender discrimination. Reviewing for plain error, the Seventh Circuit upheld the district court's determination that the strike was nondiscriminatory. *Id.* at 178. The court stated that "a prosecutor may permissibly strike a prospective juror on the grounds that close relatives or friends have been convicted of the very crime at issue." *Id.* In *United States v. Brown*, 289 F.3d 989 (7th Cir. 2002), the Seventh Circuit upheld a district court's determination that a strike of an

12

African-American potential juror was nondiscriminatory. *Id.* at 993. The juror's husband had been convicted of a firearm offense in the 1970s, and she had failed to disclose the conviction on a written questionnaire. *Id.* at 992–93.

Setting aside the fact that defendants cite criminal cases, where a juror's personal experience with the crime charged may matter more than in a civil case arising from an exoneration, each of these cases is distinguishable. In both of them, the potential juror's romantic partner, not a distant relative, had a conviction similar to the charged offense. Furthermore, in *Brown*, the potential juror had initially not disclosed the conviction. In *Lampkins*, the juror knew two people with the same type of conviction as the charge against the defendants, and the Seventh Circuit was reviewing only for plain error a determination already made by the district court. In this case, by contrast, the Court made a finding of fact in the first instance. *See Hendrix*, 509 F.3d at 369.

In addition, in neither *Brown* nor *Lampkins* was there another member of the venire to whom the prosecutors' expressed rationale applied even more strongly. Here, by contrast, defendants' justification for their strike was that Ms. McKee might be sympathetic to Jimenez concerning damages due to the fact that her relative had been in prison. As the Court has noted, this justification applied even more strongly to another member of the venire, Mr. Casey, who had been imprisoned himself. *Compare Miller-El*, 545 U.S. at 241–53 (issuing writ of habeas corpus when state prosecutor struck African-American jurors who expressed doubt about death penalty but not white jurors who expressed similar doubts) *with Hendrix*, 509 F.3d at 371 (no *Batson* violation when African-American and white potential jurors struck for the same reason).

Defendants finally contend that they are entitled to a new trial because they "could and should have [challenged Ms. McKee for cause] on the basis of implied bias." Def. Rule 59 Mot. at 8. As defendants' statement makes clear, they did not challenge Ms. McKee for cause. Even if Ms. McKee were challengeable for cause, such a challenge can be forfeited, and that is what occurred here. *See United States v. Brazelton*, 557 F.3d 750, 753–55 (7th Cir. 2009) (defendant waived implied-bias challenge to a juror, who was the second cousin of a potential witness who had allegedly been shot by defendant, when district court asked if defense lawyer would like to challenge the juror for cause and defense lawyer declined). The Court notes that in response to this argument in defendants' post-trial motion, Jimenez contended the point was forfeited, and defendants did not reply to the forfeiture argument in their reply brief.

In sum, the Court again finds that defendants' proffered explanations for their peremptory challenge of Ms. McKee are not credible. The Court appropriately disallowed the strike of Ms. McKee because defense counsel exercised the strike in a racially discriminatory manner.

### 3. Propriety of the remedy

Defendants contend that even if their peremptory challenge of Ms. McKee violated her equal protection rights, the Court erred in concluding that their strike was forfeited and that were not entitled to another.

There is no controlling authority discussing the proper remedy for a *Batson* violation in these circumstances. In *Batson*, the Supreme Court reserved the question of what remedy was appropriate, though it stated that two possible options were

14

ordering a mistrial and starting again with a new venire, or seating the improperly challenged jurors. *Batson*, 476 U.S. at 99 n.24. The Court did not discuss whether a party who made an improper peremptory challenge should be allowed to reuse the improperly exercised challenge.

In *Maloney v. Plunkett*, 854 F.2d 152 (7th Cir. 1988), the court held that a district court could not, as a remedy for *Batson* violations by both sides, order a mistrial and bar either party from using any peremptory challenges at all in the retrial. The Seventh Circuit granted the plaintiffs' petition for a writ of mandamus. The court called the district court's sanction "utterly without precedent" and held that it conflicted with the statutory grant of three peremptory challenges to each party. *Id.* at 154. As the Seventh Circuit noted, a federal statute provides that, "[i]n civil cases, each party shall be entitled to three peremptory challenges." 28 U.S.C. § 1870; *see* Fed. R. Civ. P. 47(b).

Defendants argue that the Court's determination that they had forfeited their strike by using it in a racially discriminatory manner is contrary to *Maloney*. That case, however, involved a very different situation in which the district court precluded both sides from using any strikes at all in an entirely new trial. In the present case, the Court did not anticipatorily bar the defendants from using peremptory challenges. Nor did the Court limit defendants' use of their other strikes based on their single racially discriminatory strike.

Indeed, the Court did not deprive defendants of the peremptory challenges provided by section 1870. They used all three of them. The Court found they had used

15

one in a racially discriminatory manner and declined to give them a do-over, finding they had forfeited that particular challenge. This is not the same as refusing to permit a litigant to use all three of his peremptory challenges. Defendants offers no reason why this particular statutory entitlement, like other entitlements, cannot be forfeited.

Defendants contend that "[t]he proper sanction for discriminating against a juror is having the juror seated." Def. Rule 59 Mot. at 4. Defendants do not, however, cite to any authority to support the contention that this is the only proper remedy for a *Batson* violation. Indeed, this argument is contrary to the Supreme Court's reservation of the question of the proper remedy for a *Batson* violation. *Batson*, 476 U.S. 99 n.24.

Defendants also argue that the Court's sanction left Jimenez with more strikes than them and thus "skew[ed] the jury towards the favored party." *United States v. Harbin*, 250 F.3d 532, 549 (7th Cir. 2001). In *Harbin*, the Seventh Circuit reversed a decision by the district court allowing the government to use, in the middle of trial, a peremptory challenge it had foregone during voir dire, when new information about a juror came to light. *Id.* at 538–39. The defendants had exhausted their strikes during voir dire but were unaware that they might be able to save them and use them during the trial. *Id.* at 538, 541. The Seventh Circuit held that the district court's decision was erroneous because "[t]he prosecution was unilaterally granted control over the composition of the jury during the trial stage . . . [and the] jury selection process . . . failed to minimally inform [defendants] of the procedures that ultimately were followed." *Id.* at 541–42.

The current case is nothing like the situation in *Harbin*. Here, each side

received, and used, three peremptory challenges. Both sides also knew full well that they were prohibited from using any of their challenges in a racially discriminatory manner. All parties to the case were subject to the same requirements, and the jury selection process was not weighted in Jimenez's favor. Only defendants violated the Constitution, and accordingly only they were found to have forfeited the right to re-use the disallowed challenge.

The Court has found no cases discussing forfeiture of a discriminatory peremptory challenge in a civil case in which a party is entitled to three peremptory strikes under section 1870 and Rule 47. Several courts of appeal have, however, discussed the issue in the context of a federal criminal case, in which the parties are entitled to a particular number of peremptory challenges under Federal Rule of Criminal Procedure 24.

In *United States v. Walker*, 490 F.3d 1282 (11th Cir. 2007), the defendants used all of their peremptory challenges to remove white male jurors. *Id.* at 1289. After hearing the defendants' race-neutral explanations for the strikes, the district court disallowed four of them and did not allow defendants to reuse the disallowed strikes. *Id.* at 1290. The district court reasoned that replacing the impermissible strikes would simple restore the status quo, and "improperly reward [defendants] for violating *Batson*." *Id.* at 1295. In reviewing the decision, the Eleventh Circuit noted that the Supreme Court had never stated whether a party should be allowed replacement strikes. *Id.* The court held that lower courts have wide latitude to apply *Batson* and should consider the "practicalities of the situation" as well as "'the nature and scope of the constitutional

violation.'" *Id.* at 1294 (quoting *Young Soo Koo v. McBride*, 124 F.3d 869, 873 (7th Cir. 1997)). The court upheld the district court's remedy, based on the district court's reasoning and the fact that the remaining members of the venire had already been discharged, so that allowing defendants additional strikes would have required another day of jury selection. *Id.* at 1295.

In *United States v. Aleman*, 246 F. App'x 731 (2d Cir. 2007) (unpublished), the district court had determined that defendant used three strikes against African-American jurors in a discriminatory manner and ruled that the challenges had been forfeited. *Id.* at 734. The Second Circuit upheld the forfeiture ruling. It reasoned that allowing the defendant replacement strikes would mean that there were no consequences, and thus no deterrent, to using strikes in an improper discriminatory manner. *Id.* at 734–35; *see Peetz v. State*, 180 S.W.3d 755, 761 (Tex. Ct. App. 2005) ("In short, appellant exercised his three strikes, the court invalidated two of them, and appellant must cope with losing his race-based gamble."). The court also noted that "trial courts retain broad discretion to fashion an appropriate remedy for a violation" of *Batson*. *Aleman*, 246 F. App'x at 735.

In *United States v. Ramirez-Martinez*, 273 F.3d 903 (9th Cir. 2001), *overruled in part on other grounds by United States v. Lopez*, 484 F.3d 1186, 1200 n.17 (9th Cir. 2007) (en banc), the district court had barred two government peremptory challenges as discriminatory, but granted the government two replacement strikes. *Id.* at 910. The Ninth Circuit upheld this decision, noting that trial courts have discretion in fashioning *Batson* remedies. *Id.* at 910. The court recognized that there would be scant

18

punishment for the prosecution because its strikes had been returned, but stated that "'the nature of the remedy must be determined by the nature and the scope of the constitutional violation.'" *Id.* (quoting *Young Soo Koo*, 124 F.3d at 873). The Ninth Circuit noted that the district court had thought the strikes by the prosecution a very close case and had admitted that it could be wrong in ruling that they were barred by *Batson*. *Id.* The court also noted that there was nothing in the record to indicate bad faith on the part of the prosecutor, so there was little need for punishment. *Id.*

The Court is further persuaded by the reasoning of these analogous criminal cases that it had the discretion to determine an appropriate remedy for defendants' race-based discrimination and was not obliged to allow defendants to have a do-over. Defendants' justification of their decision to challenge an African-American juror was not at all credible, because the justification applied much more strongly to a white juror whom defendants did not strike. When confronted with the discrepancy, defendants could not give a satisfactory explanation, thus further confirming that any nonracial justification they offered was pretextual. And as the Court has noted, defense counsel attempted to rely on a hypothesized rationale that was contrary to the record, which is significant evidence that counsel's attempted justification was a mere pretext for invidious discrimination. The Court is persuaded by the reasoning of *Walker* and *Aleman* that allowing defendants to try again would have merely restored the status quo and would provide an insufficient sanction for and deterrence of racially discriminatory conduct.

Defendants contend that because the finding that they exercised their peremptory challenge in a discriminatory manner was "close," forfeiture of the strike

was not appropriate. *People v. Luciano*, 890 N.E.2d 214, 219 (N.Y. 2008); *see Ramirez-Martinez*, 273 F.3d at 910. The Court does not agree that the matter was close, for the reasons already discussed. Defendants also contend that because they only used one peremptory challenge in a discriminatory manner, forfeiture of their strike was inappropriate. *See Walker*, 490 F.3d at 1290 (defendants forfeited four strikes by using them in racially discriminatory manner); *Gabe v. United States*, No. CV408-156, 2009 WL 50161, at *3 (S.D. Ga. Jan. 6, 2009) (six strikes forfeited when defendant used them in a racially discriminatory manner). None of defendants' cited authority, however, suggests that forfeiture is appropriate only if a party commits multiple constitutional violations. *See Luciano*, 890 N.E.2d at 219 ("even a single instance of discriminatory conduct may warrant forfeiture"). The Court declines to adopt a course that would, in effect, invite litigants to attempt one discriminatory strike, knowing that if caught they would get a second bite at the apple.

For these reasons, the Court concludes that its determination of the *Batson* matter was appropriate and does not warrant a new trial.

**B.     Jury instruction**

Defendants argue that the Court erred in refusing to give a proposed jury instruction that set out their view of the evidence that Jimenez could use to prove his claim that Bogucki violated his due process right to a fair trial by withholding exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In their proposed instruction, they sought to limit the jury to consideration of the concealment of coercion of Tueffel and Phil Torres to identify Jimenez as the shooter; showing Elder a photo of Jimenez

20

before she was asked to identify the shooter in a lineup; and inducing witnesses to say that the shooter was wearing a Duke jacket.

"[The Court] construe[s] jury instructions in their entirety in order to determine whether as a whole the instructions were sufficient to inform the jury correctly of the applicable law." *Lasley v. Moss*, 500 F.3d 586, 589 (7th Cir. 2007). "[T]he issued instructions must be correct legal statements and must convey the relevant legal principles in full." *Id.* A new trial is appropriate only if the instructions had a legal error and that error was "likely [to] confuse or mislead the jury and prejudice the objecting litigant." *Javier v. City of Milwaukee*, 760 F.3d 823, 828 (7th Cir. 2012).

The Court's instruction told the jurors the elements of a *Brady* due process claim—concealment of material exculpatory or impeachment information—and it defined the terms concealment, exculpatory, impeachment, and material. Def. Ex. 3*; see Carvajal v. Dominguez*, 542 F.3d 561, 567–68 (7th Cir. 2008). Defendants do not contend that there were any errors in this instruction, and in particular they do not contend that the Court defined any of the key terms incompletely or incorrectly. Indeed, the wording of that instruction is virtually the same as the one defendants proposed. Def. Ex. 3; Pl. Ex. B. Rather, defendants' contention is that in addition to telling the jury what the law required Jimenez to prove, the Court should also have instructed the jury on specifically what facts they could consider when deciding whether Bogucki had withheld material exculpatory evidence. Defendants have not, however, offered any authority indicating that a jury that has been properly instructed on the elements of a *Brady* due process claim must also be instructed on specifically what evidence it can

21

consider.

Defendants contend that because the jury instructions did not contain a list of the evidence the jury should consider for the due process claim, the jury may have improperly considered other evidence, including evidence that defendants believe Jimenez's attorney mentioned for the first time in closing argument.  In closing arguments, Jimenez's attorney referenced a number of matters that he claimed were concealed.  He stated:

> [The jury instruction] says you have to conceal exculpatory information. We only have to show one thing was concealed that might have changed the outcome in this very close case and we win.  Well, I'm going to show you ten things, ladies and gentlemen, ten things that were concealed. And so we win the case ten times over, and certainly in any combination they would have changed the outcome.

Def. Ex. 1 at 2814.  Defendants, however, did not object to Jimenez's closing argument at the time, and they make clear now that they are not asserting that they are entitled to a new trial because the closing argument was improper.  They claim only that the failure to give their proposed jury instruction requires a new trial because the juror may have considered some of the items of suppressed evidence Jimenez's attorney mentioned in his closing argument.  The Court has a hard time seeing how defendants can, on the one hand, let counsel's argument go without objection and then, on the other hand, claim that the jury might have inappropriately considered some of the points that counsel referenced in that selfsame argument.

That aside, defendants' arguments regarding the items of evidence listed in the closing argument of Jimenez's counsel amount to either a contention that the evidence was disclosed to Jimenez or was available to him with the exercise of reasonable

22

diligence and thus was not suppressed, or a contention that the evidence was not material. *E.g.*, Def. Rule 59 Mot. at 14 (claiming that Tueffel coercion was disclosed to Jimenez because he heard police yelling at Tueffel); *id.* at 15 (claiming that Tina Elder's exposure to picture of Jimenez next to picture of her friend Morro's corpse was inconsequential because Tina recognized Jimenez from the neighborhood); *see Carvajal*, 542 F.3d at 567–68. The jury instructions, however, made clear to the jurors that Jimenez's claim would succeed only if the evidence was concealed by police and was material, and the instructions defined those terms with clarity. Def. Ex. 3. As even defendants concede, the jury instructions given contained no errors. That being the case, defendants were not prejudiced by the absence of a particularized-evidence instruction. The instructions that the jury had gave it all the tools it needed to evaluate whether the evidence cited by Jimenez's attorney was sufficient to sustain Jimenez's *Brady* claim.

Defendants cite cases that they argue indicate that due process rights should be narrowly construed. *See Albright v. Oliver*, 510 U.S. 266, 273 (1995) (plurality) (indicating that claims should be analyzed under specific provisions of Bill of Rights instead of more general notion of substantive due process); *id.* at 284 (Kennedy, J., concurring in the judgment) (not every wrong committed by government official is a violation of Fourteenth Amendment); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1028–29 (7th Cir. 2006) (no *Brady* violation when defendant complained that the circumstances of her own confession had been concealed by police); *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003) (procedural due process claim regarding

manufacturing evidence failed when state malicious prosecution action provided a remedy). Again, however, none of these cases indicates that a jury instruction telling the jury that it can consider only certain evidence is required in a case involving a claim for violation of a person's due process right to a fair trial.

Defendants also note that "[a]n incorrect instruction calls for a new trial even if the jury could have based its verdict on a different, properly instructed theory. In that situation, [courts] cannot speculate about which theory the jury chose." *Dawson v. New York Life Ins. Co.*, 135 F.3d 1158, 1165 (7th Cir. 1998). Defendants essentially argue that each item of *Brady* evidence amounted to its own separate theory of liability and that if any particular item of evidence mentioned by plaintiff's counsel was not a proper basis for a *Brady* claim, they are entitled to a new trial because there is a chance that the jury based its verdict on an incorrect theory. *See id.* (if jury could have based verdict on incorrect instruction, new trial is required even if there were properly instructed theories that could have supported claim). Defendants, however, misunderstand the nature of a *Brady* claim. There is not a separate claim for each piece of evidence that Bogucki concealed. Instead, the claim is that Jimenez was denied his due process right to a fair trial because Bogucki concealed exculpatory evidence. *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (question for a *Brady* claim is whether in the absence of suppressed evidence, criminal defendant received a fair trial). All items of evidence that were concealed or suppressed are considered as part of a single, unitary claim. *See Kyles*, 514 U.S. at 440–41; *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) (all evidence is considered cumulatively to evaluate *Brady*

24

claim).

Defendants note that in a previous case tried some seven years ago, the Court gave a jury instruction providing a detailed description of the evidence that defendants allegedly concealed in a previous case. *See Manning v. Miller*, Case No. 02 C 372, docket no. 206 at 26 (N.D. Ill. Jan. 5, 2005) (Jury Instructions). The fact that the Court has given instructions similar to the ones defendants requested here in a previous case does not mean that the Court committed a legal error requiring a new trial by not doing so in the present case.

Furthermore, the *Manning* case was significantly more complicated than the claims brought by Jimenez. Manning claimed that federal agents had sought to frame him for two different crimes, a kidnaping in Missouri and a murder in Illinois. *Id.*, docket no. 75 ¶¶ 19–22, 38, 40 (N.D. Ill. Apr. 29, 2004) (Second Amended Complaint). Each of these crimes gave rise to separate claims that the agents had violated Manning's due process rights to a fair trial by withholding exculpatory evidence. Jury Instructions at 23–25. Each *Brady* claim, however, involved different evidence. Manning also claimed that the agents had violated the Racketeer Influenced and Corrupt Organizations Act (RICO) and conspired to do the same. Second Amended Complaint ¶¶ 93–109. The evidence supporting the RICO claims overlapped with the evidence supporting the *Brady* claims. Jury Instructions at 36–37. Jimenez's single *Brady* claim did not require that the jury be so specifically instructed.

## C. Evidentiary issues

Defendants contend that four evidentiary issues require the Court to order a new

25

trial.  An erroneous evidentiary ruling requires a new trial only if the losing party was prejudiced by the error.  *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 868 (7th Cir. 2005).

### 1.    Carmelo Cortez

Defendants sought to have Carmelo Cortez testify as an impeachment witness. They contend he would have testified that he was best friends with Morro and on the night of the shooting asked Tueffel what had happened.  Pl. Ex. D.  Defendants contend that Cortez would have testified that Tueffel told him Jimenez shot Morro.  *Id.* Defendants argue that Cortez was an important witness because he would have shown that Tueffel identified Jimenez as the shooter before the police pressured and coerced Tueffel to finger Jimenez.

Defendants did not disclose Cortez as a potential witness until October 26, 2011, long after fact discovery had closed.  At the time, trial was scheduled for December 5, 2011, only about five weeks after disclosure of Cortez, although the trial was later postponed to January 9, 2012.  And during that period, the parties were engaged in expert discovery and were preparing intensively for trial.  The Court barred Cortez as a witness, citing Federal Rule of Civil Procedure 26(a)(1), local rule 16.1, and "lateness and unfair prejudice."  Dec. 7, 2011 Pretrial Conf. Tr. at 19–20.

Defendants contend that barring Cortez was error.  The Court assumes for purposes of this discussion that Rule 26(a)(1) did not apply to Cortez because he was an impeachment witness (though this is not so clear as defendants argue).  *See Hammel*, 407 F.3d at 869.  Cortez was also listed as a defense witness in the pretrial

order, so Local Rule 16.1 did not bar him from testifying. The Court did not err, however, in barring Cortez because defendants disclosed him so late.

At the time of disclosure, fact discovery was long since closed, as the Court has noted. Had the Court permitted defendants to call Cortez, it would have been required to reopen fact discovery. In that event, plaintiff would have had little more than a month to conduct investigation and discovery related to Cortez, and even after the brief continuance he would have postponement of the trial Jimenez had only two months. And as Jimenez argued at the time, this discovery and the associated investigation would not have been limited to simply taking Cortez's deposition, as defendants suggest. Rather, Cortez was first appearing as a witness almost nineteen years after the day in 1993 that Tueffel spoke to him. Jimenez would have had to investigate and conduct discovery to determine if Cortez had spoken to others in those nineteen years about his alleged conversation with Tueffel. Further, Jimenez would have had to investigate the circumstances under which defendants located Cortez and learned what he had to say—significant factors in a case involving claims that the police influenced witnesses to the Morro murder. And last but not least, as the Court has noted, the parties were still conducting intensive expert discovery at the time of the disclosure. Allowing defendants to call Cortez would have required counsel to divert their attention from this and from trial preparation. These are among the reasons why the Court did not err in sustaining Jimenez's objection to the calling of Cortez as a witness.

Finally, defendants were not substantially prejudiced by their inability to present Cortez as a witness. They offered copious evidence at trial to attempt to impeach Tueffel. The jury learned that in both of Jimenez's criminal trials, Tueffel testified that

27

Jimenez had shot Morro, and he did not recant until an investigator talked to him while he was institutionalized due to a diagnosis of paranoid schizophrenia. The jury also heard the deposition testimony of Elizabeth Gutekanst, Jimenez's girlfriend at the time of the shooting, who testified that Tueffel told her a few days after the shooting that Jimenez had done it. Tr. 2641. (Tueffel confirmed that they had met but said that he told her Jimenez did not do it. Tr. 979–80.) Defendants note that, unlike Cortez, Tueffel talked to Gutekanst after he had allegedly been pressured by Bogucki. The jurors also heard, however, deposition testimony from Phil Torres, who stated that he talked to Tueffel at the scene of the crime. Tr. 2671. Torres stated that Tueffel told him that Jimenez had shot Morro. Tr. 2672. Torres's deposition testimony was often confused and he admitted that he had testified differently at the criminal trials, but at the deposition, he stuck to his story that immediately after the shooting, Tueffel told him that Jimenez was the shooter. Tr. 2687–88. Given this and the other evidence defendants offered to contradict Tueffel, the exclusion of Cortez was not substantially prejudicial even if it can be claimed to have been erroneous.

### 2. Evidence that Jimenez threatened Romo

Defendants sought to offer the testimony of Margot Gillin, a worker at the juvenile home where both Jimenez and Romo were incarcerated before trial. Gillin would have testified that she heard Jimenez threaten to kill Romo's father if Romo testified against him. On the third day of trial, after Romo had testified and defendants had not asked him about the threat, the Court barred any mention of the threat. Tr. 756–57. The Court determined that the threat was relevant only to show Jimenez's consciousness of

guilt, an issue that the Court concluded related primarily to damages. Tr. 756. The Court held that the threat was barred by Federal Rule of Evidence 403, because it was of little probative value, other threats made by Jimenez had been admitted, and there was a potential for jury confusion if this evidence were admitted. Tr. 756–57.

Defendants argue that, in addition to showing consciousness of guilt, evidence of the threat was also relevant to the malice element of Jimenez's malicious prosecution claim. "Malice is defined as the initiation of a prosecution for any reason other than to bring a party to justice." *Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340, 349, 733 N.E.2d 835, 842 (2000). It is undisputed that, however, Bogucki never knew about the threat to Romo, making it rather difficult to see how the threat could have any bearing on whether Bogucki had malice. *See Porter v. City of Chicago*, 393 Ill. App. 3d 855, 867, 912 N.E.2d 1262, 1272 (2009) (generally only information the police know about at the time is relevant to malice or probable cause elements of malicious prosecution).

Defendants argue that in *Aguirre v. City of Chicago*, 382 Ill. App. 3d 89, 887 N.E.2d 656 (2008), three men wrongly accused of murder were allowed to present the testimony of the actual murderer to support their malicious prosecution claim even though it was not known to police at the time the three men were prosecuted. *Id.* at 96–98; 887 N.E.2d at 662–64. Defendants contend that this establishes that the Romo threat was admissible evidence of malice. In *Aguirre*, however, plaintiffs had a clear theory illustrating the relevance of the murderer's testimony on the issue of malice. Each plaintiff had been coerced to give a confession, and all of the confessions had

29

similar details even though the evidence established that the plaintiffs had not spoken while police interrogated them. *Id.* at 97–99; 887 N.E.2d at 663–64. The jury could infer from this either that plaintiffs actually committed the crime or that the police told them what to say, which if true would tend to establish malice. The testimony of the actual killer was relevant to show that plaintiffs' confessions were inaccurate and thus had to have been based on police suggestion rather than actual memories of the murder. *Id.* The same analysis does not apply here.

Defendants have offered no argument to show why, as in *Aguirre*, evidence of which Bogucki was not aware could tend to rebut the claim that he acted with malice. *Aguirre* is limited to situations where there is some link between evidence of guilt that was not known to police at the time and a party's theory of the case. *Porter*, 393 Ill. App. 3d at 867; 912 N.E.2d at 1272. It may even be limited to situations involving a coerced confession, which was not an issue in this case. *Gauger v. Hendle*, _ Ill. App. 3d _, 954 N.E.2d 307, 335 (2011).

Furthermore, Jimenez's alleged threat against Romo was not strongly probative even of consciousness of guilt. It is undisputed that when Jimenez purportedly threatened Romo, Romo had already told the police that Juan Carlos Torres was the actual shooter. At that point, Jimenez would have less reason to fear Romo's testimony. Defendants contend that the purported threat caused Romo's father to fabricate the tape of Torres confessing that he obtained. Although Romo's father testified in a deposition that he had heard about threats, he also testified that he was not nervous about the threats and could not remember any specific details. Def. Resp.

30

to Pl. Mot. in Limine, Ex. 13 at 75.  In any event, the taped statement that Romo's father

obtained from Juan Carlos Torres is consistent with the story Romo had given before

he was allegedly threatened.  This tends to further minimize the probative value of the

threat.  An additional indication of the relatively low probative value of the threat

evidence is that defendants failed to ask Romo about the threat when he was on the

witness stand, even though the Court had not yet excluded the evidence at that time.

Tr. 749–51.

　　　In sum, the Court did not err in barring evidence of the threat against Romo.  It

was not particularly probative, and it posed a considerable risk of unfair prejudice or jury

confusion.  The jury could have been given a limiting instruction, but there would still

have been a risk of confusion or misuse of the evidence.  "[E]vidence of threats on

witnesses can be highly prejudicial . . . [such evidence] appeals to the jury's

sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise

may cause a jury to base its decision on something other than the established

propositions in the case."  *United States v. Thomas*, 86 F.3d 647, 654 (7th Cir. 1996)

(internal quotation marks omitted).

　　　The evidence of the threat was also cumulative in a way that far outweighed its

probative value.  *See* Fed. R. Evid. 403.  Defendants were able to introduce and cross-

examine Jimenez about several letters that he wrote to his girlfriend at the time of the

murder that included threats against Tueffel for testifying against him.  Tr. 666–75.

Jimenez claimed that the threats were taken out of context, but he did not deny that he

had made them.  By contrast, the existence of a threat against Romo was disputed.  At

his deposition, Jimenez denied making any threat to Romo (although he wrote while he

31

was in the home that he had gotten in trouble for saying he was going to kill someone).

Def. Ex. 9; Pl. Ex. C. And Romo stated only that he heard of a threat from Jimenez

secondhand. Pl. Ex. C. These factors render the evidence less probative and minimize

any prejudice to defendants. *Cf. Cobige v. City of Chicago*, 651 F.3d 780, 784–85 (7th

Cir. 2011) (defendants entitled to new trial when district court excluded evidence that

plaintiff decedent had a criminal record and was addicted to drugs, when that evidence

called into question how much enjoyment plaintiff got out of life and could have

significantly reduced damages).

To support their argument, defendants cite a criminal case that notes that threats

made by a criminal defendant are routinely admitted to show consciousness of guilt.

*United States v. Blake*, 286 F. App'x 337, 340 (7th Cir. 2008) (unpublished). That,

however, does not suggest that such evidence is always admissible irrespective of the

circumstances. Cases in which a court says a trial judge did not abuse his discretion in

admitting evidence of a particular type do not amount to authority that a trial judge does

abuse his discretion in excluding such evidence.

### 3. Jimenez's juvenile arrests

Defendants also sought to introduce evidence that Jimenez had been arrested

numerous times as a juvenile before he was arrested for Morro's murder. Before trial,

the Court barred this evidence because it was irrelevant and pursuant to Rule 403, but

it specifically authorized defendants to offer evidence of the juvenile arrests to the

extent that they explained specific investigative decisions by Bogucki or other police.

Dec. 12, 2011 Pretrial Conf. Tr. 31–32. Defendants, however, made no attempt to

introduce any of the arrests for that purpose. But because Jimenez's attorney opened

32

the door, the Court permitted defendants to elicit that Jimenez had previously been arrested, before his arrest for the Morro murder.

Defendants argue that they are entitled to a new trial because Jimenez's juvenile arrests resulted in him being charged as an adult. They state that his claimed damages are higher because he was charged as an adult, because if his case had been litigated in Illinois's juvenile system, he would have been released when he turned twenty-one. *People v. L.J.*, 274 Ill. App. 3d 977, 982, 654 N.E.2d 671, 674 (1995). Instead, Jimenez was incarcerated from the time he was thirteen until he was released at age twenty-nine. Defendants contend that because Bogucki did not cause Jimenez to be charged as an adult, he should have been able to argue to the jury that he was not responsible for all of the damages Jimenez suffered. *See Duncan v. Nelson*, 466 F.2d 939, 943 (7th Cir. 1972) (police who obtained illegal confession did not proximately cause the years plaintiff spent in prison when sentence was at the discretion of trial judge and thus were not liable for damages based on time of imprisonment).

The Court doubts the continued vitality of the holding in *Duncan*, because it calls into question the availability of any damages in a wrongful conviction case and is in serious tension with the principle that a tortfeasor takes the victim as he finds him. *See Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("a prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision"). But even if *Duncan* still represents good law, the Court did not err by barring evidence of Jimenez's earlier

33

juvenile charges.  The decision to prosecute Jimenez as an adult was made by a state court judge.  The judge issued a two-page order, listing eight factors that justified treating Jimenez as an adult.  Def. Ex. 14.  One of those eight factors was that "Jimenez has had previous Juvenile Court involvement."  *Id.* at 1.  The order contains no analysis indicating the relative importance of the factors.  Three of the other factors listed were that Jimenez was charged with murder, the crime was aggressive and premeditated, and Jimenez possessed a deadly weapon at the time.  *Id.* at 1–2.  Given these factors, there is scarcely any basis to believe that Jimenez's prior arrests played a determinative role in whether he was charged as an adult.

The probation officer who recommended charging Jimenez as an adult stated that Jimenez's juvenile arrests were a factor in that recommendation.  Def. Ex. 13 at 27. When asked at his deposition whether the arrests were "one of the major bases" for trying Jimenez as an adult, the probation officer replied only that "I think there were seven criteria for where you make that recommendation.  So that would be one of the criteria.  And it was definitely a reason, yes."  *Id.*  In sum, Jimenez's arrests appear to be no more than a single factor in what likely was nearly a foregone conclusion, specifically that a juvenile charged with committing a premeditated murder by firearm would be prosecuted as an adult.  *See L.J.*, 274 Ill. App. at 980–82, 654 N.E.2d at 673–75 (considering factors and ordering that fifteen-year-old accused of premeditated murder by firearm be tried as an adult).

Against the relatively small probative value of the arrests, the Court concluded, and continues to believe, that admission of the evidence would have posed a significant risk of unfair prejudice, confusing the issues, misleading the jury, and waste of time.

34

The jury could have been tempted to use Jimenez's history of arrests improperly as a factor affecting defendants' liability. *See Gregory v. Oliver*, No. 00 C 5984, 2003 WL 1860270, at *1–2 (N.D. Ill. Apr. 9, 2003). Additionally, one of defendants' contentions at trial was that Jimenez was guilty of the murder and that accordingly Bogucki was not liable. Tr. 269; *see* Dec. 7, 2011 Pretrial Conf. Tr. 57. The presence of this contention enhanced the likelihood that jurors might have improperly used Jimenez's previous arrests on the issue of liability, specifically as evidence that he was guilty of killing Morro. Finally, admission of evidence of the arrests would have required substantial additional trial time, to establish what the charges and the final disposition were. The Court concludes that it did not err in excluding this evidence.

### 4.    Prosecution of Juan Carlos Torres

Defendants contend that Jimenez should have been barred from introducing the fact that Juan Carlos Torres is being prosecuted for the Morro murder and from calling Torres to testify at trial.

Torres was charged for the murder on the same date that Jimenez's conviction was vacated at the behest of Cook County prosecutors. Given these circumstances, the fact that Torres has been charged was relevant and highly probative to establish that the charges against Jimenez had been dropped under circumstances indicative of innocence, an element of Jimenez's malicious prosecution claim. *See Swick v. Liautaud*, 169 Ill. 2d 504, 512–13, 662 N.E.2d 1238, 1242–43 (1996). Though defendants offered at the pretrial conference to concede that element, *see* Dec. 7, 2011 Pretrial Conf. Tr. 53, Jimenez was not required to accept the concession. And given

35

defendants' clear indication that they intended to argue that Jimenez had, in fact, committed the Morro murder, the evidence regarding Torres would have been relevant and admissible even if the "indicative of innocence" requirement had been eliminated.

In any event, the Court did not rule at the pretrial conference that Jimenez would be allowed to put into evidence the fact that Torres was under indictment. Rather, the Court specifically reserved ruling. *See id.* at 61.[1] At trial, Jimenez's counsel did not bring up the point in his opening statement. Defense counsel did so, however, stating:

> The State's Attorney got duped. Juan Carlos Torres got arrested. He hasn't had a trial. He's presumed innocent. He's going to get acquitted, and he's probably going to have his own trial, and somebody might be on his jury.

Trial Tr. 291-92. Having first brought the issue before the jury, defendants cannot now insist on a new trial on that basis. *United States v. Villegas*, 655 F.3d 662, 672 (7th Cir. 2011).

In any event, defendants' contention that Jimenez had actually committed the Morro murder – a contention they previewed at the pretrial conference and repeated in their opening statement – made Torres's prosecution relevant. To put it another way, defendants opened the door to admission of this evidence and thus cannot now complain that it was admitted. (The Court again notes that at that point, it still had

---

[1] Defendants note that in an order the Court stated "Defendants' Motion No. 6 to bar references to the prosecution of Juan Carlos Torres is denied." Def. Reply at 26 n.13. This order was a summary drafted by the parties, purportedly based on the Court's oral rulings at the pretrial conference. To the extent it varied from the Court's specific oral rulings, the oral rulings control; indeed, the order specifically incorporated the Court's comments at the pretrial conference. At the conference, the Court clearly stated that it was reserving the question of the admissibility of the indictment of Torres. *See* Dec. 7, 2011 Pretrial Conf. Tr. 61.

under advisement whether it would admit evidence that Torres had been charged.)

Aside from any door-opening, the fact that Torres was charged with the murder was, together with the vacating of Jimenez's conviction, probative in rebutting defendants' contention that Jimenez was guilty after all. The Court acknowledges that the charge does not prove that Torres committed the murder. But that does not make it irrelevant. The Court offered at the pretrial conference to entertain a request for an instruction that the charge did not mean that Torres was guilty. *See* Dec. 7, 2011 Pretrial Conf. Tr. 52. But despite this invitation, defendants never proposed such an instruction. That aside, in a case in which the plaintiff claimed to have been wrongfully convicted not once but twice, there is no reason to believe that the jury would inappropriately believe that the fact Torres was charged proved his guilt.

Defendants claim that it was unfair for the Court to allow evidence related to Torres's prosecution as relevant to Jimenez's guilt and then later bar discussion of the threat against Romo which was also relevant to guilt. But as the Court has discussed, the Torres evidence was significantly more probative, and it did not pose the same risk of unfair prejudice.

Defendants also argue that Jimenez should not have been allowed to call Torres to testify at trial. In this regard, they do not argue that testimony by Torres regarding whether he committed the murder was irrelevant – nor could they, given their freely-chosen strategy of injecting into the case the contention that Jimenez was guilty after all. Instead, defendants take issue with the manner in which Torres was presented. Before trial, Torres's criminal counsel made it clear that if called to testify, he would claim his privilege against self-incrimination. Defendants contend that for this reason,

37

Jimenez should have been required to stipulate to what Torres would say if called to testify and should not have been permitted to present his self-incrimination claim live at trial.

Defendants have offered two cases to support their argument. *See United States v. Mabrook*, 301 F.3d 503, 507 (7th Cir. 2002) (witness should not be forced to take the stand, because the jury cannot draw any inference from exercise of Fifth Amendment privilege); *United States v. Vandetti*, 623 F.2d 1144, 1147 (6th Cir. 1980) (witness can be called even if he will assert Fifth Amendment privilege, but the potential for prejudice is very high). Both of these cases, however, are criminal cases in which it is impermissible to draw an inference from a witness's invocation of his Fifth Amendment privilege. *Mabrook*, 301 F.3d at 507. In a civil case, by contrast, the jury can draw a negative inference from a party's invocation of his Fifth Amendment privilege, and defendants do not suggest that the rule for witnesses in civil cases is any different.[2] *See Baxter v. Palmigiano*, 425 U.S. 308, 318–19 (1976) (recognizing general rule that parties in civil actions are subject to a negative inference if they refuse to testify). Thus the criminal cases that defendants cite are not controlling.

Defendants also cite *Old Chief v. United States*, 519 U.S. 172 (1997), another criminal case. In *Old Chief*, the Court held that a prosecutor could be forced to prove a defendant's prior conviction by stipulation, because testimony about the conviction conveyed no more information than a stipulation and bore a large risk of prejudice.

---

[2] Defendants do not challenge the Court's instruction to the jury that "[y]ou may, but are not required to, draw an inference from Mr. Torres's invocation of his Fifth Amendment privilege that truthful answers to the questions he was asked would have incriminated him." Jury Instructions (docket no. 287) at 10.

*Id.* at 190–92. The Supreme Court also recognized, however, that the situation was an unusual one and that even in criminal cases a prosecutor generally should not be forced to accept defense stipulations. *Id.* at 188–89. Defendants cite no authority suggesting that the Court's holding in *Old Chief* governs civil cases in which a witness plans to invoke his Fifth Amendment privilege, and they offer no authority to support the proposition that a party in a civil case is required to accept a stipulation in lieu of proving a point at trial. The Court also notes that defendants have not described any stipulation they proposed that would have conveyed the information that was conveyed by Torres's invocation of the Fifth Amendment.

For these reasons, the Court concludes that it did not abuse its discretion in allowing Jimenez to call Torres at trial or in permitting him to introduce evidence that Torres had been charged with the murder.

**D.     Motion for judgment as a matter of law**

Defendants move for judgment as a matter of law on all of Jimenez's claims. Fed. R. Civ. P. 50(b). After trial, however, a party can move for judgment as a matter of law only on issues he raised before submission of the case to the jury. *Id.* A Rule 50(b) motion for judgment as a matter of law "is only a renewal of the preverdict motion, [and] can be granted only on grounds advanced in the preverdict motion." *Wallace v. McGlothlan*, 606 F.3d 410, 418 (7th Cir. 2010) (internal quotation marks omitted).

> The earlier [preverdict] motion informs the opposing party of the challenge to the sufficiency of the evidence and affords a clear opportunity to provide additional evidence that may be available. The earlier motion also alerts the court to the opportunity to simplify the trial by resolving some issues, or even all issues, without submission to the jury.

Fed. R. Civ. P. 50, advisory committee note, 2006 amendment.

It is undisputed that before the verdict, defendants moved for judgment as a matter of law only on Jimenez's conspiracy claim, arguing that there was no evidence that Bogucki had conspired with others.  Tr. 2722.  Defendants have thus forfeited any opportunity to argue for judgment as a matter of law on Jimenez's due process and malicious prosecution claims.  *See Witherspoon v. City of Waukegan*, No. 06 C 7089, 2011 WL 1230986, at *4 (N.D. Ill. Mar. 30, 2011).

Defendants make several arguments that the contentions in their Rule 50(b) motion have not been forfeited.  First, they argue that the issues presented in the motion are purely legal and thus are not forfeited as arguments based on the sufficiency of the evidence presented at trial.  Although defendants are correct that one purpose of the forfeiture rule in Rule 50 is to allow the other party to provide additional evidence when the evidence already presented may not be sufficient, the requirement that a motion for judgment as a matter of law be made before submission of the case to the jury also serves to "alert[ ] the court to the opportunity to simplify the trial by resolving some issues, or even all issues, without submission to the jury."  Fed. R. Civ. P. 50, advisory committee note, 2006 amendment.

More importantly, defendants do not cite any authority recognizing that purely legal issues may be argued in a Rule 50(b) motion when they were not advanced in a Rule 50(a) motion.  The cases they cite involve appellate court review of legal issues, not district court consideration of legal issues on a Rule 50(b) motion.  *See Carlson v. Bukovic*, 621 F.3d 610, 617 n.13 (7th Cir. 2010) (appellate court could consider purely legal issues on appeal even though plaintiff had not filed any sort of Rule 50 motion);

40

*Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718–20 (7th Cir. 2003) (appellate court could review purely legal issues involved in denial of summary judgment even though plaintiff had not filed any Rule 50 motion at trial). Even if the Court were to agree that defendants' Rule 50(b) arguments are purely legal, the arguments are still forfeited in the Rule 50(b) context, based on the plain language of Rule 50. Fed. R. Civ. P. 50(b) & advisory committee note, 2006 amendment; *Wallace*, 606 F.3d at 418.

Defendants also argue that their position on Jimenez's due process claim has always been clear throughout this litigation and that similar arguments were raised at summary judgment and the preliminary jury instruction conference held off the record.[3] Again, however, defendants provide no authority to disregard the plain language of Rule 50. They cite *Laborers' Pension Fund v. A&C Envtl., Inc.*, 301 F.3d 768 (7th Cir. 2002), but in that case the moving party had made a Rule 50(a) motion. The nonmoving party's contention was simply that the motion was not sufficiently specific. *Id.* at 777–78. Unlike in *Laborers' Pension Fund*, defendants did not make a Rule 50(a) motion in this case that simply failed to give enough detail regarding the grounds for the motion. To the contrary, it is undisputed that defendants never made any Rule 50(a) motion for judgment as a matter of law on Jimenez's due process and malicious prosecution claims.

Defendants also cite *Petit v. City of Chicago*, 239 F. Supp. 2d 761, 767 (N.D. Ill. 2002). There, the court stated:

---

[3] The Court made it clear to all parties that the preliminary instruction conference would be held off the record but that the parties would have the opportunity to put any point they wished on the record.

> The Seventh Circuit has held that a failure to expressly state all grounds or expressly state a sufficient argument when the motion is presented at the close of evidence will not result in waiver if previously presented arguments (in an earlier Rule 50(a) motion, in trial briefs, in motions in limine, or summary judgment, or otherwise) have made the moving party's position clear for the court and opposing party.

*Id.* at 767. This, however, is not a situation in which defendants requested judgment on Jimenez's due process and malicious prosecution claim but simply failed to express all of the grounds they now advance or made only cursory arguments. Rather, they failed entirely to ask for judgment on these claims, on any ground at all. Neither the court's decision in *Petit* nor the Seventh Circuit cases it cites as support allow a district court to consider a Rule 50(b) motion requesting judgment on claims that were entirely ignored in the Rule 50(a) motion. *See Rankin v. Evans*, 133 F.3d 1425, 1431–32 (7th Cir. 1998) (Rule 50(b) motion not forfeited when defendant made Rule 50(a) motion and court and plaintiffs understood the grounds on which it was made); *Urso v. United States*, 72 F.3d 59, 61 (7th Cir. 1995) (Rule 50(b) argument not forfeited when party made Rule 50(a) motion but did not support it with argument, because position was clear and district court addressed Rule 50(b) on the merits).

Finally, defendants contend that because Jimenez raised new due process claims in his closing argument, the most appropriate time to ask for judgment as a matter of law on those claims is now. The premise of this argument is incorrect; Jimenez did not advance new *Brady* claims in closing argument. In any event, Defendants' only authority to support this contention is an inapposite case addressing when an issue must be raised in summary judgment briefing. *See Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) (defendants had not waived

issue that was addressed in cursory fashion in opening brief, when response and reply briefs both contained full discussions of the issue).

In sum, defendants have forfeited the opportunity to contend via Rule 50(b) that they are entitled to judgment as a matter of law on Jimenez's due process and malicious prosecution claims. Accordingly, the Court declines to grant judgment as a matter of law in favor of defendants on those claims. To the extent defendants seek any judgment in their favor on the conspiracy claim, their only contention is that this claim is dependent on the due process claim. Because the Court has declined to enter judgment as a matter of law on the due process claim, this argument fails.

### Conclusion

For the reasons stated above, the Court denies defendants' motion for a new trial [docket no. 301] and their motion for judgment as a matter of law [docket no. 302].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 11, 2012