July 12, 2005

Professor Steven A. Drizin
Legal Law Clinic
McCormick 370 CHL311
Northwestern University
633 Clark Street
Evanston, IL. 60208



Thaddeus Jimenez
DOC# K-51114
Western Illinois Corr. Ctr.
RR#4, BOX 196
Mt. Sterling, IL. 62353

Dear Prof. Drizin,

My name is Thaddeus Jimenez. I am a prisoner presently incarcerated in the Western Illinois Correctional Center in Mt. Sterling, Illinois, for the offense of first-degree murder, a crime I did not commit. I am serving a 45-year sentence for this offense, under the day-for-day law. I've been in prison for over twelve years, since February of 1993, and I'm not scheduled for parole until some time in 2017. However, despite my conviction and sentence, I have not given up trying to prove my innocence. This is why I am writing you.

I was arrested for the above crime when I was only 13 years-old, and because I had a previous police record I was tried as an adult, convicted, and punished under adult standards. I've had two trials and two appeals. In the end, I was denied justice. And now here I am, 26 years-old, still fighting the system in any way I can. My family does not have anymore money to hire a competent attorney, so I am pursuing the matter on my own. My education is very limited, as can be expected. But I know how to read and write, so I am trying my very best to learn the ins and outs of criminal law, especially the areas that directly relate to my own case. At the same time, I've constantly attempted to find someone to help me with my fight. I've written numerous letters to attorneys, professors, local politicians, legal organizations and advocacy groups, and bar associations asking for whatever assistance they can give. But time and time again, I was either referred to someone else, or I was flat-out turned down. My mother and other family relatives have done the same thing, to no avail. Over the past three or four years alone, my family and I have written at least 200 letters. We are desparate for help, but no one seems to care. For example, in 1997 I was supposed to have the assistance of Prof. Protess from your university. I have several letters where he promised to help. But he kept putting my case to the side, and finally after a few

1

JIM05859

years I recieved a letter from his personal assistant informing me that because his case load was full, Prof. Proteus would not be able to help me. And this is after about six years of correspondence between my family and Prof. Proteus. But this is only one example. I've been turned down so many times, my family has all but given up on me. However, I don't believe personally that the entire legal world could be so cold and heartless, and so I myself have continued to write letters to anyone and everyone I can think of and ask for their help. And as I've mentioned, I have taken the steps to begin learning the law. I have new hope today because of two things. First, a recent study has emerged in which experts have discovered that the part of the brain responsible for controlling impulses and weighing consequences does fully develop until around the age of 25. I'm sure you are familiar with this important study. Second, after a recent correspondence with Professor Laurence Steinberg of Temple University, I've come to understand that you specialize in cases like mine, and that you might be interested in looking into my case and possibly help me. I know nothing is guaranteed, but if I can convince you to just take a look at my case and the surrounding evidence, I believe you'd be quite interested.

I don't want to overwhelm you with all the details of my case unless and until you agree to review them. But let me give you the basic facts just so you'll have some kind of understanding of what I'm up against.

On February 3, 1993, at approximately 6:30 p.m., the victim (Eric Morro) and a friend (Larry Tuoffel) were walking down the street on the northwest side of Chicago. As they were walking, two boys approached them and started questioning the victim about some money he (the victim) owed to "Leo." The victim told the boys that it was none of their business. Words were exchanged, followed by a brief scuffle. One of the boys, 12 year-old Victor Romo, allegedly pushed the victim back against a nearby wall after he (the victim) took a swing at the other boy, 14 year-old Juan Carlos Torrez. Once the victim was pushed against the wall, Juan Carlos pulled out a hand gun, put it to the victim's chest and fired a single shot. The two boys then fled away, as did Larry. The victim staggered a few steps and fell to the ground. He was died immediately. Larry returned soon after. The police were called, and when they arrived and confirmed the report of a shooting, called for an ambulance. The ambulance arrived soon after, and took the victim to the hospital. The victim was pronounced DOA.

The police who initially responded to the call, after requesting an ambulance,

JIM05860

2

learned that there were two witnesses to the crime that were still present, and they immediately questioned them. First was Larry, who was with the victim when he was killed. The second was a man named Philip Torres, who happened to be looking out his livingroom window at the time of the shooting. Larry and Philip were friends, and both had known the victim for some time. The victim, Eric Morro, was 19 years-old at the time of his death. Upon questioning, Larry told police that he knew the shooter to be someone by the name of "Frankie," and described him as being 13- to 14- years of age, with black curly hair. Philip did not know either of the boys by name, but agreed with Larry's physical description of the shooter. The police also learned that there was two other witnesses, Sandra Elder and her daughter, Tina. Neither Sandra nor Tina was immediately available for interviewing. Sandra had went to the hospital with the victim's body, Tina had left the scene before the police arrived.

It is important to note that I knew everyone involved in this matter, and they know me. Larry and I were young members of the Simon City Royals street gang (Larry was 15 years-old and I was 13, as previously mentioned). Philip was a veteran drug dealer in the neighborhood, and because I was a gang member, I often interacted with him, as did many other "Royals." Tina was a common figure in the neighborhood, and had been in relationships with some of the older members of the "Royals." Her mother Sandra had lived in the neighborhood for several years, and was well known. But although they all knew me, both by face and name, they did not identify me as having anything to do with the murder of Eric Morro, who was a friend of mine. As far as the police were concerned, their suspect was a boy named "Frankie" with black curly hair. I was known around the neighborhood as "T.J.," and I never had black curly hair.

Early the next morning at about 1:00 a.m., Philip called police and said that he wanted to change his account of what happened. When police again interviewed him, Philip told them that I was the person who shot and killed Eric, and that the reason he did not say so before was because he was afraid the "Royals" would retaliate. Tina also identified me as the shooter, although she did not do so earlier. In fact, she did not bother to speak with police at all about what she allegedly saw, prior to a police line-up that was conducted the following day on February 4, 1993. And Sandra also did not inform police that I was the shooter until she picked me out of this same line-up, despite the fact that she plenty of opportunities to do so the previous day when she and police were at the hospital together. Coincidentally, it wasn't until later when Philip called police and said he wanted to change his story

JIM05861

3

that Sandra and Tina decided to finally give their accounts of what they saw. After re-interviewing Phillip, police went to Larry's residence and told him that they knew he was lying about what he told police earlier. The police went on to say that they knew it was "T.J." who shot Eric. Larry first denied that he lied earlier, but after much insistence by police, he finally agreed that it was me who was the shooter.

Later that morning, at 3:30 a.m., police came to my grandmother's home where I was sleeping over at, and arrested me for first-degree murder. During questioning at the police station, police tried to persuade to confess to the crime. But I did not even know Eric had been shot and killed, and I told them so. They charged me anyway. Phillip, Larry and Tina positively identified me as the shooter. Sandra was unsure, picking out me and another individual. Tina and Sandra had denied that they knew me or ever saw me before, although they both later testified at trial that they did know me, and Sandra went as far as to say that she told police so. But the police deny it.

A few days later, 12 year-old Victor Romo told his father, Ezekiel, that on February 3rd he was with a friend of his named Juan Carlos Torrez, that as they were walking down the street returning from another friend's house, they saw two boys also walking, one older and the other younger. Juan Carlos approached the older boy and questioned him about money he owed to someone named "Leo." A verbal confront-ation broke out, at which point the older boy swung and tried to hit Juan Carlos. Juan Carlos ducked the swing and pulled out a hand gun. At this point Victor tells his father that he got scared and turned around and started running, and as he ran away he heard a gun shot. The older boy was killed. Upon hearing this, Victor's father, Ezekiel, decided to try and get some kind of evidence that may be of some help to his son. Ezekiel had Victor call Juan Carlos on the telephone and arrange a meeting between Ezekiel and Juan Carlos. They later met at a local restaurant. Juan Carlos and Ezekiel sat together at table, while Victor sat at another table out of hearing distance. Ezekiel was carrying a voice-activated tape recorder, which he had hidden in his coat pocket. Juan Carlos and Ezekiel spoke in spanish. Ezekiel asked Juan Carlos to tell him what happened, and Juan Carlos went on to describe how the victim owed money to "Leo" and all he did was ask him about it. Juan Carlos explained that the victim swung and hit him in the face, and because the victim was much bigger than him, he got scared and shot him. Juan Carlos also admitted to knowing that another boy (me) had been arrested and charged with the murder. This tape was turned over to police upon Victor's arrest, and eventually a copy was given to my defense. Police went to Juan Carlos' home and asked him if he was involved in the murder, to which he said no. His mother and father vouched for his whereabouts.

4

The police were satisfied and Juan Carlos was left out of the case. My defense presented the testimony of Victor, who confessed to being at the scene of the crime with the shooter who he identified as his friend Juan Carlos. I did not know Victor before our arrests, and he testified to this as well. We also attempted to present the tape-recorded confession of Juan Carlos as well as the testimony of Ezekiel, But the trial court would not permit it. I presented four alibi witnesses who testified that I was with them at my grandmother's home during the time of the murder. There were four other alibi witnesses but for some reason my attorney did not call upon their testimony. In short, I was convicted by a jury after two days of deliberation.

There are many, many issues I want to tell you about, such as police incompetence and lack of any physical evidence, inconsistent and often conflicting testimony of the state's witnesses, numerous counts of ineffective assistance of counsel, and so forth. But I will not go into that right now. The primary reason I'm writing you is in relation to one specific issue—the fact that I was only 13 years-old when I was arrested and tried as an adult, while the codefendant, Victor, remained in the juvenile system because one year younger than me. I am innocent. I cannot stress that enough. But this issue regarding my age does not challenge either my innocence or my alleged guilt. Instead, I believe that because I was so young, I should never have been tried in adult court, regardless of my past juvenile record. I know that statutory law permits the presiding court to use its own discretion in determining whether or not I should be treated as a juvenile or an an adult. But the study I mentioned at the beginning of this letter brings new evidence arguing against this procedure, especially in cases where the accused was or is as young as I was. Furthermore, under the principle of "desparity of sentence" I should not have recieved such a severe sentence when the codefendant recieved a relatively lighter one ( he did about 3 years in juvenile corrections). These are my main arguments that I'm hoping will get my case back into court so I can enter them and all my other issues based on new evidence and recent court decisions. My post-conviction deadline expired several years ago in 2000, But with the findings of the aforementioned brain study, I think I can persuade the court to accept my petition on grounds of the discovery of new evidence that wasn't available before. It is my only hope. This brain study is really ground-breaking. It is what was used to convince the U.S. Supreme Court in March to ban the death penalty of convicted killers who committed their crimes before they reached their 18th birthday. I have all the reports published by the National Institute of Mental Health which conducted the study, as well as the briefs written by the attorneys in the

JIM05863

U.S. Supreme Court case, Roper v. Simmons, along with that Court's opinion, I also have the amicus briefs submitted by the American Medical Association and the American Psychological Association. I've read all these documents carefully and I believe if used properly, they can be of immense help in arguing my case. Plus, I have copies of the brain study itself. When I wrote Professor Steinberg, I asked him to help me in any way he can, and he referred me to you. I don't know if you approve of him doing that, but please consider my situation. He told me you are a specialist in these kind of cases. If you can help, then please do so. I've been way too long for a crime I had nothing to do with. And although I only talked about a couple issues that can be argued in my behalf, believe me when I say that there are many more legitimate arguments to be made. All I need is some assistance. Me and my family have been through enough. We need your help. We need it more than anything in the world. I don't know much about you other than the fact that you're a law professor. I don't know if you have the time or the resources to help me. I don't know if there is a 5-year waiting list to have you review my case. All I know is Prof. Steinberg suggested I write you because he felt you might be able to assist me somehow. So here I am, at your mercy. If you want, I will send you every piece of document I have. All my transcripts and legal briefs. And I'll explained what issues I found in my case that I think can be argued effectively. Understand that I tried everything else. I don't want to rush into anything on myown because it might be my only chance at getting my case back in front of a judge, and I don't want to screw it up. I just want to go home and leave all this behind me.

I've already written more than I originally intended. I don't want to discourage you by going on and on, so I WILL bring this to a close now. But please give it some thought and at least agree to review my case. If you decide after looking at my case that there's nothing you can do for me, then I'll be thankful. I am innocent and I know I have more than enough evidence to prove it. All I need is a competent attorney to help me. If we had money to hire a lawyer, then we'd have done so. But we have no more money. We gave it all to my former attorneys. Now we're broke, and those same attorneys are no longer around. I know there are good lawyers out there who can help me. But I just can't find them.

I hope to hear to hear back from you soon--with good news. But I will appreciate any response, so long as it is an honest one. Take care.

Respectfully & Sincerely,

Thaddeus Jimenez

6

JIM05864