1                IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3

4   THADDEUS JIMENEZ,             )

5                    Plaintiff,  )   Docket No. 09 C 8081

6             vs.         )

7   JEROME BOGUCKI,        )   Chicago, Illinois
                          )   January 24, 2012
8                Defendant.  )   9:30 a.m.

9

10                       VOLUME 11
                 TRANSCRIPT OF PROCEEDINGS
11     BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

12   APPEARANCES:

13

14   For the Plaintiff:   LOEVY & LOEVY
                       BY:  MR. JONATHAN I. LOEVY
15                          MR. VINCENZO FIELD
                       312 North May Street
16                       Suite 100
                       Chicago, Illinois  60607
17

18                MR. LOCKE E. BOWMAN, III
                       MAC ARTHUR JUSTICE CENTER
19                       Northwestern University
                       School of Law
20                       357 East Chicago Avenue
                       Chicago, Illinois  60611
21

22                VALOREM LAW GROUP, LLC
                       BY:  MR. STUART J. CHANEN
23                          MS. LISA R. CARTER
                       35 East Wacker Drive
24                       Suite 3000
                       Chicago, Illinois  60601
25

```
 1   For the Defendant:      ANDREW M. HALE & ASSOCIATES
                             BY:  MR. ANDREW M. HALE
 2                                MS. JOAN E. AHN
                                  MR. AVI T. KAMIONSKI
 3                           53 West Jackson Boulevard
                             Suite 1800
 4                           Chicago, Illinois  60604

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
               LAURA M. BRENNAN - Official Court Reporter
24              219 South Dearborn Street - Room 2102
                      Chicago, Illinois  60604
25                        (312) 435-5785
```

1    (The following proceedings were had in open court out of the
2    presence and hearing of the jury:)
3              THE CLERK:  09 C 8081, Jimenez v. City.
4              THE COURT:  Good morning.
5              MR. CHANEN:  Stuart Chanen and Vince Field for
6    plaintiff Thaddeus Jimenez.
7              MR. HALE:  Good morning, your Honor; Andrew Hale, Avi
8    Kamionski and Joan Ahn for the defendant.
9              THE COURT:  All right.  So let me put on the record
10   that the note that came out from the jury at the very end of
11   the day yesterday as they were leaving reads as follows:
12              "By law, did a parent or lawyer need to be present
13   when a minor was questioned and/or arrested?"
14              And the lawyers have known this since the end of the
15   day yesterday.  So I don't know what people's thoughts are.
16              MR. HALE:  Judge, I would like to pass up a copy,
17   with a copy to counsel, this topic.
18              THE COURT:  Did it come up in the evidence?  That's
19   what I was trying to remember.
20              MR. HALE:  Yes.  I'm going to hand it up to you,
21   through Bogucki.
22              THE COURT:  So you've handed me pages 1313 to 1314
23   where he's asked about questions.  And, honestly, there may
24   have been some other point where he was asked about this, too,
25   at some point in his examination.  I remember it coming up

1    more than once.

2            MR. CHANEN:  It did, Judge.  It also came up on

3    page 16 -- 1165 from 11 to 18, although that was more about a

4    youth officer than a parent or a guardian.

5            THE COURT:  Okay.  So if they have heard evidence

6    about it, I guess -- I mean, they're asking about what the law

7    provided, which is a different question from what the evidence

8    said.

9            But, anyway, what are your thoughts as to what I

10   should tell them?

11           MR. HALE:  Judge, our thoughts were that we could

12   tell them that -- refer them to what Bogucki said and then

13   also --

14           THE COURT:  Well, I'm not going to single out any

15   particular part of the transcript.  I mean, that's a mistake,

16   I think.

17           I mean, I can tell them you rely on your recollection

18   of the evidence, but they're not asking about --

19           I think if you read the question literally, they're

20   asking what the law provided.

21           Anyway, go ahead and finish what you were going to

22   say.

23           MR. HALE:  Well, I guess -- I think you indicated

24   your opinion.

25           THE COURT:  Yes.

1          MR. HALE:  I think the question was answered during

2     the trial by Bogucki.  And, you know, my concern is they might

3     not remember that testimony.  So maybe even something that you

4     heard evidence about this at trial, use your recollections of

5     what the evidence was, because it did come up.

6          THE COURT:  Yes, it came up.

7          Okay, Mr. Chanen.

8          MR. CHANEN:  Well, my only concern, as to a parent or

9     a lawyer, I'm okay with you heard the evidence and you should

10    rely on your memory.

11         THE COURT:  Hang on one second.

12      (Brief interruption.)

13         THE COURT:  Go ahead.

14         MR. CHANEN:  So as far as a parent or lawyer goes, I

15    think that would be an acceptable solution.

16         THE COURT:  What would be an acceptable solution?

17         MR. CHANEN:  To say you heard evidence about this and

18    you can rely on your memory.

19         However, and it's a pretty big however -- it's the

20    exception swallowing the rule -- Mr. Hale elicited from

21    Mr. Bogucki this question and this answer.

22         THE COURT:  What page are you referring to?

23         MR. CHANEN:  1314, lines 5 and 6.

24         THE COURT:  Right.  I've got it here.

25         MR. CHANEN:  "Were you required to have a youth

1     officer present?  No."

2             The law at that time, Judge, said, and I'm quoting

3     705 ILCS 405/5-405(2)--

4             THE COURT:  My God, who writes those section numbers?

5             MR. CHANEN:  I don't know, Judge.

6             "Shall deliver a juvenile without unnecessary delay

7     to the nearest juvenile police officer."

8             He then goes on in more detail, Judge, in a different

9     section to say that he brought in the youth officer for

10    charging purposes but well after the interview with TJ.

11            THE COURT:  The problem with that is you could have

12    tried to elicit that during the testimony, and you didn't.

13    You could have asked for an instruction on it and didn't.

14            First of all, I don't think it's appropriate under

15    any circumstances for me to go singling out particular parts

16    of the testimony.  If they were asking about the evidence, I

17    would tell them rely on your collective recollection of the

18    evidence.  They're not asking about the evidence; they're

19    asking about the law.

20            And it's a nuanced issue.  It's probably both a

21    factual and a legal issue, and I guess my inclination would be

22    to say no further instructions can be given to you at this

23    point regarding the law on this issue, period.

24            MR. CHANEN:  I'm fine with that, Judge.

25            MR. HALE:  Can I have just one minute?

1          THE COURT:  Yes.

2      (Brief interruption.)

3          MR. HALE:  That seems fine, Judge.

4          THE COURT:  Fine.  That's what I'm going to do.  Let

5   me write it out.  I'm going to read it to you so it's in the

6   record.

7      (Brief interruption.)

8          THE COURT:  Members of the jury, no further

9   instructions on the law on this issue can be given to you at

10  this point.

11         MR. CHANEN:  That's fine with the plaintiff.

12         THE COURT:  All right.  I'm going to give that back

13  to them.

14          We're off the record.

15          (Brief recess.)

16

17

18

19

20

21

22

23

24

25

```
 1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3

 4   THADDEUS JIMENEZ,              )
                                    )
 5                  Plaintiff,      )   Docket No. 09 C 8081
                                    )
 6             vs.                  )
                                    )
 7   JEROME BOGUCKI,                )   Chicago, Illinois
                                    )   January 24, 2012
 8                  Defendant.      )   2:35 p.m.

 9

10                        VOLUME 11
                   TRANSCRIPT OF PROCEEDINGS
11     BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

12
     APPEARANCES:
13

14   For the Plaintiff:    LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
15                               MR. VINCENZO FIELD
                            312 North May Street
16                          Suite 100
                            Chicago, Illinois   60607
17

18                         MR. LOCKE E. BOWMAN, III
                           MAC ARTHUR JUSTICE CENTER
19                         Northwestern University
                           School of Law
20                         357 East Chicago Avenue
                           Chicago, Illinois   60611
21

22                         VALOREM LAW GROUP, LLC
                           BY:  MR. STUART J. CHANEN
23                               MS. LISA R. CARTER
                           35 East Wacker Drive
24                         Suite 3000
                           Chicago, Illinois   60601
25
```

| | |
|---|---|
| 1 | For the Defendant:     ANDREW M. HALE & ASSOCIATES |
| 2 |                        BY:  MR. ANDREW M. HALE<br>                             MS. JOAN E. AHN |
| 3 |                             MR. AVI T. KAMIONSKI<br>                        53 West Jackson Boulevard |
| 4 |                        Suite 1800<br>                        Chicago, Illinois  60604 |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | LAURA M. BRENNAN - Official Court Reporter<br>    219 South Dearborn Street - Room 2102 |
| 25 |         Chicago, Illinois  60604<br>              (312) 435-5785 |

1        THE CLERK:  09 C 8081, Jimenez v. City.

2        MR. LOEVY:  Good afternoon, your Honor; Jon Loevy,

3  Locke Bowman, Vince Field here for the plaintiff.

4        MR. HALE:  Good afternoon, your Honor; Andrew Hale

5  and Avi Kamionski for the defendant.

6        THE COURT:  Okay.  So I've got this motion asking me

7  to talk to the jurors individually about whether they have --

8  this is my words, not yours -- violated my instructions.

9        MR. HALE:  Yes, I would like to be heard, Judge.

10        The blog post you have got there, and I can hand it

11  up.

12        THE COURT:  I printed it out.  I've got it.

13        MR. HALE:  There's actually three.

14        THE COURT:  Three.

15        MR. HALE:  The first one was May 4th, 2009, an

16  article about Mr. Jimenez getting exonerated.

17        THE COURT:  Yes.

18        MR. HALE:  The next one dated --

19        THE COURT:  April 8th, 2010.

20        MR. HALE:  Yes.  That is a link to a Sun-Times

21  article.  The part that is underlined, Rummana Hussain of the

22  Chicago Sun-Times, that is simply a link to a Sun-Times

23  article that appeared in the paper.

24        And then the next one, April 21st --

25        THE COURT:  Right.

1           MR. HALE:  -- that is a link -- and I've got the

2    article here because that one is still retrievable.

3           That is a link to an article that was in Chicago

4    Breaking News, a link to that article.  So these two posts

5    were specific links back in April to newspaper articles that

6    appeared.

7           Now, the last thing I want to point out is if you

8    Google Thaddeus Jimenez, which I just did, the very first

9    thing that you get is the exoneration of Thaddeus Jimenez,

10   which is a nine-minute YouTube video.

11          The second link is from --

12          THE COURT:  From Northwestern.  I've got it on my

13   screen, from Northwestern.

14          MR. HALE:  And the other thing I wanted to point out,

15   the fifth link is from the Katten Muchin site, and it actually

16   has -- I can show your Honor -- it has like virtually every

17   pleading in the case, certificate of innocence, the petition

18   for the certificate of innocence, grand jury indictment of

19   Juan Carlos Torres.  It's got the appellate brief.  It's got

20   videos.  It's got all kinds of links to material about Mr.

21   Jimenez's innocence, and that's the first page.

22          THE COURT:  Right.

23          MR. HALE:  Our two little blog posts, that -- I would

24   be happy to know there were people reading it; that would make

25   me feel good -- is we're simply reporting news articles back

1    in April.  And if people did do a Google research, what they

2    would have seen -- they're not supposed to -- what they would

3    see is the nine-minute YouTube video and all the other things.

4         So this is a long way of saying there is no prejudice

5    in here.  There is no bad intent here.  I don't think anything

6    needs to be done about it.  The jury was instructed not to

7    look at the Internet, and I think we should just leave things

8    the way they are.

9         MR. LOEVY:  Only one side of the things that were

10   just talked about on the Internet, Northwestern talks about

11   the exoneration, et cetera, only one side has stuff that's

12   been barred by the Court's order.  In other words, everything

13   they saw on the Internet above Mr. Hale's blog post is things

14   that came out in the courtroom.

15        What that blog post --

16        THE COURT:  I don't know if that's accurate or not.

17   And, quite honestly, when you say at the end of paragraph 5,

18   "the parties have been working too hard for too long for this

19   sort of attempt to influence the proceedings," when I read

20   that -- I'm just going to give the impression of the reader --

21   you made me think that this was something that had just been

22   posted as opposed to something that had been posted 21 months

23   ago.  Okay.  So that's what the reader of this, when the

24   reader looked at it, understood you to be saying, "attempt to

25   influence these proceedings."  That's what I understood.

1         So why should I --

2         First of all, all of this stuff, judging by the dates

3    that appear on the Google, the little blurb, was stuff that

4    was in place before the voir dire, before I asked all of the

5    members of the venire whether they had read anything about

6    this case before coming in.  Nobody raised their hand.  Before

7    I instructed them more than once on not looking up things.

8         So basically you're asking me to assume that somebody

9    has violated an instruction.  Now, I grant you, if there had

10   been an article recently appearing in the newspaper or on

11   something that had just popped up, you know, that hadn't been

12   the subject of anything I had asked them about, you know, it's

13   a pretty common practice to say, has anybody read anything,

14   heard anything, seen anything about the case.

15        That's not what we're talking about here.  We're

16   talking about stuff that's been there for a long time.  So why

17   should I -- why should I interrupt the middle of their

18   deliberations, yank them out here one at a time, and

19   interrogate them about whether they violated my instructions?

20        MR. LOEVY:  Well, specific to paragraph 5, I should

21   give more background to that.  Mr. Hale's office and I had a

22   trial earlier this summer that got postponed, involved a

23   member of the Latin Kings street gang.  And I Googled Latin

24   Kings just to see what came up, and I came up with Mr. Hale's

25   website, and it was references to Latin Kings shoot, kill, you

1    know, gang leaders.  And I called Mr. Kamionski and I asked

2    him, will you take this down, because I think that, you know,

3    if a juror looks up Latin Kings, they're going to find your

4    website, and he respectfully declined.

5          So that's why maybe I assumed more than I should have

6    that we're having this article about Mr. Jimenez's gun

7    charges, which, as you know, we have a totally different side

8    of it.

9          This motion was admittedly written quickly and in

10   somewhat anger because we have all been working for a month,

11   and your Honor has worked so hard to keep what's in the

12   courtroom in the courtroom, and to learn that if you type in

13   Thaddeus Jimenez on the first page there are things that are

14   contrary to your motions in limine, we wanted to do something.

15         Now, to answer your question more directly, I don't

16   know that -- you know, I think there is some risk if we voir

17   dire the jurors that it would just draw attention to it.

18         THE COURT:  Well, yes.  I mean, that would be like

19   has anybody read anything or seen anything about -- I don't

20   know what I would ask them.  But, I mean, whatever I ask them

21   is pretty clearly going to suggest that there's something out

22   there that we really don't want them to look at in a

23   particularly pointed way because it wouldn't be like a general

24   instruction like I've given to anybody.  It would be you're in

25   the middle of the second day of deliberations and I'm bringing

1    you into my chambers or whatever one at a time and saying, you

2    know, have you looked up or tried to look up or seen anything

3    on the Internet or otherwise about the case, about any of the

4    people involved in the case, anything at all -- they're going

5    to think -- I mean, at least one out of the 12 and probably

6    more than one out of the 12 is going to go back and say, wow,

7    there must be something really juicy out there.  It could be

8    about the plaintiff; it could be about the defendant.  They're

9    not going to know.

10       MR. LOEVY:  Maybe we should have blogged about

11   Mr. Bogucki and the Warfield.  You know, we just didn't do

12   that.  That's just not how we did things.

13       THE COURT:  I'm just blogging Mr. Bogucki, or not

14   blogging him -- Googling Mr. Bogucki as I sit here.  Yes, it's

15   all stuff about -- it's about this case.  Other than his what

16   I assume to be his -- oh, it's pretty clear it's his my life

17   profile, which is the first thing that comes up.  Yes, nothing

18   about --

19       Yes, Warfield is, interestingly enough, the last

20   thing on the first page.

21       MR. LOEVY:  What's the link, your Honor?

22       THE COURT:  Leagle.com, L-e-a-g-l-e.  It's a printout

23   of an opinion in the case issued by whatever judge had the

24   case.

25       MR. LOEVY:  I guess this is a new era.  You know, we

1    can fight the wars on the Internet, too, and make our

2    positions known that way.

3           THE COURT:  You know, I tell you what.  I guess based

4    on this and given what appears to be the fact that it was

5    posted quite some time ago, April of 2010 the most recent one,

6    I'm really not inclined to bring them out here and do anything

7    right now.  You know, I would be -- if the deliberations

8    continue after tonight, I would be willing to bring them out

9    here and have them come out here when they start in the

10   morning and just remind them -- tomorrow morning, in other

11   words -- remind them of their obligations not to read anything

12   and ask whether anyone has read or heard or seen anything

13   about the case even if it's just accidentally.  I would be

14   willing to do that.

15          I would prefer not to do it one at a time.  I just

16   don't think there's a basis for that at this point.

17          MR. LOEVY:  Now, one thing we could do is we could

18   ask Mr. Hale to take it down.

19          THE COURT:  Well, when I do that, if I were to do

20   that, so that would be like me telling somebody how they can

21   exercise their right to free speech.  I seem to recall that

22   there was an amendment with a fairly low number that says that

23   I'm not supposed to do that.  Well, it says Congress, but it's

24   been interpreted as meaning the government.  That would be me.

25          I'm not in the business of violating the First

1    Amendment.  So I'm not going to tell anybody to take anything
2    down.  I just won't do it, just like I'm not going to tell
3    anybody to take down, you know, the other stuff that's up
4    there.

5            And when you say that -- when you say that there is
6    only one thing that contains stuff that I kept out, I mean, I
7    don't know.  I suppose I could go -- I know that -- I'm pretty
8    confident.  I mean, I'm looking at the video that says "The
9    Exoneration of Thaddeus Jimenez."  That's the title.  That's
10   the first item up.  It's eight minutes and 36 seconds long.
11   I'm pretty darned sure we didn't play anything eight minutes
12   and 36 seconds long in here.

13           Let's see.  What else do I find?  And right below it
14   are uploader comments, and one of which is by -- I guess it's
15   by the person -- it says Eric Morro was her uncle.  I'm not
16   sure how that could be.  Well, no, he could have had an older
17   brother or sister.

18           I'm not listening to it, but it's clearly Mr. Drizin,
19   sort of as a talking head, so to speak.  You know, the
20   Northwestern site, which is link number 2, says that the
21   certificate of innocence qualified him for compensation from
22   the state for the miscarriage of justice.  They kept that out
23   actually on your request.  So that would be two things.

24           I'm not going to do it.  I mean, I'm willing in the
25   morning -- and so everybody would need to be here at 9:30.

1    I'm willing to bring them out when they come in and just sort

2    of remind them of their obligations, but I'm not -- that's the

3    most I will do.

4           So the emergency motion, we'll just say it's denied

5    to the extent stated in open court.

6           While I've got you here, as it turned out, as you

7    were walking over, another question came out.  I don't know if

8    people have your copy of the instructions per chance.  The

9    question is:

10          "What is the definition of good faith as stated on

11   page 14, number 3?"

12          Page 14 is the malicious prosecution instruction, and

13   number 3 is the malice instruction, which reads as follows:

14          "The defendant acted with malice.  A person acts with

15   malice in commencing or continuing a criminal prosecution if

16   he acts for any reason other than to bring another person to

17   justice.  You may infer that a person acts with malice if the

18   absence of probable cause is clearly proven and the

19   circumstances are inconsistent with actions made in good

20   faith."

21          So the question from the jurors is asking for the

22   definition of good faith at the tail end.  I don't remember --

23   I mean, I'm not going to pretend to know as much about the law

24   in this area as any of you folks do.  I don't remember there

25   being that definition of it.

1      MR. LOEVY:  Nor do I.

2      MR. KAMIONSKI:  Neither do I.

3      THE COURT:  On the other hand, this is different from

4  some of the other questions in the sense that it's asking

5  for -- at least different from some of the other questions.

6  It's asking for a definition of a term that I have given them.

7      And if there is a way of doing it, I would like to

8  give them some guidance even if it's only apply the common

9  meaning of the term, which I think is normally the rule for

10  when there's an instruction that has a term that is not

11  defined.

12      So one way of doing it would be to say there is no --

13  I cannot give you a particularized -- I cannot give you a

14  particularized legal definition of this term.  You should

15  apply the common meaning of the term, something like that.

16      MR. HALE:  That's fine.

17      MR. LOEVY:  That would be acceptable for the

18  plaintiff.

19      THE COURT:  Let me write it out and I will read it

20  back to you.

21      (Brief interruption.)

22      THE COURT:  Members of the jury, I did not provide

23  you a particularized legal definition of this term.  You

24  should apply the common meaning of the term.  Signed, Judge

25  Kennelly.

1          Okay, we'll send that back to them.

2          MR. LOEVY:  Your Honor, we did not file this on the

3    docket.  And with your Honor's permission, we would wait until

4    after the verdict actually --

5          THE COURT:  That's fine.  Yes, you can wait.

6          MR. LOEVY:  -- in case anybody finds it.  Thank you.

7          MR. HALE:  You said show up at 9:30 tomorrow?

8          THE COURT:  Yes.  Be here at 9:30, and we'll bring

9    them out.  Once they all get here, we'll bring them out and I

10   will do it.

11         MR. HALE:  Thank you, your Honor.

12         (Brief recess.)

13   (The following proceedings were had out of the presence and

14   hearing of the jury:)

15         THE CLERK:  09 C 8081, Jimenez v. City.

16         THE COURT:  All right, all the lawyers are present.

17   The jury has reached a verdict.  I'm going to bring them out.

18   As I indicated, if it's a verdict for the plaintiff, I'm going

19   to tell them there is another very brief phase of the trial

20   that I wasn't able to tell them about before that we're going

21   to conduct after a five-minute break so that I can confer with

22   the lawyers.  I don't expect it to take very long.  I'm not

23   going to define very long.  I don't think it should take more

24   than a half an hour, frankly, total, including arguments.

25         We'll take a five-minute break, and then we'll start.

1    Obviously, if it's a defense verdict, then I won't tell them
2    that.
3              I do want to say, because I know there's a lot of
4    people in the courtroom, and I know that there's a lot of very
5    strong feelings on both sides -- I want everybody to listen to
6    me.  There's not going to be any outbursts, demonstrations or
7    anything.  If there is, the person or people involved in it
8    will be immediately ejected from the courtroom, and you will
9    not be able to come back.  Everybody is looking at me, so
10   you're all hearing me, okay.
11             Bring the jury out.
12        (The following proceedings were had in the presence and
13   hearing of the jury:
14             THE COURT:  All right, everyone can have a seat.  I
15   understand the jury has reached a verdict, is that correct?
16             A JUROR:  We have.
17             THE COURT:  Please hand it to the officer.
18        (Brief interruption.)
19             THE COURT:  Okay.  I'm going to read the verdict into
20   the record.  It says:
21             We, the jury, unanimously find as follows on the
22   claims of Thaddeus Jimenez against Jerome Bogucki:  On each of
23   the three claims, the verdict is for the plaintiff.  And the
24   verdict form goes on to say that we award the plaintiff
25   compensatory damages in the amount of $25 million.  It's

1  signed by all 12 of the jurors.

2        Let me just confer briefly with the lawyers at

3  sidebar.  Just sit there for a second.

4      (Brief interruption.)

5        THE COURT:  Okay.  I wasn't able to tell you what I'm

6  about to tell you before, but your duties are not quite done

7  yet.  There is one more extremely short part of the trial that

8  I actually don't expect to take more than about half an hour,

9  if that long.  I need to -- it involves the issue of punitive

10 damages.  I need to confer with the lawyers about five minutes

11 just to make sure we're all on the same page, although we have

12 done a lot of talking about it.

13       So I'm going to give you a five-minute break.  You're

14 going to hear very brief testimony or evidence.  You're going

15 to hear very brief argument.  The old time limits are out the

16 window, and I'm kind of cracking the whip on this one, so to

17 speak.  And like I say, I don't expect it to take more than

18 half an hour.  So just sit tight and we'll have you back out

19 here in five minutes.

20       (The following proceedings were had out of the

21 presence and hearing of the jury:)

22       THE COURT:  Okay, everybody can have a seat.

23       So you've got this instruction.  Essentially what it

24 is is a sentence at the beginning that says the only issue in

25 this part of the trial is whether you should assess punitive

1   damages against the defendant and, if so, how much, and you

2   were to consider all of the evidence that was admitted during

3   the earlier part of the trial as well as all of the

4   instructions that I gave you at the end of the earlier part of

5   the trial.

6          And then the rest of it is the standard pattern

7   instruction for punitive damages with the line at the end

8   about the defendant's financial condition.

9          So, first of all, does either side have any objection

10  to the instruction or any part of it?

11         MR. LOEVY:  Not from the plaintiff, your Honor.

12         MR. HALE:  Judge, we don't intend -- I think what I

13  intend to do is just to argue.

14         THE COURT:  You don't intend to put on financial

15  condition evidence.

16         MR. HALE:  Can I confer one second?

17         THE COURT:  Yes, that's fine.  It's easy to take that

18  out if it to needs come out.

19     (Brief interruption.)

20         MR. HALE:  Judge, we don't have an objection to the

21  instruction, and we are going to put on the financial

22  evidence.

23         THE COURT:  All right.  So I'm telling you, we're

24  getting right to the point on this.  Everything else --

25         Does anybody intend or think that they want to do

1    something other than deal with the financial evidence?

2            MR. LOEVY:  Yes, your Honor.

3            THE COURT:  What?

4            MR. LOEVY:  Here's what we would like to do.  If you

5    will permit us a short opening, what we'd like to say --

6            THE COURT:  There's not going to be opening

7    statements.

8            MR. LOEVY:  All right.  Well, what we would like to

9    do is explain to Mr. Bogucki that if he accepts

10   responsibility, like a criminal sentencing context, that we

11   would seek zero punitive damages.  So we want to clear that

12   with the Court, but it seems to be --

13           THE COURT:  Well, he's now heard you say it, and so

14   if testimony like that comes out either on direct or cross,

15   then you will get up in closing argument and you will say,

16   we're not asking for any.

17           MR. HALE:  Now, just to clarify, what I would ask is

18   that you actually withdraw it because you could say that, but

19   they could still do something.

20           THE COURT:  That would be fine.  I mean, you could

21   ask for a sidebar.

22           MR. HALE:  Why couldn't we even stipulate to that

23   right now?  We could read something if that's the case, and

24   they wouldn't have to decide anything.

25           MR. LOEVY:  We could talk to them about that and

1     avoid the whole proceeding.

2           THE COURT:  You have one minute, all right.

3           MR. LOEVY:  All right.

4        (Brief interruption.)

5           MR. HALE:  My other client is not here.  Would I --

6           THE COURT:  What other client?

7           MR. HALE:  The --

8           THE COURT:  Folks, we have a jury here.  I told you

9     we were going to go right into this.  Everything can be

10    anticipated.  No, that's the answer.  We're starting in a

11    minute.  Okay, unless somebody tells me we're not, we're

12    starting in one minute.

13       (Brief interruption.)

14          MR. LOEVY:  Your Honor, can we explain to you at a

15    sidebar the agreement we have reached?

16          THE COURT:  Do I need the court reporter?

17          MR. LOEVY:  Yes.

18          THE COURT:  So we can put it under seal, if

19    necessary.  Laura, why don't you come over here.

20

21

22

23

24

25

1    (The following proceedings are under seal, at sidebar, out of

2    the presence and hearing of the jury:)

3              THE COURT:  Yes.

4              MR. LOEVY:  Your Honor, the offer that we have

5    communicated and I think we have reached a meeting of the

6    minds on, is we're going to seek no punitive damages.  In

7    exchange Mr. Bogucki is going to give sworn testimony at

8    sidebar in secret that he acknowledges that he violated TJ's

9    constitutional rights, he's sorry, and that the verdict was

10   correct in every way.

11             His concern --

12             THE COURT:  This sidebar is under seal.

13             MR. LOEVY:  Yes.  His concern is he doesn't want --

14             THE COURT:  Appeal.

15             MR. LOEVY:  He doesn't want it to be public.  He

16   doesn't want it to be publicized on the Internet.  We're never

17   going to use this again unless there's an appeal and a

18   successful retrial, in which case then we would be able to use

19   this.  That's the only conceivable way this testimony would be

20   under seal.

21             THE COURT:  Do you understand things the same way he

22   just said?

23             MR. HALE:  I think so, yes.

24             THE COURT:  Do you want to do it right now?

25             MR. LOEVY:  Yes.

1          MR. HALE:  Yes.

2          THE COURT:  Okay.

3          MR. LOEVY:  I will ask leading questions.

4          MR. HALE:  And just for clarification, what we did

5     agree upon --

6          THE COURT:  Let me just make sure I understand.  So

7     in the event of an appeal, what happens to this?

8          MR. HALE:  Well, we can argue what this means.

9          THE COURT:  In other words, you're not asking me to

10    keep it from the Court of Appeals.

11         MR. HALE:  No.

12         THE COURT:  It would be kind of hard for me to do.

13         MR. HALE:  What I'm not conceding is it could affect

14    an issue we may raise, and we can argue it each the way we

15    want to argue it.

16         MR. LOEVY:  Let's make sure we understand.  Let's say

17    they win a Batson challenge and the Court says do this again.

18    We intend to use this at the retrial.

19         THE COURT:  You said that a minute ago.

20         MR. LOEVY:  That's what I'm saying.

21         All right.  He acknowledges he violated TJ's rights,

22    he's sorry, and that his view is that the verdict was correct

23    in every way.

24         THE COURT:  Okay.

25         So, Mr. Bogucki, do you understand you're still under

1  oath?

2         THE DEFENDANT:  Yes, Judge.

3         THE COURT:  Okay, go ahead.  Do whatever you want to

4  do.

5         Augie, could you go hit the red button?

6     (Brief interruption.)

7     JEROME BOGUCKI, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

8                      DIRECT EXAMINATION

9  BY MR. LOEVY:

10  Q   Sir, do you want to say it in your own words, sir?

11  A   I will respond to you.

12  Q   Do you acknowledge, sir, that by your actions you violated

13  Mr. Jimenez's constitutional rights?

14  A   Yes.

15  Q   Do you acknowledge and agree that the verdict against you,

16  the finding that you violated his constitutional rights, was

17  correct in every way?

18  A   Yes.

19  Q   All right.  Do you want to apologize to Mr. Jimenez?  And

20  I will leave this one to you.  Do you want to apologize?

21  A   Yes.

22  Q   Please, in your own words, whatever you want to say.

23  A   I'm sorry if you have been wronged.

24         MR. LOEVY:  Thank you.

25         MR. HALE:  Judge, I just wanted to say this was done

1  for purposes of avoiding punitive damages, too.  That's the

2  procedure, and we're not waiving any arguments we may make on

3  appeal about the effect of it.

4       THE COURT:  Okay, fine.  So I'm going to bring the

5  jury back in.  I'm going to tell them that the other phase of

6  the trial isn't necessary, I'm going to excuse them, and we'll

7  be done.

8       I'm actually going to say one thing on the public

9  record before we get the jury.  So we're going to give you the

10  verdict form, okay, just to preview it.  It has names on it.

11  Mr. --

12       I want everybody over here listening to this.  I'm

13  going to say it to the courtroom in a second.  The verdict

14  form has the jurors' names on it.  The practice in this Court

15  when we image those is to blot out the names.  Nobody -- I had

16  better never see this verdict on a website anywhere by anybody

17  or there will be hell to pay, and you don't know what hell

18  means until you've paid this kind of hell.

19       MR. LOEVY:  When you say the verdict, you don't mean

20  the report.

21       THE COURT:  I mean the form.  I mean the form with

22  the jurors' names on it that you guys are all going to get.

23       MR. LOEVY:  Thank you.

24

25

1    (The following proceedings were had in open court:)

2    MR. CHANEN:  I just said to the lawyers at sidebar

3  and I'm just saying to everybody else now that the verdict

4  form in this case has the names of the jurors on it, obviously

5  their signatures, and the lawyers will get that.  But I'm

6  going to direct the lawyers not to -- they can obviously give

7  it to their clients, and that includes the City, obviously, on

8  the defense side.  I'm going to direct that you not

9  disseminate it beyond that, and I had best never see it on a

10  website anywhere with the jurors' names on it because somebody

11  will be back in here answering why.  Okay.  It's a privacy

12  consideration for the jurors.

13    MR. LOEVY:  Your Honor, on that subject, can we not

14  contact jurors?

15    THE COURT:  The rules of the Court say you can't

16  unless I say you can, and I'm not saying you can.

17    MR. LOEVY:  Thank you.

18    (The following proceedings were had in the presence and

19  hearing of the jury:)

20    THE COURT:  You can all have a seat for about 30

21  seconds.

22    Scratch what I said before.  It turns out that we'll

23  not need a second phase of the trial after all.  So I'm going

24  to excuse you from further service at this time.  Your service

25  is completed in the case.  I want to thank all of you.

1         Two weeks and two days I think is what it ended up

2  being, a little bit shorter than I thought, but still a very

3  long time, and obviously we started in the second week of your

4  jury service, so it was a very big commitment for all of you.

5  I very much appreciate it, and I thank you on behalf of the

6  Court.

7         I will be back there right after you are to answer

8  any questions you might have and to, you know, get any

9  suggestions you might have for how we can improve the process.

10  And I thank you again for your service.

11         All rise.

12     (Jury excused.)

13         THE COURT:  So I expect judgment will be entered

14  within the next day.  Thanks.

15         MR. LOEVY:  Thank you, your Honor.

16         MR. HALE:  Thank you.

17         THE COURT:  The exhibits will be available tomorrow

18  in chambers for you to pick up as well as that computer.

19         MR. CHANEN:  Thank you.

20         MR. LOEVY:  Your Honor, both sides thank you for your

21  hard work.  We appreciate it.

22

23     (Which were all the proceedings had in the above-entitled

24  cause on the day and date aforesaid.)

25

C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript of the above-entitled matter.


*/s/ Laura M. Brennan*                    January 24, 2012


_____          _____
Laura M. Brennan
Official Court Reporter                  Date
Northern District of Illinois